UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-106
Investigation
POI: 07/01/2018-12/31/2018
**Public Document**
E&C/OV: RG/KA/ES

February 21, 2020

| | |
|---|---|
| **MEMORANDUM TO:** | Jeffrey I. Kessler<br>Assistant Secretary<br> for Enforcement and Compliance |
| **FROM:** | James Maeder<br>Deputy Assistant Secretary<br> for Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value |

## I.    SUMMARY

The Department of Commerce (Commerce) finds that wooden cabinets and vanities and components thereof (wooden cabinets and vanities) from the People's Republic of China (China) are being, or are likely to be, sold in the United States at less than fair value (LTFV), as provided in section 735 of the Tariff Act of 1930, as amended (the Act).  The mandatory respondents subject to this investigation are The Ancientree Cabinet Co., Ltd (Ancientree), Rizhao Foremost Woodwork Manufacturing Company Ltd. (Foremost Woodwork), and Dalian Meisen Woodworking Co., Ltd (Meisen).

After analyzing the comments submitted by interested parties, and based on our verification findings, we have made certain changes to the margin calculation programs of Ancientree and Foremost Woodwork.  In addition, we have continued to assign a margin to Meisen based on adverse facts available (AFA).  We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum.

Below is a complete list of the issues in this investigation on which we received comments from interested parties.

General Comments

Comment 1:   Initiation of the Investigation
Comment 2:   Respondent Selection
           A.  Mandatory Respondent Selection Methodology

              B.  Voluntary Respondents
Comment 3:    Separate Rate Applicants
              A.  Brentridge Holding Co., Ltd. (Brentridge) and Harbin Hongsen Wood Co.,
                  Ltd. (Harbin)
              B.  ZHONG SHAN KING YUANDUN WOOD PRODUCTS CO., LTD. (Zhong
                  Shan)
Comment 4:    Company Name for Supree (Fujian) Wood Co., Ltd. (Supree)
Comment 5:    Calculation of the Separate Rate Assigned to Non-Selected Companies


Surrogate Value (SV) Comments

Comment 6:    Surrogate Country
Comment 7:    SVs for Birch and Poplar
Comment 8:    Calculation of Financial Ratios
Comment 9:    Labor Rate Calculation


Company-Specific Comments

*Ancientree*

Comment 10:   Whether to Apply AFA to Ancientree
              A.  Usage Rates
              B.  Wood Veneer
Comment 11:   Treatment of Jiangsu Hongjia Wood Ltd. (Jiangsu Hongjia) as an Affiliate
Comment 12:   SV Selections
              A.  Glue
              B.  Medium Density Fiberboard (MDF)
              C.  Paint
              D.  Particleboard


*Foremost*

Comment 13:   Combination Kits
Comment 14:   Exempted Sales
Comment 15:   Early Payment Discounts
Comment 16:   Section 301 Duties
Comment 17:   Foremost's U.S. Inland Freight Charges from the Port to the Warehouse
Comment 18:   Foremost's U.S. Inland Freight Charges to the Customer
Comment 19:   FGI's Acquisition Costs
Comment 20:   Labor Hours
Comment 21:   Calculation and Programing Revisions


*Meisen*

Comment 22:   Total AFA for Meisen

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

## II.    BACKGROUND

On October 9, 2019, Commerce published the *Preliminary Determination* of sales in the LTFV investigation of wooden cabinets and vanities from China.[1]  Also in October 2019, we received timely allegations that Commerce had made significant ministerial errors in the *Preliminary Determination* from a number of companies requesting separate rates in this investigation,[2] and in November 2019, we determined that the allegations raised by the SRA Companies were significant ministerial errors within the meaning of 19 CFR 351.224(g), while the allegation raised by Zhong Shan was not.  On November 14, 2019, Commerce published the *Amended Preliminary Determination*.[3]

From October 2019 through December 2019, we conducted verification of the sales and factors of production (FOP) data reported by Ancientree,[4] as well as the sales and FOP information reported by Foremost Woodwork and its affiliates, Foremost Worldwide Company Ltd. (Foremost Worldwide) and Foremost Groups Inc (FGI) (collectively, Foremost),[5] in accordance with section 782(i) of the Act.  During this same time period, we notified interested parties that we had suspended the verification of Meisen's reported data in order to consider comments from interested parties;[6] we subsequently informed Meisen that we would not verify its questionnaire responses.[7]

---

[1] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 FR 54106 (October 9, 2019) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM), as corrected by *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 FR 56420 (October 22, 2019).

[2] These companies are:  MJB Supply (Dalian) Co., Ltd, Shouguang Honsoar Imp. & Exp. Trading Co., Ltd, and Nantong Ouming Wood Co., Ltd. (collectively, SRA Companies), and Zhong Shan.  *See* SRA Companies' Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Ministerial Error Comments to Correct Spelling of Company Names," dated October 8, 2019; and Zhong Shan's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Ministerial Error Comments -  Prelim Determination," dated October 8, 2019.

[3] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Amended Preliminary Determination of Sales at Less Than Fair Value*, 84 FR 61875 (November 14, 2019) (*Amended Preliminary Determination*).

[4] *See* Memorandum, "Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Verification of the Export Price Sales and Factors of Production Response of The Ancientree Cabinet Co., Ltd," dated December 10, 2019 (Ancientree Verification Report).

[5] *See* Memoranda, "Verification of the Responses of Foremost Worldwide Company Ltd. In the Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," dated January 10, 2020 (Foremost Worldwide Verification Report); "Verification of the Responses of Rizhao Foremost Woodwork Manufacturing Co. Ltd. in the Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," dated January 10, 2020 (Foremost Woodwork Verification Report); and "Verification of the Responses of Rizhao Foremost Woodwork Manufacturing Co. Ltd. in the Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," dated January 10, 2020 (FGI Verification Report).

[6] *See* Memorandum, "Verification of the Questionnaire Responses of Dalian Meisen Woodworking Co. Ltd.," dated October 18, 2019 (Meisen Verification Memo).

[7] *See* Commerce's Letter, "Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Verification," dated December 27, 2019.

3

From November 2019 through January 2020, we received timely case and rebuttal briefs from numerous interested parties.  At the request of certain of these parties, Commerce held a public hearing on February 6, 2020, to discuss the issues raised in the case briefs.[8]

Based on our analysis of the comments received, as well as our verification findings, we revised our calculations of the weighted-average dumping margins for Ancientree and Foremost.[9]

## III.   PERIOD OF INVESTIGATION

The period of investigation (POI) is July 1, 2018 through December 31, 2018.  This corresponds to the two most recent fiscal quarters prior to the month of the filing of the Petition,[10] which was March 2019.[11]

## IV.   SCOPE OF THE INVESTIGATION

The products covered by this investigation are wooden cabinets and vanities from China.  For a complete description of the scope of this investigation, *see* Appendix I of the accompanying *Federal Register* notice.

## V.   SCOPE COMMENTS

During the course of this investigation and the concurrent countervailing duty (CVD) investigation of wooden cabinets and vanities from China, Commerce received scope comments from interested parties.  Commerce issued a Preliminary Scope Memorandum to address these comments and set aside a period of time for parties to address scope issues in case and rebuttal

---

[8] *See* Hearing Transcript, "Public Hearing in the Matter of:  Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," dated February 6, 2020.

[9] *See* Memoranda, "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Final Analysis Memorandum for The Ancientree Cabinet Co., Ltd.," dated concurrently with this memorandum (Ancientree Final Analysis Memorandum); and "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Final Analysis Memorandum for Rizhao Foremost Woodwork Manufacturing Company Ltd.," dated concurrently with this memorandum (Foremost Final Analysis Memorandum).

[10] *See* Petitioner's Letters, "Petitions for the Imposition of Antidumping and Countervailing Duties on Wooden Cabinets and Vanities from the People's Republic of China," dated March 6, 2019; "Petitioner's Responses to Supplemental Questions Regarding Petitioner Volume I Injury," dated March 12, 2019; "Petitioner's Responses to Supplemental Questions Regarding Petition Volume II China AD," dated March 12, 2019; and "Second Supplemental Responses – Volume I Injury," dated March 20, 2019; Petitioner's Letter, "Second Supplemental Responses – Volume II China AD Petition," dated March 20, 2019 (collectively, the Petition).  The Petition was filed by The American Kitchen Cabinet Alliance and its individual members, who include:  ACProducts, Inc., American Woodmark Corporation, Bellmont Cabinet Co., Bertch Cabinet Manufacturing, The Corsi Group, Crystal Cabinet Works, Inc., Dura Supreme Cabinetry, Jim Bishop Cabinets, Inc., Kitchen Kompact Inc., Koch & Co., Inc., Kountry Wood Products, LLC, Lanz Cabinets Incorporated, Leedo Cabinetry, Marsh Furniture Company, Master Woodcraft Cabinetry LLC, MasterBrand Cabinets, Inc., Nation's Cabinetry, Showplace Wood Products, Inc., Smart Cabinetry, Tru Cabinetry, Wellborn Cabinet, Inc., Wellborn Forest Products, Inc., Woodland Cabinetry, Inc., Woodmont Cabinetry, and W.W. Wood Products Inc. (collectively, the petitioner).

[11] *See* 19 CFR 351.204(b)(1).

briefs.[12]  We received comments from interested parties on the Preliminary Scope Memorandum, which we address in the Final Scope Memorandum.[13]  For this final determination, we have made no changes to the scope of this investigation, as published in the *Preliminary Determination*.[14]

## VI.    USE OF ADVERSE FACTS AVAILABLE

Sections 776(a)(1) and 776(a)(2)(A)-(D) of the Act, provide that if necessary information is not available on the record or if an interested party:  (A) withholds information that has been requested by Commerce; (B) fails to provide such information in a timely manner or in the form or manner requested subject to section 782(c)(1) and (e) of the Act; (C) significantly impedes a proceeding under the antidumping statute; or (D) provides such information but the information cannot be verified as provided for in section 782(i) of the Act, Commerce shall, subject to subsection 782(d) of the Act, use facts otherwise available in reaching the applicable determination.

Section 782(c)(1) of the Act provides that if an interested party "promptly after receiving a request from {Commerce} for information, notifies {Commerce} that such party is unable to submit the information requested in the requested form and manner," Commerce shall consider the ability of the interested party and may modify the requirements to avoid imposing an unreasonable burden on that party.

Section 782(d) of the Act provides that, if Commerce determines that a response to a request for information does not comply with the request, Commerce shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person an opportunity to remedy or explain the deficiency.  If that person submits further information that continues to be unsatisfactory, or this information is not submitted within the applicable time limits, Commerce may, subject to section 782(e), disregard all or part of the original and subsequent responses, as appropriate.

Section 782(e) of the Act states that Commerce shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority if:  (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination; (4) the interested party has demonstrated that it acted to the best of its ability; and (5) the information can be used without undue difficulties.

---

[12] *See* Memorandum, "Wooden Cabinets and Vanities and Components thereof from the People's Republic of China:  Scope Comments Decision Memorandum for the Preliminary Determinations," dated October 3, 2019 (Preliminary Scope Memorandum).
[13] *See* Memorandum, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Final Scope Comments Decision Memorandum," dated concurrently with this memorandum (Final Scope Memorandum).
[14] *See Preliminary Determination*, 84 FR at 54113.

5

Section 776(b) of the Act provides that Commerce may use an adverse inference in applying the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.[15]  In doing so, Commerce is not required to determine, or make any adjustments to, a weighted average dumping margin based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information.  Section 776(b)(2) provides that an adverse inference may include reliance on information derived from the petition, the final determination from the investigation, a previous administrative review, or other information placed on the record.  In addition, the SAA accompanying the URAA explains that Commerce may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[16]

In *Nippon Steel*, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) held that, while the statute does not provide an express definition of the "failure to act to the best of its ability" standard, the ordinary meaning of "best" is "one's maximum effort."[17]  Thus, according to the Federal Circuit, the statutory mandate that a respondent act to the "best of its ability" requires the respondent to do the maximum it is able to do.  The Federal Circuit indicated that inadequate responses to an agency's inquiries would suffice to find that a respondent did not act to the best of its ability.  While the Federal Circuit noted that the "best of its ability" standard does not require perfection, it does not condone inattentiveness, carelessness, or inadequate record keeping.[18]  The "best of its ability" standard recognizes that mistakes sometimes occur; however, it requires a respondent to, among other things, "have familiarity with all of the records it maintains," and "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of" its ability to do so.[19]  Moreover, further, affirmative evidence of bad faith on the part of a respondent is not required before Commerce may make an adverse inference.[20]

Section 776(c) of the Act provides that, when Commerce relies on secondary information rather than on information obtained in the course of an investigation, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.  Secondary information is defined as information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[21]  Further, Commerce is not required to corroborate any dumping margin applied in a separate segment of the same proceeding.

---

[15] *See* section 776(b)(1)(B) of the Act.

[16] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act (URAA), H.R. Doc. 103-316, vol. 1 (1994) (SAA) at 870.

[17] *See Nippon Steel Corp. v. United States*, 337 F. 3d 1373, 1382-83 (Fed. Cir. 2003) (*Nippon Steel*).

[18] *Id.*, 377 F. 3d at 1382.

[19] *Id.*

[20] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value:  Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000); *Antidumping Duties; Countervailing Duties:  Final Rule*, 62 FR 27296, 27340 (May 19, 1997); and *Nippon Steel*, 337 F. 3d at 1382-83.

[21] *See* SAA at 870.

Finally, under section 776(d) of the Act, Commerce may use any dumping margin from any segment of a proceeding under an antidumping duty (AD) order when applying an adverse inference, including the highest of such margins.  When selecting an AFA margin, Commerce is not required to estimate what the dumping margin would have been if the interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.

*Application of Partial AFA:  Foremost*

As explained in more detail at Comments 13, 15, and 17, and 20, we find that the application of partial AFA to Foremost is appropriate for this final determination.  Specifically, we determine that Foremost withheld information, failed to provide information in a timely manner, significantly impeded the investigation, and/or provided information that could not be verified, pursuant to section 776(a)(2)(A)-(D) of the Act.  In particular, we found that Foremost failed to report certain U.S. sales, discounts, and product information, and its responses contained contradictory, and difficult for Commerce to locate, information with respect to one inland freight expense.  Because the missing information was within Foremost's possession and it was within Foremost's ability to report and/or present its data accurately, pursuant to section 776(b) of the Act, we find that Foremost failed to cooperate by not acting to the best of its ability.  Thus, we find that an adverse inference is warranted in selecting from the facts available with the respect to the information in question.

*Application of Total AFA:  Meisen*

As explained in more detail at Comment 22, below, we continue to find that the application of total AFA to Meisen is appropriate for this final determination.  Specifically, we determine that Meisen withheld information, failed to provide such information in a timely manner, and significantly impeded the investigation, pursuant to section 776(a)(2)(A)-(C) of the Act.  This was information that Meisen had in its possession and could have voluntarily presented to Commerce; however, instead, Meisen chose not to disclose essential information until after the *Preliminary Determination* and only after Commerce had suspended verification.  Accordingly, we find that Meisen failed to cooperate by not acting to the best of its ability and that an adverse inference is warranted in selecting from the facts available.  As a result, we are assigning a final margin to Meisen based on total AFA, in accordance with section 776(a)-(b) of the Act.

*Application of AFA:  China-wide Entity*

In the *Preliminary Determination*, we found that the China-wide entity did not respond to Commerce's requests for information, withheld information requested by Commerce, failed to provide information in a timely manner, and significantly impeded this proceeding by not submitting the requested information.[22]  We further determined that because non-responsive Chinese companies had not demonstrated their eligibility for separate rate status, Commerce considered them part of the China-wide entity.  Because this information was within the China-wide entity's possession, we continue to assign a China-wide rate based on the facts otherwise

---

[22] *See Preliminary Determination* PDM at 22-23.

available, pursuant to sections 776(a)(1) and (a)(2)(A)-(C) of the Act, using an adverse inference, pursuant to 776(b) of the Act.

*Selection and Corroboration of the China-Wide and Meisen AFA Rate*

As discussed above, when using facts otherwise available, section 776(c) of the Act provides that, where Commerce relies on secondary information (such as the Petition) rather than information obtained in the course of an investigation, it must corroborate, to the extent practicable, information from independent sources that are reasonably at its disposal. Secondary information is defined as information derived from the Petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[23] The SAA clarifies that "corroborate" means that Commerce will satisfy itself that the secondary information to be used has probative value,[24] although Commerce is not required to corroborate any dumping margin applied in a separate segment of the same proceeding.[25] To corroborate secondary information, Commerce will, to the extent practicable, examine the reliability and relevance of the information to be used, although Commerce is not required to estimate what the dumping margin would have been if the interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.[26]

In selecting an AFA rate, Commerce selects a rate that is sufficiently adverse to ensure that the uncooperative party does not obtain a more favorable result by failing to cooperate than if it had fully cooperated.[27] In an investigation, Commerce's practice with respect to the assignment of an AFA rate is to select the higher of: (1) the highest dumping margin alleged in the Petition; or (2) the highest calculated dumping margin of any respondent in the investigation.[28]

In the *Preliminary Determination*, when selecting an appropriate rate to apply as AFA, we found that we were able to corroborate the highest dumping margin found in the Petition. Based on the information on the record, we continue to corroborate the 262.18 percent rate in this final determination. In corroborating this rate, we compared the highest petition rate of 262.18 percent to the individually-investigated respondents' highest control number (CONNUM)-specific dumping margins and found that both Foremost's and Ancientree's highest calculated

---

[23] *See* SAA at 870.

[24] *Id.*; *see also* 19 CFR 351.308(d).

[25] *See* section 776(c)(2) of the Act.

[26] *See* section 776(d)(3) of the Act; *see also, e.g.*, *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, from Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 61 FR 57391, 57392 (November 6, 1996), unchanged in *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from Japan; Final Results of Antidumping Duty Administrative Reviews and Termination in Part*, 62 FR 11825 (March 13, 1997).

[27] *Id.*

[28] *See, e.g.*, *Certain Uncoated Paper from Indonesia: Final Determination of Sales at Less Than Fair Value*, 81 FR 3101 (January 20, 2016), and accompanying Issues and Decision Memorandum (IDM) at Comment 1; *Welded Line Pipe from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 80 FR 61362 (October 13, 2015), and accompanying IDM at Comment 20.

CONNUM-specific dumping margins exceed the highest petition rate.[29]  Because we were able to corroborate the highest dumping margin contained in the Petition, we assigned to the China-wide entity, and to Meisen, a dumping margin of 262.18 percent.  We continue to do so for this final determination.

## VII.   CHANGES SINCE THE PRELIMINARY DETERMINATION

We calculated constructed export price (CEP), export price (EP), and normal value (NV) for the respondents using the same methodology as stated in the *Preliminary Determination*,[30] except as follows:[31]

*Ancientree:*

- We made adjustments to Ancientree's electricity consumption to incorporate the total electricity quantity provided as a minor correction at verification.[32]

- We based the SV for brokerage and handling (B&H) expenses on Malaysian data.  *See* Comment 6.

*Foremost:*

- We revised our calculations based on our findings at verification.[33]

- We based the SV for B&H expenses on Malaysian data.  *See* Comment 6.

- We adjusted the reported sales and expense data for Foremost's sales of combination kits to account for certain unreported non-subject components, using partial AFA, and to remove overhead expenses from the ratio used to allocate these data to subject merchandise.  We made similar adjustments to the data reported for sales of products that Commerce discovered at verification were combination kits.  *See* Comment 13.

- We made adjustments for early payment discounts, inland freight expenses to the U.S. warehouse, and section 301 duties.  *See* Comments 15, 16, and 17.

- We recalculated the following values and expenses for all combination kits to remove the portion of the value/expense related to the non-subject components:  entered value, bank charges, direct selling expenses, commissions, early payment discounts, and other discounts.  *See* Comment 21.

---

[29] *See* Ancientree Final Analysis Memorandum and Foremost Final Analysis Memorandum.
[30] *See Preliminary Determination* PDM at 34-46; *see also* Memorandum, "Preliminary Results Analysis Memorandum for Rizhao Foremost Woodwork Manufacturing Company Ltd.," dated October 2, 2019 (Foremost Prelim Analysis Memo); and Memorandum, "Preliminary Determination Analysis Memorandum for the Ancientree Cabinet Co., Ltd.," dated October 2, 2019.
[31] *See* Ancientree Final Analysis Memorandum; and Foremost Final Analysis Memorandum.
[32] *See* Ancientree Final Analysis Memorandum.
[33] *See* Foremost Worldwide Verification Report; *see also* Foremost Woodwork Verification Report; FGI Verification Report; and Comment 21.

- We recalculated U.S. customs duties (USDUTYU) as a percentage of entered value, rather than as of gross unit price.  *See* Comment 21.

- We revised our conversion of Foremost's glass inputs by converting the input from kilograms (kg) to square meters (M$^2$).  *See* comment 21.

## VIII.   ADJUSTMENT UNDER SECTION 777A(f) OF THE ACT

As discussed in the *Preliminary Determination*,[34] in applying section 777A(f) of the Act, Commerce examines:  (1) whether a countervailable subsidy (other than an export subsidy) has been provided with respect to a class or kind of merchandise; (2) whether such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period; and (3) whether Commerce can reasonably estimate the extent to which that countervailable subsidy, in combination with the use of NV determined pursuant to section 773(c) of the Act, has increased the weighted-average dumping margin for the class or kind of merchandise.[35]  For a subsidy meeting these criteria, the statute requires Commerce to reduce the dumping margin by the estimated amount of the increase in the weighted-average dumping margin due to a countervailable subsidy, subject to a specified cap.[36]  In conducting this analysis, Commerce has not concluded that concurrent application of non-market economy (NME) dumping duties and countervailing duties necessarily and automatically results in overlapping remedies.  Rather, a finding that there is an overlap in remedies, and any resulting adjustment, is based on a case-by-case analysis of the totality of facts on the administrative record for that segment of the proceeding as required by the statute.[37]

In our *Preliminary Determination*, upon consideration of the responses from Ancientree and Foremost and the relevant statutory criteria, we concluded that an adjustment under section 777A(f) of the Act was not warranted in this investigation.[38]  No party challenged Commerce's preliminary determination not to grant an offset to parties' cash deposit rates.  Therefore, consistent with our *Preliminary Determination*, we have not made any adjustment under section 777A(f) of the Act to the rates assigned to any of the mandatory respondents, the separate rate respondents, or the China-wide entity in this final determination.

## IX.   ADJUSTMENTS TO CASH DEPOSIT RATES FOR EXPORT SUBSIDIES

As we stated in the *Preliminary Determination*, in an LTFV investigation, where there is a concurrent CVD investigation, it is Commerce's normal practice to calculate the cash deposit rate for each respondent by adjusting the respondent's estimated weighted-average dumping margin to account for export subsidies found for each respective respondent in the concurrent

---

[34] *See Preliminary Determination* PDM at 46-49.
[35] *See* sections 777A(f)(1)(A)-(C) of the Act.
[36] *See* sections 777A(f)(1)-(2) of the Act.
[37] *See, e.g.*, *Fine Denier Polyester Staple Fiber from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24740 (May 30, 2018), and accompanying IDM at Comment 2.
[38] *See Preliminary Determination* PDM at 48-49.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

CVD investigation.[39]  Doing so is in accordance with section 772(c)(1)(C) of the Act, which states that U.S. price "shall be increased by the amount of any countervailing duty imposed on the subject merchandise … to offset an export subsidy."

Commerce determined in the final determination of the concurrent CVD investigation that two of the mandatory respondents (*i.e.*, Foremost and Ancientree), the non-selected respondents (*i.e.*, the "All Others" companies), and the companies receiving subsidy rates based upon total AFA, each benefitted from the Export Buyer's Credit subsidy program, which is export contingent, and whose subsidy rate equals 10.54 percent.[40]  Accordingly, in order to avoid a double remedy as a result of export subsidies which are collected as part of the companion CVD proceeding, and pursuant to section 772(c)(1)(C) of the Act, we must adjust the estimated weighted-average dumping margins by the amount of export subsidies that are countervailed as a result of the companion CVD proceeding.  Therefore, we are adjusting each of the estimated weighted-average dumping margins for this final determination by 10.54 percent to determine the cash deposit rate for the mandatory respondents, the non-examined companies which are eligible for a separate rate, and the China-wide entity.

## X.      DISCUSSION OF THE ISSUES

General Comments

## Comment 1:  Initiation of the Investigation

*Fabuwood Case Brief* [41]
- Commerce improperly initiated this investigation, based on an improper finding that the Petition has adequate industry support.
- The petitioner's estimated U.S. market size fails to adequately capture all U.S. shipments of residential and non-residential wooden cabinets and vanities that are covered by the scope of the investigation.  Commerce relied on the petitioner's faulty methodology and underestimated the size of the U.S. market, while improperly rejecting Fabuwood's proposed alternative market size.  The petitioner's numbers distorted the measure of industry support required to initiate an investigation.
- The shipment numbers provided by the petitioners included shipments of non-subject merchandise and imported cabinets or parts resold by domestic producers; thus, the shipment numbers were overvalued.  This further distorted industry support.
- Although the petitioner adjusted its U.S. domestic market measurement to exclude subject merchandise and imports, it performed no such adjustment for the shipment numbers of its members, thereby dramatically inflating the shipments that were supportive of the Petition.

---

[39] *Id*. at 49-50.
[40] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, dated concurrently with this notice, and accompanying IDM.
[41] *See* Fabuwood's Case Brief, "Case Brief of Fabuwood (General Issues)," dated December 18, 2019 (Fabuwood Case Brief).

- Because of the distortion, Commerce was required under the Act to conduct its own analysis of industry support.  However, Commerce neglected its statutory duty and initiated an investigation based on a legally-insufficient petition.  Thus, the investigation was initiated under improper circumstances and should be terminated.

*Petitioner Rebuttal Brief*[42]
- Commerce already found that the petitioner has standing as an interested party, and it met the required domestic industry support to file the petition.[43]  Many of Fabuwood's arguments are the same arguments Commerce rejected in its decision to initiate this investigation.[44]
- Fabuwood entirely ignores section 732(c)(4)(E) of the Act, which provides that, once Commerce makes a decision regarding industry support, the agency's determination cannot be reconsidered.[45]
- Commerce's regulations also prohibit Commerce from reconsidering industry support after the initiation of an investigation.[46]  Commerce maintains significant discretion in determining industry support, and it exercised this discretion based on substantial record evidence in this case.[47]
- The International Trade Commission (ITC) determined in its accompanying investigation that a total value of U.S. shipments of subject merchandise was closer to the petitioner's estimate than Fabuwood's, and, thus, the petitioner's market estimate was reasonable.[48]

**Commerce's Position**:  Section 732(c)(4)(E) of the Act directs Commerce as follows regarding the consideration of comments with respect to industry support:

> Before the administering authority makes a determination with respect to initiating an investigation, any person who would qualify as an interested party under section 771(9) if an investigation were initiated, may submit comments or information on the issue of industry support.  <u>After the administering authority makes a determination with respect to initiating an investigation, the determination regarding industry support shall not be reconsidered.</u>[49]

---

[42] *See* Petitioner's Rebuttal Brief, "Rebuttal Brief Regarding General and Ancientree-Specific Issues," dated December 26, 2019 (Petitioner December 26 Rebuttal Brief).

[43] *Id.* at 30 (citing "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," March 26, 2019 (Initiation Checklist) at Attachment II, 6-20).

[44] *Id.*

[45] *See* section 732(c)(4)(E) of the Act.

[46] *See* Petitioner December 26 Rebuttal Brief at 32 (citing *PT Pindo Deli Pulp & Paper Mills v. United States*, 825 F. Supp. 2d 1310, 1323 (CIT 2012)).

[47] *Id.* at 32 (citing Initiation Checklist at Attachment II:  Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China).

[48] *Id.* at 38 (citing *Wooden Cabinets and Vanities from China*, Inv. Nos 701-TA-620 and 731-TA-1445, USITC Pub 4891 (April 2019) at I-3 (USITC Pub 4891)).

[49] *See* section 732(c)(4)(E) of the Act (emphasis added).

12

Therefore, Commerce is statutorily precluded from reconsidering its industry support determination at this stage of the investigation.[50]  As a result, we continue to rely on our determination of industry support provided in the Initiation Checklist.[51]

Based on information provided in the Petition, the share of total estimated U.S. production of the domestic like product in calendar year 2018 represented by the petitioner was more than 50 percent of the production of the domestic like product.[52]  Pursuant to section 732(c)(4)(D)(i) of the Act, if the petition does not establish the support of domestic producers accounting for more than 50 percent of the total production of the domestic like product, Commerce is required to poll the industry or rely on other information to determine industry support.  However, because at the time of the filing of the Petition, we determined that the Petition did establish the support of domestic producers accounting for more than 50 percent of the total production of the domestic like product, we found no need to poll the U.S. industry to establish industry support.[53]  Thus, we reiterate below our analysis from the Initiation Checklist.

> The petitioner has provided, with extensive supporting documentation, a reasonable estimate of total 2018 production of wooden cabinets and vanities in the United States, starting with U.S. demand and making adjustments for annual U.S. market segment and overall market growth, U.S. demand in non-residential/commercial applications, imports and exports.  We further note that the petitioner provided a detailed explanation of the methodology used to estimate total U.S. production in 2018 and provided supporting declarations from an individual …{producer of} wooden cabinets and vanities in the United States.  {…}In addition, we note that the petitioner's methodology considers annual growth in the replace and remodel market segment and new construction segment, demand for nonresidential/commercial applications, U.S. imports of wooden cabinets and vanities, U.S. exports of wooden cabinets and vanities and components thereof, and annual growth for the overall U.S. cabinet market.  {…}Accordingly, we conclude that the petitioner's estimate using data on U.S. cabinet demand {from a business proprietary source} as the starting point is reasonable.
>
> While Fabuwood contends that the NKBA data it provided on the U.S. market for residential kitchen and bathroom cabinetry for the new residential and remodeling segments should be used as the denominator, we agree with the petitioner that the NKBA data on the record do not represent the value of production or shipments of wooden cabinets and vanities.  Based on information on the record, the NKBA data reflect retail values and installed values of kitchen and bathroom cabinets, which include built-in costs for commissions, delivery fees, {…certain other fees}, and customized treatments, and which have been sold once or twice before being sold{…}.  Accordingly, we find that the petitioner has provided a reasonable estimate of total U.S. production that accounts for all production of the domestic like product.  As a result, the petitioner has demonstrated that

---

[50] *See PT Pindo Deli Pulp*, 825 F. Supp. 2d at 1323 ("Commerce is prohibited from reconsidering industry support after the initiation of an investigation").
[51] *See* Initiation Checklist at Attachment II.
[52] *Id.* at Attachment II at 9.
[53] *Id.* at Attachment II at 18.

it has adequate industry support for initiating the investigations; therefore, it is unnecessary to poll the industry to determine support for the Petitions.[54]

## Comment 2:  Respondent Selection

### A.  Mandatory Respondent Selection Methodology

*Wen Bo Case Brief*[55]
- Commerce should have relied on import value, rather than volume, data for mandatory respondent selection.
- Both the petitioner and U.S. Customs and Border Protection (CBP) collected import data on a value, not a volume, basis to calculate industry support.[56]  This demonstrates value as a reliable metric.
- Commerce unreasonably used an unreliable metric and ignored the fact that CBP's data and the Petition itself relied on value.[57]

*Petitioner Rebuttal Brief*[58]
- Commerce correctly determined its mandatory respondent selection using import volumes.
- Wen Bo fails to provide any additional reasoning supporting its argument that import values would have been a "reliable metric" and Commerce previously specifically addressed and rejected the same argument.
- Regardless of the metric utilized by Commerce, the mandatory respondents selected would remain representative of the Chinese industry.

