## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Gary S. Katzmann, Judge**

| | |
|---|---|
| THE ANCIENTREE CABINET CO., LTD. | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Court No. 20-00114 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PLAINTIFF'S RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION

## FOR JUDGMENT UPON THE AGENCY RECORD

Gregory S. Menegaz
J. Kevin Horgan
Judith L. Holdsworth
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiffs*

Dated: September 11, 2020

## TABLE OF CONTENTS

I.     RULE 56.2 STATEMENT ...................................................................... 1

    A.   Administrative Determination Subject to Appeal ........................... 1

    B.   Issues Presented ................................................................................ 1

II.    Standards of Review ........................................................................... 2

III.   ARGUMENT ........................................................................................ 5

    A.   The Department's Selection of Romania as the Primary Surrogate
       Country is Not Supported by Substantial Evidence ....................... 5

        1.   The Romanian Log Import Values Cannot be Relied Upon ................... 6

        2.   Malaysia Sources Superior Surrogate Financial Data ......................... 13

        3.   Malaysia Sources the Best Available Surrogate Data .......................... 21

    B.   The Department's HTS Selection for Certain Inputs was Not Supported
       by Substantial Evidence ................................................................. 23

        1.   Ancientree's MDF ............................................................................... 24

        2.   Ancientree's Paint ............................................................................... 25

        3.   Ancientree's Particleboard .................................................................. 25

    C.   The Department's Surrogate Financial Ratio Calculation is Arbitrary and
       Unsupported by Substantial Evidence ........................................... 26

IV.    Conclusion and Prayer for Relief ..................................................... 29

## TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F. Supp. 2d 1366 (Ct. Int'l Trade Nov. 30, 2012) ..................................................................................................................7

*Allied Pac. Food (Dalian) Co. v. United States*, 435 F. Supp. 2d 1295 (2006)..............................4

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984).......................................2, 6

*Citic Trading Co. v. United States*, 27 C.I.T. 356 (Ct. Int'l Trade 2003). ...................................2-3

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003)....................................4, 26

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197 (1938) ..................................................2

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (Ct. Int'l Trade 1983)..................2

*Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262 (CIT 2006)...........................................3

*Guandong Chemicals Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365 (CIT 2006) ......3

*Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323 (2006)................................................3

*Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344 (April 19, 2018) ........................ 10-13

*Juancheng Kangtai Chem. Co. v. United States*, 2015 Ct. Intl. Trade LEXIS 94 (Ct. Int'l Trade Aug. 21, 2015) ...............................................................................................................................10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29  (1983)............4, 11, 26

*Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) ...............7

*Shanghai Foreign Trade Enters. Co. v. United States*, 318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) ..........................................................................................................................................8, 11

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)......................................................4

*SNR Roulements v. United States*, 402 F.3d 1358 (Fed Cir. 2005)..................................................2

*Taian Ziyang Food Co. v. United States*, 637 F. Supp. 2d 1093 (Ct. Int'l Trade 2009).................7

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ................................................................2

**Statutes & Regulations**

19 U.S.C. § 1516a(b)(1)(B) ..................................................................................................2

**Administrative Decisions**

*Alloy and Certain Carbon Steel Threaded Rod Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 Fed. Reg. 50,379 (September 25, 2019) ..............................................22

*Certain Activated Carbon From the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 67,337 (Dep't Comm. Nov. 9, 2012) ...18

*Certain Hardwood Plywood Products Final Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 82 Fed. Reg. 53,460 (November 16, 2017) ................................................................................................................27

*Certain Passenger Vehicle and Light Truck Tires Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 17,781 (April 26, 2019) ..............................................................................................................19

*Certain Steel Threaded Rod Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 83,800 (November 22, 2016) ....................................................................7-8

*Chlorinated Isocyanurates Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 4852, January 17, 2017) .............................................................................................14

*Chlorinated Isocyanurates Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 5,053 (February 20, 2019) .............................................................................14

*Chlorinated Isocyanurates Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 10,411 (February 24, 2020) .........................................................................17

*Fine Denier Polyester Staple Fiber Final Affirmative Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 24,740 (May 30, 2018) ...........................................................................19

*Hardwood and Decorative Plywood from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 58,273 (Dep't Comm. Sept. 23, 2013) ...............................................................................................................................16

*Hardwood Plywood Products from China.  See Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 38,002 (August 5, 2019) ...........................................................................................27

*Mattresses Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 84 Fed. Reg. 56,761 (October 23, 2019) ..................................................................................................................19

*Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Rescission; 2015-2016*, 83 Fed. Reg. 35,461 (July 26, 2018) ...............................................................................................................27

*Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Partial Rescission of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 25,766 (June 5, 2017) ....................................27

*Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 46,899 (July 19, 2016) ........................................................................27

*Refillable Stainless Steel Kegs Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 84 Fed. Reg. 57,010 (October 24, 2019) ........................................................................................................19

*Steel Wire Garment Hangers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2010-2011*, 78 Fed. Reg. 28,803 (May 16, 2013)..................................................................................................................18

*Xanthan Gum Final Results of the Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed, Reg. 6,513 (February 14, 2018)...............19

## I.      RULE 56.2 STATEMENT

Pursuant to Rule 56.2 (c)(1), Plaintiff The Ancientree Cabinet Co., Ltd., ("Ancientree" or "Plaintiff") hereby states the administrative decision subject to appeal and the issues of law presented:

### A.  Administrative Determinations Subject to Appeal

The U.S. Department of Commerce (the "Department") published its contested final results in the Federal Register on March 31, 2020 and the Antidumping Order on April 21, 2020. *Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Antidumping Duty Order*, 85 Fed. Reg. 22,126 (April 21, 2020*); see also Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Corrected Notice of Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 17855 (March 31, 2020), *incorporating* Issues & Decision Memorandum ("IDM").

### B.  Issues Presented

1.       <u>Issue One</u>: Whether the Department's selection of Malaysia as the primary surrogate country was supported by substantial evidence?

2.       <u>Issue Two</u>: Whether the Department's surrogate value selection for birch and poplar sawnwood as the best available information was supported by substantial evidence?

3.       <u>Issue Three</u>:  Whether the Department's surrogate value selection for particleboard, MDF, and paint as the best available information was supported by substantial evidence?

4.       <u>Issue Four</u>:  Whether the Department's surrogate value ratio calculation was not supported by substantial evidence or arbitrary and capricious?

