**UNITED STATES COURT OF INTERNATIONAL TRADE**
BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

———————————————————————————
                                                            )
THE ANCIENTREE CABINET CO., LTD.,                           )
                                                            )
            *Plaintiff,*                                    )
                                                            )
CABINETS TO GO, LLC,                                        )
                                                            )
            *Plaintiff-Intervenor,*                         )
                                                            )
      v.                                                    )        Court No. 20-00114
                                                            )
UNITED STATES,                                              )
                                                            )
*Defendant,*                                                )
                                                            )
            and                                             )
                                                            )
AMERICAN KITCHEN CABINET ALLIANCE,                          )
                                                            )
*Defendant-Intervenor.*                                     )
———————————————————————————)

## <u>ORDER</u>

Upon consideration of the motions for judgment on the administrative record filed by plaintiff and plaintiff-intervenor, the responses thereto filed by the defendant and the defendant-intervenor, plaintiff's and plaintiff-intervenor's reply, the administrative record, and all other papers and proceedings herein, it is hereby:

**ORDERED** that the motion is **DENIED**; and it is further

**ORDERED** that the U.S. Department of Commerce's final determination is sustained; and it is further

**ORDERED** that plaintiffs' complaint is **DISMISSED**.

It is **SO ORDERED**.

_____
Honorable Gary S. Katzmann, Judge
U.S. Court of International Trade

Dated: _____, 2021
      New York, New York

PUBLIC VERSION

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | | |
|---|---|---|
| ———————————————————— ) | | |
| THE ANCIENTREE CABINET CO., LTD., | ) | |
| | ) | PUBLIC VERSION |
| *Plaintiff,* | ) | |
| | ) | |
| CABINETS TO GO, LLC, | ) | |
| | ) | |
| *Plaintiff-Intervenor,* | ) | |
| | ) | |
| v. | ) | Court No. 20-00114 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| *Defendant,* | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN KITCHEN CABINET ALLIANCE, | ) | |
| | ) | |
| *Defendant-Intervenor.* | ) | |
| ———————————————————— ) | | |

## DEFENDANT-INTERVENOR'S RESPONSE BRIEF IN OPPOSITION TO THE MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

Roger B. Schagrin, Esq.
Christopher T. Cloutier, Esq.
Elizabeth J. Drake, Esq.
Luke A. Meisner, Esq.

SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for the American Kitchen
Cabinet Alliance*

Dated: December 21, 2020

PUBLIC VERSION

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2(c)(1) ................................................................ 1

I.  Administrative Determination Under Review ................................................ 1

II. Issues Presented for Review ......................................................................... 2

SUMMARY OF ARGUMENT ........................................................................................ 7

STANDARD OF REVIEW ............................................................................................. 2

STATEMENT OF FACTS ............................................................................................... 4

ARGUMENT ................................................................................................................ 10

I.  Commerce's Selection of Romania as the Primary Surrogate Country Should Be
    Upheld ......................................................................................................... 10

    A.  Ancientree's Arguments Regarding Sawnwood Are Devoid of Merit ......... 10

        1.  The Record Supports Commerce's Findings that the Romanian Poplar Sawnwood
            Imports Were Specific to Ancientree's Poplar Sawnwood Inputs ......................... 11

        2.  Substantial Evidence Supports Commerce's Finding that There Was Nothing
            Aberrational with the Romanian Import Values for Birch and Poplar Sawnwood . 14

    B.  Commerce Properly Found that the Romanian Financial Statements Were Superior to
        the Malaysian Financial Statements ........................................................... 20

    C.  Malaysia's Surrogate Information for Labor and B&H Do Not Warrant a Different
        Selection of Surrogate Country ................................................................. 24

    D.  Ancientree Impermissibly Asks This Court to Reweigh the Evidence to Reach a
        Different Conclusion than Commerce Regarding the Appropriate Surrogate Country. 25

II.  Commerce's Valuation of MDF, Particleboard, and Paint Should Be Sustained ................ 26

III. Commerce's Surrogate Financial Ratio Calculation Should Be Upheld .......................... 29

IV.  Conclusion ................................................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d 1256 (Ct. Int'l Trade 2017) .......................................................................................... 13, 29

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984)......................................... 15

*Baoding Mantong Fine Chemistry Co. v. United States*, 222 F. Supp. 3d 1231 (Ct. Int'l Trade 2017) ............................................................................................................ 16, 19

*Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ........................... 3

*Catfish Farmers of Am. v. United States*, 33 Ct. Int'l Trade 1258, 641 F. Supp. 2d 1362, (2009).................................................................................................................................. 26

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) ................. 3, 4

*China Manufacturers All., LLC v. United States*, 205 F. Supp. 3d 1325 (Ct. Int'l Trade 2017) .. 21

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ............................................................... 2

*Daewoo Elecs. Co. v. United States*, 6 F.3d 1511 (Fed. Cir. 1993)................................................ 4

*Diamond Sawblades Manufacturers' Coal. v. United States*, 219 F. Supp. 3d 1368 (Ct. Int'l Trade 2017) ........................................................................................................................ 21

*Diamond Sawblades Manufacturers' Coal. v. United States*, 301 F. Supp. 3d 1326 (Ct. Int'l Trade 2018) ........................................................................................................................ 25

*Dorbest Ltd. v. United States,* 30 C.I.T. 1671, 1728 (2006) .................................................. 12, 29

*Evonik Rexim (Nanning) Pharm. Co. v. United States*, 253 F. Supp. 3d 1364 (Ct. Int'l Trade 2017) .................................................................................................................................... 27

*Fine Furniture (Shanghai) Ltd. v. United States*, 353 F. Supp. 3d 1323, (Ct. Int'l Trade 2018) 12, 29

*Foreign Trade Enters. Co. v. United States*, 28 Ct. Int'l Trade 480, 318 F. Supp. 2d 1339 (2004)................................................................................................................................. 19

*Gemtron Corp. v. Saint–Gobain Corp.*, 572 F.3d 1371 (Fed. Cir. 2009).................................... 28

*GGB Bearing Tech. (Suzhou) Co. v. United States*, 279 F. Supp. 3d 1233 (Ct. Int'l Trade 2017) ........................................................................................................................................... 21

*Goldlink Indus. Co. v. United States*, 30 CIT 616, 431 F. Supp. 2d 1323 (2006) ...................... 25

*Heze Huayi Chem. Co. v. United States*, No. 17-00032, 2018 Ct. Intl. Trade LEXIS 60 (Ct. Int'l Trade May 22, 2018) ................................................................................................... 15

*Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344 (Ct. Int'l Trade 2018) ................... 16

*Juancheng Kangtai Chem. Co. v. United States*, 2017 CIT LEXIS 3  (CIT 2017) .................... 18

*Juancheng Kantai Chem. Co. v. United States*, Juancheng Kantai Chem. Co. v. United States, 2015 Ct. Intl. Trade LEXIS 94, *65-66, 78 (CIT 2015) .................................................... 18, 25

*Koyo Seiko Co. v. United States*, 36 F.3d 1565 (Fed. Cir. 1994) .................................................. 4

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) ........................... 2, 3

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056 (Fed. Cir. 2001) .......................... 3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ................ 3, 31

*NMB Singapore Ltd. v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) ....................................... 31

*NSK Ltd. v. United States*, 28 CIT 1535, 1561, 346 F. Supp. 2d 1312 (2004) .............................. 4

*Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372 (Fed. Cir. 2001) ...................... 4

*Qingdao Qihang Tyre Co. v. United States*, 308 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) .......... 22

*Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 23 Ct. Int'l Trade 479, 59 F. Supp. 2d 1354 (1999) .......................................................................... 17

*Solar World Ams., Inc. v. United States*, 234 F. Supp. 3d 1286 (Ct. Int'l Trade 2017) ............... 11

