**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE**:    **THE HONORABLE GARY S. KATZMANN, JUDGE**

_____

|  |  |  |
|---|---|---|
| THE ANCIENTREE CABINET CO., LTD., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| CABINETS TO GO, LLC, | ) | |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | Court No. 20-00114 |
| | ) | |
| UNITED STATES, | ) | PUBLIC DOCUMENT |
| | ) | |
| *Defendant*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN KITCHEN CABINET ALLIANCE, | ) | |
| | ) | |
| *Defendant-Intervenors*. | ) | |

_____)

**DEFENDANT'S MEMORANDUM
IN OPPOSITION TO PLAINTIFF AND PLAINTIFF-INTERVENOR'S
RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Of Counsel:

SAVANNAH ROSE MAXWELL
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

TARA K. HOGAN
Assistant Director

IOANA CRISTEI
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-0001

December 22, 2020                                           *Attorneys for Defendant*

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2(c)(1) ....................................................... 2

    I.    Administrative Determination Under Review ....................................... 2

    II.    Issues Presented For Review .................................................................. 2

STATEMENT OF FACTS ........................................................................................... 3

    I.    Initiation Of Investigation ...................................................................... 3

    II.    Commerce's Determination Of Primary Surrogate Country .................. 6

SUMMARY OF THE ARGUMENT ......................................................................... 10

ARGUMENT .............................................................................................................. 11

    I.    Standard Of Review ............................................................................... 11

    II.    Commerce's Selection of Romania As The Primary Surrogate Country Is
        Supported By Substantial Evidence And Is In Accordance With Law ............... 12

        A.    Legal Standard .......................................................................... 12

        B.    Substantial Evidence Supports Commerce's Determination That Romania
            Had The Best Available Surrogate Data .................................................. 14

            1.    Commerce's Determination That Romanian Financial Data Were
                Superior To Malaysian Data Is Supported By Substantial Evidence
                On The Record And Is In Accordance With Law ........................... 15

            2.    Commerce's Calculation Of The Surrogate Financial Ratio Is
                Supported By Substantial Evidence and Commerce's Reasoning is
                Clearly Discernable .................................................................. 20

            3.    Commerce's Determination That The Romanian Wood Import
                Values Were Of Commercial Quantities Is Supported By Substantial
                Evidence And Is In Accordance With Law .................................... 21

            4.    Commerce's Selection of Surrogate Values for Labor and Brokerage
                and Handling Supports its Selection of Romania as the Primary
                Surrogate Country .................................................................... 25

        C.    Commerce's Valuations Of Ancientree's Inputs Of Birch And Poplar
            Sawnwood, MDF, Paint, And Particleboard Were Based On Substantial
            Evidence And In Accordance With Law .................................................. 27

1.  Commerce's Determination To Value Ancientree's Birch Sawnwood And Poplar Sawnwood Inputs Under The Romanian Six-Digit HTS Is Based On Substantial Evidence And In Accordance With Law .. 27

2.  Commerce's Determination To Value Ancientree's MDF Using HTS 4411.14.90 Is Based On Substantial Evidence And In Accordance With Law ................................................................................. 29

3.  Commerce's Determination To Value Ancientree's Paint Using HTS 3208.10.90 Is Based On Substantial Evidence And In Accordance With Law ................................................................................. 31

4.  Commerce's Determination To Value Ancientree's Particleboard Using HTS 3208.10.90 Is Based On Substantial Evidence And In Accordance With Law ................................................................ 32

CONCLUSION ................................................................................................ 33

# TABLE OF AUTHORITIES

## CASES

*Bristol Metals L.P. v. United States,*
    703 F. Supp.2d 1370 (Ct. Int'l Trade 2010)............................................................. 13

*Camau Frozen Seafood Processing Import Export Corp. v. United States,*
    929 F. Supp.2d 1352 (Ct. Int'l Trade 2013)....................................................... 13, 26

*Coalition for the Preservation of Am. Brake Drum and Rotor Aftermarket Mfr. v. United States,*
    44 F. Supp.2d 229 (Ct. Int'l Trade 1999)............................................................... 13

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966)................................................................................................ 11

*CS Wind Vietnam Co., Ltd. and CS Wind Corporation v. United States,*
    971 F. Supp. 2d 1271 (Ct. Int'l Trade 2014)........................................................... 28

*Dorbest Ltd. v. United States,*
    462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006)........................................................... 29

*FMC Corp. v. United States,*
    27 CIT 240 (Ct. Int'l Trade 2003)........................................................................... 15

*FMC Corp. v. United States,*
    87 F. Appx. 753 (Fed. Cir. 2004)....................................................................... 15, 16

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996)................................................................................ 11

*Goldlink Indus. v. United States,*
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006)........................................................... 29

*Home Meridian Int'l. Inc. v. United States,*
    772 F.3d 1289 (Fed. Cir. 2014)............................................................................... 12

*INS v. Elias-Zacarias,*
    502 U.S. 478 (1992)................................................................................................ 11

*Jiaxing Bro. Fastener Co., Ltd. v. United States,*
    822 F.3d 1289 (Fed. Cir. 2016).......................................................... 5, 12, 13, 14

*Jinan Farmlady Trading Co. v. United States,*
    228 F. Supp. 3d 1351 (Ct. Int'l Trade 2017)........................................................... 24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................................ 21

*Nation Ford Chem. Co. v. United States*,
  166 F.3d 1373 (Fed. Cir. 1999) ............................................... 12, 13, 24, 28

*NMB Singapore Ltd. v. United States*,
  557 F.3d 1316 (Fed. Cir. 2009) ......................................................................... 21

*PAM, S.p.A. v. United States*,
  582 F.3d 1336 (Fed. Cir. 2009) ......................................................................... 11

*Peer Bearing Co.-Changshan v. United States*,
  804 F. Supp.2d 1337 (2011) .............................................................................. 13

*Qingdao Qihang Tyre Co., Ltd. v. United States*,
  308 F.Supp.3d 1329 (Ct. Int'l Trade 2018) ................................................ 17

*QVD Food Co., Ltd v. United States*,
  658 F.3d 1318 (Fed. Cir. 2011) ......................................... 23, 25, 26, 30

*Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*,
  59 F. Supp.2d 1354 (Ct. Int'l Trade 1999) ................................................ 22

*Sichuan Changhong Electric Co. v. United States*,
  460 F. Supp. 2d 1338 (Ct. Int'l Trade 2006) ........................................... 22

*Trust Chem. Co. v. United States*,
  791 F. Supp.2d 1257 (Ct. Int'l Trade 2011) ...................................... 22, 23

*Zhejiang DunAn Hetian Metal Co. v. United States*,
  652 F.3d 1333 (Fed. Cir. 2011) .......................................... 12, 13, 27

## **STATUTES**

19 U.S.C. § 1673 ...................................................................................................... 3

19 U.S.C. § 1677b(c) ............................................................................................. 4

19 U.S.C. § 1677b(c)(1) ................................................................................ 5, 13

19 U.S.C. § 1677b(c)(1)(B) .......................................................................... 6, 12

19 U.S.C. § 1677b(c)(4)(A) ................................................................................. 4

## REGULATIONS

19 C.F.R. § 351.408(c)(2) ................................................................................................ 6

## ADMINISTRATIVE DETERMINATIONS

*Administrative Review of Certain Frozen Warmwater Shrimp From the People's Republic of China:  Final Results, Partial Rescission of Sixth Antidumping Duty Administrative Review and Determination Not To Revoke in Part*,
      77 Fed. Reg. 53,856 (Dep't of Commerce Sept. 4, 2012) ................................................ 20

*Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, In Part*,
      80 Fed. Reg. 34,893 (Dep't of Commerce June 18, 2015) ............................................... 19

*Carbazole Violet Pigment 23 from the People's Republic of China: Final Results of Antidumping Administrative Review*,
      75 Fed. Reg. 36,630 (Dep't of Commerce June 28, 2010) ............................................... 26

*Certain Frozen Warmwater Shrimp from the People's Republic of China:  Preliminary Results, Partial Rescission, Extension of Time Limits for the Final Results, and Intent to Revoke, in Part, of the Sixth Antidumping Duty Administrative Review*,
      77 Fed. Reg. 12,801, 12,809 (Dep't of Commerce March 2, 2012) ................................. 20

*Citric Acid and Certain Citrate Salts from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*,
      74 Fed. Reg. 16,838, 16,839 (Dep't of Commerce April 13, 2009) ................................. 17

