## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Gary S. Katzmann, Judge**

| | |
|---|---|
| THE ANCIENTREE CABINET CO., LTD. ) | |
| ) | |
| ) | |
| Plaintiff, ) | Court No. 20-00114 |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## <u>PLAINTIFF'S REPLY BRIEF</u>

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

Dated: January 21, 2021

1

## TABLE OF CONTENTS

I.    The Department's Selection of Romania as the Primary Surrogate Country is Not Supported by Substantial Evidence ............................................................... 1

II.   The Department's HTS Selection for Certain Inputs was Not Supported by Substantial Evidence.................................................................................... 13

III.  The Department's Surrogate Financial Ratio Calculation is Arbitrary and Unsupported by Substantial Evidence .................................................... 15

IV.   Conclusion and Prayer for Relief .................................................... 16

i

## TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F. Supp. 2d 1366 (Ct. Int'l Trade Nov. 30, 2012) ................................................................................................................11

*Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262 (CIT 2006)..............................................1

*Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344 (April 19, 2018) ..........................8-9

*Juancheng Kangtai Chem. Co. v. United States*, 2015 Ct. Intl. Trade LEXIS 94 (Ct. Int'l Trade Aug. 21, 2015) ................................................................................................................9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29  (1983)........................6

*Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) ............11

*Shanghai Foreign Trade Enters. Co. v. United States*, 318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) ................................................................................................................8

*Taian Ziyang Food Co. v. United States*, 637 F. Supp. 2d 1093 (Ct. Int'l Trade 2009)...............11

**Administrative Decisions**

*Certain Passenger Vehicle and Light Truck Tires Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 17,781 (April 26, 2019) ................................................................................................5-6

*Certain Steel Threaded Rod Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 83,800 (November 22, 2016).......................................................................12

*Fine Denier Polyester Staple Fiber Final Affirmative Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 24,740 (May 30, 2018)..........................................................................6

*Mattresses Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 84 Fed. Reg. 56,761 (October 23, 2019) ................................................................................................................5

*Refillable Stainless Steel Kegs Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 84 Fed. Reg. 57,010 (October 24, 2019) ................................................................................................5

*Xanthan Gum Final Results of the Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed, Reg. 6,513 (February 14, 2018)..................6

Pursuant to Rule 56.2 (c)(1), Plaintiff The Ancientree Cabinet Co., Ltd., ("Ancientree" or "Plaintiff") hereby files their reply brief.  *See* U.S. Response Brief (December 22, 2020); Def-Int. Response Brief (December 22, 2020); *see also Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Antidumping Duty Order*, 85 Fed. Reg. 22,126 (April 21, 2020*); see also Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Corrected Notice of Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 17855 (March 31, 2020), *incorporating* Issues & Decision Memorandum ("IDM"). Plaintiff continues to maintain that the Department has not properly analyzed its surrogate country selection in this review.  This, in turn, has led the Department to rely on information that is not the best available to value these exporters' factors of production.

**I.**      **The Department's Selection of Romania as the Primary Surrogate Country is Not Supported by Substantial Evidence.**

The United States fails to properly assess the significant data advantages in Malaysia. Malaysia sources at least two financial statements from producers of identical merchandise (and a third from a highly comparable producer) and sources usable, reliable surrogate data for the primary wood raw materials.  In contrast, Romania sources only one financial statement from company that produces merely comparable merchandise at best and Romania lacks reliable surrogate data for the primary raw materials.  While less critical, Malaysia also sourced superior data for brokerage & handling and labor.  Despite these infirmities, the Department relied upon Romania as the primary surrogate country.  A fair view of the record can only lead a reasonable mind to conclude that Malaysia sources the best available information and must be relied upon as the primary surrogate country.  *Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262, 1268 (CIT 2006).

