United States Court of International Trade
One Federal Plaza
New York, NY 10278



CHAMBERS OF
Gary S. Katzmann
JUDGE

March 29, 2021

Gregory Stephen Menegaz
deKieffer & Horgan, PLLC
1090 Vermont Avenue, NW, Suite 410
Washington, DC 20004

Mark Rett Ludwikowski
Clark Hill PLC
1001 Pennsylvania Avenue, NW, Suite 1300 South
Washington, DC 20004

Ioana Cristei
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

Luke Anthony Meisner
Schagrin Associates
900 Seventh Street, NW, Suite 500
Washington, DC 20001

Re:   **Ancientree v. United States**
      **Court No. 20-00114**
      **Questions for Oral Argument**

Dear Counselors:

In light of the current COVID-19 pandemic, oral argument in this case will be held remotely via WebEx, in lieu of a proceeding at the courthouse, on Wednesday, April 14, 2021 at 11:00 a.m. The court will provide dial-in information to the parties. Information on how the public can listen to open proceedings can be found on the court's website under "Upcoming Court Proceedings Accessible via Teleconference"(https://www.cit.uscourts.gov/upcoming-court-

proceedings-accessible-teleconference).  The argument, if public and not closed, will be recorded and made available to the public via the court's website.  If you will be requesting a closed argument or portions of the argument, please inform my case manager, Geoffrey Goell, no later than close of business, Thursday, April 8, 2021.  The court encourages the parties to maintain a public argument, if possible.

The court has examined the parties' briefs and documents and would like counsel to submit answers in writing to the court's questions for oral argument by close of business on Thursday, April 8, 2021.  Parties shall file public and, if necessary confidential, versions of their answers, of not more than twenty pages.  The oral argument shall be dedicated only to rebuttal arguments to the answers filed by opposing counsel on Thursday, April 8, 2021.  The court will also permit but not require brief opening statements.  Presentations shall not exceed twenty-five (25) minutes shared by the plaintiff and the plaintiff-intervenor; and shall not exceed twenty-five (25) minutes shared by the defendant and the defendant-intervenor.

**I.   Questions to Plaintiff The Ancientree Cabinet Co., Ltd. ("Ancientree"), and Plaintiff-Intervenor, Cabinets to Go, LLC**

1. In Juancheng Kangtai Chemical Company v. United States, the court upheld Commerce's explanation that "transactions are made at commercial quantities when they reflect market values, i.e., competitive commercial transactions, either large or small." 41 CIT __, __, 38 ITRD 2129, 2017 WL 218910 at *10–*14 (2017) (internal quotations and alternation omitted).  What record evidence demonstrates that the Romanian imports failed to reflect market values?

2. Must Commerce determine whether the quantity of surrogate imports is commercial if a respondent has not provided sufficient data for comparison?  What authorities support your answer?

3. Did the Romanian sawnwood quantities substantially impact their average unit value ("AUV")?  What, if any, difference exists between the Romanian sawnwood AUV and the Malaysian sawnwood AUV, and is any difference due to the respective quantity of imports?

4. Ancientree cites Shanghai Foreign Trade Enterprises Co. v. United States, 28 CIT 480, 318 F. Supp. 2d 1339 (2004), as support for the proposition that "[Commerce] is always obligated to rely upon a statistically or commercially significant quantity for an import value."  Pl.'s Mot. For J. on Agency R. and Rule 56.2 Mem. in Supp. of Mot. for J. Upon the Agency R. at 11–12, Sept. 11, 2020, ECF No. 28 ("Pl.'s Br.").  However, given that the court there emphasized Commerce's aberrancy analysis in determining whether a quantity is commercial, should the court view the aberrancy analysis and commercial quantity analysis as separate requirements or as interdependent?  See 318 F. Supp. 2d at 1352.

    a. Furthermore, does Commerce's explanation of why it did not perform an aberrancy analysis here distinguish this case from Shanghai Foreign Trade? See id. at 1352–53 (explaining that Commerce broke from past practice by not explaining why they failed to do an aberrancy analysis).

5. What standard did Commerce use or should it have used for determining whether the Lii Hen and Poh Huat products were identical to the subject merchandise?

    a. How do you respond to Defendants' contention that the merchandise produced by the Malaysian manufacturers is not identical based on the websites and financial statements in the record? See Def.'s Mem. in Opp'n to Pl. and Pl.-Inter.'s Rule 56.2 Mots. for J. on the Agency R. at 15–16, Dec. 22, 2020, ECF No. 35 ("Def.'s Br."); Def.-Inter.'s Resp. Br. in Opp'n to the Mots. for J. on the Agency R. at 22–23, Dec. 21, 2020, ECF No. 34 ("Def.-Inter.'s Br."). What other record evidence supports your assertion that Lii Hen and Poh Huat produce identical products to those at issue, specifically wooden kitchen cabinets and vanities?

6. Ancientree's brief contains a table demonstrating that almost half of Sigstrat's revenue is generated from the sale of molded products, such as furniture. Pl.'s Br. at 16. What authority supports that it was unreasonable for Commerce to determine that a primary function of their business is making comparable wooden furniture based on the percentage of revenue generated?

