# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Gary S. Katzmann, Judge**

|  |  |  |
|---|---|---|
| THE ANCIENTREE CABINET CO., LTD. | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Court No. 20-00114 |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S ANSWERS TO COURT'S QUESTIONS FOR ORAL ARGUMENT

Gregory S. Menegaz
J. Kevin Horgan
Judith L. Holdsworth
Alexandra H. Salzman
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

Dated: April 8, 2021

**I.  Questions to Plaintiff The Ancientree Cabinet Co., Ltd. ("Ancientree")**

1.  In <u>Juancheng Kangtai Chemical Company v. United States</u>, the court upheld Commerce's explanation that "transactions are made at commercial quantities when they reflect market values, <u>i.e.</u>, competitive commercial transactions, either large or small."  41 CIT __, __, 38 ITRD 2129, 2017 WL 218910 at *10–*14 (2017) (internal quotations and alternation omitted).  What record evidence demonstrates that the Romanian imports failed to reflect market values?

**Ancientree Answer:  The record contains evidence that the Romanian imports were based on transactions that are not commercial quantities and therefore they do not reflect representative market values for inputs consumed by manufacturers of downstream products such as Ancientree.  Ancientree has raised three measures of commercial reality on the record.  First, there is the basic commercial measure of a container load.  A container is a basic unit of international commerce—to ship less than a container incurs consolidation fees (i.e. joining the exports of different exporters into a single container); and is not normal practice for significant transactions in commodity raw materials such as those consumed in the subject merchandise.  A standard 20 foot container holds approximately 30 M3 and a 40 foot container holds approximately 50 M3.  Foremost SVs (August 7, 2019) at Exhibit SV-6-C; PD963.  As demonstrated at page 13 of Ancientree's R56.2 brief, the total quantities imported into Romania from various countries during a given month in this six-month period of investigation ("POI") were only roughly a container.  Those are the monthly *totals* by country, so it is not even certain that such total quantity was shipped all together in a single shipment in a single container.  This circumstance strongly suggests that the imports into Romania were not commercial quantities.  In contrast, the Malaysia monthly import totals by country (for a more specific HTS as discussed below) averaged approximately a hundred containers (average 300 M3) a month.**

Second, the Chinese manufacturers' commercial experience is evidence that the Romanian import quantity is not commercial. For example, Ancientree alone consumed approximately 2500 M3 of birch sawnwood during the POI to produce subject merchandise and approximately 750 M3 of poplar sawnwood. Ancientree Section D at Exhibit D-2.1; CD1023, PD911. That is, approximately 248% and 1072% times as much poplar and birch sawnwood during the POI to produce subject merchandise than was imported into all of Romania. *See* R56.2 Brief at 13. As briefed, while it is true that the Department is not required to perfectly match a respondents' purchasing situation in selecting a surrogate value it does not entail that such a comparison has no place in its analysis. Afterall, the goal of selecting a surrogate value is to rely upon a value that most closely approximates the price a cabinet manufacturer would pay if producing in a market economy and that is the best available information. *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("Commerce need not duplicate the exact production experience of the Chinese manufacturers at the expense of choosing a surrogate value that most accurately represents the fair market value of [the respective input] in a hypothetical market-economy.").

Therefore, Ancientree's purchase quantity reasonably indicates commercial quantities in the industry. This Court in *Kangtai* and *Jacobi Carbons* have also found that a respondents' own purchasing situation is a clear indicator of commercial quantity in the industry. *See Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1361-1362 (April 19, 2018) ("Commerce's conclusory assertion regarding the significance of the imports into Thailand fails to apprise the court why 122 metric tons is sufficiently significant to yield a representative price in light of respondents' production experience.") *see also Juancheng*

*Kangtai Chem. Co. v. United States*, 2015 Ct. Intl. Trade LEXIS 94, *65-66, 78 (Ct. Int'l Trade Aug. 21, 2015) (finding the Department's refusal to consider the respondent's actual purchasing and consumption quantity at odds with the Department's practice regarding other surrogate values and the statutory objective in general, maintaining that, "the commercial significance of import statistics is not something in the abstract, they must be reflective of, if not 'exactly' reflecting, such significance in comparison with actual experience, of the producers or exporters of the input under consideration, to the extent possible."). The data that the Department suggests is representative of Chinese industry consumption from Romania is insufficient to supply Ancientree's production requirements, strongly suggesting that it should not be used as a surrogate for the value to Chinese industry's consumption of these raw materials.

