#### UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | | |
|---|---|---|
| THE ANCIENTREE CABINET CO., LTD., | ) | PUBLIC VERSION |
| *Plaintiff,* | ) | |
| and | ) | |
| CABINETS TO GO, LLC, | ) | |
| *Plaintiff-Intervenor*, | ) | |
| v. | ) | Court No. 20-00114 |
| UNITED STATES, | ) | |
| *Defendant,* | ) | |
| and | ) | |
| AMERICAN KITCHEN CABINET ALLIANCE, | ) | |
| *Defendant-Intervenor*. | ) | |

### DEFENDANT-INTERVENOR'S WRITTEN ANSWERS
### TO THE COURT'S QUESTIONS FOR ORAL ARGUMENT

Pursuant to USCIT Rule 56.2 and the Court's March 29, 2021 letter, Defendant-Intervenor the American Kitchen Cabinet Alliance ("AKCA" or the "Petitioner") submits the following written answers to the Court's questions in the above-captioned action.

1. **How has Commerce determined whether a quantity of imports was commercially significant in other investigations in which there was limited data regarding import quantities on the record? Did Commerce perform a similar analysis here?**

   **Response**: In other proceedings, the U.S. Department of Commerce ("Commerce") has determined whether a quantity of imports was commercially significant by comparing it to the quantity of imports into other countries that are economically comparable to China. However, as

the Court has previously recognized, "Commerce {does} not ha{ve} a longstanding practice of omitting import values merely because they were the product of a small quantity of imported goods." *Sichuan Changhong Electric Co. v. United States*, 460 F. Supp. 2d 1338, 1356 (Ct. Int'l Trade 2006). Instead, Commerce's long-established practice, which has been upheld by this Court for decades, is "to disregard small-quantity import data when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other countries." *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 59 F. Supp. 2d 1354, 1360 (Ct. Int'l Trade 1999).

In *Juancheng Kantai Chem. Co. v. United States*, for example, the Court recognized that if import data involve a small quantity, "Commerce's practice is to determine if the price for the imports is aberrational . . . by comparing the average import price against other sources of market value." 2015 Ct. Intl. Trade LEXIS 94, *65-66, 78 (CIT 2015). In that case, the respondent submitted comprehensive data regarding imports for each potential surrogate country, which allowed Commerce to analyze whether an allegedly noncommercial quantity was consistent with other import volumes and whether the input in question was often traded in smaller quantities. *Id.* On remand, Commerce was able to conclude, based on a detailed analysis of price and quantity, that transactions are made at commercial quantities when they are competitive commercial transactions and that a finding that import volumes are commercial was not tied to a respondent's consumption levels. *See Juancheng Kangtai Chem. Co. v. United States*, 2017 CIT LEXIS 3, *26-31 (CIT 2017). The Court ultimately sustained Commerce's conclusion on remand that an allegedly small quantity was, in fact, a commercial quantity. *Id.*

In other cases where Commerce has examined whether import quantities are commercially significant, the parties submitted benchmark data and other information that

demonstrably called into question the reliability of the import data used by Commerce to calculate surrogate values. *Shanghai Foreign Trade Enters. Co. v. United States*, 318 F. Supp. 2d 1339, 1352 (Ct. Int'l Trade 2004) (plaintiff submitted import statistics from prior period and other data that was relevant to whether import quantities from the review period were commercially significant as well as information regarding market prices from other sources relevant to whether import values were aberrational).

In this case, unlike the parties in *Juancheng Kangtai* and *Shanghai Foreign Trade*, Ancientree did not submit any benchmark data or other information that would allow Commerce to analyze whether the import quantities were not commercial transactions or were otherwise aberrational. Thus, as Commerce explained in its final determination in the underlying investigation, the agency was not able to perform an analysis similar to the analyses it performed in cases such as *Juancheng Kangtai* and *Shanghai Foreign Trade*. *Wooden Cabinets and Vanities and Components Thereof from China,* 85 Fed. Reg. 11,953 (Feb, 28, 2020) and accompanying Issues and Decision Memorandum ("Final IDM") (P.D. 1554) at 37-38.

