# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| THE ANCIENTREE CABINET CO., LTD., | ) |
| *Plaintiff*, | ) |
| CABINETS TO GO, LLC, | ) |
| *Plaintiff-Intervenor*, | ) |
| v. | ) Court No. 20-00114 |
| UNITED STATES, | ) |
| *Defendant*, | ) |
| and | ) |
| AMERICAN KITCHEN CABINET ALLIANCE, | ) |
| *Defendant-Intervenors*. | ) |

## DEFENDANT'S RESPONSE TO
## THE COURT'S QUESTIONS FOR ORAL ARGUMENT

Defendant, the United States, respectfully submits these responses to the Court's Corrected Questions for Oral Argument, ECF No. 41, in advance of oral argument scheduled for April 14, 2021.

**1. How has Commerce determined whether a quantity of imports was commercially significant in other investigations in which there was limited data regarding import quantities on the record? Did Commerce perform a similar analysis here?**

In determining whether a quantity of imports was commercially significant, in other investigations where there was limited data regarding import quantities on the record, Commerce's practice is to compare the surrogate values in question to the Global Trade Atlas (GTA) average unit values calculated for the same period in other potential surrogate countries,

1

to the extent that such data are available. Commerce also examines data from the same Harmonized Tariff Scheduled (HTS) category for the surrogate country over multiple years to assess whether the data are aberrational in an historical context. *See Trust Chem. Co. v. United States*, 791 F. Supp.2d 1257 (Ct. Int'l Trade 2011).

In other cases, where parties placed relevant historical data on the record, Commerce has performed a similar analysis. *See Administrative Review 2005-2006 of the Antidumping Duty Order on Saccharin from the People's Republic of China*, 72 Fed. Reg. 51,800 (Dep't of Commerce Sept. 11, 2007) and IDM at Comment 1. But, in cases where parties have not placed additional import data on the record, Commerce has relied on import value data to determine if the price for those imports is aberrational. This import value data lets Commerce evaluate when the import volume is not a commercial quantity such that it would be distortive and aberrational. *See Final Determination of Sales at less Than Fair Value for the Antidumping Duty Investigation of Certain Color Television Receivers from the People's Republic of China*, 69 Fed. Reg. 20,594 (Dep't of Commerce April 16, 2004), and IDM at Comment 9 and Comment 11 (*aff'd*, *Sichuan Changhong Electric Co., Ltd. v. United States*, 460 F.Supp.2d 1338 (Ct. Int'l Trade 2006)). In other cases where parties argue that data are not commercial quantities compared with respondent's own sales, Commerce determined that comparing respondent's own sales to that of the import value data did not prove that the import value data were insignificant commercial quantities. *See Lightweight Thermal Paper from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 57,329 (Dep't of Commerce Oct. 2, 2008), and IDM at Comment 7.

Here, no party submitted any data for any of the remaining countries on the surrogate value list—Brazil, Kazakhstan, Mexico, and Russia—that would allow Commerce to calculate

GTA average unit values and compare to Romanian and Malaysian surrogate values. IDM at 38. Nor did the parties submit any data for any of the potential surrogate countries for any period outside of the period of investigation. *Id*. Because "the burden of creating an adequate record lies with {interested parties} and not with Commerce," *QVD Food Co., Ltd v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011), Ancientree cannot now complain that Commerce did not conduct such an evaluation.

Based on available evidence, Commerce was unable to determine whether the Malaysian GTA average unit value was within a range of the average unit values from the other countries, or whether it was instead an outlier relative to those average unit values. IDM at 38. In addition, absent any historic context for the GTA average unit value from Romania, or from other countries, Commerce could not conduct a comparative analysis of the Romanian data during the period of investigation to evaluate its reliability. IDM at 38. Therefore, Commerce determined that "a comparison between two data points, Malaysia and Romania import values, only during the {period of investigation}, without any historical context, does not allow us to conclude that the import values associated with the import quantities for Romania are aberrational values or otherwise unusable." IDM at 38.

2. **Why can't Commerce use two countries to determine whether a quantity of imports is commercially significant? Hasn't it done so before?** *See Shanghai Foreign Trade*, 318 F. Supp. 2d at 1352–53.

