UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Gary S. Katzmann, Judge**

| | |
|---|---|
| THE ANCIENTREE CABINET CO., LTD. | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Court No. 20-00114 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF'S POST-ARGUMENT SUBMISSION**

Pursuant to the Court's instructions, Plaintiff Ancientree hereby submits the following post-argument comments. *See* ECF 47.

Financials: Commerce frequently makes its surrogate country determination based on the relative quality and number of financial statements among competing surrogate countries. Any fair reading of the record must determine that Malaysia offers superior financial statements. The comparability of the production process of the surrogate financial company is Commerce's primary concern in selecting financial statements. This stems from the obvious fact that Commerce is using the company's statement as a surrogate cost for overhead, SG&A, and profit of a cabinet producer. The comparability of the overhead costs, equipment purchased, raw materials purchased, level of integration, etc. is the most critical component of calculating ratios that are most representative. *See* Ancientree R56.2 at 16; *see also Yantai Xinke Steel Structure Co. v. United States*, 2014 Ct. Intl. Trade LEXIS 39, *56-57 (Ct. Int'l Trade 2014) (Discussing surrogate financial ratios and finding "[p]roduction processes and the physical characteristics of the compared products are therefore the more important factors.").

1

Malaysia provides three financial statements from companies that produce wooden furniture, two of the companies even produce various types of cabinets. Defendant argues that the Malaysian companies do not produce identical merchandise because they produce stand-alone cabinets rather than cabinets for permanent installation that are subject to this order. This argument misses the fact that on the other side, i.e. in Romania, the single Romanian financial statement does not produce cabinets at all, of any nature. Sigstrat produces molded furniture and plywood. Molded products are not the same production process as cabinets or other types of wooden furniture. Plywood, as explained in the briefing and at Court, is a step removed upstream and is <u>not</u> a comparable product to cabinets.

Defendant-Intervenor suggested at oral argument that the Malaysian companies are engaged in some degree of dissimilar production. However, the record does not support this insinuation. Each of these companies describes its primary or sole business as the manufacture and sale of furniture. *See* Ancientree R56.2 at 14-16. The webpage materials from each company establish that all, or the overwhelmingly majority, of the furniture products produced are wooden furniture products. Lii Henn and Poh Huat's financial statements even list the main raw materials consumed by the companies, which further confirm how highly comparable these companies are to Ancientree. Lii Hen's "main raw materials used in the manufacturing of the furniture products are mainly wood that comprise of solid wood, particleboard, veneers, MDF, plywood, pine wood and oak wood" and other finishing/packing materials. *Id.* at 15. Poh Huat lists its main raw materials as "solid wood, MDF, particleboards, veneers, metal components, finishing materials and carton boxes" as its key materials. *Id*. at 15.

The record contains three financial statements from Malaysian companies primarily engaged in the production of comparable wooden furniture. The record contains only one

financial statement from a Romanian company primarily engaged in dissimilar production. The country that sources the best available information for the financial ratios is Malaysia.

Sawnwood Commercial Quantity: Defendant and Defendant-Intervenor wrongly claim that Ancientree provided no precedent for its argument that Commerce must support its conclusion that the quantity of imports was commercially significant. Ancientree provided precedent in its briefing, and specifically highlighted *Jacobi* in its answers to the Court's questions on this issue. As explained, *Jacobi* is a relatively recent case (2018) discussing a significant amount of other caselaw on this issue. While it is true that in some cases discussed the inquiry into commercial significance was followed with a discussion of aberrancy, that is not true of all cases. The Court in *Jacobi* specifically rejected the argument that the carbonized material import value into Thailand was aberrant; instead remanding to Commerce to specifically address whether the import quantity was commercially significant. The Court specifically addressed this as a separate inquiry independent from aberrancy—i.e., the carbonized material import value could be not aberrant but still an unreliable surrogate value because it was not based on a commercial quantity. Even some of the cases raised by Defendant separately addressed the commercial quantity issue without being coupled with a discussion of aberrancy. *See* e.g. *Sichuan Changhong* 460 F. Supp. 2d at 1348 ("In order to rely on the Infodriveindia statistics, on remand, Commerce must point to record evidence supporting its conclusion that the quantities shown in the Infodriveindia data represent commercial quantities, and explain why its conclusion is valid."). Commerce cannot avoid the necessary inquiry into whether the Romanian imports of sawnwood are a commercial quantity. And Commerce must support its decision with substantial evidence, "including whatever fairly detracts" from its decision or the "evidence opposed to [its]

view." Commerce cannot simply dismiss the metrics of commercial significance argued by Ancientree.

