Slip Op. 21-87

## UNITED STATES COURT OF INTERNATIONAL TRADE

THE ANCIENTREE CABINET CO., LTD.,

          Plaintiff,

    and

CABINETS TO GO, LLC,

          Plaintiff-Intervenor,

    v.

UNITED STATES,

          Defendant,

    and

AMERICAN KITCHEN CABINET
ALLIANCE,

          Defendant-Intervenor.

Before: Judge Gary S. Katzmann,
Court No. 20-00114

## <u>OPINION</u>

[Plaintiff's motion is granted, in part, and Commerce's <u>Final Determination</u> is remanded for further explanation.]

Dated: <u>July 12, 2021</u>

<u>Gregory S. Menegaz</u> and <u>Alexandra H. Salzman</u>, DeKieffer & Horgan, PLLP, of Washington, D.C., argued for plaintiff.  With them on the brief was <u>J. Kevin Horgan</u>.

<u>Mark R. Ludwikowski</u>, Clark Hill PLC, of Washington, D.C., argued for  plaintiff-intervenor. Within him on the brief were <u>Courtney Gayle Taylor</u>, <u>R. Kevin Williams</u> and <u>William Sjoberg</u>.

<u>Iona Cristei</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant.  With her on the brief were <u>Jeffrey Bossert Clark</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Tara K. Hogan</u>, Assistant Director.  Of Counsel <u>Savannah Rose Maxwell</u>, Attorney, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

<u>Luke A. Meisner</u>, Schagrin Associates, of Washington, D.C., argued for defendant-intervenor. With him on the brief were <u>Roger B. Shagrin</u>, <u>Christopher T. Cloutier</u>, and <u>Elizabeth J. Drake</u>.

Katzmann, Judge: This case arises from an investigation by the U.S. Department of Commerce ("Commerce") concerning whether wooden cabinets and vanities from the People's Republic of China ("China") were being imported at less than fair value in violation of domestic statutes designed to protect American products from unfair trade. The principal questions are whether in the resulting antidumping ("AD") investigation, Commerce based both its primary surrogate country selection and surrogate factors of production ("FOP") valuations on substantial evidence and calculated the subsequent financial ratios in a way that was not arbitrary and capricious. Plaintiff, The Ancientree Cabinet Co., Ltd. ("Ancientree"), and Plaintiff-Intervenor, Cabinets to Go, LLC,[1] exporters of wooden cabinets, vanities, and components thereof from China, brought this suit against Defendant the United States ("Government") to challenge Commerce's surrogate value analysis and calculation in its <u>Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Corrected Notice of Final Affirmative Determination of Sales at Less Than Fair Value for</u>, 85 Fed. Reg. 17,855 (Dep't Commerce Mar. 31, 2020); <u>Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Antidumping Duty Order</u>, 85 Fed. Reg. 22,126 (Dep't Commerce Apr. 21, 2020) ("<u>Order</u>") (collectively, "<u>Final Determination</u>"). Pl.'s Mot. For J. on Agency R. and Supp. Opening Br., Sept. 11, 2020, ECF No. 27 ("Pl.'s Br."). The Government and Defendant-Intervenor

---

[1] The court uses Ancientree's briefs to represent both plaintiffs' arguments as Plaintiff-Intervenor Cabinets to Go, LLC, incorporated by reference all of Ancientree's arguments into its brief. <u>See</u> Pl.-Inter.'s R. 56.2 Mot. for J. on the Agency R. at 3, Sept. 11, 2020, ECF No. 27 ("Pl.-Inter.'s Br."). Cabinets to Go is an importer of subject merchandise, including from two non-party mandatory respondents, <u>see</u> n.2 <u>infra</u>, to Commerce's investigation -- Rizhao Foremost Woodwork Manufacturing Company Ltd. and Dalian Meisen Woodworking Company Ltd. -- and from separate rate respondents. Pl.-Inter.'s Br. at 2–3. Cabinets to Go thus asks the court to apply "any recalculation under this appeal of Plaintiff's AD rate resulting from a change of the surrogate country to Malaysia" to all other imports of subject merchandise. <u>Id.</u> at 3. Because the court affirms Commerce's selection of surrogate country, the court denies Cabinets to Go's motion.

American Kitchen Cabinet Alliance ("AKC Alliance") ask the court to sustain Commerce's determination.  Def.'s Mem. in Opp'n to Pl. and Pl.-Inter.'s Rule 56.2 Mot. for J. on the Agency R., Dec. 22, 2020, ECF No. 35 ("Def.'s Br."); Def.-Inter.'s Resp. Br. in Opp'n to the Mots. For J. on the Agency R., Dec. 21, 2020, ECF No. 34 ("Def.-Inter.'s Br.").  The court denies Plaintiff's motion, in part, and grants Plaintiff's motion, in part.  Commerce's <u>Final Determination</u> is remanded for further explanation consistent with this opinion.

**BACKGROUND**

### I.     *Legal Background*

Congress's AD statute empowers Commerce to impose remedial duties on imported goods when those goods are sold in the United States for less than their fair market value, and when the International Trade Commission ("ITC") determines that the domestic industry is thereby "materially injured, or . . . is threatened with material injury."  <u>See</u> 19 U.S.C. § 1673(2)(A)(i)–(ii); <u>Diamond Sawblades Mfrs. Coal. v. United States</u>, 866 F.3d 1304, 1306 (Fed. Cir. 2017).  Dumping constitutes unfair competition because it permits foreign producers to undercut domestic companies by selling products below their fair market value.  <u>Sioux Honey Ass'n v. Hartford Fire Ins. Co.</u>, 672 F.3d 1041, 1046 (Fed. Cir. 2012).  To address the harmful impact of such unfair competition, Congress enacted the Tariff Act of 1930, which empowers Commerce to investigate potential dumping and, if necessary, to issue orders instituting duties on subject merchandise.  <u>Id.</u> at 1047.  In these instances, "the amount of the [AD] duty is 'the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise.'"  <u>Shandong Rongxin Imp. & Exp. Co. v. United States</u>, 42 CIT __, __, 331 F. Supp. 3d 1390, 1394 (2018) (quoting 19 U.S.C. § 1673), <u>aff'd</u>, 779 F. App'x 744 (Fed. Cir. 2019).

If the exporting country is a non-market economy that provides insufficient information to determine the normal value, Commerce may use surrogate values from market economy countries for "the [FOPs] utilized in producing the merchandise and . . . for general expenses and profit plus the cost of containers, coverings, and other expenses."  19 U.S.C. § 1677b(c)(1).  Section 1677b(c)(3)(A)–(D) lists the FOPs as including, but not limited to: (A) labor hours required; (B) quantities of raw materials used; (C) energy and other utilities consumed in production; and (D) capital costs and depreciation.  "Once Commerce has selected and totaled the surrogate values, the agency then adds an amount designed to approximate the producing firm's noninput costs of production, which include factory overhead, selling, general, and administrative expenses, and profit."  CP Kelco US, Inc. v. United States, 40 CIT __, __, 37 ITRD 2984, Slip Op. 16-36 at 3 (Apr. 8, 2016).  To incorporate these costs, Commerce generates surrogate financial ratios from "the financial statements of other manufacturing firms" within the primary surrogate country and using "select financial statements based on which provide the 'best available information.'"  Id.  Commerce then uses the market economy surrogate values and financial ratios to calculate a surrogate value -- used in place of a home-market value -- for comparison to the export price.  Id.

Section 1677b(c)(1) requires that Commerce value the FOPs "based on the best available information regarding the values of such factors in a market economy country."  In determining which data are the best available, "Commerce has broad discretion to determine the best available information because 'best available information' is not defined by statute."  QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (citing Ad Hoc Shrimp Trade Action Comm. v. United States, 618 F.3d 1316, 1322 (Fed. Cir. 2010); Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999)); see also Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994).  However, Commerce's discretion to select surrogate values is

"curtailed by the purpose of the statute, i.e., to construct the product's normal value as it would have been if the NME country were a market economy country." Rhodia, Inc. v. United States, 25 CIT 1278, 1286, 185 F. Supp. 2d 1343, 1351 (2001) (citing Nation Ford Chem. Co., 166 F.3d at 1375). Commerce must also establish AD margins as accurately as possible. Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001).

