**Web Pages Cited in the Opinion**

<u>Import Administration Policy Bulletin</u>

Number: 04.1
Topic: Non-Market Economy Surrogate Country Selection Process

Approved: _____

      James Jochum
      Assistant Secretary
        for Import Administration


_____
Date

<u>Statement of Issue</u>

This policy bulletin provides guidance regarding the Department's selection of surrogate market economy countries in non-market economy ("NME") cases.

<u>Background</u>

The statute provides broad discretion in the selection of surrogate market economy countries to value NME factors of production. In particular, section 773(c)(1)(B) of the Act reads:

> ...the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

Section 773(c)(4) of the Act adds:

The administering authority shall utilize *to the extent possible* ... prices ... in one or more market economy countries that are -

> 1. at a level of economic development comparable to that of the nonmarket economy country, and

> 2. a significant producer of comparable merchandise.

The terms "comparable level of economic development," "comparable merchandise," and "significant producer" are not defined in the statute. However, the Department's regulations attempt to clarify the statute's general guidance regarding surrogate country selection. In determining economic comparability, section 351.408 of the regulations places primary emphasis on per capita income, although other information can be considered. Some clarification is also provided in the Conference Report to the 1988 Omnibus Trade and Competitiveness Act, which added to the statute the current NME provisions and states that "significant producer" includes any country that is a "significant net exporter."[1] Section 351.408 of the regulations also makes clear that the relative weight attached to each of the two selection criteria, described above, is unspecified because the relative importance that the Department attaches to each will necessarily vary depending on the specific facts in each case.

The Conference Report also states that the Department should seek to use, if possible, data (in the surrogate market economy country) that reflect levels of technology and production volumes that are similar to the producers under investigation.

Statement of Policy

In each NME investigation and review, the team considers potential surrogate countries in terms of their economic comparability to the NME country, and whether they are significant producers of comparable merchandise. The team then designates one country as the primary surrogate in a memo to the file, which explains how that country satisfies the statutory selection criteria. The memo must give substantive reasons on the record for why it deems the country selected to be a "significant producer" of comparable merchandise. It must include more than mere assertions, and must separately address the significant producer and comparable merchandise requirements. If one or both of the statutory criteria cannot be met, the memo should explain why this is the case, and why the particular country was selected as the primary surrogate.

The statute does not require that the Department use a surrogate country that is at a level of economic development *most* comparable to the NME country and that is the *most* significant producer of comparable merchandise. The statute requires only that the Department use a surrogate market economy country that is at a level of economic development comparable to that of the NME country and that is a significant producer of comparable merchandise. Even these requirements are not binding, as the statute requires that they be met *only to the extent possible*. Accordingly, the Department has adopted the following approach of sequential consideration of the statutory elements.[2]

*Economic Comparability*

First, early in a proceeding, the operations team sends the Office of Policy ("OP") a written request for a list of potential surrogate countries. In response, OP provides a list of potential surrogate countries that are at a comparable level of economic development to the NME country.[3] OP determines economic comparability on the basis of per capita gross national income, as reported in the most current annual issue of the World Development Report (The World Bank).[4] The surrogate countries on the list are not ranked and should be considered equivalent in terms of economic comparability.[5] Both the team's written request and OP's response should be made available to interested parties by being placed on the record of the proceeding.

*Comparable Merchandise*

Second, the operations team identifies those countries with producers of comparable merchandise among the potential surrogates on OP's list. As noted above, "comparable merchandise" is not defined in the statute or the regulations, since it is best determined on a case-by-case basis. Even so, there are some basic rules that every team should follow. In all cases, if identical merchandise is produced,[6] the country qualifies as a producer of comparable merchandise. In cases where identical merchandise is not produced, the team must determine if other merchandise that is comparable is produced. How the team does this depends on the subject merchandise. For example, in some cases, *e.g.*, steel and textiles, physical form and the extent of processing/finishing essentially distinguish different products. In such cases, consideration of major inputs often is not required, as it is normally sufficient for the team to identify comparable merchandise on the basis of physical differences in the merchandise and whether the product is one of low or high value-added. Thus, if circular steel pipe and tube were the subject merchandise, rectangular steel pipe and tube, hot-rolled steel sheet and plate, steel wire rod, steel wire rope, steel bar, and structurals,

all of which are low value-added products of roughly similar form (made by combining iron, energy, and further processing), would constitute comparable merchandise.

