A-570-106
Remand
Slip Op. 21-87
POI:  07/01/2018 – 12/31/2018
**Public Document**
E&C/OV:  RG

***The Ancientree Cabinet Co., Ltd. v. United States***
**Court No. 20-00114, Slip Op. 21-87 (CIT July 12, 2021)**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.  SUMMARY

The Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the decision and remand order of the Court of International Trade

(CIT) in *The Ancientree Cabinet Co., Ltd. v. United States*, Court No. 20-00114, Slip Op. 21-87

(CIT July 12, 2021) (*Remand Opinion and Order*).  These final results of redetermination

concern Commerce's final determination in the less-than-fair-value (LTFV) investigation of

wooden cabinets and vanities and components thereof (wooden cabinets and vanities) from the

People's Republic of China (China).[1]  In the *Remand Opinion and Order*, the CIT remanded

Commerce's calculation of the surrogate financial ratios, computed using the financial

statements of S.C. Sigstrat s.a. (Sigstrat).  Specifically, the CIT ordered Commerce to address the

objections raised by The Ancientree Cabinet Co. Ltd. (Ancientree) to Commerce's calculation

and explain its departure from Commerce's financial ratio calculations using Sigstrat's financial

statements in other proceedings.[2]

---

[1] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 11953 (February 28, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Corrected Notice of Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 17855 (March 31, 2020) (*Corrected Final Determination*).
[2] *See Remand Opinion and Order* at 28.

Pursuant to the *Remand Opinion and Order*, we further explain Commerce's surrogate financial ratio calculations and why it was appropriate to apply the methodology used in this investigation rather than the one used in an administrative review of a separate proceeding.[3]  In particular, we address the arguments submitted in Ancientree's administrative case brief[4] and the administrative rebuttal brief submitted by American Kitchen Cabinet Alliance (the petitioner)[5] related to the surrogate financial ratios, as well as comments on our Draft Remand,[6] and we provide additional explanation to support the calculations used in *Preliminary Determination*,[7] which were unchanged in the *Final Determination*.  After analyzing the information on the record and considering the comments from Ancientree and the petitioner, we are making no changes to the financial ratio calculations used in the *Final Determination*.

## II.   BACKGROUND

On April 2, 2019, Commerce published the *Initiation Notice* in the LTFV investigation of wooden cabinets and vanities from China.[8]  Subsequently, we selected three Chinese exporters and producers of subject merchandise as mandatory respondents to Commerce's initial questionnaire:  Ancientree, Dalian Meisen Woodworking Co., Ltd. (Meisen), and Rizhao

---

[3] *See Multilayered Wood Flooring from the People's Republic of China:  Final Results of the Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 38005 (August 5, 2019) (*MLWF from China 2016-2017*).

[4] *See* Ancientree's Letter, "Case Brief," dated December 17, 2019 (Ancientree's Case Brief) at 14-15.

[5] *See* Petitioner's Letter, "Rebuttal Brief Regarding General and Ancientree-Specific Issues," dated December 26, 2019 (Petitioner's Rebuttal Brief) at 22-25.

[6] *See* Draft Results of Redetermination Pursuant to Court Remand:  *The Ancientree Cabinet Co., Ltd. v. United States*, Court No. 20-00114, Slip Op. 21-87 (CIT July 12, 2021), dated September 10, 2021 (Draft Remand); *see also* Ancientree's Letter, "Comment on Draft Remand Redetermination," dated September 17, 2021 (Ancientree's Draft Remand Comments); and Petitioner's Letter, "Comments on Draft Remand Redetermination," dated September 17, 2021 (Petitioner's Draft Remand Comments).

[7] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 FR 54106 (October 9, 2019) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

[8] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Initiation of Less-Than-Fair-Value Investigation*, 84 FR 12587 (April 2, 2019) (*Initiation Notice*).

Foremost Woodwork Manufacturing Company Ltd. (Foremost).[9]  The period of investigation (POI) is July 1, 2018, through December 31, 2018.

On October 9, 2019, Commerce published the *Preliminary Determination*, finding that wooden cabinets and vanities from China are being sold in the United States at LTFV.[10]  On December 17, 2019, Ancientree submitted its case brief, and on December 26, 2019, the petitioner submitted its rebuttal brief in response to Ancientree's arguments.[11]  In its case brief, Ancientree contested various aspects of Commerce's calculation of the surrogate financial ratios used to determine Ancientree's preliminary dumping margin.

On February 28, 2020, Commerce published the *Final Determination* and continued to find that wooden cabinets and vanities from China are sold at LTFV in the United States by the three mandatory respondents and the China-wide entity.[12]  In the *Final Determination*, Commerce made no changes to its calculation of the surrogate financial ratios.  On March 31, 2020, Commerce published a *Corrected Final Determination* to correct errors that were present in the *Final Determination* in certain company names.[13]

On July 12, 2021, the CIT held that Commerce did not adequately address Ancientree's Case Brief comments on the calculation of the surrogate financial ratios in its *Final Determination*.[14]  As a result, the CIT remanded the *Final Determination* to Commerce to address Ancientree's arguments and further explain this calculation.[15]

---

[9] *See* Memorandum, "Respondent Selection," dated June 4, 2019.
[10] *See Preliminary Determination*.
[11] *See* Ancientree's Case Brief; *see also* Petitioner's Rebuttal Brief.
[12] *See Final Determination*.
[13] *See Corrected Final Determination*.
[14] *See Remand Opinion and Order* at 27-28.
[15] *Id.* at 27-28.

On September 10, 2021, Commerce released to interested parties the Draft Remand and established the deadline for interested parties to submit comments.[16]  On September 17, 2021, Ancientree and the petitioner timely submitted comments on the Draft Remand.[17]

## III.   REMANDED ISSUE

The CIT remanded the surrogate financial ratio calculation from the *Final Determination*, holding that Commerce did not adequately address Ancientree's arguments opposing the methodology used for the calculation.  The CIT specifically noted that the methodology used for calculating the surrogate financial ratios in this investigation differed from the methodology used in *MLWF from China 2016-2017*, although both proceedings relied on Sigstrat's financial statements (albeit from different years).  Therefore, the CIT instructed Commerce to address Ancientree's Case Brief arguments, and explain why it was appropriate to change the financial ratio calculation methodology used in this investigation from the methodology employed in *MLWF from China 2016-2017*.[18]

Accordingly, we summarize and respond to the comments presented by Ancientree and the petitioner in their respective case and rebuttal briefs and comments on the Draft Remand regarding the surrogate financial ratio calculations below.  We also explain why Commerce's calculation in this case, which differed from the calculation in *MLWF from China 2016-2017*, was appropriate based on the facts on this record and was also in accordance with the Tariff Act of 1930, as amended (the Act).

---

[16] *See* Draft Remand.
[17] *See* Ancientree's Draft Remand Comments; *see also* Petitioner's Draft Remand Comments.
[18] *Id*. at 27.

1.      **Legal Framework**

Pursuant to section 773(c)(1) of the Act, when investigating imports from a non-market economy (NME) country, Commerce bases normal value (NV), in most circumstances, on the NME producer's factors of production (FOPs), valued in a surrogate market economy (ME) country or countries considered to be appropriate by Commerce.  Once Commerce selects the most appropriate surrogate ME country, in accordance with section 773(c)(1)(B) of the Act, Commerce calculates NV based on the FOP data reported by a respondent by multiplying the per-unit FOP consumption rates by the best publicly available surrogate value (SV) information. According to 19 CFR 351.408(c)(4), Commerce must value overhead, selling, general and administrative (SG&A) expenses, and profit using non-proprietary information gathered from producers of merchandise that is identical or comparable to the merchandise under consideration in the primary surrogate country.  Commerce uses the non-proprietary information from the surrogate producers to compute overhead, SG&A, and profit ratios; these ratios are known as the "surrogate financial ratios."

2.      **Background**

Between July 16 and September 13, 2019, we received comments regarding the selection of a surrogate country and SVs from the petitioner,[19] Ancientree,[20] Foremost,[21] Meisen,[22] and

---

[19] *See* Petitioner's Letters, "Surrogate Country Comments," dated July 16, 2019; "Petitioner's Initial Surrogate Value Comments," dated August 7, 2019 (Petitioner's SV Comments); "Petitioner's Initial Rebuttal Surrogate Value Comments," dated August 19, 2019; "Petitioner's Final Surrogate Value Comments," dated September 3, 2019; and "Petitioner's Comments on Respondents' Final Surrogate Value Comments," dated September 13, 2019.

[20] *See* Ancientree's Letters, "Surrogate Country Comments," dated July 16, 2019; "Preliminary Surrogate Value Submission," dated August 7, 2019; "Rebuttal Preliminary Surrogate Value Submission," dated August 19, 2019 (Ancientree's Rebuttal SV Comments); and "Final Surrogate Value Submission," dated September 3, 2019.

[21] *See* Foremost's Letters, "Foremost's Surrogate Country Selection Comments," dated July 16, 2019; "Foremost's Affirmative Surrogate Value Submission," dated August 7, 2019; "Foremost's Rebuttal Surrogate Value Submission," dated August 19, 2019; and "Foremost's Final Surrogate Value Submission," dated September 3, 2019.

[22] *See* Meisen's Letters, "Surrogate Country Comments," dated July 5, 2019; "Surrogate Value Comments," dated August 7, 2019; and "Rebuttal Surrogate Value Comments," dated August 19, 2019.