**Commerce's Position:**  We disagree with Wen Bo's claim that Commerce should have based respondent selection on import values, rather than import volume, during the POI.  There is no evidence on the record to demonstrate that values are more accurate or consistent than reported volumes.[59]  Commerce's longstanding practice is to find that volume provides a consistent and reliable metric by which to rank the largest exporters during the POI.[60]  Indeed, the statute indicates that, where we limit our examination of respondents in an investigation, we may limit our examination to "exporters and producers accounting for the largest *volume* of the subject merchandise from the exporting country that can be reasonably examined."[61]

---

[54] *See* Initiation Checklist at Attachment II at 17-18 (footnotes omitted).
[55] *See* Shanghai Wen Bo Industries Co., Ltd.'s (Wen Bo's) and Dalian Jiaye Wood Products Co. Ltd.'s (JY's) Case Brief, "Case Brief," dated December 17, 2019 (Wen Bo Case Brief).
[56] *Id.* at 2.
[57] *Id.* (citing Memorandum, "Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Respondent Selection," dated June 4, 2019 (Respondent Selection Memo) at 6-7).
[58] *See* Petitioner December 26 Rebuttal Brief at 27.
[59] *See* Respondent Selection Memo at 6.
[60] *See Hardwood and Decorative Plywood from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 58273 (September 23, 2013) (*Decorative Plywood*), and accompanying IDM at Comment 2.
[61] *See* section 777A(c)(2)(B) of the Act (emphasis added).

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

We further note that Wen Bo did not cite any precedent to support the proposition that Commerce should adjust its respondent selection methodology.  Further, Wen Bo failed to demonstrate that the mandatory respondents selected on the basis of import volume are unrepresentative of the Chinese wooden cabinet and vanity industry.[62]  Therefore, we continue to find Wen Bo's argument to be without merit.

### B.  Voluntary Respondents

On June 4, 2019, we selected the three largest exporters/producers of subject merchandise by volume, Ancientree, Foremost, and Meisen, for individual examination as mandatory respondents.[63]  Wen Bo requested to participate in this investigation as a voluntary respondent,[64] and it submitted timely responses to Commerce's AD questionnaire by the due dates specified for the mandatory respondents.[65]  On October 2, 2019, we determined not to select Wen Bo as a voluntary respondent because doing so would continue to be unduly burdensome and would inhibit the timely completion of this investigation.[66]

*Wen Bo Case Brief*[67]
- Commerce stated it would consider any request for voluntary respondent status, yet it declined Wen Bo's voluntary respondent request.
- Meisen's uncooperativeness opened a spot for Wen Bo to be selected as a voluntary respondent.  Thus, to meet the targeted three mandatory respondent companies, Commerce should examine Wen Bo's response.
- In LTFV investigations, Commerce is under the obligation to calculate dumping margins as accurately as possible.[68]
- Representativeness plays a central role in calculating the all-others rate.  In *National Knitwear,* the Court of International Trade (CIT) upheld Commerce's decision to exclude a mandatory respondent from the calculation of the all others rate on the grounds that the rate was not "representative of the pricing practices of the non-investigated companies."[69]

---

[62] Indeed, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) stated that "the very fact that the statute contemplates using data from the largest volume of exporters suggests an assumption that those data can be viewed as representative of all exporters."  *See Albemarle Corp v. United States*, 821 F. 3d 1345, 1353 (Fed. Cir. 2016) (*Albemarle*).

[63] *Id.* at 1.

[64] *See* Wen Bo's Letter, "Wooden Cabinets and Vanities From People Republic of China:  Entry of Appearance; Request to Be a Voluntary Respondent," dated March 26, 2019.

[65] *See* Wen Bo's Letter, "Section A Questionnaire Response," dated July 3, 2019; Wen Bo's Letter, "Section D Questionnaire Response," dated July 19, 2019; and Wen Bo's Letter, "Section C and E Questionnaire Responses," dated July 22, 2019.

[66] *See* Memorandum, "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Selection of Voluntary Respondent," dated October 2, 2019 (Voluntary Respondent Memo); *see also Preliminary Determination* PDM at 7-8.

[67] *See* Wen Bo Case Brief.

[68] *Id*. at 4 (citing *Lasko Metal Prods. v United States*, 43 F. 3d 1442, 1446 (Fed. Cir. 1994) (quoting *Rhone-Poulenc Inc. v United States*, 899 F. 2d 1185, 1191 (Fed. Cir. 1990)); *Albemarle*, 821 F. 3d at 1354; and *Mueller Commercial de Mexico v. United States*, 753 F. 3d 1227, 1235 (Fed. Cir. 2014) (*Mueller*)).

[69] *Id*. at 4-5 (citing *National Knitwear & Sportswear Ass'n v. United States*, 15 CIT 548 (1991) (*National Knitwear*)).

The timely, complete response provided by Wen Bo would yield an "all others rate" based on record evidence rather than AFA.

- Because Wen Bo requested voluntary treatment and timely submitted a complete questionnaire response, it cannot be said that an "all others rate" calculated on other respondents' rates is representative of Wen Bo's own rate.
- With respect to Wen Bo's own rate, Commerce does not have a basis to assume Wen Bo engaged in unfair pricing.  Thus, if Commerce does not analyze Wen Bo's voluntary response, Commerce should assign Wen Bo a zero percent margin and exclude it from the order.

*Petitioner Rebuttal Brief* [70]

- Commerce appropriately declined to investigate voluntary respondent Wen Bo and the company failed to demonstrate that Commerce was unreasonable in declining its examination.
- Wen Bo is mistaken in its presumption that Commerce has the resources to investigate Wen Bo because of its preliminary decision to base Meisen's dumping margin on AFA. Commerce has conducted a full investigation of Meisen, including issuing multiple supplemental questionnaires and evaluating all comments raised by interested parties.
- Ancientree and Foremost account for a significant Chinese production volume for which Commerce could individually calculate dumping margins.  Essentially, neither Wen Bo nor other Chinese respondents would be unfairly treated if Commerce continued to use Ancientree's and Foremost's experience as the basis for the separate rate.

**Commerce's Position:**  We disagree that we should have selected Wen Bo as a voluntary respondent in this investigation because it timely submitted voluntary questionnaire responses. On June 4, 2019, we selected the three largest exporters/producers of subject merchandise by volume, Ancientree, Foremost, and Meisen, for individual examination as mandatory respondents.[71]  In the Respondent Selection Memo, we stated that we would reevaluate resource constraints during the course of this investigation and that, if exporters submitted voluntary responses in accordance with the deadlines and other criteria set forth in section 782(a) of the Act, and 19 CFR 351.204(d), we would consider whether resources existed to examine those exporters as voluntary respondents.[72]  In the Voluntary Respondent Memo that accompanied the *Preliminary Determination*, Commerce revisited Wen Bo's request and explained that examining a voluntary respondent would have been an undue burden and would have inhibited the timely completion of this investigation.[73]

Wen Bo itself acknowledges that, after the completion of the *Preliminary Determination*, Commerce delayed verification of mandatory respondent Meisen and issued multiple supplemental questionnaires to it.[74]  Further, Meisen submitted a case brief containing arguments which must be considered and addressed in this final determination.  Thus, contrary to Wen Bo's

---

[70] *See* Petitioner December 26 Rebuttal Brief.
[71] *See* Respondent Selection Memo at 1.
[72] *Id.* at 9-10.
[73] *See* Voluntary Respondent Memo at 3-4.
[74] *See* Wen Bo Case Brief at 3-4.

16

assertions, the assignment of AFA to Meisen in the *Preliminary Determination* did not end the administrative burden placed on Commerce when we selected it as a mandatory respondent. While we agree with Wen Bo that Commerce should accept voluntary respondents when we have the resources to do so, in this case, those resources simply did not – and still do not – exist. Under these circumstances, analyzing Wen Bo's voluntary response "would be unduly burdensome and inhibit the timely completion of the investigation."[75]

With respect to Commerce's current resource constraints, it is important to note that the issues presented in this investigation are complex, and the information submitted by the mandatory respondents and other interested parties has been voluminous.  For example, Commerce received 221 applications from companies seeking to qualify for separate rates, an extraordinarily large number by any measure, and we expended considerable resources in reviewing each of these applications to ensure that it met Commerce's standards.  Further, Meisen and the other respondents submitted thousands of pages of documentation in response to Commerce's questionnaires, all of which had to be analyzed and acted upon within the statutory deadlines set forth in the Act.  In addition, this was the first time that any of the examined companies were investigated as mandatory respondents before Commerce and, thus we had to expend additional resources to become familiar with these companies' corporate structures, record-keeping, and business practices.  Indeed, we issued multiple supplemental questionnaires to the mandatory respondents, which included numerous questions concerning their FOP and sales reporting methodologies, their costing and selling practices, and the multitude of individual calculations performed when presenting their reported data.  We also encountered numerous issues during the verifications conducted for these respondents, giving rise to a large number of comments to be addressed in this final determination.

Equally significant, interested parties have raised numerous issues related to the scope of this investigation, many of which are novel and highly complex.  For this reason, and the reasons stated above, we find that this case already requires the devotion of significant resources by Commerce, which prohibits the examination of an additional respondent.  Accepting Wen Bo as a voluntary respondent would have required additional resources not currently at our disposal in order to review and analyze its questionnaire responses, issue potential multiple additional supplemental questionnaires, and conduct verification of those questionnaire responses.  Further, a full examination of Wen Bo would have required the preparation of an additional margin program specific to Wen Bo, as well as analysis memoranda and verification reports.  Moreover, the uncertain nature of any investigation allows for the possibility that additional complex situations may have arisen, requiring even more time for the case team to analyze and address novel issues.  We further note that Commerce was conducting numerous investigations and

---

[75] *See* section 782(a)(1) of the Act.

17

reviews during the preliminary phase of this investigation,[76] and the number of new administrative segments has only increased since then.[77]

Notwithstanding the issues described above, we disagree with Wen Bo that Commerce, in the alternative, should assign it a final margin of zero percent and exclude it from any potential order since Commerce declined its review.  First, contrary to Wen Bo's assumption, Commerce has not included Meisen's AFA rate in the calculation of the rate assigned to the non-selected companies eligible for separate rates.[78]

Second, our decision to assign Wen Bo a separate rate based on a weight-average of the mandatory respondents' rates that were not zero, *de minimis*, or based entirely on facts available, is consistent with our past practice.[79]  Further, we disagree with Wen Bo that this rate is not representative of Wen Bo's own rate.  While Wen Bo argues that Meisen's assigned AFA rate is not usable for purposes of calculating the rate for separate rate companies, Wen Bo failed to explain why the rate that Commerce did assign to the separate rate companies is not representative of Wen Bo's rate.  The rate assigned to the separate rate companies is a weighted average of the dumping margins calculated for two of the largest Chinese subject merchandise producers, using the publicly-ranged quantities of each producer, whose rates are not zero, *de minimis*, or based entirely on facts available.[80]  Our use of these rates to determine the separate rate for non-selected respondents in this investigation is consistent with long-standing Commerce

---

[76] *See* Voluntary Respondent Memo at 4, noting in the preliminary phase of this investigation, Office V was also assigned to the following investigations and reviews:  AD and CVD investigations of wooden cabinets and vanities from the People's Republic of China; AD and CVD investigation of carbon and alloy steel threaded rod from India; AD changed circumstances review and administrative review of certain steel nails from China; AD investigation of carbon and alloy steel threaded rod from Thailand; AD administrative review of certain frozen fish fillets from Vietnam; AD administrative review of magnesia carbon bricks from China; AD and CVD administrative reviews of 1-Hydroxyethylidene-1, 1-Diphosphonic Acid from China; AD administrative review of hot-rolled steel flat products from Australia and South Korea; AD administrative review of uncoated paper from Portugal and Brazil; AD administrative review of honey from China; CVD administrative review of cold drawn mechanical tubing from India; AD administrative review of uncovered innerspring units from China; AD administrative review of certain frozen warmwater shrimp from China; AD administrative review of steel wire garment hangers from China; AD administrative review of ESB rubber from Korea; AD administrative review of circular welded steel pipe and tubes from Taiwan; AD administrative review of certain cut-to-length plate from China; AD and CVD administrative reviews of hardwood plywood products from China; AD and CVD circumvention inquiries of certain uncoated paper from Australia, Brazil, China, Indonesia, and Portugal; and AD and CVD circumvention inquiries of hardwood plywood products from China.

[77] Since the date of the *Preliminary Determination*, Commerce has initiated AD and/or CVD investigations on at least four different products covering numerous countries, in addition to receiving multiple new anti-circumvention inquiries, scope inquires, and initiating multiple new administrative reviews.  *See http://enforcement.trade.gove/ia-highlights-and-news.html*.

[78] *See* Memorandum, "Final Determination of the Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Calculation of the Final Margin for Separate Rate Companies," dated concurrently with this memorandum.

[79] *See, e.g.*, *Certain Fabricated Structural Steel from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 5376, 5378 (January 30, 2020), and accompanying IDM.

[80] *See* Memorandum, "Preliminary Determination of the Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Calculation of the Preliminary Margin for Separate Rate Companies," dated October 2, 2019.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

practice in NME LTFV investigations,[81] in which we look to section 735(c)(5) of the Act, which pertains to the calculation of the all others rate in market economy LTFV investigations.[82] Wen Bo made no attempt in its arguments to explain how these two other subject merchandise producers are not representative of the dumping that is occurring beyond stating that "where WB and JY have requested voluntary treatment and submitted a complete questionnaire response on a timely basis, it cannot be said that a rate calculated based on other respondents' rates is representative of WB and JY."[83] Wen Bo provides no further elaboration on why the rate assigned to it is not representative of its own.  Indeed, Wen Bo notes that the Federal Circuit has elaborated on what is required of Commerce in calculating antidumping rates, and the separate rate, or all-others rate, in particular. "{A}ccuracy and fairness must be Commerce's primary objectives in calculating a separate rate for cooperating exporters."[84]  As explained above in Comment 1(A), when we determine to limit respondents, section 735(c)(5)(A) of the Act – which, again, we look to for guidance in determining the separate rate for non-selected companies such as Wen Bo in NME AD investigations – "contemplates using data from the largest volume exporters suggestions an assumption that those data can be viewed as representative of all exporters."[85]  Therefore, Wen Bo's contention that Commerce should assign a zero percent margin to Wen Bo and exclude it from the AD Order is unreasonable and unsupported by the record evidence or any precedent.[86]

For the reasons discussed in the Voluntary Respondent Memo, and reiterated above, we continue to find that we did not have sufficient resources, or time, to individually examine Wen Bo in this investigation.  Consequently, we continue to assign Wen Bo the separate rate margin determined in this final determination.

## Comment 3:  Separate Rate Applicants

### A.  Brentridge and Harbin

In the *Preliminary Determination*, we found that both Brentridge and Harbin failed to cooperate by not providing information requested from them related to their application for separate rate status, including a request to publicly identify the producers for which they are requesting combination rates.[87]

---

[81] *See, e.g.*, *Cast Iron Soil Pipe Fittings from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination and Extension of Provisional Measures*, 83 FR 7145 (February 20, 2018), and accompanying PDM at 13-14, unchanged *Cast Iron Soil Pipe Fittings from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part*, 83 FR 33205 (July 17, 2018), and accompanying IDM.

[82] *Id.*  Separately, we disagree with Wen Bo's reference to an "all others rate" in its case brief.  Commerce does not calculate an "all others rate" in NME LTFV investigations.  Rather, where Commerce determines to limit its examination to particular respondents, it determines a rate for non-selected respondents who demonstrate that they are entitled to a "separate rate."

[83] *See* Wen Bo Case Brief at 5.

[84] *See* Wen Bo Case Brief at 4 (citing *Albemarle*, 821 F. 3d at 1354).

[85] *See Albemarle*, 821 F. 3d at 1353.

[86] *See* Wen Bo Case Brief at 5.

[87] *See Preliminary Determination* PDM at 18.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

*Brentridge Case Brief*[88]
- Brentridge timely filed a full and complete separate rate application (SRA) but did not file an entry of appearance.  Therefore, Brentridge is not an interested party in this investigation.
- Although Commerce issued a supplemental questionnaire to "Interested Parties,"[89] this questionnaire did not cover Brentridge nor did Commerce specifically name Brentridge in the supplemental questionnaire.
- The first question of the August SRA Supplemental requested an excel file from "Interested Parties," but did not request any information that was not already in Brentridge's SRA.
- Since the *Preliminary Determination*, Brentridge has publicly identified its producer for which it is requesting a combination rate.[90]

*Harbin Case Brief*[91]
- This is Harbin's first time participating in a proceeding and the company has no experience with ACCESS.  It was not until Harbin saw Commerce's *Preliminary Determination* that it realized there was a supplemental questionnaire that required its attention.
- Because the Public Release Digest email message and ACCESS website did not identify Harbin's name, the company believed the supplemental was irrelevant to Harbin.
- The August SRA Supplemental did not request any new information not already in Harbin's timely SRA or information in Harbin's possession.

*Petitioner Rebuttal Brief*[92]
- Both Brentridge and Harbin should have been aware that a supplemental questionnaire regarding their SRA submissions would be applicable to them.
- The August SRA Supplemental clearly applied to all "Interested Parties" and only certain attachments applied to specific applicants.
- Despite the argument by both companies that any information submitted would not have been of use to Commerce, that is not justification for failing to submit any response and it is not for respective parties to decide what information is required and which companies necessitate questionnaire response submissions.
- The use of AFA does not require a finding of intent on behalf of an interested party, and may be applied where a party's failure is based on inadvertence or neglect.  Therefore, Commerce should continue denying a separate rate to these companies.[93]

---

[88] *See* Brentridge's Case Brief, "Brentridge Case Brief," dated November 8, 2019 (Brentridge Case Brief) at 1.
[89] *See* Memorandum, "Separate Rate Application Supplemental Questionnaire," dated August 22, 2019 (August SRA Supplemental).
[90] *See* Brentridge Case Brief at Attachment.
[91] *See* Harbin's Case Brief, "Case Brief," dated December 16, 2019 (Harbin Case Brief) at 2.
[92] *See* Petitioner December 26 Rebuttal Brief at 25-27.
[93] *Id.* (citing *Nippon Steel*, 337 F. 3d 1373, 1382-83).

**Commerce's Position:**  We disagree with Brentridge and Harbin that their respective SRA filings were full and complete.  With respect to Brentridge, Commerce preliminarily found that this exporter was ineligible for a separate rate because it failed in its SRA to disclose publicly the name of the entity that supplied it with subject merchandise.  The public disclosure of this information is essential to the proper administration of this proceeding because the identity of exporter-producer combinations requested by Commerce in separate rate applications must be publicly published in the *Federal Register*.  However, since the *Preliminary Determination*, Brentridge has publicly identified its producer,[94] such that Commerce is now able to publicly publish the exporter-producer combination for Brentridge. Therefore, because this deficiency has been remedied, and Brentridge's SRA otherwise meets our requirements for granting a separate rate, we are granting Brentridge a separate rate in this final determination.

We disagree with Harbin that it should be considered eligible for a separate rate despite its failure to respond to the August SRA Supplemental, which it concedes it was aware of but disregarded.  In its case brief, Harbin described working with Commerce employees to register for the ACCESS system,[95] suggesting that Harbin was aware that Commerce had resources available to provide Harbin technical assistance with its filings if Harbin required clarification. Further, Commerce identified deficiencies in Harbin's SRA that required Harbin's attention on three out of three requested action lists in the August SRA Supplemental.[96]  Specifically Harbin's SRA did not identify its ultimate owners, it did not provide a U.S. Customs Form 7501, and it did not provide a business license with an accompanying English language version.[97] With respect to the first of these deficiencies, Harbin claimed in its case brief that exhibits 7 and 9 of its SRA showed the names of its individual shareholders and their percentages owned;[98] however, those documents are Chinese-language documents with no accompanying English-language translations,[99] and, thus, Harbin failed to comply with the requirements of 19 CFR 351.303(e) in submitting them.[100]  With respect to the second deficiency, Harbin claimed in its case brief that it did not have a Form 7501;[101] however, it stated in its SRA that it was submitting the U.S. Customs 7501 Entry Summary in exhibit 4.[102]  Even if this statement were in error and Harbin did not have the Form 7501 in its possession, it was required by the SRA to submit an explanation as to why submission of that document was not possible.[103]  Finally, with respect to the third deficiency, Harbin argues in its case brief that it provided a business license in exhibit 5 of its SRA, and an English translation of its export certificate of approval in exhibit 6, where "{t}he basic content of exhibit 6 such as company name, address and company nature are similar to that of business license";[104] however, Harbin failed to submit a translated copy of its most fundamental of documents, its business license, again in violation of 19 CFR 351.303(e).

---

[94] *See* Brentridge Case Brief at 2.
[95] *See* Harbin Case Brief at 2.
[96] *See* August SRA Supplemental at Appendices I, II, and III.
[97] *See* Harbin's Letter, "Separate Rate Application," dated May 10, 2019 (Harbin SRA).
[98] *See* Harbin Case Brief at 3.
[99] *See* Harbin SRA at Exhibits 7 and 9.
[100] *See* August SRA Supplemental at Appendices I, II, and III.
[101] *See* Harbin Case Brief at 3-4.
[102] *See* Harbin SRA at 7.
[103] *Id.* at 6, fn. 7.
[104] *See* Harbin Case Brief at 3-4.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

We are sympathetic to the position of small companies that are unfamiliar with our process, and in particular that of *pro se* companies.  However, in this instance, Harbin's case brief raises additional concerns regarding the potential for serious misrepresentations of its reported information.  Specifically, Harbin notes that its filings were all completed by itself and it wrote a law firm's name on those files because "we saw other companies also wrote a law firm's name in their files" and because "Heilongjiang ShanXing Law Firm is a local law firm in Harbin" that "generally gives legal advices (*sic*) to our company about other Chinese law matters."[105] However, the cover letter of Harbin's SRA is signed by "GuXiangGuo," purportedly of "Heilongjiang ShanXing Law Firm," and the "Representative Certification" is purportedly completed and signed by the same counsel at exhibit 3 of the SRA.  Thus, Harbin either misstates the facts of its representation in its case brief or committed severe misrepresentations in its SRA by claiming to have secured representation and fraudulently completing a representative certification by said counsel.

The SRA itself provides the following:

> If the applicant does not provide the required documentation in the appropriately required form or is unable or unwilling to make the requested certifications, the applicant will not have demonstrated its eligibility for a separate rate.  If necessary, {Commerce} will issue questionnaires for the purpose of clarifying fully responsive answers.  {Commerce} retains the right to require additional information concerning the representations made in your firm's application.  All information submitted and representations made by applicants are subject to verification.[106]

Accordingly, we continue to find that Harbin did not provide the requested information that was required of it to be considered eligible for a separate rate and it is, therefore, ineligible for a separate rate in this final determination.

## B.  Zhong Shan

In the *Preliminary Determination*, we did not grant Zhong Shan a separate rate because we found that it did not separately submit an application for each company included in its application.[107]

*Zhong Shan Case Brief*[108]
- In its initial SRA response, Zhong Shan reported its own name as the exporter and producer, indicating it applied for a separate rate only on its own behalf.
- After not receiving the separate rate in the *Preliminary Determination*, Zhong Shan filed preliminary ministerial error comments definitively proving Zhong Shan's sale to an unaffiliated U.S. customer.

---

[105] *Id.* at 2.
[106] *See* Commerce's Letter, "People's Republic of China Separate Rate Application and Required Supporting Documentation," available on Enforcement and Compliance's website at *https://enforcement.trade.gov/nme/nme-sep-rate.html* (SRA Template).
[107] *See Preliminary Determination* PDM at 18.
[108] *See* Zhong Shan's Case Brief, "Case Brief," dated November 28, 2019 (Zhong Shan Case Brief).

- Chin-Shu Wooden is a paper company registered in the market economy Samoa.  It did not apply for a separate rate nor is it seeking one.
- Commerce's mistaking Chin-Shu Wooden as a company requiring its own separate rate submission, and subsequent denial of Zhong Shan's separate rate, constitutes an abuse of discretion and must be corrected.

No other interested party provided comments on this issue.

**Commerce's Position:**  We continue to disagree with Zhong Shan that the record evidence clearly supports its qualification for a separate rate.  In the *Preliminary Determination*, we stated:

> The SRA posted on E&C's website states that "Each applicant seeking separate rate status must submit a separate and complete individual application regardless of any common ownership or affiliation between firms and regardless of foreign ownership.  Each firm must apply for a separate rate by submitting an individual application.  Only one firm per application is permitted."[109]

In its SRA, Zhong Shan noted in certain places that it was also known as (or "AKA") Chin-Shu Wooden, but it did not identify this AKA name in other places.[110]  The SRA instructed companies to:

> Ensure that each applicant seeking separate rate status is submitting a separate and complete individual application regardless of any common ownership or affiliation between firms and regardless of foreign ownership.  Your response to this question should have only one company name.[111]

The SRA also stated:

> Trade names are other names under which the company does business.  It does not include product brand names or the names of any other entities in the applicant's "group," affiliated or otherwise.  If your firm is assigned separate rate status, your firm will only be able to ship under your separate rate under names that are included on your business license/registration documents, or are otherwise permitted, as explained in your response to this question.[112]

Despite the above instructions, Zhong Shan did not consistently indicate that Chin-Shu Wooden was actually an AKA name and its assertions that it is so now are belied by the record.  Zhong Shan answered "no" when asked if the disregard the instructions under Section II requesting; "applicant identified by any other names, such a trade names or 'doing-business-as.' ('d.b.a.') names, as a legal matter in the home market, in third countries or in the United States'."  [113]

---

[109] *See Preliminary Determination* PDM at 18.
[110] *See* Zhong Shan SRA at 10-11.
[111] *Id*. at 10.
[112] *Id.*
[113] *See* SRA Template at 10.

Arguably, this question affords applicants the opportunity to distinguish any "AKA" and provide documentation demonstrating the AKA. Although Zhong Shan erroneously addresses its AKA within the context of its selling practices, none of Zhong Shan's underlying documentation indicates that this company is an AKA company. We reviewed Zhong Shan's business license, articles of association, capital verification report and financial statements, and none of these documents indicated that Chin-Shu Wooden is an AKA of Zhong Shan.[114] Furthermore, later in the SRA, Zhong Shan states that Chin-Shu wooden is actually a close affiliated company.[115] Because the record does not support Zhong Shan's claim that Chin-Shu Wooden is an "AKA" company, and instead indicates that Chin-Shu Wooden is a company distinct from Zhong Shan, we find that Chin-Shu Wooden is not an AKA company of Zhong Shan, and therefore, it was required to file a separate and complete application in order to be considered eligible for a separate rate. Because Chin-Shu Wooden did not file an SRA, we are continuing to not grant Chin-Shu Wooden a separate rate.

In light of our finding that Chin-Shu Wooden was a distinct company, and that the SRA was for Zhong Shan, and not Chin-Shu Wooden, in the *Preliminary Determination*, we did not grant Zhong Shan a separate rate given that its application was for two companies.[116] However, even if we examined the SRA filed on behalf of Zhong Shan only, we would reach the same conclusion that Zhong Shan is not eligible for a separate rate. Zhong Shan noted that "all subject merchandise exported to the United States were (*sic*) produced by Zhong Shan King Yuandun itself."[117] In its SRA, Zhong Shan noted that "Chin-Shu Wooden issued the sales documents such as invoice and packing list to the unaffiliated US customer and received payment from it."[118] Zhong Shan then provided a commercial invoice, packing list, bill of lading, and bank notice of payment receipt purportedly demonstrating one of its sales of subject merchandise to the United States.[119] None of the underlying documentation supported Zhong Shan's claim that it had produced or exported subject merchandise to the United States. Indeed, the documentation clearly indicated that its self-identified affiliated company Chin-Shu Wooden was actually the company that made the sale.[120] However, as discussed above, Chin-Shu Wooden did not, either separately or in Zhong Shan's SRA, request separate rate status.

We find Zhong Shan's argument that Commerce's separate rate denial constitutes an abuse of discretion to be misplaced. As explained above, Zhong Shan's SRA contained substantial inconsistencies. The record evidence simply does not support that Zhong Shan is the exporter, nor do we have verifiable information on which to rely to confirm its eligibility for a separate rate. Zhong Shan's SRA ambiguity, combined with evidence demonstrating Chin-Shu as the exporter, forecloses our ability to grant Zhong Shan a separate rate. We continue finding Zhong Shan ineligible for a separate rate and we, therefore, continue to find that it is part of the China-wide entity. Moreover, to the extent Zhong Shan is arguing that Chin-Shu Wooden is located in a market economy, we require an SRA providing ultimate ownership information in NME

---

[114] *Id*. at Exhibits 2, and 4-7.
[115] *Id*. at 12.
[116] *See Preliminary Determination* PDM at 18.
[117] *See* Zhong Shan SRA at 14.
[118] *Id*. at 13.
[119] *Id*. at Exhibit 1.
[120] *Id*.

24

proceedings.[121]  In any case, Zhong Shan omitted documentation supporting Chin Shu's Samoan domicile.[122]

## Comment 4:  Company Name for Supree

*Supree Case Brief*[123]
- Commerce granted Supree a separate rate using the name reported by Supree in response to the August SRA Supplemental.  However, Commerce should instead grant Supree a separate rate under the name "Supree (Fujian) Wood Co., Ltd.," which was provided in the company's SRA filing.
- It is Commerce's practice to correct errors in original information submitted by a respondent where the error is obvious from the administrative record.  Supree spelled its name correctly in both its SRA and quantity and value response.
- The spelling, "Fuijian," is obviously a misspelling of the Chinese province Fujian.

No other interested party provided comments on this issue.

**Commerce's Position:**  We have examined the information on the record and agree that we should grant Supree a separate rate under the name Supree (Fujian) Wood Co., Ltd., as stated in its SRA and quantity and value submissions.  We have corrected the company's name in our final determination.