1

## II.     Standards of Review

This Court "shall hold unlawful any determination . . . found . . . to be unsupported by substantial evidence on the record or otherwise not in accordance with law.[1]  Different standards of review are applicable to the issues in this case.

### A.     Substantial Evidence Standard for Non-Market Economy Cases

"[S]ubstantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[2]  Furthermore, "substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence."[3]  Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'"[4]

In cases involving non-market-economy ("NME") countries, although "the standard of review precludes the court from determining whether Department's choice of surrogate value was the best available on an absolute scale, the court may determine the reasonableness of Commerce's selection of surrogate prices."[5]  While the statute "'grants to Commerce broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis.' . . . [t]his discretion . . . is constrained by the underlying objective of [19 U.S.C. §

---

[1] 19 U.S.C. § 1516a(b)(1)(B)(i); *accord SNR Roulements v. United States*, 402 F.3d 1358, 1361 (Fed Cir. 2005).
[2] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (*quoting Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938)).
[3] *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).
[4] *Diversified Products Corp. v. United States*, 572 F. Supp. 883, 888 (1983) (*quoting Universal Camera*, 340 U.S. at 488).
[5] *Citic Trading Co. v. United States*, 27 C.I.T. 356, 366 (Ct. Int'l Trade 2003).

1677b(c)]; to obtain the most accurate dumping margins possible."[6]  "'This objective is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable relationship to the factor of production it represents.'"[7]

The courts have elaborated on the meaning of "best available" in the NME normal value statute.  The *Dorbest* court wrote a seminal opinion summarizing the law:

> The term "best available" is one of comparison, i.e., the statute requires Commerce to select, from the information before it the best data for calculating an accurate dumping margin.  The term "best" means "excelling all others."  II Oxford English Dictionary 139 (2d 1989); Webster's II new Riverside University Dictionary 168 (1988) ("{e}xceeding all others in excellence, achievement, or quality").  This "best" choice is ascertained by examining and comparing the advantages and disadvantages of using certain data as opposed to other data.

*Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262, 1268 (CIT 2006) ("*Dorbest*"), *citing Guandong Chemicals Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365 (CIT 2006).  The *Dorbest* Court thus concluded that "{o}n factual issues, the court's role 'is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'"  *Dorbest* at 1269, *citing Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1327 (2006) (add'l citations omitted).

According to *Dorbest*, "Commerce needs to justify its selection of data with a reasoned explanation."  *Dorbest* at 1269 (citation omitted).  The *Dorbest* Court further cautioned that {i}n doing so, Commerce must 'conduct a fair comparison of the data sets on the record' with regard to its announced method or criteria."  *Id*., citing *Allied Pac. Food (Dalian) Co. v. United States*,

---

[6] *Citic Trading Co. v. United States*, 27 C.I.T. 356, 365 (Ct. Int'l Trade 2003) n.12 (citations omitted).
[7] *Id.* (citations omitted).

435 F. Supp. 2d 1295, 1313-14 (2006).  Finally, *Dorbest* warned:  "Commerce's findings or conclusions rendered in equations or numeric form are not beyond scrutiny."  *Id*.

### B.  Arbitrary & Capricious Standard

 This Court will hold as unlawful any administrative decision that is arbitrary, capricious, or an abuse of discretion.  *See* 19 U.S.C. § 1516a(b)(l)(A).  Normally, an agency decision would be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Moreover, Commerce acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003). It is well-established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (alteration, quotation marks and citation omitted).  An agency "must cogently explain why it has exercised its discretion in a given manner."  *Motor Vehicle Mfrs.*, 463 U.S. at 48 (citations omitted).  Thus, when the administering agency's actions are internally inconsistent and self-contradictory, and the agency treats similarly situated parties differently or fails to consider an important aspect of a problem, the agency's decisions are arbitrary and capricious and subject to reversal.

### III.   ARGUMENT

Plaintiff takes appeal of the Department's final determination in the antidumping duty investigation on Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China.  Because this was a nonmarket economy order, the Department does not use respondents' actual cost records to value its inputs, home market sales, and financial statements for the purposes of calculating the normal value.  Rather, the Department selects surrogate values from a surrogate country.  Each of the issues Plaintiff appeals concerns the Department's choice of surrogate country or surrogate values.

### A.   The Department's Selection of Romania as the Primary Surrogate Country is Not Supported by Substantial Evidence.

In the Preliminary and Final Results, the Department relied upon Romania as the primary surrogate country.  The record contained a full surrogate value record for Romania and Malaysia.  The Department determined that both Romania and Malaysia satisfied the statutory requirements for selection as a surrogate country.  IDM at 31.  Both Romania and Malaysia are economically comparable to China, are significant producers of comparable merchandise, and had quality available surrogate data.  Accordingly, the Department made its surrogate country determination based upon which country sourced the best available information for the surrogate values.  The Department selected Romania instead of Malaysia, finding that the Romanian record was superior because the single Romanian surrogate financial statement, Sigstrat, had an energy line item and a supposedly more detailed overhead line item.  *Id.* at 37.  However, the Department's emphasis on these line items rather than the overall comparability of the production of the company and the number of financial statements available, is not reasonable and contrary to normal practice.  The record supports a finding that Malaysia is superior with respect to surrogate financial data.  Further, the Department's analysis of the most critical inputs, birch and

poplar sawnwood, in Malaysia and Romania was wholly inadequate.  The Romanian sawnwood

import values are not only less specific than those available in Malaysia, but are unusable.

Lastly, other less critical surrogate value data is also superior in Malaysia.  In sum, any

reasonable view of the record as a whole must conclude that Malaysia sources the best available

information, and therefore, Malaysia should have been selected as the primary surrogate country.

*Atlantic Sugar*, 744 F.2d at 1562 ("[S]ubstantial evidence" must be measured by a review of the

record as a whole, "including whatever fairly detracts from the substantiality of the evidence.").

### 1.   The Romanian Sawnwood Import Values Cannot be Relied Upon.

While the Department's surrogate country determination was based on the relative

quality of the financial statements in each country, Plaintiff submits that the surrogate value data

for the main inputs, sawnwood, is equally, if not a more, critical component of the analysis.

Further, Plaintiff submits that even if the Court upholds the Department's reliance on Romania

as the primary surrogate country despite its data quality issues, the Court should nonetheless find

that the Department's reliance on the Romanian sawnwood import values is not supported by the

record.  Malaysia sources the best available information to value Ancientree's most critical

inputs, birch and poplar sawnwood.  The Romanian sawnwood import values relied upon are not

as specific as that available in Malaysia, and critically, the Romanian import values were based

on insignificant and uncommercial quantities.