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed. Cir. 1994) ........ 2

*Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330 (Fed. Cir. 2002) ................... 4

*United States Steel Group v. United States*, 96 F.3d 1352 (Fed. Cir. 1996) .................................. 3

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) ...................................................................... 4

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*, SLIP OP. 2013-30, 2013 Ct. Intl. Trade LEXIS 34, *19 ................................................................................................... 17

*Zhejiang DunAn Hetian Metal Co. v. United States,* 652 F.3d 1333 (Fed. Cir. 2011) ................ 25

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................................ 2

19 U.S.C. § 1677b(c)(1) .............................................................................................. 11

19 U.S.C. § 1677b(c)(1)(B) ........................................................................................... 5

19 U.S.C. §1677b(c)(4) ............................................................................................... 10

**Regulations**

19 C.F.R. § 351.301(c)(3) ........................................................................................... 14

19 C.F.R. § 351.408(c)(4) ............................................................................................. 7

**Administrative Determinations**

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China,*,
   85 Fed. Reg. 11,953 (February 28, 2020) ................................................................. 2

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:
   Initiation of Less-Than-Fair-Value Investigation*, 84 Fed. Reg. 12,587 (April 2, 2019) ............ 4

PUBLIC VERSION

# UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

———————————————————————
|  |  |  |
|---|---|---|
| THE ANCIENTREE CABINET CO., LTD., | ) | PUBLIC VERSION |
|  | ) |  |
| *Plaintiff,* | ) |  |
|  | ) |  |
| CABINETS TO GO, LLC, | ) |  |
|  | ) |  |
| *Plaintiff-Intervenor*, | ) |  |
|  | ) |  |
| v. | ) | Court No. 20-00114 |
|  | ) |  |
| UNITED STATES, | ) |  |
|  | ) |  |
| *Defendant,* | ) |  |
|  | ) |  |
| and | ) |  |
|  | ) |  |
| AMERICAN KITCHEN CABINET ALLIANCE, | ) |  |
|  | ) |  |
| *Defendant-Intervenor.* | ) |  |

———————————————————————

## DEFENDANT-INTERVENOR'S RESPONSE BRIEF IN OPPOSITION TO THE MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to USCIT Rule 56.2 and the Court's amended scheduling order, Defendant-Intervenor the American Kitchen Cabinet Alliance ("AKCA" or the "Petitioner") submits the following response in opposition to the motion for judgment on the agency record filed by Plaintiff The Ancientree Cabinet Co., Ltd. ("Ancientree") in the above-captioned action.

### STATEMENT PURSUANT TO RULE 56.2(c)(1)

**I.      Administrative Determination Under Review**

The administrative determination under review is the final determination of the U.S. Department of Commerce ("Commerce") in the antidumping investigation of *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China,*, 85 Fed. Reg.

11,953 (February 28, 2020) ("Final Determination"), including the accompanying Issues and

Decision Memorandum ("IDM") (P.D. 1554).[1]

## II.   Issues Presented for Review

1. Whether Commerce's decision to select Romania as the primary surrogate country
   should be upheld as being supported by substantial evidence.

2. Whether Commerce's selection of certain import data to value Ancientree's
   particleboard, medium density fiberboard ("MDF"), and paint should be upheld as
   being supported by substantial evidence.

3. Whether Commerce's calculation of the surrogate value ratios was supported by
   substantial evidence or otherwise in accordance with law.

## STANDARD OF REVIEW

The standard of review requires that the Court uphold an agency determination as lawful

unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance

with law" 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "more than a mere

scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed.

Cir. 1994) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In evaluating

Commerce's determination, the Court must decide whether "the administrative record contain{s}

substantial evidence to support" Commerce's decision and whether that decision was "rational."

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

A plaintiff must do more than simply point to contradictory evidence in the record to

overturn the agency's decision. "{T}he possibility of drawing two inconsistent conclusions from

---

[1]   Citations to confidential documents from the Index to the Administrative Record are
      designated as "C.D. __," and citations to public documents and public versions are
      designated as "P.D. __."

PUBLIC VERSION

the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* (citations omitted). To the extent, therefore, that a plaintiff claims the evidence before Commerce "could be open to multiple interpretations, its argument does not require, or even allow, reversal." *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001) (citing *Matsushita*, 750 F.2d at 933). In addition, a plaintiff may not ask the Court to re-weigh the evidence and decide the case for Commerce. *See Matsushita*, 750 F.2d at 933. The role of the Court is not to question the agency's decisions about the weight or quality of the evidence. *See United States Steel Group v. United States*, 96 F.3d 1352, 1356-57 (Fed. Cir. 1996) (it is the agency's task to evaluate and assign weight to the evidence); *see also Matsushita*, 750 F.2d at 933 (it is not the weight of the evidence, but whether it reasonably supports a rational decision, that is evaluated by a reviewing court). The Court may not substitute its judgment or its interpretation of the evidence for that of the agency. *See Matsushita*, 750 F.2d at 936.

The standard also requires Commerce to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29, 43 (1983). While Commerce must explain the basis for its decisions, the court "will . . . 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

In reviewing Commerce's interpretation of a statutory provision, this Court is guided by the principles set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Under *Chevron*, a court reviewing an agency's interpretation of a statute must begin with the statutory test: "{i}f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of

Congress." 467 U.S. at 842-43 (citations omitted). If this Court finds that the statute is silent or ambiguous with respect to the specific question at issue, the question for the Court is whether Commerce's interpretation is based on a permissible interpretation of the statute. *Chevron*, 467 U.S. at 842. The agency's reasonable interpretations of its statutory responsibilities are entitled to judicial deference. *Id.* at 844; *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1379-80 (Fed. Cir. 2001).

Finally, given Commerce's special expertise in applying the antidumping law, this Court has repeatedly held that Commerce is the "master" of the antidumping law, entitling its decision to great deference from the courts. *See NSK Ltd. v. United States*, 28 CIT 1535, 1561, 346 F. Supp. 2d 1312, 1335 (2004), *aff'd*, 481 F.3d 1355 (Fed. Cir. 2007) (citation omitted). The Federal Circuit has also noted that Commerce's "special expertise in administering the anti-dumping law entitles its decisions to deference from the courts." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002) (citations omitted); *see also Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) ("Deference to an agency's statutory interpretation is at its peak in the case of a court's review of Commerce's interpretation of the antidumping laws.") (citing *Daewoo Elecs. Co. v. United States*, 6 F.3d 1511, 1516 (Fed. Cir. 1993)). In addition, the Supreme Court has held that where the agency is applying the antidumping statute, "we ask only whether the Department's application was reasonable." *United States v. Eurodif S.A.*, 555 U.S. 305, 319 (2009).