*Corrected Notice of Final Affirmative Determination of Sales at Less-Than-Fair Value for Wooden Cabinets and Vanities and Components Thereof from the Peoples Republic of China*,
      85 Fed. Reg. 17,855 (Dep't of Commerce March 31, 2020) ............................................. 2

*Initiation of Less-Than-Fair Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China*,
      84 Fed. Reg. 12,587 (April 2, 2019) ................................................................................. 3

*Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part: Certain Lined Paper Products from the People's Republic of China*,
      71 Fed. Reg. 53,079 (Dep't of Commerce Sept. 8, 2006) ............................................... 26

*Lightweight Thermal Paper from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*,
      73 Fed. Reg. 57,329 (Dep't of Commerce, October 2, 2008) ........................................... 26

*Saccharin from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review*,
    71 Fed. Reg. 7,515 (Dep't of Commerce Feb. 13, 2006) .................................................. 26

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*,
    84 Fed. Reg. 54,106 (Dep't of Commerce Oct. 9, 2019)..................................................... 7

*Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China*: *Final Affirmative Determination of Sales at Less Than Fair Values*,
    85 Fed. Reg. 11,953 (Dep't Commerce Feb. 28, 2020)...................................................... 2

*Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Antidumping Duty Order*,
    85 Fed. Reg. 22,126 (Dep't of Commerce April 21, 2020) ......................................... 2, 11

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE GARY S. KATZMANN, JUDGE
_____

|  |  |  |
|---|---|---|
| THE ANCIENTREE CABINET CO., LTD., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| CABINETS TO GO, LLC, | ) | |
| | ) | |
| *Plaintiff-Intervenor*, | ) | |
| | ) | |
| v. | ) | Court No. 20-00114 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| *Defendant*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN KITCHEN CABINET ALLIANCE, | ) | |
| | ) | |
| *Defendant-Intervenors*. | ) | |
| _____ | ) | |

**DEFENDANT'S MEMORANDUM
IN OPPOSITION TO PLAINTIFF AND PLAINTIFF-INTERVENOR'S
<u>RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD</u>**

Defendant, the United States, respectfully submits this response to the motions for

judgment upon the agency record filed by plaintiff, The Ancientree Cabinet Co., LTD

(Ancientree), and plaintiff-intervenor Cabinets To Go (CTG),[1] challenging the Department of

Commerce's final determination in the antidumping investigation of wooden cabinets and

vanities from the People's Republic of China.  As demonstrated below, Commerce's affirmative

determination is supported by substantial evidence and is otherwise in accordance with law.

_____

[1] CTG did not take a position regarding Ancientree's arguments.  But, as discussed in section II.C.4, *infra*, CTG requests that any change necessitated by the Court also be applied to its entries.

1

Accordingly, the United States respectfully requests that the Court sustain Commerce's determination and deny Ancientree's motion.

## STATEMENT PURSUANT TO RULE 56.2(c)(1)

### I.      Administrative Determination Under Review

The administrative determination under review is *Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China*: *Final Affirmative Determination of Sales at Less Than Fair Values*, 85 Fed. Reg. 11,953 (Dep't Commerce Feb. 28, 2020) (*Final Determination*) (P.R. 1559), and accompanying Issues and Decision Memorandum dated February 21, 2020 (IDM), P.R. 1554, as corrected by *Corrected Notice of Final Affirmative Determination of Sales at Less-Than-Fair Value for Wooden Cabinets and Vanities and Components Thereof from the Peoples Republic of China*, 85 Fed. Reg. 17,855 (Dep't of Commerce March 31, 2020), P.R. 1575; *Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Antidumping Duty Order*, 85 Fed. Reg. 22,126 (Dep't of Commerce April 21, 2020).  The period of investigation is July 1, 2018 through December 31, 2018.  *Id.*

### II.      Issues Presented For Review

1.      Whether Commerce's selection of Romania as the primary surrogate country is supported by substantial evidence and is in accordance with law.

2.      Whether Commerce's calculation of the surrogate financial ratio is supported by substantial evidence and is in accordance with law.

3.      Whether Commerce's surrogate valuation for labor using Romanian data and brokerage and handling using Malaysian data required Commerce to select Malaysia as the primary surrogate country.

4.      Whether Commerce's surrogate valuation for birch and poplar logs using

Romanian surrogate values is supported by substantial evidence and is in accordance with law.

5.      Whether Commerce's surrogate valuation for multi-density fiberboard (MDF) based on Romanian import data under Harmonized Tariff Scheduled (HTS) category 4411.14.90 is supported by substantial evidence and is otherwise in accordance with law.

6.      Whether Commerce's surrogate valuation for paint based on Romanian HTS category 3208.10.90 is supported by substantial evidence and is otherwise in accordance with law.

7.      Whether Commerce's surrogate valuation for particleboard using Romanian Global Trade Atlas (GTA) data for HTS category 4410.11.10 is supported by substantial evidence and is otherwise in accordance with law.

**STATEMENT OF FACTS**

**I.      <u>Initiation Of Investigation</u>**

Commerce initiated a less than fair value investigation of wooden cabinets and vanities from China on March 26, 2019.  *See Initiation of Less-Than-Fair Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China*, 84 Fed. Reg. 12,587 (April 2, 2019), P.R. 67.  The purpose of an antidumping duty investigation is to determine whether an imported product is being, or are likely to be, sold at less than fair value. If the investigation is affirmative, Commerce will calculate an antidumping duty rate.  This duty is the amount by which the "normal value" of subject merchandise exceeds its "export price (or the constructed export price)."  19 U.S.C. § 1673.  The merchandise subject to the investigation "consists of wooden cabinets and vanities that are for permanent installation (including floor mounted, wall mounted, ceiling hung or by attachment of plumbing), and wooden components thereof."  *Final Determination*, 85 Fed. Reg. at 11961.

Commerce selected three mandatory respondents as a subset of known exporters from China:  Ancientree, Rizhao Foremost Woodwork Manufacturing Co., Ltd. (Foremost), and Dalian Meisen Woodworking Co., Ltd. (Meisen).  *See* Memorandum, "Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Respondent Selection," dated June 4, 2019, P.R. 838, C.R. 948.

Because the proceedings involved a non-market economy, Commerce was required to determine the subject merchandise's normal value by relying on the "best available information" from a market economy country to derive surrogate valuations for the non-market economy entity's factors of production, including raw materials, labor, and utilities.  19 U.S.C. § 1677b(c).  To those factors, Commerce also adds "an amount for general expenses and profit plus the cost of containers coverings, and other expenses."  *Id.*

On June 17, 2019, consistent with 19 U.S.C. § 1677b(c)(4)(A), Commerce's Office of Policy (OP) determined that Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia were countries at a comparable level of economic development as China, based on the current annual issue of the World Development Report.  *See* Surrogate Country Letter, which contained the memorandum regarding the List of Surrogate Countries for Antidumping Investigations and Reviews from the People's Republic of China (China), dated August 2, 2018 (*i.e.*, the surrogate country list).  The comparable level of economic development was based on per capita 2017 gross national income (GNI) data.  *See* Commerce's letter re: Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information, dated June 17, 2019 (Surrogate Country Letter), P.R. 850.  Commerce also found that all six countries were significant producers of comparable merchandise.  *See* Import Admin.,

U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy

Bulletin 04.1 (2004), *http://enforcement.trade.gov/policy/bull04-1.html* (last visited Dec. 7,

2020) (Policy Bulletin 04.1).  Because more than one potential surrogate country satisfied the

statutory requirements for selection, Commerce selected the primary surrogate country based on

data availability and reliability, consistent with Policy Bulletin 04.1.  IDM at 31.

To determine the best surrogate country to use, Commerce must use, "to the extent

possible," surrogate factors from "one or more market economy countries that are—(A) at a level

of economic development comparable to that of the nonmarket economy country, and (B)

significant producers of comparable merchandise."  *Id.* § 1677b(c)(4)(A)-(B).  If more than one

market economy country is economically comparable and is a significant producer of

comparable merchandise, then Commerce will evaluate and compare the reliability and

completeness of the record data from those countries.  *Jiaxing Bro. Fastener Co., Ltd. v. United

States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016); Policy Bulletin 04.1.