A.      **Financials**

The Department's surrogate country determination was based on the relative quality of the surrogate financial statements in Romania and Malaysia.  As an initial matter, Plaintiff again stresses that the record contains ten Malaysian financial statements from comparable and identical producers.  Plaintiff addressed these statements in its opening brief.  Pl. R56.2 Br. at 14. While Plaintiff does not necessarily dispute that the three Malaysian financials placed in focus by the Department are the most comparable and contemporaneous and therefore are more appropriate for calculating the financial ratios than other record statements, the plentitude of financial statements also further lends credence to the overall comparability of the Malaysian market.  Malaysia has a significant market of identical merchandise.  The high quality and availability of surrogate values discussed below, both for financial statements and sawnwood, flow logically from the fact that there is robust identical market in Malaysia.

First, the United States continues to dispute that two of the Malaysian financial companies produce identical merchandise.  U.S. Br. at 15.  The United States' analysis is incorrect and overlooks the record as a whole.  Lii Hen's financial statement and webpage contained pictures of identical merchandise.  Ancientree Final SVs at Exhibit 3 (containing webpage materials and the financial statement); PD1328-1331.  The company produces wooden cabinet units for the bedroom and living room.  *Id*.  Likewise, Poh Huat produces wooden cabinet units for the office, bedroom, and living room.  Ancientree Final SVs at Exhibit 4.  Poh Huat's parent company's financial statement also specifically discusses that it produces and sells wooden office and home furniture "cabinets."  *Id*. at pages 13-14.

In response, the United States notes that Lii Hen's webpage does show pictures of "bed frames, nightstands, dressers, and television stands" but does not contain images of "wooden

2

cabinets and vanities for permanent installation." U.S. Br. at 15. Likewise, for Poh Huat, the United States notes they produce "wooden bedroom furniture and standalone tables and television stands." *Id*. at 15-16. The "permanent installation" distinction was not raised by the Department below. Moreover, this is a false distinction as to comparability. A stand-alone cabinet or vanity does not have a discernable production difference compared with a cabinet or vanity that is floor or wall mounted. Moreover, the scope also includes cabinet components:

> Subject merchandise includes the following wooden component parts of cabinets and vanities: (1) Wooden cabinet and vanity frames (2) wooden cabinet and vanity boxes (which typically include a top, bottom, sides, back, base blockers, ends/end panels, stretcher rails, toe kicks, and/or shelves), (3) wooden cabinet or vanity doors, (4) wooden cabinet or vanity drawers and drawer components (which typically include sides, backs, bottoms, and faces), (5) back panels and end panels, (6) and desks, shelves, and tables that are attached to or incorporated in the subject merchandise.

Final FR at Appendix I "Scope".

The production of standalone cabinets and vanities by Lii Hen and Poh Huat is identical to that of a producer of such cabinets parts or cabinets or vanities that must be mounted. This is not a reasonable distinction. The companies consume identical raw materials. Lii Hen's statement states that the "main raw materials used in the manufacturing of the furniture products are mainly wood that comprise of solid wood, particleboard, veneers, MDF, plywood, pine wood and oak wood" and other finishing/packing materials. Lii Hen financial statement at 7. Poh Huat's financial statement also states that as a manufacturer, the costs of its direct materials impact its costs, listing "solid wood, MDF, particleboards, veneers, metal components, finishing materials and carton boxes" as its key materials. *Id*. at 16.

The consideration of these two statements and the third Malaysian statement, Yeo Aik Wood, must also be considered in comparison to the sole financial statement in Romania, Sigstrat. Sigstrat states it is engaged in manufacturing "wooden plywood, veneering, seats and

3

backrests, chairs, tables, wood chip lights, and other wooden products." *See* Pet. Prelim. SVs at Exhibit 10 (Sigstrat 2018 financial statement) at 2l; PD956-961.  The main activity objective is the "manufacturing of veneer and wooden panels." *Id*.  Further, the company delineated its revenue by product indicating over half of its profit was from the sale of plywood.  Sigstrat 2018 financial statement at 23.  Sigstrat also produces molded wooden furniture[1], but its primary business remains plywood and veneer.  Plywood and veneer production is a significant step removed *upstream* from the production of subject merchandise.  Ancientree <u>consumes</u> plywood in its production of cabinets.  Foremost <u>consumes</u> plywood and veneer in its production of cabinets.  Moreover, presumably Sigstrat consumes self-produced plywood in its production of moulded products and does not purchase plywood like the respondents, further making Sigstrat's production costs less comparable from the standpoint of the level of integration.