7. Do you agree with AKC Alliance that Ancientree's proposed methodology differed from Commerce's previous methodology involving the Sigstrat financials? See Def.-Inter.'s Br. at 30–31. If so, does that impact your argument that Commerce unlawfully deviated from its past practice?

8. What obligation did Ancientree have to place Sigstrat financial statements used in other reviews on the record? See Def.'s Br. at 20; Def.-Inter.'s Br. 29–30.

9. Defendants argue that Commerce's calculation of the financial ratio was reasonably discernible because there is a detailed calculation worksheet in the record. Def.'s Br. at 21; Def.-Inter.'s Br. 31. Is the detailed calculation worksheet that accompanies Commerce's financial ratio calculation enough to explain the differences between its past determinations, e.g. Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017, 84 Fed. Reg. 38,002 (Aug. 5, 2019) ("Multilayered Wood Flooring"), and the administrative review in question?

10. Where in the record were the sawnwood inputs sufficiently described such that Commerce should have applied the more specific HTS classification?

    a. How do you respond to AKC Alliance's contention that a respondent may not describe its factors of production ("FOP") in its surrogate value comments? See Def.-Inter.'s Br. at 13–14, 27–28.

11. Defendants argue that there is insufficient evidence in the record to support using more specific HTS classifications for the Medium Density Particleboard ("MDF"), paint, and particleboard in the surrogate value analysis. See Def.'s Br. at 29–33; Def.-Inter.'s Br. 26–29. Given that respondents bear the burden of building the record, where in the record did you identify the specific characteristics of these FOPs?

12. What cases and authorities best support your argument?

13. Are there any recent or pending Federal Circuit or CIT cases that may change the analysis?

## II. Questions to Defendant the United States ("Government") and Defendant-Intervenor American Kitchen Cabinet Alliance ("AKC Alliance")

1. How has Commerce determined whether a quantity of imports was commercially significant in other investigations in which there was limited data regarding import quantities on the record? Did Commerce perform a similar analysis here?

2. Why can't Commerce use two countries to determine whether a quantity of imports is commercially significant? Hasn't it done so before? See Shanghai Foreign Trade, 318 F. Supp. 2d at 1352–53.

    a. Is there a certain difference in magnitude needed to warrant the commercial significance analysis? Is it only reserved for exceptionally low amounts and, if so, is this one such amount?

3. Assuming Commerce has an affirmative obligation to determine that the import value it uses for raw material inputs is based on a commercial quantity, where on the record did Commerce provide that explanation?

    a. What authorities best support the proposition that Commerce need not always determine whether import values are of a commercially significant quantity? See Def.'s Br. at 22–24; Def.-Inter.'s Br. 14–20.

4. Is there a difference between the aberrancy analysis and the commercial significance analysis? Does Commerce have to first determine that a small quantity is commercially significant prior to determining an effect on the AUV?

5. What standard did Commerce use for determining that the Lii Hen and Poh Huat products were not identical to the subject merchandise?

6. Ancientree argues that Commerce prefers using primary surrogate countries which source multiple financial statements. Pl.'s Br. at 18–19. Can this preference be overridden if the primary surrogate country only sources one financial statement of higher quality? What authorities support your answer?

7. Ancientree argues that Commerce acted arbitrarily and capriciously by not explaining why it altered its financial ratio calculation methodology from previous administrative decisions. Pl.'s Br. at 27–28. What reason, if any, did Commerce provide for changing its surrogate financial ratio calculation using Sigstrat's financial statements?

   a. Please explain how the calculation worksheet implicitly addresses the differences between those past decisions and the administrative review in question such that Commerce's altered methodology was reasonably discernible. See Def.'s Br. at 21 ("While Commerce did not respond directly to Ancientree's claims, it explained its calculation of financial ratios using Sigstrat's financial statements in the detailed calculation worksheet.").

   b. What, if any, relevance does any difference between Ancientree's suggested financial ratio calculation and the Multilayered Wood Flooring calculation have on the court's determination that Commerce arbitrarily changed its methodology? See Def.-Inter.'s Br. at 30–31.

8. Why must a respondent provide financial statements that Commerce previously used in other determinations? Wouldn't this information already be in Commerce's possession? See Def.'s Br. at 20; Def.-Inter.'s Br. 29.

9. Ancientree cites multiple instances in the record where it explained that its sawnwood imports are not planed or end-jointed. See Pl.'s Br. at 6–7 (collecting citations). Why do these citations fail to demonstrate that a narrower HTS classification should have been applied?

10. Ancientree argues that there is record support for using more specific HTS classifications for the MDF, paint, and particleboard FOPs. See Pl.'s Br. at 23–26. Why do these record citations fail to prove that a more specific HTS classification should be used?

    a. What standard does Commerce apply in determining whether an FOP should be classified under a more specific HTS classification?

    b. Why weren't Ancientree's suggested HTS classifications sufficient to demonstrate the classification of their FOPs? See, e.g., Ancientree Preliminary Surrogate Value Submission at Ex. SV-1, Aug. 7, 2019, P.R. 952–53. What authority supports that

this information cannot be provided in at the surrogate value comments stage? See Def.-Inter.'s Br. at 14.

11. What cases and authorities best support your argument?

12. Are there any recent or pending Federal Circuit or CIT cases that may change the analysis?

Sincerely,

*/s/ Gary S. Katzmann*
Gary S. Katzmann
Judge