Third, the higher quantity of imports in Malaysia indicates that the Romanian import quantity is not commercial. Ancientree agrees that while the Malaysian import data alone may not be adequate to determine what is a commercial quantity, the Malaysian import volume can be considered alongside the Respondents' consumption volumes to corroborate its significance. Romania imported a mere 324 M3 under HTS 4407.97 and 259 M3 under HTS 4407.96. Those are 6-digit HTS. Malaysia had more specific Harmonized Tariff Schedule breakouts for import data collection than that available than Romania, another reason Ancientree has argued Malaysia sources the best available information for these primary raw materials. Malaysia imported 2,240 M3 under the highly specific HTS for poplar, 4407.97.90.90 and 955 M3 under the highly specific HTS for birch, 4407.96.90.90. In other words, Malaysia imported 691% more (poplar) and 369% more (birch) than Romania imported. The record does not contain the 6-digit HTS

import volumes into Malaysia, but the volume difference necessarily would be even greater with the comparison. Further, we note that the Romania tariff schedule did have more detailed HTS, HTS 4407.97.99 for poplar and 4407.96.99 for birch. However, Romania imported 0 M3 under 4407.97.99 and only 196 M3 under 4407.96.99. Comparing Malaysia and Romania at the specific HTS level shows how small the import quantity is into Romania by comparison. The Department indeed determined it could not rely on those more specific Romanian HTS because the quantities were too small or nonexistent.

While the Court has not asked a question concerning the HTS specificity comparison between the Malaysian and Romania HTS, Ancientree notes here that given Romania had no imports under the more specific 8-digit HTS for birch and very few imports under the 8-digit HTS for poplar, it is also established that the 6-digit more basket category HTS relied upon does not reflect the actual specific poplar sawnwood that Ancientree consumed and contains very little of the birch sawnwood. The 6-digit HTS is merely the sum of all of the imports from the various more specific 8-digit HTS options under that HTS. Thus, HTS 4407.97.99 is the total of imports from HTS 4407.97.10, 4407.97.91, and 4407.97.99. HTS 4407.97.99 theoretically contains the poplar sawnwood Ancientree actually consumed and Romania imported 0 M3 of that HTS. Therefore, it is not merely that the 6-digit HTS is less specific but that the 6-digit HTS definitely does not contain the same poplar sawnwood Ancientree consumed and very little of the birch sawnwood. In contrast, Malaysia has imports under HTS 4407.96.90.90, which is specific to birch sawnwood other than planed or end-jointed and imports under HTS HTS 4407.97.90.90, which is specific to poplar sawnwood other than planed or end-jointed.

We note that the standard for valuing factors of production such as raw material inputs is the "best available information" and the requirement for a commercially significant volume ensures that the best information will be used in this case and furthers the primary goal of accuracy of the dumping margin calculation. *Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001) (noting Commerce's obligation to "establish[] antidumping margins as accurately as possible."). The Department must calculate an accurate dumping margin, representative, to the extent possible, of the fair market value in a hypothetical market. A commercial producer purchases commercial quantities of its raw materials. Small insignificant import volumes are understandably presumed not representative of the commercial quantities and values that a hypothetical commercial producer would purchase. At the very minimum, the Department must consider that the Romanian import volumes are less commercial (and as we have argued, should not be considered commercial at all) than Malaysia and the Romanian imports are less specific to the input than Malaysia. The superiority of Malaysia on this point alone—the key raw materials—should have led the Department to select Malaysia as host to the "best available information" in this investigation.

2. Must Commerce determine whether the quantity of surrogate imports is commercial if a respondent has not provided sufficient data for comparison? What authorities support your answer?