In prior cases, the Court has required that Commerce consider a respondent's own purchase quantity and consumption in determining whether a surrogate value is based on a commercially significant quantity. *See, e.g., Juancheng Kangtai*, 2015 CIT LEXIS 94 at \*78. As Commerce explained in its final determination, it "disagree{d} that the decision in *Juancheng Kangtai* compels a one-dimensional comparison between a respondent's consumption and the import quantities under consideration." *See* Final IDM at 38. This is consistent with Commerce's decisions in other cases. For example, in *Certain Polyethylene Terephthalate Resin from China*, Commerce rejected the notion that an import quantity was unreliable simply because it was smaller than one respondent's consumption of that input:

3

> Although Xingyu claims that this volume is small relative to its own consumption needs, and in relation to Thai domestic production capacity, the statute does not require the Department to match importation or production volumes for inputs in potential surrogate countries with the respondents' own consumption volumes, nor is it the Department's practice to undertake such a comparison in determining the best available information with which to value FOPs. The mere fact that respondents' (and overall Thai) consumption might exceed the Thai import volume does not necessarily render those import quantities unreliable or unreasonable. Ultimately, there is no evidence on the record demonstrating that the Thai import data does not reflect a commercial quantity.

*Certain Polyethylene Terephthalate Resin from China*, 81 Fed. Reg. 13331 (Dep't Commerce Mar. 4, 2016) and accompanying IDM at Cmnt. 1. *See also Lightweight Thermal Paper from China*, 73 Fed. Reg. 57329 (Dep't Commerce Oct. 2, 2008) and accompanying IDM at Cmnt. 10 ("It does not automatically follow, as Hanhong purports, that if the import volumes are exceeded by the respondent's sales that they cannot be commercially significant.").

Furthermore, based on the Federal Circuit's precedent in *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016), this Court has rejected the notion that Commerce must compare import quantities to a respondent's own consumption experience to determine whether the import quantities reflect "the economic or commercial reality of the parties generally, or of the industry more generally, in some broader sense." *Diamond Sawblades Manufacturers' Coal. v. United States*, 301 F. Supp. 3d 1326, 1340 (Ct. Int'l Trade 2018). In *Nan Ya*, the Federal Circuit stated that "Commerce's determination (1) is 'accurate' if it is correct as a mathematical and factual matter, thus supported by substantial evidence; and (2) reflects 'commercial reality' if it is consistent with the method provided in the statute, thus in accordance with law." *Nan Ya*, 810 F.3d at 1344 (citations omitted). In *Diamond Sawblades*, the Court specifically upheld Commerce's "explanation{} that it does not compare the volume of imports in the import data to the volume of the input a respondent purchased or non-identical

4

inputs, and that it need not replicate the respondent's actual experience" as comporting with the Federal Circuit's guidance in *Nan Ya*. 301 F. Supp. 3d at 1340.

Nevertheless, to the extent that this Court holds, contrary to Commerce's practice and the guidance in *Nan Ya,* that respondents' consumption quantities are relevant to whether import quantities are commercially significant, conducting this comparison does not show that the Malaysian import data are somehow superior to the Romanian import data. The chart below compares the consumption quantities of Ancientree and the other respondent, Foremost, to the import quantities of the relevant inputs in both Malaysia and Romania:

|  | Ancientree Consumption | Foremost Consumption | Malaysian Imports | Romanian Imports |
|---|---|---|---|---|
| Birch | [            ] | | | 2,240 | 324 |
| Poplar | [            ] | | | 955 | 259 |

*Sources*: Final SV Memo at Att. 3e (P.D. 1560, 1571); Ancientree Sec. D Resp (P.D. 911) and Database; Foremost Sec. D Resp. at Exhibit D-6-2 (P.D. 912) and Database.

As can be seen from the chart, Romanian imports of birch are [

]. However, the same can be said for Malaysian imports of birch. Similarly, Malaysian imports of poplar are [

]. Thus, a comparison of import quantities to the respondents' consumption quantities does not show that Romanian import quantities are insignificant or that the Malaysian import data are somehow superior to the Romanian data.