As Commerce explained in the underlying decision, this comparison of two values is of little probative value. IDM at 31. Specifically, Ancientree did not identify a basis upon which Commerce could evaluate whether the Romanian import volume was insignificant or not a commercial quantity such that it would be distortive and aberrational. *See* Def. Br. at 22; 25. Instead, Ancientree compared the Romanian input values to the Malaysian input values to assert that the Romanian input data reflect non-commercial quantities. Ancientree's argument simply

3

assumes that, because Malaysian GTA data for wood inputs is based on a larger quantity than the Romanian GTA data, the Romanian data is "uncommercial," and, thus, unrepresentative or distortive, and thus aberrational. However, Commerce does not use quantity *per se* to determine whether a particular import quantity results in an aberrational import value. *See, e.g.*, *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, Slip Op. 2013-30, 2013 Ct. Intl. Trade LEXIS 34, *19 (Ct. Int'l Trade 2017) (recognizing "the proposition that a small import volume *may indicate* that the data relied upon is aberrational is not the same as the proposition that a small import volume *makes* the data aberrational") (emphasis in original).

Additionally, *Shanghai Foreign Trade Enterprises Co. v. United States*, 318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) presented different facts that warranted a different outcome. In that case, the Court held that the Indian import statistics were based on a commercially insignificant quantity of pig iron, and importantly, that evidence on the record demonstrated the price obtained from those statistics was aberrational. *See Shanghai Foreign Trade Enters. Co. v. United States*, 28 Ct. Int'l Trade 480, 495, 318 F. Supp. 2d 1339, 1352 (Ct. Int'l Trade 2004). There, the plaintiff submitted import statistics from the prior period and other data relevant to whether the import quantities from the review period were commercially significant. Plaintiff in that case also submitted information regarding market prices from other sources relevant to whether the import values were aberrational. In contrast, here, Ancientree has not argued, and has not identified any information, showing that the Romanian data are in any way aberrational such that using them would be inappropriate or an abuse of discretion. Ancientree only argues that the quantity is a small relative to the Malaysia data.

### a. Is there a certain difference in magnitude needed to warrant the commercial significance analysis? Is it only reserved for exceptionally low amounts and, if so, is this one such amount?

Commerce "{does} not ha{ve} a longstanding practice of omitting import values merely because they were the product of a small quantity of imported goods." *Sichuan Changhong Electric Co. v. United States*, 460 F. Supp. 2d 1338, 1356 (Ct. Int'l Trade 2006). Instead, Commerce has previously found that even small import quantities are not inherently distortive, but instead must be demonstrated to be too small to be a viable surrogate source. *See Trust Chem. Co.*, 791 F. Supp. 2d at 1263-64 (finding that low value did not render data aberrational where importer failed to introduce evidence showing that chosen data were not representative of commercial activity but rather represented only small fraction of surrogate country's domestic consumption). Import volumes may be small and nevertheless be of a commercial quantity such that it is reasonable for Commerce to use the data as surrogate data. *E.g., Glycine from China*, 77 Fed. Reg. 64,100 (Dep't of Commerce Oct. 18, 2012) (final results), and accompanying IDM at Comment 4 (determining that 604 metric tons of steam coal is a commercial quantity even though it is the lowest volume imported among all potential surrogate countries).

Here, Commerce relied on the average wood densities of birch and poplar reported, as inputs by Ancientree. The Romanian GTA quantities at the HTS six-digit level for birch and poplar were equal to 173,530 kg and 137,700 kg. Ancientree argues that these quantities are too small and thus must be distortive. However, Ancientree did not attempt to demonstrate or explain *why* the values were too small to be a viable surrogate source, nor did Ancientree offer any standard or record evidence demonstrating that this quantity was too insignificant to serve as a surrogate value. Accordingly, Commerce determined that these quantities were not "insignificant" volumes. IDM at 39.