Further, not only should the Court direct Commerce to justify that it relied upon a surrogate value based upon a commercial quantity, but the Court should also order Commerce to reconsider whether it relied upon the best available information to value sawnwood in light of both the commercial quantity inquiry and the specificity of the Malaysian tariff schedule. At the very minimum, Commerce must consider that the Romanian import volumes are *less commercial* than Malaysia and the Romanian imports are *less specific* to the input than Malaysia; not better or best. Afterall, the goal of selecting a surrogate value is to rely upon a value that most closely approximates the price a cabinet manufacturer would pay if producing in a market economy— that inquiry includes the specificity to the input and the commercial nature of the price.

Sawnwood Specificity & Other Inputs: Defendant and Defendant-Intervenor also maintain that it was inappropriate for Ancientree to further describe its sawnwood inputs, or other inputs, in its surrogate value submissions. Defendant-Intervenor wrongly claims such an approach is out of the normal order of questionnaires and surrogate value deadlines. Rather, it is most common in antidumping proceedings that further details concerning the nature of inputs is discussed in surrogate value submissions or potentially later supplemental questionnaires. For example, in several reviews of *Crystalline Silicon Photovoltaic Cells from China*, Commerce has issued supplemental questionnaires on the nature of inputs when it was uncertain whether the HTS recommended by the respondent was correct. *See* <u>Attachment</u>. Commerce's lack of curiosity with respect to Ancientree's assertions reasonably infers the descriptions were accepted; but would also justify remand to elicit any needed clarification.

Ancientree initially described in its Section D questionnaire that it purchased birch sawnwood and poplar sawnwood. Then, in evaluating the potential applicable HTS, Ancientree further elaborated that the most specific HTS to its sawnwood input are the HTS covering sawnwood that is not planed or endjointed. This classification is also supported by Ancientree's production process which shows that Ancientree cut the sawnwood, and drilled, milled, and slotted the wood. Commerce also observed this at verification, fully aware from Ancientree's surrogate value submissions and preliminary comments that Ancientree maintained its sawnwood was not planed or endjointed. Commerce asked no further questions of Ancientree concerning this input and nothing on the record suggests that Ancientree purchased wood that was planed or endjointed. The Court should find Commerce was obligated to find Ancientree's sawnwood inputs were properly classified under the more specific Malaysian HTS. Likewise, for particleboard, paint, and MDF, Ancientree not only certified the accuracy of the more specific nature of these inputs in the surrogate value submissions, but the production process and other record documentation raised in the briefing support the classifications suggested by Ancientree.

Date: April 19, 2021

  /s/ Gregory S. Menegaz
Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman*
**deKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email: gmenegaz@dhlaw.com
*Counsel to Plaintiff*

*Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Order, the undersigned certifies that this response complies with the word limitations. Specifically, excluding those exempted portions of the comment, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this comment contains **1,246** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

# ATTACHMENT

Barcode:4060923-01 A-570-979 REV - Admin Review 12/1/18 - 11/30/19

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-979
Administrative Review
12/01/2018 - 11/30/2019
**Public Document**
ITA/E&C/Office IV: EB

December 2, 2020

Risen Energy Co. Ltd. (Risen Energy)
c/o Gregory S. Menegaz
deKieffer & Horgan, PLLC
1090 Vermont Avenue, NW, Suite 410
Washington, DC 20005

Dear Mr. Menegaz:

This letter concerns the antidumping duty (AD) administrative review of crystalline silicon photovoltaic solar cells from the People's Republic of China (China), covering the period December 1, 2018 through November 30, 2019, and your client, Risen Energy Co. Ltd. (Risen Energy) and its affiliates (collectively Risen). The Department of Commerce (Commerce) has reviewed Risen Energy's responses to Commerce's supplemental questionnaire and has identified certain areas that require additional information. *See* Attachment. The additional information requested in the attachment to this letter is due by the close of business on **December 9, 2020**.