In choosing "one or more market economy countries" to provide surrogate factor values, 19 U.S.C. § 1677b(c)(4) requires that Commerce "utilize, to the extent possible" costs of FOPs from market economy countries that are "at a level of economic development comparable to that of the nonmarket economy country, and . . . significant producers of comparable merchandise." Although Commerce "normally will value all factors in a single surrogate country," 19 C.F.R. § 351.408(c)(2), Commerce may also "mix and match" surrogate country values where a non-primary country provides values that are more accurate, Lasko Metal Prods., Inc. v. United States, 16 CIT 1079, 1082, 810 F. Supp. 314, 317 (1992), aff'd, 43 F.3d 1442 (Fed. Cir. 1994). If more than one market economy country meets the requirements to provide surrogate values, Commerce may choose a primary surrogate country based on whether the FOP data are (1) publicly available; (2) contemporaneous with the period of investigation ("POI"); (3) a broad market average covering a range of prices; (4) from an approved surrogate country; (5) specific to the input in question; and (6) tax exclusive. See Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process (Mar. 1, 2004), http://enforcement.trade.gov/policy/bull04-1.html (last accessed July 8, 2021) ("Policy Bulletin 04.1"); see also, e.g., Jiaxing Bro. Fastener Co. v. United States, 822 F.3d 1289, 1302 (Fed. Cir. 2016) (finding "no error in Commerce's . . . preference to appraise surrogate values from a single surrogate country" with statistics that were "specific, contemporaneous, and

represented broad market averages").   Upon review of Commerce's choice of certain surrogate

values as the best available information, the court will not determine whether the data used were

actually the best available, but "whether a reasonable mind could conclude that Commerce chose

the best available information."  Jiaxing Bro. Fastener, 822 F.3d at 1301 (citing Zhejiang DunAn

Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011)); see also Maverick Tube

Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citation omitted).

## II.   *Factual Background*

On March 26, 2019, Commerce initiated an AD duty investigation on the importation of

wooden cabinets and vanities from China during the POI of July 1, 2018 to December 31, 2018.

See Wooden Cabinets and Vanities and Components Thereof From the People's Republic of

China: Initiation of Less-Than-Fair-Value Investigation, 84 Fed. Reg. 12,587 (Dep't Commerce

Apr. 2, 2019).  Commerce selected Ancientree as a mandatory respondent to the investigation.[2]

See Dep't, Respondent Selection Mem. (June 4, 2019), P.R. 838.  Commerce then issued an AD

questionnaire to Ancientree, which requested that Ancientree report the FOPs consumed to

---

[2] In AD investigations, Commerce may select mandatory respondents pursuant to 19 U.S.C. §
1677f-1(c)(2), which provides:

> If it is not practicable to make individual weighted average dumping margin
> determinations under paragraph (1) because of the large number of exporters or
> producers involved in the investigation or review, the administering authority may
> determine the weighted average dumping margins for a reasonable number of
> exporters or producers by limiting its examination to--
>
> > (A) a sample of exporters, producers, or types of products that is
> > statistically valid based on the information available to the
> > administering authority at the time of selection, or
> >
> > (B) exporters and producers accounting for the largest volume of the
> > subject merchandise from the exporting country that can be reasonably
> > examined.

produce its wooden cabinets -- the merchandise under investigation.  See Dep't, AD Questionnaire

(Apr. 25, 2019), P.R. 842.  In its response, Ancientree reported various FOPs, including birch and

poplar sawnwood, particleboard, medium density fibreboard ("MDF"), and paint.  See Pl.'s Br. at

6, 23; Ancientree, Sec. C and D Questionnaire Resp. at Ex. D-2.1 (July 19, 2019), P.R. 911

("Ancientree Sec. CDQ Resp.").

On June 17, 2019, Commerce's Office of Policy ("OP") determined that Romania,

Malaysia, Russia, Mexico, Brazil, and Kazakhstan were all countries at a comparable level of

economic development as China based on the World Development Report's per capita 2017 gross

national income data.  See Dep't, Request for Economic Development, Surrogate Country and

Surrogate Value Comments and Information at Attach. (June 17, 2019), P.R. 850.  Commerce also

requested interested party comments on the potential surrogates, including on: (1) the OP's list of

countries; (2) surrogate country selection broadly; and (3) surrogate value data.  See id. at 1–2.

AKC Alliance recommended Romania as the primary surrogate country, while Ancientree

recommended Malaysia.  See Petitioner, Initial Surrogate Value Comments (Aug. 7, 2019), P.R.

956–61 ("AKC Alliance Prelim. SV Comments"); Ancientree, Prelim. Surrogate Value

Submission (Aug. 7, 2019), P.R. 952–53 ("Ancientree Prelim. SV Comments").

On October 9, 2019, Commerce issued its preliminary determination.  Wooden Cabinets

and Vanities and Components Thereof from the People's Republic of China: Preliminary

Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination

and Extension of Provisional Measures, 84 Fed. Reg. 54,106 (Dep't Commerce Oct. 9, 2019)

("Preliminary Determination"), and accompanying Preliminary Decision Memorandum ("PDM"),

P.R. 1407, as corrected by Wooden Cabinets and Vanities and Components Thereof from the

People's Republic of China: Preliminary Affirmative Determination of Sales at Less than Fair

Value, Postponement of Final Determination and Extension of Provisional Measures, 84 Fed. Reg.

56,420 (Dep't Commerce Oct. 22, 2019).  Commerce selected Romania as the primary surrogate

country because it had a comparable level of economic development as China, it was a significant

producer of comparable merchandise, and it had reliable and useable surrogate value data.  See

PDM at 14.  Further, when comparing Romania and Malaysia, Commerce examined financial

statements provided by Ancientree, AKC Alliance, and other respondents -- those of one

Romanian company, S.C. Sigstrat S.A. ("Sigstrat"), and of three Malaysian companies, Lii Hen

Industries Bhd ("Lii Hen"), Poh Huat Furniture Industries Sdn Bhd ("Poh Huat"), and Yeo Aik

Wood Sdn Bhd ("Yeo Aik") -- to determine that the Romanian surrogate data provided the best

available information.  See id. at 13–14.  Using this information, Commerce preliminarily selected

surrogate values for FOPs, including energy, labor, packing materials, manufacturing overhead,

and certain raw materials such as birch and poplar sawnwood, particleboard, MDF, glue, and paint,

and calculated a financial ratio.  Dep't, Prelim. Surrogate Value Memo (Oct. 3, 2019), P.R. 1411–

12 ("Prelim. SV Memo").  Following Commerce's Preliminary Determination, Ancientree and

other interested parties submitted case briefs.  See Ancientree, Case Br. (Dec. 17, 2019), P.R. 1511

("Ancientree's Admin. Case Br.").

On February 28, 2020, Commerce issued its Final Determination, in which it concluded

that wooden cabinets and vanities from China were being sold at less than fair value in the United

States.  85 Fed. Reg. at 11,953; see also Final IDM (Feb. 21, 2020), P.R. 1554 ("IDM").

Commerce continued to find that Romania provided the best available surrogate information and

would serve as the primary surrogate country.  IDM at 26.  Commerce largely maintained its

surrogate value analysis and determinations, including its calculation of a financial ratio using

Sigstrat's financial statements.  Id. at 29–40.  Commerce corrected punctuation errors in this

determination on March 31, 2020.  <u>Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Corrected Notice of Final Affirmative Determination of Sales at Less Than Fair Value</u>, 85 Fed. Reg. 17,855 (Dep't Commerce Mar. 31, 2020).  Following the ITC's affirmative injury determination, Commerce issued a final AD duty order on April 21, 2020. <u>Order</u>, 85 Fed. Reg. 22,126.