A similar approach can also be used in the case of industrial commodity chemicals and when the subject merchandise is part of a spectrum of light manufactured products, *e.g.*, paper clips, fireworks, wax candles, cased pencils, toys, shoes, gift boxes, folding metal tables and chairs. In these cases, the large number, and generic nature, of the inputs makes input matching very complicated. Therefore, it may make more sense for the operations team to consider the physical characteristics of the merchandise, and the extent of further value-added process in identifying comparable merchandise.

In other cases, however, where there are major inputs, *i.e.*, inputs that are specialized or dedicated or used intensively, in the production of the subject merchandise, *e.g.*, processed agricultural, aquatic and mineral products, comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs, including energy, where appropriate.

*Significant Producer*

Third, the operations team determines whether any of the countries which produce comparable merchandise are "significant" producers of that comparable merchandise. The extent to which a country is a *significant* producer should not be judged against the NME country's production level or the comparative production of the five or six countries on OP's surrogate country list. Instead, a judgement should be made consistent with the characteristics of world production of, and trade in, comparable merchandise (subject to the availability of data on these characteristics). Since these characteristics are specific to the merchandise in question, the standard for "significant producer" will vary from case to case. For example, if there are just three producers of comparable merchandise in the world, then arguably any commercially meaningful production is significant. Intermittent production, however, would not be significant. If there are ten large producers and a variety of small producers, "significant producer" could be interpreted to mean one of the top ten. If, in the example above, there is also a middle-size group of producers, then "significant producer" could be interpreted as one of the top ten or middle group. In another case, there may not be adequate data available from major producing countries. In such a case, "significant producer" could mean a country that is a net exporter, even though the selected surrogate country may not be one of the world's top producers. Because the meaning of "significant producer" can differ significantly from case to case, fixed standards such as "one of the top five producers" have not been adopted. For example, South Korea is, by almost any measure, a significant producer of steel, even though in 2001 it was not one of the top five producers overall.

Given that the decision as to what constitutes "significant production" in a particular case depends on available (often scarce) data, the specific criteria and supporting factual information used to determine whether a potential surrogate country is a significant producer is left to the discretion of the operations team. The operations team may consult with U.S. Government experts who have made their own assessments of the world's producers of comparable merchandise or who can supply the team with country production or trade data. Other possible sources of data supporting the "significant production" decision may include non-governmental organizations or international trade/industry association publications and similar sources.

Sometimes, none of the countries identified as being economically comparable are a

significant producer of comparable merchandise, as defined above. Or, it may happen that some countries meet both criteria, but sufficient data (with respect to quantity and quality) are not available to enable the Department to use any of those countries as the primary surrogate. In such cases, the team should request a second list of potential surrogate countries from OP, and then follow the country selection procedure described above.

### Data Considerations

Fourth, if more than one country has survived the selection process to this point, the country with the best factors data is selected as the primary surrogate country.[7] Even if no issues arise regarding economic comparability and significant production, data quality is a critical consideration affecting surrogate country selection. After all, a country that perfectly meets the requirements of economic comparability and significant producer is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable. Limited data availability sometimes is the reason why the team will "go off" the OP list in search of a viable primary surrogate country.

In assessing data and data sources, it is the Department's stated practice to use investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data.