Shanghai Wen Bo Industries Co., Ltd. (Wen Bo),[23] an exporter of subject merchandise. After considering the information provided within those submissions, we selected Romania as the primary surrogate country.[24] In calculating the overhead, SG&A, and profit surrogate financial ratios used for determining NV, we used the 2017-2018 financial statements of a Romanian producer of plywood and veneers, Sigstrat, which the petitioner provided along with its suggested financial ratio calculations.[25] In response to Petitioner's SV Comments, Ancientree submitted a spreadsheet with its own suggested financial ratio calculations and the spreadsheet with financial ratio calculations from *MLWF from China 2016-2017*, a case where Commerce also relied on Sigstrat's financial statements. Ancientree argued that Commerce should use its calculation because it followed the methodology used in *MLWF from China 2016-2017* (albeit with some modifications).[26]

In the *Preliminary Determination*, Commerce used a financial ratio calculation methodology containing elements from each suggested methodology provided in SV comments (*e.g.*, similar to the suggestion provided by the petitioner, we started with Note 7 and Sigstrat's cost of goods sold (COGS) to calculate the financial ratios),[27] and consistent with the suggestions provided by Ancientree, we included segregated energy costs in the calculation of the

---

[23] *See* Web Bo's Letters, "Surrogate Country Comments," dated July 16, 2019; "Surrogate Value Selection Comments," dated August 7, 2019; "Surrogate Value Selection Rebuttal Comments," dated August 19, 2019; and "Factual Information to Value Factors of Production," dated September 3, 2019.

[24] *See Preliminary Determination* PDM at 11-14; *see also* Memorandum, "Surrogate Value Memorandum for the Preliminary Determination," dated October 2, 2019 (Preliminary SV Memorandum) at 2-5. Commerce's decision to use Romania as the primary surrogate country was unchanged in the *Final Determination*. In the *Remand Opinion and Order*, the CIT ruled that Commerce properly selected Romania as the primary surrogate country. *See Final Determination* IDM at Comment 6; *see also Remand Opinion and Order* at 11-12.

[25] *See* Petitioner's SV Comments at Exhibits 10A and 10B.

[26] *See* Ancientree's Rebuttal SV Comments at 1-2 and Exhibits SVR1 and SVR2 (referencing *MLWF from China 2016-2017*, and citing Memorandum, "Antidumping Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China; 2016-2017: Surrogate Values for the Preliminary Determination," dated December 17, 2018) (*MLWF from China 2016-2017* SV Memorandum).

[27] *See* Petitioner's SV Comments at Exhibit 10A *cf.* Preliminary SV Memorandum at Exhibit 12.

denominators.[28]  Thus, the preliminary financial ratio calculation methodology incorporated aspects of both the petitioner's and Ancientree's suggested calculations.

After the issuance of the *Preliminary Determination*, Ancientree submitted a case brief and argued that Commerce should recompute the surrogate financial ratios using Ancientree's suggested methodology.[29]  The petitioner rebutted Ancientree's argument and did not dispute Commerce's financial ratio calculations.[30]  In the *Final Determination*, Commerce made no changes to the financial ratio calculations.[31]

### 3.     The Court's Remand Order

In the *Remand Opinion and Order*, the CIT found that Commerce failed to address Ancientree's Case Brief arguments regarding the calculation of the surrogate financial ratios.[32] The CIT held that Commerce was obligated to not only specifically address Ancientree's arguments, but that it must explain why the methodology used in this case differed from previous financial ratio calculations that also relied on Sigstrat's financial statements.  The CIT explained that "{c}onsistency has long been a core interest of administrative law, and inconsistent treatment is inherently significant."[33]  It continued by explaining that, "{w}hen an agency departs from prior determinations, it is appropriate to compel the agency to explain whether:  (1) good reasons prompt that departure; or (2) the prior determinations are inapposite such that it is not in fact a departure at all."[34]  While the CIT noted that prior determinations are not legally binding, and that Commerce may exercise its discretion in selecting its methodology, Commerce

---

[28] *See* Preliminary SV Memorandum at Exhibit 12 *cf.* Ancientree's SV Rebuttal at Exhibits SVR-1 and SVR-2.
[29] *See* Ancientree's Case Brief at 15.
[30] *See* Petitioner's Rebuttal Brief at 22-25.
[31] *See* Memorandum, "Surrogate Value Memorandum for the Final Determination," dated February 21, 2020 (Final SV Memorandum) at Attachment 12.
[32] *See Remand Opinion and Order* at 24-28.
[33] *Id.* at 25 (citing *DAK Americas LLC v. United States*, 456 F. Supp. 3d 1340, 1355 (CIT 2020) (*Dak Americas LLC*)).
[34] *Id.* (citing *DAK Americas LLC*, 456 F. Supp. 3d at 1356).

"is constrained by the need to provide an adequate explanation for any deviation from its past practice,"[35] and that Commerce's decision "must be reasonably discernable."[36]  Therefore, the CIT remanded this issue to Commerce, and directed it to respond to Ancientree's Case Brief arguments and to further explain the calculations used in this investigation.

### 4.    Ancientree's Case Brief Arguments and the Petitioner's Rebuttal

In its case brief, Ancientree argued that Commerce computed the surrogate financial ratios in the *Preliminary Determination* in a manner that differed from the methodology it has "always" used to calculate Sigstrat's financial ratios in the past.[37]  Specifically, Ancientree claimed that, in several earlier administrative reviews of the antidumping duty order on multilayered wooden flooring from China, and in the LTFV investigation of certain hardwood plywood products from China, Commerce also used Sigstrat's financial statements, but computed the financial ratios using significantly more detailed line items compared to the information Commerce used in the instant proceeding.[38]  Ancientree asserted that the financial ratio calculations it submitted in Ancientree's SV Comments, which it claimed were based on the *MLWF from China 2016-2017* Sigstrat financial ratio calculations, provided more "critical detail" by including line items for raw materials, consumables, and personnel expenditures, than the calculations used in the *Preliminary Determination*.[39]

---

[35] *Id.* at 25 (citing *SFK USA Inc. v. United States*, 263 F.3d. 1369, 1382 (Fed. Cir. 2001)).
[36] *Id.* at 26 (citing *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)).
[37] *See* Ancientree's Case Brief at 14-15.
[38] *Id.* at 14 (citing *MLWF from China 2016-2017*, *Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Administrative Review; 2013-2014*, 81 FR 46899 (July 19, 2016) (*MLWF from China 2013-2014*); *Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Partial Rescission of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 25766 (June 5, 2017) (*MLWF from China 2014-2015*), *Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Recission; 2015-2016*, 83 FR 35461 (July 26, 2018) (*MLWF from China 2015-2016*), and *Certain Hardwood Plywood Products from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 82 FR 53460 (November 16, 2017) (*Plywood from China*)).
[39] *Id.* at 14-15.

In rebuttal, the petitioner noted that Ancientree did not contest the accuracy of the financial ratio calculations used in this investigation and argued that there is no record information to support modifying Commerce's calculations according to Ancientree's suggestion.[40]  The petitioner also noted that the calculations provided in Ancientree's SV Rebuttal Comments are themselves not consistent with the methodology used in *MLWF from China 2016-2017*, and that these differences undermine Ancientree's claim that its suggested calculation is based on Commerce's past practice.[41]  Further, the petitioner argued that, because the underlying financial statements (*i.e.*, covering Fiscal Year (FY) 2016-2017) used to compute the surrogate financial ratios in *MLWF from China 2016-2017* are not on this record, there is no information on this record to explain why the *MLWF from China 2016-2017* financial ratios were calculated the way they were.[42]  The petitioner pointed to *Xanthan Gum from China*, where Commerce made adjustments that were unique to that segment which may not have been appropriate in other segments of that proceeding, let alone other proceedings.[43]  Thus, the petitioner contended, without additional information to explain the *MLWF from China 2016-2017* financial ratio calculations, there is no way for Commerce to confirm whether those calculations match the unique circumstances of this investigation.[44]

### 5. Analysis

In selecting the best information and methodology for the surrogate financial ratio calculations in this investigation, Commerce considered all information on this record.  During the SV comment period, Commerce evaluated three proposed calculation methodologies, one

---

[40] *See* Petitioner's Rebuttal Brief at 24.
[41] *Id.*
[42] *Id.* at 23.
[43] *Id.* at 23-24 (citing *Xanthan Gum from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2013-2014*, 82 FR 11428 (February 23, 2017) (*Xanthan Gum from China*), and accompanying IDM at Comment 14).
[44] *Id.* at 23.

from the petitioner and two from Ancientree.[45]  Specifically, the petitioner's methodology, provided along with Sigstrat's FY 2017-2018 contemporaneous financial statements that cover the entire POI and an English translation,[46] started with the COGS from Note 7 of Sigstrat's financial statements to calculate the financial ratios.[47]  Ancientree provided two methodologies: (1) its own calculation using the 2017-2018 Sigstrat financial statements, which it stated was based on Commerce's methodology in *MLWF from China 2016-2017*;[48] and (2) a spreadsheet with Commerce's calculation from *MLWF from China 2016-2017*.[49]  Both calculations submitted by Ancientree started with line items from Sigstrat's income statement (*i.e.*, costs identified by the type of transaction)[50] to calculate the financial ratios.

In our calculations for the *Final Determination*, we agreed with the petitioner that Note 7 accompanying the financial statements[51] was the appropriate starting point for the financial ratio calculations because Note 7 identifies Sigstrat's costs by function (*i.e.*, COGS, SG&A, *etc.*), not type of transaction, and allows Commerce to properly classify the costs as either manufacturing costs, operating costs (*i.e.*, SG&A costs), or financial expenses.  Further, using the change in finished inventory, as reported on the balance sheet, and the COGS reported in the accompanying Note 7 to the financial statements, we can accurately calculate the cost of manufacturing (COM), and we can also accurately segregate the COM between direct

---

[45] *See* Petitioner's SV Comments at Exhibits 10B; *see also* Ancientree's Rebuttal SV Comments at Exhibits SVR-1.
[46] *See* Petitioner's SV Comments at Exhibits 10A and 10B; *see also Final Determination* IDM at 33.
[47] *Id.*
[48] *See* Ancientree's Rebuttal SV Comments at Exhibits SVR-1.
[49] *Id.* at SVR-2.
[50] While the income statement that Commerce relied on in *MLWF from China 2016-2017* is not on the record of this proceeding, the income statement from the 2017-2018 Sigstrat financial statements is on this record.  The 2017-2018 Sigstrat income statement, for example, shows a cost for "Salaries and wages."  These costs are not necessarily associated with the manufacture of finished goods during the fiscal year (*i.e.*, they can include the salaries of staff that only work in an administrative office).  *See* Petitioner's SV Comments at Exhibit 10B.
[51] In Sigstrat's financial statements, Note 4 is identical to Note 7.

manufacturing costs and factory overhead.[52]  As discussed below, Commerce's preference is to calculate the financial ratios starting from COGS, when available.