## Comment 5:  Calculation of the Separate Rate Assigned to Non-Selected Companies

*Separate Rate Respondents Case Briefs*[124]
- If Commerce reduces the mandatory respondents' rates, it should also recalculate and reduce the separate rate companies' rate.
- If Meisen receives an AFA rate in the final determination, that AFA rate should be excluded from the separate rate calculation in continuance with the *Preliminary Determination*.

**Commerce's Position**:  We made changes to the margins calculated for Ancientree and Foremost for purposes of this final determination.  Because the dumping margin assigned to the companies who have received separate rates in this investigation is based on the weighted-average of these rates (excluding any rates based on AFA), we have also recalculated the margin assigned to the separate rates companies in accordance with our practice.[125]

---

[121] *See* SRA Template at 3.
[122] *See* Zhong Shan SRA at Exhibit 2.
[123] *See* Supree's Case Brief, "General Issues Case Brief," dated December 17, 2019, at 1-4.
[124] *See* Weihai Adornus Cabinetry Manufacturing Co., Ltd., *et. al.*,'s Letter, "Letter in Lieu of Brief," dated December 17, 2019; and Ronbow Hong Kong Limited's and Wuxi YuSheng Kitchen Bathroom Equipment Co., Ltd.'s Case Brief, "Case Brief," dated December 17, 2019.
[125] *See Decorative Plywood* IDM at Comment 1.

SV Comments

## Comment 6:  Surrogate Country

In the *Preliminary Determination*, we selected Romania as the primary surrogate country on the basis that Romania is at the same level of economic development as China, is a significant producer of comparable merchandise, and has reliable and useable SV data.[126]  In making this determination, we relied, in part, on the fact that the record contains financial statements from a producer of wooden furniture and wood products that separately identify energy expenses.[127]  These financial statements are from a Romanian company, S.C. Sigstrat S.A.  (Sigstrat).

*Ancientree Case Brief*[128]
- Commerce erred in its selection of Romania as the primary surrogate country in this investigation.  For purposes of the final determination, Commerce should rely on SVs from Malaysia instead.
- Commerce chose Romania as the surrogate country solely because Sigstrat's financial statements separately identify energy costs.  In so doing, Commerce failed to properly weigh other – even more important – factors, such as the fact that the record contains multiple financial statements from Malaysian producers of identical merchandise, higher import volumes into Malaysia for two of the most significant raw material inputs, and more specific SVs for labor costs and B&H expenses.
- With respect to the ten Malaysian financial statements on the record, Commerce declined to rely on four because they were from large investment companies involved in a variety of activities.  However, in the past, Commerce has relied on financial statements from companies with even more variety in their activities; therefore, Commerce can rely upon the statements from the four investment companies here.[129]
- Commerce declined to rely on three financial statements because they do not break out energy costs.  Given that Commerce often relies on financial statements which do not separately break out energy, Commerce's reasoning again was flawed.[130]  Commerce's decision was also unreasonable because the financial statements were from producers of identical merchandise (wooden furniture) or of products with very similar production

---

[126] *See Preliminary Determination* PDM at 14.
[127] *Id.*
[128] *See* Ancientree's Letter, "Case Brief, "dated December 17, 2019 (Ancientree Case Brief) at 1-11.
[129] *Id.* at 2-3 (citing *Chlorinated Isocyanurates Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 4852 (January 17, 2017) (*2014-2015 Chlorinated Isos*), and accompanying IDM at Comment 2; and *Chlorinated Isocyanurates Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 5053 (February 20, 2019) (*2016-2017 Chlorinated Isos*), and accompanying IDM at Comment 3).
[130] *See* Ancientree Case Brief at 1-2 (citing *Refillable Stainless Steel Kegs from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 84 FR 57010 (October 24, 2019); *see also Mattresses from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 84 FR 56761 (October 23, 2019); *Fine Denier PSF; Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 17781 (April 26, 2019); and *Xanthan Gum Final from the People's Republic of China:  Results of the Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 FR 6513 (February 14, 2018)).

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

processes (wooden table sets or beds).  In contrast, the information on the record shows that Sigstrat's primary activity is the manufacturing of plywood and veneer.

- There is substantial other evidence on the record to show that Malaysia is a significant producer of identical merchandise.  On the other hand, the record contains no information showing that Romania produces more than comparable merchandise, given that Sigstrat's financial statements are only for comparable products and the Romanian export data on the record are for a basket HTS category covering wooden furniture.

- With respect to raw materials, Romania's imports of birch and poplar sawn wood (two main inputs into the production of subject merchandise) were of uncommercial quantities, given that they were only 196 cubic meters ($M^3$) and 320 $M^3$, respectively.  These quantities are particularly low when considered in relation to both a containerload and Ancientree's own consumption.  Specifically, Ancientree consumed approximately 248 percent and 1,078 percent as much poplar and birch, respectively, during the POI than was imported into all of Romania, whereas Malaysia imported 691 percent and 369 percent more.  The CIT found in *Juancheng Kangtai* that Commerce must consider the respondent's actual purchasing and consumption in surrogate country selection.[131]

- To remedy lack of commercial import quantities of poplar and birch sawn wood into Romania, Commerce resorted to the use of imports under a six-digit level for the same HTS categories.  This was an inappropriate fix because it sacrificed specificity, the most critical factor in Commerce's analysis.[132]

- With respect to labor, the record contains only a general overall manufacturing rate in Romania, whereas the Malaysian labor rate on the record is for a "manufacturer of wooden and cane furniture."  Similarly, the record contains no information on Romanian B&H expenses, and, thus, Commerce relied on B&H values from "Europe and Central Asia" (countries that were not economically comparable to China).  Thus, the Malaysian data on the record are clearly superior.

*Foremost Case Brief*[133]

- Commerce should reconsider its selection of Romania as the primary surrogate country because it is not the source of best available information within the meaning of section 773(c)(1) of the Act.  Commerce should instead select Malaysia as the primary surrogate country.

- The record contains only one set of Romanian financial statements, from Sigstrat, a producer of plywood and molded wood products (neither of which is comparable merchandise).  Nothing on the record suggests that producers of plywood or molded wood have operations, capital structures, overhead, or expected profits similar to the experience of companies in the cabinets industry.

---

[131] *Id*. at 6-7 (citing *Juancheng Kantai Chem. Co. v. United States*, 2015 Ct. Intl. Trade LEXIS 94, *65-66, 78 (CIT 2015) (*Juancheng Kangtai*).

[132] *Id*. at 8-9 (citing *Taian Food Co. v. United States*, 783 F. Supp. 2d, 1292, 1330 (CIT 2011); *Qingdao Sea-Line*, 766 F. 3d at 1386 (Fed. Cir. 2014); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F. 3d 1316, 1320 (Fed. Cir. 2010); and *Certain Steel Threaded Rod; Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 FR 83800 (November 22, 2016), and accompanying IDM at 8.

[133] *See* Foremost's General Case Brief, "Foremost's General Issues Brief," dated December 17, 2019, at 1.

- The Malaysian financial statements are usable.  The petitioner acknowledges that the record contains financial statements from one Malaysian producer of identical merchandise (*i.e.*, Sin Heng Furniture Industries Sdn. Bhd. (Sin Heng)), and the fact that these financial statements are slightly outside the POI does not render them obsolete.[134]
- Commerce's practice is to consider the physical characteristics, end uses, and production processes of the various products when making a comparability determination.  Because assembly is required, the respondents' production process for subject merchandise is more similar to that of furniture than it is to the production process for plywood.
- The level of vertical integration and whether the financial statements allow Commerce to segregate indirect production expenses and the "production experience" are not material to Commerce's analysis, given that Commerce is not required to duplicate the exact production experience of the respondent or undertake an "item-by-item" analysis when computing factory overhead.[135]

*Petitioner Rebuttal Brief*[136]
- Commerce properly chose Romania as the primary surrogate country because it offered the best financial statements for calculating financial ratios. The Malaysian financial statements have serious flaws which render them unusable.
- Importantly, the Malaysian financial statements do not permit Commerce to calculate an accurate factory overhead ratio because they provide no breakout for any overhead expenses except depreciation.  Similarly, the Malaysian financial statements also do not separately identify energy costs, so Commerce would also have to disregard the respondents' energy FOPs.  This latter point alone renders the Malaysian financial statements inferior to Sigstrat's.
- Commerce correctly disregarded certain non-contemporaneous Malaysian financial statements because the record contained contemporaneous financial statements.  *Fish Fillets* is not on point, given that Commerce rejected non-contemporaneous financial statements, in preference for contemporaneous ones, in that case.
- Commerce correctly disregarded the Malaysian financial statements from large holding/investment companies.  *2014–2015 Chlorinated Isos* and *2016–2017 Chlorinated Isos* are also not on point, because Commerce did not consider the producers' level of integration in those cases but instead looked to whether the financial statements were the best available information overall.  Further, Commerce has a strong preference not to use financial statements from consolidated companies which reflect production of numerous non-comparable products.[137]
- There is no evidence indicating that any of the other Malaysian financial statements are for producers of identical merchandise, despite the respondents' claims to the contrary.  Rather, the Malaysian producers make only comparable merchandise, which Commerce

---

[134] *Id*. at 4 (citing *Certain Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and New Shipper Reviews; 2010-2011*, 78 FR 38002 (March 21, 2013) (*Fish Fillets*), and accompanying IDM at Comment 2).
[135] *Id*. at 5 (citing *Fish Fillets* IDM at Comment II).
[136] *See* Petitioner December 26 Rebuttal Brief at 4.
[137] *Id*. at 10-12 (citing *Pure Magnesium from the People's Republic of China:  Final Results of Antidumping Duty Review*, 73 FR 76336 (December 16, 2008) (*Pure Magnesium*), and accompanying IDM at Comment 6).

28

defined in the *Preliminary Determination* as "wooden furniture and wood products" as well as plywood and veneers.

- The record also shows that Sigstrat produces a large volume of wooden furniture, and not just plywood.  Therefore, even under the respondents' definition, Sigstrat also produces comparable merchandise.

- Commerce's determination that plywood and veneers are comparable merchandise is supported by Foremost's own production, because Foremost reported that it performs its own veneering.  Sigstrat's and Foremost's production processes are remarkably similar.

- There is no basis to conclude that furniture is more comparable to wooden cabinets than is plywood.  Wooden furniture covers a wide range of products, a large number of which (unlike cabinets) are complex and require special tooling to produce.  Further, many cabinets producers (including Foremost) also produce plywood.  It is immaterial that Foremost consumes the plywood as an input instead of selling it.[138]

- The Malaysian financial statements appear to cover a wide range of business operations, including all types of wooden furniture, such that there would be little correlation between the profit experience of the respondents and the Malaysian producers.  Further, Ancientree and Foremost have different levels of integration, which makes integration level a less important factor to consider; that said, Foremost's level of integration appears to be similar to Sigstrat's.[139]

- With respect to raw materials, Malaysia is incapable of producing almost all of the wood inputs used by respondents to make subject merchandise because these wood species cannot grow in the tropics (as they can in Romania).  This renders Romania's SVs for wood more of a broad-market average because Romania's imports compete with domestic production (whereas Malaysia's imports cannot).  The lack of domestic competition in Malaysia undoubtedly affects the pricing and availability of the inputs.

- Finally, the Romanian import values for birch and poplar sawn wood are comparable to the values into Malaysia, and Commerce correctly found in its *Preliminary Determination* that their import quantities were commercial.  Because Ancientree has offered no new facts, Commerce should continue to disregard this argument.[140]

**Commerce's Position:**  In the *Preliminary Determination*, we selected Romania as the primary surrogate country.  As detailed below, we continue to find that Romania is the appropriate surrogate country by which to value the respondents' FOPs in this investigation.

As explained in the *Preliminary Determination*,[141] when Commerce is investigating imports from an NME country, section 773(c)(1) of the Act directs it to base NV, in most circumstances, on the NME producer's FOPs, valued in a surrogate market economy (ME) country or countries considered to be appropriate by Commerce.  Specifically, in accordance with section 773(c)(4) of the Act, in valuing the FOPs, Commerce shall utilize, "to the extent possible, the prices or costs of FOPs in one or more {ME} countries that are:  (A) at level of economic development comparable to that of the {NME} country; and (B) significant producers of comparable

---

[138] *Id*. at 14.
[139] *Id*. at 14-15.
[140] *Id*. at 8.
[141] *See Preliminary Determination* PDM at 9.

merchandise."[142]   As a general rule, Commerce selects a surrogate country that is at the same level of economic development as the NME unless it is determined that none of the countries are viable options because:  (a) they either are not significant producers of comparable merchandise; (b) do not provide sufficiently reliable sources of publicly available SV data; or (c) are not suitable for use based on other reasons.[143]   Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh the difference in levels of economic development.  To determine which countries are at a similar level of economic development, Commerce generally relies solely on per capita Gross National Income (GNI) from the World Bank's World Development Report.[144]   In addition, if more than one country satisfies the two criteria noted above, Commerce narrows the field of potential surrogate countries to a single country (pursuant to 19 CFR 351.408(c)(2), Commerce "normally will value all factors in a single surrogate country") based on data availability and quality.

Consistent with our practice, and section 773(c)(4)(A) of the Act, we determined that Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia were countries at the same level of economic development as China, based on the most current annual issue of World Development Report.[145]   No party asserts that we should use a country not on this list.

Section 773(c)(4)(B) of the Act requires Commerce, to the extent possible, to value FOPs in a surrogate country that is a significant producer of comparable merchandise.  Neither the Act nor Commerce's regulations provide further guidance on what may be considered comparable merchandise.  Among the factors we consider in determining whether a country is a significant producer of comparable merchandise is whether the country is an exporter of comparable merchandise.[146]   In order to determine whether the above-referenced countries are significant producers of comparable merchandise, we examined which countries on the surrogate country list exported merchandise comparable to the subject merchandise.[147]   Consistent with our *Preliminary Determination*, we continue to find that information on the record indicates that all of the six countries listed above are significant exporters of merchandise covered by the HTSUS categories identified in the scope of this investigation, and are, thus, significant exporters of

---

[142] *See* Policy Bulletin 04.1:  Non-Market Economy Surrogate Country Selection Process (March 1, 2004) (Policy Bulletin 04.1) available on Commerce's website at *http://enforcement.trade.gov/policy/bull04-1.html*.
[143] *See, e.g.*, *Certain Quartz Surface Products from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*, 84 FR 23767 (May 23, 2019), and accompanying IDM at Comment 8.
[144] *See* Policy Bulletin 04.1.
[145] *See Preliminary Determination* PDM at 9; *see also* Commerce's Letter to All Interested Parties, "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information," dated June 17, 2019, which contains the Memorandum, "List of Surrogate Countries for Antidumping Investigations and Reviews from the People's Republic of China ('China')," dated August 2, 2018 (*i.e.*, the surrogate country list).
[146] *See, e.g.*, *Certain Fabricated Structural Steel from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 5376 (January 30, 2020), and accompanying IDM at Comment 2.
[147] *See Preliminary Determination* PDM at 11.

30

comparable merchandise.[148]  Accordingly, consistent with our *Preliminary Determination*, we find that Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia meet the significant producer of comparable merchandise prong of the surrogate country selection criteria, as provided in section 773(c)(4)(B) of the Act.[149]

If more than one potential surrogate country satisfy the statutory requirements for selection as a surrogate country, Commerce selects the primary surrogate country based on data availability and reliability.[150]  When evaluating SV data, Commerce considers several factors, including whether the SVs are publicly available, contemporaneous with the POI, representative of a broad market average, tax- and duty-exclusive, and specific to the inputs being valued.[151]  There is no hierarchy among these criteria.[152]  It is Commerce's practice to carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis.[153]

In the *Preliminary Determination*, we found that parties placed complete data for Malaysia and Romania on the record;[154] and that no party provided complete SV information for the other

---

[148] *Id*.; *see also* Memorandum, "Surrogate Value Memorandum for the Preliminary Determination," dated October 2, 2019 (Preliminary SV Memorandum) at Attachment 4.

[149] *See Preliminary Determination* PDM at 11.

[150] *See* Policy Bulletin 04.1; *see also, e.g., Citric Acid and Certain Citrate Salts from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 80 FR 77323 (December 14, 2015).

[151] *See* Policy Bulletin 04.1; *see also SolarWorld Americas, Inc. v. United States*, 910 F. 3d 1216, 1222 (Fed. Cir. 2018) *citing Qingdao Sea-Line Trading Co. v. United States*, 766 F. 3d 1378, 1386 (Fed. Cir. 2014) (*Qingdao Sea-Line*).

[152] *See, e.g., Certain Preserved Mushrooms from the People's Republic of China: Final Results and Final Partial Rescission of the Sixth Administrative Review*, 71 FR 40477 (July 17, 2006), and accompanying IDM at Comment 1.

[153] *See* Policy Bulletin 04.1.

[154] *See Preliminary Determination* PDM at 12; *see also* Petitioner's Letter, "Wooden Cabinets and Vanities and Components, Thereof from the People's Republic of China: Petitioner's Initial Surrogate Value Comments," dated August 7, 2019 (Petitioner SV Comments); Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Petitioner's Initial Rebuttal Surrogate Value Comments," dated August 19, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Petitioner's Final Surrogate Value Comments," dated September 3, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Petitioner's Comments on Respondents' Final Surrogate Value Comments," dated September 13, 2019; Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China: Preliminary Surrogate Value Submission," dated August 7, 2019 (Ancientree SV Comments); Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China: Rebuttal Preliminary Surrogate Value Submission," dated August 19, 2019; Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China: Final Surrogate Value Submission," September 3, 2019 (Ancientree Pre-prelim SV Comments); Meisen's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Surrogate Value Comments," dated August 7, 2019; Meisen's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Rebuttal Surrogate Value Comments," dated August 19, 2019; Foremost's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Foremost's Affirmative Surrogate Value Submission," dated August 7, 2019; Foremost's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Foremost's Rebuttal Surrogate Value Submission," dated August 19, 2019 (Foremost Rebuttal SV Comments); Foremost's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Foremost's Final Surrogate Value Submission," dated September 3, 2019 (Foremost Pre-prelim SV Comments); Wen Bo's Letter, "Wooden Cabinets and Vanities from the People's Republic of China: Surrogate Value Selection Comments," dated August 7, 2019; Wen Bo's Letter, "Wooden Cabinets and Vanities from the People's Republic of China: Surrogate Value Selection Rebuttal

countries on the list (*i.e.*, for Brazil, Kazakhstan, or Russia), or argued in favor of using SV information for any of the other countries.

In the *Preliminary Determination*, we found that the Romanian data constitutes the best available data for valuing respondents' FOPs because:  (1) we have complete, contemporaneous Romanian Global Trade Atlas (GTA) data for each input used by the respondents; and (2) the Romanian surrogate financial statements on the record are preferable to the Malaysian financial statements because these statements specifically break out energy costs from other manufacturing costs. Further, these statements are from a producer of wooden furniture (*i.e.*, chairs and tables), which is merchandise comparable to the merchandise under consideration in this investigation, and other wooden products (*i.e.*, plywood).[155]  Therefore, because complete SV information is available from Romania and the financial statements from Romania are reliable and more detailed than the Malaysian statements, we determined that the Romanian data are the best available source of SV data.[156]  The factual record in this case has not changed.  Nor have parties pointed to record evidence which is contrary to our findings for the *Preliminary Determination*. Therefore, we continue to find that Romania meets the criteria in section 773(c)(4) of the Act as being:  (1) at a similar level of economic development to China; and (2) a significant producer of comparable merchandise.  Furthermore, we find that Romania has the best data availability. Thus, we continue to find that Romania is the best choice for the surrogate country in this investigation.

We disagree with Ancientree and Foremost that Malaysia is a more suitable surrogate country because record evidence shows that it is a producer of identical merchandise.  Issues of contemporaneity and diversity of activities aside, while certain Malaysian financial statements cover the production and sale of wooden furniture (which is comparable to wooden cabinets and vanities), none of these financial statements, or any other record information, explicitly identify financial data for production or sales of in-scope wooden cabinets or vanities (the identical product).  For example, the website of Lii Hen Industries Bhd. (Lii Hen) contains images of items such as bed frames, nightstands, and dressers (items that appear to meet the description of the scope of the wooden bedroom furniture order instead),[157] and television stands.[158]  Similarly, the website of Poh Huat Resources Holdings Berhad (Poh Huat Resources) also contains images of wooden bedroom furniture and standalone tables and television stands that appear to contain as much metal as they do wood components.[159]  The website of Sin Heng clearly states that it specializes in "flat packed furniture such as Wardrobe, bedroom set, computer table, bookcase, office table, shoes rack and *etc.*"[160]  The website of CT Heng Furniture Sdn., Bhd. (CT Heng) contains numerous images of the very types of furniture produced by the Romanian company,

---

Comments," dated August 19, 2019; and Wen Bo's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Factual Information to Value Factors of Production," dated September 3, 2019.

[155] *See Preliminary Determination* PDM at 14; *see also* Petitioner SV Comments at Exhibit 10B.

[156] *Id*.

[157] *See*, *e.g.*, *Wooden Bedroom Furniture from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments in Part; 2017*, 84 FR 24749 (May 29, 2019), and accompanying IDM.

[158] *See* Ancientree Pre-prelim SV Comments at Exhibit 3.

[159] *Id.* at Exhibit 4.

[160] *See* Ancientree SV Comments at Exhibit 10.

32

tables and chairs, in addition to bed frames,[161] as do the websites of Yeo Aik Wood Sdn. Bhd. (Yeo Aik) and Latitude Tree Furniture Sdn. Bhd (Latitude).[162]  For these latter three companies, in addition to the absence of any record evidence that they produce identical merchandise, the lack of contemporaneity further detracts from their suitability as potential sources of surrogate financial ratios.  Indeed, the only information provided by Ancientree for companies that could potentially represent Malaysian producers of kitchen cabinets is limited to website information for those companies, rather than their financial statements.[163]  Thus, contrary to Ancientree's claims that the financial statements from Malaysia demonstrate that Malaysia is a significant producer of identical merchandise, none of the financial statements submitted by Ancientree appear to support its claim.  To the contrary, the Malaysian financial statements merely demonstrate that the Malaysian producers in question make wooden furniture such as tables and chairs, the very products produced by Sigstrat, and those products are comparable merchandise.  As a consequence, we find that none of the financial statements on the record are from producers of identical merchandise and all of these financial statements are, therefore, of equal suitability in terms of comparability of products produced.

Given that the record does not support the claim that the Malaysian financial statements are from producers of identical merchandise, and notwithstanding Ancientree's apparent concession that wooden tables and chairs represent comparable merchandise,[164] we look to the record information regarding Sigstrat to determine whether its statements continue to be a suitable source for valuation of the financial ratios in this investigation.  In the *Preliminary Determination*, Commerce stated that Sigstrat's financial statements represent the financial position of a profitable Romanian producer of comparable wooden products (*i.e.*, wooden furniture) that explicitly identify energy costs, are contemporaneous and cover the entire POI, and contain no evidence of countervailable subsidies.[165]

While the record does contain three contemporaneous financial statements from Malaysian producers of comparable merchandise, we find that Sigstrat's financial statements offer a higher level of data quality than do the Malaysian statements.  Significantly, Sigstrat's financial statements completely segregate two costs important to Commerce's analysis – energy and manufacturing overhead – whereas the Malaysian financial statements do not.

Although we agree with Ancientree that we have relied on financial statements that do not separately break out energy,[166] in instances where the record contains a usable set of SVs from one country, including financial statements that break out energy FOPs, and a comparably useable set of SVs from another country, but with financial statements that do not break out

---

[161] *Id.* at Exhibit 6.
[162] *Id.* at Exhibits 7 and 8.
[163] *Id.* at Exhibit 9.
[164] *See, e.g.*, Ancientree Case Brief at 4 (arguing the "much higher comparability of the Malaysian producers and noting the fact that "Yeo Aik Wood lists its principal activities as manufacturing and selling of furniture, in particularly (*sic*) wooden table sets and beds."); *see also* Ancientree Pre-prelim SV Comments at 1 ("Exhibits SV2-3 through SV2-8 contains financial statements from six Malaysian producers of comparable or identical merchandise." Product information for four of the six companies indicate production/sale of tables and chairs).
[165] *See Preliminary Determination* PDM at 14.
[166] *See* Ancientree Case Brief at 1-2.

energy costs, Commerce prefers to select the surrogate country that contains financial statements that break out energy.[167]  When Commerce is unable to segregate and, therefore, exclude energy costs from the calculation of the surrogate financial ratios, as is the case with the Malaysian financial statements on this record, it is Commerce's practice to disregard the respondents' energy inputs in the calculation of NV in order to avoid double counting energy costs which have necessarily been captured in the surrogate financial ratios.[168]  Disregarding the Romanian set of SVs and financial statements that break out energy would require that we sacrifice the accuracy of our calculations by not separately valuing multiple energy FOPs reported by respondents, and that were verified by Commerce, simply because we cannot determine where those energy FOPs are accounted for in the financial statements.  Thus, disregarding the respondents' actual energy FOPs would introduce uncertainty into our calculations.

With respect to manufacturing overhead, as noted by the petitioner, the Malaysian financial statements contain a level of detail that severely limits our ability to confidently calculate accurate financial ratios.[169]  As explained below in Comment 8, the Romanian financial statements contain a single item for production overhead, which represents all manufacturing costs that are not direct materials or direct labor and are indirect to the manufacturing operations of the company.  Because those statements also contain an itemized expense for energy costs, we are able to reduce the total amount of production overhead expenses by the value of Sigstrat's energy costs,[170] a calculation we cannot make using the Malaysian financial statements.  By contrast, not only do the Malaysian financial statements lack a detailed breakout of energy, but the manufacturing overhead they do identify is extremely limited, which raises the question of where energy and other indirect expenses are accounted for at all.  For example, the financial statements of Lii Hen only account for "Land and Buildings" and "Plant, machinery and equipment," and none of the other itemized expenses could conceivably include the cost of energy and other manufacturing costs that are not direct materials or direct labor and are indirect to the manufacturing operation of the company.[171]  Similarly, the financial statements of Yeo Aik only identify depreciation and rental expenses as overhead items and none of the other line-items appear to be related to indirect production expenses.[172]  The financial statements of Poh Huat

---

[167] *See, e.g.*, *Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, In Part*, 80 FR 34893 (June 18, 2015), and accompanying IDM at Comment 9 ("The Department's practice is to reject those financial statements that are not sufficiently detailed, and specifically, that do not contain a breakout for energy costs, when there are alternative financial statements on the record that contain a line item for energy costs.").

[168] *See, e.g.*, *Citric Acid and Certain Citrate Salts from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 74 FR 16838, 16839 (April 13, 2009), and accompanying IDM at Comment 2; *see also Certain Frozen Warmwater Shrimp from the People's Republic of China:  Preliminary Results, Partial Rescission, Extension of Time Limits for the Final Results, and Intent to Revoke, in Part, of the Sixth Antidumping Duty Administrative Review*, 77 FR 12801, 12809 (March 2, 2012), unchanged in *Administrative Review of Certain Frozen Warmwater Shrimp From the People's Republic of China:  Final Results, Partial Rescission of Sixth Antidumping Duty Administrative Review and Determination Not To Revoke in Part*, 77 FR 53856 (September 4, 2012).

[169] *See, e.g.*, Ancientree Pre-prelim SV Comments at Exhibits 3-8; Foremost Pre-prelim SV Comments at Exhibits 1-5.

[170] *See* Preliminary SV Memorandum.

[171] *See* Foremost Pre-prelim SV Comments at Exhibit 1.

[172] *See* Ancientree Pre-prelim SV Comments at Exhibit 7.

Furniture Industries Sdn Bhd (Poh Huat Furniture) only contain overhead items identified as "depreciation of property, plant and equipment," "direct operating expenses on investment properties," and "loss on disposal of property, plant, and equipment."[173]  Accordingly, we cannot determine whether all of the manufacturing overhead expenses are accounted for in these financial statements, or where those expenses are reflected in the financial ratios calculated by interested parties.  Thus, we find that reliance on the Malaysian financial statements to value manufacturing overhead would result in the undercounting of these costs.

We disagree with Ancientree that Commerce should disregard Sigstrat's financial statements because Sigstrat's primary activity may be the manufacturing of plywood and veneer.  Sigstrat's financial statements indicate that the company produces wood plywood, veneering, seats and backrests, chairs, tables, and other wooden products.[174]  As explained below, it is unclear whether Sigstrat's production is primarily wooden furniture or plywood, but the record indicates that wooden furniture has been the increasing focus of the company.  In addition, Foremost's production process includes elements that are very similar to Sigstrat's plywood, veneering, and wooden furniture processes.[175]

Accordingly, Sigstat's financial statements are at least an equally valid source of SV information as the Malaysian statements.  First, all parties recognize that Sigstrat is a significant producer of wooden furniture, making its financial statements a legitimate source of financial ratios on this point alone.  Second, while it is true that 50 percent of Sigstrat's sales in 2018 were of plywood and 47.3 percent of its sales were of molded products (i.e., chairs, tables, etc.),[176] those figures represent a proportion of sales rather than costs.  Accordingly, we cannot determine whether a majority of Sigstrat's production was of plywood products or wooden furniture.  However, Sigstrat's financial statements also state that the "objectives of the company continue to focus on the (sic) increasing the share of the production of molded elements in the total production."[177]  Indeed, the statements indicate that the relative share of furniture products has increased year over year since 2016 and that Sigstrat's development strategy is mainly based on increasing the production capacity and expanding production of wooden furniture.[178]  By contrast, of the Malaysian financial statements that are contemporaneous and are not from large conglomerates with diversified operations (i.e., for Lii Hen, Poh Huat Resources, and Yeo Aik), the record contains no information regarding the relative production amounts by product for either Yeo Aik or Poh Huat Furniture.  In fact, the financial statements of Poh Huat Furniture state that it is "principally engaged in the businesses of manufacturing and sale of furniture and investment holding,"[179] but there is no breakdown in the statements regarding the costs and revenues of these different business units.  Similarly, the financial statements of Lii Hen state that "{t}here are six major subsidiary companies that are involved in the manufacture of a vast range of wood

---

[173] Id. at Exhibit 5.
[174] See Petitioner SV Comments at Exhibit 10B (Sigstrat Statements) at 1.1.a and 1.1.2.
[175] See, e.g., Foremost's September 23, 2019 Supplemental Section D Questionnaire Response (Foremost September 23, 2019 SDQR) at 20 (noting labor hours for veneering related to "pasting veneers onto wooden board and semi-finished parts").
[176] Id. at 1.1.4. and Note 10.
[177] Id. at 1.1.2.a.
[178] Id. at 1.1.2.b.
[179] See Ancientree Pre-prelim SV Comments at Exhibit 5, page 1.