The Department relied upon the 6-digit HTS 4407.97 to value Ancientree's poplar

sawnwood input, which covers "Poplar and Aspen wood sawn or chipped lengthwise, sliced or

peeled, whether or not planed, sanded, or end-jointed of a thickness exceeding 6 mm" and relied

upon the 6-digit HTS 4407.96 to value Ancientree's birch sawnwood input, which covers "Birch

wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded, or end-

jointed of a thickness exceeding 6 mm."  Ancientree explained that its sawnwood inputs are not

6

planed or end-jointed in its surrogate value submissions and comments before the Department.

*See* Ancientree Prelim. SVs (August 7, 2019) at Exhibit SV-1; PD952-953; Ancientree Final SVs

(September 3, 2019) at Exhibit SV2-1; PD1328-1331; Ancientree Preliminary Comments

(September 19, 2019) at 4; PD1371; *see also generally* Ancientree Fourth Supplemental

(September 18, 2019) (production flowchart) at Exhibit SQ4-10; CD1365-1366, PD1367.

Therefore, reliance on these six-digit HTS numbers includes these dissimilar wood products.  In

contrast, Malaysia provided 10-digit specific HTS for its sawnwood inputs, namely HTS

4407.97.90.90, which specifies "Poplar and Aspen wood sawn of a thickness exceeding 6 mm,

Other than Planed, sanded or end-jointed: Other than Sawn lengthwise and Sliced or peeled" and

4407.96.90.90 "Birch wood sawn of a thickness exceeding 6 mm, Other than Planed, sanded or

end-jointed: Other than Sawn lengthwise and Sliced or peeled."  These HTS numbers are

specific to the sawnwood that Ancientree consumes and therefore constitute the best available

information for the final determination.

The Department prefers specificity, particular for the valuation of the subject

merchandise's primary raw material.  While the Department considers several factors in its

surrogate value analysis, specificity is clearly the most critical component.  The Court has upheld

this finding "in sum, 'product specificity' logically must be the primary consideration in

determining 'best available information.' If a set of data is not sufficiently 'product specific,' it is

of no relevance whether or not the data satisfy the other criteria set forth in Policy Bulletin 04.1."

*See Taian Ziyang Food Co. v. United States*, 783 F. Supp. 2d 1292, 1330 (Ct. Int'l Trade 2011),

*see also Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014)

(surrogate value selection justified where Commerce treated product-specificity as "more

important factor" than other criteria); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618

F.3d 1316, 1320 (Fed. Cir. 2010) (affirming selection of "product-specific data" as "best available information"); *see also Certain Steel Threaded Rod Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 83,800 (November 22, 2016) and accompanying IDM at 8 (Relying on Bulgaria as the primary surrogate country because it had greater specificity for the relevant diameter of the steel inputs).  The Department failed to follow its well-established preference for specificity in determining that Romanian sawnwood import values were no less superior than the Malaysian sawnwood import values.

Not only did the Department rely on less specific sawnwood import values in Romania, but the Department improperly relied upon values based on insignificant and uncommercial quantities.  *Shanghai Foreign Trade Enters. Co. v. United States*, 28 C.I.T. 480, 495 (2004) ("The Commerce decision fails to establish that the small amount of pig iron imported by India during the period of investigation was statistically or commercially significant and demonstrates no apparent consideration of that issue. Commerce did not address the issue whether the Indian Import Statistics were based on too small a sample to be reliable.") (finding 1,132 metric tons imported into India during the POI was not commercially significant and therefore could not be relied upon.). Romania imported a mere 324 M3 under HTS 4407.97 and 259 M3 under HTS 4407.96.  Final SV Memo at Att. 3e; PD1560&1571.  The small quantity of these shipments is even more obvious when looking at the monthly import volumes by exporter:

| Importer | Exporter | HTS | Year | Month | Euro | M3 |
|---|---|---|---|---|---|---|
| Romania | Latvia | 440796 | 2018 | 7 | 14338 | 30 |
| Romania | Austria | 440796 | 2018 | 7 | 14717 | 29 |
| Romania | Netherlands | 440796 | 2018 | 8 | 309 | 1 |
| Romania | Austria | 440796 | 2018 | 8 | 17147 | 10 |
| Romania | Austria | 440796 | 2018 | 9 | 35612 | 38 |
| Romania | Italy | 440796 | 2018 | 10 | 3291 | 3 |
| Romania | Austria | 440796 | 2018 | 10 | 14059 | 28 |
| Romania | Austria | 440796 | 2018 | 11 | 29687 | 59 |
| Romania | Russia | 440796 | 2018 | 12 | 2760 | 26 |
| Romania | Italy | 440796 | 2018 | 12 | 2948 | 3 |
| Romania | Latvia | 440796 | 2018 | 12 | 19261 | 32 |
|  |  |  | total |  | € 154,129 | 259 |
| Romania | Ukraine | 440797 | 2018 | 8 | 5497 | 40 |
| Romania | Ukraine | 440797 | 2018 | 9 | 5203 | 38 |
| Romania | Bosnia & Herzegovina | 440797 | 2018 | 10 | 3531 | 33 |
| Romania | Ukraine | 440797 | 2018 | 10 | 17810 | 127 |
| Romania | Estonia | 440797 | 2018 | 11 | 3965 | 4 |
| Romania | Ukraine | 440797 | 2018 | 11 | 10524 | 77 |
| Romania | United States | 440797 | 2018 | 12 | 2308 | 5 |
|  |  |  | total |  | € 48,838 | 324 |

*Id.*  Imports of less than a container load or at most, one container, during an entire month are not commercial shipments.  These import quantities are not adequate to supply a single commercial wooden cabinet manufacturer, much less an entire cabinet industry.  Moreover, sawnwood is a major raw material used in numerous wood industries.