## STATEMENT OF FACTS

On April 2, 2019, Commerce initiated the underlying investigation of wooden cabinets and vanities and components thereof from China. *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 84 Fed. Reg. 12,587 (April 2, 2019) (P.D. 67). On June 5, 2019, Commerce issued

an antidumping questionnaire to Ancientree and the other mandatory respondents in the investigation. *See* Commerce Antidumping Questionnaire (Apr. 25, 2019) (P.D. 842). In its antidumping questionnaire, Commerce requested Ancientree to report the factors of production ("FOPs") consumed to produce the merchandise under investigation. *Id.* at D-1. Commerce instructed Ancientree to report each specific raw material used to produce the subject merchandise. *Id.* at D-6 to D-8. In its questionnaire response, Ancientree reported various FOPs, including but not limited to birch wood, poplar wood, particleboard, MDF, and paint. *See* Ancientree Sec. C-D Resp. at Exhibit D-2.1 (P.D. 911). Ancientree described these FOPS as simply "Birch Sawnwood," "Poplar Sawnwood," "Particleboard," "MDF," and "paint." *Id.* Ancientree did not provide any further details in its narrative description of these FOPs. Nor did it provide any purchasing documents or other documentation that would shed light on the characteristics of these FOPS. *See id.*

In an antidumping investigation involving a nonmarket economy ("NME") such as China, Commerce calculates normal value based on the respondent's FOPs as valued in a surrogate market economy country. 19 U.S.C. § 1677b(c)(1)(B). Ancientree and the other respondents advocated that Commerce select Malaysia as the primary surrogate country and submitted information from Malaysia which they proposed could be used to calculate surrogate values. Preliminary Decision Memorandum at 12 (P.D. 1407). Petitioner advocated that Commerce select Romania as the primary surrogate country and submitted surrogate value information from Romania. *Id.*

Commerce published the preliminary determination in its investigation on October 3, 2019. *Id.* at 13-14. In the preliminary determination, Commerce selected Romania as the primary surrogate country as it found that the Romanian data constituted the best available data for

valuing the respondents' FOPs because: (1) the agency had complete, contemporaneous

Romanian import data for each input used by the respondents; and (2) the Romanian surrogate

financial statements on the record are preferable to the Malaysian financial statements because

these statements specifically break out energy costs from other manufacturing costs. *Id.*

Commerce also found that these statements are from a producer of wooden furniture (*i.e.*, chairs

and tables), which is merchandise comparable to the merchandise under consideration in this

investigation, and other wooden products (*i.e.*, plywood). *Id.* Thus, because complete SV

information was available from Romania and the financial statements from Romania are reliable

and more detailed than the Malaysian statements, Commerce determined that the Romanian data

are the best available source of SV data. *Id.*

     To value Ancientree's birch wood, poplar wood, particleboard, MDF, and paint inputs,

Commerce used Romanian import data under the following Harmonized Tariff System ("HTS")

codes:

| FOP | HTS | HTS Description |
|---|---|---|
| Birch Sawnwood | 440796 | Birch Wood Sawn/Chipped, Thickness Gt 6Mm |
| Poplar Sawnwood | 440797 | Poplar And Aspen Wood Saw/Chip Lgthw, Thick Gt 6Mm |
| Particleboard | 44101190 | Particle Board Of Wood, Whether Or Not Agglomerate |
| MDF | 44111490 | Medium Density Fiberboard MDF Of Wood |
| Paint | 32081090 | Paints and Varnishes, Incl. Enamels and Lacquers. |

*See* Commerce Preliminary Surrogate Value Memorandum (Oct. 3, 2019) (P.D. 1411-1412) at

Attachments 1 and 3.

     As part of Commerce's NME methodology for calculating normal value, Commerce

calculates surrogate amounts for and manufacturing overhead, general expenses, and profit using

the financial statements gathered from producers of identical or comparable merchandise in the

surrogate country. 19 C.F.R. § 351.408(c)(4). In the preliminary determination, Commerce

calculate surrogate financial ratios based on the financial statements of the Romanian company,

S.C. Sigstrat S.A. ("Sigstrat"). Preliminary Decision Memorandum at 4 (P.D. 1407).

On December 17, 2019, Ancientree filed a case brief arguing, *inter alia*, that Commerce

erred in the preliminary determination in its selection of the primary surrogate country, erred in

the selection of the appropriate HTS codes to value certain FOPs, and erred in the manner in

which it calculated the surrogate financial ratios based on Sigstrat's financial statements. *See*

*generally* IDM (P.D. 1554). On December 27, 2019, Petitioner filed a case brief arguing, *inter*

*alia*, that Commerce's preliminary determination was correct with respect to each of these issues

and that Commerce should thus make no changes on these issues in the final determination. *Id.*

Commerce published its final determination on February 28, 2020. *Id.* Commerce made a

number of changes between the preliminary determination and the final determination, including

certain changes advocated by Ancientree for other issues. *Id.* However, Commerce continued to

select Romania as the primary surrogate country for the calculation of surrogate values for

Ancientree's and the other respondent's FOPs. *Id.* Commerce also made no changes to the HTS

codes it used to value Ancientree's birch wood, poplar wood, particleboard, MDF, and paint

inputs. *Id.* Nor did Commerce make any changes to the calculation of the surrogate financial

ratios.

## SUMMARY OF ARGUMENT

In antidumping proceedings involving a non-market economy, Commerce decides how to

select a surrogate country to value the respondents' FOPs by weighing numerous and competing

facts and policy considerations. Ancientree asks the Court in this case to reweigh all of the

record evidence and overturn Commerce's surrogate country selection in favor of Malaysia – *i.e.*, its own preferred surrogate country in the underlying investigation. The Court should reject this request. Commerce's selection of Romania as the primary surrogate country is not only supported by substantial evidence, it was the only reasonable choice as a surrogate country given that Romania offered financial statements for calculating surrogate financial ratios that were superior to the financial statements available in Malaysia.

Ancientree argues that its sawnwood inputs should have been valued using Malaysian import statistics that were specific to sawnwood that was not further worked. However, Ancientree never described its sawnwood inputs in any detail greater than "birch sawnwood" or "poplar sawnwood." There was thus no basis to use more specific Malaysian HTS codes.

There is likewise no merit to Ancientree's argument that the Romanian import data for birch and poplar sawnwood were not suitable for calculating surrogate values because they were based on "insignificant quantities." There is no evidence showing that the Romanian import data were based on insignificant quantities. Ancientree's own metric for measuring commercial significance shows that if the Romanian import quantities are small, then Malaysian imports quantities [                    ]. Finally, even assuming *arguendo* that Romanian import quantities for birch and poplar sawnwood are small, Ancientree did not even attempt to show to Commerce how the import data were aberrational in relation to other benchmarks for sawnwood that are on the record.

Commerce's key finding that Sigstrat's financial statements were superior to the Malaysian financial statements is supported by substantial evidence. Sigstrat's financial statements completely segregate two costs important to Commerce's analysis – energy and manufacturing overhead – whereas the Malaysian financial statements do not. On the other hand,

the record does not support Ancientree's contention that the Malaysian financial statements better reflected the production and sale of merchandise that is identical or comparable to the subject merchandise.

Finally, the Court should reject Ancientree's request to remand Commerce's selection of a primary surrogate country based on the surrogate values for labor and brokerage and handling ("B&H") expenses. Ancientree itself concedes that these FOPs "are less important" compared to other FOPs such as the primary raw material inputs and the financial ratios. Even if this Court's role was to reweigh the evidence supporting Commerce's surrogate country selection, the agency could not be faulted for giving the valuation of these FOPs less weight in its decision.

Turning to the second issue raised in Ancientree's moving brief, Commerce did not commit any error when it declined to use the more specific HTS codes proposed by Ancientree to value its MDF, particleboard, and paint. Ancientree's claims in this regard suffer from the same flaw as Ancientree's claims regarding birch sawnwood and poplar sawnwood. Namely, Ancientree never described these inputs with sufficient detail or presented any other evidence warranting the use of more specific HTS codes than the codes used by Commerce.

Lastly, the Court should uphold Commerce's calculation of surrogate financial ratios using Sigstrat's financial statements. Ancientree claimed below that Commerce deviated from the manner in which the agency had calculated Sigstrat's financial ratios in prior antidumping proceedings, but it failed to submit information that would allow Commerce to evaluate this claim. Furthermore, while Ancientree asserts that it submitted a calculation worksheet demonstrating how Commerce should have calculated the surrogate financial ratios for Sigstrat based on a prior case, Ancientree's proffered calculation differed from Commerce's calculation in that prior case in numerous respects. In addition, while Commerce did not directly address

Ancientree's arguments regarding the calculation of financial ratios, the agency's reasoning for calculating the financial ratios is set forth plainly in the detailed calculation worksheet accompanying its final surrogate value memorandum. Thus, while it may represent a decision of "less than ideal clarity," the path of Commerce's decision is readily discernable to the Court and should, therefore, be upheld.