If more than one market economy country meets the requirements to provide surrogate

values, Commerce may select a primary surrogate country based on data availability and

reliability.  Specifically, Commerce considers whether the factors of production data are:  (1)

publicly available; (2) contemporaneous with the period; (3) a broad market average covering a

range of prices; (4) specific to the input in question; and (5) tax exclusive.  Policy Bulletin 04.1;

*see also Jiaxing Bro.*, 822 F.3d at 1293.

Pursuant to 19 U.S.C. § 1677b(c)(1), Commerce must determine the value of subject

merchandise from nonmarket economy countries "on the basis of the value of the factors of

production utilized in producing the merchandise."  In doing so, Commerce must use "the best

available information regarding the values of such factors in a market economy country or

countries considered to be appropriate" by Commerce.  19 U.S.C. § 1677b(c)(1)(B).  Pursuant to

19 C.F.R. § 351.408(c)(2), Commerce will normally select all of its individual surrogate values

for factors of production from the primary surrogate country

On June 17, 2019, Commerce invited comments from interested parties on:  (1) the non-

exhaustive OP list of countries; (2) surrogate country selection; and (3) surrogate value data.  *See*

Surrogate Country Letter.  From July through September 2019, interested parties submitted

comments on the list of countries and submitted surrogate value information.[2]  The American

Kitchen Cabinet (AKC) Alliance recommended that Commerce select Romania as the primary

surrogate country.  Respondents, including Ancientree, recommended that Commerce select

Malaysia as the primary surrogate country.

## II.     Commerce's Determination Of Primary Surrogate Country

Commerce issued its preliminary affirmative determination on October 9, 2019.  *See*

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:*

---

[2]  *See* American Kitchen Cabinet (AKC) Alliance Letter re:  Surrogate Country Comments, dated July 16, 2019 (P.R. 898); AKC Alliance Letter re:  Petitioner's Initial Surrogate Value Comments, dated August 7, 2019 (AKC Alliance SV Comments), P.R. 956-961; AKC Alliance Letter re:  Petitioner's Initial Rebuttal Surrogate Value Comments, dated August 19, 2019, P.R. 1013-1014;  AKC Alliance Letter re: Petitioner's Final Surrogate Value Comments, dated September 3, 2019 (AKC Alliance Pre-prelim SV Comments), P.R. 1327; and AKC Alliance Letter re:  Petitioner's Comments on Respondents' Final Surrogate Value Comments, dated September 13, 2019 (AKC Alliance Pre-prelim SV Rebuttal Comments), P.R. 1356.  *See* Ancientree's Letter re:  Surrogate Country Comments, dated July 16, 2019, P.R. 899; Ancientree's Letter, re:  Preliminary Surrogate Value Submission, dated August 7, 2019, P.R.952-955; Ancientree's Letter re:  Rebuttal Preliminary Surrogate Value Submission, dated August 19, 2019 (Ancientree Rebuttal SV Comments), P.R. 1007-1008; and Ancientree's Letter re:  Final Surrogate Value Submission, September 3, 2019 (Ancientree Pre-prelim SV Comments), P.R. 1328-1332.  *See* Foremost's Letter re:  Foremost's Surrogate Country Selection Comments, dated July 16, 2019, P.R. 900; Foremost's Letter re:  Foremost's Affirmative Surrogate Value Submission, dated August 7, 2019, P.R. 963-966; Foremost's Letter re:  Foremost's Rebuttal Surrogate Value Submission, dated August 19, 2019, P.R. 1010-1012; and Foremost's Letter re:  Foremost's Final Surrogate Value Submission, dated September 3, 2019 (Foremost Pre-prelim SV Comments), P.R. 1316-1322.

*Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 Fed. Reg. 54,106 (Dep't of Commerce Oct. 9, 2019) (*Preliminary Determination*), P.R. 1426, and accompanying Preliminary Decision Memorandum (PDM), P.R. 1407, as corrected by *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 Fed. Reg. 56,420 (Dep't of Commerce Oct. 22, 2019), P.R. 1442.  Commerce preliminarily determined that the parties had placed complete data for Malaysia and Romania on the record, and no party had placed complete data from, nor argued for, using any other country as the primary surrogate country.  PDM at 12.

After evaluating data availability and reliability, Commerce preliminarily selected Romania as the primary surrogate country.  Commerce made this selection because Romania was at a comparable level of economic development as China, was a significant producer of comparable merchandise, and had reliable and useable surrogate value data.  *See* PDM at 14.

The factors of production that Commerce considered included energy, labor, packing materials, manufacturing overhead, and certain raw materials such as birch and poplar sawnwood, particleboard, MDF, glue, and paint.  In making its determination, Commerce also had to consider which financial statements to use to calculate financial ratios.  The record contained a financial statement from a Romanian company, S.C. Sigstrat S.A. (Sigstrat)—a producer of comparable, though not identical, wooden furniture and wood products that separately identified energy expenses.  *Id.*; *see* AKC Alliance SV Comments at Exhibit 10B (Sigstrat Statements) at 1.1.a and 1.1.2., P.R. 956-961.  The record additionally contained ten financial statements from Malaysia.

7

In comparing the statements from Malaysia with the statement from Romania, Commerce explained that four of the Malaysian financial statements were from companies[3] representing large holding or investment companies with numerous subsidiaries engaged in various activities that would not necessarily reflect the cost structure of a manufacturer of wood products.  PDM at 13.  Moreover, two of those four Malaysian statements, from Sern Kou Resources Berhad and Latitude Tree Holdings Berhad, were not contemporaneous with the period of investigation.  *Id.* Of the remaining six Malaysian financial statements, Commerce determined that the statements of CT Heng Furniture Sdn. Bhd., Latitude Tree Furniture Sdn. Bhd., and Sin Heng Furniture Industries Sdn. Bhd. were for the year-ending June 30, 2018, and, therefore, were also not contemporaneous with the period of investigation (July 1, 2018 through December 31, 2018).  PDM at 13.  Because Commerce determined that seven of the Malaysian financial statements were unsuitable for valuing financial ratios, only three statements remained that were contemporaneous with the period of investigation from manufacturers of comparable merchandise:  Lii Hen Industries Bhd (Lii Hen), Poh Huat Furniture Industries Sdn Bhd (Poh Huat), and Yeo Aik Wood Sdn Bhd (Yeo Aik).  For each of these three statements, however, Commerce determined that not one of them separated energy costs from other manufacturing costs.  PDM at 13.

In its administrative case brief, Ancientree argued that Commerce had incorrectly selected Romania as the primary surrogate country.  Ancientree Admin. Case Br., P.R. 1523.  Ancientree's argument centered on four points.  First, that the Malaysian financial statements were from producers of identical merchandise, and thus were more specific than the Romanian

---

[3]  The companies were:  Jay Corp Berhand, Latutude Tree Holdings Berhad, Poh Hat Res Resources Holdings Berhad, and Sern Kou Resources Berhad.

financial statements.  *Id.* at 3-6.  Second, Ancientree argued that the Romanian import values for birch sawnwood and poplar sawnwood inputs were based upon non-commercial quantities, as compared to the quantities of the Malaysian import values.  Ancientree *Id.* at 6-8.  Third, Ancientree argued that the Malaysian labor and brokerage and handling data were superior to the Romanian data, and thus Commerce, having used Malaysian data solely for brokerage and handling, should have selected Malaysia as the primary surrogate country.  Fourth, Ancientree argued that the Romanian HTS categories that Commerce used to value Ancientree's birch sawnwood and poplar sawnwood inputs was not specific to the inputs Ancientree used in its production of subject merchandise.  *Id*.  Finally, Ancientree argued that Commerce incorrectly valued three of its inputs:  medium density fibreboard (MDF), particleboard, and paint.  *Id.* at 11-13.  For the valuation of each of these inputs Ancientree argued that the HTS category selected was not specific to the input it used in producing the subject merchandise.

That same month, Commerce conducted verification of the sales and factor of production information data reported by Ancientree.  *See* Memorandum re:  Verification of the Export Price Sales and Factors of Production Response of The Ancientree Cabinet Co., Ltd, dated December 10, 2019 (Ancientree Verification Report), P.R. 1502, C.R. 1530.