The Malaysian financial companies produce end tables, desks, entertainment consoles, desk drawers, bedroom tables, etc. that are essentially identical or highly comparable to the production of cabinets.  Lii Hen's financial statement states that its revenue was "wholly generated from the sales of furniture products" in 2018.  Lii Hen financial statement at 2.  Lii Hen has "six major subsidiary companies that are involved in the manufacturing of a vast range of wood based products."  Lii Hen financial statement at 4.  The company is solely engaged in comparable production of wooden furniture.  Poh Huat describes its principal business as the "manufacturing and sale of furniture."  Poh Huat Furniture Industries financial statement at 15.  Yeo Aik Wood's financial statement, while not specifically showing production of cabinets or vanities, describes its principal business as "manufacturing and selling furniture."  Yeo Aik

---

[1] As explained in its opening brief, moulded furniture is also less comparable than the furniture produced by the Malaysian companies. While cabinets could have mouldings on the cabinet, cabinets themselves are not moulded products.  Pl. R56.2 at 16-17.

Wood financial statement at 11.  Yeo Aik Wood's webpage shows pictures of its merchandise—all various types of wooden furniture.  Ancientree Final SVs at Exhibit 7 (containing webpage materials and the financial statement).

The record is clear that Malaysia sources multiple financial statements from producers of highly comparable, if not identical, merchandise.  In contrast, Romania only sources one financial statement from a company primarily engaged in dissimilar plywood production and also in the production of moulded furniture, which is also less comparable.

The primary reason proffered by the Department and United States that the single less comparable Romanian financial statement is better than the (at least) three more comparable Malaysian financial statements is the disaggregation of energy expenses—i.e., the statements do not have a separate line item breaking out the energy expenses; rather it is included the cost of goods (COGS) overall.  IDM at 37.  However, the Department has relied upon financial statements that do not segregate energy costs in numerous cases without finding that this lack of detail was a sufficient a reason not to rely on those statements or on a surrogate country generally.  *Refillable Stainless Steel Kegs Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 84 Fed. Reg. 57,010 (October 24, 2019) ("*Steel Kegs from China*") (relying on Malaysia as the primary surrogate country and relying on a Malaysian financial statement that did not break out energy or labor); *Mattresses Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 84 Fed. Reg. 56,761 (October 23, 2019) ("*Mattresses from China*") (relying on Malaysia as the primary surrogate country and relying on a Malaysian financial statement that did not break out energy or labor); *Certain Passenger Vehicle and Light Truck Tires Final Results of Antidumping Duty Administrative*

*Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 17,781 (April 26, 2019) (relying on Thailand as the primary surrogate country and relying on a Thai financial statement that did not break out energy); *Fine Denier Polyester Staple Fiber Final Affirmative Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 24,740 (May 30, 2018) (relying on Thailand as the primary surrogate country and relying on a Thai financial statement that did not break out energy); *Xanthan Gum Final Results of the Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed, Reg. 6,513 (February 14, 2018) (relying on Thailand as the primary surrogate country and relying on two Thai financial statements that did not break out energy or labor). Accordingly, the Department's position here is inconsistent with its practice. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (the agency cannot treat similarly situated companies differently).