**Ancientree Answer: The Department must consider the entire record as a whole "including whatever fairly detracts" from its decision or the "evidence opposed to [its] view."** *See* **Ancientree R56.2 at 6 citing** *Atlantic Sugar, Ltd. v. United States*, **744 F.2d 1556, 1562 (Fed. Cir. 1984);** *Diversified Products Corp. v. United States*, **572 F. Supp. 883, 888 (1983). Merely because the data on the record is not exactly the information the Department wants in order to make this determination does not entail that the Department**

can ignore record evidence.  The evidence discussed above that the Romanian import

quantities are not commercial must be considered and the Department's determination to

rely upon Romania justified in light of this information.  The term "best" in the statute is

necessarily one of comparison.  ***Dorbest Ltd. et al. v. United States***, **462 F. Supp. 2d 1262,**

**1268 (CIT 2006).  Hence, the Department is compelled to make comparisons of record**

**evidence and support with substantial evidence its conclusion as to which data source is the**

**"best."**

3.     Did the Romanian sawnwood quantities substantially impact their average unit value
       ("AUV")?  What, if any, difference exists between the Romanian sawnwood AUV and
       the Malaysian sawnwood AUV, and is any difference due to the respective quantity of
       imports?

**Ancientree Answer:  The price differences are as follows:**

| Birch_Sawnwood | Malaysia 4407.96.9090 | $253.54 | USD/M3 | 955 M3 |
|---|---|---|---|---|
| Poplar_Sawnwood | Malaysia 4407.97.9090 | $351.90 | USD/M3 | 2,239 M3 |
| Birch_Sawnwood | Romania 4407.96 | $695.14 | USD/M3 | 259 M3 |
| Poplar_Sawnwood | Romania 4407.97 | $173.85 | USD/M3 | 324 M3 |

**Ancientree Prelim. SVs at Exhibit 1; PD1007; Dep't Final SV Memo at Attachment 1**

**(exchange rate 1.174798263); PD 1571.**

        **As seen, the Romanian birch price is over twice as high as the Malaysian birch**

**price.  Ancientree consumed approximately 2500 M3 of birch sawnwood and**

**approximately 750 M3 of poplar sawnwood during the POI to produce subject**

**merchandise.  Ancientree Section D at Exhibit D-2.1; CD1023, PD911.  Birch sawnwood is**

**Ancientree's most critical input.  Having this main raw material valued at double the**

**otherwise representative cost based on a very small or non-existant quantity is very**

**significant.**

        **However, Ancientree did not argue that the Romanian sawnwood prices were**

**aberrant before the Department.  As evidenced by other Department decisions, the**

Department finds aberrancy only when a price is significantly higher – sometimes finding surrogate prices several times higher are not aberrant, over the objections of respondents. However, merely because a value is not aberrant does not mean it is a commercial value and a representative surrogate value. Ancientree, and any manufacturer, purchases their primary raw materials in large commercial quantities. And large commercial quantities generally have lower prices (and more consistent pricing) than small quantity purchases. Stemming from this logic, the commercial quantity test has developed for determining whether a surrogate value is reliable indicator of whether the price is commercial, as endorsed in several opinions of this Court.

The poplar price in Romania happens to be lower than Malaysia's import AUV during the POI. As discussed above, the quantity imported into Romania is still very small and uncommercial. While the value during this POI happens not to be high, the low quantity imported still presents the concerns of the quantity not being commercial and of potential volatility in pricing. Therefore, Ancientree raised this commercial quantity concern for both inputs out of consistent principle. Malaysia imports a large commercial quantity and presents commercial prices for these major raw materials during the POI with the expectation of that continuing to be the case in future reviews. This circumstance lends more predictability for exporters that are attempting to set U.S. prices above cost to avoid dumping moving forward. While technically each review stands alone (i.e. the Department need not rely on the same surrogate country from review to review), the Department most often does continue to rely on the same country in reviews unless the surrogate country list changes.

4. Ancientree cites Shanghai Foreign Trade Enterprises Co. v. United States, 28 CIT 480, 318 F. Supp. 2d 1339 (2004), as support for the proposition that "[Commerce] is always

obligated to rely upon a statistically or commercially significant quantity for an import value." Pl.'s Mot. For J. on Agency R. and Rule 56.2 Mem. in Supp. of Mot. for J. Upon the Agency R. at 11–12, Sept. 11, 2020, ECF No. 28 ("Pl.'s Br."). However, given that the court there emphasized Commerce's aberrancy analysis in determining whether a quantity is commercial, should the court view the aberrancy analysis and commercial quantity analysis as separate requirements or as interdependent? See 318 F. Supp. 2d at 1352.