> **2. Why can't Commerce use two countries to determine whether a quantity of imports is commercially significant? Hasn't it done so before? See <u>Shanghai Foreign Trade</u>, 318 F. Supp. 2d at 1352–53.**

**Response**: In *Shanghai Foreign Trade Enterprises Co. v. United States*, it does not appear that Commerce relied on two countries to determine whether a quantity of imports was commercially significant. 318 F. Supp. 2d 1339, 1352-53 (2004). Rather, it appears that the

5

Court examined the record and found that the quantity of pig iron imported into India during the period of investigation was not commercially significant when compared to the quantity of imports into Indonesia and when compared to the consumption of one Indian company. *Id.* The Court noted that Indonesia imported approximately fifty times the amount of pig iron imported into India and that the amount imported into India was one-half of one percent of the amount produced by just one Indian domestic company. *Id.* The Court thus remanded the case to Commerce to "address whether the price for pig iron obtained from the Indian Import Statistics is based on a statistically or commercially insignificant quantity" and in doing so "state its method for determining what is an insignificant quantity." *Id.* at 1353. Significantly, however, the case was dismissed by the Court at the request of the plaintiff before Commerce ever issued any remand. *See* Order Dismissing Case in *Shanghai Foreign Trade*, CIT No. 03-218, ECF 28 (June 14, 2004). Because the case was dismissed, Commerce never had a chance to explain on remand its finding that the Indian import data involved a commercially significant quantity.

In this case, in contrast, Commerce has already explained why it was inappropriate to use two countries to determine whether a quantity of imports is commercially significant.

> The record of this investigation contains SV data for Malaysia and Romania, but no data for the other countries on the surrogate country list, Brazil, Kazakhstan, Mexico, and Russia. Nor did interested parties submit any data for any of the potential surrogate countries for any period outside of the POI. Accordingly, a comparison between two data points, Malaysia and Romania import values, only during the POI, without any historical context, does not allow us to conclude that the import values associated with the import quantities for Romania are aberrational values or otherwise unusable. No parties submitted wood import data for the POI for Brazil, Kazakhstan, Mexico, or Russia, which prevents us from determining whether the Malaysian AUV is within the range of AUVs from those countries or whether it is an outlier relative to those AUVs. Similarly, absent any historical context for the AUVs from Romania, or any of the other countries on the surrogate country list, we cannot determine whether there was a sharp drop in the Romanian data during the POI that could impugn the reliability of the POI data. For those same reasons, we cannot draw any conclusions as to the commercial significance of the Romanian import quantities relative to any

6

> country other than Malaysia, which, as a single data point, is too limited to permit a meaningful analysis

Final IDM at 38.

In any event, conducting comparisons similar to those conducted by the Court in *Shanghai Foreign Trade* shows that Malaysia imported seven times the amount of birch as Romania (2,240 / 324 = 6.9) and that the amount of birch imported into Romania was [    ] of Ancientree's consumption of birch and [    ] of Foremost's consumption of birch. This is a far cry from the facts at issue in *Shanghai Foreign Trade*, where Indonesia imported 50 times the amount that India did, and the amount of imports in India was less than one percent of the consumption of an Indian producer. Thus, by the metric employed in *Shanghai Foreign Trade*, there is no reason to disregard the Romanian data in favor of the Malaysian data.

    a. **Is there a certain difference in magnitude needed to warrant the commercial significance analysis? Is it only reserved for exceptionally low amounts and, if so, is this one such amount?**

**Response**: This question illustrates the impossibility of determining commercial significance based on only one comparison point. This type of comparison does not allow Commerce to assess whether the first quantity is aberrationally low, whether the second quantity is aberrationally high, nor whether both quantities are non-aberrational and fall squarely within a range of other relevant benchmarks. This is why—to the extent a party believes import data are aberrational—it has the burden of placing numerous benchmarks on the record so that Commerce can determine whether the import value falls within a range of similar quantities or involves an outlier relative to the other import values. Ancientree did not meet that burden here.

    3. **Assuming Commerce has an affirmative obligation to determine that the import value it uses for raw material inputs is based on a commercial quantity, where on the record did Commerce provide that explanation?**

7

**Response**: Under Commerce's regulations and practice, the interested parties have an obligation to submit publicly available information to value the respondents' raw material inputs. *See* 19 C.F.R. § 351.301(c)(3)(i). To the extent that interested parties believe that the information submitted by another party involves commercially insignificant quantities or aberrational values, they have an obligation to submit rebuttal factual information showing that is the case. *Id.* § 351.301(c)(3)(iv). It is not Commerce's burden to build the record with information that will allow it to determine whether import values are based on a commercial quantity. *Diamond Sawblades*, 301 F. Supp. 3d at 1340 ("the burden of creating an adequate record, including surrogate value information, lies with the interested parties"). *See also Polyethylene Retail Carrier Bags from China*, 73 Fed. Reg. 14216 (Dep't Commerce Mar. 17, 2008) and accompanying IDM at Cmnt. 6 ("We find that the burden is on the respondents to demonstrate that the Indian import statistics are in fact aberrational"). Thus, to the extent that Commerce has an affirmative obligation to determine that the import value it uses for raw material inputs is based on a commercial quantity, that obligation is only triggered when the party challenging the import value provides the information necessary to conduct that determination.