5

3. **Assuming Commerce has an affirmative obligation to determine that the import value it uses for raw material inputs is based on a commercial quantity, where on the record did Commerce provide that explanation?**

Commerce addressed the Romanian import value commercial quantities in the Issues and Decision Memorandum at pages 37-39, as well as in the Preliminary Decision Memorandum at page 13.

   a. **What authorities best support the proposition that Commerce need not always determine whether import values are of a commercially significant quantity?** *See* **Def.'s Br. at 22–24; Def.-Inter.'s Br. 14–20.**

**Authorities:**

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*, SLIP OP. 2013-30, 2013 Ct. Intl. Trade LEXIS 34, *19 (Ct. Int'l Trade 2017);

*Baoding Mantong Fine Chemistry Co. v. United States*, 222 F. Supp. 3d 1231, 1248 (Ct. Int'l Trade 2017) (finding unpersuasive argument that data was of a commercially insignificant quantity where Commerce reasonably gave weight to fact that plaintiff's proposed data were from a country not economically comparable to the originating country);

*Trust Chem. Co. v. United States*, 791 F. Supp.2d 1257 (Ct. Int'l Trade 2011);

*Sichuan Changhong Electric Co. v. United States*, 460 F. Supp. 2d 1338, 1356 (Ct. Int'l Trade 2006) ("Commerce {does} not ha{ve} a longstanding practice of omitting import values merely because they were the product of a small quantity of imported goods.").

4. **Is there a difference between the aberrancy analysis and the commercial significance analysis? Does Commerce have to first determine that a small quantity is commercially significant prior to determining an effect on the AUV?**

Yes, the two analyses are different and Commerce does not need to first determine that a small quantity is commercially significant prior to determining an effect on the AUV. Commerce finds a difference between the argument that an AUV is aberrational as supported by information that allows Commerce to evaluate the claim, and the argument that an AUV is not commercially significant. Commercial significance is a factor that Commerce may evaluate in determining whether to use an AUV. However, here, Ancientree argues that the Romanian data

6

are aberrant as a result of being based on small quantities. However, Commerce does not use quantity *per se* to determine whether a small import quantity results in an aberrational import value. *Xinjiamei Furniture (Zhangzhou) Co.*, 2013 Ct. Intl. Trade LEXIS 34, *19. As Commerce explained, "Ancientree has not argued, nor has it provided any reason for Commerce to believe, that the values associated with those quantities are in any way unrepresentative of the prices Ancientree itself would pay were it located in a market economy country at a comparable level of economic development to China." IDM at 43.

**5. What standard did Commerce use for determining that the Lii Hen and Poh Huat products were not identical to the subject merchandise?**

Generally, Commerce conducts a case-by-case evaluation to determine whether merchandise is identical. *See, e.g.*, *RHP Bearings Ltd., NSK v. United States*, 83 F. Supp. 2d 1322 (Ct. Int'l Trade 1999); *AK Steel Corp. v. United States*, No. 970-152, 96-05-01312, 1997 WL 728284,*11-13 (Ct. Int'l Trade Nov. 14, 1997). To make this evaluation, Commerce examines record evidence, taking into account the specific physical characteristics of the merchandise, how the merchandise is produced, and the relevant market. Commerce's "broad discretion" to determine what is the best available information encompasses the determination of whether merchandise is not identical. *See Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1365 (Fed. Cir. 2019) (affirming Commerce's selection of surrogate financial information).

Here, Commerce examined the record evidence regarding the physical characteristics of the products sold by both Lii Hen and Poh Hua to determine whether the companies sold products that were identical to the subject merchandise. *See* IDM at 32. Lii Hen's website contains images of items such as bed frames, nightstands, dressers, and television stands, but does not contain images of subject merchandise such as wooden cabinets and vanities for

7

permanent installation. *See* Ancientree Pre-Prelim. SV Comments at Exhibit 3, P.R. 1328. Similarly, Poh Huat's website contains images of wooden bedroom furniture and standalone tables and television stands that appear to contain as much metal as they do wood components, but does not contain images of in-scope merchandise. *See id.* at Exhibit 4. Accordingly, the companies' websites do not support Ancientree's allegation, and most importantly, none of the Malaysian financial statements identified financial data for production or sales of in-scope wooden cabinets and vanities. *See* Def. Br. at 15-16.