Commerce must conduct this administrative review in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached supplemental questionnaire by the established deadline or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the supplemental questionnaire response. If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline. Statements included within a supplemental questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request. Any factual statements made in support of such reasons must be accompanied by the certifications required under section 351.303(g) of the regulations. An extension request submitted without a proper certification for any factual information contained therein will be considered improperly filed and, as with any other improperly filed document, will not be accepted. Any extension granted in response to your request will be in writing; otherwise the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding. Pursuant to 19 CFR 351.302(d), any information submitted

Filed By: Elizabeth Bremer, Filed Date: 12/3/20 10:13 AM, Submission Status: Approved

Barcode:4060923-01 A-570-979 REV - Admin Review 12/1/18 - 11/30/19

after this date will be untimely filed and may be rejected and removed from the record. In such case, we may rely on facts available, including adverse inferences, as required by section 776(a)(2)(B) of the Tariff Act of 1930, as amended (the Act), in making our determination. Furthermore, upon receipt of a response that is incomplete or deficient to the extent Commerce determines it to be non-responsive, Commerce may not issue additional supplemental questionnaires but may use facts available.

The information you submit may be subject to verification. Failure to allow verification of any item may affect the consideration that we will accord to that item or to any other material, whether or not we verify the latter. In all cases where we have requested a re-submission of data, you should ensure that we receive information in the same format that was requested in the original questionnaire.

If you have any questions on this matter, please contact Elizabeth Bremer at (202) 482-4987 or by e-mail at Elizabeth.Bremer@Trade.Gov.

Sincerely,

*{signature: Jeff Pedley for}*

Howard Smith
Program Manager
AD/CVD Operations, Office IV

Enclosure

Barcode:4060923-01 A-570-979 REV - Admin Review 12/1/18 - 11/30/19

<u>December 2, 2020 Supplemental Questionnaire</u>

Risen Energy Co. Ltd. (Risen Energy)

Please ensure that all documents submitted to the Department of Commerce (Commerce) are translated fully into English and ensure their legibility.  Risen Energy should repeat the question in full to which it is responding in its narrative submission and place its answer directly below it.  Risen Energy should also fully answer each question in this supplemental questionnaire.  Please ensure that Risen Energy provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.

Identifying Inputs

1. Diluent
    a. Does your diluent contain more than 25 percent by weight of one or more aromatic or modified aromatic substance?
2. Dye
    a. Does your plastic dye contain 80 percent or more by weight of titanium dioxide calculated on the dry matter?
3. Kraft Paper
    a. Is your kraft paper condenser paper or wrapping paper?
4. Tin Ribbon
    a. Is the thickness of the tin ribbon 5 mm or more?
5. Gas
    a. Regarding Exhibit D-2 FOB database of Cell and Exhibit D-2 FOP database of Module, for all inputs for gas, please describe each input and specify the type and form of the gas as purchased.
6. Regarding Exhibit D-2 FOB database of Cell and Exhibit D-2 FOP database of Module, please provide the full name and descriptions of the following inputs:
    a. A_RWALUM
    b. R_TDROSS
    c. R_RTDROSS
    d. CB_TDROSS
    e. R_RTWASTE
    f. R_RCWASTE

Filed By: Elizabeth Bremer, Filed Date: 12/3/20 10:13 AM, Submission Status: Approved

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-979
Administrative Review
12/01/2018 - 11/30/2019
**Public Document**
ITA/E&C/Office IV:  EB

February 5, 2021

Risen Energy Co. Ltd. (Risen Energy)
c/o Gregory S. Menegaz
deKieffer & Horgan, PLLC
1090 Vermont Avenue, NW, Suite 410
Washington, DC 20005

Dear Mr. Menegaz:

This letter concerns the antidumping duty (AD) administrative review of crystalline silicon photovoltaic solar cells from the People's Republic of China (China), covering the period December 1, 2018 through November 30, 2019, and your client, Risen Energy Co. Ltd. (Risen Energy) and its affiliates (collectively Risen).  The Department of Commerce (Commerce) has reviewed Risen Energy's responses to Commerce's supplemental questionnaire and has identified certain areas that require additional information.  *See* Attachment.  The additional information requested in the attachment to this letter is due by the close of business on **February 12, 2021.**