### III.   *Procedural History*

Ancientree initiated this litigation on May 21, 2020.  Summons, ECF No. 1; Compl., ECF No. 6.  AKC Alliance joined the litigation as Defendant-Intervenor on June 17, 2020.  Consent Mot. to Intervene as Def.-Inter., ECF No. 10; Order Granting Mot. to Intervene, ECF No. 14. Cabinets To Go then joined this litigation as Plaintiff-Intervenor on June 19, 2020.  Consent Mot. to Intervene as Pl.-Inter., ECF No. 15; Order Granting Mot. to Intervene, ECF No. 19.   On September 11, 2020, Ancientree and Cabinets To Go filed motions for judgment on the agency record pursuant to Rule 56.2 of the Rules of the United States Court of International Trade.  <u>See</u> Pl.'s Br; Pl.-Inter.'s R. 56.2 Mot. for J. on the Agency R., Sept. 11, 2020, ECF No. 27.   The Government and AKC Alliance responded in opposition to Ancientree's motion on December 21 and 22, 2020.  <u>See</u> Def.'s Br.; Def.-Inter.'s Br.  Ancientree replied in support of its motion on January 21, 2021.  Pl.'s Reply Br., ECF No. 36.  Oral argument was held on April 14, 2021.  Oral Arg., ECF No. 47.  Prior to oral argument, the court issued and the parties responded to questions regarding the case.  Amended Letter re: Questions for Oral Arg., Mar. 30, 2021, ECF No. 41; Pl.'s Answers to Ct.'s Questions for Oral Arg., Apr. 8, 2021, ECF No. 43; Pl.-Inter.'s Letter in Resp. to Ct.'s Questions, Apr. 8, 2021, ECF No. 42; Def.'s Resp. to the Ct.'s Questions for Oral Arg., Apr. 8, 2021, ECF No. 46; Def.-Inter.'s Written Answers to the Ct.'s Questions for Oral Arg., Apr. 8, 2021, ECF No. 45.  As directed by the court, the parties also filed briefs following oral argument.

Pl.'s Post-Arg. Submission, Apr. 19, 2021, ECF No. 53; Pl.-Inter.'s Letter Post-Oral Arg., Apr.

19, 2021, ECF No. 54; Def.'s Post-Arg. Submission, Apr. 19, 2021, ECF No. 52; Def.-Inter.'s Br.

Following the Apr. 14, 2021 Oral Arg., Apr. 19, 2021, ECF No. 51.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)(2)(B)(iii).   Section 1516a(b)(1)(B)(i) states the standard of review in AD duty

proceedings: "[t]he Court shall hold unlawful any determination, finding, or conclusion" by

Commerce that is "unsupported by substantial evidence on the record, or otherwise not in

accordance with law."

Commerce "must examine the relevant data and articulate a satisfactory explanation for its

action including a 'rational connection between the facts found and the choice made.'" Motor

Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting

Burlington Truck Lines v. United States, 371 U.S. 156, 168, (1962)) (referring to the arbitrary and

capricious standard); see also Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d

1370, 1378 (Fed. Cir. 2013) (citing Amanda Foods (Vietnam) Ltd. v. United States, 33 CIT 1407,

1416, 647 F. Supp. 2d 1368, 1379 (2009)) (requiring the same of Commerce with respect to the

substantial evidence standard).   A determination by Commerce "is supported by substantial

evidence if a reasonable mind might accept the evidence as sufficient to support the finding."

Maverick Tube Corp., 857 F.3d at 1359 (citing Consol. Edison Co. of N.Y. v. NLRB, 305 U.S.

197, 229 (1938)).   Substantial evidence may nevertheless support Commerce's determination even

if there is "evidence that detracts from the agency's conclusion or [if] there is a 'possibility of

drawing two inconsistent conclusions from the evidence.'" Aluminum Extrusions Fair Trade

Comm. v. United States, 36 CIT 1370, 1373, 34 ITRD 2119 (2012) (quoting Consolo v. Fed. Mar.

Comm'n, 383 U.S. 607, 620 (1966)).  Finally, although Commerce is not required to address every

piece of evidence submitted, it is required to respond to those arguments the parties make that are

material to Commerce's determination.  Id.; Itochu Bldg. Prods., Co. v. United States, 40 CIT__,

__, 163 F. Supp. 3d 1330, 1337 (2016).

## DISCUSSION

As discussed below, Ancientree challenges: (I) Commerce's selection of Romania as the

primary surrogate country; (II) Commerce's financial ratio calculation; and (III) Commerce's

selection of HTS headings for surrogate value inputs.  Pl.'s Br. at 6–28.  The court addresses each

in turn and concludes that:  Commerce's selection of Romania as the primary surrogate country

was supported by substantial evidence; Commerce's explanation of its financial ratio calculation

was arbitrary and capricious; and Commerce's selection of surrogate values were supported by

substantial evidences and sufficiently specific.

I.   ***Commerce's Decision to Select Romania as the Primary Surrogate Country was Supported by Substantial Evidence and In Accordance with Law.***

Ancientree contends that Commerce abused its discretion in selecting Romania as the

primary surrogate country over Malaysia because, according to Ancientree, Malaysia provided

superior data.  See id. at 5–6.  Ancientree does not dispute that, in accordance with 19 U.S.C. §

1677b(c)(4), Commerce determined that both Romania and Malaysia are at comparable levels of

economic development to China and that they are both significant producers of comparable

merchandise.  See IDM at 31–32; Pl.'s Br. at 5.  Commerce found that Romania provided the best

available data because it had "complete, contemporaneous Romanian Global Trade Atlas ("GTA")

data for each input used by the respondents" and concluded that "the Romanian surrogate financial

statements on the record are preferable to the Malaysian financial statements because these

statements specifically break out energy costs from other manufacturing costs."   IDM at 32.

Nevertheless, Ancientree challenges three aspects of Commerce's decision: (1) the reliability of the Romanian sawnwood values, Pl.'s Br. at 6–13; (2) the superiority of the Romanian financial statements, id. at 13–21; and (3) the selection of Romania in light of the superiority of Malaysian values for other inputs such as brokerage and handling ("B&H") fees and labor data, id. at 21–23. For the reasons discussed below, the court is unpersuaded by Ancientree's arguments and concludes that Commerce acted based on substantial evidence in determining that Romania provided the best available information and selecting it as the primary surrogate country.

### A.   Commerce's Decision to Rely on the Romanian Sawnwood Values Was Supported by Substantial Evidence.

First, Ancientree alleges that the Romanian sawnwood values were unreliable due to their small quantities.   Id. at 8–13.   Commerce determined that the Romanian birch and poplar sawnwood import quantities within the six-digit HTS subheadings, totaling 173,530 kg and 137,700 kg, respectively, "do not appear to be immaterial [quantities]" and explained that Ancientree provided no "metric, other than relative to its own consumption, [by which] such volumes would be considered insignificant."  IDM at 43.  Commerce also determined it was unable to conduct an aberrancy analysis due to the lack of sufficient information in the record.  Id. at 42–43.  In short, Commerce simply stated that, without evidence suggesting otherwise, the size of the Romanian quantities indicated that they were commercial and representative of market prices.  Id. at 43.

When evaluating the reliability of surrogate values, Commerce does not have "a longstanding practice of omitting import values merely because they were the product of a small quantity of imported goods," but may disregard small import values where they are distortive or aberrational.  Sichuan Changhong Elec. Co. v. United States, 30 CIT 1481, 1501, 460 F. Supp. 2d 1338, 1356 (2006).  "The proposition that a small import volume may indicate that the data relied

upon is aberrational is not the same as the proposition that a small import volume <u>makes</u> the data aberrational." <u>Xinjiamei Furniture (Zhangzhou) Co. v. United States</u>, 37 CIT 308, 316 (2013). However, while "Commerce need not duplicate respondent's exact production experience," "a surrogate value must be as representative of the situation in the NME country as is feasible." <u>Nation Ford Chem.</u>, 166 F.3d at 1377 (quoting <u>Nation Ford Chem Co. v. United States</u>, 21 CIT 1371, 1375, 985 F. Supp. 133, 137 (1997)); <u>see also</u> <u>Longkou Haimeng Mach. Co. v. United States</u>, 33 CIT 603, 612–13, 617 F. Supp. 2d 1363, 1372–73 (2009). "Representativeness is important if Commerce is to fulfill its statutory mandate of calculating dumping margins as accurately as possible." <u>Jacobi Carbons AB v. United States</u>, 42 CIT __, __, 313 F. Supp. 3d 1344, 1361 (2018). Therefore, Commerce must "adequately address the commercial significance of the quantities underlying its selected surrogate values." <u>Id.</u>; <u>see also</u> <u>Shanghai Foreign Trade Enters. Co. v. United States</u>, 28 CIT 480, 495, 318 F. Supp. 2d 1339, 1352 (2004) (finding error by Commerce where it failed to address the commercially significant quantity of imports and "summarily discarded the alternatives as flawed" without evaluating the reliability of its selection).