### Exceptions to the Sequencing Procedure

Occasionally, there are also cases in which it is more appropriate for the team to address economic comparability only *after* the significant producer of comparable merchandise requirement is met. Cases where particular emphasis on "significant producer of comparable merchandise" is warranted are generally those that involve subject merchandise that is unusual or unique (with correspondingly unusual or unique inputs or other unique aspects of the cost of production), *e.g.*, crawfish, which is produced by only a few countries. See *Freshwater Crawfish Tail Meat from the People's Republic of China: Notice of Preliminary Results of Antidumping Duty Administrative Review*, 67 FR 63877 (October 16, 2002). Particular emphasis on "significant producer of comparable merchandise" is also generally warranted where major inputs are not widely traded internationally, *e.g.*, electricity, which is used intensively in the production of magnesium. See *Notice of Preliminary Results of Antidumping Duty Administrative Review: Pure Magnesium from the Russian Federation*, 59 FR 55427 (November 7, 1994).[8]

The significant producer requirement is particularly important in these cases because the Department wants to avoid selecting a surrogate country in which the relative scarcity (either through domestic sources or through imports) of a major non- or little-traded input precludes the country from being a competitive producer of comparable merchandise. For example, in the *Notice of Preliminary Determination of Sales at Less Than Fair Value: Urea Ammonium Nitrate Solutions From the Russian Federation*, 67 FR 62008 (October 3, 2002), the Department placed particular emphasis on the significant producer requirement in light of the gas-intensive nature of urea ammonium nitrate production, and the fact that natural gas is not commonly imported into the countries being considered as surrogate countries.

In cases in which the significant producer of comparable merchandise criterion is particularly important, the team should first ensure, on the basis of in-house research (including possible communications with other U.S. Government experts) and any interested party comments, that the significant producer of comparable merchandise requirement is met. Only after this

requirement is met should the team consider economic comparability. If the competing significant producer countries are at disparate levels of economic development, and the necessary factors data is available in these countries, then the team should use the country closest to the NME country in terms of per capita GNI. On the other hand, if the significant producer countries are at closely similar levels of economic development, as are the countries on a surrogate country selection list, the team should use the country with the best factor price data. Where only one country satisfies the significant producer and data requirements, that country will normally be used.

---

1. A net exporter is defined as a country whose exports exceed its imports.

2. An alternative approach that the Department has considered, but rejected as administratively unfeasible would be to assess the extent to which each country "grades out" *overall* with respect to the two statutory criteria. For example, each country would be assessed with respect to economic comparability and the extent to which it was a significant producer of comparable merchandise. These two grades would then be weighted together to arrive at a composite grade for each country. Teams would then have to combine with this composite grade an assessment or grading of factors data quality and completeness in the country. The best surrogate would then be selected on the basis of this overall grade.

3. OP excludes non-market economy countries from the list of potential surrogate countries, and also excludes countries that technically are presumed to be market economies, but which in OP's judgement are unsuitable sources for factor values (*e.g.*, Cuba).

4. In the past, the OP memos also referenced growth rates and the national distribution of labor between the agriculture and non-agriculture sectors. However, since these factors are not determinative in the selection of an economically comparable surrogate country, they will no longer be included in future OP memos.

5. IA's current practice reflects in large part the fact that the statute does not require the Department to use a surrogate country that is at a level of economic development *most* comparable to the NME country.

6. If considering a producer of identical merchandise leads to data difficulties, the operations team may consider countries that produce a broader category of reasonably comparable merchandise.

7. An additional surrogate is sometimes used to fill factor price "holes" in the primary surrogate.

8. For example, concerns were raised in *Pure Magnesium from the Russian Federation* about the electricity-intensive nature of magnesium production and the fact that electricity, as a general rule, is not significantly traded into potential surrogate countries. These concerns made clear the importance, from an electricity valuation standpoint, of selecting a surrogate that was a significant producer of magnesium or some other comparable electricity-intensive product. However, none of the countries on OP's initial surrogate country list produced "comparable merchandise," even after that had been more broadly defined. (After consulting with experts at the U.S. Bureau of Mines and the DOC Trade Development Metals Division, the Department concluded in that case that "comparable merchandise" comprised magnesium

and aluminum because both are "light metals" in terms of weight, are electricity-intensive products, are produced using an electrolytic process, and share some common end-uses. The Department, with the help of the U.S. Bureau of Mines, identified four significant producers of such "comparable merchandise," defining significant production as production exceeding 100,000 metric tons per year. Venezuela, Argentina, Brazil and South Africa were found to be "significant producers" of either magnesium or aluminum. Because only Brazil produced magnesium, the Department selected Brazil as the primary surrogate country.