The CIT in *Nantong* outlined Commerce's practice with respect to the calculation of the surrogate financial ratios:

> {In calculating the}... surrogate financial ratios:  (1) for factory overhead, Commerce divides a surrogate company's total factory overhead expenses by its total direct manufacturing expenses; (2) for selling, general, and administrative expenses, Commerce divides the surrogate's selling, general, and administrative costs by its total cost of manufacture; and (3) for profit, Commerce divides the surrogate's before-tax profit by the sum of direct manufacturing expenses, overhead, and selling, general, and administrative expenses.[53]

Importantly, the denominator of Commerce's surrogate financial ratios incorporates the surrogate producer's total direct manufacturing costs,[54] and, therefore, selecting the best record information for the total direct manufacturing costs used in the financial ratio calculations is integral to the accuracy of Commerce's calculations.

Section 773(c)(1)(B) of the Act states that "the valuation of the factors of production shall be based on the best available information regarding the values of such factors{.}"[55] Therefore, when Commerce calculates surrogate financial ratios to value overhead, SG&A, and profit in an NME proceeding, it selects the best information on the record of the proceeding for direct manufacturing costs, which, as noted above is a core component to calculating the financial ratios.  The CIT upheld Commerce's decision in *Nantong*, where Commerce selected financial statements that specifically reported a surrogate company's COGS for calculating the financial ratios and maintained that using COGS for calculating direct manufacturing expenses is

---

[52] This segregation is necessary to compute the factory overhead ratio.
[53] *See Nantong Uniphos Chems. Co. v. United States*, 415 F. Supp. 3d 1345, 1351 (CIT 2019) (*Nantong*).
[54] As explained further below, COGS, adjusted for the net change in a company's finished goods inventory, represents a company's total COM during the fiscal year; a company's total direct manufacturing cost is COM less fixed factory overhead.
[55] *See* section 771(c)(1)(B) of the Act.

preferred over the reliance on individual income statement line items for calculating the

surrogate financial ratios.  The CIT summarized Commerce's preference, explaining:

> Commerce prefers to use financial statements that list costs by function rather than by
> type of transaction, because expenses such as labor can relate to manufacturing,
> administration, and selling … Commerce's preference is to use financial statements that
> include a line item for the cost of goods sold, because we know that the cost of goods
> sold include{s} all the manufacturing costs and changes in the finished goods inventory.
> From the cost of goods sold amount, we can calculate the cost of manufacturing by
> accounting for the change in the finished goods inventory from the inventory amounts
> reported in the corresponding comparative balance sheets.  From the cost of
> manufacturing, we deduct the depreciation costs reflected in the notes to the financial
> statements, with the residual classified as materials, labor and energy (MLE).[56]

In that case, the plaintiff argued that Commerce could not rely on the financial statements of

CYDSA S.A.B. de C.V. (CYDSA) because the financial statements did not include line items

that clearly delineated labor, energy, and administrative expenses.[57]  However, Commerce

explained that it had reasonably used CYDSA's financial statements for calculating the financial

ratios because they were "the best available source of information to find an amount for the

surrogate producer's total cost of manufacture, and then MLE, because it contained an entry for

the cost of goods sold."[58]  The CIT explained that:

> Commerce, using the normal rules of cost accounting, expressed its preference for
> deriving the cost of manufacture from the cost of goods sold {*i.e.*, COGS} entry on
> financial statements, rather than by adding various individual entries for items such as
> wages and salaries that may, or may not, relate to the manufacture of a product.  By
> definition, *the cost of goods sold entry captures all of the costs of manufacture*.[59]

In sum, the CIT upheld Commerce's decision to use COGS as the starting point for valuing

overhead, SG&A, and profit surrogate financial ratios, because COGS captures the "the vast

majority of the costs of manufacture" relevant to Commerce's surrogate financial ratio

---

[56] *See Nantong*, 415 F. Supp 3d at 1354-5.
[57] *Id.*, 415 F. Supp 3d at 1354.
[58] *Id.*
[59] *Id.*, 415 F. Supp 3d at 1355 (emphasis added).

calculation (in the case of *Nantong*, COGS included labor costs that were disputed by the plaintiff).[60]

      In the instant case, the line items from Sigstrat's income statement do not permit us to ascertain Sigstrat's direct manufacturing costs because, as described below, they include costs related to both cost of manufacturing and SG&A, and do not distinguish between the two.[61] Thus, our chosen methodology (which starts with COGS from Note 7 of Sigstrat's financial statements, and accordingly, by its nature captures all costs of manufacture),[62] is preferable to the methodologies submitted by Ancientree (which use line items from the income statement that do not distinguish between manufacturing and administrative costs).[63]  In this way, we are able to start from COGS and specifically identify the direct and indirect manufacturing costs necessary for the financial ratio calculations.  Further, using COGS allows Commerce to avoid the uncertainty – and potential distortion – that comes with "adding various individual entries … that may, or may not, relate to the manufacture of {the} product."[64]  Accordingly, we determine that, overall, the approach we employed in this review to calculate the surrogate financial ratios is more precise and accurate than the *MLWF from China 2016-2017* calculations, which used line

---

[60] *Id.*, 415 F. Supp 3d at 1359 (holding that "Commerce's Use of CYDSA's Cost of Goods Sold Amount to Determine the Denominators of Surrogate Financial Ratios Is Sustained," and explaining that "Commerce did not find MLE by determining the sum of various individual entries on the financials.  Rather, it started with the cost of goods sold entry, which accounted for the cost of labor along with the other costs of manufacture … Commerce's rationale for concluding that labor is adequately represented in the cost of goods sold entry is both reasonably discernable and reasonable itself.  While it made some adjustments to the cost of goods sold amount, {Commerce} knew that it already had the vast majority of the costs of manufacture, because the cost of goods sold entry accounts for those costs.  The overarching problem with Plaintiffs' claims is that, by definition, the cost of goods sold entry contains all of the costs of manufacture, including materials, labor, and energy.").

[61] *Id.*, 415 F. Supp 3d at 1351 and 1355; *see also, e.g.*, Petitioner's SV Comments at Exhibit 10B, English translation page 9 "Profit and Loss Account."

[62] "By definition, the cost of goods sold entry captures all of the costs of manufacture."  *Id.*, 415 F. Supp 3d at 1354-5; *see also* Petitioner's SV Comments at Exhibit 10A and Exhibit 10B at the English translation, Notes 4 and 7.

[63] *See* Ancientree's SV Comments at Exhibits SVR-1 and -2; *see also* Petitioner's SV Comments at Exhibit 10B at the English translation, pages 9 and 20.

[64] *See Nantong*, 415 F. Supp 3d at 1355; *see also* Petitioner's SV Comments at Exhibit 10A and Exhibit 10B at the English translation, Notes 4 and 7 *cf.*  Ancientree's Rebuttal SV Comments and Exhibits SVR-1 and -2.

items from Sigstrat's financial statements that do not appear to clearly distinguish between manufacturing and administrative costs.[65]

Ancientree suggests that, because the methodology used in *MLWF from China 2016-2017* includes "more critical detail, including line items for raw materials and consumables and personnel expenditure," the methodology used in that case is superior to the methodology used in the *Final Determination*. We disagree because, as explained above, the methodology used in the *Final Determination* is more precise because it allows Commerce to determine which expenses are tied to manufacturing, without having to estimate the proportion of the line item related to those costs. "{M}ore delineated line items," do not necessarily equate to "more critical detail," as Ancientree asserts, and these multiple line items do not necessarily capture the requisite costs or the "critical detail" most relevant (*i.e.*, directly related to production) to Commerce's financial ratio calculation.[66] Using more line items from the financial statements, as laid out in Ancientree's SV comments, would lead to a less accurate calculation because these line items are either not limited to manufacturing costs (in the case of labor) or do not make critical distinctions (in the case of raw material-related overhead).[67]

In the *MLWF from China 2016-2017* SV Memorandum, Commerce summed the line items labeled "raw materials and consumables expenses," "personnel expenditure – total," and "other external expenses (energy and water)" to calculate the costs directly related to manufacturing used in the denominators of the financial ratio calculations.[68] Sigstrat's 2017-2018 income statement (on the record of this review), which includes some of Sigstrat's 2016-

---

[65] *See* Preliminary SV Memorandum at Exhibit 12, unchanged in Final SV Memorandum at Attachment 12.
[66] *See* Ancientree's Case Brief at 14.
[67] *See* Ancientree's Rebuttal SV Comments at Exhibits SVR-21 and Exhibits SVR-2; *see also* Petitioner's SV Comments at Exhibit 10B, English translation, page 9 "Profit and Loss Account."
[68] *See* Ancientree's Rebuttal SV Comments at Exhibit SVR-2 (citing *MLWF from China 2016 2017* SV Memorandum).