35

based products, namely bedroom sets, solid dinettes, office furniture, upholstery sofa set, utilities shelves, occasional items and kiln drying timber processing,"[180] but the statements do not indicate what proportion of production or sales is related to upholstered furniture, utility shelves, and office furniture, products that may or may not be considered comparable.  The statements also indicate that Lii Hen, in addition to furniture manufacturing, is also engaged in cultivation of rubber trees and investments, which could have further effects on the cost structure of the company that would adversely affect their suitability for calculating financial ratios in this investigation.[181]  Accordingly, although the Sigstrat statements identify the relative proportion of revenue earned in 2018 by product type, we do not find that those proportions necessarily render the statements any less appropriate for valuing surrogate financial ratios than the Malaysian statements, given that:  (1) we cannot determine based on the record whether Sigstrat primarily produced furniture or plywood; and (2) none of the Malaysian statements offer a superior level of detail.

We also disagree with Foremost that Sigstrat's financial statements are unsuitable because the respondents' production process for subject merchandise is more similar to that of furniture than to the production process for plywood.  As noted by the petitioner, Foremost's production process includes stages that are comparable to plywood production, indicating that the mix of products manufactured by Sigstrat involves a reasonably-comparable production process to the mandatory respondents.

Further, we disagree that we improperly disregarded each of the financial statements of the Malaysian producers, in preference to those of Sigstrat, a profitable Romanian producer of comparable wooden products (*i.e.*, chairs and tables).  As stated in the *Preliminary Determination*, four of these financial statements (*i.e.*, for Jay Corp Berhad, Latitude, Poh Huat Resources, and Sern Kou Resources Berhad) were from large holding/investment companies with numerous subsidiaries engaged in various activities that would not necessarily reflect the cost structure of a manufacturer of wood products.[182]  Further, an additional three financial statements (*i.e.*, for CT Heng, Latitude, and Sin Heng) are for periods prior to the POI.[183]  It is Commerce's practice to reject such financial statements, where other, more preferable, contemporaneous financial statements are on the record.[184]  Ancientree argues that Sin Heng is a producer of identical merchandise, and Commerce should accord this fact more weight than whether its financial statements cover the POI.  However, as explained above, there is nothing on the record to support the claim that any of the Malaysian financial statements are for companies that produce identical merchandise.

---

[180] *See* Ancientree Pre-prelim SV Comments at Exhibit 3, p 2.

[181] *Id.* at note 37.

[182] *See Preliminary Determination* PDM at 13; *see also Pure Magnesium* IDM at Comment 6 ('We agree with Petitioner and Datuhe that it is inappropriate to use Sterlite's audited financial statements to determine the surrogate financial ratios in this review.  Sterlite is a multinational corporation with operations in a number of countries.  It is the Department's practice to reject such financial statements, where other viable financial statements are on the record").

[183] *See Preliminary Determination* PDM at 13.

[184] *See, e.g.*, *Pure Magnesium* IDM at Comment 6 ("The Department also selects surrogate financial statements that are publicly available, comparable to the respondent's experience, and contemporaneous with the review period or period of investigation"); *see also* Policy Bulletin 04.1 ("In assessing data and data sources, it is the Department's stated practice to use,,, prices that are contemporaneous with the period of investigation or review").

36

With respect to the remaining three Malaysian financial statements on the record (*i.e.*, for Lii Hen, Poh Huat Furniture, and Yeo Aik),[185] while these financial statements could be potentially valid sources of information for surrogate financial ratios absent any other more preferable statements on the record, as noted above, we continue to have concerns regarding the manufacturing overhead expenses reported in these statements. Although we agree in principle that it is our preference to rely on multiple financial statements to determine the surrogate financial ratios in NME cases,[186]  section 773(c)(1)(B) of the Act requires Commerce to value FOPs based "on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." Because the record contains a set of financial statements that are contemporaneous, profitable, from a producer of comparable merchandise that identify the relative sales by product, and that do not suffer the same deficiencies regarding manufacturing overhead, and also break out energy, we do not find it preferable to resort to the Malaysian statements merely because there are more statements from Malaysian companies than there are from Romanian ones. Instead, based on the foregoing, we find that Sigstrat's financial statements represent the best available information by which to value financial ratios in this investigation, in accordance with section 773(c)(1) of the Act.

We also disagree with the respondents that the remaining Malaysian SV data on the record are necessarily better than the Romanian SV data. While Ancientree argues that the Malaysian GTA data for wood is more robust than the Romanian data, this argument hinges on the premise that small quantities are by definition "uncommercial" (and by implication unrepresentative or distortive). However, neither the record in this case, nor Commerce's practice in general, supports this premise. In making its argument, Ancientree fails to connect the quantity of the imports in question to their average unit value (AUV). Absent such a connection, Ancientree's argument is not meaningful. It is of no moment that Ancientree itself purchases wood in greater quantities. In the *Preliminary Determination*, we stated that Ancientree's claim is based solely on a comparison of the Romanian and Malaysian import quantities, an analysis, which alone, we find to be of limited value, and that "information on the import quantities or values for other countries on the surrogate country list would be more probative."[187]  We further stated that no parties submitted such data for us to evaluate.[188]  In light of the complete lack of evidence in this regard, as also discussed in Comment 7, below, Commerce has no basis to conclude that the AUVs computed using those quantities are unreliable.

---

[185] *See Preliminary Determination* PDM at 13.
[186] *See, e.g.*, *Pure Magnesium* IDM at Comment 6 ("We agree in principal with Petitioner that it is our preference to rely on multiple financial statements to determine the surrogate financial ratios in NME cases. (citation omitted) However, section 773(c)(1)(B) of the Act requires the Department to value FOPs based 'on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.'").
[187] *See Preliminary Determination* PDM at 13.
[188] *Id.*

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

Further, Commerce does not use quantity *per se* to determine whether a small import quantity necessarily results in an aberrational import value.[189]  When Commerce undertakes an analysis as to whether certain SVs are aberrational or unreliable for purposes of calculating an AD margin, it applies certain criteria in making a decision.  First, Commerce's practice is to compare the SVs in question to the GTA AUVs calculated for the same period using data from the other potential surrogate countries on the surrogate country list, to the extent that such data are available.[190]  Commerce has also examined data from the same HTS subheading for the surrogate country over multiple years to determine if the current data appear aberrational with respect to historical values.[191]  The record of this investigation contains SV data for Malaysia and Romania, but no data for the other countries on the surrogate country list, Brazil, Kazakhstan, Mexico, and Russia.[192]  Nor did interested parties submit any data for any of the potential surrogate countries for any period outside of the POI.  Accordingly, a comparison between two data points, Malaysia and Romania import values, only during the POI, without any historical context, does not allow us to conclude that the import values associated with the import quantities for Romania are aberrational values or otherwise unusable.  In any dataset there will inevitably be a highest and lowest value, but pointing to the lowest value in a dataset alone is insufficient grounds to conclude that the value is somehow distortive or unreasonable.[193]  No parties submitted wood import data for the POI for Brazil, Kazakhstan, Mexico, or Russia, which prevents us from determining whether the Malaysian AUV is within the range of AUVs from those countries or whether it is an outlier relative to those AUVs.  Similarly, absent any historical context for the AUVs from Romania, or any of the other countries on the surrogate country list, we cannot determine whether there was a sharp drop in the Romanian data during the POI that could impugn the reliability of the POI data.  For those same reasons, we cannot draw any conclusions as to the commercial significance of the Romanian import quantities relative to any country other than Malaysia, which, as a single data point, is too limited to permit a meaningful analysis.

Although Ancientree points to *Juancheng Kangtai* for the proposition that Commerce must consider the respondent's actual purchasing and consumption in surrogate country selection,[194] we disagree that the decision in *Juancheng Kangtai* compels a one-dimensional comparison between a respondent's consumption and the import quantities under consideration.  Specifically,

---

[189] *See, e.g.*, *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 23 CIT 479, 485, 59 F. Supp. 2d 1354, 1360 (CIT 1999).

[190] *See, e.g.*, *Carbazole Violet Pigment 23 from the People's Republic of China:  Final Results of Antidumping Administrative Review*, 75 FR 36630 (June 28, 2010) (*Carbazole Violet Pigment*), and accompanying IDM at Comment 4, and *Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part:  Certain Lined Paper Products from the People's Republic of China*, 71 FR 53079 (September 8, 2006) (*Lined Paper Products*), and accompanying IDM at Comment 5.

[191] *See, e.g.*, *Lightweight Thermal Paper from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 73 FR 57329 (October 2, 2008) (*Lightweight Thermal Paper*), and accompanying IDM at Comment 10; and *Saccharin from the People's Republic of China:  Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 71 FR 7515 (February 13, 2006) (*Saccharin*), and accompanying IDM at Comment 5.

[192] *See Preliminary Determination* PDM at 12.

[193] *See Jinan Farmlady Trading Co. v. United States*, 228 F. Supp. 3d 1351, 1356 (CIT 2017) ("First, Farmlady focuses on the data for Indian imports of packaging tape from Nepal, asserting broadly that this data was 'aberrational and low' because it reflects a value that is lower than the average value.  But merely showing that a price is low is not enough").

[194] *See* Ancientree Case Brief at 6-9.

the record in *Juancheng Kangtai* included comprehensive data regarding various AUVs for each country on the surrogate country list in the underlying review, which allowed a detailed discussion and analysis of the prices and quantities traded among countries on the surrogate country list.[195]  Importantly, those facts allowed Commerce to analyze whether an allegedly non-commercial quantity was consistent with other import volumes and whether the input in question was often traded in smaller quantities.[196]  On remand, Commerce was able to conclude, based on a detailed analysis of price and quantity, that transactions are made at commercial quantities when they are competitive commercial transactions, either large or small, and that a finding that import volumes are commercial is not exclusively tied to a respondent's consumption levels.[197]  The CIT ultimately sustained Commerce's conclusion in *Juancheng Kangtai II* that an allegedly small quantity was, in fact, a commercial quantity, but Ancientree has failed to provide the requisite data for Commerce to conduct such an analysis.[198]  Accordingly, and as further discussed below at Comment 7, Ancientree's claim that the Romanian import values for birch and poplar are associated with commercially insignificant quantities and somehow not reliable SVs by which to value FOPs in this investigation is not supported by the record and does not persuade us that Romania is a less suitable primary surrogate country than Malaysia.

Ancientree also contends that valuing birch and poplar sawn wood using the Romanian six-digit level HTS subheading sacrifices specificity, which is a crucial factor in our analysis.[199]  As explained below at Comment 7, however, the record does, in fact, support the valuation of birch and poplar using the Romanian six-digit level HTS without sacrificing specificity (*i.e.*, the SV is specific to the input consumed by the respondents, birch and poplar sawn wood).

Finally, with respect to Ancientree's argument that the Malaysian data are superior to that of Romania because the labor rate is for "manufacture of wooden and cane furniture"[200] and because the brokerage and handling SV is more specific, we disagree that the selection of the primary surrogate country in this investigation is most appropriately decided by the suitability of these two factors.  With respect to labor, we note that Ancientree's suggested SV is for "manufacture of wooden and cane furniture," but Ancientree did not provide a definition of "cane furniture" and the source data does not provide any information as to the relative proportion that "cane furniture" comprises of the overall industry.  Thus, it is unclear that this SV

---

[195] *See Juancheng Kangtai*, 2015 CIT LEXIS 94, *66-69 ("Kangtai lists the import data for each country on the OP list (Indonesia, Costa Rica, the Philippines, Colombia, South Africa, and Thailand), the total US$ value and total quantities in kilograms, the AUV, and the percentage out of total kilograms for all listed country's import data. Of those, the Philippines' AUV is the lowest at US$0.21/kg (or US$210 per metric ton), while Indonesia and Costa Rica, with total imports in metric tons of 2,305.6 and 1,887.2, respectively, both show AUVs of US$0.54/kg (US$ 540 per metric ton).  Colombia, South Africa, and Thailand, with total imports in metric tons of 84.0 9.7 and 3.0, respectively, display AUVs of US$0.50, US$ 3.54, and US$ 3.40, respectively.").

[196] *See Juancheng Kangtai Chem. Co. v. United States*, 2017 CIT LEXIS 3, *26-31 (CIT 2017) (*Juancheng Kangtai II*) ("Commerce explained that transactions are made at 'commercial quant{ities}' when they 'reflect market values', '*i.e.*, competitive commercial transactions, either large or small.'", ". . . these examples indicated that the chemical was commercially traded in quantities smaller than Kangtai's annual consumption.").

[197] *Id.*

[198] *See, e.g.*, *QVD Food v. United States*, 658 F. 3d 1318, 1324 (Fed. Cir. 2011) (*QVD Food*) ("{T}he burden of creating an adequate record lies with {interested parties} and not with Commerce.").

[199] *See* Ancientree Case Brief at 8-9.

[200] *See* Ancientree Case Brief at 9; *see also* Ancientree SV Comments at Exhibit 4.

is more representative of the respondents' own labor rates than the Romanian SV, based on general manufacturing operations. (For example, cane furniture may represent a woven product that is manufactured without the various hardware components required to produce the subject merchandise.) Although it is true that the labor rate used in the *Preliminary Determination* was for manufacturing generally,[201] the record also contains a Romanian labor rate for wages in general.[202] It is evident that the manufacturing wage rate is lower than the general wage rate and there is no evidence on the record that would suggest a wage rate specific to furniture manufacturing would necessarily be any more precise, or that the Romanian manufacturing wage rate is any less specific to labor associated with merchandise under consideration than a wage rate for "cane furniture."

With regard to the Malaysian SV for brokerage and handling, we agree with Ancientree that the Romanian SV used in the *Preliminary Determination* was not specific to Romania and, therefore, the Malaysian SV is superior to the Romanian SV. While it is true that we have a regulatory preference for valuing all FOPs in a single surrogate country,[203] the CIT has held that such a preference must still yield to reason and the sourcing of particular SVs from outside the primary surrogate country.[204] Accordingly, we have used the Malaysian SV for B&H for this final determination.[205] However, based on the totality of circumstances, and in consideration of the analysis of record information related to financial ratios, birch and poplar wood inputs, and labor, above, we do not find that the superiority of an SV for B&H warrants a departure from our conclusion in the *Preliminary Determination* that Romania is the superior selection as the primary surrogate country for this final determination.

**Comment 7: SVs for Birch and Poplar**

Prior to the *Preliminary Determination*, Ancientree argued that Romanian imports for birch and poplar sawn wood, its primary inputs, were based on insignificant and uncommercial quantities for purposes of use as surrogate values.[206] Commerce acknowledged this, and in response, "noted that Ancientree merely asserted the import volume was insignificant and non-commercial rather than identifying a basis of this evaluation."[207] We then relied on the Romanian GTA data for imports of birch and poplar sawn wood, at the HTS six-digit (for Ancientree) or eight-digit (for Foremost) level, in our margin calculations.

---

[201] *See* Preliminary SV Memorandum.
[202] *See* Petitioner SV Comments at exhibit 5.
[203] *See* 19 CFR 351.408(c)(2).
[204] *See, e.g.*, *Juancheng Kangtai*, 2015 CIT LEXIS 94, *71.
[205] *See* Ancientree SV Comments at Exhibit 7, page 44; *see also* Memorandum, "Surrogate Value Memorandum for the Final Determination," dated February 21, 2020 (Final SV Memorandum).
[206] *See* Ancientree Case Brief at 6 (citing Ancientree's Letter, "Pre-Preliminary Comments," dated September 19, 2019 (Ancientree Pre-Preliminary Comments).
[207] *See* Ancientree Case Brief at 6 (citing *Preliminary Determination* PDM at 12).

Barcode:3946193-01 A-570-106 INV - Investigation  -

*Petitioner Case and Rebuttal Briefs*[208]
- There does not appear to be a reason why Commerce used the six-digit HTS code to value Ancientree's birch and poplar inputs since all other inputs were valued at the HTS eight-digit level.
- Commerce used the eight-digit categories to value birch and poplar reported by Foremost; there is no reason to treat the respondents differently.
- The Malaysian and Romanian import statistics for the wood inputs are equivalent, except that the Romanian data represent broad-market averages, whereas the Malaysian data do not.  In particular, Malaysia lacks domestic production for the temperate-climate hardwoods consumed by respondents, resulting in import values that do not compete with a domestic industry.[209]
- Even though there are HTS values for these wood inputs from Malaysia, they must be considered inferior in terms of their availability and reliability in comparison with Romania, which has vast forests located in the growing region of these wood species.
- The Romania HTS values are comparable to the Malaysian HTS for birch and poplar and constitute commercial quantities.

*Ancientree Case and Rebuttal Brief*[210]
- Commerce should base the SV for birch and poplar sawn wood on Malaysia GTA data for the final determination.  The Romanian values are insignificant and uncommercial when viewed in the context of a common commercial quantity of a container load and Ancientree's own commercial consumption and purchasing.[211]
- Commerce sacrificed specificity in resorting to the six-digit level, as the categories cover "wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded, or end-jointed."  This is dissimilar to Ancientree's consumed sawn wood.  However, the Malaysian HTS numbers at the eight-digit level specifically cover "Other than Planed, sanded or end-jointed:  Other than Sawn lengthwise and sliced or peeled" and are more specific to the inputs that Ancientree consumes.[212]
- The quantities for the SVs at the Romanian six-digit level are still too small to be reliable.[213]  Ancientree consumed 1,072 percent as much birch sawn wood during the POI than was imported by Romania overall.[214]
- While Ancientree agrees specificity is a critical component in SV selection, Commerce chose not to rely on the Romanian eight-digit HTS category because it considered the import volume too small to be commercial.
- Commerce should not rely upon the eight-digit HTS category suggested by the petitioner as it contains an even a smaller volume than the six-digit category.  If Commerce must

---

[208] *See* Petitioner's Case Brief, "Case Brief Regarding General and Ancientree-Specific Issues," dated December 17, 2019 (Petitioner December 17 Case Brief) at 33; *see also* Petitioner's December 26 Rebuttal Brief at 5-8.

[209] *See* Petitioner December 26 Rebuttal Brief at 8.

[210] *See* Ancientree Case Brief at 1-10; and Ancientree's Rebuttal Brief, "Rebuttal Brief," dated December 26, 2019 (Ancientree Rebuttal Brief).

[211] *See* Ancientree Case Brief (citing Ancientree Pre-Preliminary Comments at 5).

[212] *Id.* at 8.

[213] *See* Ancientree Case Brief at 7 (citing Preliminary SV Memorandum at 3e).

[214] *See* Ancientree Case Brief at 7 (citing Ancientree's Letter, "Section C & D Questionnaire Response," dated July 19, 2019 (Ancientree July 19, 2019 DQR) at exhibit D-2.1).

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

rely upon Romanian values, it must proceed with the six-digit HTS level due to the import quantity.

**Commerce's Position**:  We agree with the petitioner that there is no basis for using different SVs for the mandatory respondents in this proceeding to value the same input.  However, we note that we inadvertently valued the birch and poplar inputs for Foremost at the eight-digit level when we stated in the *Preliminary Determination* that we intended to value poplar and birch sawn wood inputs at the six-digit level.[215]  We have corrected this error for the final determination.

As explained above in Comment 6, Commerce applies certain criteria in determining whether certain SVs are aberrational or unreliable for purposes of calculating an AD margin.  Specifically, our practice is to compare the SVs in question to the GTA AUVs calculated for the same period in other potential surrogate countries, to the extent that such data are available, and also to examine data from the same HTS category for the surrogate country over multiple years to assess whether the data are aberrational in a historical context.[216]  No interested party provided such data so that we may undertake an informed and reasonable analysis of the reliability of these particular Romanian SVs.  Furthermore, the CIT has held that, "…when faced with a choice between two imperfect options, it is within Commerce's discretion to determine which choice represents the best available information."[217]  Accordingly, we cannot conclude that the Romanian import values are aberrational or otherwise unusable for this final determination.  Consequently, when presented with these two choices (Romania or Malaysia data to value the FOP), we find it appropriate to select the option from our primary surrogate country, which is Romania.

In the *Preliminary Determination*, we stated that "Ancientree merely asserts that the Romanian import values are based on insignificant and non-commercial quantities, but does not identify a basis for evaluating when an import volume becomes an insignificant or no longer commercial quantity."[218]  In its case brief, Ancientree averred that in its pre-preliminary comments it "also explained that the import volume into Romania was non-commercial (1) based on the common commercial quantity of a container load and (2) based on its own commercial consumption and purchasing."[219]  However, Ancientree's pre-preliminary comments were based on the quantities suggested by the petitioner at the eight-digit HTS subheading and not the six-digit level that we used in the *Preliminary Determination*.  Moreover, merely pointing to the relative difference between an import quantity and an interested party's own consumption or the common commercial quantity of a standard container load does not necessarily make a quantity commercially insignificant, nor does it speak to the reliability of such an import value.[220]

---

[215] *See Preliminary Determination* PDM at 13.

[216] *See, e.g.*, *Carbazole Violet Pigment* IDM at Comment 4; *Lined Paper Products* IDM at Comment 5; *Lightweight Thermal Paper* IDM at Comment 10; and *Saccharin* IDM at Comment 5.

[217] *See CS Wind Vietnam Co., Ltd. and CS Wind Corporation v. United States*, Slip Op. 14-33 at 26 (CIT 2014) (citing *Dorbest Ltd. v. United States*, 30 CIT 1671, 1687, 462 F. Supp. 2d 1262, 1277 (CIT 2006)).

[218] *See Preliminary Determination* PDM at 12.

[219] *See* Ancientree Case Brief at 6 (citing Ancientree Pre-Preliminary Comments at 5).

[220] *See, e.g.*, *Certain Frozen Warmwater Shrimp from the People's Republic of China:  Final Results of Administrative Review; 2011-2012*, 78 FR 56209 (September 12, 2013), and accompanying IDM at Comment 4; and

42

Although Ancientree points to *Juancheng Kangtai* for the proposition that Commerce must consider the respondent's actual purchasing and consumption in surrogate country selection,[221] as explained above in Comment 6, we disagree that the decision in *Juancheng Kangtai* compels a one-dimensional comparison between a respondent's consumption and the import quantities under consideration.  Rather, the record in *Juancheng Kangtai* allowed Commerce to conduct a detailed analysis of the quantities, and AUVs, in other countries on the surrogate country list,[222] and the CIT ultimately sustained Commerce's conclusion in *Juancheng Kangtai II* that an allegedly small quantity was, in fact, a commercial quantity.[223]

We acknowledge Ancientree's argument that valuing birch and poplar at the Romanian HTS six-digit level does not cure the perceived problem because the import quantities at that level remain small.[224]  However, using the average wood densities of birch and poplar reported by Ancientree,[225] the Romanian quantities at the six-digit level for birch and poplar were equal to 173,530 kg and 137,700 kg, respectively, which do not appear to be immaterial, nor has Ancientree explained by what metric, other than relative to its own consumption, such volumes would be considered insignificant.  In the *Preliminary Determination*, we stated that Ancientree's claim is based solely on a comparison of the Romanian and Malaysian import quantities, an analysis, which alone, we find to be of limited value, and that "information on the import quantities or values for other countries on the surrogate country list would be more probative."[226]  We further stated that no parties submitted such data for us to evaluate.[227]  In light of the complete lack of evidence in this regard, Commerce has no basis to conclude that the AUVs computed using those quantities are unreliable.  That said, it is important to recognize that Commerce does not directly use the import quantities at issue in its SV calculations, other than as the denominators when computing per-unit values.  As noted above, Ancientree has not argued, nor has it provided any reason for Commerce to believe, that the values associated with those quantities are in any way unrepresentative of the prices that Ancientree itself would pay, were it located in an ME country at a comparable level of economic development to China.

Finally, Ancientree argues that Commerce sacrificed specificity in resorting to the six-digit level HTS subheading because such subheadings include wood that is "sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded, or end-jointed of a thickness exceeding 6 mm."[228]  However, after examining the data on the record, we disagree.  Although Ancientree asserts that its "wood inputs are not planed or end-jointed" (and, therefore, reliance on such HTS subheadings includes dissimilar wood products)[229] Ancientree cites to no record evidence to support this claim, nor does the record appear to describe Ancientree's wood inputs in any detail

---

*Certain Preserved Mushrooms from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 77 FR 55808 (September 11, 2012), and accompanying IDM at Comment 3.
[221] *See* Ancientree Case Brief at 6-9.
[222] *See Juancheng Kangtai*, 2015 CIT LEXIS 94, *66-69.
[223] *See Juancheng Kangtai II*, 2017 CIT LEXIS 3, *26-31.
[224] *See* Ancientree Case Brief at 6-7.
[225] *See* Ancientree's September 6, 2019 Supplemental Questionnaire Response (Ancientree's September 6, 2019 SQR) at Exhibit 15.
[226] *See Preliminary Determination* PDM at 13.
[227] *Id.*
[228] *See* Ancientree Case Brief at 8.
[229] *Id.*

greater than "birch sawnwood" or "poplar sawnwood."[230]  In any event, there is no requirement that Commerce needs to perfectly replicate a NME respondent's production experience.[231]  Given the lack of detail provided by Ancientree in its questionnaire responses regarding the physical characteristics of its wood inputs, the record lacks support for Ancientree's assertions and there is no basis for Commerce to rely on them here.  The burden to develop the record lies with the respondent,[232] and to accept Ancientree's claim as to the description of its wood input at face value without any support at this late stage would be inappropriate.  On the other hand, Foremost reported that it purchased both poplar sawnwood and semi-finished wood components (*e.g.*, cut-to-length poplar),[233] and it provided no additional detail regarding its birch sawnwood input.  Therefore, we find that the six-digit level poplar HTS subheading is, in fact, the most appropriate subheading by which to value Foremost's poplar input and, absent any additional detail, we cannot conclude that an eight-digit level HTS subheading would be any more specific or appropriate than the six-digit HTS subheading level for Foremost.

Accordingly, we are making no changes to the valuation of wood inputs at the six-digit level as stated in *Preliminary Determination*.  However, because we inadvertently valued Foremost's birch and poplar inputs using the eight-digit HTS numbers, we are revising the valuation of Foremost's birch and poplar inputs to conform with our decision in the *Preliminary Determination* for this final determination.[234]

## Comment 8:  Calculation of Financial Ratios

In the *Preliminary Determination* we valued the respondents' financial ratios using the audited financial statements of Sigstrat because we found its statements to "represent the financial position of a profitable Romanian producer of comparable wooden products (*i.e.*, plywood, chairs, tables) that explicitly identify energy costs, are contemporaneous and cover the entire POI, and contain no evidence of countervailable subsidies."[235]  In order to segregate energy costs, and thereby ensure that we did not double count when valuing the respondents' energy FOPs, we deducted energy expenses identified in Sigstrat's profit and loss statement from its indirect production expenses identified in Note 7 to the statements.[236]

*Petitioner Case Brief*[237]
- Commerce should not have deducted "Other outside expenses (with energy and water)" of 1,534,472 Romanian lei from the factory overhead category.

---

[230] *See, e.g.*, Ancientree's September 18, 2019 Supplemental Questionnaire Response at Exhibit 12; and Ancientree July 19, 2019 DQR at Exhibits 3 (production flowchart) and 4 (FOP Spreadsheet).

[231] *See Juancheng Kangtai II*, 2017 Ct. Intl. Trade LEXIS 3, at 31 (citing *Nation Ford Chem. v. United States*, 166 F. 3d 1373, 1378 (Fed. Cir. 1999)).

[232] *See, e.g., QVD Food*, 658 F. 3d at 1324 ("{T}he burden of creating an adequate record lies with {interested parties} and not with Commerce.").

[233] *See* Foremost July 22, 2019 CDQR, section D, at 14-15.

[234] *See* Final SV Memorandum.

[235] *See Preliminary Determination* PDM at 13-14.

[236] *See* Preliminary SV Memorandum at Attachment 12; *see also* Sigstrat Statements.

[237] *See* Petitioner December 17 Case Brief at 32-33.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

- There is no reason to assume that energy costs formed part of "Indirect Production Costs" because these two categories of expenses came from different calculations in the statements.
- "Indirect Production Costs" are identified in Note 7, while "Other outside expenses (with energy and water)" are located in the profit and loss statement.
- Based on the category name, "Other outside expenses (with energy and water)" seem to include other costs in addition to energy and water.

No other interested party provided comments on this issue.

**Commerce's Position:** We disagree with the petitioner and continue to find that we calculated the financial ratios used in the *Preliminary Determination* correctly and that we appropriately reduced "Indirect Production Costs" by an amount for energy expenses.[238]

Although the petitioner argues that our adjustment was inappropriate because the energy costs in question did not come from the same schedule in Sigstrat's financial statements as the indirect production expenses (*i.e.*, energy was identified in the profit and loss statement while indirect production expenses were in note 7),[239] our calculations are nearly identical to those proposed by the petitioner but for the deduction of energy costs from indirect production costs.[240]  However, because the petitioner's own calculation utilized data from the profit and loss statement, the balance sheet, and Note 7 of the Sigstrat statements, the fact that we deducted energy expenses identified in the profit and loss statement from indirect production expenses identified in a note to the statements in and of itself does not render the calculation inappropriate.

The petitioner appears to argue against our adjustment simply on the grounds that we deducted one value from the profit and loss statement from a value located in a separate note to the financial statements.  However, the petitioner ignores the fact that its own calculations also incorporated values from various schedules of the statements.  In order to determine how Sigstrat presented these expenses and how they should be treated in our calculation, we examined the statements as a whole, a process also used by the petitioner when it pulled data from various schedules in order to calculate financial ratios.  The only difference between the petitioner's calculation and Commerce's calculation is the treatment of energy expenses.

Specifically, a line item described as "Other outside expenses (with energy and water)" is set forth in Note 7 of the financial statements.  These expenses are also identified in the same amount elsewhere in the statements specifically as "Energy costs."[241]  Accordingly, we disagree with the petitioner that this expense item necessarily includes costs other than energy because the cash flow statement explicitly identifies this item as "Energy costs."  Moreover, the amount identified as "Indirect Production Costs" from which we deducted the energy costs is also identified elsewhere in the statements in the same amount as "Production overheads."[242]  Accordingly, record evidence indicates that we appropriately categorized indirect production

---

[238] *See* Preliminary SV Memorandum.
[239] *See* Sigstrat Statements.
[240] *Id.* at Exhibit 10A; compare to Preliminary SV Memorandum at Attachment 12.
[241] *See* Sigstrat Statements at 12 (Situation of Cash Flows).
[242] *Id.* at Exhibit page 64 (Note 4, Operating Result Analysis).

expenses as manufacturing overhead, which represent all manufacturing costs that are not direct materials or direct labor and are indirect to the manufacturing operation of the company, and appropriately reduced that amount by Sigstrat's energy costs. Therefore, we are not making any changes to our calculation of the financial ratios for this final determination.