For example, Ancientree alone consumed approximately **248%** and **1072%** times as much poplar and birch sawnwood during the POI than was imported into all of Romania.  *See* Ancientree Section D at Exhibit D-2.1; CD1023, PD911.  While the Department does not have to perfectly match the Respondent's purchasing situation, the Department must rely upon a commercially significant import volume for surrogate values and has agreed that a respondents' own purchasing situation is a clear indicator of commercial quantity in the industry.  See *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1361-1362 (April 19, 2018) ("Commerce's

conclusory assertion regarding the significance of the imports into Thailand fails to apprise the court why 122 metric tons is sufficiently significant to yield a representative price in light of respondents' production experience.") *see also Juancheng Kangtai Chem. Co. v. United States*, 2015 Ct. Intl. Trade LEXIS 94, *65-66, 78 (Ct. Int'l Trade Aug. 21, 2015) (finding the Department's refusal to consider the respondent's actual purchasing and consumption quantity at odds with the Department's practice regarding other surrogate values and the statutory objective in general, maintaining that, "the commercial significance of import statistics is not something in the abstract, they must be reflective of, if not 'exactly' reflecting, such significance in comparison with actual experience, of the producers or exporters of the input under consideration, to the extent possible.").

The commercial reality of Ancientree and the other respondents testifies to the low quantity of imports into Romania of these major inputs.  Further, while Malaysian import data alone may not be a measure for commercial quantity, the Malaysian import volume can be considered alongside the Respondents' consumption volumes to demonstrate that 324 M3 and 259 M3 are not commercial quantities for a six-month period.  Malaysia imported 2,240 M3 under the highly specific HTS for poplar, 4407.97.90.90 and 955 M3 under the highly specific HTS for birch, 4407.96.90.90.  Ancientree Prelim. SVs (August 7, 2019) at Exhibit 2, PD952-953; *see also* Ancientree Final SVs (September 3, 2019) at Exh SV2-2, PD1328-1331; *see also* Foremost Rebuttal SVs (August 19, 2019); PD1010.  Malaysia imported 691% more (poplar) and 369% more (birch) than Romania imported.  The record does not contain the 6-digit HTS import volumes into Malaysia, but the volume difference necessarily would be even greater.  A fair view of the record as a whole demonstrates that the Romanian import volumes are not commercial quantities.  Therefore, the Romanian import volumes are not a reliable, usable

surrogate value.

While Ancientree raised this argument before the Department, the Department primarily avoided the actual argument made. *See State Farm*, 463 U.S. at 43 (an agency decision is arbitrary and capricious of the agency "entirely failed to consider an important aspect of the problem"). The Department briefly states that the Romanian import volume does "not appear immaterial" and dismisses the commercial relevance of the respondents' purchase data, the Malaysian import data, and the general uncommercial nature of less than a container being imported monthly into Romania. IDM at 43. Instead, the Department focuses its discussion on its normal analysis for determining if a certain SV is aberrational, faulting Ancientree with not providing enough datasets to determine if the Romanian import AUV is aberrant. IDM at 37-38 & 42-43. In doing so, the Department also misidentifies the issues in *Juancheng Kangtai*, suggesting that an analysis of price and quantity was required. *Id*. While the plaintiffs in *Juancheng Kangtai* did also make arguments regarding the price of chlorine, there was a separate discussion of quantity alone where the Court found that "Commerce's decision was essentially *ipse dixit* and failed to establish that the amount imported into India 'was statistically or commercially significant…'" *Juancheng Kangtai*, 2015 Ct. Intl. Trade LEXIS at *70-71. Further, as discussed above and below, other caselaw clearly discusses quantity alone in the "commercially significant" analysis.

Contrary to the Department's discussion of this issue, the analysis for aberrancy and the analysis for commercial quantity are different. In determining aberrancy, the Department does compare the values on the record for the raw material, preferring to have the import values for all potential surrogate countries. However, even if a party has not specifically argued that an AUV is aberrant, the Department is always obligated to rely upon a statistically or commercially

significant quantity for an import value.  *See, e.g., Shanghai Foreign Trade Enterprises Co., Ltd. v. United States*, 318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) (Where Commerce erred in failing to establish that the import value relied on was based on a statistically or commercially significant quantity).  Plaintiff has argued that the import quantity into Romania did not meet this standard.  The requirement for a commercially significant volume is tied to the purpose and accuracy of the dumping margin calculation.  The Department must calculate an accurate dumping margin, representative, to the extent possible, of the fair market value in a hypothetical market.  A commercial producer purchases commercial quantities of its raw materials.  Small insignificant import volumes are understandably presumed not representative of the commercial quantity and value that a hypothetical commercial producer would purchase.  This Court has explained:

> Plaintiffs persuade the court, however, that a remand is required with respect to Commerce's conclusory analysis regarding commercial significance. Although "Commerce need not duplicate the exact production experience of the Chinese manufacturers at the expense of choosing a surrogate value that most accurately represents the fair market value of [the respective input] in a hypothetical market-economy []," *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (internal quotation marks, alterations, and citation omitted), **"a surrogate value must be as representative of the situation in the NME country as is feasible," id. Representativeness is important if Commerce is to fulfill its statutory mandate of calculating dumping margins as accurately as possible.** *Juancheng Kangtai Chem. Co., Ltd. v. United States, SLIP OP. 2015-93, Slip Op. 15-93, 2015 WL 4999476*, at *25 (CIT Aug. 21, 2015) (citation omitted); *see also Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001) (noting Commerce's obligation to "establish[] antidumping margins as accurately as possible."). For this reason, the court has remanded agency determinations that failed to adequately address the commercial significance of the quantities underlying its selected surrogate values. *See Juancheng Kangtai*, SLIP OP. 2015-93, 2015 WL 4999476, at *25; *Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, SLIP OP. 2013-30, 2013 WL 920276, at *5 (CIT Mar. 11, 2013); *Shanghai Foreign Trade Enters. Co., Ltd. v. United States*, 28 CIT 480, 318 F. Supp. 2d 1339, 1352-53, SLIP OP. 2004-33 (2004).

> The Government asserts generally that "Commerce was within its discretion to conclude, as it did, that Thai import quantities were not too small to be representative of respondents' production price." Gov. Rule 56.2 Resp. at 40-41. Commerce indeed has "wide discretion in the valuation of factors of production," *Nation Ford*, 166 F.3d at 1377, but that discretion does not absolve the agency of its responsibility to articulate a "rational connection between the facts found and the choice made," *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962). **Commerce's conclusory assertion regarding the significance of the imports into Thailand fails to apprise the court why 122 metric tons is sufficiently significant to yield a representative price in light of respondents' production experience.**

*Jacobi Carbons*, 313 F. Supp. at 1361-1362 (emphasis added). The Department similarly has made a conclusory assertion in this instant case that the Romanian import quantities must be significant and largely ignores Ancientree's arguments. The Department's analysis is arbitrary, and its conclusions not supported by record evidence.