## ARGUMENT

**I.      Commerce's Selection of Romania as the Primary Surrogate Country Should Be Upheld**

In the final determination, Commerce found that there were no changes to the factual record since the preliminary determination and that no parties had pointed to record evidence that was contrary to its findings in the preliminary determination that Romania should be selected as the primary surrogate country. IDM at Comment 6 (P.D. 1554). Commerce found that Romania met the criteria in 19 U.S.C. §1677b(c)(4) of the statute as being: (1) at a similar level of economic development to China; and (2) a significant producer of comparable merchandise. *Id.* Furthermore, Commerce found that Romania has the best data availability due to the superiority of the Romanian financial statements over the Malaysian financial statements. *Id.* As discussed below, Ancientree has failed in its moving brief show that any of Commerce's findings in this regard are unsupported by substantial evidence or otherwise contrary to law. Commerce's selection of Romania as the primary surrogate country should, therefore, be sustained.

**A.      Ancientree's Arguments Regarding Sawnwood Are Devoid of Merit**

The Court should reject Ancientree's claims that Malaysia offered the best available data for calculating surrogate values based on the Malaysian import data for sawnwood inputs. *See* Ancientree Brief in Support of Motion for Judgment on Agency Record (Sept. 11, 2020) (ECF 28) ("Ancientree Br.") at 6. According to Ancientree, Malaysian import data for birch and poplar

sawnwood are more specific to the company's sawnwood inputs, and Romanian import data for these two sawnwood inputs were unusable because they were "insignificant and uncommercial quantities." *Id.* Neither of these arguments has any merit.

### 1. The Record Supports Commerce's Findings that the Romanian Poplar Sawnwood Imports Were Specific to Ancientree's Poplar Sawnwood Inputs

In the final determination, Commerce valued Ancientree's "birch sawnwood" using Romanian imports under 4407.96, which covers birch sawnwood whether or not planed, sanded or end-jointed, of a thickness exceeding 6 MM, and valued Ancientree's "poplar sawnwood" using Romanian imports under HTS 4407.97, which covers poplar and aspen sawnwood whether or not planed, sanded or end-jointed, of a thickness exceeding 6 MM. *See* Commerce Final Surrogate Value Memorandum (Feb. 28, 2020) (P.D. 1556-1557) at Attachments 1 and 3. Ancientree argues than Malaysian import data were more specific to its sawnwood input because they include specific HTS codes for sawnwood that has not been planed or end-jointed, and according to Ancientree, its own birch and poplar sawnwood was not planed or end-jointed. *See* Ancientree Br. at 6-7.

It is axiomatic that when selecting HTS codes to value a respondent's FOPs, Commerce must use the best available information. 19 U.S.C. § 1677b(c)(1). However, the burden of production belongs to the party in possession of the necessary information, and thus respondents have the duty of providing evidence to Commerce regarding their FOPs that will allow the agency to select HTS codes that are specific to those HTS codes. *See Solar World Ams., Inc. v. United States*, 234 F. Supp. 3d 1286, 1305 (Ct. Int'l Trade 2017). Where respondents fail to provide detailed information regarding the physical characteristics of their FOPs, the Court has rejected challenges that Commerce should have used a more specific HTS code to value the

PUBLIC VERSION

FOPs in question. In *Fine Furniture (Shanghai) Ltd. v. United States,* for example, Commerce used an 8-digit code to value the respondent's glue input. 353 F. Supp. 3d 1323, 1348 (Ct. Int'l Trade 2018). The respondent challenged Commerce at this Court by arguing that there was a more specific 11-digit Thai HTS code available that more closely matched its glue input. *Id.* The Court upheld Commerce's determination because there was "nothing on the record regarding the specific composition of {respondent's} glue, and therefore, any claims of greater specificity of the HTS subheadings that can be applied to them are immaterial." *Id.* (internal quotation and citation omitted).

Here, the only information that Ancientree provided regarding its sawnwood inputs was that they were "birch sawnwood" and "poplar sawnwood." As Commerce found in the final determination, although Ancientree later claimed in its surrogate value submissions and briefing that its sawnwood was not planed or end-jointed, "Ancientree cites to no record evidence to support this claim, nor does the record appear to describe Ancientree's wood inputs in any detail greater than "birch sawnwood" or "poplar sawnwood." IDM at Comment 7 (citing Ancientree Sec. C-D Resp. at Exhibit D-2.1 (P.D. 911); Ancientree Supp. D. Resp. (Sept. 18, 2019) at Exhibit SQ-12 (P.D. 1367)). Thus, without any record evidence showing whether Ancientree's sawnwood inputs were planed or end-jointed, the six-digit HTS codes were the most appropriate codes to value its birch and poplar sawnwood. *Id.*

The Court's decision in *Dorbest Ltd. v. United States,* 30 C.I.T. 1671, 1728 (2006) is directly on point here. In *Dorbest*, the respondent described its styrofoam input merely as "styrofoam." It also proposed various HTS codes to value this input that were very specific in their description, including "Polyethylene having a specific gravity of less than 0.94" and "Polystyrene: Expansible polystyrene." Commerce rejected the respondent's proposed HTS

PUBLIC VERSION

classifications of its inputs because it had not provided Commerce with evidence as to why these HTS codes were more appropriate than a broader "basket provision subheading" to value the styrofoam input. On appeal, the Court upheld Commerce's decision. It explained "respondents did not provide an abundance of detail in their descriptions" of the styrofoam input. *Id.* As such, Commerce appropriately credited the respondent's descriptions of the nature of their products as much as possible when it used a "basket provision" to value the inputs, because the respondent had not provided any evidence that demonstrated the nature of its styrofoam to be other than what it had originally described. *Id.*

The facts of this case are also similar to *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d 1256, 1273 (Ct. Int'l Trade 2017). There, the respondent stated that it used "antibiotics" as an input in its questionnaire responses. Commerce valued this input using Indonesian import data under a 6-digit HTS code for antibiotics (not otherwise specified). The respondent argued that Commerce should have used a more specific HTS code for antibiotics in "measured doses" as its antibiotics were purchased in measured doses. The Court upheld Commerce's decision, however, because the respondent pointed to no record evidence indicating that it purchased its antibiotics in "measured doses" and did not cite any record evidence undermining the reasonableness of Commerce's conclusion that the six-digit HTS code used by the agency was specific to the "antibiotics" described in the respondent's questionnaire response.

In its moving brief, Ancientree cites as "evidence" that its sawnwood inputs were not planed or end-jointed its surrogate value submissions. Ancientree Br. at 6-7. However, the time to provide factual information regarding the type and specification of FOPs that a respondent consumes is in its initial and supplemental questionnaire responses. *See* Commerce Antidumping

13

PUBLIC VERSION

Questionnaire (Apr. 25, 2019) (P.D. 842). Under Commerce's regulations and practice, in

contrast, surrogate value submissions are an opportunity to submit "factual information to value

factors of production" in an antidumping investigation. 19 C.F.R. § 351.301(c)(3). Surrogate

value submissions are not due until 30 days before the preliminary determination – *i.e.*, after the

record regarding the respondents' FOPs has been developed with its initial and supplemental

questionnaire responses. *Id.* This process is designed to allow all parties to have an

understanding of respondents' FOPs before submitting factual information to value those FOPs.