In its final determination, Commerce continued to find that Romanian data constituted the best available information on the record because:  (1) the record contained complete, contemporaneous Romanian GTA data for each input used by the respondents; and (2) the Romanian financial statement on the record was reliable and more detailed than the Malaysian financial statements, allowing for a more accurate calculation of the surrogate financial ratio. IDM at 26-44.  Commerce determined that the Malaysian surrogate value for brokerage and handling was superior, and thus used Malaysian surrogate value solely for brokerage and

handling.  IDM at 40.  Commerce considered the totality of the circumstances, and in consideration of the analysis of record information related to financial ratios, birch and poplar wood inputs, and labor, did not find that the superiority of a surrogate value for brokerage and handling warranted a departure from selecting Romania as the primary surrogate country. Consequently, Commerce continued to use Romania as the primary surrogate country because it was the source of the best available information on the record.

After the International Trade Commission (ITC) made an affirmative finding, Commerce issued its order.  *Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Antidumping Duty Order*, 85 Fed. Reg. 22,126 (Dep't of Commerce Apr. 21, 2020).

## SUMMARY OF THE ARGUMENT

Commerce's final determination is supported by substantial evidence and in accordance with law, and therefore, should be sustained.  Commerce selected Romania as the primary surrogate country because it presented the best data for valuing respondents' factors of production.  The Romanian data was simply the best data on the record for valuation purposes because it contained complete, contemporaneous Romanian GTA data for each input used by the respondents with the exception of brokerage and handling for which it used Malaysian data.  In particular, the Romanian financial statement data was more detailed than the Malaysian financial statements because it specifically breaks out energy costs from manufacturing costs, and details the manufacturing overhead.  Thus, Commerce rationally made its determination consistent with its own criteria for selecting surrogate value countries.

In response, Ancientree does not challenge Commerce's determinations that Romania is at a comparable level of economic development as China or that it is a significant producer of subject merchandise.  Rather, it focuses on record data differences between Romania and

Malaysia that are not supported by the record.  None of the arguments that Ancientree raises

amount to anything more than mere disagreement with the agency's rational determination.

Ancientree essentially asks that the Court substitute its judgment for that of Commerce in

selecting the best available information on the record to value Ancientree's factors of production,

which this Court cannot do.

Accordingly, the Court should sustain Commerce's determination because its selection of

Romania as the primary surrogate country, and its valuation of Ancientree's inputs, was based on

substantial evidence and is in accordance with law.

## ARGUMENT

### I.   Standard Of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International

Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is

'unsupported by substantial evidence on the record, or otherwise not in accordance with the

law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19

U.S.C. § 1516a(b)(1)(B)(i)).  Substantial evidence means "more than a mere scintilla" and "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *PAM,*

*S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (citations omitted), but "less than

the weight of the evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  The

"possibility of drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's finding from being supported by substantial evidence." *Id*.  The

agency's conclusions should be reversed only if the record contains evidence "so compelling that

no reasonable factfinder" could reach the same conclusion.  *INS v. Elias-Zacarias*, 502 U.S. 478,

483–84 (1992).

## II.   Commerce's Selection of Romania As The Primary Surrogate Country Is Supported By Substantial Evidence And Is In Accordance With Law

Consistent with its statutory obligation and regulatory factors, Commerce determined that Romania had the best available information on the record and would best serve as the primary surrogate country for valuing the respondents' factors of production.  In challenging Commerce's selection of Romania over Malaysia, Ancientree makes several unsupported assertions regarding the inputs Ancientree uses in the production of subject merchandise. Nevertheless, Commerce relied on substantial evidence in support of its decision and thus its selection of Romania as the primary surrogate country should be sustained.

### A.   Legal Standard

In choosing the primary surrogate country, Commerce must select the "best available information" on the record to value the factors of production.  19 U.S.C. § 1677b(c)(1)(B); *see Jiaxing Bro.*, 822 F.3d at 1294.  However, because the statute is silent regarding what constitutes the "best available information," Commerce has "broad discretion" to decide the record evidence that meets the criteria.  *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (citations omitted); *see also Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("{T}his section also accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines.").

If more than one market economy country meets the requirements to provide surrogate values, Commerce may choose a primary surrogate country based on data availability and reliability.  While the data Commerce relies on must be the "best available," "there is no requirement that the data be perfect."  *Jiaxing Bro.*, 822 F.3d at 1301 (quoting *Home Meridian Int'l. Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)).  Nor is Commerce required to duplicate the precise experience of the manufacturer in the non-market economy.  *Nation Ford*,

166 F.3d at 1377.  Instead, Commerce seeks to identify and rely on the record data that "most accurately represents the fair market value" of the relevant factors of production.  *Id.*  Commerce also "has the statutory authority to use multiple surrogate countries, 19 U.S.C. § 1677b(c)(1), and has invoked that authority when it deemed such to be appropriate."  *See Camau Frozen Seafood Processing Import Export Corp. v. United States*, 929 F. Supp.2d 1352, 1355 (Ct. Int'l Trade 2013); *see e.g.*, *Peer Bearing Co.-Changshan v. United States*, 804 F. Supp.2d 1337, 1353 (2011) (noting Commerce's use of Indian and Thai data for different surrogate values in the same review).

Accordingly, given Commerce's discretion to determine the "best available information," and the fact-specific nature of this deferential case-by-case inquiry, a review of Commerce's determination should question "not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information."  *Jiaxing*, 822 F.3d at 1301 (citing *Zhejiang*, 652 F.3d at 1341).  When Commerce provides a reasoned basis for its finding that the selected data satisfy its criteria and constitute better data than plaintiff's alternatives, the Court has refrained from "substitut{ing} its own evidentiary evaluation for Commerce's and its own judgment for the agency's in considering and weighing the relative importance of various criteria applied."  *Bristol Metals L.P. v. United States*, 703 F. Supp.2d 1370, 1376 (Ct. Int'l Trade 2010).  Commerce "need not prove that its methodology was the only way or even the best way to calculate surrogate values for factors of production as long as it was a reasonable way."  *Coalition for the Preservation of Am. Brake Drum and Rotor Aftermarket Mfr. v. United States*, 44 F. Supp.2d 229, 258 (Ct. Int'l Trade 1999).

**B.      Substantial Evidence Supports Commerce's Determination That Romania Had The Best Available Surrogate Data**

This Court should sustain Commerce's determination that the Romanian data, with the exception of brokerage and handling, constituted the best available data for valuing respondents' factors of production for several reasons.  The record contained complete, contemporaneous Romanian GTA data for each input used by the respondents, including the birch and poplar sawnwood inputs.  IDM at 32.  The Romanian surrogate financial statement was more complete than the Malaysian ones because the Romanian statement specifically separated the energy costs from the other manufacturing costs.  IDM at 32.  In evaluating the information from both Romania and Malaysia, Commerce considered whether the data on the record were publicly available, product specific, representative of broad market average prices, contemporaneous with the period of investigation, and free of taxes and import duties.  IDM at 8; *see also Jiaxing Bro.*, 822 F.3d at 1293.

Ancientree makes four arguments in response.  First, Ancientree argues that three Malaysian financial statements had better data to calculate the surrogate financial ratios because they were from producers of identical products.  Second, Ancientree argues that the Romanian import values are based on insignificant and non-commercial quantities, and thus must be aberrational and distortive.  Third, Ancientree argues that the Malaysian labor and brokerage and handling data was superior to the Romanian data, and because Commerce used Malaysian data solely to value brokerage and handling Commerce should have selected Malaysia as the primary surrogate country.  Finally, Ancientree argues that the Romanian six-digit level HTS used to evaluate Ancientree's birch sawnwood and poplar sawnwood inputs was not specific to the inputs it used in its production of subject merchandise.  Ancientree Br. at 6-21.  As demonstrated below, the record does not support Ancientree's arguments.

1.    **Commerce's Determination That Romanian Financial Data Were Superior To Malaysian Data Is Supported By Substantial Evidence On The Record And Is In Accordance With Law**

Commerce reasonably determined that the Romanian Sigstrat financial statement was the best available information on the record.  The statement from Sigstrat was contemporaneous, it was from a producer of comparable merchandise, and was more detailed than the Malaysian financial statements, allowing for a more accurate calculation of the surrogate financial ratio.  IDM at 32-44.  Commerce thus rationally exercised its discretion to choose the appropriate financial statements to calculate surrogate financial ratios.  *See FMC Corp. v. United States*, 27 CIT 240, 251 (Ct. Int'l Trade 2003) (holding that Commerce can exercise discretion in choosing between reasonable alternatives), *aff'd FMC Corp. v. United States*, 87 F. Appx. 753 (Fed. Cir. 2004).