The Department also questioned the detail of the overhead costs in the Malaysian financial statements. IDM at 34. The Romanian statement has a line item that states "production overheads." Sigstrat 2018 financial statement at 64. There is no further explanation of what is included in that overhead total. In contrast, the Malaysian statement do not have a line item specifically for overhead, but instead itemize depreciation and rental expenses. IDM at 34-35. However, as the Department is aware, depreciation and rental expenses are the primary manufacturing overhead expenses. It is more common for financial statements to delineate specific items that the Department then classifies as overhead rather than an overall "production overhead" line item. The Department thus has created issue where none exists, elevating form over substance. There is nothing unusual about the classification of overhead items in the Malaysian statements and this is not a controversial issue the Department has identified in the past, including through relying on similarly detailed Malaysian financial statements in recent

cases.  *See*, *e.g.*, *Steel Kegs from China*; *Mattresses from China*.  The Department can calculate reliable surrogate financial ratios from the Malaysian financial statements of record as it normally does in the course of such proceedings.

The Department has consistently found that the comparability of the production experience of the surrogate producer, namely the products produced, the level of integration, and the raw materials consumed, is the <u>most</u> critical component of its selection of financial statements.  Malaysia sources financial statements from the most comparable producers.  The Department also has a well-established practice of preferring to rely upon *multiple* financial statements to avoid potential anomalies that may arise from reliance on merely one statement. Only Malaysia sources multiple financial statements.  Therefore, based upon the record and Department practice, Malaysia sources the best available information to value Ancientree's surrogate financial ratios.

### B.    Sawnwood

The Department's surrogate country determination fundamentally was based on the relative quality of the financial statements in Romania and Malaysia.  The United States maintains the same in their response brief, addressing the financial statement issue first, and in more detail.  While Plaintiff argues even this analysis of the financial statements is incorrect and contrary to the Department's practice, Plaintiff also submits that the relative quality of the sawnwood surrogate value is an equally, if not more, critical component of the surrogate country analysis.

Malaysia sources the best available information to value Ancientree's most critical inputs, birch and poplar sawnwood.  The Romanian sawnwood import values relied upon were based on insignificant and uncommercial quantities and are not as specific as that available in

Malaysia.  The United States cites to rulings that a small quantity of imports is not inherently distortive, but it must be demonstrated that the quantity is too small to be a viable surrogate value.  U.S. Br. at 22.  The United States unreasonably dismisses Ancientree's metrics demonstrating just that—the quantity of imports into Romania is too small to be a viable surrogate value, reliable surrogate value.  Pl. R.56.2 Br. at 6-12.  Further, The United States also perpetuates the same flawed reasoning issue raised by Ancientree in its opening brief: the Department's test for whether an import price is aberrant is different than the issue of whether the quantity is too small to be commercial and thereby is not a reliable surrogate value.  U.S. Br. at 22-24.

As explained in Ancientree's opening brief, while the Department has a practice of comparing the import price into the other potential surrogate values to determine whether a particular import price is aberrant, this is separate and distinct from the consideration of whether the quantity of an import value is too small to be a basis for a surrogate value.  Pl. R56.2 Br. at 8-12.  This Court consistently has held that the Department must rely upon a statistically or significant quantity.  *See Id*.; *see also Shanghai Foreign Trade Enters. Co. v. United States*, 28 C.I.T. 480, 495 (2004) ("The Commerce decision fails to establish that the small amount of pig iron imported by India during the period of investigation was statistically or commercially significant and demonstrates no apparent consideration of that issue. Commerce did not address the issue whether the Indian Import Statistics were based on too small a sample to be reliable.") (finding 1,132 metric tons imported into India during the POI was not commercially significant and therefore could not be relied upon.); *See Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1361-1362 (April 19, 2018) (also discussing various case law on this issue).

Romania imported a mere 324 M3 under HTS 4407.97 and 259 M3 under HTS 4407.96.