**Ancientree Answer: Ancientree submits that the commercial quantity analysis is separate from the aberrancy analysis. As discussed above, a commercial quantity underpins a commercial value—which is the goal of the surrogate value methodology (a representative price for a commercial producer consuming that input on a commercial level). In contrast, the standard for aberrancy developed by the Department requires a dramatically high AUV coupled with a low quantity. Requiring an aberrancy finding in order to also raise an argument that a quantity is not commercial removes a necessary representative element of the Department's analysis, where like here, the value may not be representative of commercial values but is not so high that the Department would find it aberrant *per se*.**

**While many times a party may raise an aberrancy argument as well as a separate commercial quantity argument, Ancientree submits that the caselaw supports that these are two separate inquiries even if a case may present both. For example, the plaintiffs in *Juancheng Kangtai* did also make arguments regarding the price of chlorine, there was a separate discussion of quantity alone where the Court found that "Commerce's decision was essentially *ipse dixit* and failed to establish that the amount imported into India 'was statistically or commercially significant…'" *Juancheng Kangtai*, 2015 Ct. Intl. Trade LEXIS at *70-71. Further, other caselaw discussed in the briefs clearly discusses quantity alone in the "commercially significant" analysis. *See Shanghai Foreign Trade Enters. Co. v. United States*, 28 C.I.T. 480, 495 (2004) ("The Commerce decision fails to establish that the small amount of pig iron imported by India during the period of investigation was**

statistically or commercially significant and demonstrates no apparent consideration of that issue. Commerce did not address the issue whether the Indian Import Statistics were based on too small a sample to be reliable.") (finding 1,132 metric tons imported into India during the POI was not commercially significant and therefore could not be relied upon.); *See Jacobi Carbons AB v. United States*, 313 F. Supp. 3d 1344, 1361-1362 (April 19, 2018) (also discussing various case law on this issue).

    a. Furthermore, does Commerce's explanation of why it did not perform an aberrancy analysis here distinguish this case from <u>Shanghai Foreign Trade</u>? <u>See</u> <u>id.</u> at 1352– 53 (explaining that Commerce broke from past practice by not explaining why they failed to do an aberrancy analysis).

**Ancientree Answer: As explained above, Ancientree did not argue that the sawnwood import values were aberrant—i.e., did not argue that the Department should conduct its normal aberrancy test which is to compare the import prices into all the listed surrogate countries (and only find aberrancy when dramatically higher than AUV into other surrogate country candidates). Ancientree instead argued that the quantity was not commercial and therefore is not a reliable basis for the surrogate value. *Shanghai Foreign Trade* at 1353 ("Had Commerce considered that evidence and the evidence that the Indian Import Statistics were not based on a sufficient quantity, it then would have been in a position to make the determination the statute requires, *i.e.,* whether the value it chose was "based on the best available information.").**

5.    What standard did Commerce use or should it have used for determining whether the Lii Hen and Poh Huat products were identical to the subject merchandise?

**Ancientree Answer: The Department must consider the entire record as a whole "including whatever fairly detracts" from its decision or the "evidence opposed to [its] view." *See* Ancientree R56.2 at 6 citing *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *Diversified Products Corp. v. United States*, 572 F. Supp. 883, 888**

**(1983). As discussed below, the record contains information that the Malaysian companies produce identical merchandise and the Department has an established preference to rely upon identical, or the most comparable, producers' financial statements.** *See Hardwood and Decorative Plywood from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, **78 Fed. Reg. 58,273 (Dep't Comm. Sept. 23, 2013) and accompanying IDM at 62 ("The Department's standard criteria for selecting financial statements in calculating surrogate financial ratios includes examining the level of integration of the surrogate company in order to approximate the overhead costs, SG&A, and profit levels of the respondent. Further, the Department has an established practice of rejecting financial statements of surrogate producers whose production process is not comparable to the respondent's production process when better information is available.");** *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018*, **85 Fed. Reg. 62,275 (October 2, 2020) and accompanying IDM at Comment 6 (relying on the sole statement from a producer of identical merchandise and declining to rely upon the statements that were merely from comparable producers).**