    a. **What authorities best support the proposition that Commerce need not always determine whether import values are of a commercially significant quantity?** <u>See</u> **Def.'s Br. at 22–24; Def.-Inter.'s Br. 14–20.**

**Response**: As discussed above, Commerce need not and indeed cannot determine whether import values are of a commercially significant quantity when the parties do not provide the information relevant to this determination. In *Diamond Sawblades*, for example, the Court rejected a respondent's challenge to the use of Thai import data on the basis that they involved insignificant import quantities, because the respondent had failed to provide import data from other potential surrogate countries. 301 F. Supp. 3d at 1340. The Court's decision in *Baoding*

8

*Mantong Fine Chemistry Co. v. United States*, is also instructive. 222 F. Supp. 3d 1231, 1248 (Ct. Int'l Trade 2017). There, the Court rejected the respondent's argument that the Indonesian import value was aberrationally high compared to the respondent's proposed surrogate value:

> {T}he court cannot conclude that Commerce was required to find on this record that the data for Indonesia . . . were aberrational. It is possible that a wider set of data could have shown the Indonesian surrogate value to be aberrationally high. . . . {The respondent} did not submit such a wider set of data for the record during the review, leaving Commerce to consider the question of whether the surrogate price was aberrational, and to make its ultimate decision, from a limited record.

*Id.* The Court thus sustained Commerce's surrogate value based on the Indonesian import data. *See also Shakeproof*, 59 F.Supp.2d at1360 (Commerce's "administrative practice with respect to aberrational data is 'to disregard small-quantity import data when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from *other countries*' ") (citation omitted; italics added).

> **4. Is there a difference between the aberrancy analysis and the commercial significance analysis? Does Commerce have to first determine that a small quantity is commercially significant prior to determining an effect on the AUV?**

**Response**: When "determining the valuation of the factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible." *Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001). The purpose of the commercial significance analysis is to ensure that the average unit value ("AUV") of import statistics is not aberrational. One means to test if the AUV is aberrational is to inquire whether it is based on a small quantity of imports that could potentially skew the AUV. However, as discussed above, Commerce does not disregard small-quantity import data when the resulting AUV is shown to be in line with other relevant benchmarks on the record. *Shakeproof Assembly*, 59 F. Supp. 2d at 1360. *See also Xinjiamei Furniture (Zhangzhou) Co. v. United States*, Slip Op.

9

2013-30, 2013 Ct. Intl. Trade LEXIS 34, *19 (recognizing "the proposition that a small import volume *may indicate* that the data relied upon is aberrational is not the same as the proposition that a small import volume *makes* the data aberrational") (emphasis in original). On the other hand, a finding that import statistics involve a small quantity is not a necessary prerequisite to a finding that an AUV is aberrational. *See id.* Rather, an AUV based on a large quantity of imports may also be rejected as aberrational if it is shown to be an outlier when compared to other benchmarks on the record.

> 5. **What standard did Commerce use for determining that the Lii Hen and Poh Huat products were not identical to the subject merchandise?**

**Response**: The standard that Commerce applied in making this determination was the definition of the subject merchandise set forth in the scope of the investigation. Applying this standard, there is no record evidence to support Ancientree's claim that Lii Hen and Poh Huat are producers of "identical merchandise." In fact, neither the companies' financial statements themselves nor the company information submitted by respondents reference the subject merchandise. *See* Ancientree Final SV Submission at Exhibit SV2-5 (P.D. 1328-1332); Foremost Final SV Submission at Exhibits SV2-1 and SV2-2 (P.D. 1319). Ancientree's claim that these companies produce identical merchandise is based on "pictures" in their financial statements and on their websites. *See* Ancientree Br. at 14-15 (ECF 28). Given that Ancientree's claim was based on pictures, it was appropriate for Commerce to analyze these pictures to determine if the companies produce identical merchandise. As Commerce explained in its final determination:

> {T}he website of {Lii Hen} contains images of items such as bed frames, nightstands, and dressers (items that appear to meet the description of the scope of the wooden bedroom furniture order instead), and television stands. Similarly, the website of {Poh Huat} also contains images of wooden bedroom furniture and standalone tables and television stands that appear to contain as much metal as they do wood components.