6. **Ancientree argues that Commerce prefers using primary surrogate countries which source multiple financial statements. Pl.'s Br. at 18–19. Can this preference be overridden if the primary surrogate country only sources one financial statement of higher quality? What authorities support your answer?**

Yes. We acknowledge that Commerce has a preference to rely on multiple financial statements to determine the surrogate financial ratios in non-market economy cases. Nonetheless, the overarching statutory objective in valuing factors of production (FOPs) is to use "the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." IDM at 37 (citing 19 U.S.C. § 1677b(c)(4)). Despite the general preference to rely on more than one financial statement, Commerce has relied on only one financial statement when it determines that the one financial statement allows for a more accurate calculation of the surrogate financial ratios than other financial statements on the record. *See, e.g., Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From the People's Republic of China: Affirmative Final Determination of Sales at Less than Fair Value*, 83 Fed. Reg. 16,322 (Dep't of Commerce April 16, 2018) and Issues and Decision Memorandum at Comment 6 (Commerce relied on one Romanian financial statement, instead of two Thai financial statements because the Romanian financial statement was more detailed, allowing Commerce to calculate a more accurate surrogate financial ratio);

*Pure Magnesium from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 76,336 (Dep't of Commerce) and Issues and Decision Memorandum at Comment 6 (Commerce relied on one financial statement as the best available information on the record because of issues and errors that called into question the reliability of the other eleven financial statements); *1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 74 Fed. Red. 10,545 (Dep't of Commerce March 11, 2009), and Issues and Decision Memorandum at Comment 1 (Commerce relied on one of the three financial statements to calculate the surrogate financial ratio because of evidence of countervailable subsidies in the other two financial statements). Additionally, Commerce has been upheld when it relies on only one financial statement where it finds errors that call into question the remaining financial statement's overall quality and reliability. *See Qingdao Sea-Line Trading Co., Ltd. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014). Moreover, an agency may always depart from a practice if it provides a reasonable explanation for doing so. *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 918 (Fed. Cir. 2019). Here, Commerce provided that explanation. Specifically, Commerce explained that "{t}he record here contains a set of financial statements that are contemporaneous, profitable, from a producer of comparable merchandise that identify the relative sales by product, and that do not suffer the same deficiencies regarding manufacturing overhead, and also break out energy. Accordingly, this set of statements is superior to those from the Malaysian companies. Thus, we do not find it preferable to resort to the Malaysian statements merely because there are more statements from Malaysian companies than there are from Romanian ones. Instead, based on the foregoing, we find that Sigstrat's financial statements represent the

best available information by which to value financial ratios in this investigation, in accordance with section 773(c)(1) of the Act." IDM at 37.

7. **Ancientree argues that Commerce acted arbitrarily and capriciously by not explaining why it altered its financial ratio calculation methodology from previous administrative decisions. Pl.'s Br. at 27–28. What reason, if any, did Commerce provide for changing its surrogate financial ratio calculation using Sigstrat's financial statements?**

Commerce explained that it changed its surrogate financial ratio calculation because Commerce found the Sigstrat financial statements to "represent the financial position of a profitable Romanian producer of comparable wooden products (i.e., plywood, chairs, tables) that explicitly identify energy costs, are contemporaneous and cover the entire POI, and contain no evidence of countervailable subsidies." IDM at 44-46. Nevertheless, regardless of whether Commerce's calculation differed from its previous methods in a different proceeding and on a different record, Commerce's calculation was reasonable because it was based on an examination of all information on the record, as well as the arguments advanced by the parties.

   a. **Please explain how the calculation worksheet implicitly addresses the differences between those past decisions and the administrative review in question such that Commerce's altered methodology was reasonably discernible.** *See* **Def.'s Br. at 21 ("While Commerce did not respond directly to Ancientree's claims, it explained its calculation of financial ratios using Sigstrat's financial statements in the detailed calculation worksheet.").**

Commerce thoroughly reviewed the record information and made a well-reasoned calculation. Ancientree's argument that the Court should order that Commerce use a different calculation methodology is nothing more than mere disagreement with Commerce's exercise of discretion. In any event, "{Commerce'}s explanations do not have to be perfect"' the law requires only that "the path of {Commerce's} decision must be reasonably discernable." *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319-20 (Fed. Cir. 2009) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). While Commerce did not respond directly to Ancientree's claims, it explained its calculation of financial ratios using

10

Sigstrat's financial statements in the detailed calculation worksheet as well as in the final calculation memorandum. *See* Commerce Prelim SV Memo (Oct. 2, 2019) (P.R. 1411); *see also* Commerce Final Determination Analysis Memorandum for Ancientree (Feb. 21, 2020) (C.R. 1569) (explaining the changes from the preliminary calculation); *see also* Commerce Final SV Memo (Feb. 28, 2012) at Exhibit 12 (P.R. 1560, 1571). These documents demonstrate that Commerce thoroughly considered the record evidence of this investigation to arrive at its calculation.