Commerce must conduct this administrative review in accordance with statutory and regulatory deadlines.  If you are unable to respond completely to every question in the attached supplemental questionnaire by the established deadline or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the supplemental questionnaire response.  If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline.  Statements included within a supplemental questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information and promises to supply such missing information when available in the future, do not substitute for a written extension request.  Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request.  Any factual statements made in support of such reasons must be accompanied by the certifications required under section 351.303(g) of the regulations.  An extension request submitted without a proper certification for any factual information contained therein will be considered improperly filed and, as with any other improperly filed document, will not be accepted.  Any extension granted in response to your request will be in writing; otherwise the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding.  Pursuant to 19 CFR 351.302(d), any information submitted

after this date will be untimely filed and may be rejected and removed from the record. In such case, we may rely on facts available, including adverse inferences, as required by section 776(a)(2)(B) of the Tariff Act of 1930, as amended (the Act), in making our determination. Furthermore, upon receipt of a response that is incomplete or deficient to the extent Commerce determines it to be non-responsive, Commerce may not issue additional supplemental questionnaires but may use facts available.

The information you submit may be subject to verification. Failure to allow verification of any item may affect the consideration that we will accord to that item or to any other material, whether or not we verify the latter. In all cases where we have requested a re-submission of data, you should ensure that we receive information in the same format that was requested in the original questionnaire.

If you have any questions on this matter, please contact Elizabeth Bremer at (202) 482-4987 or by e-mail at Elizabeth.Bremer@Trade.Gov.

Sincerely,

*for* Howard Smith
Program Manager
AD/CVD Operations, Office IV

Enclosure

Barcode:4086915-01 A-570-979 REV - Admin Review 12/1/18 - 11/30/19

Surrogate Value Supplemental Questionnaire

Risen Energy Co. Ltd. (Risen Energy)

Please ensure that all documents submitted to the Department of Commerce (Commerce) are translated fully into English and ensure their legibility. Risen Energy should repeat the question in full to which it is responding in its narrative submission and place its answer directly below it. Risen Energy should also fully answer each question in this supplemental questionnaire. Please ensure that Risen Energy provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.

Identifying Inputs

1. Aluminum Paste
    a. Is your aluminum paste an article of precious metal or an article clad with precious metals?
2. Ethyl Alcohol
    a. Is your ethyl alcohol a denatured ethyl alcohol, including methylated spirits?
    b. Is it denatured to the satisfaction of the Director General of Customs?
3. Glycol
    a. Is your glycol a polytetramethylene ether glycol?
4. Mixed Fluid
    a. Does your mixed fluid include methylated spirits?
5. Polyester Ribbon
    a. Is your polyester ribbon made of yarn, articles of yarn, strip or the like of heading 54.04 or 54.05, twine, cordage, rope or cables, not elsewhere specified or included?
    b. Is your polyester ribbon made of narrow woven fabric of manmade fibers?
    c. Is your polyester ribbon made of plastics?
    d. Is your polyester ribbon cellular or noncellular?
    e. Is your polyester ribbon rigid?
    f. What is the thickness of your polyester ribbon?
6. Round Copper Wire for Electrical Purpose
    a. Is your round copper wire for electrical purpose made of wire of copper-nickel base alloys (cupro-nickel) or copper-nickel-zinc base alloys (nickel-silver)?
7. Tin Bar
    a. Is your tin bar a soldering bar?
8. Xylene
    a. Is your xylene a xylol (xylene) or a mixed xylene isomer?
    b. Please explain the difference and why your xylene fits the criteria of one.
    c. Please provide supporting documentation

3

Filed By: Elizabeth Bremer, Filed Date: 2/10/21 5:29 PM, Submission Status: Approved

Barcode:3926823-01 A-570-979 REV - Admin Review 12/1/17 - 11/30/18

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-979
Administrative Review
12/01/2017 - 11/30/2018
**Public Document**
ITA/E&C/Office IV: JDP

January 3, 2019

Risen Energy Co. Ltd. (Risen Energy)
c/o Gregory S. Menegaz
deKieffer & Horgan, PLLC
1090 Vermont Avenue, NW, Suite 410
Washington, DC 20005

Dear Mr. Menegaz:

This letter concerns the antidumping duty (AD) administrative review of crystalline silicon photovoltaic solar cells from the People's Republic of China (China), covering the period December 1, 2017 through November 30, 2018, and your client, Risen. The Department of Commerce (Commerce) has reviewed Risen Energy's responses to Commerce's AD questionnaires and has identified certain areas that require additional information. *See* Attachment. The additional information requested in the attachment to this letter is due by the close of business on **January 10, 2019**.