Typically, Commerce determines the commercial significance of a quantity by analyzing whether the small quantity leads to an aberrational average unit value ("AUV") compared to other potential surrogate countries. <u>See</u> <u>Shakeproof Assembly Components</u>, 23 CIT at 485, 59 F. Supp. 2d at 1360. "The burden of creating an adequate record, however, lies with [interested parties] and not with Commerce." <u>QVD Food</u>, 658 F.3d at 1324 (quoting <u>Tianjin Mach. Imp. & Exp. Corp. v. United States</u>, 16 CIT 931, 936, 806 F. Supp. 1008, 1015 (1992)). Thus, if respondents fail to provide data for Commerce to adequately compare to the disputed quantity, then the court will not disturb Commerce's determination. <u>See</u> <u>Baoding Mantong Fine Chem. Co. v. United States</u>, 41 CIT __, __, 222 F. Supp. 3d 1231, 1248 (2017) ("Baoding Mantong did not submit such

a wider set of data for the record during the review, leaving Commerce to consider the question of whether the surrogate price was aberrational, and to make its ultimate decision, from a limited record."); Trust Chem. Co. v. United States, 35 CIT 1012, 1020, 791 F. Supp. 2d 1257, 1265 (2011) ("Plaintiff did not introduce evidence, for example, that the [World Trade Atlas data] volume was only a small fraction of India's domestic consumption. Therefore, on this record, Plaintiff's argument that the cumulative total for imports from 2004–2008 is too small must fail.").

Ancientree argues that Commerce did not properly establish that the Romanian imports were of a sufficient commercial quantity for Romania to be chosen as the primary surrogate country because the Romanian sawnwood import values are "based on insignificant and uncommercial quantities." Pl.'s Br. at 8. Ancientree notes that the total Romanian sawnwood imports are small relative to Malaysia's imports, which includes 691% more poplar and 369% more birch than Romania. Id. at 8–10. Thus, Ancientree contends that the Romanian imports are so small, with some shipments being of a container or less of sawnwood, that they are not commercial quantities. Id. at 9–10. Finally, Ancientree argues that Commerce did not adequately respond to this argument when they raised it, thereby, making Commerce's decision arbitrary and capricious. Id. at 11–12. The Government and AKC Alliance respond that Romania's import quantity could not be analyzed as aberrational because Ancientree did not provide AUV data for the other potential surrogate countries or historical import quantity data for Romania. Def.'s Br. at 23; Def.-Inter.'s Br. at 14. Consequently, they argue that Ancientree simply stated that Romania's quantity was much lower than Malaysia's and, in turn, did not prove that the import quantities were aberrational or uncommercial. Def.'s Br. at 24–25; Def.-Inter.'s Br. 14–20. Thus, they argue that Commerce's use of the Romanian sawnwood values was supported by record evidence. Id.

The court concludes that Commerce's decision to rely on the Romanian sawnwood values was based on substantial evidence.  While Commerce solely relied on the Romanian sawnwood quantity's weight in deeming it commercially significant, it based its determination on a limited record.  Typically, when presented with a low import quantity, Commerce will not immediately label it unreliable but begin an aberrancy analysis where it compares the materials' AUVs to those of other surrogate countries or the historical data from the selected country.  See IDM at 38; Shakeproof Assembly Components, 23 CIT at 485, 59 F. Supp. 2d at 1360.  In this instance, however, Commerce only had the Malaysian and Romanian values for the POI on the record.  See IDM at 38.  Commerce could not perform the aberrancy or commercial significance analysis because Ancientree failed to provide comparative data to Commerce, and thus failed to satisfy its burden to build the record, leaving Commerce no basis for rejecting the Romanian import quantities as commercially insignificant.  See QVD Food, 658 F.3d at 1324.

In the past, this court has found that Commerce's commercial significance and aberrancy analyses are interdependent and require comparative data from potential surrogate countries.  See Baoding Mantong Fine Chem., 222 F. Supp. 3d. at 1247–48; Trust Chem, 35 CIT at 1014–15, 791 F. Supp. 2d at 1261.  Given that these analyses are heavily dependent on comparative data, the court has held that when a party does not "offer a standard, or record evidence, demonstrating that [the quantity] was too commercially insignificant," then Commerce's determination that the data was not aberrational based on "a limited record" could be sustained.  Baoding Mantong Fine Chem., 222 F. Supp. 3d. at 1248 (quotation omitted).  Furthermore, the court has determined that a respondent's burden to provide comparative data for the commercial significance analysis extends to cases where a country's domestic production may impact the import quantity.  For example, in Trust Chem, Commerce sourced the Indian data from the World Trade Atlas ("WTA")

rather than the sources provided by petitioners and respondent.  35 CIT at 1014–15, 791 F. Supp.

2d at 1261.  When the plaintiff argued that the WTA data provided import volumes that were

commercially insignificant, the court ruled that Commerce's selection of surrogate value

information was permissible because respondent did not introduce evidence that the WTA data

was distortive relative to other data, such as India's domestic consumption.  35 CIT at 1020, 791

F. Supp. 2d at 1265.

        Ancientree argues that previous opinions of the court established an affirmative duty on

behalf of Commerce to determine that a small quantity may be commercial regardless of the

aberrancy analysis.  Pl.'s Br. at 8–11 (citing, e.g., Shanghai Foreign Trade, 318 F. Supp. 2d at

1350–53; Juancheng Kangtai Chem. Co. v. United States, 39 CIT __, __, 2015 WL 4999476, at

*25, Slip Op. 15-93 at 38–46 (Aug. 21, 2015); Jacobi Carbons, 313 F. Supp. 3d at 1361–62).

However, quite apart from the fact that as a general matter other decisions of this court are not

binding precedent, although they may have persuasive value, the cited cases are distinguishable

from the case at bar because in each underlying investigation or review the respondent had

developed a more comprehensive record to highlight the quantities' commercial insignificance.

Shanghai Foreign Trade, 28 CIT at 495, 318 F. Supp. 2d at 1352 (noting that the record contained

data revealing distortion and aberrancy in the data used by Commerce); Juancheng Kangtai Chem.,

2015 WL 4999476, at *23–*25, Slip Op. 15-93 at 41–42 (explaining that the commercial

significance test is typically based on cross-country comparisons of data); Jacobi Carbons, 313 F.

Supp. 3d at 1362 (rejecting Commerce's failure to explain commercial significance where record

evidence supported domestic sourcing of an input over imports).  Thus, where, as here, there was

no comparative data on the record of either imports or domestic production, Commerce was not

obligated to say more about the commerciality of import data when selecting a primary surrogate

country.   Accordingly, the court finds that Commerce's determination that the Romanian

sawnwood quantities were commercially significant was based on substantial evidence.

### B.   Commerce's Determination that the Romanian Financial Statements Provided Superior Data Was Supported by Substantial Evidence.

Next, in challenging Commerce's selection of Romania as the primary surrogate country,

Ancientree contends that the Romanian financial statements were inferior to the available

Malaysian financial statements.   Pl.'s Br. at 13–21.   In its Final Determination, Commerce

determined that the Romanian Sigstrat financial statements "represent the financial position of a

profitable Romanian producer of comparable wooden products . . . that explicitly identify energy

costs, are contemporaneous and cover the entire POI, and contain no evidence of countervailable

subsidies." IDM at 33.   While Commerce stated that Malaysian data included financial statements

from three different producers of comparable merchandise, Commerce noted that Sigstrat's

Romanian financial statements segregate two costs, energy and manufacturing overhead, which

are important to its analysis.   Id.   Since the Malaysian financial statements failed to segregate these

two costs, Commerce determined that Sigstrat's financial statements provided the best available

information for purposes of its analysis.   Id. at 37.

Commerce has wide discretion in choosing between two reasonable alternatives for

surrogate value sources.   FMC Corp. v. United States, 27 CIT 240, 251 (2003), aff'd, 87 F. App'x

753 (Fed. Cir. 2004).   While Commerce occasionally relies on financial statements that lack certain

details, such as energy or overhead, it prefers financial statements that "contain the full level of

details." Diamond Sawblades Mfrs.' Coal. v. United States, 41 CIT __, __, 219 F. Supp. 3d 1368,

1381 (2017); see Qingdao Qihang Tyre Co. v. United States, 42 CIT __, __, 308 F. Supp. 3d 1329,

1354 (2018) (concluding Commerce rationally determined that a set of financial statements "was

not usable because it did 'not adequately break out energy costs.'").   Specifically, it is within

Commerce's discretion to decide against using financial statements that do not segregate energy

costs.  See China Mfrs. All., LLC v. United States, 41 CIT __, __, 205 F. Supp. 3d 1325, 1352

(2017) ("Commerce acted within its discretion in deciding against the Gajah Tunggal financial

statements because of the lack of a breakdown for energy costs.").