2017 financial information (the financial information used in *MLWF from China 2016-2017*),

contains the same line items and descriptors.  However, Sigstrat's 2017-2018 income statement

does not segregate the costs in those line items into amounts which are specific to production

(*i.e.*, certain of these line items include administrative expenses), nor do they necessarily break

the amounts out into the categories relevant to Commerce's ratio calculations (such as factory

overhead).[69,70]

In *MLWF from China 2016-2017*, Commerce appears to have allocated the personnel

expenses from the income statement line item, "Staff Costs – total," between "Direct Labor"

(*i.e.*, an amount used to calculate the denominators of the surrogate ratios) and "SG&A and

Interest" (*i.e.*, an amount used to calculate the numerator in the SG&A financial ratio).[71]

However, it is unclear how the amounts for these two categories were allocated because the

amounts appear to have been assigned using a methodology that is not on this record and the

rationale for which is not evident on its face.[72]  This demonstrates the following:  (1) in *MLWF

from China 2016-2017*, the "Staff Costs – total" from Sigstrat's income statement used in the

financial ratio calculations included expenses attributable to SG&A; and (2) the basis for the

amount of personnel costs attributed to SG&A in *MLWF from China 2016-2017* is not

discernable from Sigstrat's financial statements on the record of this proceeding.  Thus, the

---

[69] *See* Petitioner's SV Comments at Exhibit 10B.
[70] For example, the line item identified as "personnel expenditure – total" in the MLWF from China 2016-2017 calculation ties to the "Staff Costs – total" reported in the Sigstrat income statement.  Although the record here does not include the Sigstrat financial statements used in MLWF from China 2016-2017, because the "Staff Costs – total" line item from Sigstrat's 2017-2018 financial statements includes costs for all personnel wages, insurance, and social protection, irrespective of the area in which the personnel were employed (*e.g.*, production, sales, *etc.*), it is reasonable to deduce that the same costs are included in that line item in the 2016-2017 Sigstrat income statement. *Id.* at Exhibit 10B, page 9 of the English translation, "Profit and Loss Account."
[71] *See* Ancientree's Rebuttal SV Comments at Exhibit SVR-2.  The total amount reported in the financial statements was 12,492,778 Ron.  Only 8,490,790 Ron was attributed to "Direct Labor"; the remainder, *i.e.*, 4,001,988 Ron, was attributed to the "SG&A and Interest" numerator.
[72] *Id.*

"personnel expenditure – total" figure that Ancientree argues Commerce should use in this investigation includes wages, insurance, and social protection expenses related to both production and administrative costs, but the actual amount of personnel expenses related to SG&A is not known.[73]  Further, there is no information on the record of this investigation related to the specific circumstances of that administrative review such that we can identify the facts that underlay Commerce's choice of methodology in that other proceeding.

Given the nature of the information that serves as the source for financial ratio calculations in NME cases (*i.e.*, that they are based on surrogate financial data from a company that is not a party to the proceeding), we cannot go behind surrogate financial statements to determine precisely what each item includes or to what activity it relates.[74]  Therefore, when assigning the various expenses to particular categories for our financial ratio calculations, we prefer to rely on the classification of expenses in a manner that requires us to make only limited assumptions.[75]  In this case, as noted above, COGS includes all costs related to manufacturing, does not include administrative costs, and is reported in the notes of the Sigstrat's 2017-2018 financial statements (*i.e.*, Notes 4 and 7).[76]  There is no information on this record to suggest that the income statement line items were more relevant or specific to the production of Sigstrat's merchandise.  As such, we are faced with a choice between starting the financial ratio calculations with Note 7 and COGS (Commerce's preferred approach), or income statement line items that include a mixture of production and administrative expenses (Ancientree's preferred approach).  Given these choices, we find it is reasonable, and more accurate, for Commerce to

---

[73] In *MLWF from China 2016-2017*, Commerce allocated the costs captured in "Personnel Expenditure-Total" between direct labor expenses and SG&A and Interest.

[74] *See Final Determination of Sales at Less Than Fair Value:  Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China*, 79 FR 25572 (May 5, 2014), and accompanying IDM at Comment 10.

[75] *See, e.g.*, *Helical Spring Lock Washers from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 FR 13833 (March 17, 2015), and accompanying IDM at Comment 5.

[76] *See* Petitioner's SV Comments at Exhibit 10B, English translation Notes 4 and 7.

select the methodology that uses COGS, which "{b}y definition … captures all of the costs of manufacture,"[77] rather than the income statement line item "transaction{s}, because expenses such as labor can relate to manufacturing, administration, and selling."[78]

Ancientree's argument that Commerce did not follow the practice that has "always" been used for calculating Sigstrat's financial ratios is also flawed and unsubstantiated.[79] While Sigstrat's financial statements have been used in several other cases, Ancientree's reference to *MLWF from China 2013-2014*, *MLWF from China 2014-2015*, *MLWF from China 2015-2016*, and *Plywood from China* as support for its case brief argument is misleading.[80] Outside of *MLWF from China 2013-2014*,[81] and the *MLWF from China 2016-2017* SV Memorandum,[82] there is no public information in the cited decisions, or information on this record, that can speak to the specifics of the financial ratio calculations from those cases. The CIT explained that, while "Commerce must consider all information timely filed by interested parties, 'the burden of creating an adequate record lies with {interested parties} and not with Commerce.'"[83] Therefore, it is reasonable for Commerce to rely on the information that Ancientree and the other interested parties to this proceeding actually submitted to this record, and the precedent the CIT upheld in *Nantong*, for determining the best methodology to use in the financial ratio calculations.

In that vein, the only documentation Ancientree provided to support its assertion that Commerce has "always" calculated Sigstrat's financial ratios in a particular way is the

---

[77] *See Nantong*, 415 F. Supp 3d at 1355.
[78] *Id.*
[79] *See* Ancientree's Case Brief at 14 ("{Commerce's} calculation of the financial ratios differed from how {Commerce} has always calculated Sigstrat's financial ratios in the past," (citing *MLWF from China 2013-2014*; *MLWF from China 2014-2015*; *MLWF from China 2015-2016*; *MLWF from China 2016-2017*; and *Plywood from China*.))
[80] *Id.*
[81] *See MLWF from China 2013-2014* IDM at Comment 5.
[82] *See* Ancientree's Rebuttal SV Comments at Exhibit SVR-2.
[83] *See QVD Food Co., Ltd. v. United States*, 653 F.3d 1318, 1324 (Fed. Cir. 2011) (*QVD Food*) (citing *Tianjin Machinery Import & Export. Corp. v. United States*, 806 F. Supp. 1008, 1015 (CIT 1992) (*Tianjin Machinery*).

preliminary *MLWF from China 2016-2017* SV Memorandum.[84]  While Ancientree lists other cases where Commerce "has calculated financial ratios from a Sigstrat financial ratios," {sic} Ancientree points to no evidence on this record which supports its assertions; further, neither the *Federal Register* notices for most of the cited cases nor the accompanying IDMs describe the specific calculations undertaken.  Commerce cannot assume that the other cases Ancientree references in its case brief use precisely the same methodology employed in the *MLWF from China 2016-2017* SV Memorandum.[85]  Thus, Ancientree's claim is unsubstantiated.

Further, only one of the four other cases that Ancientree references in its case brief, *MLWF from China 2013-2014*, publicly discussed Commerce's financial ratio calculation methodology.[86]  Interestingly, in that case, Commerce stated:

> After careful examination of Sigstrat's financial statement{s}… Note 4 provides additional detail that is useful for the calculation of the surrogate financial ratios. {Footnote 90:  We note that parties make reference to Note 7 of the financial statements … However, the calculation in reality is based on Note 4 of the same exhibit under "Analysis Operating Result".}  Specifically, Sigstrat's profit and loss statement does not segregate costs between what {Commerce} uses as a denominator to the financial ratios (*i.e.*, {Materials, Labor, and Energy} that typically form part of COGS) and the expenses that {Commerce} includes in the numerator to the calculations (*e.g.*, energy and labor that typically form part of selling, G&A, and other operating expenses)…{W}e have recalculated the surrogate financial ratios using the information derived from Note 4 of Sigstrat's financial statement.  However, we have further adjusted COGS by the change in finished goods so that "material, labor, and energy" reflects cost of manufacturing for the overhead calculation.[87]

---

[84] *See* Ancientree's Case Brief at 14 ("In each instance, {Commerce} has used significantly more delineated line items in Sigstrat's financial statement.  *See, e.g*., Ancientree's Rebuttal SVs at Exhibit 2 (submitting the 2017 Sigstrat ratio calculation relied upon in *Multilayered Wood Flooring from China*)").  We note that the *MLWF from China 2016-2017* IDM does not describe any changes to the preliminary financial ratio calculations.

[85] *See Asociacion Colombiana De Exportadores de Flores v. United States*, 40 F. Supp. 2d 455, 471-472 (CIT 1999) (The CIT explained that Commerce's determinations much be supported by substantial evidence and that substantial evidence "is more than a mere scintilla.")

[86] *See* Ancientree's Case Brief at 14; *see also MLWF from China 2013-2014* IDM at Comment 5 *cf.  MLWF from China 2014-2015* IDM; *MLWF from China 2015-2016* IDM; and *Plywood from China* IDM.

[87] *See MLWF from China 2013-2014* IDM at 27-28.

In other words, despite Ancientree's reliance on this case to support its position, the financial ratio methodology discussion from *MLWF from China 2013-2014* is in direct contradiction to Ancientree's Case Brief argument.[88]  In *MLWF from China 2013-2014*, Commerce calculated the financial ratios using COGS/Note 4 (*i.e.*, "Analysis Operating Result") from Sigstrat's financial statements (and stated that parties were referencing Note 4 and Note 7 interchangeably)[89] and explained that using COGS was preferable to using the profit and loss statement (*i.e.*, income statement) for calculating the financial ratios.

The surrogate financial ratio calculations in this investigation appear to be consistent with the financial ratio calculation description from *MLWF from China 2013-2014*, wherein Commerce based its calculation of the financial ratios on Note 4, started with COGS, and explained that Note 7 and Note 4 were referenced interchangeably.  Likewise, in this case, we based our calculations on Note 7, "Analysis of Operating Result," which is identical to Note 4, and started the calculation with COGS.[90]  Therefore, the surrogate financial ratio calculations in this investigation are consistent with past financial ratio calculations using Sigstrat's financial statements (*MLWF from China 2013-2014*), albeit not the one that served as the basis for Ancientree's proposed calculation in this review (*MLWF from China 2016-2017*).  This undermines Ancientree's claim that Commerce's practice has "always" been in the manner Ancientree proposed.

Moreover, while the 2017-2018 Sigstrat financial statements do contain some of Sigstrat's FY 2016-2017 information, this record does not include significant information that

---

[88] *See* Ancientree's Case Brief at 14; *see also* Ancientree's Rebuttal SV Comments *cf. MLWF from China 2013-2014* IDM at Comment 5.

[89] We also note that in Sigstrat's 2017-2018 financial statements Note 4 and Note 7 are identical.