## Comment 9: Labor Rate Calculation

In our *Preliminary Determination*, we calculated the hourly labor rate using manufacturing-specific data from Romania.[243] We relied on manufacturing-specific labor data from the website Trading Economics. We calculated a manufacturing-specific labor rate of 20.97 Lei per hour.

*Petitioner Case Brief*[244]
- In order to calculate an hourly labor rate in the *Preliminary Determination*, Commerce divided the monthly wages reported for Romania on the website Trading Economics by 24 days and eight hours per day.
- Data submitted from the Organization for Economic Cooperation and Development (OECD) data indicate that the actual number of hours worked in Romania is much less.
- Commerce's calculation overestimates the average number of hours worked per month because it does not account for vacation days, sick days, idle time, or holidays.
- Commerce should revise its labor calculation using the number of hours worked reported by the OECD.

*Ancientree Rebuttal Brief*[245]
- It is not Commerce's practice to use a secondary, unrelated source to determine an hourly conversion. Commerce should not depart from its established practice of using the typical working hours of 24 days a month and eight hours day.
- The proposed OECD annual labor hours are not specific to Romania; instead, they are from a basket category of OECD countries.
- Relying on the OECD source would be inaccurate and imprecise.

**Commerce's Position:** Our labor rate calculation was appropriate and in accordance with our normal practice. In *Labor Methodologies*, Commerce announced a change in our methodology for valuing the cost of labor in NME cases.[246] Although Commerce stated a preference for data from the International Labor Organization, it did not preclude reliance on data from another source.[247] Notably, Commerce explained that "{w}here data is not available on a per-hour basis, {Commerce} converts that data to an hourly basis based on the premise that there are 8 working hours per day, 5.5 working days a week and 24 working days per month."[248] Accordingly, in the *Preliminary Determination*, we divided the monthly manufacturing labor rate in Romania by 24

---

[243] *See* Preliminary SV Memorandum at 4.
[244] *See* Petitioner December 17 Case Brief at 30-32.
[245] *See* Ancientree Rebuttal Brief at 14-15.
[246] *See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 FR 36092 (June 21, 2011) (*Labor Methodologies*).
[247] *Id.*
[248] *Id.* at 36094, fn. 11.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

Barcode:3946193-01 A-570-106 INV - Investigation  -

days and eight hours per day, in accordance with our practice.[249]  Using the OECD data suggested by the petitioner for "countries not otherwise mentioned" would substitute our methodology for a methodology that is not specific to Romania and that utilizes secondary sources that are unrelated to the source used to value labor.  In *Labor Methodologies*, Commerce announced a change in our methodology for valuing the cost of labor in NME cases.[250] Although Commerce stated a preference for data from the International Labor Organization, it did not preclude reliance on data from another source.[251]  Notably, Commerce explained that "{w}here data is not available on a per-hour basis, {Commerce} converts that data to an hourly basis based on the premise that there are 8 working hours per day, 5.5 working days a week and 24 working days per month."[252]  Accordingly, in the *Preliminary Determination*, we divided the monthly manufacturing labor rate in Romania by 24 days and eight hours per day, in accordance with our practice.[253]  Using the OECD data suggested by the petitioner for "countries not otherwise mentioned"[254] would substitute our methodology for a methodology that is not specific to Romania and that utilizes secondary sources that are unrelated to the source used to value labor.  Furthermore, the petitioner has not demonstrated that the labor rate reported by Trading Economics does not account for vacation days, sick days, or holidays, or that workers are not paid for such days.

Therefore, we continue to find that our calculation of the hourly labor rate applied in the *Preliminary Determination* using monthly manufacturing labor data published by Trading Economics was the appropriate calculation and in accordance with our normal practice. Accordingly, we are not making any changes to our labor rate calculation for this final determination.

---

[249] *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 FR 35616 (July 27, 2018), and accompanying IDM at Comment 11.

[250] *See Labor Methodologies*.

[251] *Id.*

[252] *Id.* at 36094, fn. 11.

[253] *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 FR 35616 (July 27, 2018), and accompanying IDM at Comment 11.

[254] Although the petitioner claims that the number of hours worked is on the record of this investigation, it cites to data for "OECD countries not individually mentioned," not to data specific to Romania and no data exist for Romania in the petitioner's cited comments.  *See* Petitioner December 17 Case Brief at 31; *see also* Petitioner SV Comments at Exhibit 5C.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

<u>Company-Specific Comments</u>

*Ancientree*

**Comment 10: Whether to Apply AFA to Ancientree**

###### A. Usage Rates

*Petitioner Case Brief*[255]
- The stark differences between the NVs calculated for Ancientree and Foremost – especially with respect to labor and wood input usage rates – demonstrate that Ancientree failed to provide complete and accurate information.
- It is unclear how Ancientree produces cabinets and vanities using the reported number of labor hours.  The marked disparity between Foremost's and Ancientree's reported per-unit labor hours holds consistent at comparable production stages of completeness.
- Similarly, Ancientree's solid wood input usage is strikingly different when compared to Foremost's solid wood input usage at comparable production completeness levels.
- Ancientree's misrepresentation of its production process and material inputs warrants the application of total AFA, consistent with Commerce's established practice.[256]

*Ancientree Rebuttal Brief*[257]
- The petitioner's argument is fundamentally flawed because Ancientree and Foremost reported FOP consumption on a per piece basis.  Thus, comparing the products produced by Ancientree and Foremost merely demonstrates the differing input consumption levels for their respectively different products.
- Ancientree primarily produces parts or components or small ready-to-assemble kits instead of fully assembled large cabinets.  Foremost primarily produces fully-assembled bathroom vanities, a highly labor-intensive activity.  Foremost's vanities are much larger, more decorative, and complicated than Ancientree's.  The inclusion of decorative parts adds correspondingly more labor hours.
- Foremost's consumption of veneers required a separate, time-consuming production process.  Ancientree purchased veneered plywood so it did not have this step.[258]
- Commerce observed that Ancientree's production process was mostly automatic, with the extensive reliance on production equipment.  Laborers primarily direct materials through the machinery rather than manually adding parts or decorative pieces.
- At verification, Commerce found no discrepancies or concerns with Ancientree's labor consumption and Commerce examined all source documentation for direct and indirect labor.

---

[255] *See* Petitioner December 17 Case Brief.
[256] *Id.* at 7 (citing *Certain Kitchen Appliance Shelving and Racks from the People's Republic of China*, 74 FR 36656 (July 24, 2009) (*Kitchen Racks from China*), and accompanying IDM).
[257] *See* Ancientree Rebuttal Brief at 2-5.
[258] *Id.* at 4.

**Commerce's Position**:  We disagree with the petitioner.  Although the petitioner and Ancientree agree that the record demonstrates marked differences between Ancientree's and Foremost's usage rates and processes,[259] these companies have distinct production processes and end products.[260]  As a result, such differences are to be expected.  The fundamental question before Commerce is whether Ancientree's FOP reporting understates the consumption of its labor and wood inputs.  In this regard, the record does not support the petitioner's claim.

The record shows that Ancientree reported its material input consumption on a net weight basis of finished goods.[261]  Ancientree also reported FOPs for a substantial number of ready-to-assemble products, which by definition, do not require full assembly by Ancientree.[262]  We conducted a comprehensive on-site facility visit and found that Ancientree had accurately described its factory layout and production stages in its questionnaire responses.[263]  Further, Commerce verified Ancientree's allocation of material inputs to subject merchandise,[264] as well as its reported FOPs for plywood and birch sawn wood used to produce various individual products.  During this exercise, we found no discrepancies between the source documentation examined at verification and the information Ancientree had reported to Commerce.[265]

We disagree that the facts in *Kitchen Racks from China* are analogous.  In that case, Commerce found inconsistencies with the respondent's bills of materials and production note reporting at verification.[266]  In this investigation, we found no inconsistencies at verification that lead us to believe the application of AFA is similarly warranted.

As discussed above, it is unsurprising that Ancientree and Foremost reported differences in their material and labor FOPs, given their differing production processes.  Because the petitioner provides no record evidence to contradict Ancientree's reported FOP consumption, we find that AFA is not warranted here.

## B.  Wood Veneer

*Petitioner Case Brief*[267]
- Ancientree failed to report the usage of wood veneer in its production process and this omission could explain the outlying labor and wood usage rates.  Ancientree also failed to report any usage of veneered MDF.
- Commerce verified the delivery state of Ancientree's plywood.  This observation contradicts Ancientree's questionnaire responses reporting the use of plywood, not plywood with specific finished face veneers.  Sales documentation also supports the non-reporting of veneered inputs.

---

[259] *Id.* at 2-5; *see also* Petitioner December 17 Case Brief at 9-16.
[260] *See* Ancientree Verification Report at 8; *see also* Foremost Woodwork Verification Report at 11 and Exhibit 13.
[261] *See* Ancientree September 6, 2019 SQR at 22.
[262] *See* Ancientree September 6, 2019 SQR at Exhibit SQ3-1.1.
[263] *See* Ancientree Verification Report at 8.
[264] *Id.* at 18.
[265] *Id.* at 15.
[266] *See Kitchen Racks from China* IDM at Comment 16.A.
[267] *See* Petitioner December 17 Case Brief at 17-27.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

- The cost for a wood product varies considerably by the species of the wood input.[268] Ancientree's failure to separately report the cost of wood veneers prevents Commerce from accounting for the substantial differences across wood veneer species by selecting an appropriate SV.
- In the event that total AFA is not applied to Ancientree, Commerce should use facts available and adjust the NV calculation to include wood veneer as an input. This adjustment to Ancientree's SVs will properly account for the used veneered inputs separately from plywood or MDF.

*Ancientree Rebuttal Brief*[269]

- Plywood is defined as a generally flat, multilayered plywood or other veneered panel, consisting of two or more layers or plys of wood veneers and a core, with the face and/or back veneer made of wood. The veneers, along with the core, may be glued or otherwise bonded together.[270]
- Ancientree purchased plywood (including some veneer plywood and some veneered MDF); it did not purchase plywood and apply veneers to that plywood. Contrary to the petitioner's argument that Ancientree failed to separately report veneered MDF, Ancientree reported veneered MDF as plywood.
- To argue that Ancientree necessarily consumes wood veneer in order to sell a veneer-finished product is the same as arguing that a company selling galvanized steel products must consume galvanized powder (instead of already galvanized steel). Similarly, Ancientree purchased and consumed plywood with a face veneer when the merchandise required a veneer finish.[271]
- The petitioner misinterprets the definition of plywood; there is no distinction between plywood and veneered plywood. Plywood normally contains a face and back veneer, with a core in the middle.
- Heading HTS 4412 includes "plywood, veneered panels and similar laminated wood," and Commerce applied the SV including plywood with an outside veneer of various species of wood including birch, poplar or walnut.
- Contrary to the petitioner's argument that Ancientree failed to separately report veneered MDF, Ancientree reported veneered MDF as plywood.

**Commerce's Position**: We are not adjusting Ancientree's FOPs to account for veneers separately from plywood or MDF. The petitioner alleges that Ancientree failed to report that it uses "wood veneer" as an input in its production process. However, the record contains no evidence that Ancientree purchased veneers separately from its purchases of plywood as alleged

---

[268] *See* Petitioner December 17 Case Brief at 20 (citing Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Pre-Preliminary Comments for Meisen," dated September 26, 2019 (Petitioner Meisen Pre-prelim Comments) at Exhibit 7).

[268] *Id.* (citing Exhibit 7).

[269] *See* Ancientree Rebuttal Brief at 6.

[270] *Id.* (citing *Certain Hardwood Plywood Products from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in part*, 82 FR 53460 (November 16, 2017) (*Certain Hardwood Plywood Products*), and accompanying IDM at 3).

[271] *Id.*

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

by the petitioner.  The record also does not support the petitioner's claim that Ancientree's manufacturing process involves a veneering procedure.

In its response, Ancientree indicated it used plywood of a type that could be imported under HTS category 4412.33.[272]  In its initial, and various supplemental, questionnaire responses, Ancientree consistently reported its plywood FOP without separately indicating that it used veneers in its production process.[273]  The SV used to value Ancientree's plywood FOP in the *Preliminary Determination*, taken from HTS category 4412.33.00, was suggested by the petitioner.[274]  The heading for this HTS reads, "Plywood, veneered panels, and similar laminated wood."[275]  Thus, the definition of plywood in the HTS includes veneers as an integral characteristic of plywood.[276]  That the petitioner would request Commerce to separately value Ancientree's veneers, which are by definition part of the plywood input it purchases, is not supported by the record or the definition of plywood in the applicable HTS category.

During verification, we carefully reviewed Ancientree's production process; we found no evidence that Ancientree adds veneers separately to its plywood input during the production process of subject merchandise.[277]  Further, during our review of Ancientree's FOP consumption at verification, we reviewed documentation supporting Ancientree's September 2018 plywood purchases, as well as Ancientree's consumption of plywood in August 2018.[278]  We similarly found no evidence that Ancientree separately purchased or consumed veneers during the POI.

The petitioner argues that the species of veneer is an integral part of cost, and Ancientree's failure to separately report wood veneers prevents Commerce from capturing substantial differences across wood veneer species in its analysis.  However, HTS category 4412.33.00, the category suggested by the petitioner to value Ancientree's plywood FOPs, is described as "Other, with at least one outer ply of non-coniferous wood of the species alder (Alnus spp.), ash (Fraxinus spp.), beech (Fiigus spp.), birch (Betula spp.), cherry (Prunus spp.) chestnut (Castintea spp.), elm (Uhnus spp.), eucalyptus (Eucalyptus spp.), hickory (Carya spp.), horse chestnut (Aesculus spp.), lime (Tilia spp.), maple (Acer spp.) oak (Quercus spp.), plane tree (Platitnu,c spp.), poplar and aspen (Populus spp.) robinia (Robinia spp.) tulipwood (Liriodendron spp.) or walnut (Juglans Slip.)."[279]  This HTS subheading matches the description of Ancientree's plywood inputs on its source documentation; this documentation provides the wood species of the veneer used on the plywood.[280]  Therefore, contrary to the petitioner's arguments, the wood

---

[272] *See* Ancientree September 18, 2019 SDQR at Exhibit SQ 4-12.

[273] *Id.* at SQ4-10 and Exhibit SQ4-12; *see also* Ancientree Rebuttal Brief at 5-10.

[274] *See* Petitioner SV Comments at exhibit 1.

[275] *See* Petitioner SV Comments at exhibit 3.

[276] This definition is also consistent with the definition adopted by Commerce in *Certain Hardwood Plywood Products*.  *See Certain Hardwood Plywood Products* IDM at 6-7, which states that "the face veneer of hardwood plywood may be sanded; smoothed, or given a "distressed" appearance through such methods as hand-scraping or wire brushing."  *See also Certain Hardwood Plywood Products*, 82 FR at 53470.

[277] *See* Ancientree Verification Report at 8.

[278] *Id.* at 15 and 18.

[279] *See* Petitioner SV Comments at exhibit 3.

[280] *See* Ancientree September 6, 2019 SQR at exhibit SQ3-1.1.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

species of the veneered plywood is taken into account by Commerce's reliance on this HTS subheading.[281]

For the final determination, we find that the record evidence does not support that Ancientree omitted consuming wood veneer separately from plywood.  Therefore, we have accepted Ancientree's FOPs for this input as reported.

**Comment 11: Treatment of Jiangsu Hongjia as an Affiliate**

*Petitioner Case Brief*[282]
- Commerce found a close relationship between Ancientree and Jiangsu Hongjia, the entity from which Ancientree rents its facility and production equipment and purchases wood materials, and with whom Ancientree shares management.
- Ancientree self-describes its relationship with Jiangsu Hongjia as "closely affiliated companies."  Ancientree filed company certifications on behalf of all of its affiliated companies including Jiangsu Hongjia.
- It appears that Jiangsu Hongjia simply purchases wood materials and hands them over to Ancientree.  This arrangement could exist to hide Ancientree's purchases of inputs from ME countries.
- Commerce erred in preliminarily determining that Ancientree and Jiangsu Hongjia are not affiliated and should reverse its decision, consistent with section 771(33) of the Act.

No other interested party commented on this issue.

**Commerce's Position**:  We have reconsidered the evidence on the record and find that affiliation exists between Ancientree and Jiangsu Hongjia.  Section 771(33) of the Act provides that the following persons shall be considered to be "affiliated" or "affiliated persons":

(A)     Members of a family, including brothers and sisters (whether by the whole or half-blood), spouse, ancestors, and lineal descendants;

(B)     Any officer or director of an organization and such organization;

(C)     Partners;

(D)     Employer and employee;

(E)     Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization;

(F)     Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person; or,

(G)     Any person who controls any other person and such other person.

The Act further states that "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."[283]

---

[281] *See* Petitioner December 17 Case Brief at 18-20.
[282] *Id.* at 27-30.
[283] *See* section 771(33) of the Act.

"Person" is defined to include "any interested party as well as any other individual, enterprise, or entity, as appropriate."[284]

The SAA states the following:

> The traditional focus on control through stock ownership fails to address adequately modern business arrangements, which often find one firm 'operationally in a position to exercise restraint or direction' over another in the absence of an equity relationship. A company may be in a position to exercise restraint or direction, for example, through corporate or family groupings, franchise or joint venture agreements, debt financing, or close supplier relationships in which the supplier or buyer becomes reliant upon the other.[285]

Section 351.102(b)(3) of Commerce's regulations defines affiliated persons and affiliated parties as having the same meaning as in section 771(33) of the Act.  In determining whether control over another person exists, within the meaning of section 771(33) of the Act, Commerce will consider the following factors, among others:  corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships.  Commerce will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product.  Commerce will consider the temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control.[286]

As an initial matter, we note that we based our *Preliminary Determination* on record evidence at the time.[287]  On October 10, 2019, after the *Preliminary Determination*, we issued a supplemental questionnaire to Ancientree requesting further information regarding the familial relationship between Ancientree and Jiangsu Hongjia.[288]  In its response, Ancientree provided further details on the familial relationship between the owners and managers of Ancientree and Jiangsu Hongjia.[289]  The CIT has upheld Commerce's interpretation of "any person"  in section 771(33)(A) of the Act as encompassing "family," and the position that "family" is not limited to the roles enumerated in section 771(33)(A) of the Act, but rather is subject to Commerce's interpretation.[290]  Commerce may interpret the definition of "family" in section 771(33)(A) of

---

[284] *See* 19 CFR 351.102(b)(37).
[285] *See* SAA at 838.
[286] *See* 19 CFR 351.102(b)(3).
[287] *See Preliminary Determination* PDM at 26-27.
[288] *See* Commerce's Letter, "Supplemental Questionnaire," dated October 10, 2019.
[289] *See* Ancientree's October 17, 2019 Fifth Questionnaire Response (Ancientree October 17, 2019 Response) at 1-3. The details of the familial relationship are considered business proprietary in nature.  For further discussion *see* Ancientree Final Analysis Memorandum.
[290] *See Ferro Union Inc. v. United States*, 44 F. Supp. 2d 1310, 1325-1326 (CIT 1999) (*Ferro Union*) ("The intent of {section 771(33) of the Act} was to identify control exercised through 'corporate' or 'family' groupings.  By interpreting 'family' as a control person {Commerce} was giving effect to that intent."); *see also Dongkuk Steel Mill Co., v. United States*, 29 C.I.T. 724, 731 (CIT 2005).

the Act in a reasonable manner.[291]  For this final determination, we find that the record of this investigation, developed since the *Preliminary Determination*, shows that due to a close familial relationship, Ancientree and Jiangsu Hongjia are affiliated pursuant to section 771(33)(A) of the Act.[292]

Given that we did not find the companies to be affiliated parties until this final determination, the record does not contain information on Jiangsu Hongjia's purchases of raw materials, including the source of those materials.  However, if an AD order is issued in this proceeding and Ancientree is involved in subsequent reviews of this order, we intend to collect such information and evaluate it within the context of Commerce's NME practice.

**Comment 12:  SV Selections**

### A.  Glue

*Ancientree Case Brief*[293]
- In the *Preliminary Determination*, Commerce valued Ancientree's glue input based on Romanian import prices entered under HTS 3506.10.00, a value for glue sold at the retail level, not exceeding a net weight of 1 kg.  Valuing glue used for industrial purposes using an HTS category specific to retail is inherently illogical.  Commerce observed Ancientree's industrial glue consumption during verification and saw that its consumption of glue was over 1 kg.
- Commerce should value its glue input using HTS category 3506.91.90, covering glues not otherwise specified, *i.e.* glue not for retail sale and in quantities larger than 1 kg.
- Commerce used HTS category 3506.91.90 to value Foremost's glue input used in its assembly operations, yet Foremost consumes this glue in the same manner as Ancientree.

No other interested party provided comments on this issue.

**Commerce's Position**:  We have relied on Romanian GTA data under subcategory HTS 3506.91.90 to value Ancientree's glue input because the data in this HTS subcategory represents the best available information on the record.  Specifically, Ancientree's suggested subheading HTS 3506.91 is specific to "adhesives based on polymers of headings 3901 to 3913 or on rubber."[294]  The notes to chapter 39 of the HTS state that:

> 3.  Headings 3901 to 3911 apply only to goods of a kind produced by chemical synthesis, falling in the following categories:  a) liquid synthetic polyolefins of which less than 60

---

[291] *See Ferro Union*, 44 F. Supp. 2d 1310,1325 ("The word 'including' in section (A) of 19 U.S.C. § 1677(33) is an indication that Congress did not intend to limit the definition of 'family' to the members listed in this section.  Had Congress intended this list to be definitive, it would have chosen different wording.  The wording it did choose evinces an illustrative intent. Commerce's interpretation of this section is reasonable and therefore not subject to reversal by the court.").
[292] Given that the particular familial relationship constitutes business proprietary information, we discuss this separately in the Ancientree Final Analysis Memorandum.  *See* Ancientree Final Analysis Memorandum.
[293] *See* Ancientree Case Brief at 12-13.
[294] *See* Petitioner SV Comments at Exhibit 3.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

% by volume distils at 300 °C, after conversion to 1 013 mbar when a reduced pressure distillation method is used (headings 3901 and 3902); (b) resins, not highly polymerised, of the coumarone-indene type (heading 3911); (c) other synthetic polymers with an average of at least five monomer units; (d) silicones (heading 3910); (e) resols (heading 3909) and other prepolymers.[295]

Therefore, based on the information provided by Ancientree on its glue input, and the SV data on the record, we find that the record supports changing the SV to value Ancientree's glue input using HTS subheading 3506.91.90.

However, we disagree with Ancientree that we should rely on this HTS category simply because we valued Foremost's glue input.[296]  As discussed in Comment 10.A above, Ancientree and Foremost have different production process and produce different products.  Ancientree provided no record evidence that the glue it uses is the same glue used by Foremost.  Our basis for changing the HTS subheading to value Ancientree's glue is based on Ancientree's production process only and the information provided with respect to Ancientree.

### B.  MDF

*Ancientree Case Brief*[297]
- Commerce relied on HTS category 4411.14.90 to value Ancientree's MDF input.  This category is the basket "other" category covering MDF, not specified earlier under HTS category 4411.14.
- The HTS more specific to Ancientree's input, and which Commerce should use to value its MDF input, is HTS category 4411.14.10, covering "medium density fiberboard of wood, of a thickness > 9 Mm, not mechanically worked or surface-covered."  Ancientree consumes unworked or merely surface covered MDF that undergoes further processing during its production process.  The HTS category 4411.14.90 technically excludes Ancientree's MDF since it covers those not already specified.
- Foremost also provided the same HTS category, 4411.14.10, indicating this is a normal industry standard.

*Petitioner Rebuttal Brief*[298]
- Ancientree fails to cite to source documentation on the record supporting its assertion that its MDF is unprocessed at the time of acquisition.
- Ancientree's product brochure indicates that its MDF cabinets include a "matching laminate exterior."[299]  If this laminate overlay exists, then the assumption is that fiberboard and MDF are sold in a laminated state to Ancientree.  Thus, Commerce's use

---

[295] *Id*. at Chapter 39, note 3.
[296] *See* Ancientree Case Brief at 13.
[297] *Id.*
[298] *See* Petitioner December 26 Rebuttal Brief at 18-21.
[299] *Id.* at 20 (citing Ancientree's July 3, 2019 Section A Questionnaire Response (Ancientree July 3, 2019 AQR) at Exhibit A-5).

of the Romanian HTS category 4411.14.90 is appropriate since it covers products which have had processing imparted to them.

**Commerce's Position:**  An examination of the record does not support Ancientree's argument that HTS category 4411.14.10 is the most accurate HTS category with which to value Ancientree's MDF input.  Ancientree reported that its MDF input falls under HTS category 4411.14.[300]  Ancientree claims that the MDF consumed during the production of subject merchandise is unworked or merely surface covered, and that it undergoes further processing.[301] Ancientree concedes that the MDF it consumes in the production of subject merchandise *is* surfaced covered.[302]  Therefore, the HTS category Ancientree is suggesting, which specifically excludes MDF that is surface-covered, is not the appropriate HTS category to value Ancientree's MDF input.  Ancientree failed to provide documentation demonstrating that HTS category 4411.14.10 specifically applies to the MDF input it consumes (*i.e.*, through input descriptions, purchase invoices, or photographs of the input on the record).

Furthermore, as noted in Comment 12.A above, it would be inappropriate to change the HTS category for Ancientree's MDF inputs based on the fact that Foremost provided the same HTS category to value its own MDF inputs, given that the production process for these two companies is dissimilar.[303]  Because the record does not provide further detail on Ancientree's MDF input characteristics, and because the record indicates that Ancientree's MDF inputs have "had processing imparted to them," we have continued using HTS category 4411.14.90 for our final determination.

### C.  Paint

*Ancientree Case Brief*[304]
- In the *Preliminary Determination*, Commerce relied on data under HTS 3208.10.90, covering paints and varnishes dispersed or dissolved in a non-aqueous medium, to value Ancientree's paint inputs.
- Since Ancientree consumed paint that is dissolved in an aqueous medium, its paint input should be valued using HTS 3209.10, covering paints and varnishes "dispersed or dissolve in an aqueous medium."
- While conducting verification, Commerce observed Ancientree's paint type and also verified purchase invoices for "water-based paint."[305]

*Petitioner Rebuttal Brief*[306]
- The exhibit Ancientree cites to does not exclusively support Ancientree's claim that it uses water-based paint.

---

[300] *See* Ancientree September 18, 2019 SDQR at Exhibit SQ 4-12.
[301] *See* Ancientree Case Brief at 12.
[302] *Id.*
[303] *See* Foremost July 22, 2019 CDQR, at section D, Exhibits D-1 and D-6.1.
[304] *See* Ancientree Case Brief at 13.
[305] *Id.* (citing Ancientree's Verification Report at Exhibit 15).
[306] *See* Petitioner December 26 Rebuttal Brief at 21-22.  The Ancientree Final Analysis Memorandum provides the specifics of this argument, which rely on Ancientree's proprietary information.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

- The totality of evidence should support Commerce's continued use of HTS 3208.10.90 in the final determination to value Ancientree's paint input.

**Commerce's Position:**  We are continuing to value Ancientree's paint input using HTS category 3208.10.90.  At verification, we tied the painting materials worksheet provided in Ancientree's response to the Ancientree's accounting ledgers and corresponding vouchers for September 2018.[307]  We found no discrepancies between the information Ancientree had reported in its responses and the source documentation reviewed at verification.  However, during verification, we did not observe any third-party source documentation or any other documentation regarding the chemical composition for Ancientree's paint input (*e.g.*, ingredient lists).  The documentation on the record, specifically the translated portions, do not indicate which proportion, if any, of Ancientree's paint is water-based.[308]  Therefore, because the record does not support Ancientree's claim that its paint is water based, we continue to find HTS category 3208.10.90 is the most appropriate HTS category to value Ancientree's paint input.

### D. Particleboard

*Ancientree Case Brief*[309]
- The SV used for Ancientree's particleboard input for the *Preliminary Determination*, HTS category 4410.11.90, represents the "other" category covering particleboard not specified earlier under HTS category 4410.11.[310]
- The more specific HTS category is actually 4410.11.10, covering, "Particle Board Of Wood, Whether Or Not Agglomerated With Resins Or Other Organic Binding Substances, Unworked Or Not Further Worked Than Sanded (Excl. Oriented Strand Board And Waferboard, Fiberboard And Cellular Wood Panels)."[311]
- Foremost also provided HTS category 4410.11.10 as specific to its consumed particleboard, indicating the HTS is an industry standard.
- Commerce should value Ancientree's particleboard using Romanian HTS category 4410.11.10 in its final determination.

*Petitioner Rebuttal Brief*[312]
- Ancientree does not cite to record source documentation to support its argument that HTS category 4410.11.10 is more appropriate for its particleboard input, given its assertion that particleboard is not processed at the time of acquisition.
- The particleboard input Ancientree uses may have a laminate overlay, which creates the assumption that the product input is more advanced than Ancientree alleges.[313]

---

[307] *See* Ancientree Verification Report at 18.
[308] *Id.* at Exhibit 15.
[309] *See* Ancientree Case Brief at 11.
[310] *Id.* (citing Preliminary SV Memorandum at Attachment 3b)
[311] *See* Ancientree Case Brief at 11 (citing Foremost Rebuttal SV Comments)).
[312] *See* Petitioner December 26 Rebuttal Brief at 18-21.
[313] *Id.* at 20 (citing Ancientree July 3, 2019 AQR at Exhibit A-5).

**Commerce's Position:** The record evidence does not support valuing Ancientree's particleboard using HTS category 4410.11.10. Ancientree did not cite record documentation supporting HTS 4410.10.10 as the category most specific to the input it used in its production process. The proposed HTS category, 4410.11.10, "unworked or not further worked than sanded,"[314] is inappropriate, in light of Ancientree's statement that a characteristic of its particleboard is that it has a laminate overlay.[315] Finally, as noted previously, it is immaterial that Commerce used a different HTS category to value Foremost's particleboard FOPs, given its different production process and product mix.[316] Accordingly, we have continued to value Ancientree's particleboard using the Romanian GTA data for HTS category 4410.11.10.

*Foremost*

## Comment 13:  Combination Kits

Foremost reported that it sold "combination kits" in the United States during the POI. Combination kits are wooden cabinets and vanities that include components that are explicitly excluded from the scope of this investigation (such as sinks, quartz countertops, *etc.*). In the *Preliminary Determination*, we removed the portion of the price related to the non-subject components from our analysis using the relative material costs of the subject and non-subject components (also known as the "RATIO").[317]

At verification, we found that Foremost had made a number of mistakes when calculating the RATIO,[318] and it also failed to identify certain reported U.S. sales as combination kits.[319]

*Petitioner Case and Rebuttal Briefs*[320]
- Foremost failed to accurately calculate the price of combination kits because it:  (1) reversed the labels of its non-subject and subject components in the calculation worksheet used to compute the RATIO; (2) included subject components in its calculation of the non-subject component costs; (3) calculated the RATIO using total cost of manufacturing, not total cost of material inputs (as Commerce had requested in its supplemental questionnaire); and (4) failed to include all non-subject component parts in its calculations.  These errors are significant and demonstrate that the submitted data are unreliable.
- Due to the serious and pervasive nature of the issues, the information reported for combination kits cannot be considered verified.  Though Commerce did not observe errors when verifying transactions from the corrected worksheet at verification, it can be

---

[314] *See* Petitioner SV Comments at Exhibit 3.