In sum, Romania sources less specific import values for Ancientree's two most important raw materials, and the Romanian values are based on an insignificant, uncommercial quantity of merchandise. The Court should find not only that the Department's selection for this raw material is unsupported by the record, but as a consequence, the Department's entire surrogate country selection is unsupported by record evidence.

### 2. Malaysia Sources Superior Surrogate Financial Data.

The Department made its surrogate country determination based upon the relative quality of the financial statements available in Romania and Malaysia. The Department's emphasis on two line items broken out in the sole Romanian statement, which were either not available or not detailed line items in the multiple Malaysian statements, overlooks the far-greater production comparability and number of financials available from Malaysian producers.

The record contains three contemporaneous financial statements from Malaysian manufacturers engaged solely or primarily in the production of comparable and identical

merchandise[8]:  *See* Ancientree Final SVs at Exhibit 3 (Lii Hen financial statement), Exhibit 5

(Poh Huat Furniture Industries financial statement), and Exhibit 7 (Yeo Aik Wood financial

statement); PD1328-1331.  The Department acknowledged that the three Malaysian companies

produce comparable merchandise, but claimed the record lacked evidence of identical

production.  The record establishes, however, the high comparability of these three companies

and the fact that two of them are engaged in identical production.

Lii Hen's financial statement states that its revenue was "wholly generated from the sales

of furniture products" in 2018.  Lii Hen financial statement at 2.  Lii Hen has "six major

subsidiary companies that are involved in the manufacturing of a vast range of wood based

products."  Lii Hen financial statement at 4.  The company is solely engaged in comparable

production of wooden furniture.  Moreover, the pictures in the financial statement and the

company's webpage demonstrate that Lii Hen produces identical merchandise.  Ancientree Final

SVs at Exhibit 3 (containing webpage materials and the financial statement); PD1328-1331.  The

---

[8] Plaintiffs note that the record contained ten financial statements from Malaysia and only one
from Romania.  However, three of the Malaysian financial statements were slightly less
contemporaneous and four of the financial statements were from large investment companies,
albeit with subsidiaries engaged in the production of identical or comparable merchandise.
Prelim. IDM at 13-14.  In its past practice, the Department has relied on financial statements
from large investment companies with even more of a variety of activities than those on the
record here and found that so long as a company is engaged in comparable production, the
company is overall comparable.  *See*, *e.g.*, *Chlorinated Isocyanurates Final Results of
Antidumping Duty Administrative Review; 2014-2015*, 82 FR 4852, January 17, 2017) and
accompanying IDM at Comment 2 (relying on a large corporation's financial statement with a
variety of business and production activities); *Chlorinated Isocyanurates Final Results of
Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 5,053 (February 20, 2019)
and accompanying IDM at Comment 3(relying on a large corporation's financial statement with
a variety of activities).  Therefore, the Department could have relied upon these Malaysian
statements for reliable surrogate financial ratios.  Nonetheless, the record still contains three
financial statements from companies engaged solely in the production of comparable
merchandise; therefore, in any event, the Malaysia record with respect to financial data is
superior to the financial data from Romania.

company produces wooden cabinet units for the bedroom and living room.  *Id*.  The statement also indicates that the company consumes identical raw materials.  The "main raw materials used in the manufacturing of the furniture products are mainly wood that comprise of solid wood, particleboard, veneers, MDF, plywood, pine wood and oak wood" and other finishing/packing materials.  Lii Hen financial statement at 7.  Lii Hen is solely engaged in producing highly comparable products and also produces identical merchandise.

Poh Huat describes its principal business as the "manufacturing and sale of furniture." Poh Huat Furniture Industries financial statement at 15.  Poh Huat's webpage has pictures of identical merchandise, namely wooden cabinet units for the office, bedroom, and living room. Ancientree Final SVs at Exhibit 4.  Poh Huat's parent company's financial statement also specifically discusses that it produces and sells wooden office and home furniture "cabinets."  *Id*. at pages 13-14.  The parent company's financial statement also states that as a manufacturer, the costs of its direct materials impact its costs, stating "solid wood, MDF, particleboards, veneers, metal components, finishing materials and carton boxes" as its key materials.  *Id*. at 16.  The record establishes that Poh Huat is engaged primarily in comparable production, produces identical merchandise, and consumes the same raw materials as Ancientree.

Yeo Aik Wood's financial statement describes its principal business as "manufacturing and selling furniture."  Yeo Aik Wood financial statement at 11.  Yeo Aik Wood's webpage shows pictures of its merchandise—all various types of wooden furniture.  Ancientree Final SVs at Exhibit 7 (containing webpage materials and the financial statement).  The webpage also mentions in several places that rubberwood is one of its primary raw materials, which is not the same type of wood used by Ancientree, but indicates the company's main raw material is a similar type of wood.

The three Malaysian statements fulfil the Department's preference to rely upon financial statements that most closely match the respondents' production, taking into consideration the level of integration, the production process, the end-products produced, and the raw materials consumed. *See Hardwood and Decorative Plywood from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 58,273 (Dep't Comm. Sept. 23, 2013) and accompanying *Issues & Decision Memo* at 62 ("The Department's standard criteria for selecting financial statements in calculating surrogate financial ratios includes examining the level of integration of the surrogate company in order to approximate the overhead costs, SG&A, and profit levels of the respondent.  Further, the Department has an established practice of rejecting financial statements of surrogate producers whose production process is not comparable to the respondent's production process when better information is available.").

In contrast, the record contains only one financial statement from a Romanian company primarily engaged in less comparable production, Sigstrat.  Sigstrat states it is engaged in manufacturing "wooden plywood, veneering, seats and backrests, chairs, tables, wood chip lights, and other wooden products."  *See* Pet. Prelim. SVs at Exhibit 10 (Sigstrat 2018 financial statement) at 2l; PD956-961.  The main activity objective is the "manufacturing of veneer and wooden panels."  *Id*.  Further, the company delineated its revenue by the following products, further demonstrating the primacy of plywood among its manufacturing activities:

| PRODUCT NAME | VALUE (lei) |
|---|---|
| - plywood interior use | 12.197.902 |
| - veneer | 584.842 |
| - molded products | 11.539.443 |
| - lighters | 53.865 |
| TOTAL | 24.376.052 |

Sigstrat 2018 financial statement at 23.  The Department claims that merely because 50 percent

of Sigstrat's sales were of plywood that does not mean that its costs were based 50 percent on the cost of plywood. IDM at 35.  However, the fact that most of its revenue was from selling plywood, a cheaper product than a more advanced molded product[9], and the company's own classification of its main company activity as manufacturing veneer and wooden panels, validate the fact that plywood and veneer is its primary business.  Moreover, the Department has relied upon sales value as an indicator of the size of different business segments when evaluating financial statements in the past.  *Chlorinated Isocyanurates Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 10,411 (February 24, 2020) and accompanying IDM at Comment 2 (discussing the business segments of CYDSA based upon the revenue).