A respondent cannot be permitted to describe its FOPs in vague generalities in its questionnaire

responses and then wait until it submits surrogate value information to provide new evidence

regarding the specific types of FOPs it consumes. Allowing respondents to operate in this

manner would subvert Commerce's process for developing the record through the issuance of

questionnaires and supplemental questionnaires and deprive other parties from being able to

submit appropriate surrogate value information that is specific to their FOPs.

> **2.  Substantial Evidence Supports Commerce's Finding that There Was Nothing Aberrational with the Romanian Import Values for Birch and Poplar Sawnwood**

There is likewise no merit to Ancientree's argument that the Romanian import data for

birch and poplar sawnwood were not suitable for calculating surrogate values because they were

based on "insignificant quantities." Ancientree Br. at 8. As discussed below, not only has

Ancientree failed to point to evidence that the Romanian import data were based on insignificant

quantities, but it has failed to even try to show how the import data were aberrational in relation

to other benchmarks for sawnwood that are on the record.

As an initial matter, this Court has recognized that "Commerce has been delegated the

task of finding relevant facts from a given record, and it has the discretion to determine whether

a given volume, value or quantity is 'significant' under the statute after 'taking into account the entire record, including whatever fairly detracts from the substantiality of th{at} evidence." *Heze Huayi Chem. Co. v. United States*, No. 17-00032, 2018 Ct. Intl. Trade LEXIS 60, at *15 (Ct. Int'l Trade May 22, 2018) (citing *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). There is no reason to disturb Commerce's discretion in this case for finding that the Romanian import quantities were not insignificant. Ancientree's argument is based on a comparison of the import quantities in Romania for birch and poplar to the respondents' consumption quantities of birch and poplar during the POI. Ancientree Br. at 9-11. According to Ancientree, the import quantities for Romania cannot be commercially significant because they "are not adequate to supply a single commercial wooden cabinet manufacturer, much less an entire cabinet industry." *Id.* at 9. Ancientree's argument, however, proves too much. Below is a chart that sets forth for both birch and poplar the consumption quantities of Ancientree and the other respondent, Foremost, and the import quantities of these inputs in both Malaysia and Romania:

| | | Ancientree Consumption | Foremost Consumption | | Malaysian Imports | Romanian Imports |
|---|---|---|---|---|---|---|
| Birch | [ | | | ] | 2,240 | 324 |
| Poplar | [ | | | ] | 955 | 259 |

*Sources*: Final SV Memo at Att. 3e (P.D. P.D. 1560, 1571); Ancientree Sec. D Resp (P.D. 911) and Database.; Foremost Sec. D Resp. at Exhibit D-6-2 (P.D. 912) and Database.

As can be seen from the chart, Romanian imports of birch are [

]. However, the same can be said for Malaysian imports of birch. Furthermore, Romanian imports of poplar are not [

], but Malaysian imports of poplar are similarly [

]. Thus, a comparison of import quantities to the respondents'

15

consumption quantities does not show that Romanian imports quantities are insignificant or that the Malaysian import data are somehow superior to the Romanian data.

For this reason, Ancientree's citation to *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1362 (Ct. Int'l Trade 2018) is unavailing. In that case, the respondent's consumption of 7,000 metric tons of carbonized material "dwarfed" the Thai import quantities of 122 metric tons of carbonized material. *Id.* at 1362 n.28. Here, in contrast, Romanian imports of birch [

], and Romanian imports of poplar also [

]. Furthermore, Romanian imports are [      ] as commercially significant as the Malaysian imports that Ancientree proposes as an alternative.

Ancientree's argument regarding insignificant import quantities also fails because Ancientree does not point to any record evidence showing that the fact that import quantities are less than the respondents' consumption quantities means they are commercially insignificant or otherwise distortive. In this regard, this case is similar to *Baoding Mantong Fine Chemistry Co. v. United States*, 222 F. Supp. 3d 1231, 1248 (Ct. Int'l Trade 2017). There, the Court rejected a respondent's argument that Commerce's use of Indonesian import data was not supported by substantial evidence because the import quantity "was relatively small in relation to the sales of the two Indian producers." *Id.* The Court explained that the respondent did "not offer a standard, or record evidence, demonstrating that this quantity . . . was too commercially 'insignificant' a quantity to serve as a surrogate value." *Id.*

Even assuming, *arguendo*, that Romanian import quantities are relatively small – which as discussed above they are not – Commerce's decision to use the Romanian import data should still be upheld. Commerce recognizes that due to concerns such as small import volumes, import

statistics may under certain circumstances be aberrational such that they are not suitable for use

in calculating surrogate values. In this regard, Commerce's long-established practice, as has been

upheld by this Court for decades, is "to disregard small-quantity import data when the per-unit

value is substantially different from the per-unit values of the larger quantity imports of that

product from other countries." *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v.

United States*, 23 Ct. Int'l Trade 479, 485, 59 F. Supp. 2d 1354, 1360 (1999). *See also Xinjiamei

Furniture (Zhangzhou) Co. v. United States*, SLIP OP. 2013-30, 2013 Ct. Intl. Trade LEXIS 34,

*19 (recognizing "the proposition that a small import volume *may indicate* that the data relied

upon is aberrational is not the same as the proposition that a small import volume *makes* the data

aberrational") (emphasis in original).

Consistent with this well-established practice, Commerce explained in the final

determination that the agency "does not use quantity *per se* to determine whether a small import

quantity necessarily results in an aberrational import value." IDM at 38. When Commerce

undertakes an analysis as to whether certain surrogate values are aberrational or unreliable for

purposes of calculating an AD margin, it applies certain criteria in making a decision. First,

Commerce's practice is to compare the values in question to the import values calculated for the

same period using data from the other potential surrogate countries on the surrogate country list,

to the extent that such data are available. *Id.* Commerce has also examined data from the same

HTS subheading for the surrogate country over multiple years to determine if the current data

appear aberrational with respect to historical values. *Id.*

Here, Ancientree failed to submit any evidence "to connect the quantity of the imports to

their average unit value," and, as a result, Commerce had "no basis to conclude that the AUVs

computed using those quantities are unreliable." IDM at 37-38. In fact, as Commerce noted,

"Ancientree has not argued, nor has it provided any reason for Commerce to believe, that the values associated with those quantities are in any way unrepresentative of the prices that Ancientree itself would pay were it located in an ME country at a comparable level of economic development to China." IDM at 43. The bottom line is that Ancientree failed to submit any relevant benchmarks whatsoever for measuring whether the Romanian import values for birch and poplar were aberrational. Thus, there was no record evidence that would support a finding that they were, in fact, aberrational.

The cases cited by Ancientree, rather than supporting its challenge at this Court, actually further support Commerce's final determination. In *Juancheng Kantai Chem. Co. v. United States*, the Court recognized that if import data involve a small quantity, "Commerce's practice is to determine if the price for the imports is aberrational . . . by comparing the average import price against other sources of market value." 2015 Ct. Intl. Trade LEXIS 94, *65-66, 78 (CIT 2015). In that case, the respondent had submitted comprehensive data regarding imports of the FOPs for each potential surrogate country, which allowed Commerce to analyze whether an allegedly noncommercial quantity was consistent with other import volumes and whether the input in question was often traded in smaller quantities. *Id.* On remand, Commerce was able to conclude, based on a detailed analysis of price and quantity, that transactions are made at commercial quantities when they are competitive commercial transactions, either large or small, and that a finding that import volumes are commercial is not exclusively tied to a respondent's consumption levels. *See Juancheng Kangtai Chem. Co. v. United States*, 2017 CIT LEXIS 3, *26-31 (CIT 2017). The Court ultimately sustained Commerce's conclusion on remand that an allegedly small quantity was, in fact, a commercial quantity. *Id.*

PUBLIC VERSION

The other case cited by Ancientree is distinguishable for similar reasons – *i.e.*, the parties had actually submitted benchmark data and other information that actually called into question the reliability of the import data used by Commerce to calculate surrogate values. *See Shanghai Foreign Trade Enters. Co. v. United States*, 28 Ct. Int'l Trade 480, 495, 318 F. Supp. 2d 1339, 1352 (2004) (plaintiff submitted import statistics from prior period and other data that was relevant to whether import quantities from review period were commercially significant as well as information regarding market prices from other sources relevant to whether import values were aberrational). In this case, unlike the parties in *Juancheng Kangtai* and *Shanghai Foreign Trade*, Ancientree did not submit any benchmark data or other information that would allow Commerce to analyze whether the import quantities were not commercial transactions or were otherwise aberrational.