Ancientree argues that two of the three contemporaneous Malaysian financial statements were from producers of identical merchandise, *i.e.*, in-scope wooden cabinets and vanities, and as such, were better sources of data.  Ancientree Br. 13-15.  Specifically, Ancientree claims that Lii Hen and Poh Huat are producers of identical merchandise.  *Id.* 14-15.  However, the record does not support Ancientree's argument.

The only information Ancientree provided in support of its claim that the Malaysian companies produce identical products were the websites of each company, which Commerce found do not show that the products were in fact identical.  IDM at 26-27.  Lii Hen's website contains images of items such as bed frames, nightstands, dressers, and television stands, but does not contain images of subject merchandise such as wooden cabinets and vanities for permanent installation.  *See* Ancientree Pre-prelim SV Comments at Exhibit 3, P.R. 1328.  Similarly, Poh Huat's website contains images of wooden bedroom furniture and standalone

tables and television stands that appear to contain as much metal as they do wood components, but does not contain images of in-scope merchandise. *See id.* at Exhibit 4. Accordingly, the companies' websites do not support Ancientree's allegation, and most importantly, none of the Malaysian financial statements identified financial data for production or sales of in-scope wooden cabinets and vanities.

The Malaysian financial statements of each of the three contemporaneous producers, Lii Hen, Poh Huat, and Yeo Aik, demonstrate that each were producers of wooden furniture; meaning they produce comparable, but not identical merchandise. IDM at 33. Ancientree argues that nevertheless, the Malaysian financial statements were more comparable than the Romanian financial statement selected by Commerce because Sigstrat also produces plywood. But Commerce determined that the production of both plywood and wooden furniture were comparable to the production of wooden cabinets and vanities. IDM at 35. Sigstrat's financial statement also indicates that the company produces wood plywood, veneering, seats and backrests, chairs, tables, and other wooden products, all of which are similar products to those produced by the three Malaysian companies. *See* AKC Alliance SV Comments at Exhibit 10B (Sigstrat Statements) at 1.1.a and 1.1.2) (P.R. 956-961). Foremost, which is one of the respondents, has a production process that includes elements very similar to Sigstrat's plywood, veneering, and wooden furniture processes. *See, e.g.*, Foremost's September 23, 2019 Supplemental Section D Questionnaire Response (Foremost September 23, 2019 SDQR) at 20 (noting labor hours for veneering related to "pasting veneers onto wooden board and semi-finished parts"), P.R. 1392, C.R. 1388.

In addition to representing companies that produce comparable and not identical merchandise, the Malaysian financial statements were much less detailed than the Romanian

financial statement.  IDM at 33.  Generally, in considering financial statements from different countries where one set of statements breaks out the energy factors of production and the other set does not, Commerce prefers financial statements that separate the energy factors.  *See, e.g.*, *Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, In Part*, 80 Fed. Reg. 34,893 (Dep't of Commerce June 18, 2015), and accompanying IDM at Comment 9 ("The Department's practice is to reject those financial statements that are not sufficiently detailed, and specifically, that do not contain a breakout for energy costs, when there are alternative financial statements on the record that contain a line item for energy costs.").  Sigstrat's financial statement "completely segregate{s} two costs important to Commerce's analysis—energy and manufacturing overhead—whereas the Malaysian financial statements do not."  IDM at 33.

Energy factors are necessary for most manufacturing processes and thus important to valuing the overhead of the manufacturing experience.  Thus, using the Malaysian statements that do not include this separation of energy factors could result in a less accurate surrogate financial ratio.  IDM at 34.  This lack of accuracy results because where Commerce is unable to exclude energy costs from the calculation of surrogate financial ratios, Commerce's practice is to disregard the respondents' energy inputs in the calculation of normal value, to avoid double counting energy costs.  *See Qingdao Qihang Tyre Co., Ltd. v. United States*, 308 F.Supp.3d 1329, 1354 (Ct. Int'l Trade 2018) (determining Commerce rationally determined that one set of financial statements "was not usable because it did 'not adequately break out energy costs.'"); *see, e.g.*, *Citric Acid and Certain Citrate Salts from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 74 Fed. Reg. 16,838, 16,839 (Dep't

of Commerce April 13, 2009), and accompanying IDM at Comment 2; *see also Certain Frozen Warmwater Shrimp from the People's Republic of China:  Preliminary Results, Partial Rescission, Extension of Time Limits for the Final Results, and Intent to Revoke, in Part, of the Sixth Antidumping Duty Administrative Review*, 77 Fed. Reg. 12,801, 12,809 (Dep't of Commerce March 2, 2012), unchanged in *Administrative Review of Certain Frozen Warmwater Shrimp From the People's Republic of China:  Final Results, Partial Rescission of Sixth Antidumping Duty Administrative Review and Determination Not To Revoke in Part*, 77 Fed. Reg. 53,856 (Dep't of Commerce Sept. 4, 2012).  As Commerce explained, disregarding the Romanian set of surrogate values and financial statement that breaks out energy would require that Commerce sacrifice its calculations by "not separately valuing multiple energy FOPs reported by respondents, and that were verified by Commerce, simply because we cannot determine where those energy FOPs are accounted for in the financial statements."  IDM at 34.

Commerce found the Malaysian financial statements to be less preferable because they did not provide the same level of detail with respect to manufacturing overhead as the Romanian financial statement did.  *Id*.  This lack of detail on manufacturing overhead limited Commerce's ability to calculate financial ratios.  This limited detail in the Malaysian statements "raises the question of where energy and other indirect expenses are accounted for at all."  IDM at 34.  The Malaysian companies do not provide any numerical data for the *indirect* manufacturing costs, such as consumables and spares, repairs and maintenance, and other manufacturing costs.  The financial statements do not have separate line-item break outs for these indirect expenses.

For example, the financial statements of Lii Hen only account for "Land and Buildings" and "Plant, machinery and equipment," but does not break out manufacturing overhead.  None of the other itemized expenses in Lii Hen's financial statement could be interpreted to include the

cost of energy and these other indirect manufacturing costs because these other expenses direct materials or direct labor used in the production of subject merchandise.  Thus, these other expenses could not be categorized as indirect to the manufacturing operation of the company. *See* Foremost Pre-prelim SV Comments at Exhibit 1, P.R. 1316.

Similarly, the financial statements of Yeo Aik only identify depreciation and rental expenses as overhead items, and none of the other line-items are related to indirect production expenses.  *See* Ancientree Pre-prelim SV Comments at Exhibit 7, P.R. 1328-1332.  The financial statements of Poh Huat only contained overhead items identified as "depreciation of property, plant and equipment," "direct operating expenses on investment properties," and "loss on disposal of property, plant, and equipment."  *Id.* at Exhibit 5.

Thus, Commerce rationally determined that it could not determine where energy and other indirect expenses were accounted for in the Malaysian financial statements because the statements lacked a detailed breakout of energy and the manufacturing overhead identified was extremely limited.  IDM at 34-35.  In contrast, Commerce determined that the Romanian Sigstrat financial statement was preferable, because it contained a single item for production overhead, which represented all manufacturing costs that are not direct materials or direct labor and are indirect to the manufacturing operations of the company.  Because the Sigstrat statement also contained an itemized expense for energy costs, Commerce was able to reduce the total amount of production overhead expenses by the value of Sigstrat's energy costs, a calculation Commerce could not make using the Malaysian financial statements.

Thus, when comparing the data, Commerce reasonably selected the Sigstrat financial statement because this financial statement was more detailed, enabling Commerce to calculate a

surrogate financial ratio approximating respondents' experience.  Ancientree's arguments to the contrary do not detract from the reasonableness of Commerce's selection.