Final SV Memo at Att. 3e; PD1560&1571.  This already small quantity was shown to be even less commercial looking at the monthly data by exporting countries.  *See* Pl. R56.2 Br. at 8-9. Imports of less than a container load or at most, one container, during an entire month are not commercial shipments.  A container load is a basic commercial measurement and the imports into Romania do not meet this basic metric.  As a second metric, the import quantities are not adequate to supply a single commercial wooden cabinet manufacturer, much less an entire cabinet industry.  Moreover, sawnwood is a major raw material used in numerous wood industries.  The Department and United States did not give consideration of this established metric.

Second, Ancientree pointed to its own commercial experience as evidence that the Romanian imports for sawnwood are not commercial.  For example, Ancientree alone consumed approximately **248%** and **1072%** times as much poplar and birch sawnwood during the POI than was imported into all of Romania.  *See* Ancientree Section D at Exhibit D-2.1; CD1023, PD911. This Court has criticized the Department in the past for not considering a respondents' own purchasing situation is a clear indicator of commercial quantity in the industry.  See *Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1361-1362 (April 19, 2018) ("Commerce's conclusory assertion regarding the significance of the imports into Thailand fails to apprise the court why 122 metric tons is sufficiently significant to yield a representative price in light of respondents' production experience.") *see also Juancheng Kangtai Chem. Co. v. United States*, 2015 Ct. Intl. Trade LEXIS 94, *65-66, 78 (Ct. Int'l Trade Aug. 21, 2015) (finding the Department's refusal to consider the respondent's actual purchasing and consumption quantity at odds with the Department's practice regarding other surrogate values and the statutory objective in general, maintaining that, "the commercial significance of import statistics is not something in

the abstract, they must be reflective of, if not 'exactly' reflecting, such significance in comparison with actual experience, of the producers or exporters of the input under consideration, to the extent possible.").

In contrast, Malaysia imported 2,240 M3 under the highly specific HTS for poplar, 4407.97.90.90 and 955 M3 under the highly specific HTS for birch, 4407.96.90.90. Ancientree Prelim. SVs (August 7, 2019) at Exhibit 2, PD952-953; *see also* Ancientree Final SVs (September 3, 2019) at Exh SV2-2, PD1328-1331; *see also* Foremost Rebuttal SVs (August 19, 2019); PD1010. Malaysia imported 691% more (poplar) and 369% more (birch) than Romania imported under the 6-digit HTS. The record does not contain the 6-digit HTS import volumes into Malaysia, but the volume difference necessarily would be even greater. A fair view of the record as a whole demonstrates that the Romanian import volumes are not commercial quantities. Therefore, the Romanian import volumes are not a reliable, usable surrogate value. The Court should order the Department to consider these metrics on the record, rather than wrongly dismiss record evidence. In any event, the larger quantity of imports into Malaysia is more broad based and representative of respondents' production experience; yet another reason why data available in Malaysia is the "best."

Lastly, the Romanian HTS relied upon by the Department to value sawnwood are also less specific. The Department relied upon the 6-digit HTS 4407.97 to value Ancientree's poplar sawnwood input, which covers "Poplar and Aspen wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded, or end-jointed of a thickness exceeding 6 mm" and relied upon the 6-digit HTS 4407.96 to value Ancientree's birch sawnwood input, which covers "Birch wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded, or end-jointed of a thickness exceeding 6 mm." Ancientree explained that its sawnwood inputs are not

10

planed or end-jointed in its surrogate value submissions and comments before the Department. *See* Ancientree Prelim. SVs (August 7, 2019) at Exhibit SV-1; PD952-953; Ancientree Final SVs (September 3, 2019) at Exhibit SV2-1; PD1328-1331; Ancientree Preliminary Comments (September 19, 2019) at 4; PD1371; *see also generally* Ancientree Fourth Supplemental (September 18, 2019) (production flowchart) at Exhibit SQ4-10; CD1365-1366, PD1367.