    a. How do you respond to Defendants' contention that the merchandise produced by the Malaysian manufacturers is not identical based on the websites and financial statements in the record? See Def.'s Mem. in Opp'n to Pl. and Pl.-Inter.'s Rule 56.2 Mots. for J. on the Agency R. at 15–16, Dec. 22, 2020, ECF No. 35 ("Def.'s Br."); Def.-Inter.'s Resp. Br. in Opp'n to the Mots. for J. on the Agency R. at 22– 23, Dec. 21, 2020, ECF No. 34 ("Def.-Inter.'s Br."). What other record evidence supports your assertion that Lii Hen and Poh Huat produce identical products to those at issue, specifically wooden kitchen cabinets and vanities?

**Ancientree Answer: The pictures in Lii Hen's financial statement and the company's webpage demonstrate that Lii Hen produces identical merchandise. Ancientree Final SVs**

at Exhibit 3 (containing webpage materials and the financial statement); PD1328-1331. The company produces wooden cabinet units for the bedroom and living room. *Id*. Poh Huat's webpage has pictures of identical merchandise, namely wooden cabinet units for the office, bedroom, and living room. Ancientree Final SVs at Exhibit 4. Poh Huat's financial statement also specifically discusses that it produces and sells wooden office and home furniture "cabinets." *Id*. at pages 13-14.

In response to this information, the Defendant claims these are not identical because they are stand alone cabinets rather than permanent installation cabinets in the scope of the subject merchandise. The "permanent installation" distinction was not raised by the Department below and therefore is an impermissible rationale for support of its decision. Moreover, this is a false distinction as to comparability. A stand-alone cabinet or vanity does not have a discernable production difference compared with a cabinet or vanity that is floor or wall mounted. Indeed, even cabinet units for, e.g., a kitchen, are produced individually and then assembled together on site at installation. The production of standalone cabinets and vanities by Lii Hen and Poh Huat is identical to that of a producer of such cabinets parts or cabinets or vanities that must be mounted. The raw materials are the same, the production process is the same but for some minor differences in finishing a product to stand alone or equipping it to be installed against a wall.

Moreover, at a minimum, the Department should be compelled to find that the record establishes the three Malaysian companies are primarily engaged in highly comparable production. Lii Hen's financial statement states that its revenue was "wholly generated from the sales of furniture products" in 2018. The statement also indicates that the company consumes identical raw materials. The "main raw materials used in the

manufacturing of the furniture products are mainly wood that comprise of solid wood, particleboard, veneers, MDF, plywood, pine wood and oak wood" and other finishing/packing materials. Lii Hen financial statement at 7.

Poh Huat describes its principal business as the "manufacturing and sale of furniture." Poh Huat Furniture Industries financial statement at 15. Likewise, the financial statement also states that as a manufacturer, the costs of its direct materials impact its costs, listing "solid wood, MDF, particleboards, veneers, metal components, finishing materials and carton boxes" as its key materials. *Id.* at 16.

Yeo Aik Wood's financial statement (a third company) describes its principal business as "manufacturing and selling furniture." Yeo Aik does not produce identical merchandise, but does produce highly comparable merchandise. Yeo Aik Wood financial statement at 11. Yeo Aik Wood's webpage shows pictures of its merchandise—all various types of wooden furniture. Ancientree Final SVs at Exhibit 7 (containing webpage materials and the financial statement). The webpage also mentions in several places that rubberwood is one of its primary raw materials, which is not the exact same type of wood used by Ancientree, but indicates the company's main raw material is a similar type of comparable wood.

In contrast, Romania provides only one financial statement which as described below is primarily engaged in the production of plywood and molded products—not as comparable as these Malaysian companies' production. Moreover, as explained in the briefing, the Department has a preference to rely upon multiple financial statements which Malaysia provides and Romania does not.

6.     Ancientree's brief contains a table demonstrating that almost half of Sigstrat's revenue is generated from the sale of molded products, such as furniture. Pl.'s Br. at 16. What

authority supports that it was unreasonable for Commerce to determine that a primary
function of their business is making comparable wooden furniture based on the
percentage of revenue generated?