Final IDM at 32.

> **6. Ancientree argues that Commerce prefers using primary surrogate countries which source multiple financial statements. Pl.'s Br. at 18–19. Can this preference be overridden if the primary surrogate country only sources one financial statement of higher quality? What authorities support your answer?**

**Response**: This Court has recognized that while Commerce has a general preference for using multiple financial statements, this preference does not "carry the day" in every case but can be overridden by other factors to ensure that Commerce is relying on the best available information on the record to value a respondent's factors of production ("FOPs"). *Fine Furniture (Shanghai) Ltd. v. United States*, 353 F. Supp. 3d 1323, 1352 (Ct. Int'l Trade 2018). For example, in *Fine Furniture*, the Court upheld Commerce's selection of Sigstrat's financial statements over the multiple financial statements available in the alternate country of Thailand based on the "totality of the circumstances" that Commerce considered in selecting Romania as the primary surrogate country and its preference for valuing all FOPs from a single country. *Id.* In addition, the Federal Circuit has recognized that Commerce's "preference is to use multiple financial statements in order to eliminate potential distortions that may arise from using those of a single producer, *as long as those financial statements are not distortive or otherwise unreliable*." *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1374 (Fed. Cir. 2010) (emphasis added) (internal quotation and citation omitted). In other words, as Commerce found in *Chlorinated Isocyanurates from China*, the agency's preference to use multiple financial statements presupposes that the multiple statements are usable and of equal quality. *Chlorinated Isocyanurates from China*, 81 Fed. Reg. 1167 (Dep't Commerce Jan. 11, 2017) and accompanying IDM at Cmnt. 4. There, Commerce declined to use multiple financial statements in favor of a single financial statement because it was the "only financial statement that is fully

translated, shows no evidence of countervailable subsidies, and provides sufficient detail for valuing factory overhead, selling, general and administrative expenses (SG&A), and profit." *Id.*

In the instant case, Commerce found that all of the Malaysian financial statements were distorted and unreliable because they were not sufficiently detailed with respect to manufacturing overhead and energy costs. Final IDM at 37. As a result, consistent with the authorities discussed above, Commerce found it was not "preferable to resort to the Malaysian statements merely because there are more statements from Malaysian companies than there are from Romanian ones." *Id.*

> 7. **Ancientree argues that Commerce acted arbitrarily and capriciously by not explaining why it altered its financial ratio calculation methodology from previous administrative decisions. Pl.'s Br. at 27–28. What reason, if any, did Commerce provide for changing its surrogate financial ratio calculation using Sigstrat's financial statements?**

<u>Response</u>: The record of the underlying investigation contained a single alternate calculation methodology from the 2016-2017 administrative review of *Multilayered Wood Flooring from China*. *See* Ancientree Preliminary SV Rebuttal (Aug. 19, 2019) at Exhibit 2 (P.D. 1007). There is no information from prior cases showing how Commerce calculated financial ratios using Sigstrat's financial statements. Also absent is any information as to the reasoning for the methodology performed in *Multilayered Wood Flooring from China*. More problematic though, is the fact that Sigstrat's 2017 financial statement – which was used in the wood flooring review – is absent from the record of this proceeding. *See id.* It is thus impossible to know why certain categories of expenses would have been calculated as they were in *Multilayered Wood Flooring from China*. Thus, without this information, it would have been inappropriate for Commerce to assume that the methodology applicable in a prior proceeding regarding a different antidumping duty order was relevant or applicable to the underlying investigation in this case.

    a. **Please explain how the calculation worksheet implicitly addresses the differences between those past decisions and the administrative review in question such that Commerce's altered methodology was reasonably discernible. See Def.'s Br. at 21 ("While Commerce did not respond directly to Ancientree's claims, it explained its calculation of financial ratios using Sigstrat's financial statements in the detailed calculation worksheet.").**

**Response**: Commerce's calculation of financial ratios involves taking the relevant line items from the surrogate financial statement and using them to calculate the relevant ratios. In the calculation worksheet, Commerce carefully isolated the manufacturing overhead, SG&A expenses, and profit from Sigstrat's financial statements in a detailed spreadsheet and divided these amounts by the appropriate denominators to derive the surrogate financial ratios. *See* Commerce Final SV Memo (Feb. 28, 2012) at Exhibit 12 (P.D. 1571). Furthermore, as the Federal Circuit has explained, "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Qingdao Sea–Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014).