> **b. What, if any, relevance does any difference between Ancientree's suggested financial ratio calculation and the Multilayered Wood Flooring calculation have on the court's determination that Commerce arbitrarily changed its methodology?** *See* **Def.-Inter.'s Br. at 30–31.**

Because the Court's question concerns an argument raised by Defendant-Intervenor, Defendant-Intervenor is best positioned to answer.

**8. Why must a respondent provide financial statements that Commerce previously used in other determinations? Wouldn't this information already be in Commerce's possession?** *See* **Def.'s Br. at 20; Def.-Inter.'s Br. 29.**

It is well-established that "the burden of creating an adequate record lies with {interested parties} and not with Commerce." *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (internal citation and quotations omitted). *Nan Ya Plastics Corp., Ltd. v. U.S.*, 810 F.3d 1333, 1337-8 (Fed. Circ. 2016) (*citing QVD Food Co.*, 658 F.3d at 1324; *Tianjin Mach. Imp. & Exp. Corp. v. United States,* 806 F. Supp. 1008, 1015 (Ct. Int'l Trade 1992); and *NTN Bearing Corp. of Am. v. United States,* 997 F.2d 1453, 1458-59 (Fed. Cir. 1993)). The placement of the burden on interested parties stems from the fact that Commerce has no subpoena power.[1] *See Nan Ya Plastics Corp.*, 810 F.3d at 1338.

---

[1] Commerce may, however, request information through its questionnaires and supplemental questionnaires, and that information is included in the administrative record.

19 U.S.C. § 1516a(b)(2)(A)(i) limits this Court's review to the evidentiary record, which includes "a copy of all information presented to or obtained by the Secretary, the administering authority, or the Commission during the course of the administrative proceeding." The requirements for the official record are set forth in 19 C.F.R. § 351.104(a) as follows:

> The Secretary will maintain an official record of each antidumping and countervailing duty proceeding. The Secretary will include in the official record all factual information, written argument, or other material developed by, presented to, or obtained by the Secretary during the course of a proceeding that pertains to the proceeding. The official record will include government memoranda pertaining to the proceeding, memoranda of ex parte meetings, determinations, notices published in the FEDERAL REGISTER, and transcripts of hearings. The official record will contain material that is public, business proprietary, privileged, and classified. For purposes of section 516A(b)(2) of the Act, the record is the official record of each segment of the proceeding.

Here, the burden is reasonably on the parties to identify and provide Commerce with all information the parties wanted Commerce to consider during the investigation. Each investigation and proceeding is separate from other proceedings, and each particular record reflects the information provided to Commerce during that proceeding. Simply because a document was provided to Commerce in another proceeding or segment of a proceeding, does not mean the document is on the record in this particular proceeding or that the parties wish to urge that it is the best available information for Commerce to use to calculate surrogate value information in *this* investigation.

9. **Ancientree cites multiple instances in the record where it explained that its sawnwood imports are not planed or end-jointed.** *See* **Pl.'s Br. at 6–7 (collecting citations). Why do these citations fail to demonstrate that a narrower HTS classification should have been applied?**

Ancientree cites its preliminary surrogate value comments and final comments, as well as its preliminary comments, as support that its sawnwood inputs are not planed and end-jointed. *See* Ancientree Prelim. SVs (August 7, 2019) at Exhibit SV-1; PD952-953; Ancientree Final SVs

(September 3, 2019) at Exhibit SV2-1; PD1328-1331; Ancientree Preliminary Comments (September 19, 2019) at 4; PD1371; *see also generally* Ancientree Fourth Supplemental (September 18, 2019) (production flowchart) at Exhibit SQ4-10; CD1365-1366, PD1367.