Commerce must conduct this administrative review in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached supplemental questionnaire by the established deadline or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the supplemental questionnaire response. If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline. Statements included within a supplemental questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request. Any factual statements made in support of such reasons must be accompanied by the certifications required under section 351.303(g) of the regulations. An extension request submitted without a proper certification for any factual information contained therein will be considered improperly filed and, as with any other improperly filed document, will not be accepted. Any extension granted in response to your request will be in writing; otherwise the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding. Pursuant to 19 CFR 351.302(d), any information submitted after this date will be untimely filed and may be rejected and removed from the record. In such

Filed By: Jeffrey Pedersen, Filed Date: 1/6/20 2:38 PM, Submission Status: Approved

case, we may rely on facts available, including adverse inferences, as required by section 776(a)(2)(B) of the Tariff Act of 1930, as amended (the Act), in making our determination. Furthermore, upon receipt of a response that is incomplete or deficient to the extent Commerce determines it to be non-responsive, Commerce may not issue additional supplemental questionnaires but may use facts available.

The information you submit may be subject to verification. Failure to allow verification of any item may affect the consideration that we will accord to that item or to any other material, whether or not we verify the latter. In all cases where we have requested a re-submission of data, you should ensure that we receive information in the same format that was requested in the original questionnaire.

If you have any questions on this matter, please contact Jeff Pedersen at (202) 482-2769 or by e-mail at Jeffrey.Pedersen@Trade.Gov.

Sincerely,

*{signature}* for Howard Smith
Program Manager
AD/CVD Operations, Office IV

Enclosure

1. The Section D questionnaire requested that you identify the length of time you have been purchasing solar cells and/or modules from the supplier. Risen failed to do so. For each unaffiliated supplier of solar cells and solar panels, please identify the length of time you have been purchasing solar cells and/or panels from the supplier.
2. Please suggest an HTS classification for the following inputs:
    a. Scale Inhibitor
    b. Aluminum Paste
3. You have identified consumption for the following inputs, but Commerce is unable to locate a description or a suggested HTS category for each item. Please identify and fully describe what each input is and suggest an HTS category or other surrogate value for each input.
    a. A_RWALUM
    b. A_WALUM
    c. CB_TCAKE
    d. R_TCAKE
    e. R_TWASTE
    f. R_CWASTE
    g. R_RCWASTE
    h. R_RTWASTE
4. Aluminum Extrusion:
    a. Does your aluminum extrusion have a round cross-section?
    b. Is your aluminum extrusion made of "high-strength heat-treatable alloy," which contains by weight 7.0 percent or less of copper or 10.0 percent or less of zinc, and/or designated as series 2xxx and 7xxx (except 7072) in the Aluminum Association's specifications of registered alloys?
    c. Is your aluminum extrusion a "high-strength heat-treatable alloy," which contains by weight 3.0 percent or less of magnesium and 3.0 or less of silicon, and/or are designated as series 6xxx in the Aluminum Association's specifications of registered alloys?
5. Aluminum Frame:
    a. Does your aluminum frame have a round cross-section?
    b. Is your aluminum frame made of "high-strength heat-treatable alloy," which contains by weight 7.0 percent or less of copper or 10.0 percent or less of zinc, and/or designated as series 2xxx and 7xxx (except 7072) in the Aluminum Association's specifications of registered alloys?
    c. Is your aluminum frame a "high-strength heat-treatable alloy," which contains by weight 3.0 percent or less of magnesium and 3.0 or less of silicon, and/or are designated as series 6xxx in the Aluminum Association's specifications of registered alloys?
    d. In your previous response, you said that aluminum frame is a further processed version of aluminum extrusion in that is cut to length. Are there other ways that the aluminum frame is further processed from its aluminum extrusion stage?

    e. What use does the aluminum frame serve in the process? Is it used as a support in a structure? If so, in what kind of structure, or as what kind of structure is the aluminum frame used?