 Ancientree argues that Malaysia provides superior surrogate financial data as there were

three contemporaneous financial statements of Malaysian manufacturers that solely or primarily

produce comparable and identical goods on the record, whereas there was only one such financial

statement from Romania.  Pl.'s Br. at 13–14, 16–17.  Contrary to Commerce's conclusion,

Ancientree argues that the record provides evidence that the three Malaysian companies

manufacture identical products, which makes Malaysia a better source of information than the

merely comparable Romanian data.  Id. at 14–16.  Furthermore, Ancientree states that Commerce

overemphasizes the lack of segregate energy and overhead costs in the Malaysian financial

statements because that lack of detail has not prevented Commerce from using similar statements

in past decisions.  Id. at 19–20.

 In response, the Government and AKC Alliance argue that the Romanian Sigstrat financial

statement was contemporaneous, "from a producer of comparable merchandise," and "more

detailed than the Malaysian financial statements."  Def.'s Br. at 15; see Def.-Inter.'s Br. 20–24.

Because of these characteristics, the Government and AKC Alliance argue that Commerce

rationally exercised its discretion by choosing an appropriate financial statement for the surrogate

value calculation.  Id.  Furthermore, they argue that there was not enough evidence in the record

for Ancientree to sufficiently contend that two of the three Malaysian manufacturers, Lii Hen and

Poh Huat, produce identical merchandise to the subject merchandise.  Def.'s Br. at 15–16; Def.-

Inter.'s Br. 22–23.  Finally, they argue that the Sigstrat financial statement is more detailed as it

breaks out energy costs and manufacturing overhead, line items that are ambiguously accounted for in the Malaysian financial statements.  Def.'s Br. at 17–19; Def.-Inter.'s Br. 20–21.

These contentions comprise two disagreements: (1) whether the merchandise covered by the Lii Hen and Poh Huat financial statements was identical or merely comparable to subject merchandise; and (2) whether Commerce reasonably chose a single, arguably superior Romanian financial statement over three Malaysian financial statements.  First, the court concludes that Commerce's determination that the Malaysian companies do not produce identical merchandise is based on substantial evidence.  The record contains the financial statements and pictures from the websites of three Malaysian producers, Lii Hen, Poh Huat, and Yeo Aik.  See Ancientree, Final Surrogate Value Submission at Ex. 3 (Lii Hen financial statement), Ex. 5 (Poh Huat financial statement), Exh. 7 (Yeo Aik financial statement) (Sept. 2, 2019), P.R. 1328–31 ("Ancientree Final SV Comments").  It is undisputed that these three manufacturers produce comparable merchandise to Ancientree, however, Commerce concluded that no evidence supported that they produce identical merchandise.  See IDM at 33.  The court agrees with Commerce that the websites of Lii Hen and Poh Huat, the two manufacturers Ancientree argues produce identical merchandise, do not prove they produce furniture identical to the in-scope wooden cabinets and vanities.  See id. at 32.  The court's review of the record evidence shows that the websites demonstrate that the two companies produce a variety of desks, bed frames, nightstands, dressers, and television stands, but no evidence of wooden cabinets and vanities for permanent installation, typically within a kitchen as Ancientree contends.  See, e.g., Ancientree Final SV Comments at Exs. 3 and 5.  The court also agrees that Commerce reasonably found the website screenshots to be of little probative value as neither the pictures of the websites nor the financial statements themselves explicitly identified that the Malaysia manufacturers produce identical merchandise.  IDM at 32.  Furthermore,

Ancientree's argument that the financial statements of the two firms demonstrate that they consume identical raw materials to Ancientree is of little dispositive value because Sigstrat also consumes the same raw materials but does not engage in the production of identical merchandise. See AKC Alliance Prelim. SV Comments at Ex. 10B.   Therefore, the court concludes that Commerce's determination that the Malaysian companies produce comparable, rather than identical, merchandise to Ancientree was based on substantial evidence.

Ancientree also argues that Sigstrat's merchandise is less comparable than the merchandise produced by the Malaysian manufactures because Sigstrat mainly produces plywood and veneering.  Pl.'s Br. at 16–17.   Commerce reasonably concluded, however, that the record is unclear as to whether Sigstrat primarily produces plywood and veneering or wooden furniture. See IDM at 35.  Ancientree does not dispute that Sigstrat uses similar raw materials to produce "wooden plywood, veneering, seats and backrests, chairs, tables, wood chip lights, and other wooden products," but disputes the comparability of Sigstrat's products to its own.  See Pl.'s Br. at 16–77 (citing 2018 Sigstrat Financial Statement at 21).  At best, the record supports that Sigstrat produces comparable merchandise to Yeo Aik, based on the website picture in the record, and Foremost, one of the respondents to the AD investigation.  See Ancientree Final SV Comments at Ex. 7; IDM at 35.  Therefore, Commerce reasonably determined that Romanian Sigstrat data is "at least an equally valid source of [surrogate value] information as the Malaysian statements" because it produces wooden furniture, has increasingly produced more furniture every year since 2016, and the Malaysian financial statements do not identify the relative production amounts by product. IDM at 35.  Given that the Romanian company and the Malaysian companies all manufacture comparable products to Ancientree, Commerce has wide discretion to select between the two countries as reasonable alternatives.  See FMC Corp., 27 CIT at 251.  Therefore, the court affirms

Commerce's selection of Romania on the record because it is supported by substantial evidence and within its discretion.

Second, the court concludes that Commerce acted within its discretion when selecting the single, superior Romanian financial statement to the three Malaysian statements.  While there are three Malaysian financial statements, as Commerce noted, none of them segregate energy costs and all of them ambiguously account for overhead expenses.  See IDM at 33; Ancientree Final SV Comments at Exs. 3, 5, 7.  Meanwhile, Sigstrat's financial statement has a line item for "production overhead" and an itemized expense for energy costs.  See AKC Alliance Prelim. SV Comments at Ex. 10B n.7; see also IDM at 34.  Given that it is within Commerce's discretion to discard financial statements that do not segregate out energy costs, Commerce reasonably concluded that the quality of the Sigstrat financial statement outweighed that Malaysia provided three inferior financial statements.  See China Mfrs. All., 205 F. Supp. 3d at 1352.

Therefore, the court holds that Commerce acted based on substantial evidence and within its discretion to determine that the Romanian financial statement was superior to the Malaysian financial statements for purposes of surrogate country selection.

## C.   Commerce's Decision to Value Select Other Inputs from Both Romania and Malaysia Was Supported by Substantial Evidence.

Finally, Ancientree points to Commerce's selection of data for less important FOP inputs as erroneous and supportive of Malaysia as the best source of information.  Pl.'s Br. at 21–23.  In its Final Determination, Commerce used the Romanian labor value and a Malaysian B&H value in its financial ratio calculations.  IDM at 39–40.  Although Ancientree suggested a specific, Malaysian labor rate for "manufacture of wooden and cane furniture," Commerce determined that the Romanian labor value was superior because Ancientree did not explain what portion of the Malaysian labor rate was from the manufacturing of cane furniture.  Id. at 39.  Furthermore, in

response to Ancientree's case brief arguments, Commerce explained that the Romanian labor rate is specific to manufacturing and that "there is no evidence on the record that would suggest a wage rate specific to furniture manufacturing would necessarily be any more precise, or that the Romanian manufacturing wage rate is any less specific . . . than a wage rate for 'cane furniture.'" Id. at 40.  Regarding the Malaysian B&H value, Commerce agreed with Ancientree that it is more specific than the Romanian value but found that the superiority of one FOP input value did not outweigh its other considerations in selecting Romania as the primary surrogate country.  Id.