[90] *See* Petitioner's SV Comments at Exhibit 10B. (Just as they were described in *MLWF from China 2013-2014*, Sigstrat's 2017-2018 financial statements include "Operating Result Analysis" in Note 4, and this note is identical to Note 7.)

could provide context about Commerce's *MLWF from China 2016-2017* calculations.  For

example, we do not have the English translation of the 2016-2017 financial statements, or the

accompanying notes.  As Commerce explained in *Xanthan Gum from China*, the adjustments

made in each segment may not be appropriate in other segments, let alone other proceedings.[91]

*MLWF from China 2016-2017* deals with a different product, different time period, and different

interested parties who may have provided different suggested financial ratio calculations, as well

as different fact patterns, or notes and translations to the financial statements that are different

from the ones presented in this case.  Without the 2016-2017 Sigstrat financial statements and

the accompanying English translations that were on the *MLWF from China 2016-2017* record,

the record of this review does not contain the core information unique to that administrative

review, and as the CIT explained, the responsibility of building the administrative record lies

with the interested parties.[92]  Because no interested parties provided information regarding the

context of the *MLWF from China 2016-2017* financial ratio calculation, we are unable to

determine the rationale for the methodology used in that case, understand why it differed from

the methodology used in this investigation, and ultimately why Commerce departed from its

preferred use of the Notes and COGS in that case.

Finally, as the petitioner points out, Ancientree does not comment on the accuracy of

Commerce's surrogate financial ratio calculations.  As noted above, accuracy was at the core of

our decision to begin the financial ratio calculations with COGS.  By using COGS, and not the

income statement line items as Ancientree suggested, we used the methodology which yielded

the most precise ratios possible, given the information present on this record.  Therefore, it was

---

[91] *See Xanthan Gum from China* IDM at Comment 14.
[92] *See Remand Opinion and Order* at 29 (quoting *QVD Food*, 806 F. Supp. 1008, 115).

both reasonable and appropriate to rely on this methodology here, rather than the methodology

used in *MLWF from China 2016-2017*.

## IV.    SUMMARY AND ANALYSIS OF COMMENTS FROM INTERESTED PARTIES

### Comment 1:  Commerce's "Normal" Financial Ratio Calculation Methodology

*Ancientree Comments*

- It is Commerce's "normal and logical" financial ratio calculation methodology to start

  with line items from the income statement.[93]

- Commerce is unconcerned with its departure from its past methodology for calculating

  financial ratios using Sigstrat's financial statements.[94]

- In *MLWF from China 2017-2018*, Commerce calculated the ratios in the same manner as

  *MLWF from China 2013*-2014, *2014-2015*, *2015-2016*, *2016-2017*, and *Plywood from

  China*, "rather than starting with notes 7 and 14 (sic) as it did uniquely in this

  investigation."[95]  Commerce stated that the petitioner's suggested methodology in that

  administrative review was "distortive, as we do not know the components of the

  {overhead (OH)} figure which may include indirect labor expenses, thus potentially

  overstating OH."[96]  Based on the comments received in that administrative review,

  Commerce did include some of the information reported in the notes for material costs,

  but the fundamental method used the same "traditional" approach.[97]

---

[93] *See* Ancientree's Draft Remand Comments at 1.
[94] *Id*. at 3 (citing *MLWF from China 2013-2014*, *MLWF from China 2014-2015*; *MLWF from China 2015-2016*; *MLWF from China 2016-2017*; and *Plywood from China*).
[95] *Id*. (citing *MLWF from China 2013-2014*; *MLWF from China 2014-2015*; *MLWF from China 2015-2016*; *MLWF from China 2016-2017*; and *Plywood from China*).
[96] *Id*. (citing *Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and New Shipper Review and Final Determination of No Shipments*; 2017-2018, 85 FR 78118 (December 3, 2020) (*MLWF from China 2017-2018*), and accompanying IDM at Comment 1).
[97] *Id*. at 4.

- Commerce did not adequately explain why its calculation differed in this investigation from past cases that relied on Sigstrat's financial statements.[98]

*Petitioner Comments*

- Commerce responded to Ancientree's arguments regarding the differences between the methodology used in *MLWF from China 2016-2017* and the methodology used in this investigation.[99]

- When calculating financial ratios, it is Commerce's preference to start from COGS, when available.[100]

- There is no information on the record regarding why Commerce believed it was appropriate to use the line items from the income statement as the basis for calculating financial ratios in *MLWF from China 2016-2017*.[101]

- Commerce has explained in other multilayered wood flooring cases that calculating the financial ratios using COGS as the starting point is preferable to using the income statement as the starting point.[102]

**Commerce's Position**:

We disagree with Ancientree that Commerce deviated from its "normal" or "traditional" approach for calculating surrogate financial ratios.[103]  We also disagree that we did not adequately address the difference between the methodology used in this investigation and the methodology used in other proceedings that relied on Sigstrat's financial statements.  Finally, we

---

[98] *Id.* (citing *Dak Ams. LLC v. United States*, 456 F. Supp. 3d 1340, 1356 (CIT 2020) (*Dak Ams.*); *Pakfood Pub. Co. v. United States*, 753 F. Supp. 2d 1334, 1342 (CIT 2011) (*Pakfood*); and *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005) (*Martin*)).
[99] *Id.*
[100] *Id.* (citing *Nantong*, 415 F. Supp 3d at 1351).
[101] *Id.* at 4-5.
[102] *Id.* at 5 (citing *MLWF from China 2013-2014*).
[103] *See* Ancientree's Draft Remand Comments at 1.

find Ancientree's arguments regarding the financial ratios calculated in *MLWF from China 2017-2018* to be unsubstantiated and critically flawed.

With respect to the first point, Ancientree asserts that Commerce departed from its "normal" financial ratio methodology in this case, and that Commerce's "normal and logical" financial ratio methodology starts with line items from the income statement.[104]  This argument fails in multiple respects.  First, the analysis above contains two examples of cases where Commerce, consistent with its preference, used COGS from the notes of the financial statements as the basis for calculating surrogate financial ratios, and not line items from the income statement as Ancientree incorrectly asserts.[105]  Ancientree fails to address those examples, explain why the methodologies used in those cases are not part of Commerce's "normal" practice and/or are less preferable to the methodology used in *MLWF from China 2016-2017*, or explain why the CIT's holding in *Nantong* is inapplicable here.[106]

Second, additional case precedent undermines Ancientree's argument and demonstrates that Commerce's preference is "to use financial statements that list costs by function rather than by type of transaction and that includes a line item for the {COGS}, because expenses such as labor can relate to manufacturing, administration, and selling,"[107] and that Commerce has

---

[104] *Id.* at 1 and 4.

[105] *See supra* at "Analysis" (citing *MLWF from China 2013-2014* IDM at Comment 5, and *Nantong*, 415 F. Supp 3d at 1354-1355, where the CIT upheld Commerce's financial ratio calculations based on COGS as discussed in *1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 82 FR 14876 (March 23, 2017) (*HEDP from China LTFV Investigation*), and accompanying IDM at Comment 2 ("{Commerce}'s preference is to use a financial statement that includes a line item for the cost of goods sold, because we know that the cost of goods sold include all the manufacturing costs and changes in the finished goods inventory")).

[106] *See* Ancientree's Draft Remand Comments.

[107] *See 1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2016-2018*, 84 FR 33236 (December 12, 1019) (*HEDP from China 2016-2018*), and accompanying IDM at 13 (citing *HEDP from China LTFV Investigation* IDM at Comment 2); *see also Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 4852 (January 17, 2017) (*Chlorinated Isos from China 2014-2015*), and accompanying IDM at 8; *Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty*

"developed a consistent and predictable practice of using COGS as the denominator to calculate the SG&A and interest and profit ratios."[108]  Even in the *MLWF from China LTFV Investigation*, where Commerce recognized that there had been inconsistencies in its calculation of the financial ratios in past proceedings, Commerce reiterated its "preference going forward for using COGS as the denominator{.}"[109]

Third, Ancientree has only identified *one* case, *MLWF from China 2016-2017*, that nominally supports its argument that Commerce has a "normal" financial ratio calculation methodology, and that it starts with several line items from the income statement.[110]  An example of a single case where Commerce calculated financial ratios in a certain manner is not evidence of a "normal" practice.[111]  Thus, despite Ancientree's argument to the contrary, the financial ratio methodology used in this case was consistent with precedent and Commerce's stated preference to rely on COGS where the available data permitted.

While Commerce has a preference in methodology for calculating its financial ratios (*e.g.*, starting with COGS for calculating the financial ratios), each financial ratio calculation is

---

*Administrative Review; 2015-2016*, 83 FR 5243 (February 6, 2018) (*Chlorinated Isos from China 2015-2016*), and accompanying IDM at Comment 5; and *Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 5053 (February 20, 2019) (*Chlorinated Isos from China 2016-2017*).

[108] *See Citric Acid and Certain Citrate Salts from the People's Republic of China:  Final Results of the First Administrative Review of the Antidumping Duty Order*, 76 FR 77772 (December 14, 2011) (*Citric Acid from China*), and accompanying IDM at 26.

[109] *See Multilayered Wood Flooring from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 76 FR 64318 (October 18, 2011) (*MLWF from China LTFV Investigation*), and accompanying IDM at Comment 2 (citing *Wooden Bedroom Furniture from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and New Shipper Reviews*, 74 FR 41374 (August 17, 2009) (*Wooden Bedroom Furniture from China*), and accompanying IDM at Comment 15).

[110] We note that Ancientree cites several cases to support its argument that Commerce has "always" calculated the financial ratios based using Sigstrat's financial statements in a certain manner.  However, as we discussed *supra*, there is no public information or information on this record to support this assertion and certain of the cases Ancientree cites contradict its own argument because they both discuss using COGS and a methodology that is different from the methodology used in *MLWF from China 2016-2017* (*i.e.*, *MLWF from China 2013-2014* IDM at Comment 5, pages 27-29).

[111] *See Ranchers-Cattlemen Action Legal Found. v. United States*, 74 F. Supp. 2d 1353, 1374 (CIT 1999) ("An action … becomes an "agency practice" when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure").

based on record evidence, and thus, there is no "one-size-fits-all," or "normal," financial ratio

calculation methodology.  When determining the best financial ratio information and

methodology, we cannot review the factual information, interested party comments, or case brief

arguments from other cases unless they are placed on the record of the case segment at hand.