[315] *See* Ancientree July 3, 2019 AQR at Exhibit A-5.

[316] *See* Foremost July 22, 2019 CDQR, at section D, Exhibits D-1 and D-6.1.

[317] For example, if Foremost sold a combination kit consisting of a vanity and a sink for $100, with the vanity materials costing $30 and the sink costing $10, we would use a price for the vanity in our analysis of $75 (or 100*30/40).

[318] *See* Foremost Woodwork Verification Report at 19-20.

[319] *See* Foremost Worldwide Verification Report at 9-10.

[320] *See* Petitioner's Case Brief, "Case Brief Regarding Foremost," dated January 20, 2020 (Petitioner January 20 Case Brief) at 3-10; and Petitioner's Rebuttal Brief, "Petitioner's Rebuttal Brief Regarding Foremost," dated January 27, 2020 (Petitioner January 27 Rebuttal Brief) at 8-12.

58

assumed that the corrected worksheet contains errors in the combination kit data not selected for examination.

- Further, reviewing only two products in a new worksheet provided at verification does not establish that all costs in the new worksheet are accurate because the dataset is permeated with errors.  Thus, the record does not indicate that Commerce verified the completeness and accuracy of the cost data and ratios for combination kits.

- In fact, Commerce should not accept the new worksheet provided at verification because it amounts to new factual information.  Additionally, it is not clear that the new worksheet corrected all of the errors identified at verification, *i.e.*, that not all non-subject components were included in the calculations, or that the ratio was calculated using total manufacturing costs and not just total raw material input costs.

- Commerce should base the margin for all sales of combination kits, including the ones identified for the first time as combination kits at verification, on AFA.  As AFA, Commerce should apply the highest dumping margin to all sales of combination kits in the U.S. sales database.  Foremost did not put forth its maximum effort in reporting combination kits and it should not benefit from its failure to cooperate.

- Commerce should reject the new methodologies provided by Foremost in its brief for calculating RATIO for EP sales (*see* below).

*Foremost Case and Rebuttal Briefs*[321]
- Commerce's initial questionnaire did not provide instructions for reporting pricing data for combination kits.  Even so, Foremost provided three potential methodologies for Commerce to use to determine the prices of combination kits.

- All of the errors Commerce found with respect to combination kits were minor, and Commerce verified both the complete list of combination kit product codes and the completeness and accuracy of the cost data used to calculate the RATIO for all CEP combination kits.  Commerce has all of the information it needs on the record to adjust its calculations to account for these errors.

- At verification, Foremost discovered that it had erroneously reported certain EP sales as non-combination kits.  In its final determination, Commerce should apply an average RATIO to the combination kits sold to EP customers.

- Commerce may only use FA to fill gaps in the record and there are no gaps in the record for Commerce to fill, much less to fill with adverse information.

- Commerce may only apply AFA when it is applying FA and the respondent has not cooperated to the best of its ability.  Foremost cooperated to the best of its ability throughout this investigation with respect to combination kit reporting.

- The best of its ability standard "does not condone inattentiveness, carelessness, or inadequate record keeping," but it also "does not require perfection."[322]

- This was Foremost's first time participating in an AD/CVD proceeding.  It had to provide responses with very little time while simultaneously participating in the parallel CVD investigation, and it had to coordinate between three separate entities.

---

[321] *See* Foremost's Case Brief, "Case Brief of Foremost," dated January 17, 2020 (Foremost Case Brief) at 2-6 and Foremost's Rebuttal Brief, "Rebuttal Brief of Foremost," dated January 24, 2020 (Foremost Rebuttal Brief) at 4-8.
[322] *See* Foremost Rebuttal Brief at 6 (citing *Nippon Steel*, 377 F. 3d at 1382).

**Commerce's Position**:  For the final determination, we find the revised combination kit worksheet provided by Foremost at verification to be reliable and verified.  Foremost's calculation worksheet corrects for a labeling error, as well as the inadvertent inclusion of subject inputs in the non-subject input calculations.  Foremost included overhead expenses and labor in its calculation of subject inputs; however, and consistent with the *Preliminary Determination*, we find that we must revise Foremost calculations of total subject inputs to these expenses.  Finally, we are adjusting Foremost's reported data using AFA to account for:  (1) unreported backsplashes (*i.e.*, non-subject inputs) sold in combination kits; and (2) EP sales of combination kits which Foremost incorrectly identified as non-combination kits.

Errors in Foremost's Combination Kit RATIO Data

At verification, Commerce found that Foremost's combination kit data, as reported in Foremost Price Supp Part 2, contained several issues.[323]  First, we noted that Foremost's calculation worksheet contained the columns which were mislabeled, so that the cost of subject inputs was reported as the cost of non-subject inputs, and vice versa.[324]  At verification, we found this error clerical and minor and requested that Foremost correct it in a revised calculation worksheet.[325]  The steps Foremost took to reverse the labels did not involve reporting new information because all of the input costs were already on the record.

We also noted at verification that Foremost included Foremost Worldwide's cost of purchasing subject inputs from Foremost Woodwork in its calculation of Foremost Worldwide's non-subject input costs.  At verification, Commerce requested that Foremost additionally revise its worksheet to recalculate non-subject input costs.  Foremost provided this calculation worksheet with both the revised cost of non-subject inputs and corrected labels, as discussed above.  Commerce selected product codes from this calculation worksheet and verified the accuracy of the data reported.

The petitioner argues that this calculation worksheet contains new factual information, and, therefore, Commerce should reject it.  However, Commerce's regulations at 19 CFR 351.301(a) state that, "the Secretary may request any person to submit factual information at any time during a proceeding."  In addition, all of the verification outlines placed on the record of this investigation notified interested parties that "{n}ew information will be accepted at verification when…the information makes minor corrections to information already on the record."[326]  At verification, Commerce found these errors to be minor, and, as such, properly exercised its discretion in requesting that Foremost provide revised calculations of the combination kit ratios to remove subject input costs from the non-subject input costs and to label the columns correctly.  Commerce's ability to accept information at verification has been upheld by the CIT.[327]

---

[323] *See* Foremost's September 24, 2019 price reporting supplemental questionnaire response (part 2) (Foremost Price Supp Part 2) at Exhibit SCAP2-3.
[324] *See* Foremost Letter, "Verification Exhibits from FWM Verification," dated November 8, 2019, at VE-21.
[325] *Id.* at VE-28
[326] *See, e.g.*, Commerce's Letter, "Verification Agenda," dated October 16, 2019.
[327] *See, e.g.*, *Maui Pineapple Co. v. United States*, 264 F. Supp. 2d 1244, 1257 (CIT 2003) (where the CIT found that Commerce properly accepted sales data as minor corrections because Commerce "enjoys very broad…discretion with regard to the propriety of its use of facts available.").

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

Additionally, the petitioner suggests that Foremost's corrected worksheet is not verified because Commerce only reviewed a small number of transactions in the corrected worksheet, and the large number of errors in the original worksheet implies that the corrected worksheet contained still more errors. However, Commerce verified Foremost's worksheet in the same manner it verified all of the other information reported by Foremost, and the minor errors initially found in Foremost's calculations of combination kits do not detract from this fact. In *Schafer*, the CIT confirmed that verification is a "spot check" and that Commerce has the discretion to accept the credibility of documentation:

> A verification is a spot check and is not intended to be an exhaustive examination of the respondent's business. Commerce has considerable latitude in picking and choosing which items it will examine in detail...In the absence of evidence in the record suggesting that the need to examine further the supporting evidence itself, the agency may accept the credibility of the document at face value. To conclude otherwise would leave every verification effort vulnerable to successive subsequent attacks, no matter how credible the evidence and no how burdensome on the agency further inquiry would be.[328]

The Federal Circuit has held that the "basic purpose of the statute:…{is} determining current margins as accurately as possible."[329] Given this basic purpose and in light of the specific circumstances of this case, our acceptance of Foremost's corrections is appropriate.

Finally, the petitioner asserts that it is unclear as to which corrections are included in this worksheet. However, each of the corrections is discussed above. That said, we agree with the petitioner that the data on the worksheet does not account for all necessary adjustments. These additional adjustments are noted further below.

Total Cost of Manufacturing Included in Foremost's RATIO Calculations

In a supplemental questionnaire, Commerce requested that Foremost, "calculate the total cost of subject inputs for each combination kit and the total cost of non-subject inputs for each combination kit…then calculate the ratio of the cost of subject merchandise to the total cost of the combination kit."[330] Commerce provided a table as an example and the column for the requested calculated ratio was labeled "Ratio (cost of subject inputs/total cost of inputs)" as an attachment to the supplemental questionnaire.[331]

In the *Preliminary Determination*, because the combination kit data for all combination kits were submitted too close to the issuance of the *Preliminary Determination*, we used the RATIOs calculated for the three combination kits that represented the highest values of the U.S. sales database to calculate RATIOs for the remaining combination kits reported in the U.S. sales database, and to adjust all combination kits to remove non-subject inputs from the

---

[328] *See Fag Kugelfischer Georg Schafer Ag. v. United States*, 25 CIT 74, 105 (*Schafer*).
[329] *See Rhone-Poulec*, 899 F. 2d at 1191.
[330] *See* Commerce's Letter, "Adjusted Gross United Price Supplemental Questionnaire," dated September 9, 2019.
[331] *Id*. at Attachment 1.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

prices/expenses associated with these sales.[332]  For the *Preliminary Determination*, we recalculated Foremost's reported RATIO for the three combination kits because Foremost included total cost of manufacturing in its "total cost of subject inputs," which was not what Commerce intended.[333]  Foremost provided all of the required information necessary in order to recalculate RATIO for the three combination kits.[334]  At verification, we determined that Foremost's combination kit data, that included a table for all combination kit RATIO calculations, included overhead and labor expenses in Foremost's calculations of total subject inputs for all combination kits.[335]

For the final determination, we are modifying the way we calculate the RATIOs to remove Foremost's overhead and labor expenses from the total cost of inputs it reported.  Accordingly, for all combination kits other than the three reported with Foremost Price Supp Part 1, we have adjusted all of Foremost's "total cost of subject inputs" by an average of the percentage differences between Foremost's reported total material costs and reported total cost of manufacturing of the three combination kits reported at Foremost Price Supp Part 1, as facts available under section 776(a)(1) of the Act.[336]

Unreported Non-Subject Inputs

During verification, Commerce found that Foremost sold a combination kit with a backsplash. Therefore, Commerce requested that Foremost explain how it accounted for backsplashes in its calculation of non-subject inputs, to which Foremost responded that backsplashes were not accounted for.[337]  As noted above, Commerce included in its analysis only the portion of the combination kits related to subject products.  Thus, we find that Foremost's failure to properly segregate the subject and non-subject components of the kits renders its RATIO calculations inaccurate, potentially resulting in the overstatement of U.S. prices.  Further, unlike the above issues which can be resolved by record information, the record in this case lacks information on the number of combination kits with backsplashes or the cost of those backsplashes.[338]  This makes it impossible for Commerce to ascertain the impact of Foremost's omission or to determine the amount by which Foremost under-reported its non-subject inputs or over-reported its subject inputs.

In accordance with sections 776(a)(2)(B)-(D) of the Act, because Foremost failed to report all non-subject inputs in calculating its combination kit ratios, we must apply facts otherwise available for our final determination.  Specifically, because Foremost failed to include backsplashes in its RATIO calculations, Foremost withheld necessary information, significantly

---

[332] *See* Foremost Prelim Analysis Memo at 6.

[333] *Id*. at 5.

[334] *See* Foremost's September 17, 2019 price reporting supplemental questionnaire response (part 1) at Exhibit SCAP1-2.

[335] *See* Foremost Woodwork Verification Report at 19.

[336] *See* Foremost's Price Supp Part 1 at Exhibits SCAP1-1 and SCAP1-2; *see also* Foremost Final Analysis Memorandum for a complete description of our calculation of RATIO for combination kits.

[337] *See* Foremost Woodwork Verification Report at 10; and Foremost Verification Exhibits at VE-3.

[338] We note that Foremost did not address this error nor provide Commerce with any suggestion on how to calculate accurate combination kit ratios that include Foremost's unreported backsplashes.  *See* Foremost Rebuttal Brief.

impeded this investigation by preventing Commerce from performing accurate margin calculations, and provided incomplete information that could not be verified.

Foremost argues that Commerce should not apply AFA with respect to its combination kits because "{t}he best of its ability standard, of course, 'does not condone inattentiveness, carelessness, or inadequate record keeping,' but it also 'does not require perfection.'"[339] Foremost then discusses the two-step analysis that Commerce must apply when determining whether a respondent has acted to the best of its ability:  whether the respondent failed "to keep and maintain all required records" or failed "to put forth its maximum efforts to investigate and obtain the requested information from its records."[340]

We agree with Foremost that Commerce does not require respondents to submit data that are perfect in all respects.  Indeed, Commerce's acceptance of the corrections discussed above demonstrates that Commerce did not hold Foremost to such a standard in this investigation.  However, Commerce's willingness to correct Foremost's errors is not unbounded, and in this instance, Foremost's failure to investigate its own records and obtain the information requested by Commerce impacts the dumping margin computed for Foremost in a manner which is potentially significant.  At verification, Foremost confirmed that it did not include the cost of backsplashes in reported non-subject inputs, despite the fact that it possessed the records to have done so.[341]  Therefore, Foremost possessed the information Commerce requested on non-subject inputs, but did not provide it to Commerce.  Accordingly, we find that Foremost failed to put forth its maximum efforts to obtain the requested information from its records."[342]

Section 776(b) of the Act provides that, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, it may use an inference that is adverse to the interests of that party in selecting from the facts otherwise available.  Such an adverse inference may include drawing from any information placed on the record.  As discussed above, in this case, we find Foremost did not act to the best of its ability in reporting its non-subject input costs because the information necessary to report backsplashes was in Foremost's possession, but it did not report this information to Commerce.  Therefore, Commerce finds that facts available with an adverse inference are warranted to account for Foremost's omission.

We note that the only information on the record providing guidance to Commerce as to which sales of combination kits could contain a backsplash is Commerce's verification of the FOPs for particular CONNUMs at Foremost Woodwork, where Commerce noted that a vanity, with a countertop and sink, had a backsplash.  Accordingly, in applying AFA to Foremost's combination kits, Commerce is assigning the lowest calculated RATIO, after making the adjustment described above, to all combination kits that are described in their product descriptions as vanities and reported with Foremost Worldwide sink costs included on Foremost's ratio calculation worksheet, which indicate the vanity may have a backsplash.[343]

---

[339] *See* Foremost Rebuttal Brief at 6 (citing *Nippon Steel*, 377 F. 3d at 1382).
[340] *Id*. at 6-7.
[341] *See* Foremost Woodwork Verification Report at 10.
[342] *See Nippon Steel*, 377 F. 3d at 1382.
[343] *See* Foremost Verification Exhibits at VE-28; *see also* Foremost Final Analysis Memorandum for complete description of our calculation of RATIO for combination kits.

Unreported Combination Kits

At verification, we found that Foremost sold 14 combination kit products to EP customers during the POI.  Foremost claimed that this was an inadvertent error, stating that the company mistakenly assumed that it only made CEP sales of combination kits.  Foremost provided a list of the product codes that could be found in the U.S. sales database for EP sales, but were reported as non-combination kits (*i.e.*, the RATIO equaled 100 percent subject inputs).[344]

Foremost did not sell any of the misreported product codes to CEP customers and, thus, the record does not contain RATIO calculations for them.  Therefore, we find that Commerce must resort to facts available for the missing RATIO information.  In accordance with sections 776(a)(2)(B),(C) and D of the act, we find that Foremost failed to provide information requested within the deadline prescribed by Commerce and that it impeded this investigation by not providing the information necessary to calculate accurate RATIOs for these products.[345]

As noted above, section 776(b) of the Act provides that, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference that is adverse to the interests of that party in selecting from the facts otherwise available.  Such adverse inference may include any information placed on the record.  In this case, we find that Foremost did not act to the best of its ability to comply with Commerce's requests.  For example, in a supplemental questionnaire, Commerce requested a list of all components within combination kits that Foremost sold to the United States during the POI.[346]  In reporting this information, Foremost had the opportunity to review its records and determine that it had failed to identify certain products as combination kits, but it did not do so.[347]  Foremost had ample opportunity to assess its records, rather than make assumptions, and to determine that many sales were incorrectly reported.

For the final determination, we are applying facts available, with an adverse inference, to Foremost's EP sales of combination kits.  To adjust Foremost's combination kits that were reported as non-combination kits, we are applying the lowest RATIO to calculate an adjusted gross unit price.[348]

In sum, Commerce will continue to accept Foremost's revised calculation worksheet, which corrected for Foremost's labeling error and Foremost's inclusion of subject inputs in its calculation of non-subject inputs.  Commerce is applying facts otherwise available to Foremost's calculations of total inputs to adjust for Foremost's inclusion of overhead and labor expenses when calculating the RATIOs.  Finally, Commerce is applying facts otherwise available, with

---

[344] *See* Foremost's Letter, "Verification Exhibits from FWW Verification," dated November 1, 2019, at VE-12.
[345] *See* Commerce's Letter, "Section C Supplemental Questionnaire," dated August 30, 2019, at 8.
[346] *Id*. at 8.
[347] *See* Foremost's September 17, 2019 supplemental section C questionnaire response (Foremost September 17, 2019 SCQR) at Exhibit SC-22a-A.
[348] *See* Foremost Final Analysis Memorandum for a complete description of our calculation of RATIO for combination kits.

adverse inference to Foremost's sales combination kits that could have contained a backsplash as well as Foremost's sales of EP sale combination kits.

## Comment 14:  Exempted Sales

*Petitioner Case Brief*[349]

- Commerce should apply partial AFA to Foremost's sales of custom kitchens and merchandise produced by certain unaffiliated suppliers because the information in Foremost's request to not report these sales was inaccurate and misleading.[350]
- In particular, Foremost's initial section D response references a higher number of custom kitchen projects than Foremost reported in its exemption request.  Foremost later explained that the difference between the figures in the exemption request and questionnaire response was due to the fact that Foremost had produced a higher number of custom kitchens than it sold during the POI.
- During the verification at Foremost Woodwork, Foremost reported that it sold yet another number of custom kitchen projects.  Foremost provided no documentation to support its explanations of the inconsistencies.
- Further, after receiving the exemption, Foremost disclosed that sales of kitchen projects involved a large number of pieces of subject merchandise.  Thus, by citing only projects in its exemption request, Foremost misled Commerce as to the actual magnitude of the exemption.
- With respect to unaffiliated suppliers, Commerce found at verification that Foremost sold several hundred more units of merchandise produced by these companies than the quantity reported in Foremost's exemption request.
- Foremost was required to submit sales data and FOPs for merchandise produced by one unaffiliated supplier but stated that it was unable to compel it to participate.  That Foremost purchased several material inputs from this supplier, in addition to subject merchandise, suggests that Foremost had more ability to induce cooperation than it claimed.
- In the 2018 administrative review of *Stainless Steel Bar from India*, Commerce applied AFA to a respondent because it failed to demonstrate that it lacked the power to induce cooperation from non-responding parties.  Commerce based this decision on the fact that the respondent's communications with the unresponsive entity did not indicate a "robust refusal to do business in the future."[351]
- The application of partial AFA to the missing unaffiliated supplier's FOP data will encourage the cooperation of the unaffiliated supplier and companies in future proceedings.

---

[349] *See* Petitioner January 20 Case Brief at 11-18.

[350] *Id.* at 12 (citing Foremost's Letter, "Notice of Reporting Difficulties and Reporting Exemption Request," dated June 19, 2019 (Foremost's Exemption Request)).

[351] *Id*. at 17 (citing *Stainless Steel Bar from India:  Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 84 FR 15582 (April 16, 2019), unchanged in *Stainless Steel Bar from India:  Final Results of Administrative Review of the Antidumping Duty Order; 2017-2018*, 84 FR 56179 (October 21, 2019) (*Stainless Steel Bar from India*), and accompanying IDM).

*Foremost Rebuttal Brief*[352]

- Foremost has been clear throughout this proceeding that a project may contain any number of units and that the units that make up a project may not be subject merchandise.
- The error with respect to the number of units produced by the unaffiliated supplier is harmless. The quantity of pieces was still small and the reason for the request remains: Reporting FOPs for subject merchandise sold as part of custom kitchens would unnecessarily burden both Foremost and Commerce.

**Commerce's Position**: We disagree that Commerce was misled by the information in Foremost's exemption request. While the record contains several sales figures related to custom kitchens and products produced by unaffiliated suppliers, the differences are not significant. Further, the facts underlying Commerce's decision to grant these exemptions remain: requiring Foremost to report sales of subject merchandise made as part of custom kitchen projects would have been burdensome – not only in terms of data collection for Foremost, but also in terms of analysis time for Commerce – and this burden would have been heightened by the strict statutory time constraints of this investigation.

In addition, the verified number of pieces of merchandise produced by the exempted unaffiliated supplier is relatively small in comparison to the total number of pieces sold in the United States during the POI. With respect to the other unaffiliated supplier, we continue to find that Foremost made significant efforts to compel that company to provide the necessary information. Thus, the use of AFA is not appropriate for any of the unreported information.

<u>Custom Kitchens</u>

In Foremost's Exemption Request, Foremost described the complexities involved in reporting its sales of subject merchandise made as part of custom kitchen projects.[353] It explained that "each kitchen is a separate project, containing a combination of products that is different from every other kitchen…customized kitchen projects {may contain a} myriad {of} different combinations{.}"[354] In Commerce's response to Foremost's exemption request, with respect to custom kitchens, we noted, "Foremost cites to the burdens of reporting the FOPs of custom kitchens" and then explained that "{f}or the reasons detailed in Foremost's request," and we granted this request.[355]

We note that, throughout the proceeding, Foremost provided more information about its custom kitchens at Commerce's request, including the number of pieces that make up a project, and the fact that the number of custom kitchens produced, sold, and "booked" did not exactly tie to the exemption request.[356] Specifically the quantity sold as reported in Foremost's exemption request

---

[352] *See* Foremost Rebuttal Brief at 8-9.
[353] *See* Foremost's Exemption Request at 2-3.
[354] *Id*. at 3.
[355] *See* Memorandum, "Reporting Exemption Request," dated June 26, 2019.
[356] *See* Foremost's July 22, 2019 sections C and D questionnaire response (Foremost July 22, 2019 CDQR) at 7-8; and Foremost September 24, 2019 SDQR at 5-6; *see also* FGI Verification Report at 8; and Foremost Woodwork Verification Report at 12.

and reviewed at verification differed by under fifty projects, and projects, in general, contain various quantities of subject and non-subject components.[357]

However, the reasons for Commerce's decision to grant the exemption remain and were supported at verification.  At verification, Foremost demonstrated how each custom kitchen project unit in its system "represented an entire custom kitchen project (with an unknown number of cabinets making up each project)."[358]  Foremost explained that the only way to determine the actual quantity of each unit would be to look at individual invoices, and we confirmed this explanation, stating that "FGI's system only reported the quantity of custom kitchen order, and not the number of cabinets each order was comprised of."[359]  Our verification findings support our initial decision to exempt Foremost from reporting subject cabinets sold in custom kitchens, given the complexity of the projects, the short time both Commerce and Foremost had to develop a method for reporting these sales, and the relatively small number of sales that these cabinets represented compared to the total sales in the U.S. sales database.[360]

<u>Unaffiliated Supplier Sales and FOPs</u>

In Foremost's Exemption Request, Foremost also asked that Commerce permit it to not report the sales of subject merchandise produced by several unaffiliated suppliers and the suppliers' corresponding FOPs.  In making this request, Foremost stated, that it "has no ability to compel these unaffiliated suppliers to provide all of the required factors of production or otherwise participate in the Department's proceeding."[361]  In Commerce's response to Foremost's exemption request with respect to unaffiliated suppliers, we noted how Foremost, "cite{d} its inability to coerce suppliers to comply with Commerce's investigation" and then explained that "{f}or the reasons detailed in Foremost's request," and we granted this request.[362]

At verification, Commerce found that, for one of the exempted unaffiliated suppliers of subject merchandise, Foremost had underreported the quantity of merchandise supplied.[363]  While the quantity of subject merchandise produced by this unaffiliated supplier was not correctly provided in the exemption request, the underlying reason for Commerce's decision to exempt these sales and FOPs from reporting remains.  Foremost was exempted from reporting the sales and FOPs for two out of the three of its unaffiliated suppliers because the total quantity of these sales was less than five percent of the U.S. sales database.[364]  The minor discrepancies found at verification with respect to the figures initially reported does not change this reasoning, and the total quantity of sales of merchandise for both unaffiliated suppliers exempted from reporting remains at less than five percent, which we find to be small.

---

[357] *See* Foremost's Exemption Request at 3.
[358] *See* FGI Verification Report at 8.
[359] *Id*.
[360] *See* Foremost September 24, 2019 SDQR at SD-6.
[361] *See* Foremost's Exemption Request at 5.
[362] *See* Memorandum, "Reporting Exemption Request," dated June 26, 2019.
[363] Foremost Woodwork Verification Report at 12.
[364] *See* Foremost's Exemption Request at 5.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

In *Pure Magnesium from the Russian Federation*, Commerce stated that it "is not required to examine all sales transactions in the United States.  For this reason, our practice has been to disregard unusual transactions when they represent a small percentage (*i.e.*, typically less than five percent) of a respondent's total sales."[365]  In *Color Television Receivers from China*, Commerce also excluded sales because the represented less than give percent of the respondent's total sales.[366]  In this case, the sales exempted either represent less than five percent of the respondent's total sales, or as discussed above represent unusual transactions.  Despite small variations between the information in Foremost's Exemption Request and our verification findings, these unaffiliated supplier sales represent a small, less than five percent, amount of Foremost's total U.S. sales during the POI.

Commerce did require Foremost to report the sales and FOPs from the unaffiliated supplier who provided the highest quantity of subject merchandise in Foremost's exemption request.[367]  However, Foremost provided documentation to show that it was unable to compel this supplier to provide its FOPs, despite its efforts to do so.  For the *Preliminary Determination*, Commerce examined Foremost's relationship with its uncooperative unaffiliated supplier and noted several facts:  Foremost is a major exporter of subject merchandise from China; the record does not indicate that Foremost is affiliated with this supplier; and the supplier supplied raw material inputs in addition to subject merchandise to Foremost.[368]  These facts remain unchanged for this final determination, and their relevance is explained below.

The Federal Circuit, in *Mueller*, held that Commerce may, under certain circumstances, apply AFA in calculating a cooperative respondent's AD margin where it finds that the respondent could have induced an uncooperative supplier's cooperation.[369]  While the petitioner makes the argument that Foremost had the ability to compel its supplier to provide the information, the record does not support this assertion.  In contrast, the record demonstrates that Foremost attempted to collect and report the information but was prevented by the supplier's refusal to provide it.[370]

In *Canadian Solar*, the CIT held, based on the facts in the administrative review at issue, that the Commerce failed to show that the respondent had the type of long-standing relationship with its suppliers that would give it leverage in the marketplace to compel its suppliers to provide the information requested, in order to justify relying on partial AFA.[371]  With respect to Foremost's relationship with its supplier, the record remains the same since the *Preliminary Determination*.  As discussed in Foremost Prelim Analysis Memo, the communications between Foremost and its

---

[365] *See Notice of Final Determination of Sales at Not Less Than Fair Value:  Pure Magnesium from the Russian Federation*, 66 FR 49347 (September 21, 2001) (*Pure Magnesium from the Russian Federation*), and accompanying IDM at Comment 10.
[366] *See Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances:  Certain Color Television Receivers from the People's Republic of China*, 69 FR 20594 (April 16, 2004) (*Color Television Receivers from China*), and accompanying IDM at Comment 27.
[367] *Id.*
[368] *See* Foremost July 22, 2019 CDQR at section D, page 3 and Exhibit D-11.
[369] *See Mueller*, 753 F. 3d at 1233-34.
[370] *See* Foremost September 23, 2019 SDQR at Exhibit SD-4.
[371] *See Canadian Solar International et al. and Shanghai Byd Co. Ltd. et al. v. United States*, 378 F. Supp. 3d 1292, 1320 (CIT 2019) (*Canadian Solar*).

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

supplier showed no evidence that Foremost had any leverage over its supplier.[372]  Commerce continues to find, as it did in the *Preliminary Determination*, that the supplier's responses to Foremost's outreach indicate that Foremost did not have a long-standing relationship with this supplier and that Foremost was unable to induce its supplier's cooperation.[373]

We disagree with the petitioner that the facts in *Stainless Steel Bar from India* are analogous here.  In *Stainless Steel Bar from India*, Commerce found that the documentation provided by the respondent failed to meet Commerce's standard for demonstrating the inability of a company to compel its supplier to provide information.[374]  In that case, the respondent had many years of experience in being a respondent in AD cases, and all of its suppliers for which it was unable to report FOPs for were known exporters of merchandise subject to the order.[375]  Given those circumstances, Commerce found that the respondent understood its responsibilities as an exporter, and as a respondent, to collect costs from its suppliers, and, therefore, the documentation it provided Commerce failed to demonstrate that it had done everything in its power to compel its suppliers to provide those costs.

In contrast, in this investigation, Foremost is a first-time respondent and we find on this record that it has provided sufficient documentation to demonstrate that it acted to the best of its ability to compel its supplier to supply the missing FOPs.[376]  However, we note that Commerce has the same expectations of Foremost for wooden cabinets and vanities from China as it did of the respondent in *Stainless Steel Bar from India*, in that Foremost is now aware of its responsibility to collect the FOPs from all of its suppliers, and respondents in this case have been placed on notice about the importance of reporting FOPs for all of the subject merchandise sold in the United States.

The petitioner also argues that applying partial AFA is a way to discourage non-cooperation on the part of suppliers in the future, and we agree with this premise, as does the law.[377]  While we agree that the application of AFA is a tool used to induce cooperation from respondents and their suppliers, we find that the facts of this record do not support making such a determination in this segment of the proceeding, as discussed above.