Sigstrat may produce molded wooden furniture, but its primary business remains plywood and veneer.  Plywood and veneer production is a significant step removed upstream from the production of subject merchandise.  Ancientree consumes plywood in its production of cabinets.  Foremost consumes plywood and veneer in its consumption of plywood.

Further, the production of molded wooden products is also less comparable to cabinet production than other types of wooden furniture manufacturing.  The Malaysian financial companies produce end tables, desks, entertainment consoles, desk drawers, bedroom tables, etc. that are identical or highly comparable to the production of cabinets.  While cabinets may have moldings, cabinets themselves are not molded products.  Further, Sigstrat does not produce cabinets.  Therefore, even if Sigstrat produced primarily molded wooden products (which it does not), Sigstrat's production would still be less comparable than the production activities of the Malaysian companies' financial statements.

---

[9] While this should be self-evident to the Department, as a Commerce agency with investigations in both industries, Sigstrat's financial statement also states that the molded product industry products have a higher net value.  Sigstrat 2018 financial statement at 5.

The Department also points out that the Malaysian financial statements do not break down their revenue by product sold.  IDM at 36.  However, this analysis overlooks that the three Malaysian companies are solely or primarily engaged in comparable and identical production. None of the Malaysian companies list another industry among their primary businesses. Therefore, it is unnecessary for the companies to have broken down their revenue by product to indicate that their primary business is of comparable merchandise.  Further, as stated above, Lii Hen indicates its revenue was solely from furniture sales.  The other companies also list their raw materials consumed, which are the same or similar to Ancientree's raw materials.

The record establishes that the three Malaysian financial statements are from more comparable producers than Sigstrat.  Further, Malaysia sources three financial statements (two identical producers and one highly comparable producer) while Romania sources only a single financial statement.

The Department has often made surrogate country determinations based on the comparability and quantity of financial statements.  *See Certain Activated Carbon From the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 67,337 (Dep't Comm. Nov. 9, 2012), and accompanying IDM at Cmt. 1F (after preliminarily finding Thailand to be the most suitable surrogate country, the Department changed its position in the final results, selecting the Philippines because multiple Philippines financial statements provided a broader market average than the sole Thai statement, satisfying the Department's "preference for using multiple financial statements.").  This preference is based on the Department's understanding that there may be certain cost distortions in one company's financial situation, so using multiple financial statements reduces the potential for such distortions in the comparable industry. *See, e.g., Steel Wire Garment Hangers from the People's*

18

*Republic of China: Final Results of Antidumping Duty Administrative Review, 2010-2011*, 78
Fed. Reg. 28,803 (May 16, 2013) and accompanying *Issues & Decision Memo* at Cmt. 1D.
Malaysia sources multiple financial statements from identical producers while the record only
has one Romanian financial statement.  Accordingly, under Department practice, the Department
should find that Malaysia sources superior financial data.

> The Department misrepresents the full record of information regarding the comparability
of the financial statements, but also over-emphasizes supposed issues in the detail of the
Malaysian statements.  The Department declined to rely upon these statements and declined to
rely upon Malaysia overall as the primary surrogate country because the financial statements do
not break out energy costs.  IDM at 37.   However, the Department has relied upon financial
statements that do not segregate energy costs in numerous cases without finding this lack of a
detail a reason not to rely on those statements or on a surrogate country generally. *Refillable
Stainless Steel Kegs Final Affirmative Determination of Sales at Less Than Fair Value and Final
Affirmative Determination of Critical Circumstances, in Part*, 84 Fed. Reg. 57,010 (October 24,
2019) (relying on Malaysia as the primary surrogate country and relying on a Malaysian
financial statement that did not break out energy or labor); *Mattresses Final Affirmative
Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical
Circumstances, in Part*, 84 Fed. Reg. 56,761 (October 23, 2019) (relying on Malaysia as the
primary surrogate country and relying on a Malaysian financial statement that did not break out
energy or labor); *Certain Passenger Vehicle and Light Truck Tires Final Results of Antidumping
Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg.
17,781 (April 26, 2019) (relying on Thailand as the primary surrogate country and relying on a
Thai financial statement that did not break out energy); *Fine Denier Polyester Staple Fiber Final*

*Affirmative Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 24,740 (May 30, 2018) (relying on Thailand as the primary surrogate country and relying on a Thai financial statement that did not break out energy); *Xanthan Gum Final Results of the Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed, Reg. 6,513 (February 14, 2018) (relying on Thailand as the primary surrogate country and relying on two Thai financial statements that did not break out energy or labor).

The Department also questioned the detail of the overhead costs in the Malaysian financial statements. IDM at 34. The Romanian statement has a line item that states "production overheads." Sigstrat 2018 financial statement at 64. There is no further explanation of what is included in that overhead. In contrast, the Malaysian statement do not have a line item specifically for overhead, but instead itemize depreciation and rental expenses. IDM at 34-35. However, as the Department is aware, depreciation and rental expenses are the primary manufacturing expenses. It is more common for financial statements to delineate specific items that the Department then classifies as overhead rather than an overall "production overhead" line item. The Department has created issues where there are none. There is nothing unusual about the classification of overhead items in the Malaysian statements and this is not a controversial issue the Department has identified in the past, including through relying on similarly detailed Malaysian financial statements.

The Department has consistently found that the comparability of the production experience of the surrogate producer, namely the products produced, the level of integration, and the raw materials consumed, is the most critical component of its selection of financial statements. Malaysia sources financial statements from the most comparable producers. The Department also has a well-established practice of preferring to rely upon multiple financial

statements.  Only Malaysia sources multiple financial statements.  Therefore, based upon the record and Department practice, Malaysia sources the best available information to value Ancientree's financial ratios.