In this regard, the Court's decision in *Baoding* is once again instructive. 222 F. Supp. 3d at 1248. There, the Court rejected the respondent's argument that the Indonesian import value was aberrationally high compared to the respondent's proposed surrogate value:

> {T}he court cannot conclude that Commerce was required to find on this record that the data for Indonesia . . . were aberrational. It is possible that a wider set of data could have shown the Indonesian surrogate value to be aberrationally high. . .. {The respondent} did not submit such a wider set of data for the record during the review, leaving Commerce to consider the question of whether the surrogate price was aberrational, and to make its ultimate decision, from a limited record.

*Id.* The Court thus sustained Commerce's surrogate value based on the Indonesian import data.

In sum, Commerce's determination that Romanian import quantities for birch and poplar were not insignificant is supported by substantial evidence. Furthermore, even if the Romanian import quantities were small, by Ancientree's own metric, the Malaysian import quantities would [                    ] and thus are not superior to the Romanian data. Finally, Ancientree fails to point to any relevant benchmarks on the record showing that the Indonesian import values were

aberrational. Thus, there is no basis for its claim that the Malaysian import data for birch and poplar are superior to the Romanian import data for these inputs.

> **B.      Commerce Properly Found that the Romanian Financial Statements Were Superior to the Malaysian Financial Statements**

In the final determination, Commerce found that the Romanian financial statements for Sigstrat were superior to the Malaysian financial statements on the record. IDM at Comment 6. As Commerce explained: "Sigstrat's financial statements offer a higher level of data quality than do the Malaysian statements. Significantly, Sigstrat's financial statements completely segregate two costs important to Commerce's analysis – energy and manufacturing overhead – whereas the Malaysian financial statements do not." *Id.* Commerce also noted that the record evidence indicated that approximately half of Sigstrat's financial data reflected the production and sales of wooden furniture – *i.e.,* merchandise that is comparable to wooden cabinets, vanities, and components thereof. *Id.* In contrast, the three potentially usable Malaysian financial statements contained no information regarding the relative production amounts by product and could, therefore, reflect a substantial amount of production and sales of merchandise that is not comparable to the subject merchandise. *Id.*

Contrary to Ancientree's contentions, the record supports Commerce's finding that the Romanian financial statements were more detailed than the Malaysian financial statements. The Romanian financial statements contain a single all-encompassing line item for "production overhead," which represents all manufacturing costs that are not direct materials or direct labor and are indirect to the manufacturing operations of the company. *Id.* Petitioner's SV Submission at Exhibit 10(b), Note 7 (P.D. 956-961). In addition, because those statements also contain an itemized expense for energy costs, Commerce was able to reduce the total amount of production

overhead expenses by the value of Sigstrat's energy costs. IDM at Comment 6. In contrast, the

three Malaysian statements advocated by Ancientree do not allow for such a calculation:

- Lii Hen's financial statements account for "Land and Buildings" and "Plant, machinery and equipment," but none of the other itemized expenses could conceivably include the cost of energy and other manufacturing costs that are not direct materials or direct labor and are indirect to the manufacturing operation of the company. *See* Ancientree Final SV Submission at Exhibit 3 (P.D. 1328-1331).

- Yeo Aik's financial expenses only identify depreciation and rental expenses as overhead items and none of the other line-items appear to be related to indirect production expenses. *Id.* at Exhibit 7.

- Poh Huat's financial statements only contain overhead items identified as "depreciation of property, plant and equipment," "direct operating expenses on investment properties," and "loss on disposal of property, plant, and equipment." *Id.* at Exhibit 5.

Ancientree cites pointlessly to cases where Commerce accepted financial statements that

lacked certain details because, despite their deficiencies, they were nonetheless the best financial

statements on the record for calculating surrogate financial ratios. *See* Ancientree Br. at 19.

Indeed, this Court has repeatedly upheld Commerce's rejection of financial statements for use in

calculating surrogate financial ratios where they lacked sufficient detail based on Commerce's

policy that "when available on the record {it prefers} to use financial statements that contain the

full level of details." *Diamond Sawblades Manufacturers' Coal. v. United States*, 219 F. Supp. 3d

1368, 1381 (Ct. Int'l Trade 2017) (upholding Commerce's rejection of financial statements

where the one line item identifiable as "Manufacturing Overhead" was the line item

"Depreciation" and the agency could not reasonably assume that depreciation represented the

only manufacturing overhead) (alternation in original); *GGB Bearing Tech. (Suzhou) Co. v.

United States*, 279 F. Supp. 3d 1233, 1243 (Ct. Int'l Trade 2017) (upholding Commerce's

rejection of financial statements because they "do not break out raw material costs, which results

in a large gap of unknown costs"); *China Manufacturers All., LLC v. United States*, 205 F. Supp.

PUBLIC VERSION

3d 1325, 1352 (Ct. Int'l Trade 2017) ("Commerce acted within its discretion in deciding against

the Gajah Tunggal financial statements because of the lack of a breakdown for energy costs.");

*Qingdao Qihang Tyre Co. v. United States*, 308 F. Supp. 3d 1329, 1354 (Ct. Int'l Trade 2018)

(upholding Commerce's determination to choose financial statements that broke out energy costs

over those that did not adequately break out energy costs). Thus, there is no question that

Commerce properly considered the level of detail of the financial statements when considering

which country offered the best available financial data.

 Nor does Ancientree find any help by citing to cases where Commerce selected a primary

surrogate country with multiple suitable financial statements over a country with only one

suitable financial statement on the basis that "there may be certain cost distortions in one

company's financial situation, so using multiple financial statements reduces the potential for

such distortions in the comparable industry." *See* Ancientree Brief at 18. Here, the only suitable

financial statement was from the Romanian company Sigstrat. As Commerce explained,

"{b}ecause the record contains a set of financial statements that are contemporaneous, profitable,

from a producer of comparable merchandise that identify the relative sales by product, and that

do not suffer the same deficiencies regarding manufacturing overhead, and also break out

energy, we do not find it preferable to resort to the Malaysian statements merely because there

are more statements from Malaysian companies than there are from Romanian ones." IDM at 37.

Indeed, relying on multiple financial statements that all contain the same distortions would

compound the distortions – not reduce them.

 The record does not support Ancientree's contention that the Malaysian companies'

financial statements reflect the production of merchandise that is more comparable to

Ancientree. Ancientree Br. at 16. First of all, Sigstrat is engaged in the manufacturing of various

types wooden furniture products as well as plywood. Petitioner's SV Submission at Exhibit 10

(P.D. 956-961). All of these products involve the production of merchandise that is comparable

to wooden cabinets, vanities, and components thereof because they involve cutting, sanding,

pressing, and gluing wooden inputs to make the final product. *See* Petitioner's Rebuttal Brief re:

General and Ancientree Issues (Dec. 27, 2019) at 14 (P.D. 1525); *see also* IDM at 36 (finding

that the respondents' "production process includes stages that are comparable to plywood

production, indicating that the mix of products manufactured by Sigstrat involves a reasonably-

comparable production process to the mandatory respondents").