> **2.      Commerce's Calculation Of The Surrogate Financial Ratio Is Supported By Substantial Evidence and Commerce's Reasoning is Clearly Discernable**

Ancientree argues that Commerce's calculation of the surrogate financial ratios was arbitrary because Commerce failed to address Ancientree's argument regarding the calculation. Specifically, Ancientree's argument was that the "financial ratio calculation differed from how the Department has consistently calculated Sigstrat's financial ratios in the past."  Ancientree Br. at 26-27.  Regardless of whether Commerce's calculation differed from its previous methods, Commerce's calculation was reasonable because it was based on an examination of all information on the record, as well as the arguments advanced by the parties.  *See* Ancientree Admin. Case Br. at 14, P.R. 1523 (noting that Commerce has calculated financial ratios from Sigstrat's financial statement "in multiple reviews of *Multilayered Wood Flooring from China* and in the investigation of *Hardwood Plywood Products from China*.  In each instance, the Department has used significantly more delineated line items in Sigstrat's financial statement." *See*, *e.g.*, Ancientree Rebuttal SVs at Exhibit 2 (submitting the 2017 Sigstrat ratio calculation relied upon in *Multilayered Wood Flooring from China*)) (internal citations omitted); *see also* AKC December 26 Rebuttal Brief at 23, P.R.1523, C.R. 1542 ("There is no information from the other proceedings that Ancientree cites to in its brief.  Similarly absent from the record of this proceeding is any information as to the reasoning for the methodology performed in the 2016-2017 review of that order.").  Accordingly, Commerce performed a thorough review of the record information and made a well-reasoned calculation.

Nevertheless, Commerce thoroughly explained its selection of the Sigstrat financial statement to calculate the surrogate financial ratio, IDM at 29-37, and its reasoning for the

surrogate value ratio calculation.  IDM at 45-46.  Ancientree does not challenge any of this

reasoning, however, and fails to directly dispute Commerce's calculation of the financial

surrogate ratios.  Instead, Ancientree claims that Commerce's calculation is inconsistent with

prior cases, but does not explain why this inconsistency resulted in an arbitrary and capricious

calculation.  Ancientree argues that the Court should order that Commerce use a different

calculation methodology—which is nothing more than mere disagreement.  Ancientree also

asserts that because Commerce did not respond to this argument directly, Commerce's decision

is arbitrary.  Ancientree Br. at 27.  This assertion is contradictory to law.  *NMB Singapore Ltd. v.*

*United States*, 557 F.3d 1316, 1319-20 (Fed. Cir. 2009) (explaining that "while {Commerce'}s

explanations do not have to be perfect, the path of {Commerce's} decision must be reasonably

discernable.") (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29,

43 (1983)).  While Commerce did not respond directly to Ancientree's claims, it explained its

calculation of financial ratios using Sigstrat's financial statements in the detailed calculation

worksheet.  *See* Commerce Final SV Memo (Feb. 28, 2012) at Exhibit 12 (P.R. 1560, 1571).

Therefore, the reasoning of Commerce's calculation of the financial ratios is clearly discernable,

and the Court should sustain Commerce's calculation of the financial ratios.

### 3.     Commerce's Determination That The Romanian Wood Import Values Were Of Commercial Quantities Is Supported By Substantial Evidence And Is In Accordance With Law

Substantial record evidence supports Commerce's determination that the Romanian GTA

data import values for birch and poplar were of commercial quantity.  *See* AKC Alliance Prelim

SV Rebuttal Comments, at 2-3 and Exhibit 1, P.R. 1356.  Using the average wood densities of

birch and poplar reported as inputs by Ancientree, the Romanian GTA quantities at the HTS six-

digit level for birch and poplar were equal to 173,530 kg and 137,700 kg, respectively.  *See*

Ancientree's September 6, 2019 Supplemental Questionnaire Response (Ancientree's September 6, 2019 SQR) at Exhibit 15, P.R.1339, C.R. 1282-1286.

Ancientree argues that the Romanian GTA data for the birch and poplar inputs were aberrational because they were based on too small quantities.  Ancientree Br. at 13.  As an initial matter, Commerce determined that these quantities were not "insignificant" volumes.  IDM at 39.  In any event, "Commerce {does} not ha{ve} a longstanding practice of omitting import values merely because they were the product of a small quantity of imported goods."  *Sichuan Changhong Electric Co. v. United States*, 460 F. Supp. 2d 1338, 1356 (Ct. Int'l Trade 2006).  Instead, Commerce has previously found that even small import quantities are not inherently distortive, but instead must be demonstrated to be too small to be a viable surrogate source.  *See Trust Chem. Co. v. United States*, 791 F. Supp.2d 1257 (Ct. Int'l Trade 2011).  No such demonstration was made by Ancientree here.

Ancientree did not identify a basis upon which Commerce can evaluate when an import volume is insignificant or not a commercial quantity such that it would be distortive and aberrational.  Instead, Ancientree compares the Romanian input values to the Malaysian input values.  This comparison of two values is of little probative value.  IDM at 31.  Ancientree's argument simply assumes that, because Malaysian GTA data for wood inputs is based on a larger quantity than the Romanian GTA data, the Romanian data is "uncommercial," and, thus, unrepresentative or distortive.  Commerce does not use quantity *per se* to determine whether a small import quantity results in an aberrational import value.  *See, e.g.*, *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 59 F. Supp.2d 1354, 1360 (Ct. Int'l Trade 1999) (finding that Commerce has a practice of using per-unit value to determine whether to retain data).

Instead, Commerce's practice is to compare the surrogate values in question to the GTA average unit values calculated for the same period in other potential surrogate countries, to the extent that such data are available.  In addition, Commerce examines data from the same HTS category for the surrogate country over multiple years to assess whether the data are aberrational in an historical context.  *Trust Chem. Co.*, 791 F. Supp. 2d at 1257.[4]  Here, no party submitted any data for any of the remaining countries on the surrogate value list—Brazil, Kazakhstan, Mexico, and Russia—for Commerce to calculate GTA average unit values and compare to Romanian and Malaysian surrogate values.  IDM at 38.  Nor did the parties submit any data for any of the potential surrogate countries for any period outside of the period of investigation.  *Id*. Because "the burden of creating an adequate record lies with [interested parties] and not with Commerce," *QVD Food Co., Ltd v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011), Ancientree cannot now complain that Commerce did not conduct such an evaluation.

Commerce was unable to determine whether the Malaysian GTA average unit value was within a range of the average unit values from the other countries, or whether it was instead an outlier relative to those average unit values.  IDM at 38.  In addition, absent any historic context for the GTA average unit value from Romania, or from other countries, Commerce could not

---

[4]  Commerce has consistently used these criteria.  *See, e.g.*, *Carbazole Violet Pigment 23 from the People's Republic of China: Final Results of Antidumping Administrative Review*, 75 Fed. Reg. 36,630 (Dep't of Commerce June 28, 2010), and accompanying IDM at Comment 4; *Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part: Certain Lined Paper Products from the People's Republic of China*, 71 Fed. Reg. 53,079 (Dep't of Commerce Sept. 8, 2006) (*Lined Paper Products*), and accompanying IDM at Comment 5; *Lightweight Thermal Paper from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 57,329 (Dep't of Commerce, October 2, 2008), and accompanying IDM at Comment 10; and *Saccharin from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 71 Fed. Reg. 7,515 (Dep't of Commerce Feb. 13, 2006), and accompanying IDM at Comment 5.

determine whether there was a sharp drop in the Romanian data during the period of investigation that may have impugned the reliability of the data. IDM at 38. Therefore, Commerce determined that "a comparison between two data points, Malaysia and Romania import values, only during the {period of investigation}, without any historical context, does not allow us to conclude that the import values associated with the import quantities for Romania are aberrational values or otherwise unusable." IDM at 38. Commerce reasonably determined that, in any dataset, there will inevitably be a highest and lowest value, but the fact that a value is the lowest value in a dataset, alone, is insufficient to conclude that the value is distortive or unreasonable. *See Jinan Farmlady Trading Co. v. United States*, 228 F. Supp. 3d 1351, 1356 (Ct. Int'l Trade 2017) ("First, Farmlady focuses on the data for Indian imports of packaging tape from Nepal, asserting broadly that this data was 'aberrational and low' because it reflects a value that is lower than the average value. But merely showing that a price is low is not enough").

Ancientree failed to provide the information necessary for such an analysis because it failed to connect the quantity of the imports to their average unit value. Nor is it of any consequence that Ancientree itself purchases wood in greater quantities. IDM 38-39. As Ancientree acknowledges, Commerce need not "duplicate the exact production experience of the {Chinese} manufacturers at the expense of choosing a surrogate value that most accurately represents the fair market value of {the respective input] in a hypothetical market-economy {China}." Ancientree Br. at 12; *see also Nation Ford*, 166 F.3d at 1377.