The six-digit HTS numbers include these dissimilar wood products, namely wood that is planed and end-jointed.  In contrast, Malaysia provided 10-digit specific HTS for the sawnwood inputs that <u>excludes</u> planed and end-jointed sawnwood.  Specifically, HTS 4407.97.90.90, which specifies "Poplar and Aspen wood sawn of a thickness exceeding 6 mm, Other than Planed, sanded or end-jointed: Other than Sawn lengthwise and Sliced or peeled" and 4407.96.90.90 specifies "Birch wood sawn of a thickness exceeding 6 mm, Other than Planed, sanded or end-jointed: Other than Sawn lengthwise and Sliced or peeled."  These HTS numbers are specific to the sawnwood that Ancientree consumes and therefore constitute the best available information that should have been used under the legal standard for surrogate values for the final determination.

While the Department considers several factors in its surrogate value analysis, specificity is clearly the most critical component.  The Court has upheld this finding "in sum, 'product specificity' logically must be the primary consideration in determining 'best available information.' If a set of data is not sufficiently 'product specific,' it is of no relevance whether or not the data satisfy the other criteria set forth in Policy Bulletin 04.1."  *See Taian Ziyang Food Co. v. United States*, 783 F. Supp. 2d 1292, 1330 (Ct. Int'l Trade 2011), *see also Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) (surrogate value selection justified where Commerce treated product-specificity as "more important factor" than

other criteria); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1320 (Fed. Cir. 2010) (affirming selection of "product-specific data" as "best available information"); *see also Certain Steel Threaded Rod Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 83,800 (November 22, 2016) and accompanying IDM at 8 (Relying on Bulgaria as the primary surrogate country because it had greater specificity for the relevant diameter of the steel inputs). The Department failed to follow its well-established preference for specificity in determining that Romanian sawnwood import values were no less superior than the Malaysian sawnwood import values.

In sum, Romania sources less specific import values for Ancientree's two most important raw materials, and the Romanian values are based on an insignificant, uncommercial quantity of merchandise. The Court should find not only that the Department's selection for this raw material is unsupported by the record, but as a consequence, the Department's entire surrogate country selection is unsupported by record evidence.

Ancientree also presented that Malaysia sources superior information to value labor and B&H expenses, which the Department does not dispute, eve relying upon the Malaysian B&H source in the final. While these inputs are less important, they further underscore that any reasonable mind viewing the entire record would determine that Malaysia sources the best available information and should be selected as the primary surrogate country. In sum, the Department's selection of Romania is not supported by the record as a whole and not in accordance with the Department's past practice and preferences. Malaysia sources the best available information to value the primary raw materials. Malaysia sources the best available information to value the surrogate financial ratios. Malaysia also sources superior data overall, including more specific labor and B&H data. The Court should remand the Department's

determination that Romania sources the best available information, holding that the

Department's findings on these surrogate values were not supported by substantial evidence or in

accordance with law.

## II.     The Department's HTS Selection for Certain Inputs was Not Supported by Substantial Evidence.

Ancientree argued that the Department relied upon the incorrect classification for three of

its inputs: MDF, particleboard, and paint.  Pl. R56.2 Br. at 23-26.  The United States' response to

each of these arguments is essentially that it lacks record information to determine which HTS is

appropriate, and therefore finds that the HTS it relied upon is correct.  This argument does not

actually support that the Department's HTS choice was supported by substantial evidence on the

record.  Moreover, it ignores the factual statements made by Ancientree in its surrogate value

submissions concerning these inputs.