**Ancientree Answer:  As Ancientree itself noted, indeed almost half of Sigstrat's revenue**

**was generated from the sale of molded products, which can include furniture.  However,**

**half of Sigstrat's revenue was also from the sale of plywood.  Sigstrat itself even states that**

**its main company activity is manufacturing veneer and wooden panels.  Plywood and**

**veneer production is a significant step removed *upstream* from the production of subject**

**merchandise.  Ancientree <u>consumes</u> plywood in its production of cabinets.  Foremost**

**<u>consumes</u> plywood and veneer in its production of cabinets.  Moreover, presumably**

**Sigstrat consumes self-produced plywood in its production of molded products and does**

**not purchase plywood like the respondents, further making Sigstrat's production costs less**

**comparable from the standpoint of the level of integration.  This alone makes Sigstrat less**

**comparable than the Malaysian financial statements, whose statements and webpage**

**materials as described above demonstrate they are primarily engaged in highly comparable**

**merchandise only.  At a minimum, Sigstrat is only half engaged in the production of a**

**comparable product—molded wooden furniture.**

**Ancientree also notes, as briefed, that molded wooden products are also less**

**comparable to cabinet production than other types of wooden furniture manufacturing.**

**While cabinets may have moldings, cabinets themselves are not molded products.  Further,**

**Sigstrat does not produce cabinets.  Therefore, even if Sigstrat produced primarily molded**

**wooden products (which it does not), Sigstrat's production would still be less comparable**

**than the production activities of the Malaysian companies' financial statements.**

7.     Do you agree with AKC Alliance that Ancientree's proposed methodology differed from
       Commerce's previous methodology involving the Sigstrat financials?  <u>See</u> Def.Inter.'s

Br. at 30–31.  If so, does that impact your argument that Commerce unlawfully deviated from its past practice?

**Ancientree Answer:  During the course of the investigation, Ancientree did place its own calculation of the Sigstrat financial ratios on the record.  Petitioner also filed its own calculation of the Sigstrat financial ratios.  Ancientree followed the Department's prior method except for one-line item.  The Department did not rely upon Petitioner's calculation or Ancientree's calculation or the calculation method it has used in the past.  Instead, the Department calculated the Sigstrat ratios in a new manner of its own determination.**

**While Defendant-Intervenor complains that Ancientree's suggested ratios it placed on the record were different than the ratios from past reviews, Ancientree has not specifically argued that the Department must calculate the ratios in the manner Ancientree submitted on the record.  Instead, Ancientree has argued that the Department should calculate the ratios in a manner that is at least consistent with the manner in which it calculated Sigstrat's ratios in past cases where its ratios were used in final results or determinations.  At a minimum, the Department is obligated to explain why it has changed its calculation and why such changes are justified in terms of resulting in the most accurate antidumping duty margin calculation.  *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003) (Commerce acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice.").  Therefore, the fact that Ancientree also submitted slightly different ratios is not relevant to its argument that the Department should rely upon the methodology it had used in the past.**

8.     What obligation did Ancientree have to place Sigstrat financial statements used in other reviews on the record?  See Def.'s Br. at 20; Def.-Inter.'s Br. 29–30.

**Ancientree Answer:** Defendant and Defendant-Intervenor have not provided a legitimate reason why the prior Sigstrat financial statements are required to compare the financial statement calculation methodology. As the Department is aware, companies do not normally change the organization and categorization of costs from year to year in their financial statements. Ancientree provided the Department's ratio calculation from the 2017 statement, which is also the same method the Department has used to calculate earlier Sigstrat statements in other reviews. *Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Rescission; 2015-2016*, 83 Fed. Reg. 35,461 (July 26, 2018) (relying on 2016 Sigstrat); *Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Partial Rescission of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 25,766 (June 5, 2017) (relying on 2014 Sigstrat); *Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 46,899 (July 19, 2016) (relying on 2014 Sigstrat); *Certain Hardwood Plywood Products Final Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 82 Fed. Reg. 53,460 (November 16, 2017) (relying on 2016 Sigstrat). In other words, the Department generally calculates financial ratios in the same manner from year to year because the statements do not change anything significant in the categorization of expenses from year to year. The Department does not need to have the 2017 Sigstrat statement itself to explain why it has calculated the financial ratios in the 2018 Sigstrat statement differently. Ancientree was also not on notice that the Department would depart from its established practice of calculating the Sigstrat ratios until the record closed. Only in the Preliminary

**Determination did the Department calculate the ratios for the first time in this different manner, and the last opportunity for Ancientree to submit surrogate values (such as the 2017 Sigstrat statement) on the record was 30 days prior to the preliminary Determination. Further, the Department does attempt to have some level of consistency and has an Office of Policy that is known to be heavily involved in surrogate value decisions. The Department has institutional knowledge of these ratios and works with this statement on an ongoing basis in other wood product administrative reviews. Surely, the Department cannot blind itself to its institutional knowledge.**

9.      Defendants argue that Commerce's calculation of the financial ratio was reasonably discernible because there is a detailed calculation worksheet in the record. Def.'s Br. at 21; Def.-Inter.'s Br. 31. Is the detailed calculation worksheet that accompanies Commerce's financial ratio calculation enough to explain the differences between its past determinations, e.g. Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017, 84 Fed. Reg. 38,002 (Aug. 5, 2019) ("Multilayered Wood Flooring"), and the administrative review in question?

**Ancientree Answer: The mere presence of the ratio calculation on the record does not explain *why* those changes were made. The Department had consistently calculated the ratios in one manner and did not provide an explanation for the change in methodology in this review. The Department's total lack of an explanation for its calculations appears to compel remand. *CP Kelco U.S., Inc. v. United States*, 949 F.3d 1348, 1356 (Fed. Cir. 2020) ("Commerce must provide an explanation that is adequate to enable the court to determine whether its choices are actually reasonable. It must 'examine the record and articulate a satisfactory explanation for its action.'" The agency's path must "reasonably be discerned.") (internal citations omitted). .Moreover, this issue would be moot if the Court agrees that a larger number of more comparable financial statements makes Malaysia the superior surrogate country.**

10.  Where in the record were the sawnwood inputs sufficiently described such that Commerce should have applied the more specific HTS classification?

**Ancientree Answer:  In Ancientree's Preliminary surrogate value submission and again in its Final surrogate value submission, it provided that HTS 4407.96.9090 and HTS 4407.97.9090 are specific to its birch and poplar sawnwood inputs because its sawnwood is not planed or end-jointed.  As described below, this is a factual statement submitted in relation to the Section D questionnaire and certified to be accurate by Ancientree. The Department did not question its assertion; nor did the Department put Ancientree on notice that its assertions were in question.  Petitioners are indeed producers of this merchandise and had a regulatory right to rebut the assertion with facts contesting the nature of the basic raw materials consumed to make this basic product.  Petitioners did not available themselves of the opportunity provided in the regulation and waived their objections.  *See* 19 C.F.R. 351.301(c)(1)(v) (providing the opportunity to submit factual information to rebut, clarify, or correct factual information contained in the questionnaire response); *see also* 19 C.F.R. 351.301(c)(3)(iv) (providing opportunity to submit rebuttal surrogate value information).  It is somewhat rare that parties debate the nature of the inputs; more common are the disputes over which particular surrogate value source should apply to the inputs.**

   a.  How do you respond to AKC Alliance's contention that a respondent may not describe its factors of production ("FOP") in its surrogate value comments?  See Def.-Inter.'s Br. at 13–14, 27–28.

**Ancientree Answer: The Section D questionnaire that the Department issued Ancientree includes an Appendix VII spreadsheet and asks Ancientree to identify the surrogate values, i.e. appropriate HTS to value its imports.  The questionnaire also provides that the "exporter may complete this spreadsheet when filing the questionnaire response, or later in**

accordance with the deadlines set forth in section 351.301(c)(3) of Commerce's

regulations." In other words, the questionnaire allows Ancientree to submit the detailed

information and appropriate HTS to value its inputs in the surrogate value submission

rather than in its Section D questionnaire. Accordingly, in its surrogate value submission,

Ancientree submitted HTS 4407.96.9090 and 4407.97.9090 are specific to the sawnwood it

consumes because its sawnwood is not planed or end-jointed. This submission includes a

company certification to the accuracy of its statements. Ancientree's statements and

submissions of fact concerning the nature of its inputs in a surrogate value submission are

the equivalent to having submitted the information in the Section D questionnaire. The

Department did not request further information or find Ancientree's submission of these

statements of fact was incomplete. As noted, petitioners who were easily placed to

demonstrate that Ancientree's description does not match inputs to the subject

merchandise, made no such effort or assertion. Therefore, the Department must accept

this statement as accurate.

11.    Defendants argue that there is insufficient evidence in the record to support using more
       specific HTS classifications for the Medium Density Particleboard ("MDF"), paint, and
       particleboard in the surrogate value analysis. See Def.'s Br. at 29–33; Def.-Inter.'s Br.
       26–29. Given that respondents bear the burden of building the record, where in the
       record did you identify the specific characteristics of these FOPs?

Ancientree Answer: In the same way as described above, Ancientree's statements and

submissions of fact concerning these inputs in the surrogate value submission are certified

record evidence as to the nature of these inputs. For MDF and particleboard, Ancientree

explained that it does not use surface-covered MDF or particleboard. Ancientree submits

that its production process makes clear that its MDF and particleboard is further

processed by Ancientree and therefore the inputs it purchased are not already surface-

covered, which would be pointless and needlessly expensive or counterproductive to Ancientree's own surface covering of the MDF and particleboard. Ancientree Fourth Supplemental (September 18, 2019) at Exhibit SQ4-10; CD1365-1366, PD1367. For paint, invoices taken at verification for this very input indicate that Ancientree purchased "Water based color paint" and "water based UV paint." *See* Verification Exhibit 15 (translating the purchase name which then is repeated on other invoices); CD1498&1516, PD1486. Therefore, there is further evidence on the record to corroborate the statements made by Ancientree in its surrogate value submission. In contrast, the Department's alternative classifications for these inputs are based purely on assumptions and not supported by the record.

12.      What cases and authorities best support your argument?

**Ancientree Answer:** *Jacobi Carbons* **best addresses the caselaw and argument that the Department must rely upon surrogate values that are based on commercially significant quantities.** *Jacobi Carbons AB v. United States*, **313 F. Supp. 3d 1344 (April 19, 2018).** *Taian Ziyang* **best addresses that product specificity is logically the primary consideration in determining the best available information.** *Taian Ziyang Food Co. v. United States*, **783 F. Supp. 2d 1292, 1330 (Ct. Int'l Trade 2011). These two arguments together support that the sawnwood surrogate values in Malaysia are the best available information to value the most critical raw materials. The preference for specificity also supports that Malaysia sources the best available information for financial ratios.** *Citic Trading* **lays out that although the Department is given discretion in selecting factors of production, that discretion is constrained by the underlying objective to calculate the most accurate dumping margins possible and "[t]his objective is achieved only when Commerce's choice of what constitutes the best available information evidences a rational and reasonable**

relationship to the factor of production it represents." *Citic Trading Co. v. United States*, 27 C.I.T. 356, 366 (Ct. Int'l Trade 2003). Malaysia sources not only the best available information for sawnwood but also provides multiple financial statements from highly comparable producers of identical or comparable merchandise. *See* Ancientree R56.2 at 18-19 (discussing Department precedence to rely on multiple financials and the most comparable financials). The Department's long-standing practice of preferring to rely upon a country with the best available information to value the critical raw materials and financial ratios must result in a reasonable mind selecting Malaysia over Romania.

13.     Are there any recent or pending Federal Circuit or CIT cases that may change the
         analysis?

**Ancientree Answer: Ancientree is not aware of a pending Federal Circuit or CIT case that would change its analysis. The Department is obligated to determine it has relied upon the best available information as supported by substantial evidence on the record. Precedent in other cases is unlikely to match the specific facts of this case exactly. That said, our understanding is that precedents support the common sense positions of Plaintiff in this matter, such as larger data sets of wood inputs are more likely to be representative of prices available to commercial consumers of those inputs and that more numerous and more highly comparable financial statements are more likely to be representative of Chinese industry financial ratios than a single less comparable financial statement.**