    b. **What, if any, relevance does any difference between Ancientree's suggested financial ratio calculation and the Multilayered Wood Flooring calculation have on the court's determination that Commerce arbitrarily changed its methodology? See Def.-Inter.'s Br. at 30–31.**

**Response**: The difference between Ancientree's suggested financial ratio calculation and the *Multilayered Wood Flooring* calculation shows that—although it has insisted that Commerce must adhere precisely to the *Multilayered Wood Flooring* calculation—not even Ancientree was able to accomplish this task. This difference thus underscores the fact that Commerce's calculation must be based on the particular financial statements that are on the record, not on different financial statements from a prior period in a separate antidumping proceeding. In the underlying investigation, Ancientree failed to submit the particular financial statements that were used in *Multilayered Wood Flooring*. Without these financial statement on the record, there was

no way for Commerce to meaningfully assess if it was possible to precisely match the *Multilayered Wood Flooring* calculation or whether Ancientree's alternative calculation was accurate or reasonable. Ancientree cannot establish that Commerce arbitrarily changed its methodology if it cannot even demonstrate what that alleged prior methodology was.

> **8. Why must a respondent provide financial statements that Commerce previously used in other determinations? Wouldn't this information already be in Commerce's possession?** <u>See</u> Def.'s Br. at 20; Def.-Inter.'s Br. 29.

**Response**: Commerce has been involved in countless antidumping proceedings, each with its own separate evidentiary record. Commerce may technically be in "possession" of all the information in all of these proceedings. However, if the Court were to hold that Commerce must consider and address all of the information in its possession from each and every proceeding, it would wreak havoc on the process for building an administrative record as well as the very notion that there is a distinct record that forms the basis of Commerce's determinations and the Court's judicial review of those determinations.

The Court has also repeatedly held that "the burden of creating an adequate record, including surrogate value information, lies with the interested parties." *Diamond Sawblades Manufacturers' Coal. v. United States*, 301 F. Supp. 3d 1326, 1340 (Ct. Int'l Trade 2018). *See also Ta Chen Stainless Steel Pipe Ltd. v. United States*, No. 97–08–01344, 1999 WL 1001194, *13 (CIT Oct. 28, 1999) ("Commerce grounds its argument on the truism that the respondent has the burden of creating an accurate record."); *Chinsung Indus. Co., Ltd. v. United States*, 13 CIT 103, 106, 705 F. Supp. 598, 601 (1989) ("{I}f plaintiffs' argument were to prevail the result would be to ... shift the burden of creating an adequate record from respondents to Commerce.").

This Court has also recognized that "{r}eview of agency determinations in antidumping proceedings is to be undertaken upon the basis of the record made before the agency." *Sanyo*

*Elec. Co. v. United States*, 23 CIT 355, 359 (1999) (citation and quotation omitted). A corollary to this principle is that Commerce is not required to consider as part of its determinations evidence that is on the record of other antidumping proceedings. *See id.* In *Sanyo Elec.*, for example, the Court denied a respondent's argument that Commerce should have considered evidence from a prior review of the same order when determining whether its sales were made at arms' length. The Court recognized that "it is well established that {t}he record for judicial review should ordinarily not contain material from separate investigations, … including records of separate administrative reviews arising out of the same antidumping duty order, as is the case here." *Id.* (internal quotation and citation omitted). *See also Floral Trade Council of Davis, Cal. v. United States*, 13 CIT 242, 242–43 (1989) ("The court wholeheartedly recognizes the law from earlier cases indicating that documents obtained for other investigations do not automatically become part of the record of related investigations.").

9. **Ancientree cites multiple instances in the record where it explained that its sawnwood imports are not planed or end-jointed. See Pl.'s Br. at 6–7 (collecting citations). Why do these citations fail to demonstrate that a narrower HTS classification should have been applied?**

**Response**: In its moving brief, Ancientree cites its surrogate value submissions and comments as "evidence" that its sawnwood inputs were not planed or end-jointed. Ancientree Br. at 6-7. However, the time to provide factual information regarding the type and specification of FOPs that a respondent consumes is in its initial and supplemental questionnaire responses. *See* Commerce Antidumping Questionnaire (Apr. 25, 2019) (P.D. 842). Under Commerce's regulations and practice, surrogate value submissions are an opportunity to submit factual information "to *value* factors of production" – not factual information specifying and describing the factors of production. 19 C.F.R. § 351.301(c)(3) (emphasis added). Surrogate value submissions are not due until 30 days before the preliminary determination, after the record

15

regarding the type of FOPs consumed has been developed with the respondent's initial and supplemental questionnaire responses. *Id.* This process allows all parties to have an understanding of the type of FOPs consumed before having to submit factual information to value those FOPs.

A respondent cannot be permitted to describe its FOPs in vague generalities in its questionnaire responses and then wait until it submits surrogate value information to provide new factual information regarding the specific types of FOPs it consumes. Allowing respondents to operate in this manner would subvert Commerce's process for developing the record and deprive other parties of the ability to submit appropriate surrogate value information that is specific to respondents' FOPs. Consider the situation if citrus fruit were one of the inputs consumed by a respondent to produce subject merchandise. If the respondent wanted to game the system to ensure that it alone submitted the most specific surrogate value information, it could report in its initial and supplemental questionnaire responses that it consumed "citrus fruit." When it was time to submit surrogate value information, not knowing whether the respondent consumed multiple types of citrus fruit or one specific type of citrus fruit, the petitioner would submit import statistics under an HTS code for a broad basket category of citrus fruit. The respondent cannot at that time be permitted to submit import statistics that are specific to grapefruits and claim for the first time that its consumption of citrus fruit was limited specifically to grapefruits but not oranges, mandarins, lemons, or limes. This would deprive the petitioner and Commerce from exploring the veracity of this claim through the issuance of supplemental questionnaires. It would also deprive the petitioner of an opportunity to submit surrogate value information specific to grapefruit as opposed to information that covers citrus fruit more broadly.

> **10. Ancientree argues that there is record support for using more specific HTS classifications for the MDF, paint, and particleboard FOPs. See Pl.'s Br. at 23–**

**26. Why do these record citations fail to prove that a more specific HTS classification should be used?**

**Response**: Similar to the situation with its sawnwood inputs, Ancientree's citations consist of its surrogate value submissions, surrogate value rebuttal submissions, and comments to Commerce that were filed at a later stage in the proceeding. *See* Pl.'s Br. at 23–26. These citations do not consist of record evidence regarding the type of MDF, paint, and particleboard that Ancientree consumed. They consist only of legal arguments advanced by Ancientree regarding why more specific HTS classifications should be used, and they fail to prove that such more specific HTS should be used in fact.

**a. What standard does Commerce apply in determining whether an FOP should be classified under a more specific HTS classification?**

**Response**: Commerce will generally apply the most specific HTS classification possible to a respondent's reported input. *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 968 F. Supp. 2d 1255, 1268 (Ct. Int'l Trade 2014). However, where a respondent describes its inputs in general terms and fails to provide evidence that allows Commerce to justify using a more specific HTS classification, Commerce will use a broader HTS classification. *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d 1256, 1273 (Ct. Int'l Trade 2017). In *An Giang Fisheries*, for example, the respondent stated that it used "antibiotics" as an input in its questionnaire responses. Commerce valued this input using Indonesian import data under a 6-digit HTS code for antibiotics (not otherwise specified). The respondent argued that Commerce should have used a more specific HTS code for antibiotics in "measured doses," as its antibiotics were purportedly purchased in measured doses. The Court upheld Commerce's decision to use the more general category, because the respondent pointed to no record evidence indicating that it purchased its antibiotics in "measured doses" and did not cite any record

17

evidence undermining the reasonableness of Commerce's conclusion that the six-digit HTS code used by the agency was specific to the "antibiotics" described in the respondent's questionnaire response.

> **b. Why weren't Ancientree's suggested HTS classifications sufficient to demonstrate the classification of their FOPs?** <u>See, e.g.</u>, Ancientree Preliminary Surrogate Value Submission at Ex. SV-1, Aug. 7, 2019, P.R. 952–53. **What authority supports that this information cannot be provided in at the surrogate value comments stage?** <u>See</u> Def.-Inter.'s Br. at 14.

**<u>Response</u>**: When Commerce instructs a respondent to describe its FOPs in its initial antidumping questionnaire, the agency is giving the respondent an opportunity describe its FOPs in as much detail as possible and to submit any factual information that supports this description in its initial questionnaire response. If Commerce has additional questions regarding those FOPs and issues a supplemental questionnaire, the respondent may have another opportunity to provide additional evidence regarding its FOPs. However, the respondent is not allowed to supplement the record unilaterally at any point in the proceeding with new factual information regarding the nature of its FOPs. The Court has repeatedly upheld Commerce's rejection of this type of unsolicited new factual information. *See, e.g., Coal. for Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 23 CIT 88, 99 (1999) ("Because the administrative record reflects that Plaintiff's unsolicited factual information was submitted outside the time limit provided in {Commerce's regulations}, Commerce's decision was in accordance with law.")

Significantly, this same principle applies to petitioners that attempt to submit new factual information regarding a respondent's inputs outside of the regulatory timeframe for doing so. In *CS Wind Vietnam Co. v. United States*, for example, the petitioner belatedly attempted to submit new factual information on the record to show that a respondent had misrepresented the specific type of steel it consumed and that, as a result, Commerce should have used a different HTS code

to value the steel input in question. 219 F. Supp. 3d 1273, 1285 (Ct. Int'l Trade 2017), *aff'd*, 721 F. App'x 993 (Fed. Cir. 2018). Commerce rejected this untimely submitted factual information, and the Court upheld Commerce's decision as a reasonable exercise of its discretion. *Id.*

**11. What cases and authorities best support your argument?**

<u>Response</u>: Commerce's regulations set forth an orderly process for submitting factual information in response to the antidumping questionnaire, which in an NME proceeding includes information regarding the specific types of FOPs that a respondent consumes. 19 C.F.R. § 351.301(c). *See also* Commerce Antidumping Questionnaire (Apr. 25, 2019) (P.D. 842). If other parties have information to rebut, clarify or correct information that a respondent has reported regarding its specific FOPS, Commerce's regulations provide a specific timeframe to submit this rebuttal factual information. 19 C.F.R. § 351.301(c)(1)(v). These deadlines are separate from the timeframe for parties to submit "factual information to value factors of production." *Id.* § 351.301(c)(3). Finally, if a party attempts to submit untimely or unsolicited factual information, Commerce will reject this information and remove it from the record. *Id.* § 351.302.

Thus, when Ancientree claimed in its surrogate value submissions and its subsequent surrogate value comments that its sawnwood inputs are not planed or end-jointed and should be valued with a specific HTS code, these claims could only be construed as legal argument based on the record that had already been developed. If the claims were actually construed as new factual information regarding Ancientree's sawnwood inputs, they would have to be rejected from the record as untimely and unsolicited new factual information that should have been submitted in Ancientree's initial and supplemental questionnaire responses.

The Court's decision in *Dorbest Ltd. v. United States* recognized that a respondent's proposal of various HTS codes to value its styrofoam input did not constitute evidence that its

Case 1:20-cv-00114-GSK   Document 45   Filed 04/08/21   Page 20 of 20

PUBLIC VERSION

input actually matched the specific description of the merchandise covered by those codes. 30 CIT 1671, 1728 (2006). In *Dorbest*, the respondent described its styrofoam input in its questionnaire response merely as "styrofoam." It also proposed various HTS codes to value this input that were very specific in their description, including "Polyethylene having a specific gravity of less than 0.94" and "Polystyrene: Expansible polystyrene." Commerce rejected the respondent's proposed HTS classifications of its inputs because it had not provided Commerce with evidence as to why these HTS codes were more appropriate than a broader "basket provision subheading" to value the styrofoam input. On appeal, the Court upheld Commerce's decision. It explained "respondents did not provide an abundance of detail in their descriptions" of the styrofoam input. *Id.* As such, Commerce appropriately credited the respondent's descriptions of the nature of their products as much as possible when it used a "basket provision" to value the inputs, because the respondent had not provided any evidence that demonstrated the nature of its styrofoam to be other than what it had originally described. *Id.*

**12. Are there any recent or pending Federal Circuit or CIT cases that may change the analysis?**

**Response**: Petitioner is not currently aware of any recent or pending Federal Circuit or CIT cases that may change the analysis.

Respectfully submitted,

*/s/ Luke A. Meisner*
Luke A. Meisner, Esq.

SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite 500
Washington, DC 20001
(202) 223-1700

Dated: April 8, 2021                              *Counsel for the American Kitchen Cabinet Alliance*