As Commerce explained, Ancientree first asserted that its sawnwood inputs were not planed and end-jointed was in its administrative case brief. IDM at 43-44. Commerce explained its reasoning in the IDM as follows:

> Ancientree cites to no record evidence to support this claim, nor does the record appear to describe Ancientree's wood inputs in any detail greater than 'birch sawnwood' or 'poplar sawnwood.' *See, e.g.*, Ancientree's September 18, 2019 Supplemental Questionnaire Response at Exhibit 12; and Ancientree July 19, 2019 DQR at Exhibits 3 (production flowchart) and 4 (FOP Spreadsheet). In any event, there is no requirement that Commerce needs to perfectly replicate a NME respondent's production experience. *See Juancheng Kangtai II*, 2017 Ct. Intl. Trade LEXIS 3, at 31 (citing *Nation Ford Chem. v. United States*, 166 F. 3d 1373, 1378 (Fed. Cir. 1999)). Given the lack of detail provided by Ancientree in its questionnaire responses regarding the physical characteristics of its wood inputs, the record lacks support for Ancientree's assertions and there is no basis for Commerce to rely on them here. The burden to develop the record lies with the respondent, and to accept Ancientree's claim as to the description of its wood input at face value without any support at this late stage would be inappropriate. *See, e.g.*, *QVD Food*, 658 F. 3d at 1324 ("{T}he burden of creating an adequate record lies with {interested parties} and not with Commerce.").

Accordingly, because Ancientree failed to place on the record any evidence to support its claims or to describe its wood inputs in more detail, Commerce reasonably determined that there was insufficient information to accept Ancientree's claims as to its wood inputs.

10. **Ancientree argues that there is record support for using more specific HTS classifications for the MDF, paint, and particleboard FOPs.** *See* **Pl.'s Br. at 23–26. Why do these record citations fail to prove that a more specific HTS classification should be used?**

Commerce examined the record and determined that the HTS proposed by Ancientree for its MDF, paint, and particleboard factors of production were not supported by the record because

13

Ancientree did not support its claim that its sawnwood inputs were "wood inputs are not planed or end-jointed." IDM at 43. Commerce also relied on the most specific HTS category to value Ancientree's MDF. Ancientree admitted that the MDF it consumes in the production of the subject merchandise is surface covered, Ancientree Admin. Case Br., P.R. 1523, at 12, and the company's product brochure indicates that for cabinets and vanities that include particleboard or MDF, the cabinets include a "matching laminate exterior." Letter from deKieffer & Horgan PLLC to Sec'y Commerce, re: *Wooden Cabinets and Vanities from the People's Republic of China: Section A Questionnaire Response* (July 3, 2019) at Exhibit A-5 ("Ancientree A IQR"). Therefore, Commerce reasonably determined that the HTS category that Ancientree suggested, which specifically excluded surface-covered MDF, was not the most appropriate HTS category to value Ancientree's surface-covered MDF input. Commerce reasonably selected HTS category 4411.14.90 to value Ancientree's MDF because this category covers MDF that is "surface-covered."

Finally, Commerce relied on data under HTS 3208.10.90, which covers paints and varnishes dispersed or dissolved in a non-aqueous medium, to value Ancientree's paint inputs. IDM at 56. Ancientree asserts that it used a water-based paint, and that Commerce should have valued its paint using HTS 3209.10, which covers paints and varnishes "dispersed or dissolved in an aqueous medium." *See* Ancientree Br. at 25; *see also* Ancientree Rebuttal Prelim SVs at Exhibit SVR-3 (providing the Romanian import value for 3209.10), P.R. 1007. Again, Ancientree did not identify record evidence that substantiates its claim.

At verification, Commerce compared the painting materials worksheet provided in Ancientree's response to Ancientree's accounting ledgers and corresponding vouchers for September 2018. *See* Ancientree Verification Report at 18 (P.R. 1502, C.R. 1530). Commerce

14

found no discrepancies between the information Ancientree reported in its responses and the source documentation Commerce reviewed at verification. During verification, Commerce did not observe any third-party source documentation or other documentation regarding the chemical composition for Ancientree's paint input such as an ingredient lists. IDM at 56.

Ancientree also contended that the purchase invoices Commerce verified indicated that Ancientree had purchased a water-based paint. Commerce determined that these documents, specifically the translated portions of these purchase invoices, did not indicate which proportion, if any, of Ancientree's paint is water-based. *See* Ancientree Verification Report at Exhibit 15, P.R. 1502, C.R. 1530. Therefore, Commerce determined that Ancientree did not substantiate its claim that it used water-based paint. Thus Commerce reasonably valued Ancientree's paint input using Romanian values under HTS 3208.10.90 covering paints and varnishes dispersed or dissolved in a non-aqueous medium.

### a. What standard does Commerce apply in determining whether an FOP should be classified under a more specific HTS classification?

Commerce considers whether the factors of production data are: (1) publicly available; (2) contemporaneous with the period; (3) a broad market average covering a range of prices; (4) specific to the input in question; and (5) tax exclusive. Policy Bulletin 04.1; *see also Jiaxing Bro Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016). In selecting the HTS classifications to value Ancientree's factors of production, Commerce relied on the most specific HTS categories based on available record evidence. As explained above, Commerce determined that the record did not support applying Ancientree's proposed HTS classifications.

### b. Why weren't Ancientree's suggested HTS classifications sufficient to demonstrate the classification of their FOPs? *See, e.g.*, Ancientree Preliminary Surrogate Value Submission at Ex. SV-1, Aug. 7, 2019, P.R.

15

> 952–53. What authority supports that this information cannot be provided in at the surrogate value comments stage? *See* **Def.-Inter.'s Br. at 14.**

Because the Court's question concerns an argument raised by Defendant-Intervenor, Defendant-Intervenor is best positioned to answer.

## 11. What cases and authorities best support your argument?

**Authorities:**

*Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006);

*QVD Food Co., Ltd v. United States*, 658 F.3d 1318 (Fed. Cir. 2011);

*Heze Huayi Chem. Co. v. United States*, No. 17-00032, 2018 Ct. Intl Trade LEXIS 60, at *15 (Ct. Int'l Trade May 22, 2018);

*Jinan Farmlady Trading Co. v. United States*, 228 F. Supp. 3d 1351 (Ct. Int'l Trade 2017);

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*, SLIP OP. 2013-30, 2013 Ct. Intl. Trade LEXIS 34, *19 (Ct. Int'l Trade 2017);

*Baoding Mantong Fine Chemistry Co. v. United States*, 222 F. Supp. 3d 1231, 1248 (Ct. Int'l Trade 2017);

*CS Wind Vietnam Co., Ltd. and CS Wind Corporation v. United States*, 971 F. Supp. 2d 1271 (Ct. Int'l Trade 2014);

*Trust Chem. Co. v. United States*, 791 F. Supp.2d 1257 (Ct. Int'l Trade 2011);

*Goldlink Indus. v. United States*, 431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006);

*Sichuan Changhong Electric Co. v. United States*, 460 F. Supp. 2d 1338, 1356 (Ct. Int'l Trade 2006).

## 12. Are there any recent or pending Federal Circuit or CIT cases that may change the analysis?

*Solarworld Americas Inc. v. United States*, 962 F.3d 1351, 1358-59 (Fed Cir 2020). In *SolarWorld*, the Court of Appeals for the Federal Circuit remanded for Commerce's further consideration and explanation of its evaluation of whether certain surrogate value data was aberrational and therefore not usable. The Federal Circuit suggested that "Commerce's

longstanding 'administrative practice with respect to aberrational data" is "to disregard small-quantity import data {from the primary surrogate country} when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other {potential surrogate} countries.'" *Id*. at 1358 (citing *Shakeproof Assembly Components Div. of Illinois Tool Works, Inc. v. United States*, 59 F. Supp. 2d 1354 (Ct Int'l Trade 1999) (internal quotation marks omitted)). We respectfully submit that this is an inaccurate and outdated description of Commerce's practice. Commerce no longer evaluates whether subsets of import data into a potential surrogate country are aberrational.

Respectfully Submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:
SAVANNAH ROSE MAXWELL
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

/s/ Ioana Cristei
IOANA CRISTEI
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-0001
Fax: (202) 305-2062
Email: Ioana.Cristei@usdoj.gov

April 8, 2021

*Attorneys for Defendant United States*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court in that it contains 5,020 words, including text, footnotes, and headings.

/s/ Ioana Cristei