6. Cable for junction box:
   a. In your previous response to provide dimensions of the cable wire for junction box, you responded that it is 12 AWG. In order to calculate the dimensions of the cable wire from that information, Commerce used the following chart (http://www.ohmslawcalculator.com/awg-wire-chart) to determine that a 12 AWG corresponds to 2.0523 mm in diameter. According to this information, a 12 AWG wire would NOT fall into either one of the following categories below. Is this correct?
      i. 22 AWG (0.643mm in diameter) and finer but larger than 33 AWG (0.18mm in diameter).
      ii. 33 AWG (0.18 mm in diameter) and finer
   b. If the calculated diameter length for the cable according to the chart is not correct, please provide the correct diameter length for the cable for junction box.
   c. Is your cable for junction box made of winding copper wire?
   d. Is your cable for junction box a coaxial cable or any other coaxial electric conductor?

7. Diode:
   a. Is your diode a zener diode?
   b. Is your diode a microwave diode?
   c. Does your diode have a maximum current of 0.5 A or less?

8. Flocking Additive:
   a. Is your flocking additive a prepared binder for foundry molds or cores?
   b. Is your flocking additive a chemical product and/or preparation of the chemical or allied industries (including those consisting of mixtures of natural products)?
   c. Is your flocking additive composed of non-agglomerated metal carbides mixed together or with metallic binders?
   d. Please provide the full chemical contents of your flocking additive in order to help classify its HTS.
   e. What is the flocking additive flocking? How is the flocking additive used as a surface-active preparation? Please provide full details.

9. Insulation materials:
   a. Do your insulation materials have polyethylene in its primary form that has a specific gravity of more or less than 0.94?
   b. Do your insulation materials have polyethylene in its primary form that has a relative viscosity of more or less than 1.44?
   c. Do your insulation materials have polyethylene in its primary form that is linear low density polyethylene?
   d. Do your insulation materials have polyethylene in its primary form that is low density polyethylene?

  e. Do your insulation materials have polyethylene in its primary form that is medium density polyethylene?

10. Phosphoric Acid:
    a. Is your phosphoric acid fertilizer grade?
    b. Does your phosphoric acid contain less than 65 percent available diphosphorous pentaoxide or its equivalent?
    c. Is your phosphoric acid a polyphosphoric acid?

11. Plaster Base putty:
    a. Is your plaster base putty a mastic?
    b. Does your plaster base putty contain caulking compounds?
    c. Can your plaster base putty be called a painter's filling?

12. Sedimentation agent:
    a. Is your sedimentation agent elastomeric?
    b. Does your sedimentation agent contain monomer units which are aromatic or modified aromatic, or which are obtained, derived or manufactured in whole or in part therefrom?
    c. Is your sedimentation agent thermoplastic?
    d. Is your sedimentation agent thermosetting?
    e. Does your sedimentation agent contain the following chemical content: Poly(nitrilomethanetetraarylnitrilo- [2,4,6-tris-(1-methyethyl)-1,3- phenylene]]-2,6-bis(1-methylethyl)- phenyl]-ω-[[[2,6-bis(1-methylethyl)-phenyl]amino]methylene]amino carbodiimide or 2,4-diisocyanate-1,3,5-tris(1-methyl- ethyl) homopolymer with polyethylene?
    f. Does your sedimentation agent contain the following chemical content: 1,1'-Bis(methylenedi-4,1-phenylene)- 1H-pyrrole-2,5-dione, copolymer with 4,4'-methylenebis(benzeneamine); and Hydrocarbon novolac cyanate ester?

13. Wire for ingot cutting (Steel-cutting wire):
    a. Is your wire for ingot cutting a silico-manganese steel?
    b. Is your wire a high-speed steel?
    c. Is your steel wire plated or coated with copper?
    d. If your steel wire is a silico-manganese steel, does it contain by weight less than 0.20 percent of carbon, more than 0.9 percent of manganese, and more than 0.6 percent of silicon, and suitable for electric arc welding?
    e. If your steel wire is not a silico-manganese steel, does it contain by weight less than 0.20 percent of carbon and more than 0.3 percent of nickel or more than 0.08 percent of molybdenum, and suitable for electric arc welding?
    f. What is the exact diameter of your wire for ingot cutting?