While Commerce has a practice of valuing all FOPs from the same surrogate country when possible, Commerce deviates from this preference where particular surrogate values from outside the primary country are superior.  See Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States, 37 CIT 1116, 1119–21, 929 F. Supp. 2d 1352, 1355–56 (2013).  Furthermore, "Commerce need not prove that its methodology was the only way or even the best way to calculate surrogate vales for [FOPs] as long as it was a reasonable way."  Coal. for Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States, 23 CIT 88, 118, 44 F. Supp. 2d 229, 258 (1999) ("Brake Drum").

In arguing that Malaysia was the better primary surrogate country, Ancientree argues that Malaysia sources superior information concerning less crucial inputs, specifically labor and B&H expenses.  Pl.'s Br. at 21.  Ancientree contends that Malaysia provides a specific labor rate for manufacturers of wooden and cane furniture that is more specific and detailed than the general overall manufacturing labor rate in Romania.  Id.  Additionally, Ancientree contends that Commerce's acknowledgment of Malaysia's superior B&H expense data supports that Commerce should have selected Malaysia as the primary surrogate country.  Id. at 22–23.  In response, the Government states that "Ancientree contradicts its own argument by conceding these [FOPs] are

'less important.'"  Def.'s Br. at 26 (quoting Pl.'s Br. at 21); <u>see</u> Def.-Inter.'s Br. 24–25.  They note

that the superiority of less crucial FOP values does not, however, mean that Commerce was

obligated to choose Malaysia as the primary surrogate when Romania provided more accurate

values for the main inputs.  Def.'s Br. at 27; Def.-Inter.'s Br. at 24–25. Regarding Commerce's

selection of Romanian data to value labor expenses, the Government and AKC Alliance contend

that there is no evidence detailing what percentage of the Malaysian labor rate is related to cane

furniture manufacturing and, given cane furniture is produced in a different manner than wooden

furniture, the Malaysian rate is not superior to Romania's "general manufacturing" labor rate.

Def.'s Br. at 26; Def.-Inter.'s Br. at 24.

      The court concludes that Commerce's decision to use the Romanian labor rate was within

its discretion and based on substantial evidence.  Commerce determined that both the Romanian

and Malaysian labor rates lacked some detail.  IDM at 39–40.  The Romanian data provided a

broad "manufacturing" labor rate, while Malaysia's labor rate combined both wooden and cane

furniture manufacturing.  <u>Id.</u>  Therefore, Commerce, faced with two reasonable alternatives,

properly exercised its discretion.  <u>See</u> <u>FMC Corp.</u>, 27 CIT at 251.  Given that Commerce was using

Romania as its primary surrogate and both rates were not detailed, it reasonably selected the

Romanian rate exercising its discretion.  <u>See</u> <u>Brake Drum</u>, 23 CIT at 118, 44 F. Supp. 2d at 258.

      Furthermore, the court concludes that Commerce's decision to use the Malaysian B&H

value was within its discretion and based on substantial evidence.  Ancientree does not dispute that

the Malaysian B&H value was superior to the Romanian value.  <u>See</u> Pl.'s Br. at 22.  Commerce is

statutorily permitted to use multiple sources of surrogate value and the usage of a less crucial value

from a non-primary surrogate country does not require Commerce to change its primary surrogate

country.  <u>See</u> 19 U.S.C. § 1677b(c)(1); <u>see also</u> <u>Camau Frozen Seafood Processing</u>, 37 CIT at

1119–21, 929 F. Supp. 2d at 1355–56.  Therefore, Commerce reasonably used the Malaysian B&H values without selecting Malaysia as the primary surrogate.   Because the court sustains Commerce's decisions regarding the reliability of the Romanian sawnwood quantities, the superiority of the Romanian financial statement, Ancientree's arguments regarding these less important FOPs cannot defeat Commerce's selection of Romanian as the primary surrogate country.

In sum, the court sustains Commerce's selection of Romania as the primary surrogate country as supported by substantial evidence and otherwise in accordance with law.

## II.     *Commerce's Sigstrat Financial Ratio Calculation Was Arbitrary and Capricious.*

Ancientree next challenges the Final Determination by arguing that Commerce's financial ratio calculation was inconsistent with its past calculations and did not address Ancientree's objections on that point, and thus was arbitrary and capricious.   In calculating the Romanian surrogate financial ratios to incorporate into the surrogate normal value, Commerce used Sigstrat's 2018 financial statements.  See Prelim. SV Memo; Dep't, Final Surrogate Value Memo (Feb. 21, 2020), P.R. 1560, 1571 ("Final SV Memo").   Commenting on surrogate value selections, Ancientree submitted a financial ratios calculation for the 2018 Sigstrat financial statement and Commerce's "calculation of the 2017 Sigstrat financial ratios" from Multilayered Wood Flooring From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016–2017, 84 Fed. Reg. 38,002 (Dep't Commerce Aug. 5, 2019) ("Multilayered Wood Flooring") to argue that AKC Alliance's proposed financial ratio calculation was incorrect and that Commerce "should calculate the financial ratios consistent with its methodology in past reviews."   See Ancientree, Rebuttal Prelim. Surrogate Value Submission at 1, Exs. SVR-1–SVR-2 (Aug. 19, 2019), P.R. 1007.  In its case brief, Ancientree

again brought attention to this issue by arguing that Commerce's preliminary financial ratio

calculation differed from Commerce's past calculations of financial ratios using Sigstrat's

financial statements.  See Ancientree's Admin. Case Br. at 14.  Specifically, Ancientree argued

that, in each past determination using Sigstrat financial statements and financial ratios, Commerce

"used significantly more delineated line items in Sigstrat's financial statement," which

"provide[ed] far more critical detail, including line items for raw materials and consumables and

personnel expenditure."  Id. at 14–15.  As in its Preliminary Determination, Commerce's Final

Determination Commerce's methodology differed from Multilayered Wood Flooring by reducing

the number of line items used for expenses from fifteen to eight.  Prelim.SV Memo; compare

Ancientree, Rebuttal Prelim. Surrogate Value Submission at Exs. SVR-1– SVR-2 with Final SV

Memo at Attach. 12 (Financial Ratios Calculation Worksheet).  Commerce, however, did not

directly address Ancientree's challenge in the Final Determination.  See IDM at 44–45 (explaining

the financial ratio calculation).

"[C]onsistency has long been a core interest of administrative law, and inconsistent

treatment is inherently significant."  DAK Americas LLC v. United States, 44 CIT __, __, 456 F.

Supp. 3d 1340, 1355 (2020) (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944); Chisholm

v. Def. Logistics Agency, 656 F.2d 42, 47 (3d Cir. 1981)).  "[W]here an agency departs from prior

determinations, it is appropriate to compel the agency to explain whether: (1) good reasons prompt

that departure; or (2) the prior determinations are inapposite such that it is not in fact a departure

at all."  Id. at 1356.  Though Commerce's prior determinations are not legally binding, its exercise

of discretion is constrained by the need to provide an adequate explanation for any deviation from

its past practice and interpretations.  SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed.

Cir. 2001) ("[A]n agency action is arbitrary when the agency offer[s] insufficient reasons for

treating similar situations differently." (quoting <u>Transactive Corp. v. United States</u>, 91 F.3d 232,

237 (D.C. Cir. 1996))).  Furthermore, "while [Commerce's] explanations do not have to be perfect,

the path of [Commerce's] decision must be reasonably discernable."  <u>NMB Singapore Ltd. v.</u>

<u>United States</u>, 557 F.3d 1316, 1319–20 (Fed. Cir. 2009) (citing <u>Motor Vehicle Mfrs. Ass'n v. State</u>

<u>Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983)).

  Ancientree argues that Commerce's financial ratio calculation for Sigstrat, the Romanian

wooden cabinets and vanities manufacturer, differed from how it consistently calculated financial

ratios using the same financial statements in past determinations.  Pl.'s Br. at 26–28.  Ancientree

contends that Commerce previously "used several detailed notes in the Sigstrat statement to

break[]out [fifteen] different line items for expenses," while here it only used "[eight] line items

and relied on the general Profit & Loss and Balance Sheet rather than the detailed notes."  <u>Id.</u> at

27.  Ancientree states that Commerce erred in not explaining its change in the use of the Sigstrat

financial ratio calculation.  <u>Id.</u> at 27–28.  Further, Ancientree contends that Commerce's decision

was deficient because it failed to respond to Ancientree's comment on that subject.  <u>Id.</u> at 27.  The

Government argues that the detailed calculation worksheet in Commerce's Final SV Memo

adequately explained the changes to the Sigstrat financial ratio calculation.  <u>See</u> Def.'s Br. at 21.

The Government and AKC Alliance contend that Commerce's financial ratio calculation was

reasonable "because it was based on an examination of all information on the record, as well as

the arguments advanced by the parties."  Def.'s Br. at 20; <u>see</u> Def. Inter.'s Br. 31.  Additionally,

they contend that Ancientree failed to explain why Commerce's calculation methodology resulted

in an erroneous financial ratio because Ancientree provided only one alternate calculation

methodology for Sigstrat's financial ratio.  <u>See</u> Def.'s Br. at 21; Def.-Inter.'s Br. 29–31.  Moreover,

AKC Alliance states that the 2017 Sigstrat financial statement is absent from the record, making

the applicability of Commerce's methodology in <u>Multilayered Wood Flooring from China</u> unclear. Def.-Inter.'s Br. at 30.  Furthermore, AKC Alliance highlights that Ancientree's own suggested calculation differed from the methodology used by Commerce in <u>Multilayered Wood Flooring from China</u>, and thus that Ancientree should have provided the Sigstrat financial statement so that Commerce could have analyzed the accuracy of Ancientree's proposed calculation.  <u>See</u> <u>id.</u>  The Government and AKC Alliance also contend that Commerce's decision not to respond to Ancientree's argument concerning the alleged inconsistent calculation does not inherently make Commerce's decision arbitrary because the reasoning behind Commerce's calculation is reasonably discernable.  Def.'s Br. at 21; Def.-Inter.'s Br. 29–31.

   The court concludes that Commerce did not adequately explain its calculation of Sigstrat's financial ratio in light of Ancientree's direct contention that its calculation differed from its past decisions.  The Government and AKC Alliance's argument that "the path of" Commerce's calculation was "reasonably discernable" is unpersuasive.  <u>See</u> <u>id.</u>  Commerce did not explain any change in its financial ratio calculation in response to Ancientree's comment, but rather explained only how the new calculation was performed.  This is insufficient.  <u>See</u> <u>NMB Singapore</u>, 557 F.3d at 1319–20 ("[I]n the anti-dumping context, a final determination by Commerce must include an explanation of the basis for its determination that addresses relevant arguments[] made by interested parties who are parties to the investigation or review." (quoting 19 U.S.C. § 1677f(i)(3)(A))).  While AKC Alliance argues that Ancientree's proposed methodology differed from the previous calculation in <u>Multilayered Wood Flooring from China</u> and that Ancientree did not place relevant Sigstrat financial statements on the record, Def.-Inter.'s Br. at 30–31, neither of these facts relieves Commerce of its obligation to address Ancientree's argument and to explain any change in its methodology between the two administrative reviews.  Ancientree's challenge

to the financial ratio calculation was material to Commerce's <u>Final Determination</u> because it affects Ancientree's AD duty margin.  <u>See</u> <u>CP Kelco US</u>, Slip Op. 16-36 at 3.  Thus, Commerce was obligated to address it.  Accordingly, the court remands Commerce's calculation of Sigstrat's financial ratio for further explanation.  On remand, Commerce may reopen the record as necessary to gather any financial statements or documents needed to respond to Ancientree's argument. <u>Shandong Rongxin Imp. & Exp. Co.</u>, 41 CIT __, __, 203 F. Supp. 3d 1327, 1337 (2017) ("The [c]ourt may remand with instructions for Commerce to decide whether to reopen and supplement the record, in order to obtain necessary information or resolve ambiguities, per its discretion." (citing <u>Essar Steel Ltd. v. United States</u>, 678 F.3d 1268, 1278 (Fed. Cir. 2012))).

### III.    *Commerce's Surrogate Value Selections for Ancientree's Sawnwood, MDF, Paint, and Particleboard Inputs Were Supported by Substantial Evidence.*

Ancientree's third and last challenge to Commerce's <u>Final Determination</u> is that Commerce erroneously selected HTS headings for surrogate value inputs that were less specific than the HTS headings Ancientree suggested for its actual sawnwood, MDF, paint, and particleboard FOPs. Pl.'s Br. at 6–7, 23–25.  The Government and AKC Alliance respond that Commerce selected surrogate values for Ancientree's sawnwood, MDF, paint, and particleboard inputs based on substantial evidence.  Def.'s Br. at 27; Def.-Inter.'s Br. 26–29.  The court concludes that Commerce's selected surrogate values were sufficiently product specific to Ancientree's inputs and were based on substantial record evidence in light of the limited information provided by Ancientree regarding its FOPs.[3]

When confronted with a surrogate value specificity issue, the question the court must ask itself is "whether substantial evidence on the record supports that [the surrogate HTS heading] is

---

[3]AKC Alliance argues that Ancientree made certain factual submissions too late in the investigation to form a basis for FOPs different than those used by Commerce.  Def.-Inter.'s Br.

sufficiently product-specific to the FOP at issue to allow a comparison with other criteria." United Steel and Fasteners, Inc., v. United States, 44 CIT __, __, 469 F. Supp. 3d 1390, 1398 (2020) (citing Taian Ziyang Food Co., v. United States, 35 CIT 863, 906–07, 783 F. Supp. 2d 1292, 1330 (2011)).  The surrogate value is sufficiently product specific to the material input when the surrogate data is "not so removed from the material input such that they are not comparable." Id. at 1398–99.  In fact, there is no general principle requiring Commerce to select the most specific surrogate HTS heading because it is within Commerce's discretion "to select a reasonable surrogate in light of each of the criteria outlined in Policy Bulletin 04.1." Id. at 1400.  Finally, "the burden of creating an adequate record lies with [interested parties] and not with Commerce." QVD Food, 658 F.3d at 1324 (quoting Tianjin Mach. Imp. & Exp. Corp., 806 F. Supp. at 1015).

### A.   Commerce's Selection of a Sawnwood Surrogate Value Was Supported by Substantial Evidence.

Commerce selected surrogate values of Romanian birch and poplar sawnwood under the six-digit HTS subheadings 4407.96 and 4407.97, respectively, which cover birch and poplar "wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded, or end-jointed of a thickness exceeding 6 mm."  IDM at 43.  Commerce explained that this heading was sufficiently specific because Ancientree's questionnaire responses did not describe its wood inputs "in any detail greater than 'birch sawnwood' or 'poplar sawnwood.'" Id. at 43–44.  Ancientree contends that Commerce's selection of a six-digit HTS heading for surrogate value of its

---

at 28.  The court need not reach this issue since it finds Ancientree's challenge unpersuasive. Similarly, in response to the court's questioning on this issue, Ancientree also argues that Commerce could have asked for further information on Ancientree's inputs, as it has done in past investigations.  Pl.'s Post-Arg. Submission at 4–5.  The court notes that simply because Commerce can request additional information during an investigation, does not mean Commerce must have done so, especially where, as here, Commerce did not identify a deficiency or gap in the record and relied on information provided by Ancientree regarding its FOPs.

sawnwood FOPs is overly broad and includes dissimilar wood products.  Pl.'s Br. at 6–7.  Rather,

Ancientree argues that Commerce should have used the ten-digit Malaysian HTS value because it

is more specific to the type of wood used by Ancientree.  Id. at 7.  The Government and AKC

Alliance respond by highlighting that the record only describes Ancientree's sawnwood as "birch

sawnwood" and "poplar sawnwood" and, therefore, Commerce reasonably used the broader

Romanian HTS classification to value those FOPs rather than the more specific Malaysian HTS

heading.  Def.'s Br. at 28; Def.-Inter.'s Br. 11–12.

Commerce's selection of surrogate values for Ancientree's birch and poplar sawnwood

inputs is supported by substantial evidence.  Ancientree's suggestion that a narrower surrogate

HTS heading should be assigned to its sawnwood inputs is not supported by record evidence.  In

the past, the court has rejected similar challenges by respondents that provided Commerce broad

descriptions of its inputs and then requested more narrow HTS headings be used for surrogate

FOPs.  See, e.g., Dorbest Ltd. v. United States, 30 CIT 1671, 1728, 462 F. Supp. 2d 1262, 1311

(2006); An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States, 41 CIT __, __, 203 F.

Supp. 3d 1256, 1273 (2017).  For example, in Dorbest, the respondent described its styrofoam

input as simply "styrofoam" then asked for a more specific HTS heading be used to value that

input.  30 CIT at 1728–29, 462 F. Supp. 2d at 1311.  The court found that "respondents did not

provide an abundance of detail in their description" and "Commerce credited Respondents'

descriptions of the nature of their products as much as possible[] and sought to match the

descriptions to HTS subheadings."  30 CIT at 1729–30, 462 F. Supp. 2d at 1312.  The court

concludes that this analysis applies equally in this case.  Here, Commerce was given a limited

record and, as a result, used the information at its disposal to match the sawnwood inputs with a

surrogate HTS heading that was sufficiently product-specific.  See also United Steel and Fasteners,

Inc., 469 F. Supp. 3d at 1398.  As a result, the court holds that Commerce's sawnwood surrogate

value selection was based on substantial evidence.

> **B.      Commerce's MDF and Particleboard Surrogate Value Selections Were Supported by Substantial Evidence.**

To value Ancientree's MDF inputs, Commerce used HTS category 4411.14.90, which is a

basket "other" category covering MDF not otherwise specified in 4411.14.   IDM at 55–56.

Commerce rejected Ancientree's proposed surrogate HTS heading 4411.14.10, covering "[MDF]

of Wood, Of A Thickness > 9 Mm, Not Mechanically Worked Or Surface-Covered."  Id.  Rather,

Commerce stated that Ancientree "failed to provide documentation demonstrating that HTS

category 4411.14.10 specifically applies to the MDF input it consumes (i.e., through input

descriptions, purchase invoices, or photographs of the input on the record)."  Id. at 56.  Due to the

lack of record evidence and Ancientree's admission that its MDF was "surface covered,"

Commerce found 4411.14.90 to be the appropriate surrogate HTS heading to value MDF inputs

that have "processing imparted to them."  Id.  For similar reasons, Commerce used HTS heading

4410.11.90, covering particleboard not otherwise specified in HTS category 4410.11, to value

Ancientree's particleboard inputs.   Id. at 57–58.   Commerce determined that HTS category

4410.11.90 was more accurate than HTS 4410.10.10, the classification Ancientree recommended,

because of Ancientree's statement that its particleboard has a laminate overlay.  Id. at 58.

Ancientree here renews its challenge to Commerce's selection of MDF and particleboard

surrogate values.  It again argues that the MDF it uses for its products should be valued under the

more specific HTS category 4411.14.10, because Ancientree buys unworked MDF that it then

processes during production. Pl.'s Br. at 24.  Ancientree also argues that it purchases unprocessed

particleboard contrary to Commerce's selection of a surrogate value of processed particleboard.

Pl.'s Br. at 26.  In support of Commerce's surrogate value selections, the Government and AKC

Alliance note that Ancientree admitted its MDF is surface-covered and the record demonstrates that its cabinets include a laminated exterior. Def.'s Br. at 30; Def.-Inter.'s Br. 26–27. Additionally, they contend that Ancientree provided no evidence that it purchases the MDF unworked then, subsequently, processes it. Def.'s Br. at 29; Def.-Inter.'s Br. 26–27. Rather, they argue that the record shows that Ancientree does purchase processed MDF and, therefore, Commerce's HTS surrogate value selection was based on substantial evidence. Id. Similarly, the Government and AKC Alliance contend that there is no record support for Ancientree's assertion that it purchases unworked or sanded particleboard. Def.'s Br. at 32; Def.-Inter.'s Br. 27. They contend that the record shows the particleboard used in Ancientree products is processed and, consequently, Commerce's decision to use a surrogate HTS heading for processed particleboard was based on substantial evidence. Def.'s Br. at 32–33; Def.-Inter.'s Br. 27.

The court concludes that Commerce's decisions to value Ancientree's MDF inputs under HTS heading 4411.14.90 and particleboard inputs under HTS heading 4410.11.90 are supported by substantial evidence. The record contravenes Ancientree's contentions that its submissions to Commerce support the selection of more specific surrogate values for MDF and particleboard. Ancientree's production flowchart provided to Commerce does not indicate that Ancientree covers the MDF or particleboard with any sort of surface covering. See Ancientree, Fourth Suppl. Questionnaire Resp. at Ex. SQ 4-10 (Sept. 23, 2019), P.R. 1367. Additionally, Ancientree's product brochure indicates that its cabinets and vanities which include MDF and particleboard include a "matching laminate exterior." See IDM at 55; Ancientree, Sec. A Questionnaire Resp. at Ex. A-5 (July 3, 2019), P.R. 870. Thus, Commerce's selection of surrogate HTS headings for the MDF and particleboard inputs were reasonably specific because these categories include products that Ancientree's evidence shows that it uses. Therefore, Commerce acted based on

substantial evidence and within its discretion when selecting the 4411.14.90 and 4410.11.90 for

surrogate valuations of these FOP inputs.  See QVD Food, 658 F.3d at 1323–24.

> **C.    Commerce's Selectin of Paint Surrogate Value Was Supported by Substantial Evidence.**

During the investigation, Ancientree suggested that Commerce use HTS heading 3209.10,

which covers paints and varnishes "dispersed or dissolved in an aqueous medium," IDM at 56, in

valuing its paint input.  See Ancientree Prelim. SV Comments at Ex. SV-1.  However, Commerce

determined that HTS heading 3208.10.90, which covers paints and varnishes "dispersed or

dissolved in a non-aqueous medium," was the proper surrogate for Ancientree's paint inputs.  IDM

at 56–57.  During verification, Commerce did not uncover any documentation detailing the

chemical composition for Ancientree's paint input.  Id. at 57.  The translated invoices, however,

stated that Ancientree purchased "water based UV paint" and "water based color paint" alongside

"paint."  Ancientree, Verification Exhibits (Nov. 15, 2019), P.R. 1486.

Ancientree argues that there is record support that it consumes paint that is "dispersed or

dissolved in an aqueous medium" and, as a result, Commerce erred in valuing its paint inputs using

the HTS heading that covers non-aqueous based paint.  Pl.'s Br. at 25.  The Government and AKC

Alliance respond by arguing that Ancientree did not provide record evidence that it used water-

based paint -- in particular, that Ancientree's paint purchase invoices did not indicate what portion,

if any, of its paint inputs is water-based.  Def.'s Br. at 31; Def.-Inter.'s Br. 27–28.  Therefore, they

argue that Commerce's surrogate value selection forpaint inputs as non-aqueous was supported by

substantial evidence.  Def.'s Br. at 31–32; Def.-Inter.'s Br. 27–29.

The court concludes that Commerce's decision to value Ancientree's paint inputs under

HTS heading 3209.10.90 is supported by substantial evidence.  As with its MDF input, Ancientree

failed to provide detailed characteristics for its paint inputs.  While some of its invoices are for

water-based paint, most of the invoices are for simply "paint."  Ancientree, Verification Exhibits.

Given this ambiguous and limited record, Commerce reasonably selected the non-aqueous paint

surrogate HTS heading to value Ancientree's paint inputs.  See QVD Food, 658 F.3d at 1323–24.

       In short, the court is unpersuaded by this challenge to Commerce's Final Determination

and concludes that Commerce's selections of surrogate values were sufficiently product specific

to Ancientree's inputs and based on substantial record evidence.  See United Steel and Fasteners,

Inc., 469 F. Supp. 3d at 1398.

**CONCLUSION**

       The court concludes that Commerce's selection of Romania as the primary surrogate

country and selection of surrogate values in its Final Determination are each supported by

substantial evidence and otherwise in accordance with law.   However, the court remands

Commerce's calculation of Sigstrat's financial ratio for further explanation consistent with this

opinion in light of Ancientree's unaddressed contention that Commerce changed its calculation

methodology from its past decisions using Sigstrat's financial statements.  Commerce shall file

with this court and provide to the parties its remand results within ninety (90) days of the date of

this order; thereafter, the parties shall have thirty (30) days to submit briefs addressing the revised

final determination with the court, and the parties shall have thirty (30) days thereafter to file reply

briefs with the court.

       **SO ORDERED.**

                                                                      /s/   *Gary S. Katzmann*
                                                                      Gary S. Katzmann, Judge


 Dated:  July 12, 2021
             New York, New York