Because the information provided to Commerce differs in each case, it is common and

reasonable for Commerce's financial ratio methodology to vary across cases, based on the record

before it.  For example, the financial ratio calculation methodology appears to differ even within

segments of the same proceeding, as can be seen from *MLWF from China LTFV Investigation*,

*MLWF from China 2013-2014*, *MLWF from China 2016-2017*, and *MLWF from China 2017-

2018*.[112]  Ultimately, while Commerce strives for consistency, the overriding goal is accuracy,

and we are limited by the record before us.

   To the second point, we disagree that Commerce remains "unconcerned" with the

differences between this investigation and other cases that used Sigstrat's financial statements,

and that we have "not adequately explained why {we} calculated the ratios differently in this

investigation or how accuracy has been increased by this change."  In our "Analysis" discussion

above, we address the fact that the methodology in this case differs from the single other

example provided by Ancientree (*i.e.*, *MLWF from China 2016-2017*).  We explain that, despite

citing four other cases, only one of those cases provides a discussion of financial ratios in the

IDM, and in that case, Commerce used COGS and the notes as the basis for calculating the

financial ratios.[113]  In other words, there is no apparent pattern presented by Ancientree that

---

[112] *See, e.g.*, *MLWF from China LTFV Investigation* IDM at Comment 2 *cf.  MLWF from China 2013-2014* IDM at Comment 5 *cf.*  Ancientree Rebuttal SV Comments at Exhibit SVR-2 (citing *MLWF from China 2016-2017* Preliminary SV Memorandum) *cf.  MLWF from China 2017-2018* at Comment 4.

[113] *See MLWF from China 2013-2014* IDM at Comment 5:

   After careful examination of SIGSTRAT's financial statement, we agree with CAHP, in part, that Note 4 provides additional detail that is useful for the calculation of the surrogate financial ratios.  Specifically,

Commerce has deviated from.  Instead, as we explain, *supra*, Commerce prioritizes accuracy and

calculating the financial ratios using COGS is the most accurate methodology presented on the

record of the wooden cabinets and vanities from China LTFV investigation.  Further, Commerce

has a well-documented preference for beginning the financial ratio calculations with COGS.[114]

While there may be a reasonable explanation for Commerce's decision in *MLWF from China*

*2016-2017* to use the line items from the income statement and not COGS, we do not have all the

underlying record information from that case available on the record of this proceeding, and so

any explanations provided here as to the methodological rationale would be purely speculative.

To the third point, Ancientree argues that in *MLWF from China 2017-2018*, a

determination that was issued after the *Final Determination*, Commerce "calculated the ratios in

th{e} same manner," as it had in the 2013-2014, 2014-2015, 2015-2016, and 2016-2017

administrative reviews of the same order and in *Plywood from China*.[115]  Ancientree also argues

that Commerce found the suggested manufacturing overhead (MOH) ratio methodology from the

American Manufacturers of Multilayered Wood Flooring (*i.e.*, the MLWF petitioner), which

Ancientree states is the same as the petitioner's suggested methodology in this case, to be

---

SIGSTRAT's profit and loss statement does not segregate costs between what {Commerce} uses as {the}
denominator to the financial ratios (*i.e.*, MLE that typically form part of COGS) and the expenses that
{Commerce} includes in the numerator to the calculations (*e.g.*, energy and labor that typically form part of
selling, G&A, and other operating expenses)…{T}he use of the expenses in Note 4 is consistent with
{Commerce}'s practice of calculating the surrogate financial ratios using information available in the
surrogate financial statements, which includes the notes to the financial statements … Therefore, for the
Final Results of review, we have recalculated the surrogate financial ratios using the information derived
from Note 4 of SIGSTRAT's financial statement.  However, we have further adjusted COGS by the change
in finished goods so that "material, labor, and energy" reflects cost of manufacturing for the overhead
calculation.

[114] *See, e.g.*, *HEDP from China 2016-2018* IDM at 13 (citing *HEDP from China LTFV Investigation* IDM at
Comment 2, upheld by the CIT in *Nantong*); *see also Chlorinated Isos from China 2014-2015* IDM at 8;
*Chlorinated Isos from China 2016-2017* IDM at Comment 3; *Chlorinated Isos from China 2015-2016* IDM at
Comment 5; *Citric Acid from China* IDM at 26; *MLWF from China LTFV Investigation* IDM at Comment 2; *MLWF
from China 2013-2014* IDM at Comment 5; and *Wooden Bedroom Furniture from China* IDM at Comment 15.
[115] *See* Ancientree's Draft Remand Comments at 3.

distortive.  These arguments are based on assertions from Ancientree that are not supported by the *MLWF from China 2017-2018* IDM.

As noted above, the financial ratios in *MLWF from China 2013-2014*, *2014-2014*, *2015-2016*, *2016-2017*, and *Plywood from China* were not necessarily calculated in the same manner.[116]  Specifically, in *MLWF from China 2013-2014*, Commerce calculated the financial ratios starting with COGS from the notes.[117]  The other cases (*i.e.*, *MLWF from China 2014-2015*, *MLWF from China 2015-2016*, and *Plywood from China*) do not discuss the financial ratio calculations in the *Federal Register* notices or IDMs, and no party submitted those calculations for consideration on this record.  Commerce's financial ratio calculations in *MLWF from China 2017-2018* also appear to be different from the financial ratio calculations in *MLWF from China 2016-2017*.  Indeed, the *MLWF from China 2017-2018* IDM indicates that the financial ratios in that case were based on COGS from Note 4 of Sigstrat's financial statements, just like the calculations in this case:

> {W}e adjusted the COGS for the change in finished goods and removed the COGS of traded goods to derive the cost of manufacture of manufactured goods.  We backed out the items that can be reasonably identified as OH (*e.g.*, depreciation, other materials, third party expenses).  We also used the SG&A expenses indicated in the notes by adding the revenue and costs from note 4 of the financial statement (these are the bolded items) and then demonstrated how the figures from the notes agree with the total revenues, expenses, and profit from the income statement.  We note also that the SG&A ratio denominator is the COGS and the profit denominator is the COGS plus the SG&A expenses.[118]

Therefore, Ancientree's suggestion that the financial ratio calculations in those cases were all calculated in the "same manner" as *MLWF from China 2016-2017* (which did not use COGS) is contradicted by the public record.  The differences between these consecutive administrative reviews within the same proceeding undermine Ancientree's argument that there is a "normal"

---

[116] *See supra* at "Analysis."
[117] *See MLWF from China 2013-2014* IDM at Comment 5.
[118] *See MLWF from China 2017-2018* IDM at Comment 1.

financial calculation methodology that Commerce follows and argument that our calculations in this investigation must be consistent with the methodology used in *MLWF from China 2016-2017*.

Ancientree's assertion regarding the calculation of the factory overhead ratio is also unsubstantiated. Ancientree claims that, in *MLWF from China 2017-2018*, Commerce found the MLWF petitioner's suggested calculation methodology to be distortive, and that this suggestion was the same as the petitioner's suggested overhead ratio calculation methodology in this case. In that case, Commerce explained,

> Under Jinlong's calculation, as noted by the petitioner, the MLE denominator (MLE +OH) is overstated, *i.e.*, COGS after change in fixed goods inventory equals approximately RON 34 million, while the notes to the financial statements show COGS of only RON 30 million. However, the petitioner's methodology may also be distortive, as we do not know the components of the OH figure which may include indirect labor expenses, thus potentially overstating OH.[119]

As can be seen in Commerce's discussion in the *MLWF from China 2017-2018* IDM, the MLWF petitioner provided a surrogate MOH ratio calculation methodology that Commerce found to be potentially distortive. However, the assertion that the MLWF petitioner's suggestion is "the same methodology proposed by the petitioner," in this case is unsupported by the public record.[120] Therefore, we find Ancientree's argument to be unsubstantiated and unpersuasive.

Notwithstanding that Ancientree's assertions regarding *MLWF from China 2017-2018* are not supported by the public record, Ancientree fails to acknowledge that the financial ratio calculations used for the *Final Determination* do not match the petitioner's suggested ratio calculation methodology.[121] Because the methodology used for calculating the numerator of the

---

[119] *See MLWF from China 2017-2018* IDM at Comment 1.

[120] *See* Ancientree's Draft Remand Comments at 3 (emphasis added).

[121] *See* Final SV Memorandum at Attachment 12 *cf.* Petitioner's SV Comments at Exhibit 10A. Unlike the methodology from the *Final Determination*, the methodology suggested by the petitioner did not include energy expenses in the MLE denominator. It also did not lower the MOH ratio numerator by energy expenses.

MOH ratio in the *Final Determination* was not suggested by the petitioner, Ancientree's argument that the "petitioner's methodology" has been found to be distortive in other cases is inapposite to the discussion about the methodology actually used in this case.

Additionally, unlike the arguments presented in *MLWF from China 2017-2018*,[122] no party argued that the financial ratio calculations we used in the *Final Determination* were distortive.  Commerce's financial ratio calculations for *this case* were based on the information in Sigstrat's 2017-2018 financial statements,[123] the English translation of those statements,[124] and the case and rebuttal brief arguments[125] submitted onto the record of this segment.  In issuing the *Final Determination*, we can only respond to case brief arguments that were on this record (and certainly not to arguments that were made on different records for different cases that occurred after the determination was issued).  When Ancientree submitted its case brief arguments, it could have argued about any flaw, or distortion, it perceived in the financial ratio calculations from the *Preliminary Determination*.  For example, if the petitioner's MOH ratio suggestion in this case was the same as the MOH ratio suggestion in *MLWF from China 2017-2018*, Ancientree and any other interested party could have argued about potential distortions in the MOH ratio, and we would have considered those arguments in issuing the *Final Determination*.  However, Ancientree's case brief only argued that we should have used "more critical detail, including line items for raw materials and consumables and personnel expenditures" and that, because the financial ratio calculations in *MLWF from China 2016-2017* used multiple line items for the financial ratio calculations, we should continue to use that methodology in this case.[126]

---

[122] *See MLWF from China 2017-2018* IDM at Comment 1.
[123] *See* Petitioner's SV Comments at Exhibit 10B.
[124] *Id.*
[125] *See, e.g.*, Ancientree's Case Brief at 14-15 and Petitioner's Rebuttal Brief at 22-25.
[126] *See supra* at "Analysis," where we address these arguments.

We have considered Ancientree's arguments regarding Commerce's practice with respect to our financial surrogate ratio methodology, and we continue to find that the methodology used in the *Final Determination*:  (1) was consistent with Commerce's preference to rely on COGS; and (2) yielded the most accurate financial ratios possible based on the information available on this record.  Further, we find that Ancientree has not substantiated its claims that Commerce is departing from its "normal practice" with this calculation because there is only one case which seems to utilize the methodology proffered by Ancientree that is supported by record or public evidence, and one example does not constitute a practice.  Therefore, we disagree with the notion that Commerce strayed from its "normal" or "traditional" practice in calculating the financial ratios in this investigation.  Instead, Commerce derived its methodology based on the relevant record information to calculate the financial ratios as accurately as possible.

**Comment 2:  Accuracy of Commerce's Financial Ratio Calculations**

*Ancientree Comments*

- Commerce did not adequately explain how the accuracy of the financial ratios was improved using the methodology in this investigation.[127]

- It is illogical and less accurate, to start with the notes and then take some line items from the income statement because it is contrary to the flow of the financial statements.[128]  In the *MLWF from China LTFV Investigation*, Commerce stated that it "bases its determinations on the information contained within the financial statements themselves."[129]

---

[127] *See* Ancientree's Draft Remand Comments at 4 (citing *Dak Ams.*, 456 F. Supp. 3d at 1356; *Pakfood*, 753 F. Supp. 2d at 1342; and *Martin*, 546 U.S. at 139).
[128] *Id.* at 1-2.
[129] *Id.* at 2 (citing *MLWF from China LTFV Investigation* IDM at Comment 2).

- Commerce's calculations make several unsupported assumptions. For example, by taking the line item "outside expenses (with energy and water)" from the income statement and classifying it all to the MLE denominator, Commerce assumes: (1) "outside expenses (with energy and water)" are all indirect production expenses and (2) none of these expenses would be under COGS.[130]

- Commerce's financial ratio calculations do not breakout raw materials or labor. Using less line items allows for less separation of various different type of costs and a less specific and accurate ratio calculation.[131]

- The MLE denominator is deprived of significant production costs.[132]

*Petitioner Comments*

- Commerce explained why the calculation methodology it used in the underlying investigation is more precise and, therefore, preferable to that proposed by Ancientree.[133]

- Using multiple line items from the income statement may create an illusion of more precision because it is more complex, but in actuality, Commerce's methodology is more precise because it allows Commerce to determine which expenses are tied to manufacturing and which expenses are tied to another category such as SG&A.[134]

- One reason that the CIT upheld the choice of using Romanian financial statements was because Sigstrat's financial statements specifically reported production overhead.[135] In contrast, Ancientree's suggestions use a line item that only reflects the depreciation of Sigstrat's assets, *i.e.*, "value adjustment of tangible and intangible assets." Using that line

---

[130] *Id.*
[131] *Id.*
[132] *Id.*
[133] *See* Petitioner's Draft Remand Comments at 3.
[134] *Id.*
[135] *Id.* at 6 (citing *Remand Opinion and Order* at 21).

item would result in a less precise ratio that understates the total amount of

manufacturing overhead expenses.[136]

**Commerce's Position:**

We disagree with Ancientree that:  (1) the Draft Remand Results did not adequately

explain how accuracy was increased by using the methodology in the *Final Determination*, as

opposed to the *MLWF from China 2016-2017* methodology; (2) it is illogical to start with the

notes to the financial statements and then also use some line items from the income statement

when calculating the financial ratios; and (3) a denominator without individual line-item

breakouts of raw materials and labor is less accurate or "deprived" of significant production

costs.  We find several critical flaws with Ancientree's argument that Commerce's assumptions

in this case render our methodology for computing the financial ratios less accurate.

To the first point, we explain in detail in the "Analysis" section above why beginning

with COGS as the denominators of our calculations is more accurate than adding several line

items to derive a proxy for this figure.  However, it is unclear why Ancientree considers this

explanation to be insufficient because Ancientree does not identify gaps in the explanation, nor

does it suggest any flaws with such an approach.  To reiterate, by using COGS, we specifically

and unequivocally capture the direct and indirect costs related to manufacturing and are able to

ensure that administrative costs are not captured in the denominators.  Given that the line items

of the income statement do not appear to segregate between manufacturing and administrative

costs,[137] using those line items as suggested by Ancientree would require Commerce to either

capture administrative costs in the denominators, thereby distorting the calculation, or use an

---

[136] *Id*. at 6-7.
[137] *See* Petitioner's SV Comments at Exhibit 10B.

allocation methodology—an approach Commerce prefers to avoid[138] and for which the record contains no suggestion or information on how to calculate.[139]  Because Sigstrat's 2017-2018 financial statements and associated English translation, that are on this record, contained a specific line item in the notes for COGS, and using COGS is Commerce's preference and is more accurate compared to the suggested alternatives, we determined that the methodology used in the *Final Determination* was the most accurate and appropriate methodology for this case.

Ancientree's next argument, that it is "illogical to start with the notes" and then also use line items from the income statement, similarly fails.  The notes are an integral element of the financial statements because they provide critical detail intended to provide users of the financial statements a clear understanding of material information about the company.  In other words, they are there for a reason.  They provide a detailed breakdown and explanation of the individual lines within the income statement and balance sheet.  As Commerce explained in *MLWF from China 2013-2014* (a case Ancientree cites to support its argument), "{Commerce} typically uses information derived from the income statement, balance sheet, *and notes* in order to perform its surrogate financial ratio calculations."[140]  Thus, even precedent cited by Ancientree demonstrates that it is common practice for Commerce to use the notes to the financial statements when calculating the financial ratios,[141] and the CIT has upheld Commerce's use of the notes to the

---

[138] *See Wooden Bedroom Furniture from China* IDM at Comment 15 ("{W}e agree with Petitioners assertion that it has been our long-standing practice to not make adjustments to the financial statements data, as doing so may introduce unintended distortions into the data rather than achieving greater accuracy").

[139] We explain above that, in *MLWF from China 2016-2017*, Commerce used an allocation methodology for segregating personnel expenditures between manufacturing and SG&A costs.  Through this action, Commerce has recognized that the line items in Sigstrat's income statement contain both manufacturing and administrative costs. However, there is no information available on this record that explains the underlying rationale of the allocation methodology used in that particular administrative review.

[140] *See MLWF from China 2013-2014* IDM at Comment 5 (emphasis added).

[141] *See, e.g.*, *HEDP from China 2016-2018* IDM at Comment 6 ("From the cost of manufacturing, we deduct depreciation costs reflected in the notes to the financial statements, with the residual classified as material, labor, and energy").

financial statements.[142]  Further, Commerce has, in the past, declined to use financial statements

for the calculation of the surrogate financial ratios when the financial statements lacked notes.[143]

If the notes were not important, or if using them were "illogical," Commerce would not require

them in order to consider financial statements viable for calculating the surrogate financial

ratios.[144]  Accordingly, in a situation (such as this) where the notes to the financial statements

contain the most precise information, and as a result, yield the most accurate financial ratio

calculations, it would be illogical for us to *not* use the notes.

Ancientree argues that using the notes "and then tak{ing} some line items from the

{income} statement … is contrary to the flow of the statement."[145]  This argument fails because

financial statements do not read like a novel, such that the information on the last page is only

meaningful after reading the previous pages.  Instead, the line items from Sigstrat's income

statement contain the same, higher level information as the notes, but the notes include a detailed

breakdown of the various costs included within those line items.[146]  To be clear, Note 4 is many

pages after the income statement in the layout of the financial statements, but the information in

Note 4 expands on the information in the income statement, and so, when using the notes, the

order or "the flow of the statement," does not matter.[147]  In other words, that the final financial

---

[142] *See Nantong*, 415 F. Supp. 3d at 1355.

[143] *See, e.g., First Administrative Review of Steel Wire Garment Hangers from the People's Republic of China: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review*, 76 FR 27994 (May 13, 2011) (*Hangers from China*), and accompanying IDM at Comment 2:

> Bandsidhar's financial statements were missing the "notes to accounts" or notes to financial statements … Deccan's financial statements were similarly missing the "notes to accounts or notes to financial statements."  J&K's financial statements were missing the balance sheet.  Lastly, Sri Ananda's financial statements were missing {a portion}… which should contain the "notes to the financial statements."  Each of these missing sections is critical to a thorough evaluation of the information contained in the financial statements.  Therefore, {Commerce}will continue not to rely on these four financial statements."

[144] *See, e.g., Hangers from China* IDM at Comment 2.

[145] *See* Ancientree's Draft Remand Comments at 2.

[146] *See* Petitioner's SV Comments at Exhibit 10B.

[147] *See* Ancientree's Draft Remand Comments at 2.

ratio calculations do not go in the same order (or "flow") as Sigstrat's financial statements does not undermine the accuracy of the financial ratio calculations from the *Final Determination*.

To support its argument, Ancientree quotes the *MLWF from China LTFV Investigation* IDM, where Commerce appears to have used COGS as a basis for calculating the financial ratios.[148]  Specifically, Ancientree highlights the statement that, "because {Commerce} cannot go behind line items in the surrogate financial statements, {Commerce} bases its determinations on the information contained within the financial statements themselves."[149]  Commerce made this statement in response to a suggestion that it reclassify certain information reported in the financial statements for the financial ratio calculations.[150]  However, Ancientree appears to rely on this statement as a means to suggest that the notes are not part of the financial statements, and, therefore, Commerce should not use them for calculating the financial ratios.  The notes are indeed part of the financial statements.  They explain the information reported in the income statement and balance sheet at a greater level of detail, and to suggest that the notes are not part of the financial statements would be analogous to erroneously asserting that the footnotes of this document are not part of this final remand redetermination.  Accordingly, we find Ancientree's argument unpersuasive.

Ancientree's third argument again conflates the use of several line items with accuracy, but when it comes to Commerce's financial ratio calculations, using more line items is not always better.  COGS, by definition, includes direct materials, direct labor, and production overhead costs.  Using the COGS as it is reported in Sigstrat's notes to the financial statements, adjusting it by the change in inventory to arrive at COM, and then deducting production

---

[148] *Id.* (citing *MLWF from China LTFV Investigation* IDM at Comment 2).
[149] *Id.*
[150] *See MLWF from China LTFV Investigation* IDM at 17.

overhead costs, ensures that our MLE denominator only includes the raw material and labor

costs directly related to manufacturing.[151]   Ancientree does not comment on the accuracy of

using COGS or that calculation, but only reiterates that the *Final Determination* calculation

"results in no separate breakouts for raw materials or labor."[152]   The contention that we need a

separate breakout for raw materials or labor hinges on an illusion of precision — there is no need

to include several line items just because they are labeled "labor" or "materials" when there is a

single line item in the notes ("Cost of goods sold and services rendered") that includes the

complete relevant costs to this calculation.[153]

   The rationale to use several line items from the income statement is further weakened

when we consider that in *MLWF from China 2016-2017* Commerce found that the "personnel

expenditures" line item included both administrative and manufacturing costs.[154]   In other words,

record information demonstrates that Commerce already determined that Sigstrat's income

statement line items include costs that should not be captured in the denominators.   Because

COGS is more exact (*i.e.*, there is no need to remove the administrative expenses known to be

within the "personnel expenditure" line item), and there was no information presented on this

record that justified using a less accurate alternative, COGS remains the best information on the

record for calculating the financial ratios.[155]   Using this approach ensures that we capture only

the costs relevant to the financial ratio calculations and does not introduce possible distortions by

---

[151] *See* Final SV Memorandum at Attachment 12.

[152] *See* Ancientree's Draft Remand Comments at 2.

[153] *See* Petitioner's SV Comments at Exhibit 10B at Notes 4 and 7.

[154] *See* Ancientree's Rebuttal SV Comments at Exhibit SVR-2.

[155] We also note that no interest party submitted an allocation methodology for dividing the income statement line items between administrative and manufacturing expenses.  Rather, Ancientree's own suggestion improperly assigns the "personnel expenditures – total" to only direct labor (*i.e.*, assumes that all personnel expenditures were directly related to manufacturing).  This incorrect suggestion results in a lower numerator for the MOH ratio calculation because it does not include any administrative labor and results in an overstated denominator because it includes administrative labor.

requiring Commerce to make adjustments via allocations to exclude administrative costs.[156]

Moreover, is also consistent with Commerce's long-standing preference for using COGS,[157] and

with Commerce's preference to avoid adjusting information from the financial statements.[158]

Ancientree also suggests that using COGS, and not individual line items, results in a

denominator that is "deprived of significant production costs."  We disagree.  In *Nantong*, the

CIT sustained Commerce's use of the respondent's COGS to determine the denominators of the

surrogate financial ratios, explaining that:

> Commerce did not find MLE by determining the sum of various individual entries on the
> financials.  Rather, it started with the cost of goods sold entry, which accounted for the
> cost of labor along with the other costs of manufacture … *Commerce's rationale for
> concluding that labor is adequately represented in the cost of goods sold entry is both
> reasonably discernable and reasonable itself.*  While it made some adjustments to the
> cost of goods sold amount, {Commerce} knew that it already had the vast majority of the
> costs of manufacture, because the cost of goods sold entry accounts for those costs.  The
> overarching problem with Plaintiffs' claims is that, *by definition, the cost of goods sold
> entry contains all of the costs of manufacture*, including materials, labor, and energy.[159]

In sum, the MLE denominator as it is calculated (COGS, adjusted by the change in inventory,

minus overhead production costs except energy) includes raw material inputs, labor, and energy.

Therefore, the financial ratio denominators are not "deprived of significant production costs."

Finally, Ancientree's argument that Commerce's MOH ratio calculation makes

unsupported assumptions is flawed.  We based the numerator of the MOH ratio on the "Indirect

Production Expenses" (*i.e.*, overhead including energy) shown in Note 4, less "Other outside

---

[156] *See, e.g.*, *MLWF from China 2013-2014* IDM at Comment 5:
> SIGSTRAT's profit and loss statement does not segregate costs between what {Commerce} uses as a
> denominator to the financial ratios … and the expenses that {Commerce} includes in the numerator
> …{T}his application *distorts* the calculation of surrogate ratios as it does not account for any SG&A
> labor{.}" (emphasis added).

[157] *See, e.g.*, *HEDP from China 2016-2018* at 13 (citing *HEDP from China LTFV Investigation* IDM at Comment 2;
*see also Chlorinated Isos from China 2016-2017* IDM at Comment 3, *Chlorinated Isos from China 2015-2016* IDM
at Comment 5, and *Chlorinated Isos from China 2014-2015* IDM at Comment 2).

[158] *See Wooden Bedroom Furniture from China* IDM at Comment 15.

[159] *See Nantong*, 415 F. Supp 3d at 1359 (emphasis added).

expenses (with energy and water)" (*i.e.*, energy costs) shown in the same note.  As the denominator of the MOH ratio calculation, we started with COGS, which contains materials, labor, and overhead (including energy), and we removed the portion classified as MOH.[160] Ancientree contends that for the MOH ratio calculation, we "assum{ed} both that the 'outside expenses (with energy and water)' {were} all indirect production expenses and that none of these expenses would be under 'cost of goods sold.'"

Ancientree's argument that Commerce assumed "none of these {indirect production} expenses would be under 'cost of goods sold'" is untrue.  Had we made this assumption, it would have been inconsistent with accounting principles.  In fact, we did the exact opposite.  In Sigstrat's financial statements, COGS is broken into two components:  (1) expenditures on basic activities; and (2) "Production overheads" (Note 4), which is also referred to as "Indirect Production Expenses" (Note 7).[161]  Based on the use of these terms, we assumed that the production overhead figure represented all manufacturing costs other than expenditures on basic activities (direct materials and direct labor), *i.e.*, "Production overheads" is the same as manufacturing overhead costs.  Manufacturing overhead is the sum of the indirect costs which are incurred while manufacturing a product and usually includes:  depreciation of equipment, salaried factory personnel, electricity used to operate the equipment, *etc*.  Therefore, for the MOH ratio, we classified the "production overhead" component of COGS (less energy) as the numerator and the basic activities component (direct materials and direct labor), plus energy, as MLE in the denominator.

---

[160] Stated in a different way, to determine the materials and labor portion of the denominator, we started with COGS (*i.e.*, direct materials, direct labor, and production overhead), adjusted this figure for the change in finished goods inventory, and then deducted the "Indirect Production Expenses" which is referred to in Sigstrat's financial statements as "Production overhead."  We then added energy costs back to this figure to arrive at MLE.

[161] *See* Petitioner's SV Comments at Exhibit 10B.

The conclusion that the total amount of "outside expenses (with energy and water)" is part of the production overhead (or indirect production) expenses (and therefore, capable of being deducted from production overhead) is reasonable for two main reasons. First, by definition, production overhead includes energy expenses, and the record lacks any indication that these energy expenses were part of the expenditures on the basic activity component of COGS, rather than part of the "production overhead" component. Second, assuming the total amount of "outside expenses (with energy and water)" is all part of production overhead is a conservative assumption. The alternative would have been to assume that a certain (unknown) amount of electricity should have been captured elsewhere in our financial ratio calculations (*e.g.*, some energy or water could have related to the sales office and could have increased the numerator of the SG&A ratio). In the hypothetical case where we reclassified a certain portion of energy costs from "outside expenses (with energy and water)" to another ratio, that same amount of energy would, as a result, not have been added to the denominator (*i.e.*, the denominator would have been lower). This would also have resulted in a higher MOH ratio. Accordingly, the definition of production overhead, the lack of record information challenging this approach, and the fact that a different assumption on the amount of energy expenses would be less conversative, all support the reasonableness of our treatment of energy expenses as part of the MLE denominator in the final financial ratio calculations.

Ultimately, every financial ratio calculation requires certain assumptions because we are dealing with companies that are not respondents and with static information that we cannot go behind or look further into. Indeed, Ancientree's own suggestions include certain assumptions. Specifically, in Ancientree's proposed calculation, the line item "personnel expenditures – total"

is assumed to be entirely direct labor costs.[162]  Ancientree's proposed SV suggestion assumes

that all labor is – (despite the fact that we know that some would be SG&A).  As another

example, in *MLWF from China 2016-2017*, Commerce allocated "personnel expenditures –

total" using certain percentages and assigned those allocated amounts between manufacturing

and administrative labor.  For calculating those manufacturing and labor allocations, Commerce

had to assume that the percentages it used were accurate representations of the distribution of

Sigstrat's manufacturing and administrative labor costs.[163]  Interestingly, Ancientree did not

argue that the assumptions made in its proposed financial ratio calculations are preferable, nor

did it explain why the assumptions made in the *Final Determination* are less reasonable than the

ones made in its own calculation or in *MLWF from China 2016-2017*.  However, every

assumption Commerce made in this investigation was based on accounting principles and record

information, and, as a result, was inherently more accurate.

     We have considered Ancientree's arguments contesting the accuracy of the financial ratio

calculations in this investigation, and we continue to find that the financial ratio calculation

methodology from the *Final Determination* was the most accurate methodology based on the

record information of this investigation.  Therefore, Commerce is continuing to use its financial

ratio calculation methodology from the *Final Determination* for these Final Results of

Redetermination, which begin with COGS, because it leads to the most accurate calculation of

the financial ratios.

## V.  FINAL RESULTS OF REDETERMINATION

     Pursuant to the *Remand Opinion and Order*, we addressed Ancientree's Case Brief

comments regarding our financial ratio calculations and explained why the methodology used in

---

[162] *See* Ancientree's Rebuttal SV Comments at Exhibit SVR-1.
[163] *Id*. at Exhibit SVR-2.

the *Final Determination* differed from the methodology used in *MLWF from China 2016-2017*.

We find that, for the reasons discussed above, the methodology used in the *Final Determination* is reasonable and supported by substantial evidence and, therefore, it remains unchanged.

10/12/2021

X _____

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties of the
 Assistant Secretary for Enforcement and Compliance