Accordingly, because necessary FOP information is not available on the record, we continue to determine that facts available is warranted, pursuant to section 776(a)(1) of the Act, and for the final determination we have continued to use Foremost's reported FOPs for all of Foremost's sales of merchandise produced by its uncooperative supplier.[378]

---

[372] *See* Foremost Prelim Analysis Memo at 4-5.
[373] *See* *Preliminary Determination* PDM at 21.
[374] *See* Petitioner January 20 Case Brief at 17.
[375] *See* *Stainless Steel Bar from India* IDM at Comment 2.
[376] *See* Foremost September 24, 2019 SDQR at Exhibit SD-4.
[377] *See* SAA at 870.
[378] *See* Foremost Prelim Analysis Memo for a discussion of the facts available calculation.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

**Comment 15:  Early Payment Discounts**

*Petitioner Case and Rebuttal Briefs*[379]
- Foremost did not report an early payment discount granted to a customer during the POI for the sale of subject merchandise.  Foremost conceded that it could not determine whether this was a customer-specific issue, and that it could not identify on which transactions it may have incurred early payment discounts.  It is not possible for Commerce to confirm which sales had early payment discounts incorrectly reported.
- Foremost stated that even customers who did not qualify for early payment discounts could have taken one.
- The solution offered by Foremost (*see* below) is inadequate.  Foremost's suggestion would not even include one of the transactions Commerce found as an example of Foremost's early payment omission, *i.e.*, at verification, Commerce identified a customer with missing early payment discounts, but this customer was not in Foremost's proposed universe of customers that may have taken this discount.
- Foremost admits that there may be an undefined number of additional unreported early payment discounts.
- Commerce should apply an early payment discount to all sales where one was not reported.

*Foremost Case and Rebuttal Briefs*[380]
- Foremost did not have a mechanism in place to track certain early payment discounts on a transaction-specific basis, and therefore, it overlooked reporting early payment discounts taken when they were not earned.
- In the U.S. sales database, Foremost identified customers who had qualified for discounts and reported early payment discount by customer.  Commerce confirmed that Foremost correctly reported early payment discounts for the three customers reported with this discount in the U.S. sales database.
- Commerce did not identify early payment discounts for customers who were not offered such discounts.  Commerce should apply the percentage reported under PAYTERMU (*i.e.* two percent of GRSUPRU for a sale reported with "2% 15 days") for the customers with payment terms that contain early payment incentives.
- There is no gap in the record that Commerce would need to fill with AFA.  The complete universe of customers that may have taken unauthorized discounts is in the U.S. sales database (*i.e.*, CEP customers of inventory merchandise where PAYTERMU contains a percentage of a discount).
- Foremost provided programming language and its suggestion is conservative.

**Commerce's Position**:  We find that Foremost failed to report all early payment discounts as Commerce requested, and we find that this error warrants the application of facts otherwise available, with an adverse inference, to all sales with early payment incentives where no early

---

[379] *See* Petitioner January 20 Case Brief at 19-20; and Petitioner January 27 Rebuttal Brief at 15-18.
[380] *See* Foremost Case Brief at 7-9; and Foremost Rebuttal Brief at 9-11.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

payment discount was reported (and where Commerce did not verify that early payment discounts were not granted).

In Foremost's July 22, 2019 CDQR, Foremost asserted that it "did not grant any early payment discounts in the U.S. market during the POI."[381]  In Foremost's September 17, 2019 SCQR, Foremost stated that it had "reviewed its records and made an error with respect to sales to {certain customers}."[382]  As such, Foremost revised its U.S. sales database to report early payment discounts for these specific customers.

At verification, we found that Foremost had failed to report early payment discounts for certain sales.[383]  Foremost explained that it reported early payment discounts by reviewing its records for customers that had qualified for an early payment discount (including those that had qualified but had not taken one).  Foremost admitted, though, that it had not checked its records for customers who had taken an early payment discount, despite not qualifying for it.  As a result, Foremost acknowledged that it had not reported all early payment discounts taken during the POI, and that it had no method of determining which customers and sales in the U.S. sales database this impacted.

Foremost states that Commerce "may use facts otherwise available only 'to fill gaps when Commerce must rely on other sources of information to complete the factual record.'"[384]  Foremost then asserts that there is no gap in the record with respect to the early payments taken during the POI.  We disagree with the claim that there is no gap for Commerce to fill in ensuring we accurately account for Foremost's early payment discounts.  As Commerce noted its verification report, "FGI stated that it could not determine whether this {early payment issue} was a customer specific issue, and that it could not identify which transactions may have incurred early payment discounts that had not been reported in the U.S. sales database."[385]  Therefore, it is not possible for Commerce to specifically identify the sales impacted by this reporting error.  Moreover, while Foremost attempted to fill this gap with its suggestion,[386] this suggestion fails to remedy all sales where Foremost may not have reported an early discount, as evidenced by the fact that its list did not include the sales Commerce found at verification with this issue.  Additionally, as discussed below, we disagree with Foremost's assertion that its early payment discount reporting failure does not amount to the situation set forth by section 776(b) of the Act.[387]

---

[381] *See* Foremost July 22, 2019 CDQR, section C, at 23-24.
[382] *See* Foremost September 17, 2019 SCQR at 16.
[383] *See* FGI Verification Report at 10.
[384] *See* Foremost Rebuttal Brief at 10 (quoting *Zhejiang DunAn Heitan Metal Co. v. United States*, 652 F. 3d 1333, 1346 (Fed. Cir. 2011).
[385] *See* FGI Verification Report at 10.
[386] *See* Foremost Case Brief at 8 (Foremost provided a list of customers and payment terms and stated, "the following customers represents the universe of customers that may have taken unauthorized early payment discounts.").
[387] *See* Foremost Rebuttal Brief at 10 (citing *JSW Steel Ltd. v. United States*, No. 16-00165, slip op. at 5 (CIT May 9, 2018).

71

In *CORE from Italy*, Commerce applied partial AFA because Commerce discovered at verification that the respondent failed to report complete information regarding its sales, as requested by Commerce in its questionnaire responses, and this information was not discovered until verification.[388]  Similarly, we find that Foremost did not report the complete information regarding its early payment discounts and Commerce only found this information as a result of selecting certain sales for examination at verification.  Foremost failed to report all early payment discounts in its questionnaire responses,[389] and they were discovered by Commerce during verification, as described in the verification report.[390]  At verification, Foremost acknowledged that it had failed to review all of its U.S. sales for early payment discounts, and as a result it did not identify all sales where an early payment discount was taken.[391]  Accordingly, for the final determination, we are applying facts available, with an adverse inference, to Foremost's sales where the customer had payment terms with an early payment incentive, but no reported early payment discount.  Therefore, pursuant to section 776(a)(2)(B) and (C) of the Act, we are applying facts available to Foremost's sales reported without early payment discounts.

Under such circumstances, the Federal Circuit has upheld Commerce's ability to make an adverse inference in selecting from the facts available, stating that Commerce:

> assumes that importers are familiar with the rules and regulations that apply to the import activities and requires that importers, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries:  (a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce; …(b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records{.}  [392]

Accordingly, pursuant to section 776(b) of the Act, we are applying facts available with an adverse inference, because Foremost did not act to the best of its ability when reporting its early payment discounts.  As the petitioner correctly notes and Commerce addressed above, Foremost provides a methodology to adjust for this reporting failure, which identifies sales by customer and then by payment terms,[393] but this methodology does not account for all sales reported in the U.S. sales database with a payment incentive.[394]  As such, we will not use the methodology proposed by Foremost, and instead, for the final determination, for all sales unexamined at verification where Foremost did not report an early payment discount and where Foremost's payment terms with that customer included a payment incentive, we will apply the highest early payment discount Foremost granted that is on the record.

---

[388] *See Certain Corrosion-Resistant Steel Products from Italy:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, in Part, 81 FR 35320 (June 2, 2016) (*CORE from Italy*), and accompanying IDM at Comment 3
[389] *See* Foremost July 22, 2019 CDQR, section C, at 23-24; and Foremost September 17, 2019 SCQR at 16.
[390] *See* FGI Verification Report at 10.
[391] *Id.*
[392] *See Nippon Steel*, 337 F. 3d at 1382.
[393] *See* Petitioner January 27 Rebuttal Brief at 17.
[394] *See* Foremost Case Brief at 8.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

**Comment 16:  Section 301 Duties**

*Petitioner Case and Rebuttal Briefs*[395]
- The methodology employed by Foremost results in its reporting section 301 duties on none of its inventory sales in its U.S. sales database.  Foremost has not provided support for its assertion that it did not incur section 301 duties on the majority of its CEP inventory sales.
- Commerce found evidence of subject merchandise sold out of inventory on which FGI incurred section 301 duties, and, therefore, Commerce's findings raise questions as to whether reporting section 301 duties using an estimated entry date for CEP (that uses average inventory days) is accurate and reasonable.  It is improper to estimate what duties were incurred on a product based on inventory turnover calculations.
- Commerce should take the total amount of section 301 duties paid by Foremost during the POI and allocate that amount across all U.S. inventory sales.
- Foremost's reporting was inaccurate, regardless of whether the inaccuracy was intentional.

*Foremost Case and Rebuttal Briefs*[396]
- Section 301 duties were imposed for the first time on September 21, 2018; therefore, it was impossible for Foremost to incur these duties on any sale that occurred prior to September 21, 2018.  Foremost did not incur section 301 duties on the vast majority of its CEP inventory sales.
- Commerce found a single unit sold in late December 2018 on which Foremost incurred section 301 duties.  This does not detract from the reasonableness of Foremost's reporting methodology; Commerce verified that inventory products remain there for a period of time.
- If Commerce needs to adjust CEP inventory sales to account for section 301 duties, it should only do so for sales that occurred on or after the date the unit Commerce found at verification was sold.
- The petitioner's suggestion is equivalent to partial AFA.

**Commerce's Position**:  For the final determination, we are changing our calculation of Foremost's section 301 duties for CEP inventory sales.[397]  CBP began collecting section 301 duties on September 24, 2018, during the POI.[398]  Foremost explained that it does not track the entry dates of its inventory sales, and, as a consequence, it was unable to report section 301 duties on a transaction-specific basis.  However, because Foremost's average inventory carrying

---

[395] *See* Petitioner January 20 Case Brief at 21-22; and Petitioner January 27 Rebuttal Brief at 22-24.

[396] *See* Foremost Case Brief at 12-13; and Foremost Rebuttal Brief at 11-12.

[397] *See* Foremost July 22, 2019 CDQR, section C, at 34.

[398] *See Notice of Modification in Section 301 Action:  China Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 FR 47974 (September 21, 2018) (effective as of September 24, 2018).

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

period was 131 days,[399]  Foremost concluded that it had no CEP inventory sales with section 301 duties.[400]

At verification at FGI, we confirmed the accuracy of Foremost's reported average inventory carrying days and that entry date cannot be tracked in FGI's accounting system.[401]  However, we also noted that FGI booked a sale toward the end of the POI on which it incurred these duties. Therefore, we find that Foremost's methodology did not completely capture all section 301 duties on FGI's reported U.S. sales.  To account for this potential underreporting, for the final determination, we are changing the amount of section 301 duties calculated for Foremost's CEP inventory sales, from zero to ten percent of entered value, when the date of sale is equal to, or after, the "booking" date of the inventory sale with section 301 duties found at verification.[402]

We disagree with the petitioner that it is appropriate to allocate all section 301 duties that FGI incurred during the POI to the reported sales.  Foremost could not have incurred section 301 duties prior to September 21, 2018 (the date the duties were imposed), and, therefore, calculating section 301 duties for sales with sale dates prior to September 21, 2018, is not warranted. Additionally, we verified Foremost's inventory carrying days and confirmed that, on average, Foremost's merchandise was in inventory for more than four months prior to sale.  Therefore, the section 301 duties that FGI paid during the POI should apply overwhelmingly to sales made from inventory after the POI.  As a result, we find using the earliest date on the record where Foremost incurred these duties is reasonable, for purposes of adjusting CEP under section 772(c)(2)(A) of the Act.

## Comment 17:  Foremost's U.S. Inland Freight Charges from the Port to the Warehouse

*Petitioner Case and Rebuttal Briefs*[403]
- At verification, Commerce determined that Foremost did not include U.S. inland freight, from port to warehouse, in its U.S. sales database for its CEP inventory sales.
- Although Foremost claimed that it had intended to include this expense in its calculation of international freight, it did not do so.
- Commerce did not verify the U.S. inland freight that Foremost included in its exhibit.
- Commerce should account for these freight expenses by applying the highest inland freight reported and applying it to all inventory sales, instead of relying on unverified information.
- Alternatively, Commerce should use the ratio calculated that combined international freight and inland freight for Foremost's delivered, duty paid (DDP) sales for calculating a new freight expense for Foremost's CEP inventory sales.

---

[399] *Id*. at 33-34.
[400] *Id*. at 34.
[401] *Id*. at 12-13.
[402] We note that the SALEDATU is different from the date in which the sale was booked in Foremost's electronic records system (ERP).  For this change, we are using the booking date in Foremost's ERP because this was the date the sale was entered into Foremost's system and recorded as having incurred this expense.
[403] *See* Petitioner January 20 Case Brief at 24; and Petitioner January 27 Rebuttal Brief at 20-21.

*Foremost Case and Rebuttal Briefs*[404]

- Foremost prepared separate worksheets to calculate and report international freight expense ratios for CEP DDP and CEP inventory sales.  These worksheets were structured identically and include both international freight expenses and movement expenses associated with moving products from the U.S. port to the U.S. warehouse.
- In the CEP worksheet, Foremost inadvertently referenced only the international freight costs in the international freight formula.  As a result, Foremost omitted port to warehouse freight expenses for CEP inventory sales from its U.S. sales listing.
- Commerce has the information necessary to calculate the relevant freight amount.  Specifically, Commerce can adjust international freight (INTNFRU) or calculate a new inland freight variable (INLFPWU) by applying a ratio calculated by dividing the total amount of the inadvertently-omitted expense by the total value of Kitchen and Bath Division sales.

**Commerce's Position**:  For the final determination, because Foremost failed to cooperate to the best of its ability with respect to these expenses, we are basing the amount of the expenses for all of Foremost's CEP inventory sales on AFA.

In Foremost's questionnaire response, Foremost stated that "international freight fees include delivery to Foremost's U.S. warehouse."[405]  Along with its narrative response, Foremost provided two worksheets to demonstrate its calculation of international freight expenses, one for sales made out of inventory, and the other for Foremost's DDP sales, or in other words, sales where Foremost was responsible for freight expenses, but the merchandise did not go through inventory.[406]  Despite Foremost's assertion that it "structured the two worksheets identically,"[407] in Foremost's worksheet for DDP sales, Foremost calculated INTNFRU so that it included both ocean and inland freight; however, in Foremost's worksheet of inventory sales, it reported freight in two separate fields:  "Ocean Freight" and "Inland Freight," where the former represents the amount Foremost reported as INTNFRU, and the latter field is not incorporated into the U.S sales listing.  Foremost never explained why it provided "Inland Freight" as a separate amount in its worksheet instead of including the amount in INTNFRU (as it had clearly stated in its narrative).

At verification, Commerce was reviewing Foremost's method for determining its vendors for completeness when it requested that Foremost discuss the transactions booked under a particular freight vendor.  During this exercise, Commerce learned that Foremost booked payments to this company for port to warehouse inland freight (INLFPWU) for inventory sales,[408] which directly contradicted its prior claim that it incurred these expenses as part of international freight.  The verification report discussed this finding as follows:

> During completeness test #1, we noted that FGI had paid for freight services to move merchandise from Chicago to its warehouse in Indiana.  We asked FGI officials whether

---

[404] *See* Foremost Case Brief at 9-11; and Foremost Rebuttal Brief at 13.
[405] *See* Foremost July 22, 2019 CDQR, section C, at 31.
[406] *Id*. at Exhibits C-20.1(A) and (B).
[407] *See* Foremost Case Brief at 10.
[408] *See* FGI Verification Report at 8-9.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

subject merchandise was ever shipped using {this company}, to which they said yes, but that it is hard for them to identify which specific sales because the merchandise is tracked by container, which makes it harder to track in its system.

In reviewing the record and freight documentation provided, FGI concluded that its U.S. sales database did not include inland freight from the port to the warehouse for its inventory sales, but that it had intended to include the expense in its calculation of international freight.  FGI pointed to Exhibit C-20.1 of its section C questionnaire response, dated July 22, 2019 (CQR), where it provided the inland freight expense for each purchase order, but explained that it accidentally did not end up including it in its calculations of international freight.  We did not verify the U.S. inland freight reported at Exhibit C-20.1.[409]

Foremost did not reference the freight exhibit when discussing U.S. inland freight expenses in the narrative portion of its response and the information Foremost pointed to was buried in this exhibit attached to its response.  Because Commerce was unaware, prior to verification, that Foremost included data related to these expenses in an exhibit, we were faced with the choice of reviewing them for the first time at verification or deciding not to examine them further.  Ultimately, Commerce decided not to verify this information because we found that Foremost had not provided sufficient notification to Commerce regarding the U.S. inland freight expenses for its CEP inventory sales.  Prior to verification, as mentioned above, Foremost specifically stated its CEP inventory sales' "international freight fees include delivery to Foremost's U.S. warehouse."[410]  Accordingly, Commerce accepted Foremost's narrative response at face value.

In similar situations, Commerce has acted similarly.  For example, in *HFCs from China*, the respondent buried information material to Commerce's analysis in exhibits attached to a response and Commerce was unaware, until verification, that a problem existed.[411]  In its final determination, Commerce found that the mere fact that the information existed on the record was insufficient notification to Commerce about the specifics of the problem.[412]  Similarly, at verification, Commerce discovered for the first time that, for its CEP inventory sales, Foremost had not reported international freight expenses inclusive of U.S. inland freight to the warehouse.  Consistent with Commerce's practice in *HFCs from China*, and because Foremost provided affirmative statements to the contrary, we find this exhibit to provide insufficient notification to Commerce that Foremost separately incurred the U.S inland freight expenses in question.

Section 776(a)(2)(B) of the Act states that if an interested party fails to provide information in the manner requested, Commerce may use facts otherwise available in reaching its determination.  Further, section 776(a)(2)(C) states that Commerce may also resort to facts available if an interested party significantly impedes a proceeding.  In this case, Commerce requested that Foremost report all inland freight expenses in its U.S. sales database, but it did

---

[409] *Id.* at 11-12.
[410] *See* Foremost July 22, 2019 CDQR, section C, at 31.
[411] *See Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 FR 42314 (June 29, 2016) (*HFCs from China*), and accompanying IDM at Comment 13.
[412] *Id.*

not, despite its assertions to the contrary.  Moreover, section 782(d) of the Act states that if Commerce "determines that a response to a request for information under this title does not comply with the request {Commerce} shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency…"  In this case, as Commerce found in *HFCs from China*,[413] because we were unaware that a problem existed prior to verification, we find that we were not obligated under section 782(d) of the Act to notify Foremost of this issue prior to our final determination. [414]

Foremost's narrative response was incorrect and misleading because Foremost unequivocally stated in its section C questionnaire response that its international freight fees for CEP inventory sales included delivery to the U.S. warehouse.  In other words, that Foremost used a different vendor for its port to warehouse freight, was completely new information found at verification, and that Foremost's reported INTNFRU for its CEP inventory sales did not include inland delivery to the port was also new information discovered at verification.  As a result of Foremost's characterization of these expenses, Commerce was unable to analyze the information pertaining to INLFPWU prior to verification, and it also did not calculate an accurate preliminary dumping margin.

The Federal Circuit held in *Nippon Steel* that "the best of its ability" requires the respondent to do the maximum it is able to do[415] and clarified that adverse inferences should be applied when "under circumstances {when} …it is reasonable for Commerce to expect that more forthcoming responses should have been made."  The Federal Circuit also discusses intent with respect to the application of adverse inference:  "the statute does not contain an intent element.  'Inadequate inquiries' may suffice."[416]  Though Foremost stated that its omission was inadvertent, it made factually incorrect statements, which it failed to correct until Commerce discovered contradictory information at verification.

Accordingly, pursuant to section 776(b) of the Act, we find that Foremost failed to act to the best of its ability because Foremost failed to include inland freight from port to warehouse expenses for inventory sales in its U.S. sales database, and we are applying facts available, with adverse inference, to all U.S. inventory sales.  For the final determination, we are applying the highest ratio, on the record, of Foremost's reported CEP inventory freight expense to inventory value to calculate a new INLFPWU variable.  The only other U.S. inland freight expense information on the record is from the port to the customer for direct CEP and EP sales, and we find that using this information would not be reasonable or an accurate replacement for inland freight from the port to warehouse.

---

[413] *Id*.
[414] *See Certain Hot-Rolled Carbon Steel Flat Products from Thailand:  Final Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review*, 73 FR 33396 (June 12, 2008), and accompanying IDM at Comment 1.
[415] *See Nippon Steel*, 337 F. 3d at 1382.
[416] *Id*. at 1383.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

**Comment 18:  Foremost's U.S. Inland Freight Charges to the Customer**

*Petitioner Case and Rebuttal Briefs*[417]
- Foremost's method of calculating the distance component of this freight expense resulted in distorted freight expenses because Foremost used the same distance for sales shipped to Maine, Florida, and New York.

*Foremost Case and Rebuttal Briefs*[418]
- Commerce's verification report suggests that Foremost's methodology for determining distance when reporting inland freight expenses, from the warehouse to the customer (INLFWCU), was distortive.  However, freight rates are impacted by a number of various factors, so given the circumstances, Foremost's methodology was accurate and reasonable.
- Commerce tested the accuracy of Foremost's reporting and did not find any errors.

**Commerce's Position**:  For the final determination we find that Foremost's methodology for reporting INLFWCU is reasonable, and as such, are not making a change to this expense for our final determination.  In particular, while the method Foremost used is not necessarily exact, there is no record information to suggest that Foremost's methodology is clearly distortive.  Specifically, while the methodology for calculating the distances Foremost used in its calculation of INLFWCU potentially results in disparate locations with the same delivery costs per kilogram, the record does not provide any insight into whether this calculation is distortive, nor does any party point to an example of how this distance calculation distorts Foremost's calculation of inland freight.  Further, Foremost computed this expense in response to a request from Commerce, and we did not require Foremost to adjust this expense.[419]

We recognize the petitioner's concerns with respect to this methodology, and we agree that it requires further consideration.  However, we disagree that the information is unusable in this segment of the proceeding or that any of the conditions for facts available (much less AFA) have been met here.  As discussed above, Commerce requested that Foremost "recalculate {its} movement expenses so that they are based on weight of the transaction {and}…so that distance is considered."  Foremost timely responded to Commerce's request in the form and manner requested, and Commerce verified that information.  Further, Foremost's actions did not impede this investigation.  Additionally, while it is true that Foremost's inland freight expense calculation incorporates the same distance for cities geographically far apart, the record does not indicate that the results of this calculation are unrepresentative of Foremost's actual freight expense.  Accordingly, we are not making any changes for the final determination with respect to INLFWCU, but we will carefully review this methodology in an administrative review, should

---

[417] *See* Petitioner January 27 Rebuttal Brief at 18-20.
[418] *See* Foremost Case Brief at 9-10.
[419] *See* Foremost September 17, 2019 SCQR at 30 (citing Commerce's instruction, which stated:
> Please recalculate your movement expenses so that they are based on weight of the transaction.
> Please also revise your INLFWCU expense so that distance is considered or explain why distance
> is not relevant to the actual inland freight expense you incurred during the POI).

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

Commerce issue an AD order in this proceeding, and should such a review be requested of Foremost.

## Comment 19:  FGI's Acquisition Cost

*Foremost Case Brief*[420]
- Commerce should calculate FGI's acquisition costs where it is not reported, or where it needs to be revised, by adding Foremost Worldwide's standard markup to its acquisition price, so that it can recalculate entered value where necessary.

*Petitioner Rebuttal Brief*[421]
- Commerce should use the formula provided by Foremost to calculate FGI's acquisition costs as necessary.

**Commerce's Position**:  We agree that Commerce should recalculate FGI's acquisition costs (which are used to derive Foremost's entered values), where possible.[422]  Accordingly, for the final determination we are recalculating FGI's acquisition cost to equal Foremost Worldwide's purchase price plus Foremost Worldwide's standard mark up.

We note that both Foremost and the petitioner proposed a formula where Commerce would calculate FGI's acquisition price by adding Foremost Worldwide's standard markup to it.[423] However, we find this calculation mathematically infeasible, considering that Foremost did not report FGIACQU for all applicable sales.[424]  Accordingly, we are determining these costs using the methodology above instead.[425]

## Comment 20:  Labor Hours

*Foremost Case Brief*[426]
- In response to a supplemental questionnaire, Foremost updated its calculation of its direct labor hours, but inadvertently did not incorporate the update into its FOP database.
- This error was minor and resulted in Foremost overstating the direct labor hours. Commerce can reasonably disregard this discrepancy.
- If Commerce chooses to make an adjustment for this error, Commerce can use information on the record to reduce Foremost's reported labor hours.

---

[420] *See* Foremost Rebuttal Brief at 11-12.
[421] *See* Petitioner January 27 Rebuttal Brief at 21-22.
[422] *See* FGI Verification Report at 3; *see also* Foremost's Letter, "Minor Corrections Presented at Foremost's CEP Sales Verification," dated December 18, 2019 (FGI Minor Corrections) at 2.
[423] *See* Foremost Case Brief at 11.
[424] *Id*.
[425] *See* Foremost Final Analysis Memorandum.
[426] *See* Foremost Case Brief at 13-14.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

*Petitioner Rebuttal Brief*[427]
- The petitioner agrees that Foremost's error was minor and that Foremost's reported labor data do not need to be adjusted.

**Commerce's Position:**  At verification, Commerce learned that Foremost corrected its direct labor hours in response to a supplemental questionnaire but did not update its reported FOPs.[428] We agree with both the petitioner and Foremost that this error was minor and, consistent with section 777A(a)(2) of the Act, we are not making any changes to Foremost's direct labor FOP for the final determination.

## Comment 21:   Calculation and Programing Revisions

*Foremost Case and Rebuttal Briefs*[429]
- Commerce should make the minor corrections presented at verification.[430]
- Commerce should disregard one unreported U.S. sale because the error is so minor.  If Commerce does incorporate this sale into the analysis, Commerce should apply the average margin it calculates for other transactions.
- Commerce should calculate VATTAX using entered value and not gross unit price.
- Commerce should adjust the following variables to remove the portion of the value/expenses attributable to non-subject inputs from its calculations:  ENTVALU (and then Commerce should recalculate USDUTYU), BANKCHARU, DIRSELU, COMMU, EARLYPYU, and OTHDIS4U.
- Commerce should convert the glass SV to the units reported in Foremost's FOP file, *i.e.*, from kg/unit to M²/Unit.
- Commerce should reject the petitioner's suggestion (*see* below) that an unreported quality claim referenced in Commerce's verification report should be allocated across all of one customer's sales.  Commerce found no issues with this claim at verification.

*Petitioner Case and Rebuttal Briefs*[431]
- Commerce should make the minor corrections submitted by Foremost at verification.[432]
- Foremost failed to report one sale of subject merchandise because it was sold to a "sales rep."  Commerce should add this sale to Foremost's U.S. sales database and use the average sales adjustments from other U.S. sales.  Alternatively, Commerce should apply AFA to this one sale to be consistent with Commerce's practice.[433]

---

[427] *See* Petitioner January 27 Rebuttal Brief at 24-25.

[428] *See* Foremost September 24, 2019 SDQR at Exhibit SD-27c; *see also* Foremost Woodwork Verification Report at 22.

[429] *See* Foremost Case Brief at 7 and 14-17.

[430] *See* Foremost Case Brief at 12 (citing Foremost Woodwork Verification Report at 2-3; Foremost Worldwide Verification Report at 3; and FGI Verification Report at 2-3)).

[431] *See* Petitioner January 20 Case Brief at 23-24; and Petitioner January 27 Rebuttal Brief at 15.

[432] *See* Petitioner January 20 Case Brief at 23 (citing FGI Minor Corrections; Foremost Woodwork Minor Corrections; and Foremost Worldwide Minor Corrections).

[433] *See* Petitioner January 27 Rebuttal Brief at 15 (citing *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 FR 2019 (April 15, 2015), and accompanying IDM at Comment 5; and *Final Determination of Sales at Less Than Fair*

- Commerce only relied on Foremost Worldwide's short-term interest rate in the *Preliminary Determination*, but for the final determination, Commerce should use FGI's short-term interest rate.
- Foremost was unable to provide documentation to support its claim that it reduced the payment for one transaction to compensate for a quality issue related to a non-subject sale. Commerce should allocate this payment reduction across all of this customer's sales as a warranty expense.

**Commerce's Position**: For the final determination, we have made the corrections presented at the start of Foremost's verifications. We are also changing certain parts of the calculation for Foremost's U.S. price. We are removing the portion of the value/expenses related to non-subject inputs when sales are combination kits for the following variables: ENTVALU, BANKCHARU, DIRSELU, COMMU, EARLYPYU, and OTHDIS4U, and we are revising our calculation of VATTAX to base it on a percentage of ENTVALU, and not of gross unit price. We have used the revised ENTVALU to calculate both VATTAX and USDUTYU.[434]

With respect to calculating NV, Foremost notified Commerce that the correct conversion for its glass FOPs was from kg to $M^2$, but Commerce inadvertently did not convert these FOPs.[435] Accordingly, for the final determination we are converting Foremost's glass FOPs (HW3MMGLS, HW5MMGSL, HW8MMGLS) from kg/unit to $M^2$/unit.

With respect to the short-term interest rate used in calculating CREDITU, we are revising our calculation to use FGI's short-term interest rate for CEP sales, in accordance with our practice to use the U.S. interest rate as outlined in Policy Bulletin 98.2.[436] It is Commerce's practice to calculate the U.S. credit expense using a short-term interest rate tied to the currency in which the sales are denominated and this interest rate should be based on the respondent's weighted-average short-term borrowing experience in the currency of the transaction. Additionally, Policy Bulletin 98.2 states, "{t}he short-term borrowing rate realized by the respondent in the relevant currency is the best measure of the time value of money and the cost incurred by the respondent in extending credit to its customers."[437] With respect to Foremost's CEP sales, FGI is the company incurring the cost by extending credit to its customers, as it is the U.S. affiliate making these sales. Accordingly, because it is Commerce's practice to calculate credit expenses using a short-term interest rate tied to the currency in which the sales are denominated and to use the interest rate incurred by the respondent in extending credit to its customers, Commerce is

---

*Value: Silica Bricks and Shapes from the People's Republic of China*, 78 FR 70918 (November 27, 2013), and accompanying IDM at Comment 7).

[434] *See* Foremost Final Analysis Memorandum for a detailed description of the changes made for the final determination.

[435] *See* Foremost September 24, 2019 SDQR at 27.

[436] *See* Import Administration Bulletin 98.2: Imputed Credit Expenses and Interest Rate (February 23, 1998) (Policy Bulletin 98.2); *see also Certain Tapered Roller Bearings from the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 83 FR 29092 (June 22, 2018), and accompanying IDM at Comment 19.

[437] *See* Policy Bulletin 98.2.

revising its calculation of CREDITU for all CEP sales to use FGI's short-term interest rate, consistent with its practice.[438]

We are not making any adjustments with respect to the petitioner's suggestion for the sale Commerce examined at verification with a quality claim. We find that Foremost provided all of the information requested by Commerce, and the record does not contradict Foremost's assertion that its adjustment was for a sale of non-subject merchandise. [439]

In accordance with section 776(a)(2)(A) of the Act, we are applying facts otherwise available to Foremost's one unreported sale because it withheld information requested by Commerce. Specifically, we found at verification that Foremost had made one U.S. sale to a "sales rep," but Foremost chose not to report it.[440] Foremost was not able to explain why it did not report this sale. Moreover, pursuant to section 776(b)(1) of the Act, we find that Foremost failed to cooperate to the best of its ability in reporting this sale, because it simply chose not to report it.[441] Accordingly, we are applying facts available, with adverse inference, to Foremost's sale of subject merchandise at issue. Although Foremost had the necessary information in its possession, it failed to report this sale in its U.S. sales database, and it provided no reasonable explanation as to why it chose to not report this sale. Therefore, for the final determination, we are basing the dumping margin for this sale on the highest non-aberrational margin computed for any reported U.S. transaction.

## Comment 22:  Total AFA for Meisen

*Meisen Case Brief*[442]
- In the *Preliminary Determination*, Commerce accurately noted that Meisen only reported consumption of birch in its production and Commerce confirmed that point in a supplemental response. There was no evidence on the record that Meisen ever produced or sold maple products.
- Because Commerce's conclusion in the *Preliminary Determination* that Meisen failed to provide complete and accurate information about its production process and FOPs was based only on marketing materials, that finding lacked any connection to the record.
- Instead of proceeding to verification in order to test the accuracy of Meisen's statements, Commerce issued two supplemental questionnaires. In its responses, Meisen reiterated that its FOPs had been reported correctly and provided detailed documentation and other data to support its claims.

---

[438] *See Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administrative Review and Notice of Intent Not to Revoke Antidumping Duty Order in Part*, 74 FR 40167 (August 11, 2009), and accompanying IDM at Comment 12 (stating that "we find that {the U.S. affiliate's} borrowings more closely measure the opportunity cost associated with extending credit to CNA's U.S. customers").

[439] *See* Foremost Worldwide Verification Report at 13.

[440] *See* FGI Verification Report at 7; *see also* FGI Verification Exhibits at VE-6.

[441] *See Nippon Steel*, 337 F. 3d at 1382 (explaining that "the best of its ability" standard in section 776(b) of the Act "does not condone inattentiveness, carelessness, or inadequate record keeping").

[442] *See* Meisen's Case Brief, "Wooden Cabinets and Vanities from the People's Republic of China:  Case Brief," dated January 9, 2020 (Meisen Case Brief).

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

- When Commerce cancelled verification in its December 27 Letter, it noted a difference between the marketing materials and the record information establishing the use of only birch as inputs and the absence of maple but did not identify any inaccurate statement by Meisen regarding its FOPs or misrepresentation regarding its reported sales.[443]

- Although verification is the part of the investigation process in which any continuing concerns are to be addressed, the December 27 Letter offered no explanation why cancelling verification was the appropriate response to any concerns Commerce continued to have.

- Meisen has consistently reported that it does not use any wood input other than birch and that it does not sell merchandise to the United States using any other input.

- Commerce faults Meisen for not immediately responding to the petitioner's pre-preliminary comments but neglects to consider that Meisen already reported that it did not use any other inputs. The claim that Meisen failed to reply to the petitioner's comments is not a valid basis for resorting to AFA, and it is tantamount to delegating Commerce's fact-finding authority to the petitioner.

- Commerce's claim that it expended considerable time and resources to issue multiple questionnaires and review thousands of pages of documentation is ironic given that it was Commerce, not Meisen, that chose to delay verification and issue supplemental questionnaires. Commerce cannot complain on one hand that it had too little information on the maple-birch issue, then complain that it had too much information, while also refusing to verify the information.

- The regulations are unambiguous that, in the investigation phase of a case, verifications will be conducted. To the extent that Commerce is not certain whether information is accurate, the verification process becomes more important, not less.

- In the parallel CVD investigation, Meisen was assigned a calculated rate, not a rate based on AFA, and Commerce conducted a verification. Because the information received in that parallel case is relevant to the usage of birch or maple, and the use of AFA, Commerce should place the full verification outline and report on the record of this investigation and allow parties to comment.

- None of the statutory provisions for application of AFA applies to Meisen; it has met the deadlines set by Commerce and there is ample information on the record showing that Meisen did not use anything other than birch to produce the products sold, it answered every supplemental request fully and completely, and because Commerce decided to cancel verification there has been no failure of Meisen to verify its information.[444]

- Commerce must calculate a dumping margin for Meisen based on information it submitted and must treat all such information as if it had been verified.

*Petitioner Rebuttal Brief*[445]

- Commerce's decision to cancel verification and apply total AFA is supported by the record and consistent with its regulations and established practice.

---

[443] *Id.* at 5 (citing Commerce's Letter, "Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Verification," dated December 27, 2019 (December 27 Letter)).

[444] Although Meisen referred to AFA in making this argument, we understand that Meisen is referencing section 776(a)(2) of the Act.

[445] *See* Petitioner's Meisen Rebuttal Brief, "Rebuttal Brief Regarding Meisen-Specific Issues," dated January 14, 2020, at 3-22.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

- The record shows definitively that Meisen produces subject cabinets and vanities using birch wood yet markets those cabinets and vanities in the United States as maple. Meisen does not deny this fundamental discrepancy and attempts to shift focus to the narrow question of whether Meisen accurately reported the species of its wood FOPs.

- The inconsistency between Meisen's reported FOPs and the merchandise priced, marketed, and sold in the United States, causes the reported cost and sales information to be wholly unreliable and, thus, it is not possible to calculate an accurate dumping margin. This inconsistency could not be resolved at verification.

- Even if Meisen's reported information were verified as accurate, Meisen's cost and sales information would continue to be unreliable. Meisen asks Commerce to set aside this contradiction and to believe that all other information is accurate. However, the fact that Meisen submitted such false and contradictory information itself renders the remaining information submitted unreliable.

- Despite being afforded multiple opportunities to address the discrepancy between the FOPs reported and the species marketed in the United States, Meisen has not provided any argument that explains this fundamental flaw. Instead, Meisen acknowledges that it marketed and sold cabinets as being made of maple yet maintains that all such cabinets were actually made of birch.

- Given the importance of wood species to the production of cabinets and vanities, Commerce properly concluded that Meisen's cost and sales reporting was so unreliable that it must rely on total AFA. Because maple wood is substantially more expensive than birch wood, Meisen is not only misleading its customers, it is distorting its U.S. sales information and preventing an apples-to-apples comparison of costs and prices.

- If the alleged birch cabinets were sold as birch cabinets, then they would be sold at much lower prices; thus, Meisen's U.S. prices are artificially high and using such data would result in a margin that significantly underestimates the actual amount of dumping.

- Meisen submitted significant amounts of information that it knew was inaccurate and falsely described the cabinets sold in the United States, but it made no effort to explain the discrepancy until it was raised by the petitioner and Commerce, despite being afforded multiple opportunities to do so.

- Meisen attempted to explain its marketing materials by claiming that those materials refer to the "look" of the cabinets, but an overwhelming amount of evidence indicates the materials refer specifically to the wood used to produce the cabinets.

- Meisen later claimed that it marketed its cabinets as made of solid maple because there is no optical difference in the finished good between maple and birch, thereby undermining its claim that maple refers to the "look" of the cabinets.

- Meisen's reporting in this investigation falls squarely within the legal framework for total AFA because Meisen routinely provided contradictory information that calls into question the veracity of all the information provided.

- In similar situations where the respondent provided contradictory information to Commerce and to its customers, Commerce has applied total AFA because reliable information necessary to calculate a margin was not available on the record.[446]

---

[446] *Id.* at 20-22 (citing *Certain Steel Grating from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 75 FR 32366 (June 8, 2010), and accompanying IDM at 11; *see also Certain Oil Country*

84

- In other cases, Commerce has found certain deficiencies in the respondent's reporting to be significant enough to render their reported sales information entirely unreliable.[447]
- Meisen argues that it has been forthcoming and answered all of Commerce's questions, but it ignores the fact that it knew that the information it provided to its customers contradicted the information provided to Commerce and it did not inform Commerce of that fact.  Further, Meisen failed to explain why this inconsistency does not distort the reported sales information.
- Commerce's practice in *Certain Hardwood Plywood Products*, *Galvanized Steel Wire*, and *OCTG* establishes that where a respondent has failed to provide cost and sales information that can be reliably compared, Commerce must apply total AFA.
- Commerce is under no obligation to verify the information provided by Meisen in light of the unreliability of Meisen's information.  No information Meisen could have provided at verification would have resolved the flaws in Meisen's reported data; further, verification is not an opportunity for the respondent to fill gaps or cure deficiencies in its responses, but rather its purpose is to verify the information already submitted.
- Meisen's claim that verification is not optional is false, and Commerce has a consistent practice of not conducting verification of a respondent's data where failures of the respondent warrant application of total AFA.[448]

**Commerce's Position:**  We disagree with Meisen that Commerce erred in its decision to apply AFA in the *Preliminary Determination* and, consequently, delay and, ultimately, cancel verification.  We also disagree with Meisen that the continued application of total AFA to Meisen is not warranted for this final determination.

In the *Preliminary Determination*, we found that Meisen did not accurately represent and report the FOPs it consumed in the production of merchandise under consideration, it withheld information, failed to provide information in the form or manner requested, and significantly impeded this investigation.  Further, because the missing information was within Meisen's possession and also because Meisen had the ability not to misrepresent its reported data, it failed to cooperate to the best of its ability and, thus, the application of total AFA was appropriate.[449]  These findings were based largely on record information indicating that Meisen marketed and had sales of merchandise under consideration during the POI that were produced using maple wood, a primary raw material that Meisen failed to report.[450]  The finding was also based on information submitted by the petitioner, including online and print marketing materials, and a sworn affidavit from an individual with extensive experience in the wooden cabinets and vanities industry who, through direct discussions and information provided on the J&K Companies'

---

*Tubular Goods from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, Affirmative Final Determination of Critical Circumstances and Final Determination of Targeted Dumping*, 75 FR 20335 (April 19, 2010) (*OCTG*), and accompanying IDM at Comment 30).
[447] *Id.* at 23-24 (citing *Certain Hardwood Plywood Products* IDM at 13-16).
[448] *Id.* at 30-31 (citing *Certain Hardwood Plywood Products*; and *Galvanized Steel Wire from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 77 FR 17430 (March 26, 2012) (*Galvanized Steel Wire*), and accompanying IDM at 10).
[449] *See Preliminary Determination* PDM at 23-24.
[450] *Id.* at 24.

websites,[451] stated that the merchandise in question was represented to him to be made from solid maple wood.[452]  However, we also stated in the *Preliminary Determination* that, due to the fact that the issue was raised in close proximity to the *Preliminary Determination*, we would continue to consider whether the application of AFA to Meisen was warranted in light of any rebuttal factual information provided by Meisen and, if appropriate, any further information requested by Commerce after the issuance of the preliminary determination.[453]

Between October 8, 2019, and October 17, 2019, Meisen and the petitioner submitted comments regarding Commerce's *Preliminary Determination*.[454]  On October 18, 2019, Commerce notified parties that, in order to consider the comments submitted, it was suspending the planned verification of Meisen but that it might have sought to reschedule the verification at a later date.[455]  On October 25, 2019, Commerce issued Meisen a supplemental questionnaire,[456] to which Meisen responded on November 6, 2019.[457]  On November 18, 2019, Commerce issued an additional supplemental questionnaire to Meisen,[458] to which Meisen responded on November 21, 2019.[459]  On December 27, 2019, Commerce notified Meisen that it would not conduct verification and continued to find that the application of AFA was warranted for Meisen because the "admission that Meisen marketed and sold its cabinets as maple cabinets when, in fact, Meisen claims that they were made of birch, highlights continued concerns regarding the data reported in the CONNUMs for the normal value and the reported U.S. prices."[460]  In its letter, Commerce also noted the following:

> The dissonance between what Meisen marketed to its customers and what Meisen reported to Commerce was information that Meisen had in its possession and could have voluntarily presented to Commerce early in the investigation.  Instead, Meisen chose not to disclose this information until after the petitioner raised it in its comments and Commerce issued an adverse preliminary determination, suspended verification, and expended considerable time and resources to issue multiple supplemental questionnaires and review thousands of pages of documentation in response to those questionnaires.[461]

---

[451] Meisen reported 16 affiliated U.S. resellers (collectively, the "J&K Companies").  *See Preliminary Determination* PDM at 24, fn. 143.
[452] *See* Petitioner Meisen Pre-prelim Comments at Exhibit 7.
[453] *See Preliminary Determination* PDM at 25.
[454] *See* Meisen's Letter, "Meisen Preliminary Determination Rebuttal Letter," dated October 8, 2019 (Meisen Post-prelim Rebuttal Letter); *see also* Petitioner's Letter, "Petitioner's Response to Meisen's October 8th Letter," dated October 15, 2019.
[455] *See* Meisen Verification Memo.
[456] *See* Commerce's Letter, "Post-Prelim Supplemental Questionnaire," dated October 24, 2019.
[457] *See* Meisen's November 7, 2019 Post-Prelim Supplemental Questionnaire Response (Meisen November 7, 2019, PPQR).
[458] *See* Commerce's Letter, "Second Post-Prelim Supplemental Questionnaire," dated November 18, 2019 (Second Post-Prelim Questionnaire).
[459] *See* Meisen's November 21, 2019 Second Post-Prelim Supplemental Questionnaire Response, dated November 21, 2019.
[460] *See* December 27 Letter.
[461] *Id.*

To determine whether subject merchandise is being, or is likely to be, sold in the United States at LTFV, Commerce must make an appropriate comparison between the export price or constructed export price and NV.[462]  Where the subject merchandise is exported from an NME country, Commerce is directed by statute to calculate NV on the basis of the value of the FOPs utilized in producing the merchandise.[463]  In order to make such a comparison, a CONNUM is assigned to each unique product reported in the U.S. sales database based on a set of physical characteristics and matched to a corresponding CONNUM in the FOP database.  Accordingly, Commerce set aside a period of time after the initiation of this investigation for interested parties to comment on the appropriate physical characteristics of wooden cabinets and vanities to be reported in response to Commerce's AD questionnaire.[464]  We further stated that the comments solicited from interested parties would be used to identify the key physical characteristics of the subject merchandise in order to report the relevant FOPs accurately, as well as to develop appropriate product-comparison criteria.[465]

In its comments, Meisen opposed the petitioner's proposal to group wood species used as the face material in broad groupings of solid wood products, stating that the "reporting of the type of wood used as the face material is plainly an important characteristic, and thus must be reported precisely."[466]  Meisen argued that the petitioner's "suggestion to report a vague grouping of products is not tenable as it will allow for manipulation and distortion of surrogate values," and that the petitioner's proposal, "rather than collecting data based on the individual species themselves," is contrary to the way {Commerce} has collected data on wood species . . . and would result in a less accurate margin calculation than if {Commerce} followed its prior practice."[467]  Specifically, Meisen advocated for "collecting data based on individual wood species rather than broad categories of species," because the petitioner's proposal would create a "commingled reporting hierarchy which would result in an 'apples-to-oranges' comparison."[468]  In other words, Meisen argued, at the early stages of this investigation, that failure to compare the exact species sold in the U.S. market with the exact species used in production would result in an unfair comparison.  As explained below, the data that Meisen reported resulted in the same unfair "apples-to-oranges" comparison between CEP and NV as the one Meisen cautioned against in its comments.

Commerce ultimately issued the AD questionnaire with instructions for mandatory respondents to construct the CONNUM using codes for wood species grouped into general categories of "Solid wood – common-grade hardwood species" and "Solid wood – mid-grade hardwood species," where common grade (Code 4)  included "Birch (Betula)" and mid-grade (Code 5) included "Maple (all varieties)."[469]  Given these facts, there is absolutely no scenario where a U.S. sale priced for maple wood could ever be compared to the NV of a product made with birch

---

[462] *See* 19 CFR 351.401(a).

[463] *See* section 773(c) of the Act.

[464] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Initiation of Less-Than-Fair-Value Investigation*, 84 FR 12587, 12588 (April 2, 2019).

[465] *Id.*

[466] *See* Meisen's Letter, "Rebuttal Comments on Product Characteristics," dated April 25, 2019, at 3.

[467] *Id.* at 3-4.

[468] *Id.* at 4-5.

[469] *See, e.g.*, Commerce's Letter, "Antidumping Duty Questionnaire," dated June 5, 2019.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

wood, a comparison Meisen argues that Commerce should now make.  We note that this would also have been the case had we followed Meisen's recommendation of separately coding each wood species out of a concern for perfectly identical matching criteria.

In a post-preliminary questionnaire response, Meisen reiterated that it "only sold cabinets produced from birch," that "the J&K Companies only sold the cabinets produced by Meisen," and that "{t}herefore, by extension the J&K Companies only sold cabinets that were produced by Meisen using birch wood."[470]  In its second post-preliminary questionnaire response, Meisen clarified that the price lists that were a source of concern in the *Preliminary Determination* are simply generic and basic price lists that are used as pricing guides for the sales persons and do not include the final descriptions.[471]  Meisen went on to compare such price lists to a brochure a sales person might present to a purchaser at a home improvement store with basic descriptions that serve as the starting point.[472]  The implicit admission is that, in Meisen's scenario, the customer would have seen the description in the price list and would have a reasonable basis to assume that the wood species and price listed in that document was the starting point and, even if the dimensions were adjusted slightly for the final design, the species of wood presented would be the species provided, which, in this case, was maple.  Meisen's online and print marketing materials are so replete with references to its cabinets being made of solid maple wood, and completely devoid of any reference to the alleged actual species of wood, birch, that its customers would have no reason to believe that the cabinets they purchased were made from any wood species other than maple wood.[473]  In other words, Meisen's customers would have clearly believed that the products they were purchasing were made of solid maple wood, a species of wood that is considered to be of more premium value than common grade birch wood, as a result of online and print marketing, and in-store price lists presented by Meisen's sales people.

Meisen's attempts to alternatively construe any references to maple as a reference to the "look" of the cabinets because Meisen's birch cabinets look like maple, and then on the same page claim that it advertises its cabinets as solid maple wood because "there is no optical difference in the finished good between maple and birch once the cabinet is finished,"[474] is a disingenuous and illogical rationalization as to why Meisen exclusively markets its cabinets as "the finest solid maple."[475]  Indeed, given the wealth of online and print marketing materials on the record, as well as Meisen's own statements identifying Meisen's cabinets as solid maple cabinets,[476] and Meisen's admission that it does not advertise any birch products, there can be no question that Meisen is intentionally misleading its customers into believing they are purchasing maple cabinets and that Meisen's customers believe they are paying for products made of maple wood.

Evidence on the record of this investigation indicates that maple is significantly more expensive than birch, showing that maple solid wood or veneers can be as much as twice as expensive as

---

[470] *See* Meisen November 7, 2019 PPQR at 2.
[471] *See* Meisen November 21, 2019 PPQR2 at 2.
[472] *Id.*
[473] *See* Second Post-Prelim Questionnaire at 4 and Attachment II.
[474] *Id*.
[475] *See* Meisen November 21, 2019 PPQR2 at 2-3.
[476] *See, e.g.*, Meisen November 7, 2019 PQR at 1-2; and Post-Prelim Questionnaire at 3-5 and Attachment II.

birch.[477]  Indeed, the SV used to value maple and birch in the *Preliminary Determination* was 912 Euros and 622 Euros, respectively.[478]  Given that both parties acknowledge the importance of wood species in the production of cabinets, and that the SVs are significantly different, it is reasonable to infer that higher costs lead to higher selling prices when the cabinets are produced using maple rather than birch and that cabinets sold as maple products would command a higher price than cabinets made of birch.  This is implicit in Meisen's product characteristics comments in which it proposed breaking out wood species for Commerce's CONNUMs.

A consequence of Meisen's misrepresentations is the potential masking of dumped sales.  The question before Commerce is simple:  what is the "fair" value of the products Meisen sold in the United States during the POI?  By comparing Meisen's cabinets that are priced as though they were produced with maple, (and which may or may not have been sold at prices below NV for maple cabinets) to an NV based on a non-maple wood species, the degree to which Meisen may be selling at LTFV is effectively obscured.  The purpose of soliciting comments and making a reasoned decision on how respondents are to report physical characteristics in construction of the CONNUM is to avoid the very scenario we are presented with here.  Commerce intentionally separated certain species by grade into separate codes in order to match similar prices to similar costs.  Meisen has subverted Commerce's intent and process by misrepresenting the product being sold, thereby distorting the comparison that Commerce is tasked with making.

Although Meisen provided significant amounts of documentation supporting its reported FOPs,[479] its U.S. sales database is comprised of sales of merchandise priced under CONNUMs that are not included in its FOP database.  Moreover, Meisen's U.S. CONNUMs do not represent the maple cabinets it purported to sell and the record does not contain FOP data for the products Meisen represented selling in the U.S. market.  As a result, U.S. prices for purported maple cabinets and NV for birch cabinets introduces a significant mismatch between the two pillars of our AD margin calculation.  Given the above, we cannot calculate an accurate dumping margin with the data reported by Meisen, nor would verification of the accuracy of Meisen's reported data resolve the discrepancy such that the distortion could be remedied.  Accordingly, we conclude that the rejection of Meisen's data is appropriate for this final determination.

Meisen argues that because the record developed in the companion CVD investigation is relevant to the usage of birch or maple, and the use of AFA, Commerce should place the full CVD verification outline and report on the record of this investigation and allow parties to comment.  As an initial matter, the record of this investigation, and that of the CVD investigation, are separate records.[480]  Moreover, it is not clear how information from the CVD investigation would shed any light on the deficiencies in Meisen's reported information in this AD investigation.  Meisen itself admits that it represented its products to U.S. customers as products made from maple but claims that its products were actually produced using birch wood.  Accordingly, we do

---

[477] *See* Petitioner Meisen Pre-prelim Comments at Exhibit 7.

[478] *See* Preliminary SV Memorandum.

[479] *See* Meisen November 7, 2019, PPQR at Exhibits 2, 3, 8, and 9.

[480] *See, e.g., Tri Union Frozen Prods. v. United States*, 163 F. Supp. 3d 1255, 1274 n.14 (CIT 2016) (explaining that "the agency must make its determinations based on the record before it.  Each of Commerce's proceedings are treated 'as independent proceedings with separate records that lead to independent determinations'") (quoting *E.I. Du Pont de Nemours & Co. v. United States*, 22 C.I.T. 19 (CIT 1998)).

not find that placing information from the CVD investigation on the record of this AD investigation would serve any purpose at this stage of this investigation.

With regard to Meisen's contention that Commerce is required to verify the information it submitted; we disagree.  According to section 782(i)(1) of the Act and 19 CFR 351.307(b)(1)(i), Commerce will verify factual information upon which the Secretary relies in, *inter alia*, a final determination in an AD investigation.  However, for the reasons described herein, we are not relying upon any of Meisen's reported information for this final determination and, therefore, there is no information that must be verified.  Moreover, as a result of the dissonance between Meisen's reported U.S. sales data and its FOP data, its questionnaire responses contain fundamental discrepancies that were not directly addressed until well after the *Preliminary Determination* and that remain unresolved even after Meisen's belated attempt at clarification.  When a party submits substantially deficient responses, Commerce is under no obligation to use this information.[481]  Under these circumstances, there is no requirement to verify the information.[482]  If a respondent provides substantially incomplete questionnaire responses and Commerce must then base the company's rate entirely on facts available, as in this case, then verification is "meaningless."[483]

As discussed above, section 776(a)(1) and (2) of the Act provides that, if necessary information is missing from the record, or if an interested party:  (A) withholds information that has been requested by Commerce, (B) fails to provide such information in a timely manner or in the form or manner requested, subject to subsections 782(c)(1) and (e) of the Act, (C) significantly impedes a proceeding under the statute, or (D) provides such information but the information cannot be verified, Commerce shall, subject to subsection 782(d) of the Act, use facts otherwise available in reaching the applicable determination.

Where Commerce determines that a response to a request for information does not comply with the request, section 782(d) of the Act provides that Commerce will so inform the party submitting the response and will, to the extent practicable, provide that party an opportunity to remedy or explain the deficiency.  If the party fails to remedy or satisfactorily explain the deficiency within the applicable time limits, subject to section 782(e) of the Act, Commerce may disregard all or part of the original and subsequent responses, as appropriate.

Section 776(b) of the Act provides that Commerce may use an adverse inference in applying the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.  In doing so, Commerce is not required to determine, or make any adjustments to, a weighted-average dumping margin based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information.  Further, section 776(b)(2) states that an adverse inference may include reliance on information derived from the petition, the final determination from the AD investigation, a previous administrative review, or other information placed on the record.

---

[481] *See* section 782(e) of the Act which provides that Commerce should use information submitted by interested parties even if the information does not meet all applicable requirements but only when, *inter alia*, "the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination …."
[482] *See Galvanized Steel Wire* IDM at 11.
[483] *Id*.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

Section 776(c) of the Act provides that, in general, when Commerce relies on secondary information rather than on information obtained in the course of an investigation, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.  Secondary information is defined as information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[484] Further, Commerce is not required to estimate what the dumping margin would have been if the interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.[485]

Commerce first became aware of the discrepancy between Meisen's reported U.S. sales and its marketing materials on September 26, 2019,[486] which was less than two weeks prior to the *Preliminary Determination*.[487]  Given the proximity to the *Preliminary Determination*, we based our preliminary decision for Meisen based on total AFA but announced that we intended to continue to examine the issue after the *Preliminary Determination*.[488]  Meisen's claims that Commerce faulted Meisen for not responding to the petitioner's allegations or that Meisen's lack of response was our basis for AFA are misplaced.[489]  Instead, our decision was rooted firmly in the record of this investigation, as it had been developed at the time of the *Preliminary Determination*, and in no way was the result of mere allegations or a lack of response from Meisen.[490]  However, given the importance of the information to Commerce's analysis and gravity of the evidence cited in the petitioner's September 26 letter,[491] it is notable that Meisen had the opportunity to respond with factual information and explanation of its own but chose not to and, instead, waited until after the *Preliminary Determination* to request that Commerce allow Meisen to clarify the record.[492]

Although it is true that Meisen had previously reported to Commerce on more than one occasion that it did not consume any wood species other than birch,[493] the discrepancies cited in the *Preliminary Determination* were not limited to the type of wood that Meisen consumed but also were related to the manner in which Meisen's products were marketed and sold in the United States.[494]  If Meisen believed that it had already addressed the matter of wood species consumed in its production, it still had an obligation to explain to Commerce the numerous instances of marketing materials, and a sworn affidavit, that identified its products as being made of solid maple.  Instead Meisen was utterly silent regarding the discrepancy between its wood consumption and its marketing materials that appeared to directly contradict its consumption

---

[484] *See* SAA at 870.

[485] *See* sections 776(d)(3)(A) and (B) of the Act.

[486] *See* Petitioner Meisen Pre-prelim Comments.

[487] *See Preliminary Determination*.

[488] *See Preliminary Determination* PDM at 23-25.

[489] *See* Meisen Case Brief at 6.

[490] *See Preliminary Determination* PDM at 23-25.

[491] *See* Petitioner Meisen Pre-prelim Comments.

[492] *See* Meisen Post-prelim Rebuttal Letter.

[493] *See* Meisen's section D questionnaire response, dated July 19, 2019, at 12, 14, and Exhibits 1 and 2; and Meisen's supplemental Section D questionnaire response, dated September 16, 2019, at 7.

[494] *See Preliminary Determination* PDM at 23-25.

Barcode:3946193-01 A-570-106 INV - Investigation  -

claims.  As a result of Meisen's failure to clarify the record, Commerce was forced to delay verification and issue two supplemental questionnaires before Meisen directly addressed the issue.[495]  However, even in its second post-preliminary questionnaire response, Meisen gave conflicting and unconvincing reasons as to why its marketing materials misrepresented the species of wood used in its cabinets.[496]

Accordingly, we determine that Meisen withheld information, failed to provide such information in a timely manner, and significantly impeded the investigation, pursuant to section 776(a)(2)(A)-(C) of the Act.  Meisen could have raised the issue of the discrepancies between the products that it marketed to its customers and those it reported to Commerce early in the investigation, especially given Meisen's concerns of properly capturing the wood species in the CONNUM and how it could affect product matches and, ultimately, the dumping margin.  This was information that Meisen had in its possession and could have voluntarily presented to Commerce.  Instead, Meisen chose not to disclose this information until after the *Preliminary Determination* and only after Commerce suspended verification and expended considerable time and resources to issue multiple supplemental questionnaires and review thousands of pages of documentation in response to those questionnaires.  Accordingly, we also find that Meisen failed to cooperate by not acting to the best of its ability and that an adverse inference is warranted is assigning a final margin to Meisen, in accordance with section 776(b) of the Act.  We recognize the petitioner's concerns that the record of this investigation indicates that Meisen is engaged in advertising and selling its materials in an untruthful manner to consumers in the United States.  Such business practices fall within the expertise of the U.S. Federal Trade Commission, and we have therefore shared relevant public information with that agency for further investigation and, if appropriate, enforcement action.

---

[495] *See* Meisen November 21, 2019 PPQR2 at 2-5.

[496] *Id.* at 3 ("The marketing materials are not a reflection of the actual material used in the production of the wooden cabinets during the POI but rather a reflection of the 'look' of the cabinets.  They have been marketed as maple because they look like maple), 5 ("The J&K companies advertise their cabinets as solid maple wood as there is no optical difference in the finished good between maple and birch once the cabinet is finished"), and Attachment II ("all our cabinets are made of solid maple wood door and frames with plywood constructed box" . . . "solid maple wood is the main wood species we use for cabinet door, frames, molding decoration parts, and drawers.").

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

## XI.    RECOMMENDATION

We recommend approving all the above positions.  If these positions are accepted, we will publish the final determination in the *Federal Register* and will notify the ITC of our determination.

☒                          ☐

_____          _____
Agree                      Disagree

2/21/2020

X _____

Signed by: JEFFREY KESSLER

_____
Jeffrey I. Kessler
Assistant Secretary
 for Enforcement and Compliance

93