### 3.  Malaysia Sources the Best Available Surrogate Data.

As argued above, Malaysia sources the best available information to value Plaintiff's main raw materials, sawnwood, and the best available information to value Plaintiff's financial ratios.  The main raw materials and the financial ratios are the most important cost factors and should be the deciding factors in selecting the primary surrogate country.  However, Plaintiff also notes that there are no other data advantages in Romania.  In fact, Malaysia sources the best available information for other inputs as well.  While they are less important, they further underscore that any reasonable mind viewing the entire record would determine that Malaysia sources the best available information and should be selected as the primary surrogate country.

Malaysia sources superior information to value labor and B&H expenses.  The Department relied upon a general overall manufacturing labor rate in Romania. *See* Final SV Memo at Att 5; *see also* Pet. Prelim. SVs at Exhibit 5 (submitting the labor data); PD956-961; *see also* Wen Bo Rebuttal SVs (August 19, 2019) at Exhibit 1 (submitting the labor data) PD1009.  However, Malaysia provides a very specific labor rate for "manufacturer of wooden and cane furniture" that is also fully contemporaneous with the POR.  *See* Ancientree Prelim. SVs at Exhibit 4; PD952-953. The Department attempts to avoid this fact by stating it does not know what "cane furniture" entails.  IDM at 40.  However, the Department certainly understands what wooden furniture is, and therefore, although the labor rate included wooden furniture and cane furniture manufacturing labor costs, that description is obviously more specific than an overall manufacturing labor cost that covers every manufacturing industry from medicine to produce.  Further, the Romanian source does not specify what is included in this "gross wages in

manufacturing" labor rate downloaded from tradingeconomics.com.  In contrast, the record

contains the full explanation and methodology of the Malaysian labor rate, which includes

salaries and wages paid, bonuses, commissions, overtime wages, cost of living allowances, other

allowances, and social security contribution.  Ancientree Prelim. SVs at Exhibit 4 (pg 90

technical notes to labor report).  Accordingly, the Malaysian labor rate is not only more specific

to the industry but is also specific to the Department's preference to use a labor cost rate that

includes more than a mere salary or wage.

        The Department acknowledges that the Malaysia B&H surrogate value is superior to the

Romanian surrogate value.  IDM at 40.  Indeed, the Department did not rely upon a Romania

specific value for this cost, but rather used the "Europe & Central Asia" values.  *See* Pet. Prelim.

SVs at Exhibit 6; PD956-961.  Romania reports "0" for its cost to export and import, presumably

because the report is based on crossing the Germany border, which is also part of the European

Union.  Accordingly, there are no border compliance or documentary compliance documents

needed.  In other cases, the Department has relied upon the 2017 Doing Business Romania

report, when parties placed it on the record, because Romania reported a figure for this aspect of

the report when the methodology was different (it dealt with crossing different borders where

costs were incurred).  *Alloy and Certain Carbon Steel Threaded Rod Preliminary Affirmative*

*Determination of Sales at Less Than Fair Value, Postponement of Final Determination and*

*Extension of Provisional Measures*, 84 Fed. Reg. 50,379 (September 25, 2019) and

accompanying Prelim. at 29.  Accordingly, the record actually <u>completely lacks</u> a Romanian

price for B&H expenses.  Relying on the "Europe & Central Asia" price would include

numerous countries that are not economically comparable to China, and it is not the

Department's practice to rely upon such aggregated data including non-economically comparable

countries.  Accordingly, Malaysia offers available and superior surrogate values for these inputs in addition to the financials and wood inputs discussed above.

Moreover, the record also contains information generally on wooden cabinet producers in Malaysia.  *See* Ancientree Final SVs at Exhibit 9; PD1328-1331.  This information and the financial statements from cabinet producers discussed above, constitutes a significant amount of information on the record that Malaysia is a significant producer of identical merchandise.  In contrast, the information regarding Romania's production is based solely on export data from a basket category HTS classification of wooden furniture, and the record contains only one statement from a comparable producer. *See* Ancientree SC Comments at Attachment 1 (world export data).  This further supports generally the higher quality and comparability of the Malaysian data in fulfilling the Department's mandate to calculate accurate margins representative of the costs of a hypothetical cabinet manufacturer in the surrogate country.

In sum, the Department's selection of Romania is not supported by the record as a whole and not in accordance with the Department's past practice and preferences.  Malaysia sources the best available information to value the primary raw materials.  Malaysia sources the best available information to value the financial ratios.  Malaysia also sources superior data overall, including more specific labor and B&H data.  The Court should remand the Department's determination that Romania sources the best available information.

### B.    The Department's HTS Selection for Certain Inputs was Not Supported by Substantial Evidence.

The Department must calculate margins as accurately as possible.  To this end, the Department must rely upon the surrogate value most specific to the respondent's inputs.  For MDF, paint, and particleboard, the Department has relied upon an import value under the HTS that are less specific than other HTS classifications suggested by Ancientree.

23

### 1. Ancientree's MDF

In the Final Results, the Department valued Ancientree's MDF input using HTS 4411.14.90. IDM at 56. This HTS classification is the basket "other" category covering MDF not specified earlier under 4411.14. *See* Final SV Memo at Att 3b. Ancientree argues that the Department should rely upon the more specific HTS classification for its input, 4411.14.10, covering "Medium Density Fibreboard [Mdf] Of Wood, Of A Thickness > 9 Mm, Not Mechanically Worked Or Surface-Covered." Ancientree Case Brief (December 17, 2019) at 11-12; PD1511; *see also* Foremost Rebuttal SVs (August 19, 2019) at Exhibit RSV-1; PD1010. This HTS number is specific to unworked MDF such as the MDF consumed by Ancientree, which goes through further processing during the production of subject merchandise. In consideration of this argument, the Department states that Ancientree conceded that the MDF it consumed is surface covered, citing to its case brief. IDM at 56. This misinterprets Ancientree's statement; Ancientree stated in its case brief that its MDF is not further worked and corresponds to HTS 4411.14.10. Ancientree's production process makes clear that its MDF is further processed by Ancientree. Ancientree Fourth Supplemental (September 18, 2019) at Exhibit SQ4-10; CD1365-1366, PD1367. Therefore, this is record support that Ancientree does not purchase MDF that is already further worked or surface covered. Ancientree also submits that this is an industry standard. Given the use of the MDF in the cabinet industry, it is illogical to buy more expensive already processed MDF when it must then undergo more processing in the cabinet production. For example, Foremost also provided that HTS 4411.14.10 is specific to the MDF it consumes. *Id*.

By relying on HTS 4411.14.90, the Department is relying on an HTS that would <u>not</u> include this type of unworked MDF because it covers only HTS not already specified earlier. The record does not support this less specific HTS classification.

### 2.  Ancientree's Paint

In the Final Results, the Department valued Ancientree's paint input using HTS 3208.10.90 covering paints and varnishes "dispersed or dissolved in a non-aqueous medium." IDM at 56-57.  However, Ancientree argued that it consumes a paint that is dissolved in an aqueous medium.  For this reason, Ancientree has suggested from the initial surrogate value submission that its paint should be classified under HTS 3209.10, which covers paints and varnishes "dispersed or dissolved in an aqueous medium". *See* Ancientree Prelim SVs at Exhibit SV-1 (providing a Malaysian summary sheet with 3209.10); PD952-953; *see also* Ancientree Rebuttal Prelim SVs at Exhibit SVR-3 (providing the Romanian import value for 3209.10) ; PD1007.  The Department claims there is no record evidence that Ancientree's paint is water-based.  However, surrogate value submissions are factual submissions, and Ancientree made an affirmative statement that its paint was water-based by suggesting this HTS classification and rebutting petitioner's alternative SV suggestion for Romania with the proper HTS for water-based paint.  Further, the Department claims that none of the verified paint materials stated the chemical composition of the paint.  IDM at 57.  However, the invoices taken at verification do indicate that Ancientree purchased "Water based color paint" and "water based UV paint." *See* Verification Exhibit 15 (translating the purchase name which then is repeated on other invoices); CD1498&1516, PD1486.  Accordingly, HTS 3209.10 is specific to Ancientree's input. Therefore, the Department's reliance on HTS 3208.10.90 to value its paint input is not supported by the record.

### 3.  Ancientree's Particleboard

In the Final Results, the Department valued Ancientree's particleboard input using HTS

4410.11.90.  This HTS is the basket "other" category covering particleboard not specified earlier under 4410.11. *See* Final SV Memo at Att 3b (HTS 4410.11.90 "Particle Board Of Wood, Whether Or Not Agglomerated."); PD1560&1571.  However, Ancientree argues that the more specific HTS classification for Ancientree's input is 4410.11.10, covering "Particle Board Of Wood, Whether Or Not Agglomerated With Resins Or Other Organic Binding Substances, Unworked Or Not Further Worked Than Sanded (Excl. Oriented Strand Board And Waferboard, Fibreboard And Cellular Wood Panels)."  Foremost Rebuttal SVs (August 19, 2019) at Exhibit RSV-1; PD1010. This HTS number is specific to unworked or merely sanded particleboard such as the particleboard consumed by Ancientree, which goes through further processing during the production of subject merchandise.  The Department states that there is no record support that Ancientree's particleboard is not further worked.  IDM at 58.  However, similarly to MDF, Ancientree's production process is evidence of this fact.  Further, the fact that the other respondent likewise classified its particleboard under HTS 4410.11.10, while not definitive in and of itself of Ancientree's classification, corroborates Ancientree's statement that its particleboard is not further processed and that particleboard used in the cabinet industry generally is not further processed.

By relying on HTS 4410.11.90, the Department is relying on an HTS classification that would <u>not</u> include this type of unworked particleboard because it covers only articles not already specified earlier.  The record does not support this less specific HTS classification.

### C.     The Department's Surrogate Financial Ratio Calculation is Arbitrary and Unsupported by Substantial Evidence.

In the Final and Preliminary Determination, the Department relied upon the financial ratios calculated from Sigstrat's 2018 financial statement.  In Ancientree's case brief, Ancientree argues that the Department's financial ratio calculation differed from how the Department had

consistently calculated Sigstrat's financial ratios in the past.  Ancientree Case Brief (December 17, 2019) at 14-15; PD1511.  In the past, the Department used several detailed notes in the Sigstrat statement to breakout 15 different line items for expenses.  But in this investigation, the Department used only 8 line items and relied on the general Profit & Loss and Balance Sheet rather than the detailed notes.  However, the Department completely failed to address this argument in its IDM.  Petitioner had made an argument concerning making other changes to the Sigstrat financial ratios, which the Department did address.  IDM at 44-45.  However, the Department did not address Ancientree's argument.

The Department acted arbitrarily in not responding to this argument, and also arbitrarily in its inconsistent and unexplained change in an established calculation method for this statement.  *See State Farm*, 463 U.S. at 43 (An agency decision is be arbitrary and capricious "if the agency… entirely failed to consider an important aspect of the problem…"); *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003) (Commerce acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice.")

The Department has calculated financial ratios from a Sigstrat financial statement in multiple reviews of *Multilayered Wood Flooring from China* and in the investigation of *Hardwood Plywood Products from China*.  *See Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 38,002 (August 5, 2019); *Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Rescission; 2015-2016*, 83 Fed. Reg. 35,461 (July 26, 2018); *Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final*

27

*Partial Rescission of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 25,766 (June 5, 2017); *Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 46,899 (July 19, 2016); *Certain Hardwood Plywood Products Final Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 82 Fed. Reg. 53,460 (November 16, 2017).

In each instance, the Department has used significantly more delineated line items in Sigstrat's financial statement.  *See*, *e.g.*, Ancientree Rebuttal SVs at Exhibit 2 (submitting the 2017 Sigstrat ratio calculation relied upon in *Multilayered Wood Flooring from China*); PD1007. This established calculation method provides far more critical detail, including line items for raw materials and consumables and personnel expenditure.  The Department's calculation in this investigation has not properly accounted for the delineated line items in accordance with its past practice of calculating financial ratios generally, and critically, for calculating this particular company's financial ratios.  The Court should remand for the Department to follow its well-established prior calculation method or explain why it has changed its practice and how accuracy has been increased by this change.

**IV.    Conclusion and Prayer for Relief**

In light of the foregoing, the Department's *Final Results* were not supported by

substantial evidence or in accordance with the law.  Plaintiff respectfully requests that the Court

remand this case for redetermination of the issues presented in this brief.

Respectfully submitted,


 /s/ Gregory S. Menegaz

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman*
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

*Admitted to California Bar; practice supervised by
attorneys of the firm who are active D.C. Bar members
pursuant to D.C. Bar Rule 49(c)(8).

Date: September 11, 2020

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **8,260** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiffs*

1