     In addition, there is no foundation in the record for Ancientree's claim that the Malaysian

financial statements primarily reflect the production of identical merchandise as opposed to

comparable merchandise or other types of merchandise. *See* Ancientree Br. at 16. Lii Hen

produces items such as bed frames, nightstands, dressers, and television stands. Ancientree SV

Comments at Exhibit 3 (P.D. 1328-1331). Poh Huat produces wooden bedroom furniture,

standalone tables, and television stands that contain as much metal as they do wooden

components. *Id.* at Exhibit 4. Yeo Aik produces tables, chairs, and bed frames. *Id.* at Exhibits 7

and 8. Furthermore, at least two of these companies also produce merchandise that is not

comparable to wooden cabinets and vanities. Lii Hen is involved in the production of

upholstered furniture, utility shelves, office furniture, and kiln drying timber processing. *Id.* at

Exhibit 3, p 2. Poh Huat states that one of its principal business activities is "investment

holding." *Id.* at Exhibit 5, page 1.

     In sum, the record fully supports Commerce's determination that "none of the financial

statements on the record are from producers of identical merchandise and all of these financial

PUBLIC VERSION

statements are, therefore, of equal suitability in terms of comparability of products produced." IDM at 33.

### C.     Malaysia's Surrogate Information for Labor and B&H Do Not Warrant a Different Selection of Surrogate Country

The Court should reject as meritless Ancientree's request to remand Commerce's selection of a primary surrogate country based on the surrogate values for labor and B&H expenses. *See* Ancientree Br. at 21. As an initial matter, Ancientree itself concedes that these FOPs "are less important" compared to the primary raw material inputs and financial ratios. *Id.* Thus, it is unclear why this would dictate that Commerce select Malaysia as the primary surrogate country when Romania provided the best information available for far more significant FOPs such as the surrogate financial ratios.

In addition, as Commerce found in the final determination, the Malaysian surrogate value for labor was not, as Ancientree claims, vastly superior to the Romanian surrogate value for labor. While the Romanian value was based on labor for "general manufacturing," the Malaysian value was for the "manufacture of wooden and cane furniture," and there was no evidence on the record as to how much of the Malaysian labor rate reflected the manufacture of "cane furniture," which is a woven product manufactured without the various hardware components required to produce the subject merchandise. IDM at 39-40. It was thus unclear whether the Malaysian labor rate was more specific to Ancientree's labor than the Romanian labor rate and thus a more accurate manner of valuing labor. *Id.*

With respect to B&H expenses, because Commerce agreed with Ancientree that the Malaysian surrogate value for this FOP was the best information available on the record, it used the Malaysian surrogate value for B&H expenses. *Id.* at 40. This decision is consistent with this Court's instructions that under certain circumstances, Commerce's preference for valuing all

FOPS using information from the primary surrogate country must still yield to reason and the sourcing of particular SVs from outside the primary surrogate country. *See, e.g.*, *Juancheng Kangtai*, 2015 CIT LEXIS 94, *71.

> **D.      Ancientree Impermissibly Asks This Court to Reweigh the Evidence to Reach a Different Conclusion than Commerce Regarding the Appropriate Surrogate Country**

At the end of the day, Ancientree is asking this Court to reweigh the evidence regarding which potential surrogate country provided better information for calculating surrogate value, a task that the Court has repeatedly recognized is not its role in a judicial review of Commerce's antidumping determinations. For example, Ancientree argues that Commerce's selection of Romania based on its financial statements being more detailed than the Malaysian financial statements was erroneous because Commerce should have focused on "the overall comparability of the production of the company and the number of financial statements." Ancientree Br. at 5. Ancientree also asks this Court to give more weight to FOPs such as labor than factors such as surrogate financial ratios. This request to reweigh evidence should be rejected.

The party challenging Commerce's final determination must show how it is "unsupported by substantial evidence on the record" or otherwise not "in accordance with law." Applying this standard, the Court's role is to determine whether a reasonable mind could conclude that the information Commerce used was the best available. *See Zhejiang DunAn Hetian Metal Co. v. United States,* 652 F.3d 1333, 1341 (Fed. Cir. 2011) (quoting *Goldlink Indus. Co. v. United States*, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006)). The Court has consistently refrained from re-weighing the evidence and reaching a conclusion different from the agency's conclusion. *Diamond Sawblades Manufacturers' Coal. v. United States*, 301 F. Supp. 3d 1326, 1355 (Ct. Int'l Trade 2018) ("the mere fact that the record may support a different choice of

financial statement does not mean Commerce's choice is unsupported by substantial evidence"). In this regard, Ancientree's challenge is no different than the "garden variety request to reweigh evidence" that the Court has routinely rejected. *Catfish Farmers of Am. v. United States*, 33 Ct. Int'l Trade 1258, 1269-70, 641 F. Supp. 2d 1362, 1375 (2009) ("{w}here Commerce is faced with the choice of selecting from among imperfect alternatives, it has the discretion to select the best available information for a surrogate value so long as its decision is reasonable").

## II.    Commerce's Valuation of MDF, Particleboard, and Paint Should Be Sustained

In the final determination, Commerce valued Ancientree's MDF input using Romanian imports under HTS 4411.14.90 (Medium Density Fiberboard Manufactured of Wood). *See* Commerce Final SV Memo at Attachments 1 and 3 (P.D. 1560, 1571). Ancientree argues that Commerce erred in using this HTS code to value its MDF input because it is a basket category for MDF instead of an HTS code that is specific to MDF that is not further worked or surface covered. *See* Ancientree Br. at 24. Commerce similarly valued Ancientree's particleboard using HTS 4410.11.90 (Particle Board of Wood, Whether or Not Agglomerate). *See* Commerce Final SV Memo at Attachments 1 and 3 (P.D. 1560, 1571). And Ancientree similarly claims that Commerce should have used a more specific HTS code covering particle board unworked or not further worked than sanded. *See* Ancientree Br. at 26. These claims suffer from the same flaw as Ancientree's claims regarding birch sawnwood and poplar sawnwood, as Ancientree never presented evidence that its MDF was not further worked or surface covered and never presented evidence that its particleboard was unworked or not further worked than sanded. Ancientree provided no detailed descriptions of these inputs, provided no copies of purchase invoices, and provided no photographs of the inputs.

In fact, the record evidence shows that Ancientree's inputs *were* further worked. For example, Ancientree conceded in its case brief that "the MDF consumed by Ancientree" is

26

"surface covered." *See* Ancientree Case Brief (Dec. 17, 2019) at 12 (P.D. 1511). Based on this

statement alone, it would clearly be inappropriate to value Ancientree's surface covered MDF

input using the more specific HTS code for MDF that is not surface covered. Furthermore,

contrary to Ancientree's claims, the company's own description of its production process also

supports use of the general basket categories rather than the more specific HTS codes. In

particular, in its questionnaire response, Ancientree [

                                                                                ]. *See* Ancientree Sec.

C-D Resp. (July 19,2019) at Exhibit D-3 (C.D. 1023, P.D. 911). The [

                                                                ]. *Id.* However,

Ancientree's product brochure indicates that for cabinets that include MDF or particleboard, the

cabinets include a "matching laminate exterior." Ancientree Sec. A Resp. (July 3, 2019) at

Exhibit A-5 (P.D. 870). Ancientree's production process [

                                                                ]. Thus, the MDF and

particleboard must be [                                                            ]. As a result,

Commerce's use of HTS 4411.14.90 for MDF and HTS 4410.10.90 for particleboard are

appropriate as both cover products that have had [                                 ].

 Ancientree's claims related to the surrogate value for paint suffer a similar flaw.

Commerce valued Ancientree's paint input using HTS 3208.10.90, which covers paints and

varnishes in a non-aqueous medium, because there was no record evidence that Ancientree's

paint is water-based. IDM at 56. Ancientree contends this was erroneous because it "*argued* that

it consumes a paint that is dissolved in an aqueous medium." *See* Ancientree Br. at 25 (emphasis

added). However, Ancientree's *arguments* during the investigation are not *evidence* that the paint

was dissolved in an aqueous medium. *See Evonik Rexim (Nanning) Pharm. Co. v. United States*,

PUBLIC VERSION

253 F. Supp. 3d 1364, 1374 (Ct. Int'l Trade 2017), ("{I}t is well-settled that arguments made by counsel are not evidence") (citing *Gemtron Corp. v. Saint–Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009).

Ancientree counters that "surrogate value submissions are factual submissions," and Ancientree made an affirmative statement that its paint was water-based by suggesting an HTS classification that was for water-based paint. Ancientree Br. at 25. As discussed above in Section I.A.1, surrogate value submissions are not the appropriate time for a respondent to submit new descriptions or additional information regarding its FOPs. A surrogate value submission is limited to information for valuing the FOPs – as described in the respondent's initial and supplemental questionnaire responses.

The exhibits placed on the record at verification do not help Ancientree's cause. *See* Ancientree Br. at 25. The verification exhibit to which Ancientree refers in its moving brief [                                                                                                              ]. Ancientree Verification Exhibit 15 (C.D. 1498, P.D. 1486). Specifically, the [


                                                                                  ]. *Id.* However, the [


       ]. *Id.* Furthermore, during verification, Commerce did not observe any other third-party source documentation or any other documentation regarding the chemical composition for Ancientree's paint input. IDM at 57.

As discussed above, the Court has repeatedly rejected challenges to the HTS codes used by Commerce to value FOPs where plaintiffs claim that more specific HTS codes were available

but failed to present evidence showing that the more specific HTS codes match the FOPs being valued. *See Fine Furniture,* 353 F. Supp. 3d at 1348; *Dorbest,* 30 C.I.T. at 1728; *An Giang Fisheries*, 203 F. Supp. 3d at 1273. Consistent with these prior decisions, the Court should reject Ancientree's challenge to Commerce's selection of HTS codes to value its MDP, particleboard, and paint.

III.    **Commerce's Surrogate Financial Ratio Calculation Should Be Upheld**

In the final determination, Commerce calculated surrogate financial ratios using Sigstrat's 2018 financial statements – including overhead, SG&A, and profit. Commerce Final SV Memo (Feb. 28, 2012) at Exhibit 12 (P.D. 1560, 1571). Commerce's calculation was based on a detailed analysis of Sigstrat's profit and loss statement as well as the notes to the financial statement. *See id.* The Court should uphold Commerce's calculation of surrogate financial ratios as Ancientree has offered no coherent or valid basis to overturn them.

Ancientree argues that Commerce incorrectly calculated the financial ratios because its calculation differed from how Commerce had "consistently" calculated Sigstrat's financial ratios in prior antidumping proceedings. *See* Ancientree Br. at 26-27. In particular, Ancientree states that in the past, Commerce has used 15 different line items for expenses but that in this investigation Commerce used eight line items for expenses instead. *Id.* at 27. These arguments are unfounded and should be rejected.

First, there is no basis for Ancientree's assertion that the methodology employed to calculate financial ratios in the instant proceeding differed from how Commerce has "consistently" calculated Sigstrat's financial ratios in the past. The record of the underlying investigation contained a single alternate calculation methodology – namely for the 2016-2017 administrative review of *Multilayered Wood Flooring from China*. *See* Ancientree Preliminary SV Rebuttal (Aug. 19, 2019) at Exhibit 2 (P.D. 1007). There is no information from other prior

cases showing how Commerce calculated financial ratios using Sigstrat's financial statements. Also absent is any information as to the reasoning for the methodology performed in the 2016-2017 review of that order. More problematic though, is that Sigstrat's 2017 financial statement – which was used in the 2016-2017 review – is absent from the record of this proceeding. *See id.* Without this information (including the auditors' notes and schedules), it is impossible to know why certain categories of expenses would have been calculated as they were in the 2016-2017. Thus, without this information, it would have been inappropriate for Commerce to assume that the methodology applicable in a prior proceeding of a different antidumping duty order was relevant or applicable to the underlying investigation in this case.

In addition, while Ancientree asserts that it had submitted the revised 2018 Sigstrat financial ratios based on Commerce's calculation methodology in *Multilayered Wood Flooring from China*, Ancientree's proffered calculation differed from Commerce's calculation in that proceeding. *See* Ancientree Br. at 27. In particular, while Commerce assigned a certain percentage of personnel expenses to "direct labor" and a certain percentage to "SG&A and interest" in *Multilayered Wood Flooring from China*, Ancientree applied all personnel expenses to labor in its proposed calculation methodology. *See* Ancientree Preliminary SV Rebuttal (Aug. 19, 2019) at Exhibits 1 and 2 (P.D. 1007). In addition, Commerce's calculation of Sigstrat's SG&A expenses included four line items (aside from allocated labor): "third party service expenses;" "other fees, taxes and similar expenses;" "Other expenses;" and "adjustment related to provisions." *Id* at Exhibit 2. Ancientree's recalculation includes two different line items in the 2018 recalculation: (1) "adjustment to current assets," and (2) "operating expenses adjustment." *Id* at Exhibit 1. These differences underscore that – without the relevant prior year's financial

statement (including notes and schedules) – there was no way for Commerce to meaningfully assess if Ancientree's alternative calculation was accurate or reasonable.

It is also noteworthy that Ancientree does not directly dispute the accuracy of Commerce's calculation in the final determination. Instead, it makes unsupported claims that Commerce's calculation is inconsistent with its prior cases and argues for changes in the calculation methodology that are not possible for the agency to verify given the absence of information from the other proceeding.

Finally, the Court should reject Ancientree's claim that it raised this issue in its case brief but that Commerce "acted arbitrarily in not responding to this argument." Ancientree Br. at 27. As the courts have recognized, Commerce's "explanations do not have to be perfect," and the only requirement is that "the path of Commerce's decision must be reasonably discernable to a reviewing court." *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319–20 (Fed. Cir. 2009) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). While Commerce did not respond directly to Ancientree's claims, the reasoning for its calculation of financial ratios using Sigstrat's financial statements is set forth in the agency's detailed calculation worksheet. *See* Commerce Final SV Memo (Feb. 28, 2012) at Exhibit 12 (P.D. P.D. 1560, 1571). Commerce carefully isolated the manufacturing overhead, SG&A expenses, and profit from Sigstrat's financial statements in a detailed spreadsheet and divided these amounts by the appropriate denominators to derive the surrogate financial ratios. This calculation worksheet, which sets forth the path of Commerce's decision, is on the record and more than reasonably discernable to the Court. Accordingly, there is no reason for the Court to overturn Commerce's calculation of the surrogate financial ratios.

PUBLIC VERSION

**IV.     Conclusion**

For the foregoing reasons, Petitioner respectfully request that the Court uphold

Commerce's final determination as supported by substantial evidence and in accordance with

law.

Respectfully submitted,


*/s/ Luke A. Meisner*
Roger B. Schagrin, Esq.
Christopher T. Cloutier, Esq.
Elizabeth J. Drake, Esq.
Luke A. Meisner, Esq.

SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for the American Kitchen Cabinet Alliance.*

Dated: December 21, 2020

PUBLIC VERSION

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing response brief contains 9,279 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in the Court's Chamber's Procedures.


Dated: December 21, 2020                    /s/ Luke A. Meisner_____
                                            Luke A. Meisner