Finally, Ancientree's reliance on *Juancheng Kangtai* as support for its claim that Commerce must consider a respondent's actual purchasing and consumption in surrogate country selection misrepresents the facts of that case. Ancientree Br. at 9-10 (citing *Juancheng Kangtai Chem. Co. v. United States*, 2015 Ct. Intl. Trade LEXIS 94, *65-66, 78 (Ct. Int'l Trade Aug. 21,

2015)).  The record in *Juancheng Kangtai* included comprehensive data regarding various average unit values for each country on the surrogate country list, which allowed Commerce to analyze the prices and quantities traded among these other countries.  *Juancheng Kangtai Chem. Co.*, 2015 Ct. Intl. Trade LEXIS 94 at *78.  Importantly, those record facts allowed Commerce to analyze whether an allegedly non-commercial quantity was consistent with other import volumes and whether the input in question was often traded in smaller quantities.  *See Juancheng Kangtai Chem. Co. v. United States*, Slip. Op. 17-3, 2017 CIT LEXIS 3, *26-31 (Ct. Int'l Trade Jan. 19, 2017) (*Juancheng Kangtai II*) ("Commerce explained that transactions are made at 'commercial quant{ities}' when they 'reflect market values', '*i.e.*, competitive commercial transactions, either large or small.'", ". . . these examples indicated that the chemical was commercially traded in quantities smaller than Kangtai's annual consumption.").  The Court ultimately sustained Commerce's conclusion in *Juancheng Kangtai II* that an allegedly small quantity was, in fact, a commercial quantity.  Those facts are not present on this record.  Here using the information on the record, Commerce also rationally determined that the small quantities were commercial. *See, e.g.*, *QVD Food*, 658 F.3d at 1324.

Ancientree bore the burden in establishing that the values associated with the import quantities for wood inputs were aberrational or distortive, but has failed to do so here. Commerce reasonably determined based on the record evidence that the Romanian import values were of commercial quantities.  The Court should thus sustain Commerce's determination.

### 4. Commerce's Selection of Surrogate Values for Labor and Brokerage and Handling Supports its Selection of Romania as the Primary Surrogate Country

Finally, Ancientree also argues that Malaysia offered better data to value labor and brokerage and handling expenses, and thus Commerce incorrectly selected Romania as the primary surrogate country.  Ancientree Br. at 21-22.  Not only is this argument incorrect, but

Ancientree contradicts its own argument by conceding that these factors of production are "less important" when compared to the financial ratios and raw material inputs, such as birch and poplar sawnwood.  Ancientree Br. at 21.

Ancientree contends that the Malaysian data for labor were superior because the labor rate is for the "manufacture of wooden and cane furniture," whereas the Romanian surrogate value is for "general manufacturing."  Ancientree Br. at 21.  Ancientree did not define "cane furniture" or the manufacturing process of cane furniture.  As Commerce explained, cane furniture may represent a woven product that is manufactured without the various hardware components required to produce the subject merchandise.  Thus the labor rate for cane furniture may not be representative of the labor rate used in manufacturing subject merchandise.  IDM at 39-40.  The source data also did not provide information as to the relative proportion of "cane furniture" to wooden furniture in the overall industry.  This lack of proportional data means there was no record evidence to determine the proportion of the Malaysian labor rate reflecting the manufacture of "cane furniture."  *Id.*  Accordingly, Commerce reasonably determined that the Malaysian labor rate was not more representative of respondents' labor rates.

Ancientree also argues that because the Malaysian surrogate value for brokerage and handling was superior to the Romanian value, and because Commerce used the Malaysian value, Commerce should have selected Malaysia as the primary surrogate country.  Ancientree Br. at 27.  Ancientree argues that Commerce should have therefore used all Malaysian inputs because Commerce has a regulatory preference for valuing all factors of production from the primary country.  *Id.*  Although Commerce does have such a regulatory preference, such a preference must still yield to reason and the sourcing of particular surrogate values from outside the primary surrogate country.  *See Camua Frozen Seafood*, 929 F. Supp.2d at 1355; s*ee, e.g.*, *Juancheng*

26

*Kangtai*, 2015 CIT LEXIS 94, *71.  Commerce considered the totality of circumstances, and in consideration of the analysis of record information related to financial ratios, birch and poplar wood inputs, and labor, did not find that the superiority of the surrogate value for brokerage and handling, which Ancientree concedes is a "less important" input, warranted selecting Malaysia as the primary surrogate country.

Importantly, Ancientree does not argue that the calculation of the labor rate or brokerage and handling rate is incorrect, but instead asks the court to impermissibly reweigh the evidence. *Zhejiang*, 652 F.3d at 1341.  Commerce reasonably determined based on the record evidence that Romania offered the best data on the record to value key inputs and Malaysia was the best country from which to source a single value.  The Court should sustain Commerce's selection of Romania as the primary surrogate country.

### C. Commerce's Valuations Of Ancientree's Inputs Of Birch And Poplar Sawnwood, MDF, Paint, And Particleboard Were Based On Substantial Evidence And In Accordance With Law

Commerce's valuations of Ancientree's factors of production are supported by substantial evidence and represent a reasonable exercise of Commerce's discretion.  Ancientree's arguments do not demonstrate otherwise.

#### 1. Commerce's Determination To Value Ancientree's Birch Sawnwood And Poplar Sawnwood Inputs Under The Romanian Six-Digit HTS Is Based On Substantial Evidence And In Accordance With Law

Ancientree's additional arguments regarding the specificity of the Romanian six-digit level HTS subheadings for its birch sawnwood and poplar sawnwood inputs are not supported by the record.  Commerce relied on the Romanian six-digit level HTS subheading to value respondents' birch sawnwood and poplar sawnwood inputs.  IDM at 43.  Commerce valued respondents' poplar sawnwood input under HTS 4407.97.99 and the birch sawnwood input under

HTS 4407.96.99.  AKC Alliance Pre-prelim SV comments at Exhibit 2), P.R. 1327.  These six-digit level HTS subheadings include wood that is "sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded, or end-jointed of a thickness exceeding 6 mm."  IDM at 43.

Ancientree asserts that its "wood inputs are not planed or end-jointed" and, therefore, reliance on such HTS subheadings included dissimilar wood products.  Ancientree Br. at 6-7.  However, the record does not describe Ancientree's wood inputs in any detail greater than "birch sawnwood" or "poplar sawnwood."  *See, e.g.*, Ancientree's September 18, 2019 Supplemental Questionnaire Response at Exhibit 12 (P.R. 1366, C.R. 1365-1366); and Ancientree July 19, 2019 DQR at Exhibits 3 (production flowchart) and 4 (Factor of Production Spreadsheet), P.R. 911, C.R. 1030-1032.  Foremost reported that it purchased both poplar sawnwood and cut-to-length poplar and provided no additional detail regarding its birch sawnwood input.  *See* Foremost July 22, 2019 CDQR, section D, at 14-15.

Due to the lack of detail provided by Ancientree regarding the physical characteristics of its wood inputs, Commerce determined that the record did not support Ancientree's assertions that its birch sawnwood and poplar sawnwood was not planed or end-jointed.  IDM at 44.  Further, Commerce is not required to perfectly replicate a non-market economy respondent's production experience.  *See Juancheng Kangtai II*, 2017 Ct. Intl. Trade LEXIS 3, at 31 (citing *Nation Ford*, 166 F.3d at 1378).  Commerce's valuation of Ancientree's poplar sawnwood under HTS 4407.97.99 and Ancientree's birch sawnwood under HTS 4407.96.99 was thus reasonable.  Commerce reasonably determined that the Romanian data provided the best available information to value respondent's factors of production.  Ancientree's arguments merely disagree with Commerce's rational determination, but "…when faced with a choice between two imperfect options, it is within Commerce's discretion to determine which choice represents the

best available information." *See CS Wind Vietnam Co., Ltd. and CS Wind Corporation v. United States*, 971 F. Supp. 2d 1271, 1288 (Ct. Int'l Trade 2014) (citing *Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1277 (Ct. Int'l Trade 2006)); *see also Goldlink Indus. v. United States*, 431 F. Supp. 2d 1323, 1327 (Ct. Int'l Trade 2006) (The court evaluates "whether a reasonable mind could conclude that Commerce chose the best available information.").

> **2.      Commerce's Determination To Value Ancientree's MDF Using HTS 4411.14.90 Is Based On Substantial Evidence And In Accordance With Law**

Ancientree argues that Commerce failed to select the best available information when valuing its MDF using Romanian imports of "Medium density fibreboard 'MDF' of wood, of a thickness> 9mm, mechanically worked or surface-covered," which is classifiable under Romanian HTS number 4411.14.90.  Ancientree argues that Commerce was required to rely upon the surrogate value that was most specific to the respondents' inputs, and that because Commerce has relied upon an import value under an HTS that it claims is less specific than the HTS suggested by Ancientree, Commerce did not use the best available information.  Ancientree Br. at 23-24.

Despite Ancientree's claims to the contrary, Commerce relied on the most specific HTS category to value its MDF.  Ancientree admitted that the MDF it consumes in the production of the subject merchandise is surface covered.  Ancientree Admin. Case Br., P.R. 1523, at 12. Additionally, the company's product brochure indicates that for cabinets and vanities that include particleboard or MDF, the cabinets include a "matching laminate exterior."  Letter from deKieffer & Horgan PLLC to Sec'y Commerce, re: *Wooden Cabinets and Vanities from the People's Republic of China:  Section A Questionnaire Response* (July 3, 2019) at Exhibit A-5 ("Ancientree A IQR").

Before Commerce, Ancientree asserted that the MDF it consumed during the production of the subject merchandise is unworked or merely surface covered, and that it undergoes further processing.  Ancientree Admin. Case Br., P.R. 1523 at 12.  Ancientree, however, cited no record evidence to substantiate this claim.  Thus, Ancientree has failed to provide documentation demonstrating that HTS category 4411.14.10., for MDF that is not surface-covered, specifically applies to the MDF input Ancientree consumes (*i.e.*, through input descriptions, purchase invoices, or photographs of the input on the record).  IDM at 56.

Instead, record evidence supports the contrary finding.  *See* Ancientree September 18, 2019 SDQR at Exhibit SQ 4-12.  First, Ancientree conceded below that the MDF it consumes in the production of subject merchandise *is* surfaced covered.  Ancientree Admin. Case Br., P.R. 1523 at 12.  Additionally, its selling brochure shows that Ancientree marketed cabinets and vanities that included particleboard or MDF because the cabinets included a "matching laminate exterior." Ancientree's July 3, 2019 Section A Questionnaire Response (Ancientree July 3, 2019 AQR) at Exhibit A-5.  Importantly, Ancientree cited no record evidence to substantiate its assertion.  *See, e.g.*, *QVD Food*, 658 F.3d at 1324.  Ancientree's argument that Commerce should have valued Ancientree's MDF using the same category that Commerce valued another respondent's MDF inputs, Romanian HTS category 4411.14.10, ignores the fact that Ancientree and Foremost have different production processes and produce different products.  *See* Foremost July 22, 2019 CDQR, at section D, Exhibits D-1 and D-6.1 (P.R. 912, C.R. 1038-1046).

Therefore, Commerce determined that the HTS category Ancientree suggested, which specifically excluded surface-covered MDF, was not the most appropriate HTS category to value Ancientree's surface-covered MDF input.  Instead, Commerce reasonably selected HTS category 4411.14.90 to value Ancientree's MDF because this category covers MDF that is "surface-

covered."  Here, Commerce provided a reasoned basis for its finding that the selected data satisfy

its criteria and constitute better data than plaintiff's alternatives because Commerce valued

Ancientree's MDF with the HTS category that was most specific to its production process.

### 3. Commerce's Determination To Value Ancientree's Paint Using HTS 3208.10.90 Is Based On Substantial Evidence And In Accordance With Law

Commerce relied on data under HTS 3208.10.90, which covers paints and varnishes

dispersed or dissolved in a non-aqueous medium, to value Ancientree's paint inputs.  IDM at 56.

Ancientree asserts that it used a water-based paint, and that Commerce should have valued its

paint using paint classified under HTS 3209.10, which covers paints and varnishes "dispersed or

dissolved in an aqueous medium."  *See* Ancientree Br. at 25; *see also* Ancientree Rebuttal Prelim

SVs at Exhibit SVR-3 (providing the Romanian import value for 3209.10), P.R. 1007.  Again,

Ancientree did not identify record evidence that substantiates its claim.  At verification,

Commerce compared the painting materials worksheet provided in Ancientree's response to

Ancientree's accounting ledgers and corresponding vouchers for September 2018.  *See*

Ancientree Verification Report at 18 (P.R. 1502, C.R. 1530).  Commerce found no discrepancies

between the information Ancientree had reported in its responses and the source documentation

Commerce reviewed at verification.  During verification, Commerce did not observe any third-

party source documentation or other documentation regarding the chemical composition for

Ancientree's paint input such as an ingredient lists.  IDM at 56.

Ancientree argues that the purchase invoices that Commerce verified indicated that

Ancientree had purchased a water-based paint.  Ancientree Br. at 25.  However, Commerce

determined that these documents, specifically the translated portions of these purchase invoices,

did not indicate which proportion, if any, of Ancientree's paint is water-based.  *See* Ancientree

Verification Report at Exhibit 15, P.R. 1502, C.R. 1530.  Therefore, Commerce determined that

Ancientree did not substantiate its claim that it used water-based paint, and thus reasonably valued Ancientree's paint input using Romanian values under HTS 3208.10.90 covering paints and varnishes dispersed or dissolved in a non-aqueous medium.

> **4.**   **Commerce's Determination To Value Ancientree's Particleboard Using HTS 3208.10.90 Is Based On Substantial Evidence And In Accordance With Law**

Commerce valued Ancientree's particleboard using Romanian imports of "Particle board of wood, whether or not agglomerated with resins or other organic binding substances (excl. unworked or not further worked than sanded, surface-covered with melamine-impregnated paper or with decorative laminates of plastics, oriented strand board and wafer board, fibreboard and celluar wood panels)" classifiable under Romanian HTS number 4410.11.90.  Prelim SV Memo at Attachment 3B; *see also* AKC Alliance's Initial SV Submission at Exhibit 3), P.R. 956-961. Before Commerce, Ancientree argued that Commerce should use 4410.10.10 for its particleboard because that code is "specific to unworked or merely sanded particleboard such as the particleboard consumed by Ancientree which goes through further processing during the production of subject merchandise."  Ancientree Admin. Case Br., P.R. 1523 at 11.  But, there is no record support for Ancientree's assertion that the particleboard it used in the production of subject merchandise was unworked or just sanded at the time of acquisition.

In fact, the record contradicts this assertion.  Ancientree's product brochures showed that a characteristic of its particleboard is a laminate overlay.  *See* Ancientree July 3, 2019 AQR at Exhibit A-5, P.R. 870, C.R. 972.  Thus, Commerce determined that because record evidence demonstrated that Ancientree's particleboard had a laminate overlay, Ancientree's proposed HTS category, 4410.11.10, "unworked or not further worked than sanded," was not appropriate. Instead, Commerce valued Ancientree's particleboard using HTS category 4410.11.90, which includes surface-covered particleboard.

Finally, as we previously explained, it is immaterial that Commerce used a different HTS category to value Foremost's particleboard factors of production, because Foremost and Ancientree have different production processes and produce different products. *See* Foremost July 22, 2019 CDQR, at section D, Exhibits D-1 and D-6.1, P.R. 912, C.R. 1038-1046. Here, Commerce provided a reasoned basis for its finding that the selected data satisfy its criteria and constitute better data than the plaintiffs' alternatives because Commerce valued Ancientree's particleboard with the HTS category that was most specific to Ancientree's production process.

Finally, CTG makes a single argument in its motion for judgment, stating that if this Court determines that Ancientree's antidumping margin should be recalculated based on Malaysia as a surrogate country, then the same recalculation must be made for other mandatory respondents and separate rate respondents, including those that are not party to this litigation. Cabinet to Go Br. 40. CTG, as a party to this litigation, has preserved its status. However, other non-participatory parties have no status before this Court. It is not necessary for the Court to issue an opinion covering parties and claims not before it.

## CONCLUSION

For these reasons, the Court should deny Ancientree and CTG's motions for judgment on the administrative record and sustain Commerce's final determination in its entirety.


Respectfully Submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Tara K. Hogan
TARA K. HOGAN

Assistant Director

OF COUNSEL:
SAVANNAH ROSE MAXWELL
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

/s/ Ioana Cristei
IOANA CRISTEI
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-0001
Fax: (202) 305-2062
Email: Ioana.Cristei@usdoj.gov

December 22, 2020

*Attorneys for Defendant United States*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court in that it contains 10,006 words, including text, footnotes, and headings.


/s/ Ioana Cristei