For MDF, the United States claims that Ancientree did not provide information that its

MDF was not surface-covered.  Ancientree's production process makes clear that its MDF is

further processed by Ancientree.  Ancientree Fourth Supplemental (September 18, 2019) at

Exhibit SQ4-10; CD1365-1366, PD1367.  Ancientree itself also has argued and submitted this is

the correct HTS for this input.  Therefore, this is record support that Ancientree does not

purchase MDF that is already further worked or surface covered.  Ancientree also submits that

this is an industry standard.  Given the use of the MDF in the cabinet industry, it is illogical to

buy more expensive already processed MDF when it must then undergo more processing in the

cabinet production.  For example, Foremost also provided that HTS 4411.14.10 is specific to the

MDF it consumes.  *Id*.  In contrast, the United States only support is that Ancientree's product

brochure, which has pictures of the *final* merchandise, has cabinets with MDF that is laminated

on the outside.  Therefore, Ancientree must purchase finished, surface-covered MDF.  U.S. Br. at

28.  However, Ancientree has explained that it does in fact continue to process the MDF into its merchandise, including finishing the product or any potential laminating.  Ancientree Fourth Supplemental (September 18, 2019) at Exhibit SQ4-10; CD1365-1366, PD1367.  The record does not contain information that Ancientree purchased surface-covered MDF.  Therefore, the Department's classification is not supported by the record.  Ancientree's statements on the record and its production process support its classification.

Very similarly, the United States also claims that particleboard must be surface-covered because Ancientree sells a final product with particleboard that is surface-covered.  As explained above, this does not entail that Ancientree purchased particleboard that is surface-covered.  The record, both in Ancientree's statements and the production process, show that Ancientree further-processed its particleboard.   Further, the fact that the other respondent likewise classified its particleboard under HTS 4410.11.10, while not definitive in and of itself of Ancientree's classification, corroborates Ancientree's statement that its particleboard is not further processed when purchased and that particleboard used in the cabinet industry generally is not further processed.  The Department's classification is based purely on assumptions and not supported by the record.

Lastly, the United States claims the record does not support that Ancientree's paint is dissolved in an aqueous medium, going so far as to say even though the purchase invoices collected at verification say the paint is water-based, the Department is not certain of the composition.  This is nonsensical.  The invoices taken at verification for this very input indicate that Ancientree purchased "Water based color paint" and "water based UV paint."  *See* Verification Exhibit 15 (translating the purchase name which then is repeated on other invoices); CD1498&1516, PD1486.  Ancientree likewise has stated on the record that it consumes water-

14

based paint.  Accordingly, HTS 3209.10 is specific to Ancientree's input.  Therefore, the Department's reliance on HTS 3208.10.90 to value its paint input is not supported by the record in any respect whatsoever.

### III.      The Department's Surrogate Financial Ratio Calculation is Arbitrary and Unsupported by Substantial Evidence.

In the Final and Preliminary Determination, the Department relied upon the financial ratios calculated from Sigstrat's 2018 financial statement.  As submitted in Ancientree's opening brief, the Department's calculation is different than the way the Department has consistently calculated the ratios for the same company in the past.  The United States fails to proffer any justification for this change in practice, merely saying that Ancientree has failed to point out an error in the calculation. U.S. Br. at 20. However, Ancientree did point out that in the past, the Department used several detailed notes in the Sigstrat statement to breakout 15 different line items for expenses.  But in this investigation, the Department used only 8 line items and relied on the general Profit & Loss and Balance Sheet rather than the detailed notes.  Generally relying on more line items results in a more accurate and detailed ratio calculation.  However, the Department completely failed to address this argument or its reasoning for changing its consistent practice in calculating the ratios.  Accordingly, the Court should find that the United States waived its defense and order the Department to calculate the margins in accordance with its otherwise normal practice.

**II.     Conclusion and Prayer for Relief**

In light of the foregoing, the Department's *Final Determination* were not supported by

substantial evidence or in accordance with the law.  Plaintiff respectfully requests that the Court

remand this case for redetermination of the issues presented in this brief.

Respectfully submitted,


 /s/ Gregory S. Menegaz

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman*
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com

Date: January 21, 2021          *Counsel to Plaintiff*

*Admitted to California Bar; practice supervised by
attorneys of the firm who are active D.C. Bar members
pursuant to D.C. Bar Rule 49(c)(8).

## Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **4,587** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiffs*