# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Gary S. Katzmann, Judge**

| | |
|---|---|
| THE ANCIENTREE CABINET CO., LTD. )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UNITED STATES, )<br>)<br>Defendant. )<br>) | Court No. 20-00114 |

## REMAND RESULTS JOINT APPENDIX

Gregory S. Menegaz
J. Kevin Horgan
Judith L. Holdsworth
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

Dated: January 4, 2022

*The Ancientree Cabinet Co., Ltd. v United States*

**United States Court of International Trade**
**Ct. No. 20-00114**

**REMAND RESULTS JOINT APPENDIX**

| Joint Appendix Number | Document | PR/CR |
|---|---|---|
| 1 | Final Determination (February 28, 2020) | PR 1559 |
| 2 | Final IDM (February 21, 2020) | PR 1554 |
| 3 | Corrected Final Determination (March 31, 2020) | PR 1575 |
| 4 | Petitioner, Surrogate Country Comments (July 16, 2019) | PR 898 |
| 5 | Petitioner, Initial Surrogate Value Comments (August 7, 2019) | PR 956-961 |
| 6 | Ancientree, Rebuttal Preliminary Surrogate Value Submission (August 19, 2019) | PR 1007 |
| 7 | Department, Preliminary Surrogate Value Memo (October 3, 2019)* | PR 1411-1412 |
| 8 | Ancientree, Case Brief (December 17, 2019) | PR 1511 |
| 9 | Petitioner, Rebuttal Brief (December 26, 2019) | PR 1525 |
| 10 | Department, Final Surrogate Value Memo (February 21, 2020)* | PR 1560 |
| 11 | Department, Draft Remand Redetermination (September 10, 2021) | REM PR 1 |
| 12 | Petitioner, Comments on Draft Remand Redetermination (September 17, 2021) | REM PR 2 |
| 13 | Ancientree, Comments on Draft Remand Redetermination (September 17, 2021) | REM PR 3 |

---

* Plaintiff notes that we are filing only the public record documents for these two documents because all relevant information in the confidential record documents is also included in the public version documents.

# REM JA 1

# Final Determination (February 28, 2020)
# PR 1559


identified by CBP as an importer in the covered merchandise referral (referenced above) are exempt from the additional filing requirements for importers pursuant to 19 CFR 351.305(d).

Dated: February 24, 2020.

**Jeffrey I. Kessler,**

*Assistant Secretary for Enforcement and Compliance.*

## Appendix

### Scope of the Order

The products covered by the order are all finished circular sawblades, whether slotted or not, with a working part that is comprised of a diamond segment or segments, and parts thereof, regardless of specification or size, except as specifically excluded below. Within the scope of the order are semi-finished diamond sawblades, including diamond sawblade cores and diamond sawblade segments. Diamond sawblade cores are circular steel plates, whether or not attached to non-steel plates, with slots. Diamond sawblade cores are manufactured principally, but not exclusively, from alloy steel. A diamond sawblade segment consists of a mixture of diamonds (whether natural or synthetic, and regardless of the quantity of diamonds) and metal powders (including, but not limited to, iron, cobalt, nickel, tungsten carbide) that are formed together into a solid shape (from generally, but not limited to, a heating and pressing process).

Sawblades with diamonds directly attached to the core with a resin or electroplated bond, which thereby do not contain a diamond segment, are not included within the scope of the order. Diamond sawblades and/or sawblade cores with a thickness of less than 0.025 inches, or with a thickness greater than 1.1 inches, are excluded from the scope of the order. Circular steel plates that have a cutting edge of non-diamond material, such as external teeth that protrude from the outer diameter of the plate, whether or not finished, are excluded from the scope of the order. Diamond sawblade cores with a Rockwell C hardness of less than 25 are excluded from the scope of the order. Diamond sawblades and/or diamond segment(s) with diamonds that predominantly have a mesh size number greater than 240 (such as 250 or 260) are excluded from the scope of the order.

Merchandise subject to the order is typically imported under heading 8202.39.00.00 of the Harmonized Tariff Schedule of the United States (HTSUS). When packaged together as a set for retail sale with an item that is separately classified under headings 8202 to 8205 of the HTSUS, diamond sawblades or parts thereof may be imported under heading 8206.00.00.00 of the HTSUS. On October 11, 2011, Commerce included the 6804.21.00.00 HTSUS classification number to the customs case reference file, pursuant to a request by U.S. Customs and Border Protection.[8] Pursuant to

requests by CBP, Commerce included to the customs case reference file the following HTSUS classification numbers: 8202.39.0040 and 8202.39.0070 on January 22, 2015, and 6804.21.0010 and 6804.21.0080 on January 26, 2015.[9]

The tariff classification is provided for convenience and customs purposes; however, the written description of the scope of the order is dispositive.

[FR Doc. 2020–04118 Filed 2–27–20; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–570–106]**

### Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that wooden cabinets and vanities and components thereof (wooden cabinets and vanities) from the People's Republic of China (China) are being, or are likely to be, sold in the United States at less than fair value (LTFV). The final weighted-average dumping margins are listed in the ''Final Determination Margins'' section of this notice.

**DATES:** Applicable February 28, 2020.

**FOR FURTHER INFORMATION CONTACT:** Kabir Archuletta, Rachel Greenberg, or Eliza Siordia, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–2593, (202) 482–0652, or (202) 482–3878, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On October 9, 2019, Commerce published the *Preliminary Determination* in this investigation.[1] On

November 14, 2019, Commerce published the *Amended Preliminary Determination*.[2] The petitioner is the American Kitchen Cabinet Alliance. The mandatory respondents in this investigation are The Ancientree Cabinet Co., Ltd. (Ancientree), Dalian Meisen Woodworking Co., Ltd. (Meisen), and Rizhao Foremost Woodwork Manufacturing Co., Ltd. (Foremost).

A summary of the events that occurred since Commerce published the *Amended Preliminary Determination,* as well as a full discussion of the issues raised by parties for this final determination, are discussed in the Issues and Decision Memorandum.[3] The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov,* and to all parties in the Central Records Unit, Room B8024 of the main Commerce building. In addition, a complete version of the Issues and Decision Memorandum is available at *http://enforcement.trade.gov/frn/index.html.* The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

### Period of Investigation

The period of investigation is July 1, 2018 through December 31, 2018.

### Scope of the Investigation

The scope of the investigation covers wooden cabinets and vanities from China. For a complete description of the scope of the investigation, *see* Appendix I.

### Scope Comments

On October 2, 2019, Commerce issued a Preliminary Scope Decision

---

[8] *See Diamond Sawblades and Parts Thereof from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review,* 76 FR 76128 (December 6, 2011).

[9] *See Diamond Sawblades and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2016–2017,* 83 FR 64331 (December 14, 2018) and accompanying Issues and Decision Memorandum at 3.

[1] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures,* 84 FR 54106 (October 9, 2019) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum, as corrected by

*Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination and Extension of Provisional Measures,* 84 FR 56420 (October 22, 2019).

[2] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Amended Preliminary Determination of Sales at Less Than Fair Value,* 84 FR 61875 (November 14, 2019) (*Amended Preliminary Determination*).

[3] *See* Memorandum, ''Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value,'' dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

Memorandum.[4] Several interested parties submitted case and rebuttal briefs concerning the scope of this investigation. For a summary of the product coverage comments and rebuttal comments submitted to the record for this final determination, and accompanying discussion and analysis of all comments timely received, *see* the Final Scope Decision Memorandum.[5] Based on the comments received, Commerce is not modifying the scope language as it appeared in the *Preliminary Determination*. The scope in Appendix I remains unchanged from that which appeared in the *Preliminary Determination*.

## Analysis of Comments Received

All issues raised in the case and rebuttal briefs by parties in this investigation are discussed in the Issues and Decision Memorandum. A list of the issues that parties raised in the Issues and Decision Memorandum is attached to this notice as Appendix II.

## Verification

As provided in section 782(i) of the Tariff Act of 1930, as amended (the Act), Commerce conducted verification of the information submitted by Ancientree and Foremost for use in the final determination. We used standard verification procedures, including an examination of relevant accounting records and original source documents provided by the respondents.[6]

Commerce did not verify the information submitted by Meisen.[7]

## Changes Since the Preliminary Determination

Based on our review and analysis of the comments received from parties, minor corrections presented at verification, and our verification findings, we have made certain changes to the margin calculations for Ancientree and Foremost. For a discussion of these changes, *see* the ''Changes Since the Preliminary Determination'' section of the Issues and Decision Memorandum and the Final Calculation Memoranda.[8]

## Adverse Facts Available

In determining Meisen's dumping margin, we find that the application of facts available with an adverse inference in sections 776(a)(2)(A) through (C) and 776(b) of the Act as discussed in the Issues and Decision Memorandum.[9] Therefore, as adverse facts available (AFA), we have assigned Meisen the rate of 262.18 percent, which is the highest petition rate.[10]

For the reasons explained in the *Preliminary Determination,* we continue to find that the use of AFA, pursuant to sections 776(a) and (b) of the Act, is warranted in determining the rate for the China-wide entity.[11] In selecting the AFA rate for the China-wide entity, Commerce's practice is to select a rate that is sufficiently adverse to ensure that the uncooperative party does not obtain a more favorable result by failing to cooperate than if it had fully cooperated.[12] For the final

determination, we are also assigning the China-wide entity, as AFA, the rate of 262.18 percent, which is the highest petition rate.[13]

## Separate Rates

Generally, Commerce looks to section 735(c)(5)(A) of the Act, which provides instructions for calculating the all-others rate in a market economy antidumping duty (AD) investigation, for guidance when calculating the rate for separate rate respondents that we did not individually examine in a non-market economy AD investigation. Section 735(c)(5)(A) of the Act states that the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely on the basis of facts available.[14]

In this final determination, Commerce has calculated rates for Ancientree and Foremost that are not zero, *de minimis,* or based entirely on facts available. Thus, looking to section 735(c)(5)(A) of the Act for guidance, and consistent with our practice,[15] based on publicly ranged sales data, we are assigning the weighted-average of these mandatory respondents' rates as the rate for non-individually examined companies that have qualified for a separate rate, other than Meisen, whose rate is based entirely on section 776 of the Act as discussed above.

## Final Determination

The final estimated weighted-average dumping margins are as follows:

---

[4] *See* Memorandum, ''Certain Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Scope Comments Decision Memorandum for the Preliminary Determinations,'' dated October 2, 2019 (Preliminary Scope Decision Memorandum).

[5] *See* Memorandum, ''Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Scope Comments Decision Memorandum,'' dated concurrently with this notice (Final Scope Decision Memorandum).

[6] *See* Memorandum, ''Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Verification of the Export Price Sales and Factors of Production Response of The Ancientree Cabinet Co., Ltd,'' dated December 10, 2019; Memorandum, ''Verification of the Responses of Foremost Worldwide Company Ltd. In the Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China,'' dated January 10, 2020; Memorandum ''Verification of the Responses of Rizhao Foremost Woodwork Manufacturing Co. Ltd. in the Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China,'' dated January 10, 2020; and ''Verification of the Responses of Rizhao Foremost Woodwork Manufacturing Co. Ltd. in the Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and

Components Thereof from the People's Republic of China,'' dated January 10, 2020.

[7] *See* Commerce's Letter, ''Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Verification,'' dated December 27, 2019.

[8] *See* Memoranda, ''Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Analysis Memorandum for The Ancientree Cabinet Co., Ltd.,'' and ''Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Analysis Memorandum for Rizhao Foremost Woodwork Manufacturing Company Ltd.,'' both dated concurrently with this notice (collectively, Final Calculation Memoranda).

[9] *See* Issues and Decision Memorandum at Comment 22.

[10] *Id.*

[11] *See Preliminary Determination,* 84 FR at 54106.

[12] *See, e.g., Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Purified Carboxymethyl Cellulose from Finland,* 69 FR 77216 (December 27,

2004), unchanged in *Notice of Final Determination of Sales at Less Than Fair Value: Purified Carboxymethyl Cellulose from Finland,* 70 FR 28279 (May 17, 2005).

[13] *See* Issues and Decision Memorandum at ''Use of Adverse Facts Available.''

[14] *See, e.g., Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews and Rescission of Reviews in Part,* 73 FR 52823, 52824 (September 11, 2008), and accompanying Issues and Decision Memorandum at Comment 16.

[15] *See, e.g., Preliminary Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances: Certain Polyester Staple Fiber from the People's Republic of China,* 71 FR 77373, 77377 (December 26, 2006), unchanged in *Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances: Certain Polyester Staple Fiber from the People's Republic of China,* 72 FR 19690 (April 19, 2007).

Case 1:20-cv-00114-GSK   Document 72   Filed 01/04/22   Page 6 of 339

Barcode:3948567-01 A-570-106 INV - Investigation  -
**Federal Register**/ Vol. 85, No. 40 / Friday, February 28, 2020 / Notices   **11955**

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| The Ancientree Cabinet Co., Ltd | The Ancientree Cabinet Co., Ltd | 4.37 | 0.00 |
| Dalian Meisen Woodworking Co., Ltd | Dalian Meisen Woodworking Co., Ltd | 262.18 | 251.64 |
| Foremost Worldwide Company Limited | Rizhao Foremost Woodwork Manufacturing Company, Ltd. | 101.46 | 90.92 |
| Foremost Worldwide Company Limited | Henan AiDiJia Furniture Co., Ltd | 101.46 | 90.92 |
| Foremost Worldwide Company Limited | Suzhou Weiye Furniture Co., Ltd | 101.46 | 90.92 |
| Foremost Worldwide Company Limited | Changsha Minwan Furniture Manufacturing Co., Ltd. | 101.46 | 90.92 |
| ANHUI JIANLIAN WOOD PRODUCTS CO., LTD | ANHUI JIANLIAN WOOD PRODUCTS CO., LTD | 48.50 | 37.96 |
| Anhui Swanch Cabinetry Co., Ltd | Anhui Swanch Cabinetry Co., Ltd | 48.50 | 37.96 |
| ANHUI XINYUANDA CUPBOARD CO., LTD | ANHUI XINYUANDA CUPBOARD CO., LTD | 48.50 | 37.96 |
| Beijing Oulu Jinxin International Trade Co., Ltd | Beijing Oulu Jinxin International Trade Co., Ltd | 48.50 | 37.96 |
| Boloni Smart Home Decor (Beijing) Co., LTD | Boloni Smart Home Decor (Beijing) Co., LTD | 48.50 | 37.96 |
| BRENTRIDGE HOLDING CO., LTD | ZHOUSHAN FOR-STRONG WOOD CO., LTD | 48.50 | 37.96 |
| Caoxian Brothers Hengxin Wood Industry Co., Ltd | Caoxian Brothers Hengxin Wood Industry Co., Ltd | 48.50 | 37.96 |
| Changyi Zhengheng Woodwork Co., Ltd | Changyi Zhengheng Woodwork Co., Ltd | 48.50 | 37.96 |
| CHAOZHOU YAFENG BATHROOM EQUIPMENT CO., LTD. | CHAOZHOU YAFENG BATHROOM EQUIPMENT CO., LTD. | 48.50 | 37.96 |
| China Friend Limited | Dongming Sanxin Wood Industry Co., Ltd | 48.50 | 37.96 |
| Dalian Jiaye Wood Products Co., Ltd | Dalian Jiaye Wood Products Co., Ltd | 48.50 | 37.96 |
| Dalian Xingsen Wooden Products Co., Ltd | Dalian Xingsen Wooden Products Co., Ltd | 48.50 | 37.96 |
| Dandong City Anmin Wooden Products Group Co., Ltd. | Dandong City Anmin Wooden Products Group Co., Ltd. | 48.50 | 37.96 |
| Dandong Laroyal Cabinetry Co., Ltd | Dandong Laroyal Cabinetry Co., Ltd | 48.50 | 37.96 |
| DEHK LIMITED | DIAM DISPLAY (CHINA) CO., LTD | 48.50 | 37.96 |
| Deqing China-Africa Foreign Trade Port Co., Ltd | Suqian Welcomewood Products Co., Ltd | 48.50 | 37.96 |
| Dewell Wooden Products Haian Co., Ltd | Dewell Wooden Products Haian Co., Ltd | 48.50 | 37.96 |
| Dongguan American Parts Supplier Co., Ltd | Dongguan American Parts Supplier Co., Ltd | 48.50 | 37.96 |
| Dongguan Niusaiqu Wood Industry Co., Ltd | Dongguan Niusaiqu Wood Industry Co., Ltd | 48.50 | 37.96 |
| Dongguan Unique Life Furniture Co., Ltd. also known as Unique Life Furniture Co., Ltd (trade name). | Dongguan Unique Life Furniture Co., Ltd | 48.50 | 37.96 |
| Dorbest Ltd | Rui Feng Woodwork (Dongguan) Co., Ltd | 48.50 | 37.96 |
| EZIDONE DISPLAY CORPORATION LTD | EZIDONE DISPLAY CORPORATION LTD | 48.50 | 37.96 |
| EZIDONE DISPLAY CORPORATION LTD | EZIDONE DISPLAY INC | 48.50 | 37.96 |
| Forcer International Limited | QUFU XINYU FURNITURE CO., LTD | 48.50 | 37.96 |
| Forcer International Limited | LINYI RUNKANG CABINET CO., LTD | 48.50 | 37.96 |
| Forcer International Limited | BEIJING OULU JINXIN INTERNATIONAL TRADE CO., LTD. | 48.50 | 37.96 |
| Foshan City Shunde District Refined Furniture Co., Ltd. also known as Refined Furniture Co., Ltd. (trade name). | Foshan City Shunde District Refined Furniture Co., Ltd. also known as Refined Furniture Co., Ltd. (trade name). | 48.50 | 37.96 |
| Foshan Liansu building material trading Co., Ltd | Guangdong Lesso Home Furnishing Co., Ltd | 48.50 | 37.96 |
| FOSHAN NANHAI HONGZHOU WOOD, LTD | FOSHAN NANHAI HONGZHOU WOOD CO., LTD | 48.50 | 37.96 |
| Foshan Shunde Yajiasi Kitchen Cabinet Co., Ltd | Foshan Shunde Yajiasi Kitchen Cabinet Co., Ltd | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | FOSHAN DIBIAO BATHROOM CO., LTD | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | FOSHAN MK HOME FURISHING CO., LTD | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | PROUDER INDUSTRIAL LIMITED | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | FOSHAN DEMAX SANITARY WARE CO., LTD | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | HEBEI SHUANGLI FURNITURE CO., LTD | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | ZHANGZHOU GUOHUI INDUSTRIAL & TRADE CO., LTD. | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | SHOUGUANG FUSHI WOOD CO., LTD | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | Foshan Virtu Bathroom Furniture Ltd | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | Guangdong Purefine Kitchen & Bath Technology Co., LTD. | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED | KAIPING HONGITARYWARE TECHNOLOGY LTD | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | FOSHAN DIBIAO BATHROOM CO., LTD | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | FOSHAN MK HOME FURISHING CO., LTD | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | PROUDER INDUSTRIAL LIMITED | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | FOSHAN DEMAX SANITARY WARE CO., LTD | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | HEBEI SHUANGLI FURNITURE CO., LTD | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | ZHANGZHOU GUOHUI INDUSTRIAL & TRADE CO., LTD. | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | SHOUGUANG FUSHI WOOD CO., LTD | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | Foshan Virtu Bathroom Furniture Ltd | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | Guangdong Purefine Kitchen & Bath Technology Co., LTD. | 48.50 | 37.96 |
| Foshan Sourcever Company Limited | KAIPING HONGITARYWARE TECHNOLOGY LTD | 48.50 | 37.96 |
| Foshan Xinzhongwei Economic & Trade Co., Ltd | Foshan Lihong Furniture Sanitary Ware Co., Ltd | 48.50 | 37.96 |

**11956**   **Federal Register** / Vol. 85, No. 40 / Friday, February 28, 2020 / Notices

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| FUJIAN DUSHI WOODEN INDUSTRY CO., LTD ... | FUJIAN DUSHI WOODEN INDUSTRY CO., LTD .. | 48.50 | 37.96 |
| FUJIAN LEIFENG CABINETRY CO., LTD ............... | FUJIAN LEIFENG CABINETRY CO., LTD ............... | 48.50 | 37.96 |
| Fujian Panda Home Furnishing Co., Ltd .................. | Fujian Panda Home Furnishing Co., Ltd .................. | 48.50 | 37.96 |
| Fujian Senyi Kitchen Cabinet Co., Ltd ................... | Fujian Senyi Kitchen Cabinet Co., Ltd ................... | 48.50 | 37.96 |
| Fuzhou Biquan Trading Co., Ltd ............................ | Biquan (Fujian) Group Co., Ltd ............................. | 48.50 | 37.96 |
| Fuzhou CBM Import & Export Co., Ltd .................. | Fuzhou CBM Import & Export Co., Ltd .................. | 48.50 | 37.96 |
| Fuzhou Desource Home Décor Co., Ltd ................ | Fuzhou Desource Home Décor Co., Ltd ................ | 48.50 | 37.96 |
| FUZHOU LIMIN STONE PRODUCTS CO., LTD ..... | Fuzhou YST Cabinet Co., Ltd  .............................. | 48.50 | 37.96 |
| FUZHOU MASTONE IMPORT & EXPORT CO., LTD. | Fuzhou Yuansentai Cabinet Co., Ltd  ..................... | 48.50 | 37.96 |
| Fuzhou Minlian Wood Industry Co., Ltd ................. | Fuzhou Minlian Wood Industry Co., Ltd ................. | 48.50 | 37.96 |
| FUZHOU SUNRISING HOME DECO MANUFAC-TURING CO., LTD. | FUZHOU SUNRISING HOME DECO MANUFAC-TURING CO., LTD. | 48.50 | 37.96 |
| FUZHOU XINRUI CABINET CO., LTD ................... | FUZHOU XINRUI CABINET CO., LTD ................... | 48.50 | 37.96 |
| Gaomi City Haitian Wooden Ware Co., Ltd ........... | Gaomi City Haitian Wooden Ware Co., Ltd ........... | 48.50 | 37.96 |
| GAOMI HONGTAI HOME FURNITURE CO., LTD .. | GAOMI HONGTAI HOME FURNITURE CO., LTD | 48.50 | 37.96 |
| Guangde Bozhong Trade Company, Ltd ................. | Guangde Bozhong Trade Company, Ltd ................. | 48.50 | 37.96 |
| GUANGDONG CACAR KITCHEN TECHNOLOGY CO., LTD. | GUANGDONG CACAR KITCHEN TECHNOLOGY CO., LTD. | 48.50 | 37.96 |
| Guangdong G-Top Import and Export Co., Ltd ....... | Foshan Shunde Rongao Furniture CO., LTD ......... | 48.50 | 37.96 |
| Guangzhou Nuolande Import and Export Co., Ltd ... | Guangzhou Nuolande Import and Export Co., Ltd .. | 48.50 | 37.96 |
| Haiyang Kunlun Wood Co., Ltd  ............................. | Haiyang Kunlun Wood Co., Ltd  ............................. | 48.50 | 37.96 |
| Hangzhou Bestcraft Sanitary Equipments Co., Ltd .. | Hangzhou Bestcraft Sanitary Equipments Co., Ltd | 48.50 | 37.96 |
| Hangzhou Entop Houseware Co., Ltd .................... | Jinhua Aonika Sanitary Ware Co., Ltd  .................. | 48.50 | 37.96 |
| Hangzhou Entop Houseware Co., Ltd .................... | Hangzhou Bestcraft Sanitary Equipments Co., Ltd | 48.50 | 37.96 |
| Hangzhou Hansen Sanitary Ware Co., Ltd ............ | Hangzhou Hansen Sanitary Ware Co., Ltd ............ | 48.50 | 37.96 |
| Hangzhou Hoca Kitchen & Bath Products Co., Ltd .. | Hangzhou Hoca Kitchen & Bath Products Co., Ltd | 48.50 | 37.96 |
| Hangzhou Home Dee Sanitary Ware Co., Ltd ....... | Hangzhou Home Dee Sanitary Ware Co., Ltd ....... | 48.50 | 37.96 |
| Hangzhou Oulang Bathroom Equipment Co., Ltd .... | Hangzhou Oulang Bathroom Equipment Co., Ltd ... | 48.50 | 37.96 |
| Hangzhou Royo Import & Export Co., Ltd ............. | Jinhua Aonika Sanitary Ware Co., Ltd  .................. | 48.50 | 37.96 |
| Hangzhou Royo Import & Export Co., Ltd ............. | Hangzhou Yuxin Sanitary Ware Co., Ltd  ............... | 48.50 | 37.96 |
| Hangzhou Royo Import & Export Co., Ltd ............. | Hangzhou Fuyang Beautiful Sanitary Ware Co., Ltd | 48.50 | 37.96 |
| Hangzhou Sunlight Sanitary Co., Ltd .................... | Hangzhou Sunlight Sanitary Co., Ltd .................... | 48.50 | 37.96 |
| Hangzhou Weinuo Sanitary Ware Co., Ltd ............ | PINGHU AIPA SANITARY WARE CO., LTD .......... | 48.50 | 37.96 |
| Hangzhou Weinuo Sanitary Ware Co., Ltd ............ | HANGZHOU QILONG SANITARY WARE CO., LTD. | 48.50 | 37.96 |
| Hangzhou Xinhai Sanitary Ware Co., Ltd .............. | Hangzhou Xinhai Sanitary Ware Co., Ltd .............. | 48.50 | 37.96 |
| Hangzhou Yewlong Import & Export Co., Ltd ......... | Hangzhou Yewlong Industry Co., Ltd .................... | 48.50 | 37.96 |
| Hangzhou Zhuangyu Import & Export Co., Ltd ....... | Hangzhou Zhuangyu Import & Export Co., Ltd ....... | 48.50 | 37.96 |
| Henan Aotin Home Furnishing Co., Ltd ................. | Henan Aotin Home Furnishing Co., Ltd ................. | 48.50 | 37.96 |
| Heyond Cabinet Co., Ltd  .................................... | Heyond Cabinet Co., Ltd  .................................... | 48.50 | 37.96 |
| Homestar Corporation ........................................... | Homestar Corporation ........................................... | 48.50 | 37.96 |
| HONG KONG JIAN CHENG TRADING CO., LIM-ITED. | ZHONGSHAN YAYUE FURNITURE CO., LTD ...... | 48.50 | 37.96 |
| Xiamen Honglei Imp. & Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Changtai Guanjia Industry & Trade Company Co., Ltd. | 48.50 | 37.96 |
| Xiamen Honglei Imp. & Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Zhangzhou Huihua Industry and Trade Co., Ltd ..... | 48.50 | 37.96 |
| Xiamen Honglei Imp. & Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Fujian Xinanlong Wood Industry Co., Ltd ............... | 48.50 | 37.96 |
| Honsoar New Building Material Co., Ltd ................ | Shandong Honsoar Cabinet Materials Co., Ltd ....... | 48.50 | 37.96 |
| Hua Yin Trading Development Co., Ltd of Jiangmen City. | Jianfa Wooden Co., Ltd ........................................ | 48.50 | 37.96 |
| Hua Yin Trading Development Co., Ltd of Jiangmen City. | Heshan Yingmei Cabinets Co., Ltd ....................... | 48.50 | 37.96 |
| Hua Yin Trading Development Co., Ltd of Jiangmen City. | Hesha Feiqiu Cabinet Co., Ltd ............................. | 48.50 | 37.96 |
| Huimin Hanlong Furniture Co., Ltd ....................... | Huimin Hanlong Furniture Co., Ltd ....................... | 48.50 | 37.96 |
| HUISEN FURNITURE (LONG NAN) CO., LTD. also known as HUISEN FURNITURE (LONGNAN) CO., LTD. | HUISEN FURNITURE (LONG NAN) CO., LTD. also known as HUISEN FURNITURE (LONGNAN) CO., LTD. | 48.50 | 37.96 |
| HUIZHOU MANDARIN FURNITURE CO., LTD ...... | HUIZHOU MANDARIN FURNITURE CO., LTD ...... | 48.50 | 37.96 |
| Jiang Su Rongxin Cabinets Ltd .............................. | Jiang Su Rongxin Cabinets Ltd .............................. | 48.50 | 37.96 |
| Jiangmen Kinwai Furniture Decoration Co., Ltd ....... | Jiangmen Kinwai Furniture Decoration Co., Ltd ...... | 48.50 | 37.96 |
| Jiangmen Kinwai International Furniture Co., Ltd .... | Jiangmen Kinwai International Furniture Co., Ltd  ... | 48.50 | 37.96 |
| Jiangsu Beichen Wood Co., Ltd ............................ | Jiangsu Beichen Wood Co., Ltd ............................ | 48.50 | 37.96 |
| Jiangsu Meijun Intelligent Home Co., Ltd .............. | Jiangsu Meijun Intelligent Home Co., Ltd .............. | 48.50 | 37.96 |
| Jiangsu Pusite Furniture Co., Ltd ......................... | Jiangsu Pusite Furniture Co., Ltd ......................... | 48.50 | 37.96 |
| Jiangsu Roc Furniture Industrial Co., Ltd .............. | Jiangsu Roc Furniture Industrial Co., Ltd .............. | 48.50 | 37.96 |
| JIANGSU SUNWELL CABINETRY CO., LTD ......... | JIANGSU SUNWELL CABINETRY CO., LTD ......... | 48.50 | 37.96 |

Federal Register / Vol. 85, No. 40 / Friday, February 28, 2020 / Notices

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| JIANGSU WEISEN HOUSEWARE CO., LTD .......... | JIANGSU WEISEN HOUSEWARE CO., LTD ......... | 48.50 | 37.96 |
| Jiangsu Xiangsheng Bedtime Furniture Co., Ltd ...... | Jiangsu Xiangsheng Bedtime Furniture Co., Ltd ..... | 48.50 | 37.96 |
| Jiayuan (Xiamen) Industrial Co., Ltd ...................... | Jiayuan (Xiamen) Industrial Co., Ltd ...................... | 48.50 | 37.96 |
| JINJIANG PERFECT GENERATION IMP. & EXP. CO., LTD. | Homebi Technology Co., LTD ............................... | 48.50 | 37.96 |
| King's Group Furniture (Enterprises) Co., Ltd .......... | Zhongshan King's Group Furniture (ENTER-PRISES) Co., Ltd. | 48.50 | 37.96 |
| KM Cabinetry Co., Limited ................................... | Zhongshan KM Cabinetry Co., Ltd ........................ | 48.50 | 37.96 |
| Kunshan Baiyulan Furniture Co., Ltd ...................... | Kunshan Baiyulan Furniture Co., Ltd ...................... | 48.50 | 37.96 |
| Kunshan Home Right Trade Corporation ................ | Kunshan Fangs Furniture Co., Ltd ........................ | 48.50 | 37.96 |
| LIANYUNGANG SUN RISE TECHNOLOGY CO., LTD. | LIANYUNGANG SUN RISE TECHNOLOGY CO., LTD. | 48.50 | 37.96 |
| Linshu Meibang Furniture Co., Ltd ........................ | Linshu Meibang Furniture Co., Ltd ........................ | 48.50 | 37.96 |
| Linyi Bomei Furniture Co., Ltd .............................. | Linyi Bomei Furniture Co., Ltd .............................. | 48.50 | 37.96 |
| LINYI BONN FLOORING MANUFACTURING CO., LTD. | LINYI BONN FLOORING MANUFACTURING CO., LTD. | 48.50 | 37.96 |
| Linyi Kaipu Furniture Co., Ltd .............................. | Linyi Kaipu Furniture Co., Ltd .............................. | 48.50 | 37.96 |
| Linyi Runkang Cabinet Co., Ltd ............................ | Linyi Runkang Cabinet Co., Ltd ............................ | 48.50 | 37.96 |
| Liu Shu Woods Product (Huizhou) Co., Ltd also known as Liu Shu Wood Products Co., Ltd (trade name) and Liu Shu Woods Product Co., Ltd (trade name). | Liu Shu Woods Product (Huizhou) Co., Ltd ............ | 48.50 | 37.96 |
| Master Door & Cabinet Co., Ltd ........................... | Master Door & Cabinet Co., Ltd ........................... | 48.50 | 37.96 |
| Masterwork Cabinetry Company Limited ................. | Shandong Compete Wood Co., Ltd ....................... | 48.50 | 37.96 |
| Masterwork Cabinetry Company Limited ................. | Linyi Zhongsheng Jiaju Zhuangshi Co., Ltd ........... | 48.50 | 37.96 |
| MEILIN WOOD PRODUCTS(DALIAN)CO., LTD ...... | MEILIN WOOD PRODUCTS(DALIAN)CO., LTD ...... | 48.50 | 37.96 |
| Minhou Beite Home Decor Co., Ltd ....................... | Minhou Beite Home Decor Co., Ltd ....................... | 48.50 | 37.96 |
| MJB Supply (Dalian) Co., Ltd ............................... | Mulin City Bamiantong Linyeju Jisen Wood ........... | 48.50 | 37.96 |
| MOREWOOD CABINETRY CO., LTD ..................... | MOREWOOD CABINETRY CO., LTD ..................... | 48.50 | 37.96 |
| Nanjing Kaylang Co., Ltd .................................... | Nanjing Kaylang Co., Ltd .................................... | 48.50 | 37.96 |
| Nantong Aershin Cabinets Co., Ltd ....................... | Nantong Aershin Cabinets Co., Ltd ....................... | 48.50 | 37.96 |
| Nantong Ouming Wood Co., ................................ | Nantong Ouming Wood Co., ................................ | 48.50 | 37.96 |
| Ltd., also known as Nantong Ouming Wood Indus-try Co., Ltd. | Ltd., also known as Nantong Ouming Wood Indus-try Co., Ltd. | | |
| NANTONG YANGZI FURNITURE CO., LTD ........... | NANTONG YANGZI FURNITURE CO., LTD ........... | 48.50 | 37.96 |
| NINGBO KINGWOOD FURNITURE CO., LTD ........ | NINGBO KINGWOOD FURNITURE CO., LTD ....... | 48.50 | 37.96 |
| NINGBO ROVSA HOME FURNISHING CO., LTD .. | NINGBO ROVSA HOME FURNISHING CO., LTD .. | 48.50 | 37.96 |
| Ojans Company Limited ...................................... | Foshan Shunde Ojans Intelligent Sanitary Ware Co., Ltd. | 48.50 | 37.96 |
| Oppein Home Group Inc. ..................................... | Oppein Home Group Inc. ..................................... | 48.50 | 37.96 |
| PIZHOU OUYME IMPORT & EXPORT TRADE CO., LTD. | XUZHOU OUMEC WOOD-BASED PANEL CO., LTD. | 48.50 | 37.96 |
| Pneuma Asia Sourcing & Trading Co. LIMITED ...... | Dalian Tianxin Home Product Co., Ltd ................... | 48.50 | 37.96 |
| Pneuma Asia Sourcing & Trading Co. LIMITED ...... | Qingdao Haiyan Drouot Household Co., Ltd ........... | 48.50 | 37.96 |
| Putian Jinggong Furniture Co., Ltd ....................... | Putian Jinggong Furniture Co., Ltd ....................... | 48.50 | 37.96 |
| Qingdao Coomex Sources Co., Ltd. also known as Coomex Sources Co., Ltd. | Nantong Aershin Cabinets Co., Ltd ....................... | 48.50 | 37.96 |
| Qingdao Haiyan Drouot Household Co., Ltd ........... | Qingdao Haiyan Drouot Household Co., Ltd ........... | 48.50 | 37.96 |
| Qingdao Liangmu Hongye Co., Ltd ....................... | Qingdao Liangmu Hongye Co., Ltd ....................... | 48.50 | 37.96 |
| Qingdao Liangmu Jinshan Woodwork Co., Ltd ........ | Qingdao Liangmu Jinshan Woodwork Co., Ltd ....... | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Lankao Sanqiang Wooden Products Co., Ltd ......... | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Lanshan Chengxinli Woods Co., Ltd ............. | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Shouguang Shi Qifeng Woods Co., Ltd ................. | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Mingzhu Woods Co., Ltd .............................. | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Yichun Senhai Woods Industry Co., Ltd ................ | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Jinde Arts & Crafts Co., Ltd ......................... | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Qingdao Ruirong Woods Co., Ltd ......................... | 48.50 | 37.96 |
| Qingdao Shousheng Industry Co., Ltd ................... | Qingdao Shousheng Industry Co., Ltd ................... | 48.50 | 37.96 |
| Qingdao Yimei Wood Work Co., Ltd ...................... | Qingdao Yimei Wood Work Co., Ltd ...................... | 48.50 | 37.96 |
| QINGDAOHONGXINCHENGDA WOOD INDUS-TRY CO., LTD. | QINGDAOHONGXINCHENGDA WOOD INDUS-TRY CO., LTD. | 48.50 | 37.96 |
| QUFU XINYU FURNITURE CO., LTD ..................... | QUFU XINYU FURNITURE CO., LTD ..................... | 48.50 | 37.96 |
| Ronbow Hong Kong Limited ................................. | Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd | 48.50 | 37.96 |

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| Sagarit Bathroom Manufacturer Limited .................. | Shouguang Fushi Wood Co., Ltd ........................... | 48.50 | 37.96 |
| Sagarit Bathroom Manufacturer Limited .................. | Zhangzhou Guohui Industrial & Trade Co., Ltd ...... | 48.50 | 37.96 |
| Sagarit Bathroom Manufacturer Limited .................. | Qingdao Runpeng Wood Industrial Co., Ltd ........... | 48.50 | 37.96 |
| Sankok Arts Co., Ltd ........................................... | Sankok Arts Co., Ltd ........................................... | 48.50 | 37.96 |
| Senke Manufacturing Company ............................. | Qindao Yimei Wood Work Co., Ltd ....................... | 48.50 | 37.96 |
| Senke Manufacturing Company ............................. | Linyi Kaipu Furniture Co., Ltd .............................. | 48.50 | 37.96 |
| Senke Manufacturing Company ............................. | Shandon Honsoar Cabinetry Co., Ltd ................... | 48.50 | 37.96 |
| Senke Manufacturing Company ............................. | Huimin Hanlong Furniture Co, Ltd ........................ | 48.50 | 37.96 |
| Shandong Cubic Alpha Timber Co., Ltd ................ | Shandong Cubic Alpha Timber Co., Ltd ................ | 48.50 | 37.96 |
| Shandong Fusheng Wood Co., Ltd ........................ | Shandong Fusheng Wood Co., Ltd ........................ | 48.50 | 37.96 |
| Shandong Huanmei Wood Co., Ltd ....................... | Shandong Huanmei Wood Co., Ltd ....................... | 48.50 | 37.96 |
| SHANDONG JINGYAO HOME DECORATION PRODUCTS CO., LTD. | SHANDONG JINGYAO HOME DECORATION PRODUCTS CO., LTD. | 48.50 | 37.96 |
| Shandong Longsen Woods Co., Ltd ...................... | Shandong Longsen Woods Co., Ltd ...................... | 48.50 | 37.96 |
| Shandong Sanfortune Home and Furniture Co., Ltd | Shandong Sanfortune Home and Furniture Co., Ltd | 48.50 | 37.96 |
| Shanghai Aiwood Home Supplies Co., Ltd ............ | Jiangsu Gangxing Kitchen Cabinet Co., Ltd .......... | 48.50 | 37.96 |
| Shanghai Aiwood Home Supplies Co., Ltd ............ | Shanghai Homebase SanSheng Household Product Co., Ltd. | 48.50 | 37.96 |
| Shanghai Baiyulan Furniture Co., Ltd ................... | Kunshan Baiyulan Furniture Co., Ltd .................... | 48.50 | 37.96 |
| Shanghai Beautystar Cabinetry Co., Ltd ............... | Jiangsu Sunwell Cabinetry Co., Ltd ..................... | 48.50 | 37.96 |
| Shanghai Beautystar Cabinetry Co., Ltd ............... | Nantong Jiegao Furniture Co., Ltd ....................... | 48.50 | 37.96 |
| Shanghai Jiang Feng Furniture Co., Ltd ............... | Shanghai Jiang Feng Furniture Co., Ltd ............... | 48.50 | 37.96 |
| SHANGHAI LINE KING INTERNATIONAL TRADING CO., LTD. | SHANGHAI YAZHI WOODEN INDUSTRY CO., LTD. | 48.50 | 37.96 |
| Shanghai Mebo Industry Co. Ltd ........................... | Shanghai Mebo Industry Co. Ltd ........................... | 48.50 | 37.96 |
| Shanghai Qingzhou Woodenware Co., Ltd ............ | Shanghai Qingzhou Woodenware Co., Ltd ............ | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Anhui GeLun Wood Industry Co., Ltd ................... | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Ning'an City Jiude Wood Co., Ltd ........................ | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Muling City Bamiantong Forestry Bureau Jisen Wood Co., Ltd. | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Dalian Ruiyu Mountain Wood Co., Ltd .................. | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Linshu Meibang Furniture Co., Ltd ....................... | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Jiamusi City Quanhong Wood Industry Co., Ltd ..... | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Kunshan Fangs Furniture Co., Ltd ....................... | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Dalian Chunyao Wood Industry Co., Ltd ............... | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Anhui Juxin Wood Industry Co., Ltd ..................... | 48.50 | 37.96 |
| Shanghai Wang Lei Industries- Taicang Branch ...... | Shanghai Wang Lei Industries- Taicang Branch ..... | 48.50 | 37.96 |
| Shanghai Wen Bo Industries Co. Ltd .................... | Shanghai Yinbo Manufacturing Co. Ltd ................. | 48.50 | 37.96 |
| Shanghai Wen Bo Industries Co. Ltd .................... | Dalian Jiaye Wood Products Co., Ltd ................... | 48.50 | 37.96 |
| Shanghai Wen Bo Industries Co. Ltd .................... | Shanghai Baiyulan Furniture Co., Ltd ................... | 48.50 | 37.96 |
| Shanghai Xietong (Group) Co., Ltd ....................... | Nantong Jiegao Furniture Co., Ltd ....................... | 48.50 | 37.96 |
| Shanghai Xietong (Group) Co., Ltd ....................... | Jiangsu Senwei Smart Home Co., Ltd .................. | 48.50 | 37.96 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | SHANDONG GAINVAST WOODEN PRODUCTS CO., LTD. | 48.50 | 37.96 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | SHANGHAI WENYI WOODEN CO., LTD .............. | 48.50 | 37.96 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | NAN TONG DI LIN FURNITURE CO., LTD ........... | 48.50 | 37.96 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | JIANGSU YANAN WOODEN CO., LTD ................. | 48.50 | 37.96 |
| Sheen Lead International Trading (Shanghai) Co., Ltd. | SHANGHAI RUIYING FURNITURE CO., LTD ........ | 48.50 | 37.96 |
| Shouguang Fushi Wood Co., Ltd ........................... | Shouguang Fushi Wood Co., Ltd ........................... | 48.50 | 37.96 |
| Shouguang Honsoar Imp. & Exp. Trading Co., Ltd .. | Shandong Honsoar Cabinet Materials Co., Ltd ...... | 48.50 | 37.96 |
| SHOUGUANG JIAXIU WOOD CO., LTD ............... | SHOUGUANG JIAXIU WOOD CO., LTD ............... | 48.50 | 37.96 |
| SHOUGUANG JIAXIU WOOD CO., LTD ............... | SHOUGUANG JIAXIU WOOD CO., LTD ............... | 48.50 | 37.96 |
| Shouguang Jinxiangyuan Home Furnishing Co., Ltd | Shouguang Jinxiangyuan Home Furnishing Co., Ltd. | 48.50 | 37.96 |
| Shouguang Sanyang Wood Industry Co., Ltd .......... | Shouguang Sanyang Wood Industry Co., Ltd ......... | 48.50 | 37.96 |
| Silver Stone Group Co., Ltd ................................. | QINGDAO FAMILY CRAFTS CO., LTD ................. | 48.50 | 37.96 |
| Silver Stone Group Co., Ltd ................................. | QingDao XiuZhen Furniture Co., Ltd .................... | 48.50 | 37.96 |
| Smart Gift International ........................................ | Anhui GeLun Wood Industry Co., Ltd ................... | 48.50 | 37.96 |
| Smart Gift International ........................................ | Ning'an City Jiude Wood Co., Ltd ........................ | 48.50 | 37.96 |
| Smart Gift International ........................................ | Muling City Bamiantong Forestry Bureau Jisen Wood Co., Ltd. | 48.50 | 37.96 |
| Smart Gift International ........................................ | Dalian Ruiyu Mountain Wood Co., Ltd .................. | 48.50 | 37.96 |
| Smart Gift International ........................................ | Jiamusi City Quanhong Wood Industry Co., Ltd ..... | 48.50 | 37.96 |
| Smart Gift International ........................................ | Dalian Chunyao Wood Industry Co., Ltd ............... | 48.50 | 37.96 |
| SUNCO TIMBER(KUNSHAN) CO., LTD ............... | SUNCO TIMBER(KUNSHAN) CO., LTD ............... | 48.50 | 37.96 |
| Supree (Fujian) Wood Co., Ltd ............................. | Supree (Fujian) Wood Co., Ltd ............................. | 48.50 | 37.96 |

**Federal Register**/Vol. 85, No. 40/Friday, February 28, 2020/Notices                                    **11959**

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| Supree (Fujian) Construction Materials Co., Ltd ...... | Supree (Fujian) Construction Materials Co., Ltd ..... | 48.50 | 37.96 |
| SUZHOU BAOCHENG INDUSTRIES CO., LTD ...... | WALLBEYOND (SHUYANG) HOME DECOR CO., LTD. | 48.50 | 37.96 |
| Suzhou Five Cubic Wood Co., Ltd ........................... | Suzhou Geda Office Equipment Manufacturing Co., Ltd. | 48.50 | 37.96 |
| Suzhou Oriental Dragon Import and Export Co., Ltd. also known as Suzhou Oriental Dragon Import and Export Corp., Ltd. | Lingbi Xianghe Wood Co., Ltd ................................ | 48.50 | 37.96 |
| Tai Yuan Trading Co., Ltd also known as Heshan Tai Yuan Trading Co., Ltd. | Heshan Yingmei Cabinet Co., Ltd ........................... | 48.50 | 37.96 |
| Taishan Changfa Wood Industry Co., Ltd ............... | Taishan Changfa Wood Industry Co., Ltd ............... | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Chang He Xing Wood Manufacturer Co., Ltd ......... | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Heshan Yingmei Cabinets Co., Ltd ........................ | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Heshan Feiqiu Cabinet Co., Ltd ............................. | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Yuanwang Wood Product Factory Dajiang Taishan | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Can-am Cabinet Ltd ............................................... | 48.50 | 37.96 |
| Taishan Hongzhou Cabinet Co., Ltd ...................... | Taishan Hongzhou Cabinet Co., Ltd ...................... | 48.50 | 37.96 |
| Taishan Jiahong Trade Co., Ltd ............................. | Taishan Dajiang Town Dutou Wood Furniture Factory. | 48.50 | 37.96 |
| Taishan Jiahong Trade Co., Ltd ............................. | Foshan Nanhai Jinwei Cabinet Furniture Co., Ltd .. | 48.50 | 37.96 |
| Taishan Jiahong Trade Co., Ltd ............................. | Taishan Huali Kitchen Cabinet Co., Ltd ................. | 48.50 | 37.96 |
| Taishan Jiahong Trade Co., Ltd ............................. | Taishan Empire Wood Co., Ltd .............................. | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | TAISHAN GANHUI STONE KITCHEN CO., LTD ... | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | Can-am Cabinet Ltd ............................................... | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | TAISHAN QUANMEI KITCHEN WARE CO., LTD .. | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | TAISHAN JIAFU CABINET CO., LTD ...................... | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | TAISHAN DAJIANG TOWN DUTOU FURNITURE FACTORY. | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | Feiteng Kitchen Cabinets Taishan Corporation ....... | 48.50 | 37.96 |
| Taizhou Overseas Int'l Ltd .................................... | Zhejiang Royal Home Co., Ltd ............................... | 48.50 | 37.96 |
| TANGSHAN BAOZHU FURNITURE CO., LTD ....... | TANGSHAN BAOZHU FURNITURE CO., LTD ....... | 48.50 | 37.96 |
| Tech Forest Cabinetry Co., Ltd ............................. | Tech Forest Cabinetry Co., Ltd ............................. | 48.50 | 37.96 |
| The Frame Manufacturing Co. Ltd ......................... | HUIZHOU DIWEIXIN JIATINGYONGPIN CO., LTD | 48.50 | 37.96 |
| Top Goal International Group Ltd. (Hong Kong) ...... | Dongguan City Top Goal Furniture Co., Ltd .......... | 48.50 | 37.96 |
| Tradewinds Ltd ..................................................... | Tradewinds Furniture Ltd ...................................... | 48.50 | 37.96 |
| Wa Fok Art Craft Furniture (MACAO) Co., Ltd ...... | Zhongshan Huafu Art Craft Furniture Co., Ltd ........ | 48.50 | 37.96 |
| Weifang Fuxing Wood Co., Ltd .............................. | Weifang Fuxing Wood Co., Ltd .............................. | 48.50 | 37.96 |
| WEIFANG KITCHINET CORPORATION ................. | WEIFANG KITCHINET CORPORATION ................. | 48.50 | 37.96 |
| Weifang Lan Gu Wood Industry Co., Ltd ............... | Weifang Lan Gu Wood Industry Co., Ltd ............... | 48.50 | 37.96 |
| Weifang Master Wood Industry Co., Ltd ................ | Weifang Master Wood Industry Co., Ltd ................ | 48.50 | 37.96 |
| Weifang Yuanlin Woodenware Co., Ltd .................. | Weifang Yuanlin Woodenware Co., Ltd .................. | 48.50 | 37.96 |
| Weihai Adornus Cabinetry Manufacturing Co., Ltd .. | Weihai Adornus Cabinetry Manufacturing Co., Ltd | 48.50 | 37.96 |
| WEIHAI JARLIN CABINETRY MANUFACTURE CO., LTD. | WEIHAI JARLIN CABINETRY MANUFACTURE CO., LTD. | 48.50 | 37.96 |
| Wellday International Company Limited also known as Dongguan Wellday Household Co., Ltd. | Wellday International Company Limited also known as Dongguan Wellday Household Co., Ltd. | | |
| Wenzhou Youbo Industrial Co., Ltd ....................... | Wenzhou Youbo Industrial Co., Ltd ....................... | 48.50 | 37.96 |
| Wuxi Yushea Furniture Co., Ltd ............................ | Wuxi Yushea Furniture Co., Ltd ............................ | 48.50 | 37.96 |
| Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd. | Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd. | 48.50 | 37.96 |
| Xiamen Adler Cabinetry Co., Ltd .......................... | Xiamen Adler Cabinetry Co., Ltd .......................... | 48.50 | 37.96 |
| XIAMEN GOFOR STONE CO., LTD ...................... | KAICHENG (FUJIAN) KITCHEN CABINET CO., LTD. | 48.50 | 37.96 |
| XIAMEN GOLDEN HUANAN IMP. & EXP. CO., LTD. | Changtai Guanjia Industrial Co., Ltd ...................... | 48.50 | 37.96 |
| XIAMEN GOLDENHOME CO., LTD ...................... | XIAMEN GOLDENHOME CO., LTD ...................... | 48.50 | 37.96 |
| XIAMEN KAICHENG TRADING LIMITED COMPANY. | KAICHENG (FUJIAN) KITCHEN CABINET CO., LTD. | 48.50 | 37.96 |
| Xiamen Sintop Display Fixtures Co., Ltd ................ | Xiamen Sintop Display Fixtures Co., Ltd ................ | 48.50 | 37.96 |
| XINGZHI INTERNATIONAL TRADE LIMITED ......... | XUZHOU YIHE WOOD CO., LTD ........................... | 48.50 | 37.96 |
| XUZHOU JIA LI DUO IMPORT & EXPORT CO., LTD. | XUZHOU OUMEC WOOD-BASED PANEL CO., LTD. | 48.50 | 37.96 |
| XUZHOU YIHE WOOD CO., LTD ........................... | XUZHOU YIHE WOOD CO., LTD ........................... | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ................................... | DONGGUAN TODA FURNITURE CO., LTD .......... | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ................................... | GUANGZHOUSHI BAISEN DECORATIVE MATERIALS COMPANY LIMITED. | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ................................... | DONGGUAN FANYANUO FURNITURE CO., LTD | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ................................... | DONGGUANSHI ANKE BUILDING MATERIALS CO., LTD. | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ................................... | Oriental Chic Furniture Company Limited ............... | 48.50 | 37.96 |

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| YEKALON INDUSTRY, INC ..................................... | DONGGUAN FRANCISS FURNITURE CO., LTD .. | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ..................................... | SHANGHAI YUANYANG WOODEN CO., LTD ....... | 48.50 | 37.96 |
| Yi Sen Wood Industry Limited Company of Ning An City. | Yi Sen Wood Industry Limited Company of Ning An City. | 48.50 | 37.96 |
| Yichun Dongmeng Wood Co., Ltd ............................ | Yichun Dongmeng Wood Co., Ltd ............................ | 48.50 | 37.96 |
| Yichun Dongmeng Wood Co., Ltd ............................ | Qingdao Dimei Wood Co., Ltd ................................ | 48.50 | 37.96 |
| Yichun Sunshine Wood Products Co., Ltd ............... | Yichun Sunshine Wood Products Co., Ltd ............... | 48.50 | 37.96 |
| Yixing Pengjia Cabinetry Co. Ltd ............................ | Yixing Pengjia Cabinetry Co. Ltd ............................ | 48.50 | 37.96 |
| Zhangjiagang Daye Hotel Furniture Co., Ltd ........... | Zhangjiagang Daye Hotel Furniture Co., Ltd ........... | 48.50 | 37.96 |
| ZHANGJIAGANG PRO-FIXTURE CO., LTD ............ | Zhangjiagang Yuanjiahe Home Furniture Co., Ltd .. | 48.50 | 37.96 |
| ZHANGZHOU CITY XIN JIA HUA FURNITURE CO., LTD. | ZHANGZHOU CITY XIN JIA HUA FURNITURE CO., LTD. | 48.50 | 37.96 |
| Zhangzhou Guohui Industrial & Trade Co., Ltd ........ | Zhangzhou Guohui Industrial & Trade Co., Ltd ...... | 48.50 | 37.96 |
| Zhangzhou OCA Furniture Co., Ltd ........................ | Zhangzhou OCA Furniture Co., Ltd ........................ | 48.50 | 37.96 |
| Zhaoqing Centech Decorative Material Company Ltd. | Zhaoqing Centech Decorative Material Company Ltd. | 48.50 | 37.96 |
| Zhejiang Jindi Holding Group Co., Ltd ..................... | Zhejiang Jindi Holding Group Co., Ltd ..................... | 48.50 | 37.96 |
| Zhong Shan Shi Yicheng Furniture & Craftwork Co., Ltd. | Zhong Shan Shi Yicheng Furniture & Craftwork Co., Ltd. | 48.50 | 37.96 |
| Zhong Shan Yue Qin Imp. & Exp. Co., Ltd ............. | Zhongshan Jinpeng Furniture Co., Ltd .................... | 48.50 | 37.96 |
| Zhongshan City Shenwan Meiting Furniture Factory | Zhongshan City Shenwan Meiting Furniture Factory. | 48.50 | 37.96 |
| Zhongshan Fookyik Furniture Co., Ltd .................... | Zhongshan Fookyik Furniture Co., Ltd .................... | 48.50 | 37.96 |
| ZHONGSHAN GAINWELL FURNITURE CO., LTD | ZHONGSHAN GAINWELL FURNITURE CO., LTD | 48.50 | 37.96 |
| Zhongshan Guanda Furniture Manufacturing Co., Ltd also known as Guanda Furniture Co., Ltd. | Zhongshan Guanda Furniture Manufacturing Co., Ltd. | 48.50 | 37.96 |
| ZHONGSHAN HENGFU FURNITURE COMPANY LIMITED. | ZHONGSHAN HENGFU FURNITURE COMPANY LIMITED. | 48.50 | 37.96 |
| Zhongshan King's Group Furniture (ENTER-PRISES) Co., Ltd. | Zhongshan King's Group Furniture (ENTER-PRISES) Co., Ltd. | 48.50 | 37.96 |
| Zhoushan For-strong Wood Co., Ltd ....................... | Zhoushan For-strong Wood Co., Ltd ....................... | 48.50 | 37.96 |
| Zhoushan For-strong Wood Co., Ltd ....................... | Shanghai Wanmuda Furniture Co., Ltd ................... | 48.50 | 37.96 |
| Zhucheng Tonghe Woodworks Co., ltd .................... | Zhucheng Tonghe Woodworks Co., ltd .................... | 48.50 | 37.96 |
| Zhuhai Seagull Kitchen and Bath Products Co., Ltd | Zhuhai Seagull Kitchen and Bath Products Co., Ltd | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | DONGGUAN FANG CHENG FURNITURE LTD ...... | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | ZhongShan PRO-YEARN Crafts Product Co., Ltd .. | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | FUJIAN NEWMARK INDUSTRIAL CO., LTD .......... | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | Fuzhou Zhonghe Houseware CO., LTD ................... | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | MING LIANG FURNITURE PRODUCT CO., LTD .. | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | XIANJU JUNYANG HOUSEHOLD PRODUCTS CO., LTD. | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | DongGuan HeTai Homewares CO., LTD ................. | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | CHENG TONG HARDWARE RPODUCT LTD ........ | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED ..................... | Nantong Jon Ergonomic office Co., Ltd ................... | 48.50 | 37.96 |
| China-Wide Entity [16] ............................................. | ................................................................................. | 262.18 | 251.64 |

## Disclosure

We intend to disclose to parties the calculations performed in this proceeding within five days of any public announcement of this notice in accordance with 19 CFR 351.224(b).

## Continuation of Suspension of Liquidation

In accordance with section 735(c)(1)(B) of the Act, we will instruct U.S. Customs and Border Protection (CBP) to continue to suspend liquidation of all entries of wooden cabinets and vanities from China, as described in the ''Scope of the Investigation'' section, entered, or withdrawn from warehouse, for consumption on or after October 9, 2019, the date of publication of the Preliminary Determination notice in the **Federal Register**.

Pursuant to section 735(c)(1)(B)(ii) of the Act, Commerce will instruct CBP to require a cash deposit [17] equal to the weighted-average amount by which normal value exceeds U.S. price as follows: (1) The cash deposit rate for the exporter/producer combination listed in the table above will be the rate identified for that combination in the table; (2) for all combinations of China exporters/producers of merchandise under consideration that have not received their own separate rate above,

[16] Commerce preliminarily determined that BRENTRIDGE HOLDING CO., LTD., Harbin Hongsen Wood Co., Ltd., SAICG International Trading Co., Ltd, Shanghai East Best Foreign Trade Co., Ltd., SHANGHAI TIMBER IMPORT & EXPORT CORP., and ZHONG SHAN KING YUANDUN WOOD PRODUCTS CO., LTD. also known as CHIN-SHU WOODEN LTD each failed to establish their eligibility for a separate rate and, therefore, we preliminarily determined that these companies are part of the China-wide entity. See Preliminary Decision Memorandum. We continue to find these entities, except for BRENTRIDGE HOLDING CO., LTD., as ineligible for separate rate for our final determination. See Issues and Decision Memorandum at Comment 3. For this final determination, except for BRENTRIDGE HOLDING CO., LTD., we continue to find that these companies are part of the China-wide entity. For further discussion with respect to certain of these companies, see the Issues and Decision Memorandum accompanying this notice at Comment 3.

[17] See Modification of Regulations Regarding the Practice of Accepting Bonds During the Provisional Measures Period in Antidumping and Countervailing Duty Investigations, 76 FR 61042 (October 3, 2011).

the cash-deposit rate will be the cash deposit rate established for the China-wide entity; and (3) for all non-China exporters of the merchandise under consideration which have not received their own separate rate above, the cash-deposit rate will be the cash deposit rate applicable to the China exporter/ producer combination that supplied that non-China exporter. These suspension of liquidation instructions will remain in effect until further notice.

We normally adjust AD cash deposit rates by the amount of export subsidies, where appropriate. In the companion countervailing duty (CVD) investigation, with respect to the mandatory respondents individually examined in the CVD investigation, and the separate-rate companies, we find that an export subsidy adjustment of 10.54 percent to the cash deposit rate is warranted because this is the export subsidy rate included in the CVD all-others rate to which the separate-rate companies are subject. As part of our determination in this final determination to apply AFA the China-wide entity, Commerce has adjusted the China-wide entity's AD cash deposit rate by the lowest export subsidy rate determined for any party in the companion CVD proceeding, *i.e.,* 10.54 percent.[18 19]

Pursuant to section 777A(f) of the Act, we normally adjust cash deposit rates for estimated domestic subsidy pass-through, where appropriate. However, in this case there is no basis to grant a domestic subsidy pass-through adjustment.[20]

## International Trade Commission Notification

In accordance with section 735(d) of the Act, we notified the International Trade Commission (ITC) of the final affirmative determination of sales at LTFV. As Commerce's final determination is affirmative, in accordance with section 735(b)(2) of the Act, the ITC will determine, within 45 days, whether the domestic industry in the United States is materially injured,

---

[18] *See, e.g., Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value; Preliminary Affirmative Determination of Critical Circumstances; In Part and Postponement of Final Determination,* 80 FR 4250 (January 27, 2015), and accompanying Issues and Decision Memorandum at 35.

[19] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* dated concurrently with this notice, and accompanying Issues and Decision Memorandum. The final determination in this companion CVD proceeding is being issued on the same day as this final AD determination.

[20] *See* Issues and Decision Memorandum at "Adjustment Under Section 777A(f) of the Act."

or threatened with material injury, by reason of imports of wooden cabinets and vanities for sale from China, or sales (or the likelihood of sales) for importation, of wooden cabinets and vanities from China. If the ITC determines that such injury does not exist, this proceeding will be terminated and all securities posted will be refunded or canceled. If the ITC determines that such injury does exist, Commerce will issue an antidumping duty order directing CBP to assess, upon further instruction by Commerce, antidumping duties on all imports of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the effective date of the suspension of liquidation.

## Notification Regarding Administrative Protective Orders (APO)

In the event that the ITC issues a final negative injury determination, this notice will serve as the only reminder to parties subject to the APO of their responsibility concerning the destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return/ destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

## Notification to Importers

This notice also serves as an initial reminder to importers of their responsibility under 19 CFR 351.402(f) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation. Failure to comply with this requirement could result in Commerce's presumption that reimbursement of antidumping duties occurred and the subsequent assessment of doubled antidumping duties.

## Notification to Interested Parties

This determination is issued and published in accordance with sections 735(d) and 777(i)(1) of the Act, and 19 CFR 351.210(c).

Dated: February 21, 2020.

**Jeffrey I. Kessler,**

*Assistant Secretary for Enforcement and Compliance.*

## Appendix I

### Scope of the Investigation

The merchandise subject to this investigation consists of wooden cabinets and vanities that are for permanent installation (including floor mounted, wall mounted, ceiling hung or by attachment of plumbing), and wooden components thereof.

Wooden cabinets and vanities and wooden components are made substantially of wood products, including solid wood and engineered wood products (including those made from wood particles, fibers, or other wooden materials such as plywood, strand board, block board, particle board, or fiberboard), or bamboo. Wooden cabinets and vanities consist of a cabinet box (which typically includes a top, bottom, sides, back, base blockers, ends/end panels, stretcher rails, toe kicks, and/or shelves) and may or may not include a frame, door, drawers and/ or shelves. Subject merchandise includes wooden cabinets and vanities with or without wood veneers, wood, paper or other overlays, or laminates, with or without non-wood components or trim such as metal, marble, glass, plastic, or other resins, whether or not surface finished or unfinished, and whether or not completed.

Wooden cabinets and vanities are covered by the investigation whether or not they are imported attached to, or in conjunction with, faucets, metal plumbing, sinks and/or sink bowls, or countertops. If wooden cabinets or vanities are imported attached to, or in conjunction with, such merchandise, only the wooden cabinet or vanity is covered by the scope.

Subject merchandise includes the following wooden component parts of cabinets and vanities: (1) Wooden cabinet and vanity frames (2) wooden cabinet and vanity boxes (which typically include a top, bottom, sides, back, base blockers, ends/end panels, stretcher rails, toe kicks, and/or shelves), (3) wooden cabinet or vanity doors, (4) wooden cabinet or vanity drawers and drawer components (which typically include sides, backs, bottoms, and faces), (5) back panels and end panels, (6) and desks, shelves, and tables that are attached to or incorporated in the subject merchandise.

Subject merchandise includes all unassembled, assembled and/or "ready to assemble" (RTA) wooden cabinets and vanities, also commonly known as "flat packs," except to the extent such merchandise is already covered by the scope of antidumping and countervailing duty orders on *Hardwood Plywood from the People's Republic of China. See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 83 FR 504 (January 4, 2018); *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order,* 83 FR 513 (January 4, 2018). RTA wooden cabinets and vanities are defined as cabinets or vanities packaged so that at the time of importation they may include: (1) Wooden components required to assemble a cabinet or vanity (including drawer faces and doors); and (2) parts (*e.g.,* screws, washers, dowels, nails, handles, knobs, adhesive glues) required to assemble a cabinet or vanity. RTAs may enter the United States in one or in multiple packages.

Subject merchandise also includes wooden cabinets and vanities and in-scope components that have been further processed in a third country, including but not limited to one or more of the following: Trimming,

**11962**    **Federal Register** / Vol. 85, No. 40 / Friday, February 28, 2020 / Notices

cutting, notching, punching, drilling, painting, staining, finishing, assembly, or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the in-scope product.

Excluded from the scope of this investigation, if entered separate from a wooden cabinet or vanity are:

(1) Aftermarket accessory items which may be added to or installed into an interior of a cabinet and which are not considered a structural or core component of a wooden cabinet or vanity. Aftermarket accessory items may be made of wood, metal, plastic, composite material, or a combination thereof that can be inserted into a cabinet and which are utilized in the function of organization/ accessibility on the interior of a cabinet; and include:

• Inserts or dividers which are placed into drawer boxes with the purpose of organizing or dividing the internal portion of the drawer into multiple areas for the purpose of containing smaller items such as cutlery, utensils, bathroom essentials, *etc.etc.*

• Round or oblong inserts that rotate internally in a cabinet for the purpose of accessibility to foodstuffs, dishware, general supplies, *etc.*

(2) Solid wooden accessories including corbels and rosettes, which serve the primary purpose of decoration and personalization.

(3) Non-wooden cabinet hardware components including metal hinges, brackets, catches, locks, drawer slides, fasteners (nails, screws, tacks, staples), handles, and knobs.

(4) Medicine cabinets that meet all of the following five criteria are excluded from the scope: (1) Wall mounted; (2) assembled at the time of entry into the United States; (3) contain one or more mirrors; (4) be packaged for retail sale at time of entry; and (5) have a maximum depth of seven inches.

Also excluded from the scope of this investigation are:

(1) All products covered by the scope of the antidumping duty order on *Wooden Bedroom Furniture from the People's Republic of China. See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Wooden Bedroom Furniture from the People's Republic of China,* 70 FR 329 (January 4, 2005).

(2) All products covered by the scope of the antidumping and countervailing duty orders on *Hardwood Plywood from the People's Republic of China. See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 83 FR 504 (January 4, 2018); *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order,* 83 FR 513 (January 4, 2018).

Imports of subject merchandise are classified under Harmonized Tariff Schedule of the United States (HTSUS) statistical numbers 9403.40.9060 and 9403.60.8081. The subject component parts of wooden cabinets and vanities may be entered into the United States under HTSUS statistical number 9403.90.7080. Although the HTSUS

subheadings are provided for convenience and customs purposes, the written description of the scope of this investigation is dispositive.

## Appendix II

**Issues and Decision Memorandum**

I. Summary
II. Background
III. Period of Investigation
IV. Scope of the Investigation
V. Scope Comments
VI. Use of Adverse Facts Available
VII. Changes Since the Preliminary Determination
VIII. Adjustments Under Section 777A(f) of the Act
IX. Adjustments to Cash Deposit Rates for Export Subsidies
X. Discussion of the Issues
  *General Comments*
  Comment 1: Initiation of the Investigation
  Comment 2: Respondent Selection
  Comment 3: Separate Rate Applicants
  Comment 4: Company Name for Supree (Fujian) Wood Co., Ltd. (Supree)
  Comment 5: Calculation of the Separate Rate Assigned to Non-Selected Companies
  *Surrogate Value (SV) Comments*
  Comment 6: Surrogate Country
  Comment 7: SVs for Birch and Poplar
  Comment 8: Calculation of Financial Ratios
  Comment 9: Labor Rate Calculation
  *Company-Specific Comments*
  Ancientree
  Comment 10: Whether to Apply AFA to Ancientree
  Comment 11: Treatment of Jiangsu Hongjia Wood Ltd. (Jiangsu Hongjia) as an Affiliate
  Comment 12: SV Selections
  *Foremost*
  Comment 13: Combination Kits
  Comment 14: Exempted Sales
  Comment 15: Early Payment Discounts
  Comment 16: Section 301 Duties
  Comment 17: Foremost's U.S. Inland Freight Charges from the Port to the Warehouse
  Comment 18: Foremost's U.S. Inland Freight Charges to the Customer
  Comment 19: FGI's Acquisition Costs
  Comment 20: Labor Hours
  Comment 21: Calculation and Programing Revisions
  *Meisen*
  Comment 22: Total AFA for Meisen
XI. Recommendation

[FR Doc. 2020–04121 Filed 2–27–20; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

### International Trade Administration

[C–570–107]

### Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers and/or exporters of wooden cabinets and vanities and componets thereof (wooden cabinets and vanities) from the People's Republic of China (China).

**DATES:** Applicable February 28, 2020.

**FOR FURTHER INFORMATION CONTACT:** Justin Neuman or Benito Ballesteros, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0486 or (202) 482–7425, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On August 12, 2019, Commerce published the *Preliminary Determination* in this investigation.[1] The petitioner is the American Kitchen Cabinet Alliance. In addition to the Government of China (GOC), the mandatory respondents in this investigation are The Ancientree Cabinet Co., Ltd. (Ancientree), Dalian Meisen Woodworking Co., Ltd. (Meisen), and Rizhao Foremost Woodwork Manufacturing Co., Ltd. (Foremost).

A summary of the events that occurred since Commerce published the *Preliminary Determination,* as well as a full discussion of the issues raised by parties for this final determination, are discussed in the Issues and Decision Memorandum, which is hereby adopted by this notice.[2] The Issues and Decision

---

[1] *See Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination,* 84 FR 39798 (August 12, 2019) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, "Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Fabricated Structural Steel from the People's Republic of China," dated concurrently with, and

REM JA 2

Final IDM (February 21, 2020)
PR 1554

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-106
Investigation
POI: 07/01/2018-12/31/2018
**Public Document**
E&C/OV: RG/KA/ES

February 21, 2020

| | |
|---|---|
| **MEMORANDUM TO:** | Jeffrey I. Kessler<br>Assistant Secretary<br>  for Enforcement and Compliance |
| **FROM:** | James Maeder<br>Deputy Assistant Secretary<br>  for Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value |

## I.   SUMMARY

The Department of Commerce (Commerce) finds that wooden cabinets and vanities and components thereof (wooden cabinets and vanities) from the People's Republic of China (China) are being, or are likely to be, sold in the United States at less than fair value (LTFV), as provided in section 735 of the Tariff Act of 1930, as amended (the Act).  The mandatory respondents subject to this investigation are The Ancientree Cabinet Co., Ltd (Ancientree), Rizhao Foremost Woodwork Manufacturing Company Ltd. (Foremost Woodwork), and Dalian Meisen Woodworking Co., Ltd (Meisen).

After analyzing the comments submitted by interested parties, and based on our verification findings, we have made certain changes to the margin calculation programs of Ancientree and Foremost Woodwork.  In addition, we have continued to assign a margin to Meisen based on adverse facts available (AFA).  We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum.

Below is a complete list of the issues in this investigation on which we received comments from interested parties.

General Comments

Comment 1:   Initiation of the Investigation
Comment 2:   Respondent Selection
            A.  Mandatory Respondent Selection Methodology

B.  Voluntary Respondents

Comment 3:  Separate Rate Applicants

    A.  Brentridge Holding Co., Ltd. (Brentridge) and Harbin Hongsen Wood Co., Ltd. (Harbin)

    B.  ZHONG SHAN KING YUANDUN WOOD PRODUCTS CO., LTD. (Zhong Shan)

Comment 4:  Company Name for Supree (Fujian) Wood Co., Ltd. (Supree)

Comment 5:  Calculation of the Separate Rate Assigned to Non-Selected Companies

Surrogate Value (SV) Comments

Comment 6:  Surrogate Country

Comment 7:  SVs for Birch and Poplar

Comment 8:  Calculation of Financial Ratios

Comment 9:  Labor Rate Calculation

Company-Specific Comments

*Ancientree*

Comment 10:  Whether to Apply AFA to Ancientree

    A.  Usage Rates

    B.  Wood Veneer

Comment 11:  Treatment of Jiangsu Hongjia Wood Ltd. (Jiangsu Hongjia) as an Affiliate

Comment 12:  SV Selections

    A.  Glue

    B.  Medium Density Fiberboard (MDF)

    C.  Paint

    D.  Particleboard

*Foremost*

Comment 13:  Combination Kits

Comment 14:  Exempted Sales

Comment 15:  Early Payment Discounts

Comment 16:  Section 301 Duties

Comment 17:  Foremost's U.S. Inland Freight Charges from the Port to the Warehouse

Comment 18:  Foremost's U.S. Inland Freight Charges to the Customer

Comment 19:  FGI's Acquisition Costs

Comment 20:  Labor Hours

Comment 21:  Calculation and Programing Revisions

*Meisen*

Comment 22:  Total AFA for Meisen

## II.     BACKGROUND

On October 9, 2019, Commerce published the *Preliminary Determination* of sales in the LTFV investigation of wooden cabinets and vanities from China.[1]  Also in October 2019, we received timely allegations that Commerce had made significant ministerial errors in the *Preliminary Determination* from a number of companies requesting separate rates in this investigation,[2] and in November 2019, we determined that the allegations raised by the SRA Companies were significant ministerial errors within the meaning of 19 CFR 351.224(g), while the allegation raised by Zhong Shan was not.  On November 14, 2019, Commerce published the *Amended Preliminary Determination*.[3]

From October 2019 through December 2019, we conducted verification of the sales and factors of production (FOP) data reported by Ancientree,[4] as well as the sales and FOP information reported by Foremost Woodwork and its affiliates, Foremost Worldwide Company Ltd. (Foremost Worldwide) and Foremost Groups Inc (FGI) (collectively, Foremost),[5] in accordance with section 782(i) of the Act.  During this same time period, we notified interested parties that we had suspended the verification of Meisen's reported data in order to consider comments from interested parties;[6] we subsequently informed Meisen that we would not verify its questionnaire responses.[7]

---

[1] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 FR 54106 (October 9, 2019) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM), as corrected by *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 FR 56420 (October 22, 2019).

[2] These companies are:  MJB Supply (Dalian) Co., Ltd, Shouguang Honsoar Imp. & Exp. Trading Co., Ltd, and Nantong Ouming Wood Co., Ltd. (collectively, SRA Companies), and Zhong Shan.  *See* SRA Companies' Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Ministerial Error Comments to Correct Spelling of Company Names," dated October 8, 2019; and Zhong Shan's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Ministerial Error Comments -  Prelim Determination," dated October 8, 2019.

[3] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Amended Preliminary Determination of Sales at Less Than Fair Value*, 84 FR 61875 (November 14, 2019) (*Amended Preliminary Determination*).

[4] *See* Memorandum, "Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Verification of the Export Price Sales and Factors of Production Response of The Ancientree Cabinet Co., Ltd," dated December 10, 2019 (Ancientree Verification Report).

[5] *See* Memoranda, "Verification of the Responses of Foremost Worldwide Company Ltd. In the Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," dated January 10, 2020 (Foremost Worldwide Verification Report); "Verification of the Responses of Rizhao Foremost Woodwork Manufacturing Co. Ltd. in the Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," dated January 10, 2020 (Foremost Woodwork Verification Report); and "Verification of the Responses of Rizhao Foremost Woodwork Manufacturing Co. Ltd. in the Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," dated January 10, 2020 (FGI Verification Report).

[6] *See* Memorandum, "Verification of the Questionnaire Responses of Dalian Meisen Woodworking Co. Ltd.," dated October 18, 2019 (Meisen Verification Memo).

[7] *See* Commerce's Letter, "Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Verification," dated December 27, 2019.

3

From November 2019 through January 2020, we received timely case and rebuttal briefs from numerous interested parties.  At the request of certain of these parties, Commerce held a public hearing on February 6, 2020, to discuss the issues raised in the case briefs.[8]

Based on our analysis of the comments received, as well as our verification findings, we revised our calculations of the weighted-average dumping margins for Ancientree and Foremost.[9]

## III.   PERIOD OF INVESTIGATION

The period of investigation (POI) is July 1, 2018 through December 31, 2018.  This corresponds to the two most recent fiscal quarters prior to the month of the filing of the Petition,[10] which was March 2019.[11]

## IV.    SCOPE OF THE INVESTIGATION

The products covered by this investigation are wooden cabinets and vanities from China.  For a complete description of the scope of this investigation, *see* Appendix I of the accompanying *Federal Register* notice.

## V.    SCOPE COMMENTS

During the course of this investigation and the concurrent countervailing duty (CVD) investigation of wooden cabinets and vanities from China, Commerce received scope comments from interested parties.  Commerce issued a Preliminary Scope Memorandum to address these comments and set aside a period of time for parties to address scope issues in case and rebuttal

---

[8] *See* Hearing Transcript, "Public Hearing in the Matter of:  Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," dated February 6, 2020.

[9] *See* Memoranda, "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Final Analysis Memorandum for The Ancientree Cabinet Co., Ltd.," dated concurrently with this memorandum (Ancientree Final Analysis Memorandum); and "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Analysis Memorandum for Rizhao Foremost Woodwork Manufacturing Company Ltd.," dated concurrently with this memorandum (Foremost Final Analysis Memorandum).

[10] *See* Petitioner's Letters, "Petitions for the Imposition of Antidumping and Countervailing Duties on Wooden Cabinets and Vanities from the People's Republic of China," dated March 6, 2019; "Petitioner's Responses to Supplemental Questions Regarding Petitioner Volume I Injury," dated March 12, 2019; "Petitioner's Responses to Supplemental Questions Regarding Petition Volume II China AD," dated March 12, 2019; and "Second Supplemental Responses – Volume I Injury," dated March 20, 2019; Petitioner's Letter, "Second Supplemental Responses – Volume II China AD Petition," dated March 20, 2019 (collectively, the Petition).  The Petition was filed by The American Kitchen Cabinet Alliance and its individual members, who include:  ACProducts, Inc., American Woodmark Corporation, Bellmont Cabinet Co., Bertch Cabinet Manufacturing, The Corsi Group, Crystal Cabinet Works, Inc., Dura Supreme Cabinetry, Jim Bishop Cabinets, Inc., Kitchen Kompact Inc., Koch & Co., Inc., Kountry Wood Products, LLC, Lanz Cabinets Incorporated, Leedo Cabinetry, Marsh Furniture Company, Master Woodcraft Cabinetry LLC, MasterBrand Cabinets, Inc., Nation's Cabinetry, Showplace Wood Products, Inc., Smart Cabinetry, Tru Cabinetry, Wellborn Cabinet, Inc., Wellborn Forest Products, Inc., Woodland Cabinetry, Inc., Woodmont Cabinetry, and W.W. Wood Products Inc. (collectively, the petitioner).

[11] *See* 19 CFR 351.204(b)(1).

4

briefs.[12]  We received comments from interested parties on the Preliminary Scope Memorandum, which we address in the Final Scope Memorandum.[13]  For this final determination, we have made no changes to the scope of this investigation, as published in the *Preliminary Determination*.[14]

## VI.    USE OF ADVERSE FACTS AVAILABLE

Sections 776(a)(1) and 776(a)(2)(A)-(D) of the Act, provide that if necessary information is not available on the record or if an interested party:  (A) withholds information that has been requested by Commerce; (B) fails to provide such information in a timely manner or in the form or manner requested subject to section 782(c)(1) and (e) of the Act; (C) significantly impedes a proceeding under the antidumping statute; or (D) provides such information but the information cannot be verified as provided for in section 782(i) of the Act, Commerce shall, subject to subsection 782(d) of the Act, use facts otherwise available in reaching the applicable determination.

Section 782(c)(1) of the Act provides that if an interested party "promptly after receiving a request from {Commerce} for information, notifies {Commerce} that such party is unable to submit the information requested in the requested form and manner," Commerce shall consider the ability of the interested party and may modify the requirements to avoid imposing an unreasonable burden on that party.

Section 782(d) of the Act provides that, if Commerce determines that a response to a request for information does not comply with the request, Commerce shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person an opportunity to remedy or explain the deficiency.  If that person submits further information that continues to be unsatisfactory, or this information is not submitted within the applicable time limits, Commerce may, subject to section 782(e), disregard all or part of the original and subsequent responses, as appropriate.

Section 782(e) of the Act states that Commerce shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority if:  (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination; (4) the interested party has demonstrated that it acted to the best of its ability; and (5) the information can be used without undue difficulties.

---

[12] *See* Memorandum, "Wooden Cabinets and Vanities and Components thereof from the People's Republic of China:  Scope Comments Decision Memorandum for the Preliminary Determinations," dated October 3, 2019 (Preliminary Scope Memorandum).

[13] *See* Memorandum, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Final Scope Comments Decision Memorandum," dated concurrently with this memorandum (Final Scope Memorandum).

[14] *See Preliminary Determination*, 84 FR at 54113.

5

Section 776(b) of the Act provides that Commerce may use an adverse inference in applying the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.[15]  In doing so, Commerce is not required to determine, or make any adjustments to, a weighted average dumping margin based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information.  Section 776(b)(2) provides that an adverse inference may include reliance on information derived from the petition, the final determination from the investigation, a previous administrative review, or other information placed on the record.  In addition, the SAA accompanying the URAA explains that Commerce may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[16]

In *Nippon Steel*, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) held that, while the statute does not provide an express definition of the "failure to act to the best of its ability" standard, the ordinary meaning of "best" is "one's maximum effort."[17]  Thus, according to the Federal Circuit, the statutory mandate that a respondent act to the "best of its ability" requires the respondent to do the maximum it is able to do.  The Federal Circuit indicated that inadequate responses to an agency's inquiries would suffice to find that a respondent did not act to the best of its ability.  While the Federal Circuit noted that the "best of its ability" standard does not require perfection, it does not condone inattentiveness, carelessness, or inadequate record keeping.[18]  The "best of its ability" standard recognizes that mistakes sometimes occur; however, it requires a respondent to, among other things, "have familiarity with all of the records it maintains," and "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of" its ability to do so.[19]  Moreover, further, affirmative evidence of bad faith on the part of a respondent is not required before Commerce may make an adverse inference.[20]

Section 776(c) of the Act provides that, when Commerce relies on secondary information rather than on information obtained in the course of an investigation, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.  Secondary information is defined as information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[21]  Further, Commerce is not required to corroborate any dumping margin applied in a separate segment of the same proceeding.

---

[15] *See* section 776(b)(1)(B) of the Act.

[16] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act (URAA), H.R. Doc. 103-316, vol. 1 (1994) (SAA) at 870.

[17] *See Nippon Steel Corp. v. United States*, 337 F. 3d 1373, 1382-83 (Fed. Cir. 2003) (*Nippon Steel*).

[18] *Id.*, 377 F. 3d at 1382.

[19] *Id.*

[20] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value:  Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000); *Antidumping Duties; Countervailing Duties:  Final Rule*, 62 FR 27296, 27340 (May 19, 1997); and *Nippon Steel*, 337 F. 3d at 1382-83.

[21] *See* SAA at 870.

Finally, under section 776(d) of the Act, Commerce may use any dumping margin from any segment of a proceeding under an antidumping duty (AD) order when applying an adverse inference, including the highest of such margins.  When selecting an AFA margin, Commerce is not required to estimate what the dumping margin would have been if the interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.

*Application of Partial AFA:  Foremost*

As explained in more detail at Comments 13, 15, and 17, and 20, we find that the application of partial AFA to Foremost is appropriate for this final determination.  Specifically, we determine that Foremost withheld information, failed to provide information in a timely manner, significantly impeded the investigation, and/or provided information that could not be verified, pursuant to section 776(a)(2)(A)-(D) of the Act.  In particular, we found that Foremost failed to report certain U.S. sales, discounts, and product information, and its responses contained contradictory, and difficult for Commerce to locate, information with respect to one inland freight expense.  Because the missing information was within Foremost's possession and it was within Foremost's ability to report and/or present its data accurately, pursuant to section 776(b) of the Act, we find that Foremost failed to cooperate by not acting to the best of its ability.  Thus, we find that an adverse inference is warranted in selecting from the facts available with the respect to the information in question.

*Application of Total AFA:  Meisen*

As explained in more detail at Comment 22, below, we continue to find that the application of total AFA to Meisen is appropriate for this final determination.  Specifically, we determine that Meisen withheld information, failed to provide such information in a timely manner, and significantly impeded the investigation, pursuant to section 776(a)(2)(A)-(C) of the Act.  This was information that Meisen had in its possession and could have voluntarily presented to Commerce; however, instead, Meisen chose not to disclose essential information until after the *Preliminary Determination* and only after Commerce had suspended verification.  Accordingly, we find that Meisen failed to cooperate by not acting to the best of its ability and that an adverse inference is warranted in selecting from the facts available.  As a result, we are assigning a final margin to Meisen based on total AFA, in accordance with section 776(a)-(b) of the Act.

*Application of AFA:  China-wide Entity*

In the *Preliminary Determination*, we found that the China-wide entity did not respond to Commerce's requests for information, withheld information requested by Commerce, failed to provide information in a timely manner, and significantly impeded this proceeding by not submitting the requested information.[22]  We further determined that because non-responsive Chinese companies had not demonstrated their eligibility for separate rate status, Commerce considered them part of the China-wide entity.  Because this information was within the China-wide entity's possession, we continue to assign a China-wide rate based on the facts otherwise

---

[22] *See Preliminary Determination* PDM at 22-23.

available, pursuant to sections 776(a)(1) and (a)(2)(A)-(C) of the Act, using an adverse inference, pursuant to 776(b) of the Act.

*Selection and Corroboration of the China-Wide and Meisen AFA Rate*

As discussed above, when using facts otherwise available, section 776(c) of the Act provides that, where Commerce relies on secondary information (such as the Petition) rather than information obtained in the course of an investigation, it must corroborate, to the extent practicable, information from independent sources that are reasonably at its disposal.  Secondary information is defined as information derived from the Petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[23]  The SAA clarifies that "corroborate" means that Commerce will satisfy itself that the secondary information to be used has probative value,[24] although Commerce is not required to corroborate any dumping margin applied in a separate segment of the same proceeding.[25]  To corroborate secondary information, Commerce will, to the extent practicable, examine the reliability and relevance of the information to be used, although Commerce is not required to estimate what the dumping margin would have been if the interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.[26]

In selecting an AFA rate, Commerce selects a rate that is sufficiently adverse to ensure that the uncooperative party does not obtain a more favorable result by failing to cooperate than if it had fully cooperated.[27]  In an investigation, Commerce's practice with respect to the assignment of an AFA rate is to select the higher of:  (1) the highest dumping margin alleged in the Petition; or (2) the highest calculated dumping margin of any respondent in the investigation.[28]

In the *Preliminary Determination*, when selecting an appropriate rate to apply as AFA, we found that we were able to corroborate the highest dumping margin found in the Petition.  Based on the information on the record, we continue to corroborate the 262.18 percent rate in this final determination.  In corroborating this rate, we compared the highest petition rate of 262.18 percent to the individually-investigated respondents' highest control number (CONNUM)-specific dumping margins and found that both Foremost's and Ancientree's highest calculated

---

[23] *See* SAA at 870.
[24] *Id.*; *see also* 19 CFR 351.308(d).
[25] *See* section 776(c)(2) of the Act.
[26] *See* section 776(d)(3) of the Act; *see also, e.g.*, *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, from Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 61 FR 57391, 57392 (November 6, 1996), unchanged in *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from Japan; Final Results of Antidumping Duty Administrative Reviews and Termination in Part*, 62 FR 11825 (March 13, 1997).
[27] *Id.*
[28] *See, e.g.*, *Certain Uncoated Paper from Indonesia:  Final Determination of Sales at Less Than Fair Value*, 81 FR 3101 (January 20, 2016), and accompanying Issues and Decision Memorandum (IDM) at Comment 1; *Welded Line Pipe from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 80 FR 61362 (October 13, 2015), and accompanying IDM at Comment 20.

CONNUM-specific dumping margins exceed the highest petition rate.[29]  Because we were able to corroborate the highest dumping margin contained in the Petition, we assigned to the China-wide entity, and to Meisen, a dumping margin of 262.18 percent.  We continue to do so for this final determination.

## VII.    CHANGES SINCE THE PRELIMINARY DETERMINATION

We calculated constructed export price (CEP), export price (EP), and normal value (NV) for the respondents using the same methodology as stated in the *Preliminary Determination*,[30] except as follows:[31]

*Ancientree:*

- We made adjustments to Ancientree's electricity consumption to incorporate the total electricity quantity provided as a minor correction at verification.[32]

- We based the SV for brokerage and handling (B&H) expenses on Malaysian data.  *See* Comment 6.

*Foremost:*

- We revised our calculations based on our findings at verification.[33]

- We based the SV for B&H expenses on Malaysian data.  *See* Comment 6.

- We adjusted the reported sales and expense data for Foremost's sales of combination kits to account for certain unreported non-subject components, using partial AFA, and to remove overhead expenses from the ratio used to allocate these data to subject merchandise.  We made similar adjustments to the data reported for sales of products that Commerce discovered at verification were combination kits.  *See* Comment 13.

- We made adjustments for early payment discounts, inland freight expenses to the U.S. warehouse, and section 301 duties.  *See* Comments 15, 16, and 17.

- We recalculated the following values and expenses for all combination kits to remove the portion of the value/expense related to the non-subject components:  entered value, bank charges, direct selling expenses, commissions, early payment discounts, and other discounts.  *See* Comment 21.

---

[29] *See* Ancientree Final Analysis Memorandum and Foremost Final Analysis Memorandum.
[30] *See Preliminary Determination* PDM at 34-46; *see also* Memorandum, "Preliminary Results Analysis Memorandum for Rizhao Foremost Woodwork Manufacturing Company Ltd.," dated October 2, 2019 (Foremost Prelim Analysis Memo); and Memorandum, "Preliminary Determination Analysis Memorandum for the Ancientree Cabinet Co., Ltd.," dated October 2, 2019.
[31] *See* Ancientree Final Analysis Memorandum; and Foremost Final Analysis Memorandum.
[32] *See* Ancientree Final Analysis Memorandum.
[33] *See* Foremost Worldwide Verification Report; *see also* Foremost Woodwork Verification Report; FGI Verification Report; and Comment 21.

- We recalculated U.S. customs duties (USDUTYU) as a percentage of entered value, rather than as of gross unit price. *See* Comment 21.

- We revised our conversion of Foremost's glass inputs by converting the input from kilograms (kg) to square meters ($M^2$). *See* comment 21.

## VIII.   ADJUSTMENT UNDER SECTION 777A(f) OF THE ACT

As discussed in the *Preliminary Determination*,[34] in applying section 777A(f) of the Act, Commerce examines:  (1) whether a countervailable subsidy (other than an export subsidy) has been provided with respect to a class or kind of merchandise; (2) whether such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period; and (3) whether Commerce can reasonably estimate the extent to which that countervailable subsidy, in combination with the use of NV determined pursuant to section 773(c) of the Act, has increased the weighted-average dumping margin for the class or kind of merchandise.[35]  For a subsidy meeting these criteria, the statute requires Commerce to reduce the dumping margin by the estimated amount of the increase in the weighted-average dumping margin due to a countervailable subsidy, subject to a specified cap.[36] In conducting this analysis, Commerce has not concluded that concurrent application of non-market economy (NME) dumping duties and countervailing duties necessarily and automatically results in overlapping remedies.  Rather, a finding that there is an overlap in remedies, and any resulting adjustment, is based on a case-by-case analysis of the totality of facts on the administrative record for that segment of the proceeding as required by the statute.[37]

In our *Preliminary Determination*, upon consideration of the responses from Ancintree and Foremost and the relevant statutory criteria, we concluded that an adjustment under section 777A(f) of the Act was not warranted in this investigation.[38]  No party challenged Commerce's preliminary determination not to grant an offset to parties' cash deposit rates.  Therefore, consistent with our *Preliminary Determination*, we have not made any adjustment under section 777A(f) of the Act to the rates assigned to any of the mandatory respondents, the separate rate respondents, or the China-wide entity in this final determination.

## IX.   ADJUSTMENTS TO CASH DEPOSIT RATES FOR EXPORT SUBSIDIES

As we stated in the *Preliminary Determination*, in an LTFV investigation, where there is a concurrent CVD investigation, it is Commerce's normal practice to calculate the cash deposit rate for each respondent by adjusting the respondent's estimated weighted-average dumping margin to account for export subsidies found for each respective respondent in the concurrent

---

[34] *See Preliminary Determination* PDM at 46-49.
[35] *See* sections 777A(f)(1)(A)-(C) of the Act.
[36] *See* sections 777A(f)(1)-(2) of the Act.
[37] *See, e.g.*, *Fine Denier Polyester Staple Fiber from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24740 (May 30, 2018), and accompanying IDM at Comment 2.
[38] *See Preliminary Determination* PDM at 48-49.

10

CVD investigation.[39]  Doing so is in accordance with section 772(c)(1)(C) of the Act, which states that U.S. price "shall be increased by the amount of any countervailing duty imposed on the subject merchandise … to offset an export subsidy."

Commerce determined in the final determination of the concurrent CVD investigation that two of the mandatory respondents (*i.e.*, Foremost and Ancientree), the non-selected respondents (*i.e.*, the "All Others" companies), and the companies receiving subsidy rates based upon total AFA, each benefitted from the Export Buyer's Credit subsidy program, which is export contingent, and whose subsidy rate equals 10.54 percent.[40]  Accordingly, in order to avoid a double remedy as a result of export subsidies which are collected as part of the companion CVD proceeding, and pursuant to section 772(c)(1)(C) of the Act, we must adjust the estimated weighted-average dumping margins by the amount of export subsidies that are countervailed as a result of the companion CVD proceeding.  Therefore, we are adjusting each of the estimated weighted-average dumping margins for this final determination by 10.54 percent to determine the cash deposit rate for the mandatory respondents, the non-examined companies which are eligible for a separate rate, and the China-wide entity.

## X.    DISCUSSION OF THE ISSUES

General Comments

## Comment 1:  Initiation of the Investigation

*Fabuwood Case Brief* [41]
- Commerce improperly initiated this investigation, based on an improper finding that the Petition has adequate industry support.
- The petitioner's estimated U.S. market size fails to adequately capture all U.S. shipments of residential and non-residential wooden cabinets and vanities that are covered by the scope of the investigation.  Commerce relied on the petitioner's faulty methodology and underestimated the size of the U.S. market, while improperly rejecting Fabuwood's proposed alternative market size.  The petitioner's numbers distorted the measure of industry support required to initiate an investigation.
- The shipment numbers provided by the petitioners included shipments of non-subject merchandise and imported cabinets or parts resold by domestic producers; thus, the shipment numbers were overvalued.  This further distorted industry support.
- Although the petitioner adjusted its U.S. domestic market measurement to exclude subject merchandise and imports, it performed no such adjustment for the shipment numbers of its members, thereby dramatically inflating the shipments that were supportive of the Petition.

---

[39] *Id*. at 49-50.
[40] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, dated concurrently with this notice, and accompanying IDM.
[41] *See* Fabuwood's Case Brief, "Case Brief of Fabuwood (General Issues)," dated December 18, 2019 (Fabuwood Case Brief).

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

- Because of the distortion, Commerce was required under the Act to conduct its own analysis of industry support. However, Commerce neglected its statutory duty and initiated an investigation based on a legally-insufficient petition. Thus, the investigation was initiated under improper circumstances and should be terminated.

*Petitioner Rebuttal Brief*[42]

- Commerce already found that the petitioner has standing as an interested party, and it met the required domestic industry support to file the petition.[43] Many of Fabuwood's arguments are the same arguments Commerce rejected in its decision to initiate this investigation.[44]
- Fabuwood entirely ignores section 732(c)(4)(E) of the Act, which provides that, once Commerce makes a decision regarding industry support, the agency's determination cannot be reconsidered.[45]
- Commerce's regulations also prohibit Commerce from reconsidering industry support after the initiation of an investigation.[46] Commerce maintains significant discretion in determining industry support, and it exercised this discretion based on substantial record evidence in this case.[47]
- The International Trade Commission (ITC) determined in its accompanying investigation that a total value of U.S. shipments of subject merchandise was closer to the petitioner's estimate than Fabuwood's, and, thus, the petitioner's market estimate was reasonable.[48]

**Commerce's Position**: Section 732(c)(4)(E) of the Act directs Commerce as follows regarding the consideration of comments with respect to industry support:

> Before the administering authority makes a determination with respect to initiating an investigation, any person who would qualify as an interested party under section 771(9) if an investigation were initiated, may submit comments or information on the issue of industry support. After the administering authority makes a determination with respect to initiating an investigation, the determination regarding industry support shall not be reconsidered.[49]

---

[42] *See* Petitioner's Rebuttal Brief, "Rebuttal Brief Regarding General and Ancientree-Specific Issues," dated December 26, 2019 (Petitioner December 26 Rebuttal Brief).

[43] *Id.* at 30 (citing "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China," March 26, 2019 (Initiation Checklist) at Attachment II, 6-20).

[44] *Id.*

[45] *See* section 732(c)(4)(E) of the Act.

[46] *See* Petitioner December 26 Rebuttal Brief at 32 (citing *PT Pindo Deli Pulp & Paper Mills v. United States*, 825 F. Supp. 2d 1310, 1323 (CIT 2012)).

[47] *Id.* at 32 (citing Initiation Checklist at Attachment II: Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China).

[48] *Id.* at 38 (citing *Wooden Cabinets and Vanities from China*, Inv. Nos 701-TA-620 and 731-TA-1445, USITC Pub 4891 (April 2019) at I-3 (USITC Pub 4891)).

[49] *See* section 732(c)(4)(E) of the Act (emphasis added).

12

Therefore, Commerce is statutorily precluded from reconsidering its industry support determination at this stage of the investigation.[50]  As a result, we continue to rely on our determination of industry support provided in the Initiation Checklist.[51]

Based on information provided in the Petition, the share of total estimated U.S. production of the domestic like product in calendar year 2018 represented by the petitioner was more than 50 percent of the production of the domestic like product.[52]  Pursuant to section 732(c)(4)(D)(i) of the Act, if the petition does not establish the support of domestic producers accounting for more than 50 percent of the total production of the domestic like product, Commerce is required to poll the industry or rely on other information to determine industry support.  However, because at the time of the filing of the Petition, we determined that the Petition did establish the support of domestic producers accounting for more than 50 percent of the total production of the domestic like product, we found no need to poll the U.S. industry to establish industry support.[53]  Thus, we reiterate below our analysis from the Initiation Checklist.

> The petitioner has provided, with extensive supporting documentation, a reasonable estimate of total 2018 production of wooden cabinets and vanities in the United States, starting with U.S. demand and making adjustments for annual U.S. market segment and overall market growth, U.S. demand in non-residential/commercial applications, imports and exports.  We further note that the petitioner provided a detailed explanation of the methodology used to estimate total U.S. production in 2018 and provided supporting declarations from an individual …{producer of} wooden cabinets and vanities in the United States.  {…}In addition, we note that the petitioner's methodology considers annual growth in the replace and remodel market segment and new construction segment, demand for nonresidential/commercial applications, U.S. imports of wooden cabinets and vanities, U.S. exports of wooden cabinets and vanities and components thereof, and annual growth for the overall U.S. cabinet market.  {…}Accordingly, we conclude that the petitioner's estimate using data on U.S. cabinet demand {from a business proprietary source} as the starting point is reasonable.

> While Fabuwood contends that the NKBA data it provided on the U.S. market for residential kitchen and bathroom cabinetry for the new residential and remodeling segments should be used as the denominator, we agree with the petitioner that the NKBA data on the record do not represent the value of production or shipments of wooden cabinets and vanities.  Based on information on the record, the NKBA data reflect retail values and installed values of kitchen and bathroom cabinets, which include built-in costs for commissions, delivery fees, {…certain other fees}, and customized treatments, and which have been sold once or twice before being sold{…}.  Accordingly, we find that the petitioner has provided a reasonable estimate of total U.S. production that accounts for all production of the domestic like product.  As a result, the petitioner has demonstrated that

---

[50] See *PT Pindo Deli Pulp*, 825 F. Supp. 2d at 1323 ("Commerce is prohibited from reconsidering industry support after the initiation of an investigation").
[51] See Initiation Checklist at Attachment II.
[52] *Id.* at Attachment II at 9.
[53] *Id.* at Attachment II at 18.

13

it has adequate industry support for initiating the investigations; therefore, it is unnecessary to poll the industry to determine support for the Petitions.[54]

## Comment 2:  Respondent Selection

### A.  Mandatory Respondent Selection Methodology

*Wen Bo Case Brief*[55]
- Commerce should have relied on import value, rather than volume, data for mandatory respondent selection.
- Both the petitioner and U.S. Customs and Border Protection (CBP) collected import data on a value, not a volume, basis to calculate industry support.[56]  This demonstrates value as a reliable metric.
- Commerce unreasonably used an unreliable metric and ignored the fact that CBP's data and the Petition itself relied on value.[57]

*Petitioner Rebuttal Brief*[58]
- Commerce correctly determined its mandatory respondent selection using import volumes.
- Wen Bo fails to provide any additional reasoning supporting its argument that import values would have been a "reliable metric" and Commerce previously specifically addressed and rejected the same argument.
- Regardless of the metric utilized by Commerce, the mandatory respondents selected would remain representative of the Chinese industry.

**Commerce's Position:**  We disagree with Wen Bo's claim that Commerce should have based respondent selection on import values, rather than import volume, during the POI.  There is no evidence on the record to demonstrate that values are more accurate or consistent than reported volumes.[59]  Commerce's longstanding practice is to find that volume provides a consistent and reliable metric by which to rank the largest exporters during the POI.[60]  Indeed, the statute indicates that, where we limit our examination of respondents in an investigation, we may limit our examination to "exporters and producers accounting for the largest *volume* of the subject merchandise from the exporting country that can be reasonably examined."[61]

---

[54] *See* Initiation Checklist at Attachment II at 17-18 (footnotes omitted).
[55] *See* Shanghai Wen Bo Industries Co., Ltd.'s (Wen Bo's) and Dalian Jiaye Wood Products Co. Ltd.'s (JY's) Case Brief, "Case Brief," dated December 17, 2019 (Wen Bo Case Brief).
[56] *Id.* at 2.
[57] *Id.* (citing Memorandum, "Less-Than-Fair-Value Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Respondent Selection," dated June 4, 2019 (Respondent Selection Memo) at 6-7).
[58] *See* Petitioner December 26 Rebuttal Brief at 27.
[59] *See* Respondent Selection Memo at 6.
[60] *See Hardwood and Decorative Plywood from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 58273 (September 23, 2013) (*Decorative Plywood*), and accompanying IDM at Comment 2.
[61] *See* section 777A(c)(2)(B) of the Act (emphasis added).

14

We further note that Wen Bo did not cite any precedent to support the proposition that Commerce should adjust its respondent selection methodology.  Further, Wen Bo failed to demonstrate that the mandatory respondents selected on the basis of import volume are unrepresentative of the Chinese wooden cabinet and vanity industry.[62]  Therefore, we continue to find Wen Bo's argument to be without merit.

### B.  Voluntary Respondents

On June 4, 2019, we selected the three largest exporters/producers of subject merchandise by volume, Ancientree, Foremost, and Meisen, for individual examination as mandatory respondents.[63]  Wen Bo requested to participate in this investigation as a voluntary respondent,[64] and it submitted timely responses to Commerce's AD questionnaire by the due dates specified for the mandatory respondents.[65]  On October 2, 2019, we determined not to select Wen Bo as a voluntary respondent because doing so would continue to be unduly burdensome and would inhibit the timely completion of this investigation.[66]

*Wen Bo Case Brief*[67]
- Commerce stated it would consider any request for voluntary respondent status, yet it declined Wen Bo's voluntary respondent request.
- Meisen's uncooperativeness opened a spot for Wen Bo to be selected as a voluntary respondent.  Thus, to meet the targeted three mandatory respondent companies, Commerce should examine Wen Bo's response.
- In LTFV investigations, Commerce is under the obligation to calculate dumping margins as accurately as possible.[68]
- Representativeness plays a central role in calculating the all-others rate.  In *National Knitwear,* the Court of International Trade (CIT) upheld Commerce's decision to exclude a mandatory respondent from the calculation of the all others rate on the grounds that the rate was not "representative of the pricing practices of the non-investigated companies."[69]

---

[62] Indeed, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) stated that "the very fact that the statute contemplates using data from the largest volume of exporters suggests an assumption that those data can be viewed as representative of all exporters."  *See Albemarle Corp v. United States*, 821 F. 3d 1345, 1353 (Fed. Cir. 2016) (*Albemarle*).

[63] *Id.* at 1.

[64] *See* Wen Bo's Letter, "Wooden Cabinets and Vanities From People Republic of China:  Entry of Appearance; Request to Be a Voluntary Respondent," dated March 26, 2019.

[65] *See* Wen Bo's Letter, "Section A Questionnaire Response," dated July 3, 2019; Wen Bo's Letter, "Section D Questionnaire Response," dated July 19, 2019; and Wen Bo's Letter, "Section C and E Questionnaire Responses," dated July 22, 2019.

[66] *See* Memorandum, "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Selection of Voluntary Respondent," dated October 2, 2019 (Voluntary Respondent Memo); *see also Preliminary Determination* PDM at 7-8.

[67] *See* Wen Bo Case Brief.

[68] *Id.* at 4 (citing *Lasko Metal Prods. v United States*, 43 F. 3d 1442, 1446 (Fed. Cir. 1994) (quoting *Rhone-Poulenc Inc. v United States*, 899 F. 2d 1185, 1191 (Fed. Cir. 1990)); *Albemarle*, 821 F. 3d at 1354; and *Mueller Commercial de Mexico v. United States*, 753 F. 3d 1227, 1235 (Fed. Cir. 2014) (*Mueller*)).

[69] *Id*. at 4-5 (citing *National Knitwear & Sportswear Ass'n v. United States*, 15 CIT 548 (1991) (*National Knitwear*)).

The timely, complete response provided by Wen Bo would yield an "all others rate" based on record evidence rather than AFA.

- Because Wen Bo requested voluntary treatment and timely submitted a complete questionnaire response, it cannot be said that an "all others rate" calculated on other respondents' rates is representative of Wen Bo's own rate.
- With respect to Wen Bo's own rate, Commerce does not have a basis to assume Wen Bo engaged in unfair pricing. Thus, if Commerce does not analyze Wen Bo's voluntary response, Commerce should assign Wen Bo a zero percent margin and exclude it from the order.

*Petitioner Rebuttal Brief* [70]

- Commerce appropriately declined to investigate voluntary respondent Wen Bo and the company failed to demonstrate that Commerce was unreasonable in declining its examination.
- Wen Bo is mistaken in its presumption that Commerce has the resources to investigate Wen Bo because of its preliminary decision to base Meisen's dumping margin on AFA. Commerce has conducted a full investigation of Meisen, including issuing multiple supplemental questionnaires and evaluating all comments raised by interested parties.
- Ancientree and Foremost account for a significant Chinese production volume for which Commerce could individually calculate dumping margins. Essentially, neither Wen Bo nor other Chinese respondents would be unfairly treated if Commerce continued to use Ancientree's and Foremost's experience as the basis for the separate rate.

**Commerce's Position:** We disagree that we should have selected Wen Bo as a voluntary respondent in this investigation because it timely submitted voluntary questionnaire responses. On June 4, 2019, we selected the three largest exporters/producers of subject merchandise by volume, Ancientree, Foremost, and Meisen, for individual examination as mandatory respondents.[71] In the Respondent Selection Memo, we stated that we would reevaluate resource constraints during the course of this investigation and that, if exporters submitted voluntary responses in accordance with the deadlines and other criteria set forth in section 782(a) of the Act, and 19 CFR 351.204(d), we would consider whether resources existed to examine those exporters as voluntary respondents.[72] In the Voluntary Respondent Memo that accompanied the *Preliminary Determination*, Commerce revisited Wen Bo's request and explained that examining a voluntary respondent would have been an undue burden and would have inhibited the timely completion of this investigation.[73]

Wen Bo itself acknowledges that, after the completion of the *Preliminary Determination*, Commerce delayed verification of mandatory respondent Meisen and issued multiple supplemental questionnaires to it.[74] Further, Meisen submitted a case brief containing arguments which must be considered and addressed in this final determination. Thus, contrary to Wen Bo's

---

[70] *See* Petitioner December 26 Rebuttal Brief.
[71] *See* Respondent Selection Memo at 1.
[72] *Id.* at 9-10.
[73] *See* Voluntary Respondent Memo at 3-4.
[74] *See* Wen Bo Case Brief at 3-4.

16

assertions, the assignment of AFA to Meisen in the *Preliminary Determination* did not end the administrative burden placed on Commerce when we selected it as a mandatory respondent. While we agree with Wen Bo that Commerce should accept voluntary respondents when we have the resources to do so, in this case, those resources simply did not – and still do not – exist. Under these circumstances, analyzing Wen Bo's voluntary response "would be unduly burdensome and inhibit the timely completion of the investigation."[75]

With respect to Commerce's current resource constraints, it is important to note that the issues presented in this investigation are complex, and the information submitted by the mandatory respondents and other interested parties has been voluminous. For example, Commerce received 221 applications from companies seeking to qualify for separate rates, an extraordinarily large number by any measure, and we expended considerable resources in reviewing each of these applications to ensure that it met Commerce's standards. Further, Meisen and the other respondents submitted thousands of pages of documentation in response to Commerce's questionnaires, all of which had to be analyzed and acted upon within the statutory deadlines set forth in the Act. In addition, this was the first time that any of the examined companies were investigated as mandatory respondents before Commerce and, thus we had to expend additional resources to become familiar with these companies' corporate structures, record-keeping, and business practices. Indeed, we issued multiple supplemental questionnaires to the mandatory respondents, which included numerous questions concerning their FOP and sales reporting methodologies, their costing and selling practices, and the multitude of individual calculations performed when presenting their reported data. We also encountered numerous issues during the verifications conducted for these respondents, giving rise to a large number of comments to be addressed in this final determination.

Equally significant, interested parties have raised numerous issues related to the scope of this investigation, many of which are novel and highly complex. For this reason, and the reasons stated above, we find that this case already requires the devotion of significant resources by Commerce, which prohibits the examination of an additional respondent. Accepting Wen Bo as a voluntary respondent would have required additional resources not currently at our disposal in order to review and analyze its questionnaire responses, issue potential multiple additional supplemental questionnaires, and conduct verification of those questionnaire responses. Further, a full examination of Wen Bo would have required the preparation of an additional margin program specific to Wen Bo, as well as analysis memoranda and verification reports. Moreover, the uncertain nature of any investigation allows for the possibility that additional complex situations may have arisen, requiring even more time for the case team to analyze and address novel issues. We further note that Commerce was conducting numerous investigations and

---

[75] *See* section 782(a)(1) of the Act.

17

reviews during the preliminary phase of this investigation,[76] and the number of new administrative segments has only increased since then.[77]

Notwithstanding the issues described above, we disagree with Wen Bo that Commerce, in the alternative, should assign it a final margin of zero percent and exclude it from any potential order since Commerce declined its review.  First, contrary to Wen Bo's assumption, Commerce has not included Meisen's AFA rate in the calculation of the rate assigned to the non-selected companies eligible for separate rates.[78]

Second, our decision to assign Wen Bo a separate rate based on a weight-average of the mandatory respondents' rates that were not zero, *de minimis*, or based entirely on facts available, is consistent with our past practice.[79]  Further, we disagree with Wen Bo that this rate is not representative of Wen Bo's own rate.  While Wen Bo argues that Meisen's assigned AFA rate is not usable for purposes of calculating the rate for separate rate companies, Wen Bo failed to explain why the rate that Commerce did assign to the separate rate companies is not representative of Wen Bo's rate.  The rate assigned to the separate rate companies is a weighted average of the dumping margins calculated for two of the largest Chinese subject merchandise producers, using the publicly-ranged quantities of each producer, whose rates are not zero, *de minimis*, or based entirely on facts available.[80]  Our use of these rates to determine the separate rate for non-selected respondents in this investigation is consistent with long-standing Commerce

---

[76] *See* Voluntary Respondent Memo at 4, noting in the preliminary phase of this investigation, Office V was also assigned to the following investigations and reviews:  AD and CVD investigations of wooden cabinets and vanities from the People's Republic of China; AD and CVD investigation of carbon and alloy steel threaded rod from India; AD changed circumstances review and administrative review of certain steel nails from China; AD investigation of carbon and alloy steel threaded rod from Thailand; AD administrative review of certain frozen fish fillets from Vietnam; AD administrative review of magnesia carbon bricks from China; AD and CVD administrative reviews of 1-Hydroxyethylidene-1, 1-Diphosphonic Acid from China; AD administrative review of hot-rolled steel flat products from Australia and South Korea; AD administrative review of uncoated paper from Portugal and Brazil; AD administrative review of honey from China; CVD administrative review of cold drawn mechanical tubing from India; AD administrative review of uncovered innerspring units from China; AD administrative review of certain frozen warmwater shrimp from China; AD administrative review of steel wire garment hangers from China; AD administrative review of ESB rubber from Korea; AD administrative review of circular welded steel pipe and tubes from Taiwan; AD administrative review of certain cut-to-length plate from China; AD and CVD administrative reviews of hardwood plywood products from China; AD and CVD circumvention inquiries of certain uncoated paper from Australia, Brazil, China, Indonesia, and Portugal; and AD and CVD circumvention inquiries of hardwood plywood products from China.
[77] Since the date of the *Preliminary Determination*, Commerce has initiated AD and/or CVD investigations on at least four different products covering numerous countries, in addition to receiving multiple new anti-circumvention inquiries, scope inquires, and initiating multiple new administrative reviews.  *See http://enforcement.trade.gove/ia-highlights-and-news.html*.
[78] *See* Memorandum, "Final Determination of the Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Calculation of the Final Margin for Separate Rate Companies," dated concurrently with this memorandum.
[79] *See, e.g.*, *Certain Fabricated Structural Steel from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 5376, 5378 (January 30, 2020), and accompanying IDM.
[80] *See* Memorandum, "Preliminary Determination of the Investigation of Wooden Cabinets and Components Thereof from the People's Republic of China:  Calculation of the Preliminary Margin for Separate Rate Companies," dated October 2, 2019.

practice in NME LTFV investigations,[81] in which we look to section 735(c)(5) of the Act, which pertains to the calculation of the all others rate in market economy LTFV investigations.[82] Wen Bo made no attempt in its arguments to explain how these two other subject merchandise producers are not representative of the dumping that is occurring beyond stating that "where WB and JY have requested voluntary treatment and submitted a complete questionnaire response on a timely basis, it cannot be said that a rate calculated based on other respondents' rates is representative of WB and JY."[83] Wen Bo provides no further elaboration on why the rate assigned to it is not representative of its own. Indeed, Wen Bo notes that the Federal Circuit has elaborated on what is required of Commerce in calculating antidumping rates, and the separate rate, or all-others rate, in particular. "{A}ccuracy and fairness must be Commerce's primary objectives in calculating a separate rate for cooperating exporters."[84] As explained above in Comment 1(A), when we determine to limit respondents, section 735(c)(5)(A) of the Act – which, again, we look to for guidance in determining the separate rate for non-selected companies such as Wen Bo in NME AD investigations – "contemplates using data from the largest volume exporters suggestions an assumption that those data can be viewed as representative of all exporters."[85] Therefore, Wen Bo's contention that Commerce should assign a zero percent margin to Wen Bo and exclude it from the AD Order is unreasonable and unsupported by the record evidence or any precedent.[86]

For the reasons discussed in the Voluntary Respondent Memo, and reiterated above, we continue to find that we did not have sufficient resources, or time, to individually examine Wen Bo in this investigation. Consequently, we continue to assign Wen Bo the separate rate margin determined in this final determination.

## Comment 3:  Separate Rate Applicants

### A.  Brentridge and Harbin

In the *Preliminary Determination*, we found that both Brentridge and Harbin failed to cooperate by not providing information requested from them related to their application for separate rate status, including a request to publicly identify the producers for which they are requesting combination rates.[87]

---

[81] *See, e.g.*, *Cast Iron Soil Pipe Fittings from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination and Extension of Provisional Measures*, 83 FR 7145 (February 20, 2018), and accompanying PDM at 13-14, unchanged *Cast Iron Soil Pipe Fittings from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part*, 83 FR 33205 (July 17, 2018), and accompanying IDM.

[82] *Id.*  Separately, we disagree with Wen Bo's reference to an "all others rate" in its case brief.  Commerce does not calculate an "all others rate" in NME LTFV investigations.  Rather, where Commerce determines to limit its examination to particular respondents, it determines a rate for non-selected respondents who demonstrate that they are entitled to a "separate rate."

[83] *See* Wen Bo Case Brief at 5.

[84] *See* Wen Bo Case Brief at 4 (citing *Albemarle*, 821 F. 3d at 1354).

[85] *See Albemarle*, 821 F. 3d at 1353.

[86] *See* Wen Bo Case Brief at 5.

[87] *See Preliminary Determination* PDM at 18.

19

Barcode:3946193-01 A-570-106 INV - Investigation  -

*Brentridge Case Brief*[88]

- Brentridge timely filed a full and complete separate rate application (SRA) but did not file an entry of appearance.  Therefore, Brentridge is not an interested party in this investigation.
- Although Commerce issued a supplemental questionnaire to "Interested Parties,"[89] this questionnaire did not cover Brentridge nor did Commerce specifically name Brentridge in the supplemental questionnaire.
- The first question of the August SRA Supplemental requested an excel file from "Interested Parties," but did not request any information that was not already in Brentridge's SRA.
- Since the *Preliminary Determination*, Brentridge has publicly identified its producer for which it is requesting a combination rate.[90]

*Harbin Case Brief*[91]

- This is Harbin's first time participating in a proceeding and the company has no experience with ACCESS.  It was not until Harbin saw Commerce's *Preliminary Determination* that it realized there was a supplemental questionnaire that required its attention.
- Because the Public Release Digest email message and ACCESS website did not identify Harbin's name, the company believed the supplemental was irrelevant to Harbin.
- The August SRA Supplemental did not request any new information not already in Harbin's timely SRA or information in Harbin's possession.

*Petitioner Rebuttal Brief*[92]

- Both Brentridge and Harbin should have been aware that a supplemental questionnaire regarding their SRA submissions would be applicable to them.
- The August SRA Supplemental clearly applied to all "Interested Parties" and only certain attachments applied to specific applicants.
- Despite the argument by both companies that any information submitted would not have been of use to Commerce, that is not justification for failing to submit any response and it is not for respective parties to decide what information is required and which companies necessitate questionnaire response submissions.
- The use of AFA does not require a finding of intent on behalf of an interested party, and may be applied where a party's failure is based on inadvertence or neglect.  Therefore, Commerce should continue denying a separate rate to these companies.[93]

---

[88] *See* Brentridge's Case Brief, "Brentridge Case Brief," dated November 8, 2019 (Brentridge Case Brief) at 1.
[89] *See* Memorandum, "Separate Rate Application Supplemental Questionnaire," dated August 22, 2019 (August SRA Supplemental).
[90] *See* Brentridge Case Brief at Attachment.
[91] *See* Harbin's Case Brief, "Case Brief," dated December 16, 2019 (Harbin Case Brief) at 2.
[92] *See* Petitioner December 26 Rebuttal Brief at 25-27.
[93] *Id.* (citing *Nippon Steel*, 337 F. 3d 1373, 1382-83).

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

**Commerce's Position:** We disagree with Brentridge and Harbin that their respective SRA filings were full and complete. With respect to Brentridge, Commerce preliminarily found that this exporter was ineligible for a separate rate because it failed in its SRA to disclose publicly the name of the entity that supplied it with subject merchandise. The public disclosure of this information is essential to the proper administration of this proceeding because the identity of exporter-producer combinations requested by Commerce in separate rate applications must be publicly published in the *Federal Register*. However, since the *Preliminary Determination*, Brentridge has publicly identified its producer,[94] such that Commerce is now able to publicly publish the exporter-producer combination for Brentridge. Therefore, because this deficiency has been remedied, and Brentridge's SRA otherwise meets our requirements for granting a separate rate, we are granting Brentridge a separate rate in this final determination.

We disagree with Harbin that it should be considered eligible for a separate rate despite its failure to respond to the August SRA Supplemental, which it concedes it was aware of but disregarded. In its case brief, Harbin described working with Commerce employees to register for the ACCESS system,[95] suggesting that Harbin was aware that Commerce had resources available to provide Harbin technical assistance with its filings if Harbin required clarification. Further, Commerce identified deficiencies in Harbin's SRA that required Harbin's attention on three out of three requested action lists in the August SRA Supplemental.[96] Specifically Harbin's SRA did not identify its ultimate owners, it did not provide a U.S. Customs Form 7501, and it did not provide a business license with an accompanying English language version.[97] With respect to the first of these deficiencies, Harbin claimed in its case brief that exhibits 7 and 9 of its SRA showed the names of its individual shareholders and their percentages owned;[98] however, those documents are Chinese-language documents with no accompanying English-language translations,[99] and, thus, Harbin failed to comply with the requirements of 19 CFR 351.303(e) in submitting them.[100] With respect to the second deficiency, Harbin claimed in its case brief that it did not have a Form 7501;[101] however, it stated in its SRA that it was submitting the U.S. Customs 7501 Entry Summary in exhibit 4.[102] Even if this statement were in error and Harbin did not have the Form 7501 in its possession, it was required by the SRA to submit an explanation as to why submission of that document was not possible.[103] Finally, with respect to the third deficiency, Harbin argues in its case brief that it provided a business license in exhibit 5 of its SRA, and an English translation of its export certificate of approval in exhibit 6, where "{t}he basic content of exhibit 6 such as company name, address and company nature are similar to that of business license";[104] however, Harbin failed to submit a translated copy of its most fundamental of documents, its business license, again in violation of 19 CFR 351.303(e).

---

[94] *See* Brentridge Case Brief at 2.
[95] *See* Harbin Case Brief at 2.
[96] *See* August SRA Supplemental at Appendices I, II, and III.
[97] *See* Harbin's Letter, "Separate Rate Application," dated May 10, 2019 (Harbin SRA).
[98] *See* Harbin Case Brief at 3.
[99] *See* Harbin SRA at Exhibits 7 and 9.
[100] *See* August SRA Supplemental at Appendices I, II, and III.
[101] *See* Harbin Case Brief at 3-4.
[102] *See* Harbin SRA at 7.
[103] *Id.* at 6, fn. 7.
[104] *See* Harbin Case Brief at 3-4.

We are sympathetic to the position of small companies that are unfamiliar with our process, and in particular that of *pro se* companies.  However, in this instance, Harbin's case brief raises additional concerns regarding the potential for serious misrepresentations of its reported information.  Specifically, Harbin notes that its filings were all completed by itself and it wrote a law firm's name on those files because "we saw other companies also wrote a law firm's name in their files" and because "Heilongjiang ShanXing Law Firm is a local law firm in Harbin" that "generally gives legal advices (*sic*) to our company about other Chinese law matters."[105]  However, the cover letter of Harbin's SRA is signed by "GuXiangGuo," purportedly of "Heilongjiang ShanXing Law Firm," and the "Representative Certification" is purportedly completed and signed by the same counsel at exhibit 3 of the SRA.  Thus, Harbin either misstates the facts of its representation in its case brief or committed severe misrepresentations in its SRA by claiming to have secured representation and fraudulently completing a representative certification by said counsel.

The SRA itself provides the following:

> If the applicant does not provide the required documentation in the appropriately required form or is unable or unwilling to make the requested certifications, the applicant will not have demonstrated its eligibility for a separate rate.  If necessary, {Commerce} will issue questionnaires for the purpose of clarifying fully responsive answers.  {Commerce} retains the right to require additional information concerning the representations made in your firm's application.  All information submitted and representations made by applicants are subject to verification.[106]

Accordingly, we continue to find that Harbin did not provide the requested information that was required of it to be considered eligible for a separate rate and it is, therefore, ineligible for a separate rate in this final determination.

## B.  Zhong Shan

In the *Preliminary Determination*, we did not grant Zhong Shan a separate rate because we found that it did not separately submit an application for each company included in its application.[107]

*Zhong Shan Case Brief*[108]
- In its initial SRA response, Zhong Shan reported its own name as the exporter and producer, indicating it applied for a separate rate only on its own behalf.
- After not receiving the separate rate in the *Preliminary Determination*, Zhong Shan filed preliminary ministerial error comments definitively proving Zhong Shan's sale to an unaffiliated U.S. customer.

---

[105] *Id.* at 2.
[106] *See* Commerce's Letter, "People's Republic of China Separate Rate Application and Required Supporting Documentation," available on Enforcement and Compliance's website at *https://enforcement.trade.gov/nme/nme-sep-rate.html* (SRA Template).
[107] *See Preliminary Determination* PDM at 18.
[108] *See* Zhong Shan's Case Brief, "Case Brief," dated November 28, 2019 (Zhong Shan Case Brief).

- Chin-Shu Wooden is a paper company registered in the market economy Samoa.  It did not apply for a separate rate nor is it seeking one.
- Commerce's mistaking Chin-Shu Wooden as a company requiring its own separate rate submission, and subsequent denial of Zhong Shan's separate rate, constitutes an abuse of discretion and must be corrected.

No other interested party provided comments on this issue.

**Commerce's Position:**  We continue to disagree with Zhong Shan that the record evidence clearly supports its qualification for a separate rate.  In the *Preliminary Determination*, we stated:

> The SRA posted on E&C's website states that "Each applicant seeking separate rate status must submit a separate and complete individual application regardless of any common ownership or affiliation between firms and regardless of foreign ownership.  Each firm must apply for a separate rate by submitting an individual application.  Only one firm per application is permitted."[109]

In its SRA, Zhong Shan noted in certain places that it was also known as (or "AKA") Chin-Shu Wooden, but it did not identify this AKA name in other places.[110]  The SRA instructed companies to:

> Ensure that each applicant seeking separate rate status is submitting a separate and complete individual application regardless of any common ownership or affiliation between firms and regardless of foreign ownership.  Your response to this question should have only one company name.[111]

The SRA also stated:

> Trade names are other names under which the company does business.  It does not include product brand names or the names of any other entities in the applicant's "group," affiliated or otherwise.  If your firm is assigned separate rate status, your firm will only be able to ship under your separate rate under names that are included on your business license/registration documents, or are otherwise permitted, as explained in your response to this question.[112]

Despite the above instructions, Zhong Shan did not consistently indicate that Chin-Shu Wooden was actually an AKA name and its assertions that it is so now are belied by the record.  Zhong Shan answered "no" when asked if the disregard the instructions under Section II requesting; "applicant identified by any other names, such a trade names or 'doing-business-as.' ('d.b.a.') names, as a legal matter in the home market, in third countries or in the United States'." [113]

---

[109] *See Preliminary Determination* PDM at 18.
[110] *See* Zhong Shan SRA at 10-11.
[111] *Id*. at 10.
[112] *Id.*
[113] *See* SRA Template at 10.

23

Arguably, this question affords applicants the opportunity to distinguish any "AKA" and provide documentation demonstrating the AKA. Although Zhong Shan erroneously addresses its AKA within the context of its selling practices, none of Zhong Shan's underlying documentation indicates that this company is an AKA company. We reviewed Zhong Shan's business license, articles of association, capital verification report and financial statements, and none of these documents indicated that Chin-Shu Wooden is an AKA of Zhong Shan.[114] Furthermore, later in the SRA, Zhong Shan states that Chin-Shu wooden is actually a close affiliated company.[115] Because the record does not support Zhong Shan's claim that Chin-Shu Wooden is an "AKA" company, and instead indicates that Chin-Shu Wooden is a company distinct from Zhong Shan, we find that Chin-Shu Wooden is not an AKA company of Zhong Shan, and therefore, it was required to file a separate and complete application in order to be considered eligible for a separate rate. Because Chin-Shu Wooden did not file an SRA, we are continuing to not grant Chin-Shu Wooden a separate rate.

In light of our finding that Chin-Shu Wooden was a distinct company, and that the SRA was for Zhong Shan, and not Chin-Shu Wooden, in the *Preliminary Determination*, we did not grant Zhong Shan a separate rate given that its application was for two companies.[116] However, even if we examined the SRA filed on behalf of Zhong Shan only, we would reach the same conclusion that Zhong Shan is not eligible for a separate rate. Zhong Shan noted that "all subject merchandise exported to the United States were (*sic*) produced by Zhong Shan King Yuandun itself."[117] In its SRA, Zhong Shan noted that "Chin-Shu Wooden issued the sales documents such as invoice and packing list to the unaffiliated US customer and received payment from it."[118] Zhong Shan then provided a commercial invoice, packing list, bill of lading, and bank notice of payment receipt purportedly demonstrating one of its sales of subject merchandise to the United States.[119] None of the underlying documentation supported Zhong Shan's claim that it had produced or exported subject merchandise to the United States. Indeed, the documentation clearly indicated that its self-identified affiliated company Chin-Shu Wooden was actually the company that made the sale.[120] However, as discussed above, Chin-Shu Wooden did not, either separately or in Zhong Shan's SRA, request separate rate status.

We find Zhong Shan's argument that Commerce's separate rate denial constitutes an abuse of discretion to be misplaced. As explained above, Zhong Shan's SRA contained substantial inconsistencies. The record evidence simply does not support that Zhong Shan is the exporter, nor do we have verifiable information on which to rely to confirm its eligibility for a separate rate. Zhong Shan's SRA ambiguity, combined with evidence demonstrating Chin-Shu as the exporter, forecloses our ability to grant Zhong Shan a separate rate. We continue finding Zhong Shan ineligible for a separate rate and we, therefore, continue to find that it is part of the China-wide entity. Moreover, to the extent Zhong Shan is arguing that Chin-Shu Wooden is located in a market economy, we require an SRA providing ultimate ownership information in NME

---

[114] *Id*. at Exhibits 2, and 4-7.
[115] *Id.* at 12.
[116] *See Preliminary Determination* PDM at 18.
[117] *See* Zhong Shan SRA at 14.
[118] *Id.* at 13.
[119] *Id*. at Exhibit 1.
[120] *Id.*

proceedings.[121]  In any case, Zhong Shan omitted documentation supporting Chin Shu's Samoan domicile.[122]

## Comment 4:  Company Name for Supree

*Supree Case Brief*[123]
- Commerce granted Supree a separate rate using the name reported by Supree in response to the August SRA Supplemental.  However, Commerce should instead grant Supree a separate rate under the name "Supree (Fujian) Wood Co., Ltd.," which was provided in the company's SRA filing.
- It is Commerce's practice to correct errors in original information submitted by a respondent where the error is obvious from the administrative record.  Supree spelled its name correctly in both its SRA and quantity and value response.
- The spelling, "Fuijian," is obviously a misspelling of the Chinese province Fujian.

No other interested party provided comments on this issue.

**Commerce's Position:**  We have examined the information on the record and agree that we should grant Supree a separate rate under the name Supree (Fujian) Wood Co., Ltd., as stated in its SRA and quantity and value submissions.  We have corrected the company's name in our final determination.

## Comment 5:  Calculation of the Separate Rate Assigned to Non-Selected Companies

*Separate Rate Respondents Case Briefs*[124]
- If Commerce reduces the mandatory respondents' rates, it should also recalculate and reduce the separate rate companies' rate.
- If Meisen receives an AFA rate in the final determination, that AFA rate should be excluded from the separate rate calculation in continuance with the *Preliminary Determination*.

**Commerce's Position**:  We made changes to the margins calculated for Ancientree and Foremost for purposes of this final determination.  Because the dumping margin assigned to the companies who have received separate rates in this investigation is based on the weighted-average of these rates (excluding any rates based on AFA), we have also recalculated the margin assigned to the separate rates companies in accordance with our practice.[125]

---

[121] *See* SRA Template at 3.
[122] *See* Zhong Shan SRA at Exhibit 2.
[123] *See* Supree's Case Brief, "General Issues Case Brief," dated December 17, 2019, at 1-4.
[124] *See* Weihai Adornus Cabinetry Manufacturing Co., Ltd., *et. al.*,'s Letter, "Letter in Lieu of Brief," dated December 17, 2019; and Ronbow Hong Kong Limited's and Wuxi YuSheng Kitchen Bathroom Equipment Co., Ltd.'s Case Brief, "Case Brief," dated December 17, 2019.
[125] *See Decorative Plywood* IDM at Comment 1.

<u>SV Comments</u>

## Comment 6:  Surrogate Country

In the *Preliminary Determination*, we selected Romania as the primary surrogate country on the basis that Romania is at the same level of economic development as China, is a significant producer of comparable merchandise, and has reliable and useable SV data.[126]  In making this determination, we relied, in part, on the fact that the record contains financial statements from a producer of wooden furniture and wood products that separately identify energy expenses.[127]  These financial statements are from a Romanian company, S.C. Sigstrat S.A.  (Sigstrat).

*Ancientree Case Brief*[128]
- Commerce erred in its selection of Romania as the primary surrogate country in this investigation.  For purposes of the final determination, Commerce should rely on SVs from Malaysia instead.
- Commerce chose Romania as the surrogate country solely because Sigstrat's financial statements separately identify energy costs.  In so doing, Commerce failed to properly weigh other – even more important – factors, such as the fact that the record contains multiple financial statements from Malaysian producers of identical merchandise, higher import volumes into Malaysia for two of the most significant raw material inputs, and more specific SVs for labor costs and B&H expenses.
- With respect to the ten Malaysian financial statements on the record, Commerce declined to rely on four because they were from large investment companies involved in a variety of activities.  However, in the past, Commerce has relied on financial statements from companies with even more variety in their activities; therefore, Commerce can rely upon the statements from the four investment companies here.[129]
- Commerce declined to rely on three financial statements because they do not break out energy costs.  Given that Commerce often relies on financial statements which do not separately break out energy, Commerce's reasoning again was flawed.[130]  Commerce's decision was also unreasonable because the financial statements were from producers of identical merchandise (wooden furniture) or of products with very similar production

---

[126] *See Preliminary Determination* PDM at 14.
[127] *Id*.
[128] *See* Ancientree's Letter, "Case Brief, "dated December 17, 2019 (Ancientree Case Brief) at 1-11.
[129] *Id*. at 2-3 (citing *Chlorinated Isocyanurates Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 4852 (January 17, 2017) (*2014-2015 Chlorinated Isos*), and accompanying IDM at Comment 2; and *Chlorinated Isocyanurates Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 5053 (February 20, 2019) (*2016-2017 Chlorinated Isos*), and accompanying IDM at Comment 3).
[130] *See* Ancientree Case Brief at 1-2 (citing *Refillable Stainless Steel Kegs from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 84 FR 57010 (October 24, 2019); *see also Mattresses from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 84 FR 56761 (October 23, 2019); *Fine Denier PSF; Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 17781 (April 26, 2019); and *Xanthan Gum Final from the People's Republic of China:  Results of the Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 FR 6513 (February 14, 2018)).

26

processes (wooden table sets or beds).  In contrast, the information on the record shows that Sigstrat's primary activity is the manufacturing of plywood and veneer.

- There is substantial other evidence on the record to show that Malaysia is a significant producer of identical merchandise.  On the other hand, the record contains no information showing that Romania produces more than comparable merchandise, given that Sigstrat's financial statements are only for comparable products and the Romanian export data on the record are for a basket HTS category covering wooden furniture.

- With respect to raw materials, Romania's imports of birch and poplar sawn wood (two main inputs into the production of subject merchandise) were of uncommercial quantities, given that they were only 196 cubic meters ($M^3$) and 320 $M^3$, respectively.  These quantities are particularly low when considered in relation to both a containerload and Ancientree's own consumption.  Specifically, Ancientree consumed approximately 248 percent and 1,078 percent as much poplar and birch, respectively, during the POI than was imported into all of Romania, whereas Malaysia imported 691 percent and 369 percent more.  The CIT found in *Juancheng Kangtai* that Commerce must consider the respondent's actual purchasing and consumption in surrogate country selection.[131]

- To remedy lack of commercial import quantities of poplar and birch sawn wood into Romania, Commerce resorted to the use of imports under a six-digit level for the same HTS categories.  This was an inappropriate fix because it sacrificed specificity, the most critical factor in Commerce's analysis.[132]

- With respect to labor, the record contains only a general overall manufacturing rate in Romania, whereas the Malaysian labor rate on the record is for a "manufacturer of wooden and cane furniture."  Similarly, the record contains no information on Romanian B&H expenses, and, thus, Commerce relied on B&H values from "Europe and Central Asia" (countries that were not economically comparable to China).  Thus, the Malaysian data on the record are clearly superior.

*Foremost Case Brief*[133]

- Commerce should reconsider its selection of Romania as the primary surrogate country because it is not the source of best available information within the meaning of section 773(c)(1) of the Act.  Commerce should instead select Malaysia as the primary surrogate country.

- The record contains only one set of Romanian financial statements, from Sigstrat, a producer of plywood and molded wood products (neither of which is comparable merchandise).  Nothing on the record suggests that producers of plywood or molded wood have operations, capital structures, overhead, or expected profits similar to the experience of companies in the cabinets industry.

---

[131] *Id*. at 6-7 (citing *Juancheng Kantai Chem. Co. v. United States*, 2015 Ct. Intl. Trade LEXIS 94, *65-66, 78 (CIT 2015) (*Juancheng Kangtai*).

[132] *Id*. at 8-9 (citing *Taian Food Co. v. United States*, 783 F. Supp. 2d, 1292, 1330 (CIT 2011); *Qingdao Sea-Line*, 766 F. 3d at 1386 (Fed. Cir. 2014); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F. 3d 1316, 1320 (Fed. Cir. 2010); and *Certain Steel Threaded Rod; Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 FR 83800 (November 22, 2016), and accompanying IDM at 8.

[133] *See* Foremost's General Case Brief, "Foremost's General Issues Brief," dated December 17, 2019, at 1.

- The Malaysian financial statements are usable.  The petitioner acknowledges that the record contains financial statements from one Malaysian producer of identical merchandise (*i.e.*, Sin Heng Furniture Industries Sdn. Bhd. (Sin Heng)), and the fact that these financial statements are slightly outside the POI does not render them obsolete.[134]
- Commerce's practice is to consider the physical characteristics, end uses, and production processes of the various products when making a comparability determination.  Because assembly is required, the respondents' production process for subject merchandise is more similar to that of furniture than it is to the production process for plywood.
- The level of vertical integration and whether the financial statements allow Commerce to segregate indirect production expenses and the "production experience" are not material to Commerce's analysis, given that Commerce is not required to duplicate the exact production experience of the respondent or undertake an "item-by-item" analysis when computing factory overhead.[135]

*Petitioner Rebuttal Brief*[136]
- Commerce properly chose Romania as the primary surrogate country because it offered the best financial statements for calculating financial ratios. The Malaysian financial statements have serious flaws which render them unusable.
- Importantly, the Malaysian financial statements do not permit Commerce to calculate an accurate factory overhead ratio because they provide no breakout for any overhead expenses except depreciation.  Similarly, the Malaysian financial statements also do not separately identify energy costs, so Commerce would also have to disregard the respondents' energy FOPs.  This latter point alone renders the Malaysian financial statements inferior to Sigstrat's.
- Commerce correctly disregarded certain non-contemporaneous Malaysian financial statements because the record contained contemporaneous financial statements.  *Fish Fillets* is not on point, given that Commerce rejected non-contemporaneous financial statements, in preference for contemporaneous ones, in that case.
- Commerce correctly disregarded the Malaysian financial statements from large holding/investment companies.  *2014–2015 Chlorinated Isos* and *2016–2017 Chlorinated Isos* are also not on point, because Commerce did not consider the producers' level of integration in those cases but instead looked to whether the financial statements were the best available information overall.  Further, Commerce has a strong preference not to use financial statements from consolidated companies which reflect production of numerous non-comparable products.[137]
- There is no evidence indicating that any of the other Malaysian financial statements are for producers of identical merchandise, despite the respondents' claims to the contrary.  Rather, the Malaysian producers make only comparable merchandise, which Commerce

---

[134] *Id*. at 4 (citing *Certain Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and New Shipper Reviews; 2010-2011*, 78 FR 38002 (March 21, 2013) (*Fish Fillets*), and accompanying IDM at Comment 2).

[135] *Id*. at 5 (citing *Fish Fillets* IDM at Comment II).

[136] *See* Petitioner December 26 Rebuttal Brief at 4.

[137] *Id*. at 10-12 (citing *Pure Magnesium from the People's Republic of China:  Final Results of Antidumping Duty Review*, 73 FR 76336 (December 16, 2008) (*Pure Magnesium*), and accompanying IDM at Comment 6).

28

defined in the *Preliminary Determination* as "wooden furniture and wood products" as well as plywood and veneers.

- The record also shows that Sigstrat produces a large volume of wooden furniture, and not just plywood. Therefore, even under the respondents' definition, Sigstrat also produces comparable merchandise.

- Commerce's determination that plywood and veneers are comparable merchandise is supported by Foremost's own production, because Foremost reported that it performs its own veneering. Sigstrat's and Foremost's production processes are remarkably similar.

- There is no basis to conclude that furniture is more comparable to wooden cabinets than is plywood. Wooden furniture covers a wide range of products, a large number of which (unlike cabinets) are complex and require special tooling to produce. Further, many cabinets producers (including Foremost) also produce plywood. It is immaterial that Foremost consumes the plywood as an input instead of selling it.[138]

- The Malaysian financial statements appear to cover a wide range of business operations, including all types of wooden furniture, such that there would be little correlation between the profit experience of the respondents and the Malaysian producers. Further, Ancientree and Foremost have different levels of integration, which makes integration level a less important factor to consider; that said, Foremost's level of integration appears to be similar to Sigstrat's.[139]

- With respect to raw materials, Malaysia is incapable of producing almost all of the wood inputs used by respondents to make subject merchandise because these wood species cannot grow in the tropics (as they can in Romania). This renders Romania's SVs for wood more of a broad-market average because Romania's imports compete with domestic production (whereas Malaysia's imports cannot). The lack of domestic competition in Malaysia undoubtedly affects the pricing and availability of the inputs.

- Finally, the Romanian import values for birch and poplar sawn wood are comparable to the values into Malaysia, and Commerce correctly found in its *Preliminary Determination* that their import quantities were commercial. Because Ancientree has offered no new facts, Commerce should continue to disregard this argument.[140]

**Commerce's Position:** In the *Preliminary Determination*, we selected Romania as the primary surrogate country. As detailed below, we continue to find that Romania is the appropriate surrogate country by which to value the respondents' FOPs in this investigation.

As explained in the *Preliminary Determination*,[141] when Commerce is investigating imports from an NME country, section 773(c)(1) of the Act directs it to base NV, in most circumstances, on the NME producer's FOPs, valued in a surrogate market economy (ME) country or countries considered to be appropriate by Commerce. Specifically, in accordance with section 773(c)(4) of the Act, in valuing the FOPs, Commerce shall utilize, "to the extent possible, the prices or costs of FOPs in one or more {ME} countries that are: (A) at level of economic development comparable to that of the {NME} country; and (B) significant producers of comparable

---

[138] *Id*. at 14.
[139] *Id*. at 14-15.
[140] *Id*. at 8.
[141] *See Preliminary Determination* PDM at 9.

29

merchandise."[142]   As a general rule, Commerce selects a surrogate country that is at the same level of economic development as the NME unless it is determined that none of the countries are viable options because:  (a) they either are not significant producers of comparable merchandise; (b) do not provide sufficiently reliable sources of publicly available SV data; or (c) are not suitable for use based on other reasons.[143]   Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh the difference in levels of economic development.  To determine which countries are at a similar level of economic development, Commerce generally relies solely on per capita Gross National Income (GNI) from the World Bank's World Development Report.[144]   In addition, if more than one country satisfies the two criteria noted above, Commerce narrows the field of potential surrogate countries to a single country (pursuant to 19 CFR 351.408(c)(2), Commerce "normally will value all factors in a single surrogate country") based on data availability and quality.

Consistent with our practice, and section 773(c)(4)(A) of the Act, we determined that Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia were countries at the same level of economic development as China, based on the most current annual issue of World Development Report.[145]   No party asserts that we should use a country not on this list.

Section 773(c)(4)(B) of the Act requires Commerce, to the extent possible, to value FOPs in a surrogate country that is a significant producer of comparable merchandise.  Neither the Act nor Commerce's regulations provide further guidance on what may be considered comparable merchandise.  Among the factors we consider in determining whether a country is a significant producer of comparable merchandise is whether the country is an exporter of comparable merchandise.[146]   In order to determine whether the above-referenced countries are significant producers of comparable merchandise, we examined which countries on the surrogate country list exported merchandise comparable to the subject merchandise.[147]   Consistent with our *Preliminary Determination*, we continue to find that information on the record indicates that all of the six countries listed above are significant exporters of merchandise covered by the HTSUS categories identified in the scope of this investigation, and are, thus, significant exporters of

---

[142] *See* Policy Bulletin 04.1:  Non-Market Economy Surrogate Country Selection Process (March 1, 2004) (Policy Bulletin 04.1) available on Commerce's website at *http://enforcement.trade.gov/policy/bull04-1.html*.
[143] *See, e.g.*, *Certain Quartz Surface Products from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*, 84 FR 23767 (May 23, 2019), and accompanying IDM at Comment 8.
[144] *See* Policy Bulletin 04.1.
[145] *See Preliminary Determination* PDM at 9; *see also* Commerce's Letter to All Interested Parties, "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information," dated June 17, 2019, which contains the Memorandum, "List of Surrogate Countries for Antidumping Investigations and Reviews from the People's Republic of China ('China')," dated August 2, 2018 (*i.e.*, the surrogate country list).
[146] *See, e.g.*, *Certain Fabricated Structural Steel from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 5376 (January 30, 2020), and accompanying IDM at Comment 2.
[147] *See Preliminary Determination* PDM at 11.

30

comparable merchandise.[148]  Accordingly, consistent with our *Preliminary Determination*, we find that Brazil, Kazakhstan, Malaysia, Mexico, Romania, and Russia meet the significant producer of comparable merchandise prong of the surrogate country selection criteria, as provided in section 773(c)(4)(B) of the Act.[149]

If more than one potential surrogate country satisfy the statutory requirements for selection as a surrogate country, Commerce selects the primary surrogate country based on data availability and reliability.[150]  When evaluating SV data, Commerce considers several factors, including whether the SVs are publicly available, contemporaneous with the POI, representative of a broad market average, tax- and duty-exclusive, and specific to the inputs being valued.[151]  There is no hierarchy among these criteria.[152]  It is Commerce's practice to carefully consider the available evidence in light of the particular facts of each industry when undertaking its analysis.[153]

In the *Preliminary Determination*, we found that parties placed complete data for Malaysia and Romania on the record;[154] and that no party provided complete SV information for the other

---

[148] *Id.*; *see also* Memorandum, "Surrogate Value Memorandum for the Preliminary Determination," dated October 2, 2019 (Preliminary SV Memorandum) at Attachment 4.

[149] *See Preliminary Determination* PDM at 11.

[150] *See* Policy Bulletin 04.1; *see also*, *e.g.*, *Citric Acid and Certain Citrate Salts from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 80 FR 77323 (December 14, 2015).

[151] *See* Policy Bulletin 04.1; *see also SolarWorld Americas, Inc. v. United States*, 910 F. 3d 1216, 1222 (Fed. Cir. 2018) *citing Qingdao Sea-Line Trading Co. v. United States*, 766 F. 3d 1378, 1386 (Fed. Cir. 2014) (*Qingdao Sea-Line*).

[152] *See, e.g.*, *Certain Preserved Mushrooms from the People's Republic of China:  Final Results and Final Partial Rescission of the Sixth Administrative Review*, 71 FR 40477 (July 17, 2006), and accompanying IDM at Comment 1.

[153] *See* Policy Bulletin 04.1.

[154] *See Preliminary Determination* PDM at 12; *see also* Petitioner's Letter, "Wooden Cabinets and Vanities and Components, Thereof from the People's Republic of China:  Petitioner's Initial Surrogate Value Comments," dated August 7, 2019 (Petitioner SV Comments); Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Petitioner's Initial Rebuttal Surrogate Value Comments," dated August 19, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Petitioner's Final Surrogate Value Comments," dated September 3, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Petitioner's Comments on Respondents' Final Surrogate Value Comments," dated September 13, 2019; Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Preliminary Surrogate Value Submission," dated August 7, 2019 (Ancientree SV Comments); Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Rebuttal Preliminary Surrogate Value Submission," dated August 19, 2019; Ancientree's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Final Surrogate Value Submission," September 3, 2019 (Ancientree Pre-prelim SV Comments); Meisen's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Surrogate Value Comments," dated August 7, 2019; Meisen's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Rebuttal Surrogate Value Comments," dated August 19, 2019; Foremost's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Foremost's Affirmative Surrogate Value Submission," dated August 7, 2019; Foremost's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Foremost's Rebuttal Surrogate Value Submission," dated August 19, 2019 (Foremost Rebuttal SV Comments); Foremost's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Foremost's Final Surrogate Value Submission," dated September 3, 2019 (Foremost Pre-prelim SV Comments); Wen Bo's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Surrogate Value Selection Comments," dated August 7, 2019; Wen Bo's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Surrogate Value Selection Rebuttal

31

countries on the list (*i.e.*, for Brazil, Kazakhstan, or Russia), or argued in favor of using SV information for any of the other countries.

In the *Preliminary Determination*, we found that the Romanian data constitutes the best available data for valuing respondents' FOPs because: (1) we have complete, contemporaneous Romanian Global Trade Atlas (GTA) data for each input used by the respondents; and (2) the Romanian surrogate financial statements on the record are preferable to the Malaysian financial statements because these statements specifically break out energy costs from other manufacturing costs. Further, these statements are from a producer of wooden furniture (*i.e.*, chairs and tables), which is merchandise comparable to the merchandise under consideration in this investigation, and other wooden products (*i.e.*, plywood).[155]  Therefore, because complete SV information is available from Romania and the financial statements from Romania are reliable and more detailed than the Malaysian statements, we determined that the Romanian data are the best available source of SV data.[156]  The factual record in this case has not changed.  Nor have parties pointed to record evidence which is contrary to our findings for the *Preliminary Determination*. Therefore, we continue to find that Romania meets the criteria in section 773(c)(4) of the Act as being:  (1) at a similar level of economic development to China; and (2) a significant producer of comparable merchandise.  Furthermore, we find that Romania has the best data availability. Thus, we continue to find that Romania is the best choice for the surrogate country in this investigation.

We disagree with Ancientree and Foremost that Malaysia is a more suitable surrogate country because record evidence shows that it is a producer of identical merchandise.  Issues of contemporaneity and diversity of activities aside, while certain Malaysian financial statements cover the production and sale of wooden furniture (which is comparable to wooden cabinets and vanities), none of these financial statements, or any other record information, explicitly identify financial data for production or sales of in-scope wooden cabinets or vanities (the identical product).  For example, the website of Lii Hen Industries Bhd. (Lii Hen) contains images of items such as bed frames, nightstands, and dressers (items that appear to meet the description of the scope of the wooden bedroom furniture order instead),[157] and television stands.[158]  Similarly, the website of Poh Huat Resources Holdings Berhad (Poh Huat Resources) also contains images of wooden bedroom furniture and standalone tables and television stands that appear to contain as much metal as they do wood components.[159]  The website of Sin Heng clearly states that it specializes in "flat packed furniture such as Wardrobe, bedroom set, computer table, bookcase, office table, shoes rack and *etc.*"[160]  The website of CT Heng Furniture Sdn., Bhd. (CT Heng) contains numerous images of the very types of furniture produced by the Romanian company,

---

Comments," dated August 19, 2019; and Wen Bo's Letter, "Wooden Cabinets and Vanities from the People's Republic of China:  Factual Information to Value Factors of Production," dated September 3, 2019.
[155] *See Preliminary Determination* PDM at 14; *see also* Petitioner SV Comments at Exhibit 10B.
[156] *Id*.
[157] *See, e.g., Wooden Bedroom Furniture from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments in Part; 2017*, 84 FR 24749 (May 29, 2019), and accompanying IDM.
[158] *See* Ancientree Pre-prelim SV Comments at Exhibit 3.
[159] *Id.* at Exhibit 4.
[160] *See* Ancientree SV Comments at Exhibit 10.

32

tables and chairs, in addition to bed frames,[161] as do the websites of Yeo Aik Wood Sdn. Bhd. (Yeo Aik) and Latitude Tree Furniture Sdn. Bhd (Latitude).[162]  For these latter three companies, in addition to the absence of any record evidence that they produce identical merchandise, the lack of contemporaneity further detracts from their suitability as potential sources of surrogate financial ratios.  Indeed, the only information provided by Ancientree for companies that could potentially represent Malaysian producers of kitchen cabinets is limited to website information for those companies, rather than their financial statements.[163]  Thus, contrary to Ancientree's claims that the financial statements from Malaysia demonstrate that Malaysia is a significant producer of identical merchandise, none of the financial statements submitted by Ancientree appear to support its claim.  To the contrary, the Malaysian financial statements merely demonstrate that the Malaysian producers in question make wooden furniture such as tables and chairs, the very products produced by Sigstrat, and those products are comparable merchandise. As a consequence, we find that none of the financial statements on the record are from producers of identical merchandise and all of these financial statements are, therefore, of equal suitability in terms of comparability of products produced.

Given that the record does not support the claim that the Malaysian financial statements are from producers of identical merchandise, and notwithstanding Ancientree's apparent concession that wooden tables and chairs represent comparable merchandise,[164] we look to the record information regarding Sigstrat to determine whether its statements continue to be a suitable source for valuation of the financial ratios in this investigation.  In the *Preliminary Determination*, Commerce stated that Sigstrat's financial statements represent the financial position of a profitable Romanian producer of comparable wooden products (*i.e.*, wooden furniture) that explicitly identify energy costs, are contemporaneous and cover the entire POI, and contain no evidence of countervailable subsidies.[165]

While the record does contain three contemporaneous financial statements from Malaysian producers of comparable merchandise, we find that Sigstrat's financial statements offer a higher level of data quality than do the Malaysian statements.  Significantly, Sigstrat's financial statements completely segregate two costs important to Commerce's analysis – energy and manufacturing overhead – whereas the Malaysian financial statements do not.

Although we agree with Ancientree that we have relied on financial statements that do not separately break out energy,[166] in instances where the record contains a usable set of SVs from one country, including financial statements that break out energy FOPs, and a comparably useable set of SVs from another country, but with financial statements that do not break out

---

[161] *Id.* at Exhibit 6.
[162] *Id.* at Exhibits 7 and 8.
[163] *Id.* at Exhibit 9.
[164] *See, e.g.*, Ancientree Case Brief at 4 (arguing the "much higher comparability of the Malaysian producers and noting the fact that "Yeo Aik Wood lists its principal activities as manufacturing and selling of furniture, in particularly (*sic*) wooden table sets and beds."); *see also* Ancientree Pre-prelim SV Comments at 1 ("Exhibits SV2-3 through SV2-8 contains financial statements from six Malaysian producers of comparable or identical merchandise." Product information for four of the six companies indicate production/sale of tables and chairs).
[165] *See Preliminary Determination* PDM at 14.
[166] *See* Ancientree Case Brief at 1-2.

energy costs, Commerce prefers to select the surrogate country that contains financial statements that break out energy.[167]  When Commerce is unable to segregate and, therefore, exclude energy costs from the calculation of the surrogate financial ratios, as is the case with the Malaysian financial statements on this record, it is Commerce's practice to disregard the respondents' energy inputs in the calculation of NV in order to avoid double counting energy costs which have necessarily been captured in the surrogate financial ratios.[168]  Disregarding the Romanian set of SVs and financial statements that break out energy would require that we sacrifice the accuracy of our calculations by not separately valuing multiple energy FOPs reported by respondents, and that were verified by Commerce, simply because we cannot determine where those energy FOPs are accounted for in the financial statements.  Thus, disregarding the respondents' actual energy FOPs would introduce uncertainty into our calculations.

With respect to manufacturing overhead, as noted by the petitioner, the Malaysian financial statements contain a level of detail that severely limits our ability to confidently calculate accurate financial ratios.[169]  As explained below in Comment 8, the Romanian financial statements contain a single item for production overhead, which represents all manufacturing costs that are not direct materials or direct labor and are indirect to the manufacturing operations of the company.  Because those statements also contain an itemized expense for energy costs, we are able to reduce the total amount of production overhead expenses by the value of Sigstrat's energy costs,[170] a calculation we cannot make using the Malaysian financial statements.  By contrast, not only do the Malaysian financial statements lack a detailed breakout of energy, but the manufacturing overhead they do identify is extremely limited, which raises the question of where energy and other indirect expenses are accounted for at all.  For example, the financial statements of Lii Hen only account for "Land and Buildings" and "Plant, machinery and equipment," and none of the other itemized expenses could conceivably include the cost of energy and other manufacturing costs that are not direct materials or direct labor and are indirect to the manufacturing operation of the company.[171]  Similarly, the financial statements of Yeo Aik only identify depreciation and rental expenses as overhead items and none of the other line-items appear to be related to indirect production expenses.[172]  The financial statements of Poh Huat

---

[167] See, e.g., Antidumping Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, In Part, 80 FR 34893 (June 18, 2015), and accompanying IDM at Comment 9 ("The Department's practice is to reject those financial statements that are not sufficiently detailed, and specifically, that do not contain a breakout for energy costs, when there are alternative financial statements on the record that contain a line item for energy costs.").

[168] See, e.g., Citric Acid and Certain Citrate Salts from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value, 74 FR 16838, 16839 (April 13, 2009), and accompanying IDM at Comment 2; see also Certain Frozen Warmwater Shrimp from the People's Republic of China:  Preliminary Results, Partial Rescission, Extension of Time Limits for the Final Results, and Intent to Revoke, in Part, of the Sixth Antidumping Duty Administrative Review, 77 FR 12801, 12809 (March 2, 2012), unchanged in Administrative Review of Certain Frozen Warmwater Shrimp From the People's Republic of China:  Final Results, Partial Rescission of Sixth Antidumping Duty Administrative Review and Determination Not To Revoke in Part, 77 FR 53856 (September 4, 2012).

[169] See, e.g., Ancientree Pre-prelim SV Comments at Exhibits 3-8; Foremost Pre-prelim SV Comments at Exhibits 1-5.

[170] See Preliminary SV Memorandum.

[171] See Foremost Pre-prelim SV Comments at Exhibit 1.

[172] See Ancientree Pre-prelim SV Comments at Exhibit 7.

34

Furniture Industries Sdn Bhd (Poh Huat Furniture) only contain overhead items identified as "depreciation of property, plant and equipment," "direct operating expenses on investment properties," and "loss on disposal of property, plant, and equipment."[173]  Accordingly, we cannot determine whether all of the manufacturing overhead expenses are accounted for in these financial statements, or where those expenses are reflected in the financial ratios calculated by interested parties.  Thus, we find that reliance on the Malaysian financial statements to value manufacturing overhead would result in the undercounting of these costs.

We disagree with Ancientree that Commerce should disregard Sigstrat's financial statements because Sigstrat's primary activity may be the manufacturing of plywood and veneer.  Sigstrat's financial statements indicate that the company produces wood plywood, veneering, seats and backrests, chairs, tables, and other wooden products.[174]  As explained below, it is unclear whether Sigstrat's production is primarily wooden furniture or plywood, but the record indicates that wooden furniture has been the increasing focus of the company.  In addition, Foremost's production process includes elements that are very similar to Sigstrat's plywood, veneering, and wooden furniture processes.[175]

Accordingly, Sigstat's financial statements are at least an equally valid source of SV information as the Malaysian statements.  First, all parties recognize that Sigstrat is a significant producer of wooden furniture, making its financial statements a legitimate source of financial ratios on this point alone.  Second, while it is true that 50 percent of Sigstrat's sales in 2018 were of plywood and 47.3 percent of its sales were of molded products (*i.e.*, chairs, tables, *etc.*),[176] those figures represent a proportion of sales rather than costs.  Accordingly, we cannot determine whether a majority of Sigstrat's production was of plywood products or wooden furniture.  However, Sigstrat's financial statements also state that the "objectives of the company continue to focus on the (*sic*) increasing the share of the production of molded elements in the total production."[177]  Indeed, the statements indicate that the relative share of furniture products has increased year over year since 2016 and that Sigstrat's development strategy is mainly based on increasing the production capacity and expanding production of wooden furniture.[178]  By contrast, of the Malaysian financial statements that are contemporaneous and are not from large conglomerates with diversified operations (*i.e.*, for Lii Hen, Poh Huat Resources, and Yeo Aik), the record contains no information regarding the relative production amounts by product for either Yeo Aik or Poh Huat Furniture.  In fact, the financial statements of Poh Huat Furniture state that it is "principally engaged in the businesses of manufacturing and sale of furniture and investment holding,"[179] but there is no breakdown in the statements regarding the costs and revenues of these different business units.  Similarly, the financial statements of Lii Hen state that "{t}here are six major subsidiary companies that are involved in the manufacture of a vast range of wood

---

[173] *Id.* at Exhibit 5.
[174] *See* Petitioner SV Comments at Exhibit 10B (Sigstrat Statements) at 1.1.a and 1.1.b.
[175] *See, e.g.*, Foremost's September 23, 2019 Supplemental Section D Questionnaire Response (Foremost September 23, 2019 SDQR) at 20 (noting labor hours for veneering related to "pasting veneers onto wooden board and semi-finished parts").
[176] *Id.* at 1.1.4. and Note 10.
[177] *Id.* at 1.1.2.a.
[178] *Id.* at 1.1.2.b.
[179] *See* Ancientree Pre-prelim SV Comments at Exhibit 5, page 1.

based products, namely bedroom sets, solid dinettes, office furniture, upholstery sofa set, utilities shelves, occasional items and kiln drying timber processing,"[180] but the statements do not indicate what proportion of production or sales is related to upholstered furniture, utility shelves, and office furniture, products that may or may not be considered comparable.  The statements also indicate that Lii Hen, in addition to furniture manufacturing, is also engaged in cultivation of rubber trees and investments, which could have further effects on the cost structure of the company that would adversely affect their suitability for calculating financial ratios in this investigation.[181]  Accordingly, although the Sigstrat statements identify the relative proportion of revenue earned in 2018 by product type, we do not find that those proportions necessarily render the statements any less appropriate for valuing surrogate financial ratios than the Malaysian statements, given that:  (1) we cannot determine based on the record whether Sigstrat primarily produced furniture or plywood; and (2) none of the Malaysian statements offer a superior level of detail.

We also disagree with Foremost that Sigstrat's financial statements are unsuitable because the respondents' production process for subject merchandise is more similar to that of furniture than to the production process for plywood.  As noted by the petitioner, Foremost's production process includes stages that are comparable to plywood production, indicating that the mix of products manufactured by Sigstrat involves a reasonably-comparable production process to the mandatory respondents.

Further, we disagree that we improperly disregarded each of the financial statements of the Malaysian producers, in preference to those of Sigstrat, a profitable Romanian producer of comparable wooden products (*i.e.*, chairs and tables).  As stated in the *Preliminary Determination*, four of these financial statements (*i.e.*, for Jay Corp Berhad, Latitude, Poh Huat Resources, and Sern Kou Resources Berhad) were from large holding/investment companies with numerous subsidiaries engaged in various activities that would not necessarily reflect the cost structure of a manufacturer of wood products.[182]  Further, an additional three financial statements (*i.e.*, for CT Heng, Latitude, and Sin Heng) are for periods prior to the POI.[183]  It is Commerce's practice to reject such financial statements, where other, more preferable, contemporaneous financial statements are on the record.[184]  Ancientree argues that Sin Heng is a producer of identical merchandise, and Commerce should accord this fact more weight than whether its financial statements cover the POI.  However, as explained above, there is nothing on the record to support the claim that any of the Malaysian financial statements are for companies that produce identical merchandise.

---

[180] *See* Ancientree Pre-prelim SV Comments at Exhibit 3, p 2.

[181] *Id.* at note 37.

[182] *See Preliminary Determination* PDM at 13; *see also Pure Magnesium* IDM at Comment 6 ('We agree with Petitioner and Datuhe that it is inappropriate to use Sterlite's audited financial statements to determine the surrogate financial ratios in this review.  Sterlite is a multinational corporation with operations in a number of countries.  It is the Department's practice to reject such financial statements, where other viable financial statements are on the record").

[183] *See Preliminary Determination* PDM at 13.

[184] *See, e.g.*, *Pure Magnesium* IDM at Comment 6 ("The Department also selects surrogate financial statements that are publicly available, comparable to the respondent's experience, and contemporaneous with the review period or period of investigation"); *see also* Policy Bulletin 04.1 ("In assessing data and data sources, it is the Department's stated practice to use,,, prices that are contemporaneous with the period of investigation or review").

With respect to the remaining three Malaysian financial statements on the record (*i.e.*, for Lii Hen, Poh Huat Furniture, and Yeo Aik),[185] while these financial statements could be potentially valid sources of information for surrogate financial ratios absent any other more preferable statements on the record, as noted above, we continue to have concerns regarding the manufacturing overhead expenses reported in these statements. Although we agree in principle that it is our preference to rely on multiple financial statements to determine the surrogate financial ratios in NME cases,[186]  section 773(c)(1)(B) of the Act requires Commerce to value FOPs based "on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." Because the record contains a set of financial statements that are contemporaneous, profitable, from a producer of comparable merchandise that identify the relative sales by product, and that do not suffer the same deficiencies regarding manufacturing overhead, and also break out energy, we do not find it preferable to resort to the Malaysian statements merely because there are more statements from Malaysian companies than there are from Romanian ones. Instead, based on the foregoing, we find that Sigstrat's financial statements represent the best available information by which to value financial ratios in this investigation, in accordance with section 773(c)(1) of the Act.

We also disagree with the respondents that the remaining Malaysian SV data on the record are necessarily better than the Romanian SV data. While Ancientree argues that the Malaysian GTA data for wood is more robust than the Romanian data, this argument hinges on the premise that small quantities are by definition "uncommercial" (and by implication unrepresentative or distortive). However, neither the record in this case, nor Commerce's practice in general, supports this premise. In making its argument, Ancientree fails to connect the <u>quantity</u> of the imports in question to their average unit <u>value</u> (AUV). Absent such a connection, Ancientree's argument is not meaningful. It is of no moment that Ancientree itself purchases wood in greater quantities. In the *Preliminary Determination*, we stated that Ancientree's claim is based solely on a comparison of the Romanian and Malaysian import quantities, an analysis, which alone, we find to be of limited value, and that "information on the import quantities or values for other countries on the surrogate country list would be more probative."[187] We further stated that no parties submitted such data for us to evaluate.[188] In light of the complete lack of evidence in this regard, as also discussed in Comment 7, below, Commerce has no basis to conclude that the AUVs computed using those quantities are unreliable.

---

[185] *See Preliminary Determination* PDM at 13.
[186] *See, e.g.*, *Pure Magnesium* IDM at Comment 6 ("We agree in principal with Petitioner that it is our preference to rely on multiple financial statements to determine the surrogate financial ratios in NME cases. (citation omitted) However, section 773(c)(1)(B) of the Act requires the Department to value FOPs based 'on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.'").
[187] *See Preliminary Determination* PDM at 13.
[188] *Id.*

Further, Commerce does not use quantity *per se* to determine whether a small import quantity necessarily results in an aberrational import value.[189]  When Commerce undertakes an analysis as to whether certain SVs are aberrational or unreliable for purposes of calculating an AD margin, it applies certain criteria in making a decision.  First, Commerce's practice is to compare the SVs in question to the GTA AUVs calculated for the same period using data from the other potential surrogate countries on the surrogate country list, to the extent that such data is available.[190] Commerce has also examined data from the same HTS subheading for the surrogate country over multiple years to determine if the current data appear aberrational with respect to historical values.[191]  The record of this investigation contains SV data for Malaysia and Romania, but no data for the other countries on the surrogate country list, Brazil, Kazakhstan, Mexico, and Russia.[192]  Nor did interested parties submit any data for any of the potential surrogate countries for any period outside of the POI.  Accordingly, a comparison between two data points, Malaysia and Romania import values, only during the POI, without any historical context, does not allow us to conclude that the import values associated with the import quantities for Romania are aberrational values or otherwise unusable.  In any dataset there will inevitably be a highest and lowest value, but pointing to the lowest value in a dataset alone is insufficient grounds to conclude that the value is somehow distortive or unreasonable.[193]  No parties submitted wood import data for the POI for Brazil, Kazakhstan, Mexico, or Russia, which prevents us from determining whether the Malaysian AUV is within the range of AUVs from those countries or whether it is an outlier relative to those AUVs.  Similarly, absent any historical context for the AUVs from Romania, or any of the other countries on the surrogate country list, we cannot determine whether there was a sharp drop in the Romanian data during the POI that could impugn the reliability of the POI data.  For those same reasons, we cannot draw any conclusions as to the commercial significance of the Romanian import quantities relative to any country other than Malaysia, which, as a single data point, is too limited to permit a meaningful analysis.

Although Ancientree points to *Juancheng Kangtai* for the proposition that Commerce must consider the respondent's actual purchasing and consumption in surrogate country selection,[194] we disagree that the decision in *Juancheng Kangtai* compels a one-dimensional comparison between a respondent's consumption and the import quantities under consideration.  Specifically,

---

[189] *See, e.g.*, *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 23 CIT 479, 485, 59 F. Supp. 2d 1354, 1360 (CIT 1999).
[190] *See, e.g.*, *Carbazole Violet Pigment 23 from the People's Republic of China:  Final Results of Antidumping Administrative Review*, 75 FR 36630 (June 28, 2010) (*Carbazole Violet Pigment*), and accompanying IDM at Comment 4, and *Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part:  Certain Lined Paper Products from the People's Republic of China*, 71 FR 53079 (September 8, 2006) (*Lined Paper Products*), and accompanying IDM at Comment 5.
[191] *See, e.g.*, *Lightweight Thermal Paper from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 73 FR 57329 (October 2, 2008) (*Lightweight Thermal Paper*), and accompanying IDM at Comment 10; and *Saccharin from the People's Republic of China:  Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 71 FR 7515 (February 13, 2006) (*Saccharin*), and accompanying IDM at Comment 5.
[192] *See Preliminary Determination* PDM at 12.
[193] *See Jinan Farmlady Trading Co. v. United States*, 228 F. Supp. 3d 1351, 1356 (CIT 2017) ("First, Farmlady focuses on the data for Indian imports of packaging tape from Nepal, asserting broadly that this data was 'aberrational and low' because it reflects a value that is lower than the average value.  But merely showing that a price is low is not enough").
[194] *See* Ancientree Case Brief at 6-9.

the record in *Juancheng Kangtai* included comprehensive data regarding various AUVs for each country on the surrogate country list in the underlying review, which allowed a detailed discussion and analysis of the prices and quantities traded among countries on the surrogate country list.[195]  Importantly, those facts allowed Commerce to analyze whether an allegedly non-commercial quantity was consistent with other import volumes and whether the input in question was often traded in smaller quantities.[196]  On remand, Commerce was able to conclude, based on a detailed analysis of price and quantity, that transactions are made at commercial quantities when they are competitive commercial transactions, either large or small, and that a finding that import volumes are commercial is not exclusively tied to a respondent's consumption levels.[197]  The CIT ultimately sustained Commerce's conclusion in *Juancheng Kangtai II* that an allegedly small quantity was, in fact, a commercial quantity, but Ancientree has failed to provide the requisite data for Commerce to conduct such an analysis.[198]  Accordingly, and as further discussed below at Comment 7, Ancientree's claim that the Romanian import values for birch and poplar are associated with commercially insignificant quantities and somehow not reliable SVs by which to value FOPs in this investigation is not supported by the record and does not persuade us that Romania is a less suitable primary surrogate country than Malaysia.

Ancientree also contends that valuing birch and poplar sawn wood using the Romanian six-digit level HTS subheading sacrifices specificity, which is a crucial factor in our analysis.[199]  As explained below at Comment 7, however, the record does, in fact, support the valuation of birch and poplar using the Romanian six-digit level HTS without sacrificing specificity (*i.e.*, the SV is specific to the input consumed by the respondents, birch and poplar sawn wood).

Finally, with respect to Ancientree's argument that the Malaysian data are superior to that of Romania because the labor rate is for "manufacture of wooden and cane furniture"[200] and because the brokerage and handling SV is more specific, we disagree that the selection of the primary surrogate country in this investigation is most appropriately decided by the suitability of these two factors.  With respect to labor, we note that Ancientree's suggested SV is for "manufacture of wooden and cane furniture," but Ancientree did not provide a definition of "cane furniture" and the source data does not provide any information as to the relative proportion that "cane furniture" comprises of the overall industry.  Thus, it is unclear that this SV

---

[195] *See Juancheng Kangtai*, 2015 CIT LEXIS 94, *66-69 ("Kangtai lists the import data for each country on the OP list (Indonesia, Costa Rica, the Philippines, Colombia, South Africa, and Thailand), the total US$ value and total quantities in kilograms, the AUV, and the percentage out of total kilograms for all listed country's import data. Of those, the Philippines' AUV is the lowest at US$0.21/kg (or US$210 per metric ton), while Indonesia and Costa Rica, with total imports in metric tons of 2,305.6 and 1,887.2, respectively, both show AUVs of US$0.54/kg (US$ 540 per metric ton).  Colombia, South Africa, and Thailand, with total imports in metric tons of 84.0 9.7 and 3.0, respectively, display AUVs of US$0.50, US$ 3.54, and US$ 3.40, respectively.").

[196] *See Juancheng Kangtai Chem. Co. v. United States*, 2017 CIT LEXIS 3, *26-31 (CIT 2017) (*Juancheng Kangtai II*) ("Commerce explained that transactions are made at 'commercial quant{ities}' when they 'reflect market values', 'i.e.*, competitive commercial transactions, either large or small.'", ". . . these examples indicated that the chemical was commercially traded in quantities smaller than Kangtai's annual consumption.").

[197] *Id.*

[198] *See, e.g.*, *QVD Food v. United States*, 658 F. 3d 1318, 1324 (Fed. Cir. 2011) (*QVD Food*) ("{T}he burden of creating an adequate record lies with {interested parties} and not with Commerce.").

[199] *See* Ancientree Case Brief at 8-9.

[200] *See* Ancientree Case Brief at 9; *see also* Ancientree SV Comments at Exhibit 4.

is more representative of the respondents' own labor rates than the Romanian SV, based on general manufacturing operations.  (For example, cane furniture may represent a woven product that is manufactured without the various hardware components required to produce the subject merchandise.)  Although it is true that the labor rate used in the *Preliminary Determination* was for manufacturing generally,[201] the record also contains a Romanian labor rate for wages in general.[202]  It is evident that the manufacturing wage rate is lower than the general wage rate and there is no evidence on the record that would suggest a wage rate specific to furniture manufacturing would necessarily be any more precise, or that the Romanian manufacturing wage rate is any less specific to labor associated with merchandise under consideration than a wage rate for "cane furniture."

With regard to the Malaysian SV for brokerage and handling, we agree with Ancientree that the Romanian SV used in the *Preliminary Determination* was not specific to Romania and, therefore, the Malaysian SV is superior to the Romanian SV.  While it is true that we have a regulatory preference for valuing all FOPs in a single surrogate country,[203] the CIT has held that such a preference must still yield to reason and the sourcing of particular SVs from outside the primary surrogate country.[204]  Accordingly, we have used the Malaysian SV for B&H for this final determination.[205]  However, based on the totality of circumstances, and in consideration of the analysis of record information related to financial ratios, birch and poplar wood inputs, and labor, above, we do not find that the superiority of an SV for B&H warrants a departure from our conclusion in the *Preliminary Determination* that Romania is the superior selection as the primary surrogate country for this final determination.

**Comment 7:  SVs for Birch and Poplar**

Prior to the *Preliminary Determination*, Ancientree argued that Romanian imports for birch and poplar sawn wood, its primary inputs, were based on insignificant and uncommercial quantities for purposes of use as surrogate values.[206]  Commerce acknowledged this, and in response, "noted that Ancientree merely asserted the import volume was insignificant and non-commercial rather than identifying a basis of this evaluation."[207]  We then relied on the Romanian GTA data for imports of birch and poplar sawn wood, at the HTS six-digit (for Ancientree) or eight-digit (for Foremost) level, in our margin calculations.

---

[201] *See* Preliminary SV Memorandum.
[202] *See* Petitioner SV Comments at exhibit 5.
[203] *See* 19 CFR 351.408(c)(2).
[204] *See, e.g.*, *Juancheng Kangtai*, 2015 CIT LEXIS 94, *71.
[205] *See* Ancientree SV Comments at Exhibit 7, page 44; *see also* Memorandum, "Surrogate Value Memorandum for the Final Determination," dated February 21, 2020 (Final SV Memorandum).
[206] *See* Ancientree Case Brief at 6 (citing Ancientree's Letter, "Pre-Preliminary Comments," dated September 19, 2019 (Ancientree Pre-Preliminary Comments).
[207] *See* Ancientree Case Brief at 6 (citing *Preliminary Determination* PDM at 12).

*Petitioner Case and Rebuttal Briefs*[208]

- There does not appear to be a reason why Commerce used the six-digit HTS code to value Ancientree's birch and poplar inputs since all other inputs were valued at the HTS eight-digit level.
- Commerce used the eight-digit categories to value birch and poplar reported by Foremost; there is no reason to treat the respondents differently.
- The Malaysian and Romanian import statistics for the wood inputs are equivalent, except that the Romanian data represent broad-market averages, whereas the Malaysian data do not.  In particular, Malaysia lacks domestic production for the temperate-climate hardwoods consumed by respondents, resulting in import values that do not compete with a domestic industry.[209]
- Even though there are HTS values for these wood inputs from Malaysia, they must be considered inferior in terms of their availability and reliability in comparison with Romania, which has vast forests located in the growing region of these wood species.
- The Romania HTS values are comparable to the Malaysian HTS for birch and poplar and constitute commercial quantities.

*Ancientree Case and Rebuttal Brief*[210]

- Commerce should base the SV for birch and poplar sawn wood on Malaysia GTA data for the final determination.  The Romanian values are insignificant and uncommercial when viewed in the context of a common commercial quantity of a container load and Ancientree's own commercial consumption and purchasing.[211]
- Commerce sacrificed specificity in resorting to the six-digit level, as the categories cover "wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded, or end-jointed."  This is dissimilar to Ancientree's consumed sawn wood.  However, the Malaysian HTS numbers at the eight-digit level specifically cover "Other than Planed, sanded or end-jointed:  Other than Sawn lengthwise and sliced or peeled" and are more specific to the inputs that Ancientree consumes.[212]
- The quantities for the SVs at the Romanian six-digit level are still too small to be reliable.[213]  Ancientree consumed 1,072 percent as much birch sawn wood during the POI than was imported by Romania overall.[214]
- While Ancientree agrees specificity is a critical component in SV selection, Commerce chose not to rely on the Romanian eight-digit HTS category because it considered the import volume too small to be commercial.
- Commerce should not rely upon the eight-digit HTS category suggested by the petitioner as it contains an even a smaller volume than the six-digit category.  If Commerce must

---

[208] *See* Petitioner's Case Brief, "Case Brief Regarding General and Ancientree-Specific Issues," dated December 17, 2019 (Petitioner December 17 Case Brief) at 33; *see also* Petitioner's December 26 Rebuttal Brief at 5-8.

[209] *See* Petitioner December 26 Rebuttal Brief at 8.

[210] *See* Ancientree Case Brief at 1-10; and Ancientree's Rebuttal Brief, "Rebuttal Brief," dated December 26, 2019 (Ancientree Rebuttal Brief).

[211] *See* Ancientree Case Brief (citing Ancientree Pre-Preliminary Comments at 5).

[212] *Id.* at 8.

[213] *See* Ancientree Case Brief at 7 (citing Preliminary SV Memorandum at 3e).

[214] *See* Ancientree Case Brief at 7 (citing Ancientree's Letter, "Section C & D Questionnaire Response," dated July 19, 2019 (Ancientree July 19, 2019 DQR) at exhibit D-2.1).

rely upon Romanian values, it must proceed with the six-digit HTS level due to the import quantity.

**Commerce's Position**:  We agree with the petitioner that there is no basis for using different SVs for the mandatory respondents in this proceeding to value the same input.  However, we note that we inadvertently valued the birch and poplar inputs for Foremost at the eight-digit level when we stated in the *Preliminary Determination* that we intended to value poplar and birch sawn wood inputs at the six-digit level.[215]  We have corrected this error for the final determination.

As explained above in Comment 6, Commerce applies certain criteria in determining whether certain SVs are aberrational or unreliable for purposes of calculating an AD margin. Specifically, our practice is to compare the SVs in question to the GTA AUVs calculated for the same period in other potential surrogate countries, to the extent that such data are available, and also to examine data from the same HTS category for the surrogate country over multiple years to assess whether the data are aberrational in a historical context.[216]  No interested party provided such data so that we may undertake an informed and reasonable analysis of the reliability of these particular Romanian SVs.  Furthermore, the CIT has held that, "…when faced with a choice between two imperfect options, it is within Commerce's discretion to determine which choice represents the best available information."[217]  Accordingly, we cannot conclude that the Romanian import values are aberrational or otherwise unusable for this final determination. Consequently, when presented with these two choices (Romania or Malaysia data to value the FOP), we find it appropriate to select the option from our primary surrogate country, which is Romania.

In the *Preliminary Determination*, we stated that "Ancientree merely asserts that the Romanian import values are based on insignificant and non-commercial quantities, but does not identify a basis for evaluating when an import volume becomes an insignificant or no longer commercial quantity."[218]  In its case brief, Ancientree averred that in its pre-preliminary comments it "also explained that the import volume into Romania was non-commercial (1) based on the common commercial quantity of a container load and (2) based on its own commercial consumption and purchasing."[219]  However, Ancientree's pre-preliminary comments were based on the quantities suggested by the petitioner at the eight-digit HTS subheading and not the six-digit level that we used in the *Preliminary Determination*.  Moreover, merely pointing to the relative difference between an import quantity and an interested party's own consumption or the common commercial quantity of a standard container load does not necessarily make a quantity commercially insignificant, nor does it speak to the reliability of such an import value.[220]

---

[215] *See Preliminary Determination* PDM at 13.

[216] *See, e.g.*, *Carbazole Violet Pigment* IDM at Comment 4; *Lined Paper Products* IDM at Comment 5; *Lightweight Thermal Paper* IDM at Comment 10; and *Saccharin* IDM at Comment 5.

[217] *See CS Wind Vietnam Co., Ltd. and CS Wind Corporation v. United States*, Slip Op. 14-33 at 26 (CIT 2014) (citing *Dorbest Ltd. v. United States*, 30 CIT 1671, 1687, 462 F. Supp. 2d 1262, 1277 (CIT 2006)).

[218] *See Preliminary Determination* PDM at 12.

[219] *See* Ancientree Case Brief at 6 (citing Ancientree Pre-Preliminary Comments at 5).

[220] *See, e.g.*, *Certain Frozen Warmwater Shrimp from the People's Republic of China:  Final Results of Administrative Review; 2011-2012*, 78 FR 56209 (September 12, 2013), and accompanying IDM at Comment 4; and

Although Ancientree points to *Juancheng Kangtai* for the proposition that Commerce must consider the respondent's actual purchasing and consumption in surrogate country selection,[221] as explained above in Comment 6, we disagree that the decision in *Juancheng Kangtai* compels a one-dimensional comparison between a respondent's consumption and the import quantities under consideration.  Rather, the record in *Juancheng Kangtai* allowed Commerce to conduct a detailed analysis of the quantities, and AUVs, in other countries on the surrogate country list,[222] and the CIT ultimately sustained Commerce's conclusion in *Juancheng Kangtai II* that an allegedly small quantity was, in fact, a commercial quantity.[223]

We acknowledge Ancientree's argument that valuing birch and poplar at the Romanian HTS six-digit level does not cure the perceived problem because the import quantities at that level remain small.[224]  However, using the average wood densities of birch and poplar reported by Ancientree,[225] the Romanian quantities at the six-digit level for birch and poplar were equal to 173,530 kg and 137,700 kg, respectively, which do not appear to be immaterial, nor has Ancientree explained by what metric, other than relative to its own consumption, such volumes would be considered insignificant.  In the *Preliminary Determination*, we stated that Ancientree's claim is based solely on a comparison of the Romanian and Malaysian import quantities, an analysis, which alone, we find to be of limited value, and that "information on the import quantities or values for other countries on the surrogate country list would be more probative."[226]  We further stated that no parties submitted such data for us to evaluate.[227]  In light of the complete lack of evidence in this regard, Commerce has no basis to conclude that the AUVs computed using those quantities are unreliable.  That said, it is important to recognize that Commerce does not directly use the import quantities at issue in its SV calculations, other than as the denominators when computing per-unit values.  As noted above, Ancientree has not argued, nor has it provided any reason for Commerce to believe, that the values associated with those quantities are in any way unrepresentative of the prices that Ancientree itself would pay, were it located in an ME country at a comparable level of economic development to China.

Finally, Ancientree argues that Commerce sacrificed specificity in resorting to the six-digit level HTS subheading because such subheadings include wood that is "sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded, or end-jointed of a thickness exceeding 6 mm."[228]  However, after examining the data on the record, we disagree.  Although Ancientree asserts that its "wood inputs are not planed or end-jointed" (and, therefore, reliance on such HTS subheadings includes dissimilar wood products)[229] Ancientree cites to no record evidence to support this claim, nor does the record appear to describe Ancientree's wood inputs in any detail

---

*Certain Preserved Mushrooms from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 77 FR 55808 (September 11, 2012), and accompanying IDM at Comment 3.
[221] *See* Ancientree Case Brief at 6-9.
[222] *See Juancheng Kangtai*, 2015 CIT LEXIS 94, *66-69.
[223] *See Juancheng Kangtai II*, 2017 CIT LEXIS 3, *26-31.
[224] *See* Ancientree Case Brief at 6-7.
[225] *See* Ancientree's September 6, 2019 Supplemental Questionnaire Response (Ancientree's September 6, 2019 SQR) at Exhibit 15.
[226] *See Preliminary Determination* PDM at 13.
[227] *Id.*
[228] *See* Ancientree Case Brief at 8.
[229] *Id.*

greater than "birch sawnwood" or "poplar sawnwood."[230]  In any event, there is no requirement
that Commerce needs to perfectly replicate a NME respondent's production experience.[231]
Given the lack of detail provided by Ancientree in its questionnaire responses regarding the
physical characteristics of its wood inputs, the record lacks support for Ancientree's assertions
and there is no basis for Commerce to rely on them here.  The burden to develop the record lies
with the respondent,[232] and to accept Ancientree's claim as to the description of its wood input at
face value without any support at this late stage would be inappropriate.  On the other hand,
Foremost reported that it purchased both poplar sawnwood and semi-finished wood components
(*e.g.*, cut-to-length poplar),[233] and it provided no additional detail regarding its birch sawnwood
input.  Therefore, we find that the six-digit level poplar HTS subheading is, in fact, the most
appropriate subheading by which to value Foremost's poplar input and, absent any additional
detail, we cannot conclude that an eight-digit level HTS subheading would be any more specific
or appropriate than the six-digit HTS subheading level for Foremost.

Accordingly, we are making no changes to the valuation of wood inputs at the six-digit level as
stated in *Preliminary Determination*.  However, because we inadvertently valued Foremost's
birch and poplar inputs using the eight-digit HTS numbers, we are revising the valuation of
Foremost's birch and poplar inputs to conform with our decision in the *Preliminary
Determination* for this final determination.[234]

## Comment 8:  Calculation of Financial Ratios

In the *Preliminary Determination* we valued the respondents' financial ratios using the audited
financial statements of Sigstrat because we found its statements to "represent the financial
position of a profitable Romanian producer of comparable wooden products (*i.e.*, plywood,
chairs, tables) that explicitly identify energy costs, are contemporaneous and cover the entire
POI, and contain no evidence of countervailable subsidies."[235]  In order to segregate energy
costs, and thereby ensure that we did not double count when valuing the respondents' energy
FOPs, we deducted energy expenses identified in Sigstrat's profit and loss statement from its
indirect production expenses identified in Note 7 to the statements.[236]

*Petitioner Case Brief*[237]
   • Commerce should not have deducted "Other outside expenses (with energy and water)"
     of 1,534,472 Romanian lei from the factory overhead category.

---

[230] *See, e.g.*, Ancientree's September 18, 2019 Supplemental Questionnaire Response at Exhibit 12; and Ancientree
July 19, 2019 DQR at Exhibits 3 (production flowchart) and 4 (FOP Spreadsheet).
[231] *See Juancheng Kangtai II*, 2017 Ct. Intl. Trade LEXIS 3, at 31 (citing *Nation Ford Chem. v. United States*, 166
F. 3d 1373, 1378 (Fed. Cir. 1999)).
[232] *See, e.g., QVD Food*, 658 F. 3d at 1324 ("{T}he burden of an adequate record lies with {interested
parties} and not with Commerce.").
[233] *See* Foremost July 22, 2019 CDQR, section D, at 14-15.
[234] *See* Final SV Memorandum.
[235] *See Preliminary Determination* PDM at 13-14.
[236] *See* Preliminary SV Memorandum at Attachment 12; *see also* Sigstrat Statements.
[237] *See* Petitioner December 17 Case Brief at 32-33.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

- There is no reason to assume that energy costs formed part of "Indirect Production Costs" because these two categories of expenses came from different calculations in the statements.
- "Indirect Production Costs" are identified in Note 7, while "Other outside expenses (with energy and water)" are located in the profit and loss statement.
- Based on the category name, "Other outside expenses (with energy and water)" seem to include other costs in addition to energy and water.

No other interested party provided comments on this issue.

**Commerce's Position:** We disagree with the petitioner and continue to find that we calculated the financial ratios used in the *Preliminary Determination* correctly and that we appropriately reduced "Indirect Production Costs" by an amount for energy expenses.[238]

Although the petitioner argues that our adjustment was inappropriate because the energy costs in question did not come from the same schedule in Sigstrat's financial statements as the indirect production expenses (*i.e.*, energy was identified in the profit and loss statement while indirect production expenses were in note 7),[239] our calculations are nearly identical to those proposed by the petitioner but for the deduction of energy costs from indirect production costs.[240] However, because the petitioner's own calculation utilized data from the profit and loss statement, the balance sheet, and Note 7 of the Sigstrat statements, the fact that we deducted energy expenses identified in the profit and loss statement from indirect production expenses identified in a note to the statements in and of itself does not render the calculation inappropriate.

The petitioner appears to argue against our adjustment simply on the grounds that we deducted one value from the profit and loss statement from a value located in a separate note to the financial statements. However, the petitioner ignores the fact that its own calculations also incorporated values from various schedules of the statements. In order to determine how Sigstrat presented these expenses and how they should be treated in our calculation, we examined the statements as a whole, a process also used by the petitioner when it pulled data from various schedules in order to calculate financial ratios. The only difference between the petitioner's calculation and Commerce's calculation is the treatment of energy expenses.

Specifically, a line item described as "Other outside expenses (with energy and water)" is set forth in Note 7 of the financial statements. These expenses are also identified in the same amount elsewhere in the statements specifically as "Energy costs."[241] Accordingly, we disagree with the petitioner that this expense item necessarily includes costs other than energy because the cash flow statement explicitly identifies this item as "Energy costs." Moreover, the amount identified as "Indirect Production Costs" from which we deducted the energy costs is also identified elsewhere in the statements in the same amount as "Production overheads."[242] Accordingly, record evidence indicates that we appropriately categorized indirect production

---

[238] *See* Preliminary SV Memorandum.
[239] *See* Sigstrat Statements.
[240] *Id.* at Exhibit 10A; compare to Preliminary SV Memorandum at Attachment 12.
[241] *See* Sigstrat Statements at 12 (Situation of Cash Flows).
[242] *Id.* at Exhibit page 64 (Note 4, Operating Result Analysis).

45

expenses as manufacturing overhead, which represent all manufacturing costs that are not direct materials or direct labor and are indirect to the manufacturing operation of the company, and appropriately reduced that amount by Sigstrat's energy costs.  Therefore, we are not making any changes to our calculation of the financial ratios for this final determination.

## Comment 9:  Labor Rate Calculation

In our *Preliminary Determination*, we calculated the hourly labor rate using manufacturing-specific data from Romania.[243]  We relied on manufacturing-specific labor data from the website Trading Economics.  We calculated a manufacturing-specific labor rate of 20.97 Lei per hour.

*Petitioner Case Brief*[244]
- In order to calculate an hourly labor rate in the *Preliminary Determination*, Commerce divided the monthly wages reported for Romania on the website Trading Economics by 24 days and eight hours per day.
- Data submitted from the Organization for Economic Cooperation and Development (OECD) data indicate that the actual number of hours worked in Romania is much less.
- Commerce's calculation overestimates the average number of hours worked per month because it does not account for vacation days, sick days, idle time, or holidays.
- Commerce should revise its labor calculation using the number of hours worked reported by the OECD.

*Ancientree Rebuttal Brief*[245]
- It is not Commerce's practice to use a secondary, unrelated source to determine an hourly conversion.  Commerce should not depart from its established practice of using the typical working hours of 24 days a month and eight hours day.
- The proposed OECD annual labor hours are not specific to Romania; instead, they are from a basket category of OECD countries.
- Relying on the OECD source would be inaccurate and imprecise.

**Commerce's Position:**  Our labor rate calculation was appropriate and in accordance with our normal practice.  In *Labor Methodologies*, Commerce announced a change in our methodology for valuing the cost of labor in NME cases.[246]  Although Commerce stated a preference for data from the International Labor Organization, it did not preclude reliance on data from another source.[247]  Notably, Commerce explained that "{w}here data is not available on a per-hour basis, {Commerce} converts that data to an hourly basis based on the premise that there are 8 working hours per day, 5.5 working days a week and 24 working days per month."[248]  Accordingly, in the *Preliminary Determination*, we divided the monthly manufacturing labor rate in Romania by 24

---

[243] *See* Preliminary SV Memorandum at 4.
[244] *See* Petitioner December 17 Case Brief at 30-32.
[245] *See* Ancientree Rebuttal Brief at 14-15.
[246] *See Antidumping Methodologies in Proceedings Involving Non-Market Economies:  Valuing the Factor of Production:  Labor*, 76 FR 36092 (June 21, 2011) (*Labor Methodologies*).
[247] *Id.*
[248] *Id.* at 36094, fn. 11.

days and eight hours per day, in accordance with our practice.[249]  Using the OECD data suggested by the petitioner for "countries not otherwise mentioned" would substitute our methodology for a methodology that is not specific to Romania and that utilizes secondary sources that are unrelated to the source used to value labor.  In *Labor Methodologies*, Commerce announced a change in our methodology for valuing the cost of labor in NME cases.[250] Although Commerce stated a preference for data from the International Labor Organization, it did not preclude reliance on data from another source.[251]  Notably, Commerce explained that "{w}here data is not available on a per-hour basis, {Commerce} converts that data to an hourly basis based on the premise that there are 8 working hours per day, 5.5 working days a week and 24 working days per month."[252]  Accordingly, in the *Preliminary Determination*, we divided the monthly manufacturing labor rate in Romania by 24 days and eight hours per day, in accordance with our practice.[253]  Using the OECD data suggested by the petitioner for "countries not otherwise mentioned"[254] would substitute our methodology for a methodology that is not specific to Romania and that utilizes secondary sources that are unrelated to the source used to value labor.  Furthermore, the petitioner has not demonstrated that the labor rate reported by Trading Economics does not account for vacation days, sick days, or holidays, or that workers are not paid for such days.

Therefore, we continue to find that our calculation of the hourly labor rate applied in the *Preliminary Determination* using monthly manufacturing labor data published by Trading Economics was the appropriate calculation and in accordance with our normal practice. Accordingly, we are not making any changes to our labor rate calculation for this final determination.

---

[249] *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 FR 35616 (July 27, 2018), and accompanying IDM at Comment 11.
[250] *See Labor Methodologies*.
[251] *Id.*
[252] *Id.* at 36094, fn. 11.
[253] *See, e.g.*, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 FR 35616 (July 27, 2018), and accompanying IDM at Comment 11.
[254] Although the petitioner claims that the number of hours worked is on the record of this investigation, it cites to data for "OECD countries not individually mentioned," not to data specific to Romania and no data exist for Romania in the petitioner's cited comments.  *See* Petitioner December 17 Case Brief at 31; *see also* Petitioner SV Comments at Exhibit 5C.

<u>Company-Specific Comments</u>

*Ancientree*

## Comment 10: Whether to Apply AFA to Ancientree

### A. Usage Rates

*Petitioner Case Brief*[255]
- The stark differences between the NVs calculated for Ancientree and Foremost – especially with respect to labor and wood input usage rates – demonstrate that Ancientree failed to provide complete and accurate information.
- It is unclear how Ancientree produces cabinets and vanities using the reported number of labor hours.  The marked disparity between Foremost's and Ancientree's reported per-unit labor hours holds consistent at comparable production stages of completeness.
- Similarly, Ancientree's solid wood input usage is strikingly different when compared to Foremost's solid wood input usage at comparable production completeness levels.
- Ancientree's misrepresentation of its production process and material inputs warrants the application of total AFA, consistent with Commerce's established practice.[256]

*Ancientree Rebuttal Brief*[257]
- The petitioner's argument is fundamentally flawed because Ancientree and Foremost reported FOP consumption on a per piece basis.  Thus, comparing the products produced by Ancientree and Foremost merely demonstrates the differing input consumption levels for their respectively different products.
- Ancientree primarily produces parts or components or small ready-to-assemble kits instead of fully assembled large cabinets.  Foremost primarily produces fully-assembled bathroom vanities, a highly labor-intensive activity.  Foremost's vanities are much larger, more decorative, and complicated than Ancientree's.  The inclusion of decorative parts adds correspondingly more labor hours.
- Foremost's consumption of veneers required a separate, time-consuming production process.  Ancientree purchased veneered plywood so it did not have this step.[258]
- Commerce observed that Ancientree's production process was mostly automatic, with the extensive reliance on production equipment.  Laborers primarily direct materials through the machinery rather than manually adding parts or decorative pieces.
- At verification, Commerce found no discrepancies or concerns with Ancientree's labor consumption and Commerce examined all source documentation for direct and indirect labor.

---

[255] *See* Petitioner December 17 Case Brief.
[256] *Id.* at 7 (citing *Certain Kitchen Appliance Shelving and Racks from the People's Republic of China*, 74 FR 36656 (July 24, 2009) (*Kitchen Racks from China*), and accompanying IDM).
[257] *See* Ancientree Rebuttal Brief at 2-5.
[258] *Id.* at 4.

48

**Commerce's Position**:  We disagree with the petitioner.  Although the petitioner and Ancientree agree that the record demonstrates marked differences between Ancientree's and Foremost's usage rates and processes,[259] these companies have distinct production processes and end products.[260]  As a result, such differences are to be expected.  The fundamental question before Commerce is whether Ancientree's FOP reporting understates the consumption of its labor and wood inputs.  In this regard, the record does not support the petitioner's claim.

The record shows that Ancientree reported its material input consumption on a net weight basis of finished goods.[261]  Ancientree also reported FOPs for a substantial number of ready-to-assemble products, which by definition, do not require full assembly by Ancientree.[262]  We conducted a comprehensive on-site facility visit and found that Ancientree had accurately described its factory layout and production stages in its questionnaire responses.[263]  Further, Commerce verified Ancientree's allocation of material inputs to subject merchandise,[264] as well as its reported FOPs for plywood and birch sawn wood used to produce various individual products.  During this exercise, we found no discrepancies between the source documentation examined at verification and the information Ancientree had reported to Commerce.[265]

We disagree that the facts in *Kitchen Racks from China* are analogous.  In that case, Commerce found inconsistencies with the respondent's bills of materials and production note reporting at verification.[266]  In this investigation, we found no inconsistencies at verification that lead us to believe the application of AFA is similarly warranted.

As discussed above, it is unsurprising that Ancientree and Foremost reported differences in their material and labor FOPs, given their differing production processes.  Because the petitioner provides no record evidence to contradict Ancientree's reported FOP consumption, we find that AFA is not warranted here.

### B.  Wood Veneer

*Petitioner Case Brief*[267]
- Ancientree failed to report the usage of wood veneer in its production process and this omission could explain the outlying labor and wood usage rates.  Ancientree also failed to report any usage of veneered MDF.
- Commerce verified the delivery state of Ancientree's plywood.  This observation contradicts Ancientree's questionnaire responses reporting the use of plywood, not plywood with specific finished face veneers.  Sales documentation also supports the non-reporting of veneered inputs.

---

[259] *Id.* at 2-5; *see also* Petitioner December 17 Case Brief at 9-16.
[260] *See* Ancientree Verification Report at 8; *see also* Foremost Woodwork Verification Report at 11 and Exhibit 13.
[261] *See* Ancientree September 6, 2019 SQR at 22.
[262] *See* Ancientree September 6, 2019 SQR at Exhibit SQ3-1.1.
[263] *See* Ancientree Verification Report at 8.
[264] *Id.* at 18.
[265] *Id.* at 15.
[266] *See Kitchen Racks from China* IDM at Comment 16.A.
[267] *See* Petitioner December 17 Case Brief at 17-27.

49

- The cost for a wood product varies considerably by the species of the wood input.[268] Ancientree's failure to separately report the cost of wood veneers prevents Commerce from accounting for the substantial differences across wood veneer species by selecting an appropriate SV.
- In the event that total AFA is not applied to Ancientree, Commerce should use facts available and adjust the NV calculation to include wood veneer as an input.  This adjustment to Ancientree's SVs will properly account for the used veneered inputs separately from plywood or MDF.

*Ancientree Rebuttal Brief*[269]
- Plywood is defined as a generally flat, multilayered plywood or other veneered panel, consisting of two or more layers or plys of wood veneers and a core, with the face and/or back veneer made of wood.  The veneers, along with the core, may be glued or otherwise bonded together.[270]
- Ancientree purchased plywood (including some veneer plywood and some veneered MDF); it did not purchase plywood and apply veneers to that plywood.  Contrary to the petitioner's argument that Ancientree failed to separately report veneered MDF, Ancientree reported veneered MDF as plywood.
- To argue that Ancientree necessarily consumes wood veneer in order to sell a veneer-finished product is the same as arguing that a company selling galvanized steel products must consume galvanized powder (instead of already galvanized steel).  Similarly, Ancientree purchased and consumed plywood with a face veneer when the merchandise required a veneer finish.[271]
- The petitioner misinterprets the definition of plywood; there is no distinction between plywood and veneered plywood.  Plywood normally contains a face and back veneer, with a core in the middle.
- Heading HTS 4412 includes "plywood, veneered panels and similar laminated wood," and Commerce applied the SV including plywood with an outside veneer of various species of wood including birch, poplar or walnut.
- Contrary to the petitioner's argument that Ancientree failed to separately report veneered MDF, Ancientree reported veneered MDF as plywood.

**Commerce's Position**:  We are not adjusting Ancientree's FOPs to account for veneers separately from plywood or MDF.  The petitioner alleges that Ancientree failed to report that it uses "wood veneer" as an input in its production process.  However, the record contains no evidence that Ancientree purchased veneers separately from its purchases of plywood as alleged

---

[268] *See* Petitioner December 17 Case Brief at 20 (citing Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Pre-Preliminary Comments for Meisen," dated September 26, 2019 (Petitioner Meisen Pre-prelim Comments) at Exhibit 7).

[268] *Id.* (citing Exhibit 7).

[269] *See* Ancientree Rebuttal Brief at 6.

[270] *Id.* (citing *Certain Hardwood Plywood Products from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in part,* 82 FR 53460 (November 16, 2017) (*Certain Hardwood Plywood Products*), and accompanying IDM at 3).

[271] *Id.*

50

by the petitioner.  The record also does not support the petitioner's claim that Ancientree's manufacturing process involves a veneering procedure.

In its response, Ancientree indicated it used plywood of a type that could be imported under HTS category 4412.33.[272]  In its initial, and various supplemental, questionnaire responses, Ancientree consistently reported its plywood FOP without separately indicating that it used veneers in its production process.[273]  The SV used to value Ancientree's plywood FOP in the *Preliminary Determination*, taken from HTS category 4412.33.00, was suggested by the petitioner.[274]  The heading for this HTS reads, "Plywood, veneered panels, and similar laminated wood."[275]  Thus, the definition of plywood in the HTS includes veneers as an integral characteristic of plywood.[276]  That the petitioner would request Commerce to separately value Ancientree's veneers, which are by definition part of the plywood input it purchases, is not supported by the record or the definition of plywood in the applicable HTS category.

During verification, we carefully reviewed Ancientree's production process; we found no evidence that Ancientree adds veneers separately to its plywood input during the production process of subject merchandise.[277]  Further, during our review of Ancientree's FOP consumption at verification, we reviewed documentation supporting Ancientree's September 2018 plywood purchases, as well as Ancientree's consumption of plywood in August 2018.[278]  We similarly found no evidence that Ancientree separately purchased or consumed veneers during the POI.

The petitioner argues that the species of veneer is an integral part of cost, and Ancientree's failure to separately report wood veneers prevents Commerce from capturing substantial differences across wood veneer species in its analysis.  However, HTS category 4412.33.00, the category suggested by the petitioner to value Ancientree's plywood FOPs, is described as "Other, with at least one outer ply of non-coniferous wood of the species alder (Alnus spp.), ash (Fraxinus spp.), beech (Fiigus spp.), birch (Betula spp.), cherry (Prunus spp.) chestnut (Castintea spp.), elm (Uhnus spp.), eucalyptus (Eucalyptus spp.), hickory (Carya spp.), horse chestnut (Aesculus spp.), lime (Tilia spp.), maple (Acer spp.) oak (Quercus spp.), plane tree (Platitnu,c spp.), poplar and aspen (Populus spp.) robinia (Robinia spp.) tulipwood (Liriodendron spp.) or walnut (Juglans Slip.)."[279]  This HTS subheading matches the description of Ancientree's plywood inputs on its source documentation; this documentation provides the wood species of the veneer used on the plywood.[280]  Therefore, contrary to the petitioner's arguments, the wood

---

[272] *See* Ancientree September 18, 2019 SDQR at Exhibit SQ 4-12.
[273] *Id.* at SQ4-10 and Exhibit SQ4-12; *see also* Ancientree Rebuttal Brief at 5-10.
[274] *See* Petitioner SV Comments at exhibit 1.
[275] *See* Petitioner SV Comments at exhibit 3.
[276] This definition is also consistent with the definition adopted by Commerce in *Certain Hardwood Plywood Products*.  *See Certain Hardwood Plywood Products* IDM at 6-7, which states that "the face veneer of hardwood plywood may be sanded; smoothed, or given a "distressed" appearance through such methods as hand-scraping or wire brushing."  *See also Certain Hardwood Plywood Products*, 82 FR at 53470.
[277] *See* Ancientree Verification Report at 8.
[278] *Id.* at 15 and 18.
[279] *See* Petitioner SV Comments at exhibit 3.
[280] *See* Ancientree September 6, 2019 SQR at exhibit SQ3-1.1.

51

species of the veneered plywood is taken into account by Commerce's reliance on this HTS subheading.[281]

For the final determination, we find that the record evidence does not support that Ancientree omitted consuming wood veneer separately from plywood.  Therefore, we have accepted Ancientree's FOPs for this input as reported.

## Comment 11: Treatment of Jiangsu Hongjia as an Affiliate

*Petitioner Case Brief*[282]
- Commerce found a close relationship between Ancientree and Jiangsu Hongjia, the entity from which Ancientree rents its facility and production equipment and purchases wood materials, and with whom Ancientree shares management.
- Ancientree self-describes its relationship with Jiangsu Hongjia as "closely affiliated companies."  Ancientree filed company certifications on behalf of all of its affiliated companies including Jiangsu Hongjia.
- It appears that Jiangsu Hongjia simply purchases wood materials and hands them over to Ancientree.  This arrangement could exist to hide Ancientree's purchases of inputs from ME countries.
- Commerce erred in preliminarily determining that Ancientree and Jiangsu Hongjia are not affiliated and should reverse its decision, consistent with section 771(33) of the Act.

No other interested party commented on this issue.

**Commerce's Position**:  We have reconsidered the evidence on the record and find that affiliation exists between Ancientree and Jiangsu Hongjia.  Section 771(33) of the Act provides that the following persons shall be considered to be "affiliated" or "affiliated persons":

(A)   Members of a family, including brothers and sisters (whether by the whole or half-blood), spouse, ancestors, and lineal descendants;
(B)   Any officer or director of an organization and such organization;
(C)   Partners;
(D)   Employer and employee;
(E)   Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization;
(F)   Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person; or,
(G)   Any person who controls any other person and such other person.

The Act further states that "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."[283]

---

[281] *See* Petitioner December 17 Case Brief at 18-20.
[282] *Id.* at 27-30.
[283] *See* section 771(33) of the Act.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

"Person" is defined to include "any interested party as well as any other individual, enterprise, or entity, as appropriate."[284]

The SAA states the following:

> The traditional focus on control through stock ownership fails to address adequately modern business arrangements, which often find one firm 'operationally in a position to exercise restraint or direction' over another in the absence of an equity relationship. A company may be in a position to exercise restraint or direction, for example, through corporate or family groupings, franchise or joint venture agreements, debt financing, or close supplier relationships in which the supplier or buyer becomes reliant upon the other.[285]

Section 351.102(b)(3) of Commerce's regulations defines affiliated persons and affiliated parties as having the same meaning as in section 771(33) of the Act.  In determining whether control over another person exists, within the meaning of section 771(33) of the Act, Commerce will consider the following factors, among others:  corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships.  Commerce will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product.  Commerce will consider the temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control.[286]

As an initial matter, we note that we based our *Preliminary Determination* on record evidence at the time.[287]  On October 10, 2019, after the *Preliminary Determination*, we issued a supplemental questionnaire to Ancientree requesting further information regarding the familial relationship between Ancientree and Jiangsu Hongjia.[288]  In its response, Ancientree provided further details on the familial relationship between the owners and managers of Ancientree and Jiangsu Hongjia.[289]  The CIT has upheld Commerce's interpretation of "any person"  in section 771(33)(A) of the Act as encompassing "family," and the position that "family" is not limited to the roles enumerated in section 771(33)(A) of the Act, but rather is subject to Commerce's interpretation.[290]  Commerce may interpret the definition of "family" in section 771(33)(A) of

---

[284] *See* 19 CFR 351.102(b)(37).
[285] *See* SAA at 838.
[286] *See* 19 CFR 351.102(b)(3).
[287] *See Preliminary Determination* PDM at 26-27.
[288] *See* Commerce's Letter, "Supplemental Questionnaire," dated October 10, 2019.
[289] *See* Ancientree's October 17, 2019 Fifth Questionnaire Response (Ancientree October 17, 2019 Response) at 1-3. The details of the familial relationship are considered business proprietary in nature.  For further discussion *see* Ancientree Final Analysis Memorandum.
[290] *See Ferro Union Inc. v. United States*, 44 F. Supp. 2d 1310, 1325-1326 (CIT 1999) (*Ferro Union*) ("The intent of {section 771(33) of the Act} was to identify control exercised through 'corporate' or 'family' groupings.  By interpreting 'family' as a control person {Commerce} was giving effect to that intent."); *see also Dongkuk Steel Mill Co., v. United States*, 29 C.I.T. 724, 731 (CIT 2005).

the Act in a reasonable manner.[291]  For this final determination, we find that the record of this investigation, developed since the *Preliminary Determination*, shows that due to a close familial relationship, Ancientree and Jiangsu Hongjia are affiliated pursuant to section 771(33)(A) of the Act.[292]

Given that we did not find the companies to be affiliated parties until this final determination, the record does not contain information on Jiangsu Hongjia's purchases of raw materials, including the source of those materials.  However, if an AD order is issued in this proceeding and Ancientree is involved in subsequent reviews of this order, we intend to collect such information and evaluate it within the context of Commerce's NME practice.

## Comment 12:  SV Selections

### A.  Glue

*Ancientree Case Brief*[293]
- In the *Preliminary Determination*, Commerce valued Ancientree's glue input based on Romanian import prices entered under HTS 3506.10.00, a value for glue sold at the retail level, not exceeding a net weight of 1 kg.  Valuing glue used for industrial purposes using an HTS category specific to retail is inherently illogical.  Commerce observed Ancientree's industrial glue consumption during verification and saw that its consumption of glue was over 1 kg.
- Commerce should value its glue input using HTS category 3506.91.90, covering glues not otherwise specified, *i.e.* glue not for retail sale and in quantities larger than 1 kg.
- Commerce used HTS category 3506.91.90 to value Foremost's glue input used in its assembly operations, yet Foremost consumes this glue in the same manner as Ancientree.

No other interested party provided comments on this issue.

**Commerce's Position**:  We have relied on Romanian GTA data under subcategory HTS 3506.91.90 to value Ancientree's glue input because the data in this HTS subcategory represents the best available information on the record.  Specifically, Ancientree's suggested subheading HTS 3506.91 is specific to "adhesives based on polymers of headings 3901 to 3913 or on rubber."[294]  The notes to chapter 39 of the HTS state that:

> 3.  Headings 3901 to 3911 apply only to goods of a kind produced by chemical synthesis, falling in the following categories:  a) liquid synthetic polyolefins of which less than 60

---

[291] *See Ferro Union*, 44 F. Supp. 2d 1310,1325 ("The word 'including' in section (A) of 19 U.S.C. § 1677(33) is an indication that Congress did not intend to limit the definition of 'family' to the members listed in this section.  Had Congress intended this list to be definitive, it would have chosen different wording.  The wording it did choose evinces an illustrative intent.  Commerce's interpretation of this section is reasonable and therefore not subject to reversal by the court.").

[292] Given that the particular familial relationship constitutes business proprietary information, we discuss this separately in the Ancientree Final Analysis Memorandum.  *See* Ancientree Final Analysis Memorandum.

[293] *See* Ancientree Case Brief at 12-13.

[294] *See* Petitioner SV Comments at Exhibit 3.

% by volume distils at 300 °C, after conversion to 1 013 mbar when a reduced pressure distillation method is used (headings 3901 and 3902); (b) resins, not highly polymerised, of the coumarone-indene type (heading 3911); (c) other synthetic polymers with an average of at least five monomer units; (d) silicones (heading 3910); (e) resols (heading 3909) and other prepolymers.[295]

Therefore, based on the information provided by Ancientree on its glue input, and the SV data on the record, we find that the record supports changing the SV to value Ancientree's glue input using HTS subheading 3506.91.90.

However, we disagree with Ancientree that we should rely on this HTS category simply because we valued Foremost's glue input.[296]  As discussed in Comment 10.A above, Ancientree and Foremost have different production process and produce different products.  Ancientree provided no record evidence that the glue it uses is the same glue used by Foremost.  Our basis for changing the HTS subheading to value Ancientree's glue is based on Ancientree's production process only and the information provided with respect to Ancientree.

### B.  MDF

*Ancientree Case Brief*[297]
- Commerce relied on HTS category 4411.14.90 to value Ancientree's MDF input.  This category is the basket "other" category covering MDF, not specified earlier under HTS category 4411.14.
- The HTS more specific to Ancientree's input, and which Commerce should use to value its MDF input, is HTS category 4411.14.10, covering "medium density fiberboard of wood, of a thickness > 9 Mm, not mechanically worked or surface-covered."  Ancientree consumes unworked or merely surface covered MDF that undergoes further processing during its production process.  The HTS category 4411.14.90 technically excludes Ancientree's MDF since it covers those not already specified.
- Foremost also provided the same HTS category, 4411.14.10, indicating this is a normal industry standard.

*Petitioner Rebuttal Brief*[298]
- Ancientree fails to cite to source documentation on the record supporting its assertion that its MDF is unprocessed at the time of acquisition.
- Ancientree's product brochure indicates that its MDF cabinets include a "matching laminate exterior."[299]  If this laminate overlay exists, then the assumption is that fiberboard and MDF are sold in a laminated state to Ancientree.  Thus, Commerce's use

---

[295] *Id*. at Chapter 39, note 3.
[296] *See* Ancientree Case Brief at 13.
[297] *Id.*
[298] *See* Petitioner December 26 Rebuttal Brief at 18-21.
[299] *Id.* at 20 (citing Ancientree's July 3, 2019 Section A Questionnaire Response (Ancientree July 3, 2019 AQR) at Exhibit A-5).

55

of the Romanian HTS category 4411.14.90 is appropriate since it covers products which
have had processing imparted to them.

**Commerce's Position:** An examination of the record does not support Ancientree's argument
that HTS category 4411.14.10 is the most accurate HTS category with which to value
Ancientree's MDF input. Ancientree reported that its MDF input falls under HTS category
4411.14.[300] Ancientree claims that the MDF consumed during the production of subject
merchandise is unworked or merely surface covered, and that it undergoes further processing.[301]
Ancientree concedes that the MDF it consumes in the production of subject merchandise *is*
surfaced covered.[302] Therefore, the HTS category Ancientree is suggesting, which specifically
excludes MDF that is surface-covered, is not the appropriate HTS category to value Ancientree's
MDF input. Ancientree failed to provide documentation demonstrating that HTS category
4411.14.10 specifically applies to the MDF input it consumes (*i.e.*, through input descriptions,
purchase invoices, or photographs of the input on the record).

Furthermore, as noted in Comment 12.A above, it would be inappropriate to change the HTS
category for Ancientree's MDF inputs based on the fact that Foremost provided the same HTS
category to value its own MDF inputs, given that the production process for these two companies
is dissimilar.[303] Because the record does not provide further detail on Ancientree's MDF input
characteristics, and because the record indicates that Ancientree's MDF inputs have "had
processing imparted to them," we have continued using HTS category 4411.14.90 for our final
determination.

### C. Paint

*Ancientree Case Brief*[304]
- In the *Preliminary Determination*, Commerce relied on data under HTS 3208.10.90,
  covering paints and varnishes dispersed or dissolved in a non-aqueous medium, to value
  Ancientree's paint inputs.
- Since Ancientree consumed paint that is dissolved in an aqueous medium, its paint input
  should be valued using HTS 3209.10, covering paints and varnishes "dispersed or
  dissolve in an aqueous medium."
- While conducting verification, Commerce observed Ancientree's paint type and also
  verified purchase invoices for "water-based paint."[305]

*Petitioner Rebuttal Brief*[306]
- The exhibit Ancientree cites to does not exclusively support Ancientree's claim that it
  uses water-based paint.

---

[300] *See* Ancientree September 18, 2019 SDQR at Exhibit SQ 4-12.
[301] *See* Ancientree Case Brief at 12.
[302] *Id.*
[303] *See* Foremost July 22, 2019 CDQR, at section D, Exhibits D-1 and D-6.1.
[304] *See* Ancientree Case Brief at 13.
[305] *Id.* (citing Ancientree's Verification Report at Exhibit 15).
[306] *See* Petitioner December 26 Rebuttal Brief at 21-22. The Ancientree Final Analysis Memorandum provides the
specifics of this argument, which rely on Ancientree's proprietary information.

- The totality of evidence should support Commerce's continued use of HTS 3208.10.90 in the final determination to value Ancientree's paint input.

**Commerce's Position:** We are continuing to value Ancientree's paint input using HTS category 3208.10.90. At verification, we tied the painting materials worksheet provided in Ancientree's response to the Ancientree's accounting ledgers and corresponding vouchers for September 2018.[307] We found no discrepancies between the information Ancientree had reported in its responses and the source documentation reviewed at verification. However, during verification, we did not observe any third-party source documentation or any other documentation regarding the chemical composition for Ancientree's paint input (*e.g.*, ingredient lists). The documentation on the record, specifically the translated portions, do not indicate which proportion, if any, of Ancientree's paint is water-based.[308] Therefore, because the record does not support Ancientree's claim that its paint is water based, we continue to find HTS category 3208.10.90 is the most appropriate HTS category to value Ancientree's paint input.

### D. Particleboard

*Ancientree Case Brief*[309]

- The SV used for Ancientree's particleboard input for the *Preliminary Determination*, HTS category 4410.11.90, represents the "other" category covering particleboard not specified earlier under HTS category 4410.11.[310]
- The more specific HTS category is actually 4410.11.10, covering, "Particle Board Of Wood, Whether Or Not Agglomerated With Resins Or Other Organic Binding Substances, Unworked Or Not Further Worked Than Sanded (Excl. Oriented Strand Board And Waferboard, Fiberboard And Cellular Wood Panels)."[311]
- Foremost also provided HTS category 4410.11.10 as specific to its consumed particleboard, indicating the HTS is an industry standard.
- Commerce should value Ancientree's particleboard using Romanian HTS category 4410.11.10 in its final determination.

*Petitioner Rebuttal Brief*[312]

- Ancientree does not cite to record source documentation to support its argument that HTS category 4410.11.10 is more appropriate for its particleboard input, given its assertion that particleboard is not processed at the time of acquisition.
- The particleboard input Ancientree uses may have a laminate overlay, which creates the assumption that the product input is more advanced than Ancientree alleges.[313]

---

[307] *See* Ancientree Verification Report at 18.
[308] *Id.* at Exhibit 15.
[309] *See* Ancientree Case Brief at 11.
[310] *Id.* (citing Preliminary SV Memorandum at Attachment 3b)
[311] *See* Ancientree Case Brief at 11 (citing Foremost Rebuttal SV Comments)).
[312] *See* Petitioner December 26 Rebuttal Brief at 18-21.
[313] *Id.* at 20 (citing Ancientree July 3, 2019 AQR at Exhibit A-5).

**Commerce's Position:**  The record evidence does not support valuing Ancientree's particleboard using HTS category 4410.11.10.  Ancientree did not cite record documentation supporting HTS 4410.10.10 as the category most specific to the input it used in its production process.  The proposed HTS category, 4410.11.10, "unworked or not further worked than sanded,"[314] is inappropriate, in light of Ancientree's statement that a characteristic of its particleboard is that it has a laminate overlay.[315]  Finally, as noted previously, it is immaterial that Commerce used a different HTS category to value Foremost's particleboard FOPs, given its different production process and product mix.[316]  Accordingly, we have continued to value Ancientree's particleboard using the Romanian GTA data for HTS category 4410.11.10.

*Foremost*

## Comment 13:  Combination Kits

Foremost reported that it sold "combination kits" in the United States during the POI.  Combination kits are wooden cabinets and vanities that include components that are explicitly excluded from the scope of this investigation (such as sinks, quartz countertops, *etc*.).  In the *Preliminary Determination*, we removed the portion of the price related to the non-subject components from our analysis using the relative material costs of the subject and non-subject components (also known as the "RATIO").[317]

At verification, we found that Foremost had made a number of mistakes when calculating the RATIO,[318] and it also failed to identify certain reported U.S. sales as combination kits.[319]

*Petitioner Case and Rebuttal Briefs*[320]
- Foremost failed to accurately calculate the price of combination kits because it:  (1) reversed the labels of its non-subject and subject components in the calculation worksheet used to compute the RATIO; (2) included subject components in its calculation of the non-subject component costs; (3) calculated the RATIO using total cost of manufacturing, not total cost of material inputs (as Commerce had requested in its supplemental questionnaire); and (4) failed to include all non-subject component parts in its calculations.  These errors are significant and demonstrate that the submitted data are unreliable.
- Due to the serious and pervasive nature of the issues, the information reported for combination kits cannot be considered verified.  Though Commerce did not observe errors when verifying transactions from the corrected worksheet at verification, it can be

---

[314] *See* Petitioner SV Comments at Exhibit 3.
[315] *See* Ancientree July 3, 2019 AQR at Exhibit A-5.
[316] *See* Foremost July 22, 2019 CDQR, at section D, Exhibits D-1 and D-6.1.
[317] For example, if Foremost sold a combination kit consisting of a vanity and a sink for $100, with the vanity materials costing $30 and the sink costing $10, we would use a price for the vanity in our analysis of $75 (or 100*30/40).
[318] *See* Foremost Woodwork Verification Report at 19-20.
[319] *See* Foremost Worldwide Verification Report at 9-10.
[320] *See* Petitioner's Case Brief, "Case Brief Regarding Foremost," dated January 20, 2020 (Petitioner January 20 Case Brief) at 3-10; and Petitioner's Rebuttal Brief, "Petitioner's Rebuttal Brief Regarding Foremost," dated January 27, 2020 (Petitioner January 27 Rebuttal Brief) at 8-12.

assumed that the corrected worksheet contains errors in the combination kit data not selected for examination.

- Further, reviewing only two products in a new worksheet provided at verification does not establish that all costs in the new worksheet are accurate because the dataset is permeated with errors.  Thus, the record does not indicate that Commerce verified the completeness and accuracy of the cost data and ratios for combination kits.

- In fact, Commerce should not accept the new worksheet provided at verification because it amounts to new factual information.  Additionally, it is not clear that the new worksheet corrected all of the errors identified at verification, *i.e.*, that not all non-subject components were included in the calculations, or that the ratio was calculated using total manufacturing costs and not just total raw material input costs.

- Commerce should base the margin for all sales of combination kits, including the ones identified for the first time as combination kits at verification, on AFA.  As AFA, Commerce should apply the highest dumping margin to all sales of combination kits in the U.S. sales database.  Foremost did not put forth its maximum effort in reporting combination kits and it should not benefit from its failure to cooperate.

- Commerce should reject the new methodologies provided by Foremost in its brief for calculating RATIO for EP sales (*see* below).

*Foremost Case and Rebuttal Briefs*[321]

- Commerce's initial questionnaire did not provide instructions for reporting pricing data for combination kits.  Even so, Foremost provided three potential methodologies for Commerce to use to determine the prices of combination kits.

- All of the errors Commerce found with respect to combination kits were minor, and Commerce verified both the complete list of combination kit product codes and the completeness and accuracy of the cost data used to calculate the RATIO for all CEP combination kits.  Commerce has all of the information it needs on the record to adjust its calculations to account for these errors.

- At verification, Foremost discovered that it had erroneously reported certain EP sales as non-combination kits.  In its final determination, Commerce should apply an average RATIO to the combination kits sold to EP customers.

- Commerce may only use FA to fill gaps in the record and there are no gaps in the record for Commerce to fill, much less to fill with adverse information.

- Commerce may only apply AFA when it is applying FA and the respondent has not cooperated to the best of its ability.  Foremost cooperated to the best of its ability throughout this investigation with respect to combination kit reporting.

- The best of its ability standard "does not condone inattentiveness, carelessness, or inadequate record keeping," but it also "does not require perfection."[322]

- This was Foremost's first time participating in an AD/CVD proceeding.  It had to provide responses with very little time while simultaneously participating in the parallel CVD investigation, and it had to coordinate between three separate entities.

---

[321] *See* Foremost's Case Brief, "Case Brief of Foremost," dated January 17, 2020 (Foremost Case Brief) at 2-6 and Foremost's Rebuttal Brief, "Rebuttal Brief of Foremost," dated January 24, 2020 (Foremost Rebuttal Brief) at 4-8.
[322] *See* Foremost Rebuttal Brief at 6 (citing *Nippon Steel*, 377 F. 3d at 1382).

**Commerce's Position**:  For the final determination, we find the revised combination kit worksheet provided by Foremost at verification to be reliable and verified.  Foremost's calculation worksheet corrects for a labeling error, as well as the inadvertent inclusion of subject inputs in the non-subject input calculations.  Foremost included overhead expenses and labor in its calculation of subject inputs; however, and consistent with the *Preliminary Determination*, we find that we must revise Foremost calculations of total subject inputs to these expenses.  Finally, we are adjusting Foremost's reported data using AFA to account for:  (1) unreported backsplashes (*i.e.*, non-subject inputs) sold in combination kits; and (2) EP sales of combination kits which Foremost incorrectly identified as non-combination kits.

Errors in Foremost's Combination Kit RATIO Data

At verification, Commerce found that Foremost's combination kit data, as reported in Foremost Price Supp Part 2, contained several issues.[323]  First, we noted that Foremost's calculation worksheet contained the columns which were mislabeled, so that the cost of subject inputs was reported as the cost of non-subject inputs, and vice versa.[324]  At verification, we found this error clerical and minor and requested that Foremost correct it in a revised calculation worksheet.[325]  The steps Foremost took to reverse the labels did not involve reporting new information because all of the input costs were already on the record.

We also noted at verification that Foremost included Foremost Worldwide's cost of purchasing subject inputs from Foremost Woodwork in its calculation of Foremost Worldwide's non-subject input costs.  At verification, Commerce requested that Foremost additionally revise its worksheet to recalculate non-subject input costs.  Foremost provided this calculation worksheet with both the revised cost of non-subject inputs and corrected labels, as discussed above.  Commerce selected product codes from this calculation worksheet and verified the accuracy of the data reported.

The petitioner argues that this calculation worksheet contains new factual information, and, therefore, Commerce should reject it.  However, Commerce's regulations at 19 CFR 351.301(a) state that, "the Secretary may request any person to submit factual information at any time during a proceeding."  In addition, all of the verification outlines placed on the record of this investigation notified interested parties that "{n}ew information will be accepted at verification when…the information makes minor corrections to information already on the record."[326]  At verification, Commerce found these errors to be minor, and, as such, properly exercised its discretion in requesting that Foremost provide revised calculations of the combination kit ratios to remove subject input costs from the non-subject input costs and to label the columns correctly.  Commerce's ability to accept information at verification has been upheld by the CIT.[327]

---

[323] *See* Foremost's September 24, 2019 price reporting supplemental questionnaire response (part 2) (Foremost Price Supp Part 2) at Exhibit SCAP2-3.
[324] *See* Foremost Letter, "Verification Exhibits from FWM Verification," dated November 8, 2019, at VE-21.
[325] *Id.* at VE-28
[326] *See, e.g.*, Commerce's Letter, "Verification Agenda," dated October 16, 2019.
[327] *See, e.g.*, *Maui Pineapple Co. v. United States*, 264 F. Supp. 2d 1244, 1257 (CIT 2003) (where the CIT found that Commerce properly accepted sales data as minor corrections because Commerce "enjoys very broad…discretion with regard to the propriety of its use of facts available.").

Additionally, the petitioner suggests that Foremost's corrected worksheet is not verified because Commerce only reviewed a small number of transactions in the corrected worksheet, and the large number of errors in the original worksheet implies that the corrected worksheet contained still more errors.  However, Commerce verified Foremost's worksheet in the same manner it verified all of the other information reported by Foremost, and the minor errors initially found in Foremost's calculations of combination kits do not detract from this fact.  In *Schafer*, the CIT confirmed that verification is a "spot check" and that Commerce has the discretion to accept the credibility of documentation:

> A verification is a spot check and is not intended to be an exhaustive examination of the respondent's business.  Commerce has considerable latitude in picking and choosing which items it will examine in detail...In the absence of evidence in the record suggesting that the need to examine further the supporting evidence itself, the agency may accept the credibility of the document at face value.  To conclude otherwise would leave every verification effort vulnerable to successive subsequent attacks, no matter how credible the evidence and no how burdensome on the agency further inquiry would be.[328]

The Federal Circuit has held that the "basic purpose of the statute:…{is} determining current margins as accurately as possible."[329]  Given this basic purpose and in light of  the specific circumstances of this case, our acceptance of Foremost's corrections is appropriate.

Finally, the petitioner asserts that it is unclear as to which corrections are included in this worksheet.  However, each of the corrections is discussed above.  That said, we agree with the petitioner that the data on the worksheet does not account for all necessary adjustments.  These additional adjustments are noted further below.

Total Cost of Manufacturing Included in Foremost's RATIO Calculations

In a supplemental questionnaire, Commerce requested that Foremost, "calculate the total cost of subject inputs for each combination kit and the total cost of non-subject inputs for each combination kit…then calculate the ratio of the cost of subject merchandise to the total cost of the combination kit."[330]  Commerce provided a table as an example and the column for the requested calculated ratio was labeled "Ratio (cost of subject inputs/total cost of inputs)" as an attachment to the supplemental questionnaire.[331]

In the *Preliminary Determination*, because the combination kit data for all combination kits were submitted too close to the issuance of the *Preliminary Determination*, we used the RATIOs calculated for the three combination kits that represented the highest values of the U.S. sales database to calculate RATIOs for the remaining combination kits reported in the U.S. sales database, and to adjust all combination kits to remove non-subject inputs from the

---

[328] *See Fag Kugelfischer Georg Schafer Ag. v. United States*, 25 CIT 74, 105 (*Schafer*).
[329] *See Rhone-Poulec*, 899 F. 2d at 1191.
[330] *See* Commerce's Letter, "Adjusted Gross United Price Supplemental Questionnaire," dated September 9, 2019.
[331] *Id*. at Attachment 1.

prices/expenses associated with these sales.[332]  For the *Preliminary Determination*, we recalculated Foremost's reported RATIO for the three combination kits because Foremost included total cost of manufacturing in its "total cost of subject inputs," which was not what Commerce intended.[333]  Foremost provided all of the required information necessary in order to recalculate RATIO for the three combination kits.[334]  At verification, we determined that Foremost's combination kit data, that included a table for all combination kit RATIO calculations, included overhead and labor expenses in Foremost's calculations of total subject inputs for all combination kits.[335]

For the final determination, we are modifying the way we calculate the RATIOs to remove Foremost's overhead and labor expenses from the total cost of inputs it reported.  Accordingly, for all combination kits other than the three reported with Foremost Price Supp Part 1, we have adjusted all of Foremost's "total cost of subject inputs" by an average of the percentage differences between Foremost's reported total material costs and reported total cost of manufacturing of the three combination kits reported at Foremost Price Supp Part 1, as facts available under section 776(a)(1) of the Act.[336]

<u>Unreported Non-Subject Inputs</u>

During verification, Commerce found that Foremost sold a combination kit with a backsplash. Therefore, Commerce requested that Foremost explain how it accounted for backsplashes in its calculation of non-subject inputs, to which Foremost responded that backsplashes were not accounted for.[337]  As noted above, Commerce included in its analysis only the portion of the combination kits related to subject products.  Thus, we find that Foremost's failure to properly segregate the subject and non-subject components of the kits renders its RATIO calculations inaccurate, potentially resulting in the overstatement of U.S. prices.  Further, unlike the above issues which can be resolved by record information, the record in this case lacks information on the number of combination kits with backsplashes or the cost of those backsplashes.[338]  This makes it impossible for Commerce to ascertain the impact of Foremost's omission or to determine the amount by which Foremost under-reported its non-subject inputs or over-reported its subject inputs.

In accordance with sections 776(a)(2)(B)-(D) of the Act, because Foremost failed to report all non-subject inputs in calculating its combination kit ratios, we must apply facts otherwise available for our final determination.  Specifically, because Foremost failed to include backsplashes in its RATIO calculations, Foremost withheld necessary information, significantly

---

[332] *See* Foremost Prelim Analysis Memo at 6.

[333] *Id*. at 5.

[334] *See* Foremost's September 17, 2019 price reporting supplemental questionnaire response (part 1) at Exhibit SCAP1-2.

[335] *See* Foremost Woodwork Verification Report at 19.

[336] *See* Foremost's Price Supp Part 1 at Exhibits SCAP1-1 and SCAP1-2; *see also* Foremost Final Analysis Memorandum for a complete description of our calculation of RATIO for combination kits.

[337] *See* Foremost Woodwork Verification Report at 10; and Foremost Verification Exhibits at VE-3.

[338] We note that Foremost did not address this error nor provide Commerce with any suggestion on how to calculate accurate combination kit ratios that include Foremost's unreported backsplashes.  *See* Foremost Rebuttal Brief.

impeded this investigation by preventing Commerce from performing accurate margin calculations, and provided incomplete information that could not be verified.

Foremost argues that Commerce should not apply AFA with respect to its combination kits because "{t}he best of its ability standard, of course, 'does not condone inattentiveness, carelessness, or inadequate record keeping,' but it also 'does not require perfection.'"[339] Foremost then discusses the two-step analysis that Commerce must apply when determining whether a respondent has acted to the best of its ability:  whether the respondent failed "to keep and maintain all required records" or failed "to put forth its maximum efforts to investigate and obtain the requested information from its records."[340]

We agree with Foremost that Commerce does not require respondents to submit data that are perfect in all respects.  Indeed, Commerce's acceptance of the corrections discussed above demonstrates that Commerce did not hold Foremost to such a standard in this investigation.  However, Commerce's willingness to correct Foremost's errors is not unbounded, and in this instance, Foremost's failure to investigate its own records and obtain the information requested by Commerce impacts the dumping margin computed for Foremost in a manner which is potentially significant.  At verification, Foremost confirmed that it did not include the cost of backsplashes in reported non-subject inputs, despite the fact that it possessed the records to have done so.[341]  Therefore, Foremost possessed the information Commerce requested on non-subject inputs, but did not provide it to Commerce.  Accordingly, we find that Foremost failed to put forth its maximum efforts to obtain the requested information from its records."[342]

Section 776(b) of the Act provides that, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, it may use an inference that is adverse to the interests of that party in selecting from the facts otherwise available.  Such an adverse inference may include drawing from any information placed on the record.  As discussed above, in this case, we find Foremost did not act to the best of its ability in reporting its non-subject input costs because the information necessary to report backsplashes was in Foremost's possession, but it did not report this information to Commerce.  Therefore, Commerce finds that facts available with an adverse inference are warranted to account for Foremost's omission.

We note that the only information on the record providing guidance to Commerce as to which sales of combination kits could contain a backsplash is Commerce's verification of the FOPs for particular CONNUMs at Foremost Woodwork, where Commerce noted that a vanity, with a countertop and sink, had a backsplash.  Accordingly, in applying AFA to Foremost's combination kits, Commerce is assigning the lowest calculated RATIO, after making the adjustment described above, to all combination kits that are described in their product descriptions as vanities and reported with Foremost Worldwide sink costs included on Foremost's ratio calculation worksheet, which indicate the vanity may have a backsplash.[343]

---

[339] *See* Foremost Rebuttal Brief at 6 (citing *Nippon Steel*, 377 F. 3d at 1382).
[340] *Id*. at 6-7.
[341] *See* Foremost Woodwork Verification Report at 10.
[342] *See Nippon Steel*, 377 F. 3d at 1382.
[343] *See* Foremost Verification Exhibits at VE-28; *see also* Foremost Final Analysis Memorandum for complete description of our calculation of RATIO for combination kits.

63

<u>Unreported Combination Kits</u>

At verification, we found that Foremost sold 14 combination kit products to EP customers during the POI.  Foremost claimed that this was an inadvertent error, stating that the company mistakenly assumed that it only made CEP sales of combination kits.  Foremost provided a list of the product codes that could be found in the U.S. sales database for EP sales, but were reported as non-combination kits (*i.e.*, the RATIO equaled 100 percent subject inputs).[344]

Foremost did not sell any of the misreported product codes to CEP customers and, thus, the record does not contain RATIO calculations for them.  Therefore, we find that Commerce must resort to facts available for the missing RATIO information.  In accordance with sections 776(a)(2)(B),(C) and D of the act, we find that Foremost failed to provide information requested within the deadline prescribed by Commerce and that it impeded this investigation by not providing the information necessary to calculate accurate RATIOs for these products.[345]

As noted above, section 776(b) of the Act provides that, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference that is adverse to the interests of that party in selecting from the facts otherwise available.  Such adverse inference may include any information placed on the record.  In this case, we find that Foremost did not act to the best of its ability to comply with Commerce's requests.  For example, in a supplemental questionnaire, Commerce requested a list of all components within combination kits that Foremost sold to the United States during the POI.[346]  In reporting this information, Foremost had the opportunity to review its records and determine that it had failed to identify certain products as combination kits, but it did not do so.[347]  Foremost had ample opportunity to assess its records, rather than make assumptions, and to determine that many sales were incorrectly reported.

For the final determination, we are applying facts available, with an adverse inference, to Foremost's EP sales of combination kits.  To adjust Foremost's combination kits that were reported as non-combination kits, we are applying the lowest RATIO to calculate an adjusted gross unit price.[348]

In sum, Commerce will continue to accept Foremost's revised calculation worksheet, which corrected for Foremost's labeling error and Foremost's inclusion of subject inputs in its calculation of non-subject inputs.  Commerce is applying facts otherwise available to Foremost's calculations of total inputs to adjust for Foremost's inclusion of overhead and labor expenses when calculating the RATIOs.  Finally, Commerce is applying facts otherwise available, with

---

[344] *See* Foremost's Letter, "Verification Exhibits from FWW Verification," dated November 1, 2019, at VE-12.
[345] *See* Commerce's Letter, "Section C Supplemental Questionnaire," dated August 30, 2019, at 8.
[346] *Id*. at 8.
[347] *See* Foremost's September 17, 2019 supplemental section C questionnaire response (Foremost September 17, 2019 SCQR) at Exhibit SC-22a-A.
[348] *See* Foremost Final Analysis Memorandum for a complete description of our calculation of RATIO for combination kits.

adverse inference to Foremost's sales combination kits that could have contained a backsplash as well as Foremost's sales of EP sale combination kits.

## Comment 14:  Exempted Sales

*Petitioner Case Brief[349]*

- Commerce should apply partial AFA to Foremost's sales of custom kitchens and merchandise produced by certain unaffiliated suppliers because the information in Foremost's request to not report these sales was inaccurate and misleading.[350]
- In particular, Foremost's initial section D response references a higher number of custom kitchen projects than Foremost reported in its exemption request.  Foremost later explained that the difference between the figures in the exemption request and questionnaire response was due to the fact that Foremost had produced a higher number of custom kitchens than it sold during the POI.
- During the verification at Foremost Woodwork, Foremost reported that it sold yet another number of custom kitchen projects.  Foremost provided no documentation to support its explanations of the inconsistencies.
- Further, after receiving the exemption, Foremost disclosed that sales of kitchen projects involved a large number of pieces of subject merchandise.  Thus, by citing only projects in its exemption request, Foremost misled Commerce as to the actual magnitude of the exemption.
- With respect to unaffiliated suppliers, Commerce found at verification that Foremost sold several hundred more units of merchandise produced by these companies than the quantity reported in Foremost's exemption request.
- Foremost was required to submit sales data and FOPs for merchandise produced by one unaffiliated supplier but stated that it was unable to compel it to participate.  That Foremost purchased several material inputs from this supplier, in addition to subject merchandise, suggests that Foremost had more ability to induce cooperation than it claimed.
- In the 2018 administrative review of *Stainless Steel Bar from India*, Commerce applied AFA to a respondent because it failed to demonstrate that it lacked the power to induce cooperation from non-responding parties.  Commerce based this decision on the fact that the respondent's communications with the unresponsive entity did not indicate a "robust refusal to do business in the future."[351]
- The application of partial AFA to the missing unaffiliated supplier's FOP data will encourage the cooperation of the unaffiliated supplier and companies in future proceedings.

---

[349] *See* Petitioner January 20 Case Brief at 11-18.

[350] *Id.* at 12 (citing Foremost's Letter, "Notice of Reporting Difficulties and Reporting Exemption Request," dated June 19, 2019 (Foremost's Exemption Request)).

[351] *Id*. at 17 (citing *Stainless Steel Bar from India:  Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 84 FR 15582 (April 16, 2019), unchanged in *Stainless Steel Bar from India:  Final Results of Administrative Review of the Antidumping Duty Order; 2017-2018*, 84 FR 56179 (October 21, 2019) (*Stainless Steel Bar from India*), and accompanying IDM).

65

*Foremost Rebuttal Brief*[352]
- Foremost has been clear throughout this proceeding that a project may contain any number of units and that the units that make up a project may not be subject merchandise.
- The error with respect to the number of units produced by the unaffiliated supplier is harmless. The quantity of pieces was still small and the reason for the request remains: Reporting FOPs for subject merchandise sold as part of custom kitchens would unnecessarily burden both Foremost and Commerce.

**Commerce's Position**: We disagree that Commerce was misled by the information in Foremost's exemption request. While the record contains several sales figures related to custom kitchens and products produced by unaffiliated suppliers, the differences are not significant. Further, the facts underlying Commerce's decision to grant these exemptions remain: requiring Foremost to report sales of subject merchandise made as part of custom kitchen projects would have been burdensome – not only in terms of data collection for Foremost, but also in terms of analysis time for Commerce – and this burden would have been heightened by the strict statutory time constraints of this investigation.

In addition, the verified number of pieces of merchandise produced by the exempted unaffiliated supplier is relatively small in comparison to the total number of pieces sold in the United States during the POI. With respect to the other unaffiliated supplier, we continue to find that Foremost made significant efforts to compel that company to provide the necessary information. Thus, the use of AFA is not appropriate for any of the unreported information.

Custom Kitchens

In Foremost's Exemption Request, Foremost described the complexities involved in reporting its sales of subject merchandise made as part of custom kitchen projects.[353] It explained that "each kitchen is a separate project, containing a combination of products that is different from every other kitchen…customized kitchen projects {may contain a} myriad {of} different combinations{.}"[354] In Commerce's response to Foremost's exemption request, with respect to custom kitchens, we noted, "Foremost cites to the burdens of reporting the FOPs of custom kitchens" and then explained that "{f}or the reasons detailed in Foremost's request," and we granted this request.[355]

We note that, throughout the proceeding, Foremost provided more information about its custom kitchens at Commerce's request, including the number of pieces that make up a project, and the fact that the number of custom kitchens produced, sold, and "booked" did not exactly tie to the exemption request.[356] Specifically the quantity sold as reported in Foremost's exemption request

---

[352] *See* Foremost Rebuttal Brief at 8-9.
[353] *See* Foremost's Exemption Request at 2-3.
[354] *Id*. at 3.
[355] *See* Memorandum, "Reporting Exemption Request," dated June 26, 2019.
[356] *See* Foremost's July 22, 2019 sections C and D questionnaire response (Foremost July 22, 2019 CDQR) at 7-8; and Foremost September 24, 2019 SDQR at 5-6; *see also* FGI Verification Report at 8; and Foremost Woodwork Verification Report at 12.

66

Barcode:3946193-01 A-570-106 INV - Investigation  -

and reviewed at verification differed by under fifty projects, and projects, in general, contain various quantities of subject and non-subject components.[357]

However, the reasons for Commerce's decision to grant the exemption remain and were supported at verification.  At verification, Foremost demonstrated how each custom kitchen project unit in its system "represented an entire custom kitchen project (with an unknown number of cabinets making up each project)."[358]  Foremost explained that the only way to determine the actual quantity of each unit would be to look at individual invoices, and we confirmed this explanation, stating that "FGI's system only reported the quantity of custom kitchen order, and not the number of cabinets each order was comprised of."[359]  Our verification findings support our initial decision to exempt Foremost from reporting subject cabinets sold in custom kitchens, given the complexity of the projects, the short time both Commerce and Foremost had to develop a method for reporting these sales, and the relatively small number of sales that these cabinets represented compared to the total sales in the U.S. sales database.[360]

<u>Unaffiliated Supplier Sales and FOPs</u>

In Foremost's Exemption Request, Foremost also asked that Commerce permit it to not report the sales of subject merchandise produced by several unaffiliated suppliers and the suppliers' corresponding FOPs.  In making this request, Foremost stated, that it "has no ability to compel these unaffiliated suppliers to provide all of the required factors of production or otherwise participate in the Department's proceeding."[361]  In Commerce's response to Foremost's exemption request with respect to unaffiliated suppliers, we noted how Foremost, "cite{d} its inability to coerce suppliers to comply with Commerce's investigation" and then explained that "{f}or the reasons detailed in Foremost's request," and we granted this request.[362]

At verification, Commerce found that, for one of the exempted unaffiliated suppliers of subject merchandise, Foremost had underreported the quantity of merchandise supplied.[363]  While the quantity of subject merchandise produced by this unaffiliated supplier was not correctly provided in the exemption request, the underlying reason for Commerce's decision to exempt these sales and FOPs from reporting remains.  Foremost was exempted from reporting the sales and FOPs for two out of the three of its unaffiliated suppliers because the total quantity of these sales was less than five percent of the U.S. sales database.[364]  The minor discrepancies found at verification with respect to the figures initially reported does not change this reasoning, and the total quantity of sales of merchandise for both unaffiliated suppliers exempted from reporting remains at less than five percent, which we find to be small.

---

[357] *See* Foremost's Exemption Request at 3.
[358] *See* FGI Verification Report at 8.
[359] *Id.*
[360] *See* Foremost September 24, 2019 SDQR at SD-6.
[361] *See* Foremost's Exemption Request at 5.
[362] *See* Memorandum, "Reporting Exemption Request," dated June 26, 2019.
[363] Foremost Woodwork Verification Report at 12.
[364] *See* Foremost's Exemption Request at 5.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

In *Pure Magnesium from the Russian Federation*, Commerce stated that it "is not required to examine all sales transactions in the United States. For this reason, our practice has been to disregard unusual transactions when they represent a small percentage (*i.e.*, typically less than five percent) of a respondent's total sales."[365] In *Color Television Receivers from China*, Commerce also excluded sales because the represented less than give percent of the respondent's total sales.[366] In this case, the sales exempted either represent less than five percent of the respondent's total sales, or as discussed above represent unusual transactions. Despite small variations between the information in Foremost's Exemption Request and our verification findings, these unaffiliated supplier sales represent a small, less than five percent, amount of Foremost's total U.S. sales during the POI.

Commerce did require Foremost to report the sales and FOPs from the unaffiliated supplier who provided the highest quantity of subject merchandise in Foremost's exemption request.[367] However, Foremost provided documentation to show that it was unable to compel this supplier to provide its FOPs, despite its efforts to do so. For the *Preliminary Determination*, Commerce examined Foremost's relationship with its uncooperative unaffiliated supplier and noted several facts: Foremost is a major exporter of subject merchandise from China; the record does not indicate that Foremost is affiliated with this supplier; and the supplier supplied raw material inputs in addition to subject merchandise to Foremost.[368] These facts remain unchanged for this final determination, and their relevance is explained below.

The Federal Circuit, in *Mueller*, held that Commerce may, under certain circumstances, apply AFA in calculating a cooperative respondent's AD margin where it finds that the respondent could have induced an uncooperative supplier's cooperation.[369] While the petitioner makes the argument that Foremost had the ability to compel its supplier to provide the information, the record does not support this assertion. In contrast, the record demonstrates that Foremost attempted to collect and report the information but was prevented by the supplier's refusal to provide it.[370]

In *Canadian Solar*, the CIT held, based on the facts in the administrative review at issue, that the Commerce failed to show that the respondent had the type of long-standing relationship with its suppliers that would give it leverage in the marketplace to compel its suppliers to provide the information requested, in order to justify relying on partial AFA.[371] With respect to Foremost's relationship with its supplier, the record remains the same since the *Preliminary Determination*. As discussed in Foremost Prelim Analysis Memo, the communications between Foremost and its

---

[365] *See Notice of Final Determination of Sales at Not Less Than Fair Value: Pure Magnesium from the Russian Federation,* 66 FR 49347 (September 21, 2001) (*Pure Magnesium from the Russian Federation*), and accompanying IDM at Comment 10.
[366] *See Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Color Television Receivers from the People's Republic of China*, 69 FR 20594 (April 16, 2004) (*Color Television Receivers from China*), and accompanying IDM at Comment 27.
[367] *Id.*
[368] *See* Foremost July 22, 2019 CDQR at section D, page 3 and Exhibit D-11.
[369] *See Mueller*, 753 F. 3d at 1233-34.
[370] *See* Foremost September 23, 2019 SDQR at Exhibit SD-4.
[371] *See Canadian Solar International et al. and Shanghai Byd Co. Ltd. et al. v. United States*, 378 F. Supp. 3d 1292, 1320 (CIT 2019) (*Canadian Solar*).

supplier showed no evidence that Foremost had any leverage over its supplier.[372]  Commerce continues to find, as it did in the *Preliminary Determination*, that the supplier's responses to Foremost's outreach indicate that Foremost did not have a long-standing relationship with this supplier and that Foremost was unable to induce its supplier's cooperation.[373]

We disagree with the petitioner that the facts in *Stainless Steel Bar from India* are analogous here.  In *Stainless Steel Bar from India*, Commerce found that the documentation provided by the respondent failed to meet Commerce's standard for demonstrating the inability of a company to compel its supplier to provide information.[374]  In that case, the respondent had many years of experience in being a respondent in AD cases, and all of its suppliers for which it was unable to report FOPs for were known exporters of merchandise subject to the order.[375]  Given those circumstances, Commerce found that the respondent understood its responsibilities as an exporter, and as a respondent, to collect costs from its suppliers, and, therefore, the documentation it provided Commerce failed to demonstrate that it had done everything in its power to compel its suppliers to provide those costs.

In contrast, in this investigation, Foremost is a first-time respondent and we find on this record that it has provided sufficient documentation to demonstrate that it acted to the best of its ability to compel its supplier to supply the missing FOPs.[376]  However, we note that Commerce has the same expectations of Foremost for wooden cabinets and vanities from China as it did of the respondent in *Stainless Steel Bar from India*, in that Foremost is now aware of its responsibility to collect the FOPs from all of its suppliers, and respondents in this case have been placed on notice about the importance of reporting FOPs for all of the subject merchandise sold in the United States.

The petitioner also argues that applying partial AFA is a way to discourage non-cooperation on the part of suppliers in the future, and we agree with this premise, as does the law.[377]  While we agree that the application of AFA is a tool used to induce cooperation from respondents and their suppliers, we find that the facts of this record do not support making such a determination in this segment of the proceeding, as discussed above.

Accordingly, because necessary FOP information is not available on the record, we continue to determine that facts available is warranted, pursuant to section 776(a)(1) of the Act, and for the final determination we have continued to use Foremost's reported FOPs for all of Foremost's sales of merchandise produced by its uncooperative supplier.[378]

---

[372] *See* Foremost Prelim Analysis Memo at 4-5.
[373] *See Preliminary Determination* PDM at 21.
[374] *See* Petitioner January 20 Case Brief at 17.
[375] *See Stainless Steel Bar from India* IDM at Comment 2.
[376] *See* Foremost September 24, 2019 SDQR at Exhibit SD-4.
[377] *See* SAA at 870.
[378] *See* Foremost Prelim Analysis Memo for a discussion of the facts available calculation.

**Comment 15:  Early Payment Discounts**

*Petitioner Case and Rebuttal Briefs*[379]
- Foremost did not report an early payment discount granted to a customer during the POI for the sale of subject merchandise.  Foremost conceded that it could not determine whether this was a customer-specific issue, and that it could not identify on which transactions it may have incurred early payment discounts.  It is not possible for Commerce to confirm which sales had early payment discounts incorrectly reported.
- Foremost stated that even customers who did not qualify for early payment discounts could have taken one.
- The solution offered by Foremost (*see* below) is inadequate.  Foremost's suggestion would not even include one of the transactions Commerce found as an example of Foremost's early payment omission, *i.e.*, at verification, Commerce identified a customer with missing early payment discounts, but this customer was not in Foremost's proposed universe of customers that may have taken this discount.
- Foremost admits that there may be an undefined number of additional unreported early payment discounts.
- Commerce should apply an early payment discount to all sales where one was not reported.

*Foremost Case and Rebuttal Briefs*[380]
- Foremost did not have a mechanism in place to track certain early payment discounts on a transaction-specific basis, and therefore, it overlooked reporting early payment discounts taken when they were not earned.
- In the U.S. sales database, Foremost identified customers who had qualified for discounts and reported early payment discount by customer.  Commerce confirmed that Foremost correctly reported early payment discounts for the three customers reported with this discount in the U.S. sales database.
- Commerce did not identify early payment discounts for customers who were not offered such discounts.  Commerce should apply the percentage reported under PAYTERMU (*i.e.* two percent of GRSUPRU for a sale reported with "2% 15 days") for the customers with payment terms that contain early payment incentives.
- There is no gap in the record that Commerce would need to fill with AFA.  The complete universe of customers that may have taken unauthorized discounts is in the U.S. sales database (*i.e.*, CEP customers of inventory merchandise where PAYTERMU contains a percentage of a discount).
- Foremost provided programming language and its suggestion is conservative.

**Commerce's Position**:  We find that Foremost failed to report all early payment discounts as Commerce requested, and we find that this error warrants the application of facts otherwise available, with an adverse inference, to all sales with early payment incentives where no early

---

[379] *See* Petitioner January 20 Case Brief at 19-20; and Petitioner January 27 Rebuttal Brief at 15-18.
[380] *See* Foremost Case Brief at 7-9; and Foremost Rebuttal Brief at 9-11.

payment discount was reported (and where Commerce did not verify that early payment discounts were not granted).

In Foremost's July 22, 2019 CDQR, Foremost asserted that it "did not grant any early payment discounts in the U.S. market during the POI."[381]  In Foremost's September 17, 2019 SCQR, Foremost stated that it had "reviewed its records and made an error with respect to sales to {certain customers}."[382]  As such, Foremost revised its U.S. sales database to report early payment discounts for these specific customers.

At verification, we found that Foremost had failed to report early payment discounts for certain sales.[383]  Foremost explained that it reported early payment discounts by reviewing its records for customers that had qualified for an early payment discount (including those that had qualified but had not taken one).  Foremost admitted, though, that it had not checked its records for customers who had taken an early payment discount, despite not qualifying for it.  As a result, Foremost acknowledged that it had not reported all early payment discounts taken during the POI, and that it had no method of determining which customers and sales in the U.S. sales database this impacted.

Foremost states that Commerce "may use facts otherwise available only 'to fill gaps when Commerce must rely on other sources of information to complete the factual record.'"[384] Foremost then asserts that there is no gap in the record with respect to the early payments taken during the POI.  We disagree with the claim that there is no gap for Commerce to fill in ensuring we accurately account for Foremost's early payment discounts.  As Commerce noted its verification report, "FGI stated that it could not determine whether this {early payment issue} was a customer specific issue, and that it could not identify which transactions may have incurred early payment discounts that had not been reported in the U.S. sales database."[385] Therefore, it is not possible for Commerce to specifically identify the sales impacted by this reporting error.  Moreover, while Foremost attempted to fill this gap with its suggestion,[386] this suggestion fails to remedy all sales where Foremost may not have reported an early discount, as evidenced by the fact that its list did not include the sales Commerce found at verification with this issue.  Additionally, as discussed below, we disagree with Foremost's assertion that its early payment discount reporting failure does not amount to the situation set forth by section 776(b) of the Act.[387]

---

[381] See Foremost July 22, 2019 CDQR, section C, at 23-24.

[382] See Foremost September 17, 2019 SCQR at 16.

[383] See FGI Verification Report at 10.

[384] See Foremost Rebuttal Brief at 10 (quoting *Zhejiang DunAn Heitan Metal Co. v. United States*, 652 F. 3d 1333, 1346 (Fed. Cir. 2011).

[385] See FGI Verification Report at 10.

[386] See Foremost Case Brief at 8 (Foremost provided a list of customers and payment terms and stated, "the following customers represents the universe of customers that may have taken unauthorized early payment discounts.").

[387] See Foremost Rebuttal Brief at 10 (citing *JSW Steel Ltd. v. United States*, No. 16-00165, slip op. at 5 (CIT May 9, 2018).

In *CORE from Italy*, Commerce applied partial AFA because Commerce discovered at verification that the respondent failed to report complete information regarding its sales, as requested by Commerce in its questionnaire responses, and this information was not discovered until verification.[388]  Similarly, we find that Foremost did not report the complete information regarding its early payment discounts and Commerce only found this information as a result of selecting certain sales for examination at verification.  Foremost failed to report all early payment discounts in its questionnaire responses,[389] and they were discovered by Commerce during verification, as described in the verification report.[390]  At verification, Foremost acknowledged that it had failed to review all of its U.S. sales for early payment discounts, and as a result it did not identify all sales where an early payment discount was taken.[391]  Accordingly, for the final determination, we are applying facts available, with an adverse inference, to Foremost's sales where the customer had payment terms with an early payment incentive, but no reported early payment discount.  Therefore, pursuant to section 776(a)(2)(B) and (C) of the Act, we are applying facts available to Foremost's sales reported without early payment discounts.

Under such circumstances, the Federal Circuit has upheld Commerce's ability to make an adverse inference in selecting from the facts available, stating that Commerce:

> assumes that importers are familiar with the rules and regulations that apply to the import activities and requires that importers, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries:  (a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce; …(b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records{.}[392]

Accordingly, pursuant to section 776(b) of the Act, we are applying facts available with an adverse inference, because Foremost did not act to the best of its ability when reporting its early payment discounts.  As the petitioner correctly notes and Commerce addressed above, Foremost provides a methodology to adjust for this reporting failure, which identifies sales by customer and then by payment terms,[393] but this methodology does not account for all sales reported in the U.S. sales database with a payment incentive.[394]  As such, we will not use the methodology proposed by Foremost, and instead, for the final determination, for all sales unexamined at verification where Foremost did not report an early payment discount and where Foremost's payment terms with that customer included a payment incentive, we will apply the highest early payment discount Foremost granted that is on the record.

---

[388] *See Certain Corrosion-Resistant Steel Products from Italy:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, in Part, 81 FR 35320 (June 2, 2016) (*CORE from Italy*), and accompanying IDM at Comment 3
[389] *See* Foremost July 22, 2019 CDQR, section C, at 23-24; and Foremost September 17, 2019 SCQR at 16.
[390] *See* FGI Verification Report at 10.
[391] *Id.*
[392] *See Nippon Steel*, 337 F. 3d at 1382.
[393] *See* Petitioner January 27 Rebuttal Brief at 17.
[394] *See* Foremost Case Brief at 8.

Barcode:3946193-01 A-570-106 INV - Investigation  -

**Comment 16:  Section 301 Duties**

*Petitioner Case and Rebuttal Briefs*[395]
- The methodology employed by Foremost results in its reporting section 301 duties on none of its inventory sales in its U.S. sales database.  Foremost has not provided support for its assertion that it did not incur section 301 duties on the majority of its CEP inventory sales.
- Commerce found evidence of subject merchandise sold out of inventory on which FGI incurred section 301 duties, and, therefore, Commerce's findings raise questions as to whether reporting section 301 duties using an estimated entry date for CEP (that uses average inventory days) is accurate and reasonable.  It is improper to estimate what duties were incurred on a product based on inventory turnover calculations.
- Commerce should take the total amount of section 301 duties paid by Foremost during the POI and allocate that amount across all U.S. inventory sales.
- Foremost's reporting was inaccurate, regardless of whether the inaccuracy was intentional.

*Foremost Case and Rebuttal Briefs*[396]
- Section 301 duties were imposed for the first time on September 21, 2018; therefore, it was impossible for Foremost to incur these duties on any sale that occurred prior to September 21, 2018.  Foremost did not incur section 301 duties on the vast majority of its CEP inventory sales.
- Commerce found a single unit sold in late December 2018 on which Foremost incurred section 301 duties.  This does not detract from the reasonableness of Foremost's reporting methodology; Commerce verified that inventory products remain there for a period of time.
- If Commerce needs to adjust CEP inventory sales to account for section 301 duties, it should only do so for sales that occurred on or after the date the unit Commerce found at verification was sold.
- The petitioner's suggestion is equivalent to partial AFA.

**Commerce's Position**:  For the final determination, we are changing our calculation of Foremost's section 301 duties for CEP inventory sales.[397]  CBP began collecting section 301 duties on September 24, 2018, during the POI.[398]  Foremost explained that it does not track the entry dates of its inventory sales, and, as a consequence, it was unable to report section 301 duties on a transaction-specific basis.  However, because Foremost's average inventory carrying

---

[395] *See* Petitioner January 20 Case Brief at 21-22; and Petitioner January 27 Rebuttal Brief at 22-24.
[396] *See* Foremost Case Brief at 12-13; and Foremost Rebuttal Brief at 11-12.
[397] *See* Foremost July 22, 2019 CDQR, section C, at 34.
[398] *See Notice of Modification in Section 301 Action:  China Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 83 FR 47974 (September 21, 2018) (effective as of September 24, 2018).

period was 131 days,[399]  Foremost concluded that it had no CEP inventory sales with section 301 duties.[400]

At verification at FGI, we confirmed the accuracy of Foremost's reported average inventory carrying days and that entry date cannot be tracked in FGI's accounting system.[401]  However, we also noted that FGI booked a sale toward the end of the POI on which it incurred these duties. Therefore, we find that Foremost's methodology did not completely capture all section 301 duties on FGI's reported U.S. sales.  To account for this potential underreporting, for the final determination, we are changing the amount of section 301 duties calculated for Foremost's CEP inventory sales, from zero to ten percent of entered value, when the date of sale is equal to, or after, the "booking" date of the inventory sale with section 301 duties found at verification.[402]

We disagree with the petitioner that it is appropriate to allocate all section 301 duties that FGI incurred during the POI to the reported sales.  Foremost could not have incurred section 301 duties prior to September 21, 2018 (the date the duties were imposed), and, therefore, calculating section 301 duties for sales with sale dates prior to September 21, 2018, is not warranted. Additionally, we verified Foremost's inventory carrying days and confirmed that, on average, Foremost's merchandise was in inventory for more than four months prior to sale.  Therefore, the section 301 duties that FGI paid during the POI should apply overwhelmingly to sales made from inventory after the POI.  As a result, we find using the earliest date on the record where Foremost incurred these duties is reasonable, for purposes of adjusting CEP under section 772(c)(2)(A) of the Act.

**Comment 17:  Foremost's U.S. Inland Freight Charges from the Port to the Warehouse**

*Petitioner Case and Rebuttal Briefs*[403]
- At verification, Commerce determined that Foremost did not include U.S. inland freight, from port to warehouse, in its U.S. sales database for its CEP inventory sales.
- Although Foremost claimed that it had intended to include this expense in its calculation of international freight, it did not do so.
- Commerce did not verify the U.S. inland freight that Foremost included in its exhibit.
- Commerce should account for these freight expenses by applying the highest inland freight reported and applying it to all inventory sales, instead of relying on unverified information.
- Alternatively, Commerce should use the ratio calculated that combined international freight and inland freight for Foremost's delivered, duty paid (DDP) sales for calculating a new freight expense for Foremost's CEP inventory sales.

---

[399] *Id*. at 33-34.
[400] *Id*. at 34.
[401] *Id*. at 12-13.
[402] We note that the SALEDATU is different from the date in which the sale was booked in Foremost's electronic records system (ERP).  For this change, we are using the booking date in Foremost's ERP because this was the date the sale was entered into Foremost's system and recorded as having incurred this expense.
[403] *See* Petitioner January 20 Case Brief at 24; and Petitioner January 27 Rebuttal Brief at 20-21.

*Foremost Case and Rebuttal Briefs*[404]

- Foremost prepared separate worksheets to calculate and report international freight expense ratios for CEP DDP and CEP inventory sales.  These worksheets were structured identically and include both international freight expenses and movement expenses associated with moving products from the U.S. port to the U.S. warehouse.
- In the CEP worksheet, Foremost inadvertently referenced only the international freight costs in the international freight formula.  As a result, Foremost omitted port to warehouse freight expenses for CEP inventory sales from its U.S. sales listing.
- Commerce has the information necessary to calculate the relevant freight amount.  Specifically, Commerce can adjust international freight (INTNFRU) or calculate a new inland freight variable (INLFPWU) by applying a ratio calculated by dividing the total amount of the inadvertently-omitted expense by the total value of Kitchen and Bath Division sales.

**Commerce's Position**:  For the final determination, because Foremost failed to cooperate to the best of its ability with respect to these expenses, we are basing the amount of the expenses for all of Foremost's CEP inventory sales on AFA.

In Foremost's questionnaire response, Foremost stated that "international freight fees include delivery to Foremost's U.S. warehouse."[405]  Along with its narrative response, Foremost provided two worksheets to demonstrate its calculation of international freight expenses, one for sales made out of inventory, and the other for Foremost's DDP sales, or in other words, sales where Foremost was responsible for freight expenses, but the merchandise did not go through inventory.[406]  Despite Foremost's assertion that it "structured the two worksheets identically,"[407] in Foremost's worksheet for DDP sales, Foremost calculated INTNFRU so that it included both ocean and inland freight; however, in Foremost's worksheet of inventory sales, it reported freight in two separate fields:  "Ocean Freight" and "Inland Freight," where the former represents the amount Foremost reported as INTNFRU, and the latter field is not incorporated into the U.S sales listing.  Foremost never explained why it provided "Inland Freight" as a separate amount in its worksheet instead of including the amount in INTNFRU (as it had clearly stated in its narrative).

At verification, Commerce was reviewing Foremost's method for determining its vendors for completeness when it requested that Foremost discuss the transactions booked under a particular freight vendor.  During this exercise, Commerce learned that Foremost booked payments to this company for port to warehouse inland freight (INLFPWU) for inventory sales,[408] which directly contradicted its prior claim that it incurred these expenses as part of international freight.  The verification report discussed this finding as follows:

> During completeness test #1, we noted that FGI had paid for freight services to move merchandise from Chicago to its warehouse in Indiana.  We asked FGI officials whether

---

[404] *See* Foremost Case Brief at 9-11; and Foremost Rebuttal Brief at 13.
[405] *See* Foremost July 22, 2019 CDQR, section C, at 31.
[406] *Id*. at Exhibits C-20.1(A) and (B).
[407] *See* Foremost Case Brief at 10.
[408] *See* FGI Verification Report at 8-9.

subject merchandise was ever shipped using {this company}, to which they said yes, but that it is hard for them to identify which specific sales because the merchandise is tracked by container, which makes it harder to track in its system.

In reviewing the record and freight documentation provided, FGI concluded that its U.S. sales database did not include inland freight from the port to the warehouse for its inventory sales, but that it had intended to include the expense in its calculation of international freight.  FGI pointed to Exhibit C-20.1 of its section C questionnaire response, dated July 22, 2019 (CQR), where it provided the inland freight expense for each purchase order, but explained that it accidentally did not end up including it in its calculations of international freight.  We did not verify the U.S. inland freight reported at Exhibit C-20.1.[409]

Foremost did not reference the freight exhibit when discussing U.S. inland freight expenses in the narrative portion of its response and the information Foremost pointed to was buried in this exhibit attached to its response.  Because Commerce was unaware, prior to verification, that Foremost included data related to these expenses in an exhibit, we were faced with the choice of reviewing them for the first time at verification or deciding not to examine them further.  Ultimately, Commerce decided not to verify this information because we found that Foremost had not provided sufficient notification to Commerce regarding the U.S. inland freight expenses for its CEP inventory sales.  Prior to verification, as mentioned above, Foremost specifically stated its CEP inventory sales' "international freight fees include delivery to Foremost's U.S. warehouse."[410]  Accordingly, Commerce accepted Foremost's narrative response at face value.

In similar situations, Commerce has acted similarly.  For example, in *HFCs from China*, the respondent buried information material to Commerce's analysis in exhibits attached to a response and Commerce was unaware, until verification, that a problem existed.[411]  In its final determination, Commerce found that the mere fact that the information existed on the record was insufficient notification to Commerce about the specifics of the problem.[412]  Similarly, at verification, Commerce discovered for the first time that, for its CEP inventory sales, Foremost had not reported international freight expenses inclusive of U.S. inland freight to the warehouse.  Consistent with Commerce's practice in *HFCs from China*, and because Foremost provided affirmative statements to the contrary, we find this exhibit to provide insufficient notification to Commerce that Foremost separately incurred the U.S inland freight expenses in question.

Section 776(a)(2)(B) of the Act states that if an interested party fails to provide information in the manner requested, Commerce may use facts otherwise available in reaching its determination.  Further, section 776(a)(2)(C) states that Commerce may also resort to facts available if an interested party significantly impedes a proceeding.  In this case, Commerce requested that Foremost report all inland freight expenses in its U.S. sales database, but it did

---

[409] *Id.* at 11-12.
[410] *See* Foremost July 22, 2019 CDQR, section C, at 31.
[411] *See Hydrofluorocarbon Blends and Components Thereof from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 FR 42314 (June 29, 2016) (*HFCs from China*), and accompanying IDM at Comment 13.
[412] *Id.*

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

not, despite its assertions to the contrary.  Moreover, section 782(d) of the Act states that if Commerce "determines that a response to a request for information under this title does not comply with the request {Commerce} shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency…"  In this case, as Commerce found in *HFCs from China*,[413] because we were unaware that a problem existed prior to verification, we find that we were not obligated under section 782(d) of the Act to notify Foremost of this issue prior to our final determination. [414]

Foremost's narrative response was incorrect and misleading because Foremost unequivocally stated in its section C questionnaire response that its international freight fees for CEP inventory sales included delivery to the U.S. warehouse.  In other words, that Foremost used a different vendor for its port to warehouse freight, was completely new information found at verification, and that Foremost's reported INTNFRU for its CEP inventory sales did not include inland delivery to the port was also new information discovered at verification.  As a result of Foremost's characterization of these expenses, Commerce was unable to analyze the information pertaining to INLFPWU prior to verification, and it also did not calculate an accurate preliminary dumping margin.

The Federal Circuit held in *Nippon Steel* that "the best of its ability" requires the respondent to do the maximum it is able to do[415] and clarified that adverse inferences should be applied when "under circumstances {when} …it is reasonable for Commerce to expect that more forthcoming responses should have been made."  The Federal Circuit also discusses intent with respect to the application of adverse inference:  "the statute does not contain an intent element.  'Inadequate inquiries' may suffice."[416]  Though Foremost stated that its omission was inadvertent, it made factually incorrect statements, which it failed to correct until Commerce discovered contradictory information at verification.

Accordingly, pursuant to section 776(b) of the Act, we find that Foremost failed to act to the best of its ability because Foremost failed to include inland freight from port to warehouse expenses for inventory sales in its U.S. sales database, and we are applying facts available, with adverse inference, to all U.S. inventory sales.  For the final determination, we are applying the highest ratio, on the record, of Foremost's reported CEP inventory freight expense to inventory value to calculate a new INLFPWU variable.  The only other U.S. inland freight expense information on the record is from the port to the customer for direct CEP and EP sales, and we find that using this information would not be reasonable or an accurate replacement for inland freight from the port to warehouse.

---

[413] *Id*.
[414] *See Certain Hot-Rolled Carbon Steel Flat Products from Thailand:  Final Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review*, 73 FR 33396 (June 12, 2008), and accompanying IDM at Comment 1.
[415] *See Nippon Steel*, 337 F. 3d at 1382.
[416] *Id*. at 1383.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

**Comment 18:  Foremost's U.S. Inland Freight Charges to the Customer**

*Petitioner Case and Rebuttal Briefs*[417]
- Foremost's method of calculating the distance component of this freight expense resulted in distorted freight expenses because Foremost used the same distance for sales shipped to Maine, Florida, and New York.

*Foremost Case and Rebuttal Briefs*[418]
- Commerce's verification report suggests that Foremost's methodology for determining distance when reporting inland freight expenses, from the warehouse to the customer (INLFWCU), was distortive.  However, freight rates are impacted by a number of various factors, so given the circumstances, Foremost's methodology was accurate and reasonable.
- Commerce tested the accuracy of Foremost's reporting and did not find any errors.

**Commerce's Position**:  For the final determination we find that Foremost's methodology for reporting INLFWCU is reasonable, and as such, are not making a change to this expense for our final determination.  In particular, while the method Foremost used is not necessarily exact, there is no record information to suggest that Foremost's methodology is clearly distortive. Specifically, while the methodology for calculating the distances Foremost used in its calculation of INLFWCU potentially results in disparate locations with the same delivery costs per kilogram, the record does not provide any insight into whether this calculation is distortive, nor does any party point to an example of how this distance calculation distorts Foremost's calculation of inland freight.  Further, Foremost computed this expense in response to a request from Commerce, and we did not require Foremost to adjust this expense.[419]

We recognize the petitioner's concerns with respect to this methodology, and we agree that it requires further consideration.  However, we disagree that the information is unusable in this segment of the proceeding or that any of the conditions for facts available (much less AFA) have been met here.  As discussed above, Commerce requested that Foremost "recalculate {its} movement expenses so that they are based on weight of the transaction {and}…so that distance is considered."  Foremost timely responded to Commerce's request in the form and manner requested, and Commerce verified that information.  Further, Foremost's actions did not impede this investigation.  Additionally, while it is true that Foremost's inland freight expense calculation incorporates the same distance for cities geographically far apart, the record does not indicate that the results of this calculation are unrepresentative of Foremost's actual freight expense.  Accordingly, we are not making any changes for the final determination with respect to INLFWCU, but we will carefully review this methodology in an administrative review, should

---

[417] *See* Petitioner January 27 Rebuttal Brief at 18-20.
[418] *See* Foremost Case Brief at 9-10.
[419] *See* Foremost September 17, 2019 SCQR at 30 (citing Commerce's instruction, which stated:
> Please recalculate your movement expenses so that they are based on weight of the transaction.
> Please also revise your INLFWCU expense so that distance is considered or explain why distance
> is not relevant to the actual inland freight expense you incurred during the POI).

Commerce issue an AD order in this proceeding, and should such a review be requested of Foremost.

## Comment 19:  FGI's Acquisition Cost

*Foremost Case Brief*[420]
- Commerce should calculate FGI's acquisition costs where it is not reported, or where it needs to be revised, by adding Foremost Worldwide's standard markup to its acquisition price, so that it can recalculate entered value where necessary.

*Petitioner Rebuttal Brief*[421]
- Commerce should use the formula provided by Foremost to calculate FGI's acquisition costs as necessary.

**Commerce's Position**:  We agree that Commerce should recalculate FGI's acquisition costs (which are used to derive Foremost's entered values), where possible.[422]  Accordingly, for the final determination we are recalculating FGI's acquisition cost to equal Foremost Worldwide's purchase price plus Foremost Worldwide's standard mark up.

We note that both Foremost and the petitioner proposed a formula where Commerce would calculate FGI's acquisition price by adding Foremost Worldwide's standard markup to it.[423] However, we find this calculation mathematically infeasible, considering that Foremost did not report FGIACQU for all applicable sales.[424]  Accordingly, we are determining these costs using the methodology above instead.[425]

## Comment 20:  Labor Hours

*Foremost Case Brief*[426]
- In response to a supplemental questionnaire, Foremost updated its calculation of its direct labor hours, but inadvertently did not incorporate the update into its FOP database.
- This error was minor and resulted in Foremost overstating the direct labor hours. Commerce can reasonably disregard this discrepancy.
- If Commerce chooses to make an adjustment for this error, Commerce can use information on the record to reduce Foremost's reported labor hours.

---

[420] *See* Foremost Rebuttal Brief at 11-12.
[421] *See* Petitioner January 27 Rebuttal Brief at 21-22.
[422] *See* FGI Verification Report at 3; *see also* Foremost's Letter, "Minor Corrections Presented at Foremost's CEP Sales Verification," dated December 18, 2019 (FGI Minor Corrections) at 2.
[423] *See* Foremost Case Brief at 11.
[424] *Id*.
[425] *See* Foremost Final Analysis Memorandum.
[426] *See* Foremost Case Brief at 13-14.

*Petitioner Rebuttal Brief*[427]
- The petitioner agrees that Foremost's error was minor and that Foremost's reported labor data do not need to be adjusted.

**Commerce's Position:**  At verification, Commerce learned that Foremost corrected its direct labor hours in response to a supplemental questionnaire but did not update its reported FOPs.[428] We agree with both the petitioner and Foremost that this error was minor and, consistent with section 777A(a)(2) of the Act, we are not making any changes to Foremost's direct labor FOP for the final determination.

## Comment 21:  Calculation and Programing Revisions

*Foremost Case and Rebuttal Briefs*[429]
- Commerce should make the minor corrections presented at verification.[430]
- Commerce should disregard one unreported U.S. sale because the error is so minor.  If Commerce does incorporate this sale into the analysis, Commerce should apply the average margin it calculates for other transactions.
- Commerce should calculate VATTAX using entered value and not gross unit price.
- Commerce should adjust the following variables to remove the portion of the value/expenses attributable to non-subject inputs from its calculations:  ENTVALU (and then Commerce should recalculate USDUTYU), BANKCHARU, DIRSELU, COMMU, EARLYPYU, and OTHDIS4U.
- Commerce should convert the glass SV to the units reported in Foremost's FOP file, *i.e.*, from kg/unit to M$^2$/Unit.
- Commerce should reject the petitioner's suggestion (*see* below) that an unreported quality claim referenced in Commerce's verification report should be allocated across all of one customer's sales.  Commerce found no issues with this claim at verification.

*Petitioner Case and Rebuttal Briefs*[431]
- Commerce should make the minor corrections submitted by Foremost at verification.[432]
- Foremost failed to report one sale of subject merchandise because it was sold to a "sales rep."  Commerce should add this sale to Foremost's U.S. sales database and use the average sales adjustments from other U.S. sales.  Alternatively, Commerce should apply AFA to this one sale to be consistent with Commerce's practice.[433]

---

[427] *See* Petitioner January 27 Rebuttal Brief at 24-25.

[428] *See* Foremost September 24, 2019 SDQR at Exhibit SD-27c; *see also* Foremost Woodwork Verification Report at 22.

[429] *See* Foremost Case Brief at 7 and 14-17.

[430] *See* Foremost Case Brief at 12 (citing Foremost Woodwork Verification Report at 2-3; Foremost Worldwide Verification Report at 3; and FGI Verification Report at 2-3)).

[431] *See* Petitioner January 20 Case Brief at 23-24; and Petitioner January 27 Rebuttal Brief at 15.

[432] *See* Petitioner January 20 Case Brief at 23 (citing FGI Minor Corrections; Foremost Woodwork Minor Corrections; and Foremost Worldwide Minor Corrections).

[433] *See* Petitioner January 27 Rebuttal Brief at 15 (citing *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 FR 2019 (April 15, 2015), and accompanying IDM at Comment 5; and *Final Determination of Sales at Less Than Fair*

- Commerce only relied on Foremost Worldwide's short-term interest rate in the *Preliminary Determination*, but for the final determination, Commerce should use FGI's short-term interest rate.
- Foremost was unable to provide documentation to support its claim that it reduced the payment for one transaction to compensate for a quality issue related to a non-subject sale. Commerce should allocate this payment reduction across all of this customer's sales as a warranty expense.

**Commerce's Position**: For the final determination, we have made the corrections presented at the start of Foremost's verifications. We are also changing certain parts of the calculation for Foremost's U.S. price. We are removing the portion of the value/expenses related to non-subject inputs when sales are combination kits for the following variables: ENTVALU, BANKCHARU, DIRSELU, COMMU, EARLYPYU, and OTHDIS4U, and we are revising our calculation of VATTAX to base it on a percentage of ENTVALU, and not of gross unit price. We have used the revised ENTVALU to calculate both VATTAX and USDUTYU.[434]

With respect to calculating NV, Foremost notified Commerce that the correct conversion for its glass FOPs was from kg to $M^2$, but Commerce inadvertently did not convert these FOPs.[435] Accordingly, for the final determination we are converting Foremost's glass FOPs (HW3MMGLS, HW5MMGSL, HW8MMGLS) from kg/unit to $M^2$/unit.

With respect to the short-term interest rate used in calculating CREDITU, we are revising our calculation to use FGI's short-term interest rate for CEP sales, in accordance with our practice to use the U.S. interest rate as outlined in Policy Bulletin 98.2.[436] It is Commerce's practice to calculate the U.S. credit expense using a short-term interest rate tied to the currency in which the sales are denominated and this interest rate should be based on the respondent's weighted-average short-term borrowing experience in the currency of the transaction. Additionally, Policy Bulletin 98.2 states, "{t}he short-term borrowing rate realized by the respondent in the relevant currency is the best measure of the time value of money and the cost incurred by the respondent in extending credit to its customers."[437] With respect to Foremost's CEP sales, FGI is the company incurring the cost by extending credit to its customers, as it is the U.S. affiliate making these sales. Accordingly, because it is Commerce's practice to calculate credit expenses using a short-term interest rate tied to the currency in which the sales are denominated and to use the interest rate incurred by the respondent in extending credit to its customers, Commerce is

---

*Value:  Silica Bricks and Shapes from the People's Republic of China*, 78 FR 70918 (November 27, 2013), and accompanying IDM at Comment 7).
[434] *See* Foremost Final Analysis Memorandum for a detailed description of the changes made for the final determination.
[435] *See* Foremost September 24, 2019 SDQR at 27.
[436] *See* Import Administration Bulletin 98.2:  Imputed Credit Expenses and Interest Rate (February 23, 1998) (Policy Bulletin 98.2); *see also Certain Tapered Roller Bearings from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value*, 83 FR 29092 (June 22, 2018), and accompanying IDM at Comment 19.
[437] *See* Policy Bulletin 98.2.

revising its calculation of CREDITU for all CEP sales to use FGI's short-term interest rate, consistent with its practice.[438]

We are not making any adjustments with respect to the petitioner's suggestion for the sale Commerce examined at verification with a quality claim. We find that Foremost provided all of the information requested by Commerce, and the record does not contradict Foremost's assertion that its adjustment was for a sale of non-subject merchandise.[439]

In accordance with section 776(a)(2)(A) of the Act, we are applying facts otherwise available to Foremost's one unreported sale because it withheld information requested by Commerce. Specifically, we found at verification that Foremost had made one U.S. sale to a "sales rep," but Foremost chose not to report it.[440] Foremost was not able to explain why it did not report this sale. Moreover, pursuant to section 776(b)(1) of the Act, we find that Foremost failed to cooperate to the best of its ability in reporting this sale, because it simply chose not to report it.[441] Accordingly, we are applying facts available, with adverse inference, to Foremost's sale of subject merchandise at issue. Although Foremost had the necessary information in its possession, it failed to report this sale in its U.S. sales database, and it provided no reasonable explanation as to why it chose to not report this sale. Therefore, for the final determination, we are basing the dumping margin for this sale on the highest non-aberrational margin computed for any reported U.S. transaction.

## Comment 22:  Total AFA for Meisen

*Meisen Case Brief*[442]
- In the *Preliminary Determination*, Commerce accurately noted that Meisen only reported consumption of birch in its production and Commerce confirmed that point in a supplemental response. There was no evidence on the record that Meisen ever produced or sold maple products.
- Because Commerce's conclusion in the *Preliminary Determination* that Meisen failed to provide complete and accurate information about its production process and FOPs was based only on marketing materials, that finding lacked any connection to the record.
- Instead of proceeding to verification in order to test the accuracy of Meisen's statements, Commerce issued two supplemental questionnaires. In its responses, Meisen reiterated that its FOPs had been reported correctly and provided detailed documentation and other data to support its claims.

---

[438] *See Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administrative Review and Notice of Intent Not to Revoke Antidumping Duty Order in Part*, 74 FR 40167 (August 11, 2009), and accompanying IDM at Comment 12 (stating that "we find that {the U.S. affiliate's} borrowings more closely measure the opportunity cost associated with extending credit to CNA's U.S. customers").
[439] *See* Foremost Worldwide Verification Report at 13.
[440] *See* FGI Verification Report at 7; *see also* FGI Verification Exhibits at VE-6.
[441] *See Nippon Steel*, 337 F. 3d at 1382 (explaining that "the best of its ability" standard in section 776(b) of the Act "does not condone inattentiveness, carelessness, or inadequate record keeping").
[442] *See* Meisen's Case Brief, "Wooden Cabinets and Vanities from the People's Republic of China:  Case Brief," dated January 9, 2020 (Meisen Case Brief).

- When Commerce cancelled verification in its December 27 Letter, it noted a difference between the marketing materials and the record information establishing the use of only birch as inputs and the absence of maple but did not identify any inaccurate statement by Meisen regarding its FOPs or misrepresentation regarding its reported sales.[443]

- Although verification is the part of the investigation process in which any continuing concerns are to be addressed, the December 27 Letter offered no explanation why cancelling verification was the appropriate response to any concerns Commerce continued to have.

- Meisen has consistently reported that it does not use any wood input other than birch and that it does not sell merchandise to the United States using any other input.

- Commerce faults Meisen for not immediately responding to the petitioner's pre-preliminary comments but neglects to consider that Meisen already reported that it did not use any other inputs. The claim that Meisen failed to reply to the petitioner's comments is not a valid basis for resorting to AFA, and it is tantamount to delegating Commerce's fact-finding authority to the petitioner.

- Commerce's claim that it expended considerable time and resources to issue multiple questionnaires and review thousands of pages of documentation is ironic given that it was Commerce, not Meisen, that chose to delay verification and issue supplemental questionnaires. Commerce cannot complain on one hand that it had too little information on the maple-birch issue, then complain that it had too much information, while also refusing to verify the information.

- The regulations are unambiguous that, in the investigation phase of a case, verifications will be conducted. To the extent that Commerce is not certain whether information is accurate, the verification process becomes more important, not less.

- In the parallel CVD investigation, Meisen was assigned a calculated rate, not a rate based on AFA, and Commerce conducted a verification. Because the information received in that parallel case is relevant to the usage of birch or maple, and the use of AFA, Commerce should place the full verification outline and report on the record of this investigation and allow parties to comment.

- None of the statutory provisions for application of AFA applies to Meisen; it has met the deadlines set by Commerce and there is ample information on the record showing that Meisen did not use anything other than birch to produce the products sold, it answered every supplemental request fully and completely, and because Commerce decided to cancel verification there has been no failure of Meisen to verify its information.[444]

- Commerce must calculate a dumping margin for Meisen based on information it submitted and must treat all such information as if it had been verified.

*Petitioner Rebuttal Brief*[445]
- Commerce's decision to cancel verification and apply total AFA is supported by the record and consistent with its regulations and established practice.

---

[443] *Id.* at 5 (citing Commerce's Letter, "Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Verification," dated December 27, 2019 (December 27 Letter)).

[444] Although Meisen referred to AFA in making this argument, we understand that Meisen is referencing section 776(a)(2) of the Act.

[445] *See* Petitioner's Meisen Rebuttal Brief, "Rebuttal Brief Regarding Meisen-Specific Issues," dated January 14, 2020, at 3-22.

Filed By: Eliza Siordia, Filed Date: 2/24/20 12:29 PM, Submission Status: Approved

- The record shows definitively that Meisen produces subject cabinets and vanities using birch wood yet markets those cabinets and vanities in the United States as maple. Meisen does not deny this fundamental discrepancy and attempts to shift focus to the narrow question of whether Meisen accurately reported the species of its wood FOPs.

- The inconsistency between Meisen's reported FOPs and the merchandise priced, marketed, and sold in the United States, causes the reported cost and sales information to be wholly unreliable and, thus, it is not possible to calculate an accurate dumping margin. This inconsistency could not be resolved at verification.

- Even if Meisen's reported information were verified as accurate, Meisen's cost and sales information would continue to be unreliable. Meisen asks Commerce to set aside this contradiction and to believe that all other information is accurate. However, the fact that Meisen submitted such false and contradictory information itself renders the remaining information submitted unreliable.

- Despite being afforded multiple opportunities to address the discrepancy between the FOPs reported and the species marketed in the United States, Meisen has not provided any argument that explains this fundamental flaw. Instead, Meisen acknowledges that it marketed and sold cabinets as being made of maple yet maintains that all such cabinets were actually made of birch.

- Given the importance of wood species to the production of cabinets and vanities, Commerce properly concluded that Meisen's cost and sales reporting was so unreliable that it must rely on total AFA. Because maple wood is substantially more expensive than birch wood, Meisen is not only misleading its customers, it is distorting its U.S. sales information and preventing an apples-to-apples comparison of costs and prices.

- If the alleged birch cabinets were sold as birch cabinets, then they would be sold at much lower prices; thus, Meisen's U.S. prices are artificially high and using such data would result in a margin that significantly underestimates the actual amount of dumping.

- Meisen submitted significant amounts of information that it knew was inaccurate and falsely described the cabinets sold in the United States, but it made no effort to explain the discrepancy until it was raised by the petitioner and Commerce, despite being afforded multiple opportunities to do so.

- Meisen attempted to explain its marketing materials by claiming that those materials refer to the "look" of the cabinets, but an overwhelming amount of evidence indicates the materials refer specifically to the wood used to produce the cabinets.

- Meisen later claimed that it marketed its cabinets as made of solid maple because there is no optical difference in the finished good between maple and birch, thereby undermining its claim that maple refers to the "look" of the cabinets.

- Meisen's reporting in this investigation falls squarely within the legal framework for total AFA because Meisen routinely provided contradictory information that calls into question the veracity of all the information provided.

- In similar situations where the respondent provided contradictory information to Commerce and to its customers, Commerce has applied total AFA because reliable information necessary to calculate a margin was not available on the record.[446]

---

[446] *Id.* at 20-22 (citing *Certain Steel Grating from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 75 FR 32366 (June 8, 2010), and accompanying IDM at 11; *see also Certain Oil Country*

- In other cases, Commerce has found certain deficiencies in the respondent's reporting to be significant enough to render their reported sales information entirely unreliable.[447]
- Meisen argues that it has been forthcoming and answered all of Commerce's questions, but it ignores the fact that it knew that the information it provided to its customers contradicted the information provided to Commerce and it did not inform Commerce of that fact. Further, Meisen failed to explain why this inconsistency does not distort the reported sales information.
- Commerce's practice in *Certain Hardwood Plywood Products*, *Galvanized Steel Wire*, and *OCTG* establishes that where a respondent has failed to provide cost and sales information that can be reliably compared, Commerce must apply total AFA.
- Commerce is under no obligation to verify the information provided by Meisen in light of the unreliability of Meisen's information. No information Meisen could have provided at verification would have resolved the flaws in Meisen's reported data; further, verification is not an opportunity for the respondent to fill gaps or cure deficiencies in its responses, but rather its purpose is to verify the information already submitted.
- Meisen's claim that verification is not optional is false, and Commerce has a consistent practice of not conducting verification of a respondent's data where failures of the respondent warrant application of total AFA.[448]

**Commerce's Position:** We disagree with Meisen that Commerce erred in its decision to apply AFA in the *Preliminary Determination* and, consequently, delay and, ultimately, cancel verification. We also disagree with Meisen that the continued application of total AFA to Meisen is not warranted for this final determination.

In the *Preliminary Determination*, we found that Meisen did not accurately represent and report the FOPs it consumed in the production of merchandise under consideration, it withheld information, failed to provide information in the form or manner requested, and significantly impeded this investigation. Further, because the missing information was within Meisen's possession and also because Meisen had the ability not to misrepresent its reported data, it failed to cooperate to the best of its ability and, thus, the application of total AFA was appropriate.[449] These findings were based largely on record information indicating that Meisen marketed and had sales of merchandise under consideration during the POI that were produced using maple wood, a primary raw material that Meisen failed to report.[450] The finding was also based on information submitted by the petitioner, including online and print marketing materials, and a sworn affidavit from an individual with extensive experience in the wooden cabinets and vanities industry who, through direct discussions and information provided on the J&K Companies'

---

*Tubular Goods from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, Affirmative Final Determination of Critical Circumstances and Final Determination of Targeted Dumping*, 75 FR 20335 (April 19, 2010) (*OCTG*), and accompanying IDM at Comment 30).

[447] *Id.* at 23-24 (citing *Certain Hardwood Plywood Products* IDM at 13-16).

[448] *Id.* at 30-31 (citing *Certain Hardwood Plywood Products*; and *Galvanized Steel Wire from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 77 FR 17430 (March 26, 2012) (*Galvanized Steel Wire*), and accompanying IDM at 10).

[449] *See Preliminary Determination* PDM at 23-24.

[450] *Id.* at 24.

85

websites,[451] stated that the merchandise in question was represented to him to be made from solid maple wood.[452]  However, we also stated in the *Preliminary Determination* that, due to the fact that the issue was raised in close proximity to the *Preliminary Determination*, we would continue to consider whether the application of AFA to Meisen was warranted in light of any rebuttal factual information provided by Meisen and, if appropriate, any further information requested by Commerce after the issuance of the preliminary determination.[453]

Between October 8, 2019, and October 17, 2019, Meisen and the petitioner submitted comments regarding Commerce's *Preliminary Determination*.[454]  On October 18, 2019, Commerce notified parties that, in order to consider the comments submitted, it was suspending the planned verification of Meisen but that it might have sought to reschedule the verification at a later date.[455]  On October 25, 2019, Commerce issued Meisen a supplemental questionnaire,[456] to which Meisen responded on November 6, 2019.[457]  On November 18, 2019, Commerce issued an additional supplemental questionnaire to Meisen,[458] to which Meisen responded on November 21, 2019.[459]  On December 27, 2019, Commerce notified Meisen that it would not conduct verification and continued to find that the application of AFA was warranted for Meisen because the "admission that Meisen marketed and sold its cabinets as maple cabinets when, in fact, Meisen claims that they were made of birch, highlights continued concerns regarding the data reported in the CONNUMs for the normal value and the reported U.S. prices."[460]  In its letter, Commerce also noted the following:

> The dissonance between what Meisen marketed to its customers and what Meisen reported to Commerce was information that Meisen had in its possession and could have voluntarily presented to Commerce early in the investigation.  Instead, Meisen chose not to disclose this information until after the petitioner raised it in its comments and Commerce issued an adverse preliminary determination, suspended verification, and expended considerable time and resources to issue multiple supplemental questionnaires and review thousands of pages of documentation in response to those questionnaires.[461]

---

[451] Meisen reported 16 affiliated U.S. resellers (collectively, the "J&K Companies").  *See Preliminary Determination* PDM at 24, fn. 143.

[452] *See* Petitioner Meisen Pre-prelim Comments at Exhibit 7.

[453] *See Preliminary Determination* PDM at 25.

[454] *See* Meisen's Letter, "Meisen Preliminary Determination Rebuttal Letter," dated October 8, 2019 (Meisen Post-prelim Rebuttal Letter); *see also* Petitioner's Letter, "Petitioner's Response to Meisen's October 8th Letter," dated October 15, 2019.

[455] *See* Meisen Verification Memo.

[456] *See* Commerce's Letter, "Post-Prelim Supplemental Questionnaire," dated October 24, 2019.

[457] *See* Meisen's November 7, 2019 Post-Prelim Supplemental Questionnaire Response (Meisen November 7, 2019, PPQR).

[458] *See* Commerce's Letter, "Second Post-Prelim Supplemental Questionnaire," dated November 18, 2019 (Second Post-Prelim Questionnaire).

[459] *See* Meisen's November 21, 2019 Second Post-Prelim Supplemental Questionnaire Response, dated November 21, 2019.

[460] *See* December 27 Letter.

[461] *Id.*

To determine whether subject merchandise is being, or is likely to be, sold in the United States at LTFV, Commerce must make an appropriate comparison between the export price or constructed export price and NV.[462]  Where the subject merchandise is exported from an NME country, Commerce is directed by statute to calculate NV on the basis of the value of the FOPs utilized in producing the merchandise.[463]  In order to make such a comparison, a CONNUM is assigned to each unique product reported in the U.S. sales database based on a set of physical characteristics and matched to a corresponding CONNUM in the FOP database.  Accordingly, Commerce set aside a period of time after the initiation of this investigation for interested parties to comment on the appropriate physical characteristics of wooden cabinets and vanities to be reported in response to Commerce's AD questionnaire.[464]  We further stated that the comments solicited from interested parties would be used to identify the key physical characteristics of the subject merchandise in order to report the relevant FOPs accurately, as well as to develop appropriate product-comparison criteria.[465]

In its comments, Meisen opposed the petitioner's proposal to group wood species used as the face material in broad groupings of solid wood products, stating that the "reporting of the type of wood used as the face material is plainly an important characteristic, and thus must be reported precisely."[466]  Meisen argued that the petitioner's "suggestion to report a vague grouping of products is not tenable as it will allow for manipulation and distortion of surrogate values," and that the petitioner's proposal, "rather than collecting data based on the individual species themselves," is contrary to the way {Commerce} has collected data on wood species . . . and would result in a less accurate margin calculation than if {Commerce} followed its prior practice."[467]  Specifically, Meisen advocated for "collecting data based on individual wood species rather than broad categories of species," because the petitioner's proposal would create a "commingled reporting hierarchy which would result in an 'apples-to-oranges' comparison."[468]  In other words, Meisen argued, at the early stages of this investigation, that failure to compare the exact species sold in the U.S. market with the exact species used in production would result in an unfair comparison.  As explained below, the data that Meisen reported resulted in the same unfair "apples-to-oranges" comparison between CEP and NV as the one Meisen cautioned against in its comments.

Commerce ultimately issued the AD questionnaire with instructions for mandatory respondents to construct the CONNUM using codes for wood species grouped into general categories of "Solid wood – common-grade hardwood species" and "Solid wood – mid-grade hardwood species," where common grade (Code 4)  included "Birch (Betula)" and mid-grade (Code 5) included "Maple (all varieties)."[469]  Given these facts, there is absolutely no scenario where a U.S. sale priced for maple wood could ever be compared to the NV of a product made with birch

---

[462] *See* 19 CFR 351.401(a).

[463] *See* section 773(c) of the Act.

[464] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Initiation of Less-Than-Fair-Value Investigation*, 84 FR 12587, 12588 (April 2, 2019).

[465] *Id.*

[466] *See* Meisen's Letter, "Rebuttal Comments on Product Characteristics," dated April 25, 2019, at 3.

[467] *Id.* at 3-4.

[468] *Id.* at 4-5.

[469] *See, e.g.*, Commerce's Letter, "Antidumping Duty Questionnaire," dated June 5, 2019.

wood, a comparison Meisen argues that Commerce should now make.  We note that this would also have been the case had we followed Meisen's recommendation of separately coding each wood species out of a concern for perfectly identical matching criteria.

In a post-preliminary questionnaire response, Meisen reiterated that it "only sold cabinets produced from birch," that "the J&K Companies only sold cabinets produced by Meisen," and that "{t}herefore, by extension the J&K Companies only sold cabinets that were produced by Meisen using birch wood."[470]  In its second post-preliminary questionnaire response, Meisen clarified that the price lists that were a source of concern in the *Preliminary Determination* are simply generic and basic price lists that are used as pricing guides for the sales persons and do not include the final descriptions.[471]  Meisen went on to compare such price lists to a brochure a sales person might present to a purchaser at a home improvement store with basic descriptions that serve as the starting point.[472]  The implicit admission is that, in Meisen's scenario, the customer would have seen the description in the price list and would have a reasonable basis to assume that the wood species and price listed in that document was the starting point and, even if the dimensions were adjusted slightly for the final design, the species of wood presented would be the species provided, which, in this case, was maple.  Meisen's online and print marketing materials are so replete with references to its cabinets being made of solid maple wood, and completely devoid of any reference to the alleged actual species of wood, birch, that its customers would have no reason to believe that the cabinets they purchased were made from any wood species other than maple wood.[473]  In other words, Meisen's customers would have clearly believed that the products they were purchasing were made of solid maple wood, a species of wood that is considered to be of more premium value than common grade birch wood, as a result of online and print marketing, and in-store price lists presented by Meisen's sales people.

Meisen's attempts to alternatively construe any references to maple as a reference to the "look" of the cabinets because Meisen's birch cabinets look like maple, and then on the same page claim that it advertises its cabinets as solid maple wood because "there is no optical difference in the finished good between maple and birch once the cabinet is finished,"[474] is a disingenuous and illogical rationalization as to why Meisen exclusively markets its cabinets as "the finest solid maple."[475]  Indeed, given the wealth of online and print marketing materials on the record, as well as Meisen's own statements identifying Meisen's cabinets as solid maple cabinets,[476] and Meisen's admission that it does not advertise any birch products, there can be no question that Meisen is intentionally misleading its customers into believing they are purchasing maple cabinets and that Meisen's customers believe they are paying for products made of maple wood.

Evidence on the record of this investigation indicates that maple is significantly more expensive than birch, showing that maple solid wood or veneers can be as much as twice as expensive as

---

[470] *See* Meisen November 7, 2019 PPQR at 2.
[471] *See* Meisen November 21, 2019 PPQR2 at 2.
[472] *Id.*
[473] *See* Second Post-Prelim Questionnaire at 4 and Attachment II.
[474] *Id*.
[475] *See* Meisen November 21, 2019 PPQR2 at 2-3.
[476] *See, e.g.*, Meisen November 7, 2019 PQR at 1-2; and Post-Prelim Questionnaire at 3-5 and Attachment II.

birch.[477]  Indeed, the SV used to value maple and birch in the *Preliminary Determination* was 912 Euros and 622 Euros, respectively.[478]  Given that both parties acknowledge the importance of wood species in the production of cabinets, and that the SVs are significantly different, it is reasonable to infer that higher costs lead to higher selling prices when the cabinets are produced using maple rather than birch and that cabinets sold as maple products would command a higher price than cabinets made of birch.  This is implicit in Meisen's product characteristics comments in which it proposed breaking out wood species for Commerce's CONNUMs.

A consequence of Meisen's misrepresentations is the potential masking of dumped sales.  The question before Commerce is simple:  what is the "fair" value of the products Meisen sold in the United States during the POI?  By comparing Meisen's cabinets that are priced as though they were produced with maple, (and which may or may not have been sold at prices below NV for maple cabinets) to an NV based on a non-maple wood species, the degree to which Meisen may be selling at LTFV is effectively obscured.  The purpose of soliciting comments and making a reasoned decision on how respondents are to report physical characteristics in construction of the CONNUM is to avoid the very scenario we are presented with here.  Commerce intentionally separated certain species by grade into separate codes in order to match similar prices to similar costs.  Meisen has subverted Commerce's intent and process by misrepresenting the product being sold, thereby distorting the comparison that Commerce is tasked with making.

Although Meisen provided significant amounts of documentation supporting its reported FOPs,[479] its U.S. sales database is comprised of sales of merchandise priced under CONNUMs that are not included in its FOP database.  Moreover, Meisen's U.S. CONNUMs do not represent the maple cabinets it purported to sell and the record does not contain FOP data for the products Meisen represented selling in the U.S. market.  As a result, U.S. prices for purported maple cabinets and NV for birch cabinets introduces a significant mismatch between the two pillars of our AD margin calculation.  Given the above, we cannot calculate an accurate dumping margin with the data reported by Meisen, nor would verification of the accuracy of Meisen's reported data resolve the discrepancy such that the distortion could be remedied.  Accordingly, we conclude that the rejection of Meisen's data is appropriate for this final determination.

Meisen argues that because the record developed in the companion CVD investigation is relevant to the usage of birch or maple, and the use of AFA, Commerce should place the full CVD verification outline and report on the record of this investigation and allow parties to comment.  As an initial matter, the record of this investigation, and that of the CVD investigation, are separate records.[480]  Moreover, it is not clear how information from the CVD investigation would shed any light on the deficiencies in Meisen's reported information in this AD investigation.  Meisen itself admits that it represented its products to U.S. customers as products made from maple but claims that its products were actually produced using birch wood.  Accordingly, we do

---

[477] *See* Petitioner Meisen Pre-prelim Comments at Exhibit 7.
[478] *See* Preliminary SV Memorandum.
[479] *See* Meisen November 7, 2019, PPQR at Exhibits 2, 3, 8, and 9.
[480] *See, e.g.*, *Tri Union Frozen Prods. v. United States*, 163 F. Supp. 3d 1255, 1274 n.14 (CIT 2016) (explaining that "the agency must make its determinations based on the record before it.  Each of Commerce's proceedings are treated 'as independent proceedings with separate records that lead to independent determinations'") (quoting *E.I. Du Pont de Nemours & Co. v. United States*, 22 C.I.T. 19 (CIT 1998)).

89

not find that placing information from the CVD investigation on the record of this AD investigation would serve any purpose at this stage of this investigation.

With regard to Meisen's contention that Commerce is required to verify the information it submitted; we disagree. According to section 782(i)(1) of the Act and 19 CFR 351.307(b)(1)(i), Commerce will verify factual information upon which the Secretary relies in, *inter alia*, a final determination in an AD investigation. However, for the reasons described herein, we are not relying upon any of Meisen's reported information for this final determination and, therefore, there is no information that must be verified. Moreover, as a result of the dissonance between Meisen's reported U.S. sales data and its FOP data, its questionnaire responses contain fundamental discrepancies that were not directly addressed until well after the *Preliminary Determination* and that remain unresolved even after Meisen's belated attempt at clarification. When a party submits substantially deficient responses, Commerce is under no obligation to use this information.[481] Under these circumstances, there is no requirement to verify the information.[482] If a respondent provides substantially incomplete questionnaire responses and Commerce must then base the company's rate entirely on facts available, as in this case, then verification is "meaningless."[483]

As discussed above, section 776(a)(1) and (2) of the Act provides that, if necessary information is missing from the record, or if an interested party: (A) withholds information that has been requested by Commerce, (B) fails to provide such information in a timely manner or in the form or manner requested, subject to subsections 782(c)(1) and (e) of the Act, (C) significantly impedes a proceeding under the statute, or (D) provides such information but the information cannot be verified, Commerce shall, subject to subsection 782(d) of the Act, use facts otherwise available in reaching the applicable determination.

Where Commerce determines that a response to a request for information does not comply with the request, section 782(d) of the Act provides that Commerce will so inform the party submitting the response and will, to the extent practicable, provide that party an opportunity to remedy or explain the deficiency. If the party fails to remedy or satisfactorily explain the deficiency within the applicable time limits, subject to section 782(e) of the Act, Commerce may disregard all or part of the original and subsequent responses, as appropriate.

Section 776(b) of the Act provides that Commerce may use an adverse inference in applying the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information. In doing so, Commerce is not required to determine, or make any adjustments to, a weighted-average dumping margin based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information. Further, section 776(b)(2) states that an adverse inference may include reliance on information derived from the petition, the final determination from the AD investigation, a previous administrative review, or other information placed on the record.

---

[481] *See* section 782(e) of the Act which provides that Commerce should use information submitted by interested parties even if the information does not meet all applicable requirements but only when, *inter alia*, "the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination …."
[482] *See Galvanized Steel Wire* IDM at 11.
[483] *Id.*

90

Section 776(c) of the Act provides that, in general, when Commerce relies on secondary information rather than on information obtained in the course of an investigation, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.  Secondary information is defined as information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[484]  Further, Commerce is not required to estimate what the dumping margin would have been if the interested party failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an "alleged commercial reality" of the interested party.[485]

Commerce first became aware of the discrepancy between Meisen's reported U.S. sales and its marketing materials on September 26, 2019,[486] which was less than two weeks prior to the *Preliminary Determination*.[487]  Given the proximity to the *Preliminary Determination*, we based our preliminary decision for Meisen based on total AFA but announced that we intended to continue to examine the issue after the *Preliminary Determination*.[488]  Meisen's claims that Commerce faulted Meisen for not responding to the petitioner's allegations or that Meisen's lack of response was our basis for AFA are misplaced.[489]  Instead, our decision was rooted firmly in the record of this investigation, as it had been developed at the time of the *Preliminary Determination*, and in no way was the result of mere allegations or a lack of response from Meisen.[490]  However, given the importance of the information to Commerce's analysis and gravity of the evidence cited in the petitioner's September 26 letter,[491] it is notable that Meisen had the opportunity to respond with factual information and explanation of its own but chose not to and, instead, waited until after the *Preliminary Determination* to request that Commerce allow Meisen to clarify the record.[492]

Although it is true that Meisen had previously reported to Commerce on more than one occasion that it did not consume any wood species other than birch,[493] the discrepancies cited in the *Preliminary Determination* were not limited to the type of wood that Meisen consumed but also were related to the manner in which Meisen's products were marketed and sold in the United States.[494]  If Meisen believed that it had already addressed the matter of wood species consumed in its production, it still had an obligation to explain to Commerce the numerous instances of marketing materials, and a sworn affidavit, that identified its products as being made of solid maple.  Instead Meisen was utterly silent regarding the discrepancy between its wood consumption and its marketing materials that appeared to directly contradict its consumption

---

[484] *See* SAA at 870.
[485] *See* sections 776(d)(3)(A) and (B) of the Act.
[486] *See* Petitioner Meisen Pre-prelim Comments.
[487] *See Preliminary Determination*.
[488] *See Preliminary Determination* PDM at 23-25.
[489] *See* Meisen Case Brief at 6.
[490] *See Preliminary Determination* PDM at 23-25.
[491] *See* Petitioner Meisen Pre-prelim Comments.
[492] *See* Meisen Post-prelim Rebuttal Letter.
[493] *See* Meisen's section D questionnaire response, dated July 19, 2019, at 12, 14, and Exhibits 1 and 2; and Meisen's supplemental Section D questionnaire response, dated September 16, 2019, at 7.
[494] *See Preliminary Determination* PDM at 23-25.

claims.  As a result of Meisen's failure to clarify the record, Commerce was forced to delay verification and issue two supplemental questionnaires before Meisen directly addressed the issue.[495]  However, even in its second post-preliminary questionnaire response, Meisen gave conflicting and unconvincing reasons as to why its marketing materials misrepresented the species of wood used in its cabinets.[496]

Accordingly, we determine that Meisen withheld information, failed to provide such information in a timely manner, and significantly impeded the investigation, pursuant to section 776(a)(2)(A)-(C) of the Act.  Meisen could have raised the issue of the discrepancies between the products that it marketed to its customers and those it reported to Commerce early in the investigation, especially given Meisen's concerns of properly capturing the wood species in the CONNUM and how it could affect product matches and, ultimately, the dumping margin.  This was information that Meisen had in its possession and could have voluntarily presented to Commerce.  Instead, Meisen chose not to disclose this information until after the *Preliminary Determination* and only after Commerce suspended verification and expended considerable time and resources to issue multiple supplemental questionnaires and review thousands of pages of documentation in response to those questionnaires.  Accordingly, we also find that Meisen failed to cooperate by not acting to the best of its ability and that an adverse inference is warranted is assigning a final margin to Meisen, in accordance with section 776(b) of the Act.  We recognize the petitioner's concerns that the record of this investigation indicates that Meisen is engaged in advertising and selling its materials in an untruthful manner to consumers in the United States.  Such business practices fall within the expertise of the U.S. Federal Trade Commission, and we have therefore shared relevant public information with that agency for further investigation and, if appropriate, enforcement action.

---

[495] *See* Meisen November 21, 2019 PPQR2 at 2-5.
[496] *Id.* at 3 ("The marketing materials are not a reflection of the actual material used in the production of the wooden cabinets during the POI but rather a reflection of the 'look' of the cabinets.  They have been marketed as maple because they look like maple), 5 ("The J&K companies advertise their cabinets as solid maple wood as there is no optical difference in the finished good between maple and birch once the cabinet is finished"), and Attachment II ("all our cabinets are made of solid maple wood door and frames with plywood constructed box" . . . "solid maple wood is the main wood species we use for cabinet door, frames, molding decoration parts, and drawers.").

92

## XI.    RECOMMENDATION

We recommend approving all the above positions.  If these positions are accepted, we will publish the final determination in the *Federal Register* and will notify the ITC of our determination.

☒                              ☐

_____          _____
Agree                          Disagree

                                        2/21/2020

X  _____

    Signed by: JEFFREY KESSLER

_____
Jeffrey I. Kessler
Assistant Secretary
  for Enforcement and Compliance

# REM JA 3

# Corrected Final Determination (March 31, 2020)
## PR 1575


## IV. Request for Comments

Comments are invited on: (a) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (b) the accuracy of the agency's estimate of the burden (including hours and cost) of the proposed collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology.

Comments submitted in response to this notice will be summarized and/or included in the request for OMB approval of this information collection; they also will become a matter of public record.

Dated: March 25, 2020.

**Sheleen Dumas,**
*Department PRA Clearance Officer, Office of the Chief Information Officer, Commerce Department.*

[FR Doc. 2020–06597 Filed 3–30–20; 8:45 am]

**BILLING CODE 3510–13–P**

---

## DEPARTMENT OF COMMERCE

### Foreign-Trade Zones Board

#### [B–73–2019]

#### Foreign-Trade Zone (FTZ) 18—San Jose, California; Authorization of Production Activity; Tesla, Inc. (Electric Passenger Vehicles and Components), Fremont, Livermore, and Oakland, California

On November 26, 2019, Tesla, Inc. submitted a notification of proposed production activity to the FTZ Board for its facilities within Subzone 18G, in Fremont, Livermore, and Oakland, California.

The notification was processed in accordance with the regulations of the FTZ Board (15 CFR part 400), including notice in the **Federal Register** inviting public comment (84 FR 66651, December 5, 2019). On March 25, 2020, the applicant was notified of the FTZ Board's decision that no further review of the activity is warranted at this time. The production activity described in the notification was authorized, subject to the FTZ Act and the FTZ Board's regulations, including Section 400.14.

Dated: March 25, 2020.

**Andrew McGilvray,**
*Executive Secretary.*

[FR Doc. 2020–06637 Filed 3–30–20; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### Foreign-Trade Zones Board

#### [Order No. 2094]

#### Approval of Subzone Status; Frank's International, LLC, New Iberia and Lafayette, Louisiana

Pursuant to its authority under the Foreign-Trade Zones Act of June 18, 1934, as amended (19 U.S.C. 81a–81u), the Foreign-Trade Zones Board (the Board) adopts the following Order:

*Whereas,* the Foreign-Trade Zones (FTZ) Act provides for ''. . . the establishment . . . of foreign-trade zones in ports of entry of the United States, to expedite and encourage foreign commerce, and for other purposes,'' and authorizes the Foreign-Trade Zones Board to grant to qualified corporations the privilege of establishing foreign-trade zones in or adjacent to U.S. Customs and Border Protection ports of entry;

*Whereas,* the Board's regulations (15 CFR part 400) provide for the establishment of subzones for specific uses;

*Whereas,* the Port of South Louisiana, grantee of Foreign-Trade Zone 124, has made application to the Board for the establishment of a subzone at the facilities of Frank's International, LLC, located in New Iberia and Lafayette, Louisiana (FTZ Docket B–69–2019, docketed October 29, 2019);

*Whereas,* notice inviting public comment has been given in the **Federal Register** (84 FR 59351–59352, November 4, 2019) and the application has been processed pursuant to the FTZ Act and the Board's regulations; and,

*Whereas,* the Board adopts the findings and recommendations of the examiner's memorandum, and finds that the requirements of the FTZ Act and the Board's regulations are satisfied;

*Now, therefore,* the Board hereby approves subzone status at the facilities of Frank's International, LLC, located in New Iberia and Lafayette, Louisiana (Subzone 124U), as described in the application and **Federal Register** notice, subject to the FTZ Act and the Board's regulations, including Section 400.13.

Dated: March 25, 2020.

**Jeffrey I. Kessler,**
*Assistant Secretary for Enforcement and Compliance, Alternate Chairman, Foreign-Trade Zones Board.*

[FR Doc. 2020–06636 Filed 3–30–20; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

#### [A–570–106]

#### Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Corrected Notice of Final Affirmative Determination of Sales at Less Than Fair Value

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** On February 28, 2020, the Department of Commerce (Commerce) published its final determination in the sales at less-than-fair-value investigation of wooden cabinets and vanities and components thereof from the People's Republic of China (China). However, the notice was not printed in the **Federal Register** as Commerce intended. This notice corrects the resultant punctuation errors in company names that occurred in the publication.

**DATES:** Applicable March 31, 2020.

**FOR FURTHER INFORMATION CONTACT:** Rachel Greenberg, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0652.

**SUPPLEMENTARY INFORMATION:**

### Background

On February 28, 2020, Commerce published the *Final Determination.*[1] However, the **Federal Register** notice stating the names of the producer-exporter combination rates was not printed as Commerce intended. Various company names contained inadvertent punctuation errors. Commerce is hereby correcting the *Final Determination* to include the correct punctuation in certain company names.

### Scope of the Investigation

The scope of this investigation has not changed from that stated in the *Final Determination.*

---

[1] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value,* 85 FR 11953 (February 28, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum.

Barcode:3959649-01 A-570-106 INV - Investigation -

**17856**        **Federal Register** / Vol. 85, No. 62 / Tuesday, March 31, 2020 / Notices

## Correction to Final Determination

The corrected producer-exporter combination rates are as follows:

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| The Ancientree Cabinet Co., Ltd ............................ | The Ancientree Cabinet Co., Ltd ............................ | 4.37 | 0.00 |
| Dalian Meisen Woodworking Co., Ltd ..................... | Dalian Meisen Woodworking Co., Ltd ..................... | 262.18 | 251.64 |
| Foremost Worldwide Company Limited .................... | Rizhao Foremost Woodwork Manufacturing Company, Ltd. | 101.46 | 90.92 |
| Foremost Worldwide Company Limited .................... | Henan AiDiJia Furniture Co., Ltd ........................... | 101.46 | 90.92 |
| Foremost Worldwide Company Limited .................... | Suzhou Weiye Furniture Co., Ltd .......................... | 101.46 | 90.92 |
| Foremost Worldwide Company Limited .................... | Changsha Minwan Furniture Manufacturing Co., Ltd. | 101.46 | 90.92 |
| ANHUI JIANLIAN WOOD PRODUCTS CO., LTD ... | ANHUI JIANLIAN WOOD PRODUCTS CO., LTD .. | 48.50 | 37.96 |
| Anhui Swanch Cabinetry Co., Ltd .......................... | Anhui Swanch Cabinetry Co., Ltd .......................... | 48.50 | 37.96 |
| ANHUI XINYUANDA CUPBOARD CO., LTD .......... | ANHUI XINYUANDA CUPBOARD CO., LTD .......... | 48.50 | 37.96 |
| Beijing Oulu Jinxin International Trade Co., Ltd ......... | Beijing Oulu Jinxin International Trade Co., Ltd ......... | 48.50 | 37.96 |
| Boloni Smart Home Decor (Beijing) Co., LTD ......... | Boloni Smart Home Decor (Beijing) Co., LTD ......... | 48.50 | 37.96 |
| BRENTRIDGE HOLDING CO., LTD ....................... | ZHOUSHAN FOR–STRONG WOOD CO., LTD ..... | 48.50 | 37.96 |
| Caoxian Brothers Hengxin Wood Industry Co., Ltd | Caoxian Brothers Hengxin Wood Industry Co., Ltd | 48.50 | 37.96 |
| Changyi Zhengheng Woodwork Co., Ltd ............... | Changyi Zhengheng Woodwork Co., Ltd ............... | 48.50 | 37.96 |
| CHAOZHOU YAFENG BATHROOM EQUIPMENT CO., LTD. | CHAOZHOU YAFENG BATHROOM EQUIPMENT CO., LTD. | 48.50 | 37.96 |
| China Friend Limited ............................................. | Dongming Sanxin Wood Industry Co., Ltd .............. | 48.50 | 37.96 |
| Dalian Jiaye Wood Products Co., Ltd .................... | Dalian Jiaye Wood Products Co., Ltd .................... | 48.50 | 37.96 |
| Dalian Xingsen Wooden Products Co., Ltd ............ | Dalian Xingsen Wooden Products Co., Ltd ............ | 48.50 | 37.96 |
| Dandong City Anmin Wooden Products Group Co., Ltd. | Dandong City Anmin Wooden Products Group Co., Ltd. | 48.50 | 37.96 |
| Dandong Laroyal Cabinetry Co., Ltd ...................... | Dandong Laroyal Cabinetry Co., Ltd ...................... | 48.50 | 37.96 |
| DEHK LIMITED ..................................................... | DIAM DISPLAY (CHINA) CO., LTD ...................... | 48.50 | 37.96 |
| Deqing China-Africa Foreign Trade Port Co., Ltd .... | Suqian Welcomewood Products Co., Ltd .............. | 48.50 | 37.96 |
| Dewell Wooden Products Haian Co., Ltd ............... | Dewell Wooden Products Haian Co., Ltd ............... | 48.50 | 37.96 |
| Dongguan American Parts Supplier Co., Ltd .......... | Dongguan American Parts Supplier Co., Ltd .......... | 48.50 | 37.96 |
| Dongguan Niusaiqu Wood Industry Co., Ltd .......... | Dongguan Niusaiqu Wood Industry Co., Ltd .......... | 48.50 | 37.96 |
| Dongguan Unique Life Furniture Co., Ltd. also known as Unique Life Furniture Co., Ltd (trade name). | Dongguan Unique Life Furniture Co., Ltd .............. | 48.50 | 37.96 |
| Dorbest Ltd ......................................................... | Rui Feng Woodwork (Dongguan) Co., Ltd ............ | 48.50 | 37.96 |
| EZIDONE DISPLAY CORPORATION LTD .............. | EZIDONE DISPLAY CORPORATION LTD .............. | 48.50 | 37.96 |
| EZIDONE DISPLAY CORPORATION LTD .............. | EZIDONE DISPLAY INC ...................................... | 48.50 | 37.96 |
| Forcer International Limited ................................... | QUFU XINYU FURNITURE CO., LTD ................... | 48.50 | 37.96 |
| Forcer International Limited ................................... | LINYI RUNKANG CABINET CO., LTD .................. | 48.50 | 37.96 |
| Forcer International Limited ................................... | BEIJING OULU JINXIN INTERNATIONAL TRADE CO., LTD. | 48.50 | 37.96 |
| Foshan City Shunde District Refined Furniture Co., Ltd. also known as Refined Furniture Co., Ltd. (trade name). | Foshan City Shunde District Refined Furniture Co., Ltd. also known as Refined Furniture Co., Ltd (trade name). | 48.50 | 37.96 |
| Foshan Liansu building material Trading Co., Ltd .... | Guangdong Lesso Home Furnishing Co., Ltd ......... | 48.50 | 37.96 |
| FOSHAN NANHAI HONGZHOU WOOD CO., LTD | FOSHAN NANHAI HONGZHOU WOOD CO., LTD | 48.50 | 37.96 |
| Foshan Shunde Yajiasi Kitchen Cabinet Co., Ltd ... | Foshan Shunde Yajiasi Kitchen Cabinet Co., Ltd ... | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ........... | FOSHAN DIBIAO BATHROOM CO., LTD ............... | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ........... | FOSHAN MK HOME FURISHING CO., LTD .......... | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ........... | PROUDER INDUSTRIAL LIMITED ....................... | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ........... | FOSHAN DEMAX SANITARY WARE CO., LTD ..... | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ........... | HEBEI SHUANGLI FURNITURE CO., LTD ........... | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ........... | ZHANGZHOU GUOHUI INDUSTRIAL & TRADE CO., LTD. | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ........... | SHOUGUANG FUSHI WOOD CO., LTD ............... | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ........... | Foshan Virtu Bathroom Furniture Ltd ...................... | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ........... | Guangdong Purefine Kitchen & Bath Technology Co., LTD. | 48.50 | 37.96 |
| FOSHAN SOURCEVER (CN) CO., LIMITED ........... | KAIPING HONGITARYWARE TECHNOLOGY LTD | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ....................... | FOSHAN DIBIAO BATHROOM CO., LTD .............. | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ....................... | FOSHAN MK HOME FURISHING CO., LTD .......... | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ....................... | PROUDER INDUSTRIAL LIMITED ....................... | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ....................... | FOSHAN DEMAX SANITARY WARE CO., LTD ..... | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ....................... | HEBEI SHUANGLI FURNITURE CO., LTD ........... | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ....................... | ZHANGZHOU GUOHUI INDUSTRIAL & TRADE CO., LTD. | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ....................... | SHOUGUANG FUSHI WOOD CO., LTD ............... | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ....................... | Foshan Virtu Bathroom Furniture Ltd ...................... | 48.50 | 37.96 |

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| Foshan Sourcever Company Limited ...................... | Guangdong Purefine Kitchen & Bath Technology Co., LTD. | 48.50 | 37.96 |
| Foshan Sourcever Company Limited ...................... | KAIPING HONGITARYWARE TECHNOLOGY LTD | 48.50 | 37.96 |
| Foshan Xinzhongwei Economic & Trade Co., Ltd .... | Foshan Lihong Furniture Sanitary Ware Co., Ltd  ... | 48.50 | 37.96 |
| FUJIAN DUSHI WOODEN INDUSTRY CO., LTD  ... | FUJIAN DUSHI WOODEN INDUSTRY CO., LTD  .. | 48.50 | 37.96 |
| FUJIAN LEIFENG CABINETRY CO., LTD .............. | FUJIAN LEIFENG CABINETRY CO., LTD .............. | 48.50 | 37.96 |
| Fujian Panda Home Furnishing Co., Ltd .................. | Fujian Panda Home Furnishing Co., Ltd .................. | 48.50 | 37.96 |
| Fujian Senyi Kitchen Cabinet Co., Ltd ................... | Fujian Senyi Kitchen Cabinet Co., Ltd ................... | 48.50 | 37.96 |
| Fuzhou Biquan Trading Co., Ltd ............................. | Biquan (Fujian) Group Co., Ltd ............................. | 48.50 | 37.96 |
| Fuzhou CBM Import & Export Co., Ltd ................... | Fuzhou CBM Import & Export Co., Ltd ................... | 48.50 | 37.96 |
| Fuzhou Desource Home Décor Co., Ltd ................. | Fuzhou Desource Home Decor Co., Ltd ................. | 48.50 | 37.96 |
| FUZHOU LIMIN STONE PRODUCTS CO., LTD ..... | Fuzhou YST Cabinet Co., Ltd  ................................ | 48.50 | 37.96 |
| FUZHOU MASTONE IMPORT & EXPORT CO., LTD. | Fuzhou Yuansentai Cabinet Co., Ltd  ...................... | 48.50 | 37.96 |
| Fuzhou Minlian Wood Industry Co., Ltd .................. | Fuzhou Minlian Wood Industry Co., Ltd .................. | 48.50 | 37.96 |
| FUZHOU SUNRISING HOME DECO MANUFAC-TURING CO., LTD. | FUZHOU SUNRISING HOME DECO MANUFAC-TURING CO., LTD. | 48.50 | 37.96 |
| FUZHOU XINRUI CABINET CO., LTD ................... | FUZHOU XINRUI CABINET CO., LTD ................... | 48.50 | 37.96 |
| Gaomi City Haitian Wooden Ware Co., Ltd ............. | Gaomi City Haitian Wooden Ware Co., Ltd ............. | 48.50 | 37.96 |
| GAOMI HONGTAI HOME FURNITURE CO., LTD .. | GAOMI HONGTAI HOME FURNITURE CO., LTD | 48.50 | 37.96 |
| Guangde Bozhong Trade Company, Ltd ................... | Guangde Bozhong Trade Company, Ltd ................... | 48.50 | 37.96 |
| GUANGDONG CACAR KITCHEN TECHNOLOGY CO., LTD. | GUANGDONG CACAR KITCHEN TECHNOLOGY CO., LTD. | 48.50 | 37.96 |
| Guangdong G-Top Import and Export Co., Ltd ........ | Foshan Shunde Rongao Furniture CO., LTD .......... | 48.50 | 37.96 |
| Guangzhou Nuolande Import and Export Co., Ltd ... | Guangzhou Nuolande Import and Export Co., Ltd .. | 48.50 | 37.96 |
| Haiyang Kunlun Wood Co., Ltd ............................... | Haiyang Kunlun Wood Co., Ltd ............................... | 48.50 | 37.96 |
| Hangzhou Bestcraft Sanitary Equipments Co., Ltd .. | Hangzhou Bestcraft Sanitary Equipments Co., Ltd | 48.50 | 37.96 |
| Hangzhou Entop Houseware Co., Ltd ...................... | Jinhua Aonika Sanitary Ware Co., Ltd ................... | 48.50 | 37.96 |
| Hangzhou Entop Houseware Co., Ltd ...................... | Hangzhou Bestcraft Sanitary Equipments Co., Ltd | 48.50 | 37.96 |
| Hangzhou Hansen Sanitary Ware Co., Ltd ............. | Hangzhou Hansen Sanitary Ware Co., Ltd ............. | 48.50 | 37.96 |
| Hangzhou Hoca Kitchen & Bath Products Co., Ltd .. | Hangzhou Hoca Kitchen & Bath Products Co., Ltd | 48.50 | 37.96 |
| Hangzhou Home Dee Sanitary Ware Co., Ltd ........ | Hangzhou Home Dee Sanitary Ware Co., Ltd ........ | 48.50 | 37.96 |
| Hangzhou Oulang Bathroom Equipment Co., Ltd .... | Hangzhou Oulang Bathroom Equipment Co., Ltd ... | 48.50 | 37.96 |
| Hangzhou Royo Import & Export Co., Ltd ............... | Jinhua Aonika Sanitary Ware Co., Ltd ................... | 48.50 | 37.96 |
| Hangzhou Royo Import & Export Co., Ltd ............... | Hangzhou Yuxin Sanitary Ware Co., Ltd ............... | 48.50 | 37.96 |
| Hangzhou Royo Import & Export Co., Ltd ............... | Hangzhou Fuyang Beautiful Sanitary Ware Co., Ltd | 48.50 | 37.96 |
| Hangzhou Sunlight Sanitary Co., Ltd ...................... | Hangzhou Sunlight Sanitary Co., Ltd ...................... | 48.50 | 37.96 |
| Hangzhou Weinuo Sanitary Ware Co., Ltd ............. | PINGHU AIPA SANITARY WARE CO., LTD .......... | 48.50 | 37.96 |
| Hangzhou Weinuo Sanitary Ware Co., Ltd ............. | HANGZHOU QILONG SANITARY WARE CO., LTD. | 48.50 | 37.96 |
| Hangzhou Xinhai Sanitary Ware Co., Ltd ............... | Hangzhou Xinhai Sanitary Ware Co., Ltd ............... | 48.50 | 37.96 |
| Hangzhou Yewlong Import & Export Co., Ltd .......... | Hangzhou Yewlong Industry Co., Ltd ..................... | 48.50 | 37.96 |
| Hangzhou Zhuangyu Import & Export Co., Ltd ....... | Hangzhou Zhuangyu Import & Export Co., Ltd ....... | 48.50 | 37.96 |
| Henan Aotin Home Furnishing Co., Ltd ................... | Henan Aotin Home Furnishing Co., Ltd ................... | 48.50 | 37.96 |
| Heyond Cabinet Co., Ltd ........................................ | Heyond Cabinet Co., Ltd ........................................ | 48.50 | 37.96 |
| Homestar Corporation ............................................. | Homestar Corporation ............................................. | 48.50 | 37.96 |
| HONG KONG JIAN CHENG TRADING CO., LIM-ITED. | ZHONGSHAN YAYUE FURNITURE CO., LTD ...... | 48.50 | 37.96 |
| Xiamen Honglei Imp. & Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Changtai Guanjia Industry & Trade Company Co., Ltd. | 48.50 | 37.96 |
| Xiamen Honglei Imp. & Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Zhangzhou Huihua Industry and Trade Co., Ltd ..... | 48.50 | 37.96 |
| Xiamen Honglei Imp. & Exp. Co., Ltd. also known as Honglei (Xiamen) Stone Co., Ltd. | Fujian Xinanlong Wood Industry Co., Ltd ............... | 48.50 | 37.96 |
| Honsoar New Building Material Co., Ltd .................. | Shandong Honsoar Cabinet Materials Co., Ltd ....... | 48.50 | 37.96 |
| Hua Yin Trading Development Co., Ltd of Jiangmen City. | Jianfa Wooden Co., Ltd ......................................... | 48.50 | 37.96 |
| Hua Yin Trading Development Co., Ltd of Jiangmen City. | Heshan Yingmei Cabinets Co., Ltd ........................ | 48.50 | 37.96 |
| Hua Yin Trading Development Co., Ltd of Jiangmen City. | Hesha Feiqiu Cabinet Co., Ltd ............................... | 48.50 | 37.96 |
| Huimin Hanlong Furniture Co., Ltd ......................... | Huimin Hanlong Furniture Co., Ltd ......................... | 48.50 | 37.96 |
| HUISEN FURNITURE (LONG NAN) CO., LTD. also known as HUISEN FURNITURE (LONGNAN) CO., LTD. | HUISEN FURNITURE (LONG NAN) CO., LTD. also known as HUISEN FURNITURE (LONGNAN) CO., LTD. | 48.50 | 37.96 |
| HUIZHOU MANDARIN FURNITURE CO., LTD ..... | HUIZHOU MANDARIN FURNITURE CO., LTD ...... | 48.50 | 37.96 |
| Jiang Su Rongxin Cabinets Ltd ............................... | Jiang Su Rongxin Cabinets Ltd ............................... | 48.50 | 37.96 |
| Jiangmen Kinwai Furniture Decoration Co., Ltd ....... | Jiangmen Kinwai Furniture Decoration Co., Ltd ...... | 48.50 | 37.96 |
| Jiangmen Kinwai International Furniture Co., Ltd ..... | Jiangmen Kinwai International Furniture Co., Ltd ..... | 48.50 | 37.96 |
| Jiangsu Beichen Wood Co., Ltd ............................. | Jiangsu Beichen Wood Co., Ltd ............................. | 48.50 | 37.96 |

Barcode:3959649-01 A-570-106 INV - Investigation -
**17858**     **Federal Register** / Vol. 85, No. 62 / Tuesday, March 31, 2020 / Notices

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| Jiangsu Meijun Intelligent Home Co., Ltd ................ | Jiangsu Meijun Intelligent Home Co., Ltd ................ | 48.50 | 37.96 |
| Jiangsu Pusite Furniture Co., Ltd .............................. | Jiangsu Pusite Furniture Co., Ltd .............................. | 48.50 | 37.96 |
| Jiangsu Roc Furniture Industrial Co., Ltd ................. | Jiangsu Roc Furniture Industrial Co., Ltd ................. | 48.50 | 37.96 |
| JIANGSU SUNWELL CABINETRY CO., LTD .......... | JIANGSU SUNWELL CABINETRY CO., LTD .......... | 48.50 | 37.96 |
| JIANGSU WEISEN HOUSEWARE CO., LTD ........... | JIANGSU WEISEN HOUSEWARE CO., LTD ........... | 48.50 | 37.96 |
| Jiangsu Xiangsheng Bedtime Furniture Co., Ltd ...... | Jiangsu Xiangsheng Bedtime Furniture Co., Ltd ..... | 48.50 | 37.96 |
| Jiayuan (Xiamen) Industrial Co., Ltd ........................ | Jiayuan (Xiamen) Industrial Co., Ltd ........................ | 48.50 | 37.96 |
| JINJIANG PERFECT GENERATION IMP. & EXP. CO., LTD. | Homebi Technology Co., LTD ................................... | 48.50 | 37.96 |
| King's Group Furniture (Enterprises) Co., Ltd .......... | Zhongshan King's Group Furniture (ENTER-PRISES) Co., Ltd. | 48.50 | 37.96 |
| KM Cabinetry Co., Limited ....................................... | Zhongshan KM Cabinetry Co., Ltd ........................... | 48.50 | 37.96 |
| Kunshan Baiyulan Furniture Co., Ltd ........................ | Kunshan Baiyulan Furniture Co., Ltd ........................ | 48.50 | 37.96 |
| Kunshan Home Right Trade Corporation .................. | Kunshan Fangs Furniture Co., Ltd ........................... | 48.50 | 37.96 |
| LIANYUNGANG SUN RISE TECHNOLOGY CO., LTD. | LIANYUNGANG SUN RISE TECHNOLOGY CO., LTD. | 48.50 | 37.96 |
| Linshu Meibang Furniture Co., Ltd ........................... | Linshu Meibang Furniture Co., Ltd ........................... | 48.50 | 37.96 |
| Linyi Bomei Furniture Co., Ltd ................................. | Linyi Bomei Furniture Co., Ltd ................................. | 48.50 | 37.96 |
| LINYI BONN FLOORING MANUFACTURING CO., LTD. | LINYI BONN FLOORING MANUFACTURING CO., LTD. | 48.50 | 37.96 |
| Linyi Kaipu Furniture Co., Ltd .................................. | Linyi Kaipu Furniture Co., Ltd .................................. | 48.50 | 37.96 |
| Linyi Runkang Cabinet Co., Ltd ................................ | Linyi Runkang Cabinet Co., Ltd ................................ | 48.50 | 37.96 |
| Liu Shu Woods Product (Huizhou) Co., Ltd also known as Liu Shu Wood Products Co., Ltd (trade name) and Liu Shu Woods Product Co., Ltd (trade name). | Liu Shu Woods Product (Huizhou) Co., Ltd ............ | 48.50 | 37.96 |
| Master Door & Cabinet Co., Ltd .............................. | Master Door & Cabinet Co., Ltd .............................. | 48.50 | 37.96 |
| Masterwork Cabinetry Company Limited .................. | Shandong Compete Wood Co., Ltd .......................... | 48.50 | 37.96 |
| Masterwork Cabinetry Company Limited .................. | Linyi Zhongsheng Jiaju Zhuangshi Co., Ltd ............ | 48.50 | 37.96 |
| MEILIN WOOD PRODUCTS(DALIAN)CO., LTD ...... | MEILIN WOOD PRODUCTS(DALIAN)CO., LTD ...... | 48.50 | 37.96 |
| Minhou Beite Home Decor Co., Ltd .......................... | Minhou Beite Home Decor Co., Ltd .......................... | 48.50 | 37.96 |
| MJB Supply (Dalian) Co., Ltd ................................... | Mulin City Bamiantong Linyeju Jisen Wood ............. | 48.50 | 37.96 |
| MOREWOOD CABINETRY CO., LTD ....................... | MOREWOOD CABINETRY CO., LTD ....................... | 48.50 | 37.96 |
| Nanjing Kaylang Co., Ltd ......................................... | Nanjing Kaylang Co., Ltd ......................................... | 48.50 | 37.96 |
| Nantong Aershin Cabinets Co., Ltd .......................... | Nantong Aershin Cabinets Co., Ltd .......................... | 48.50 | 37.96 |
| Nantong Ouming Wood Co., Ltd., also known as Nantong Ouming Wood Industry Co., Ltd. | Nantong Ouming Wood Co., Ltd., also known as Nantong Ouming Wood Industry Co., Ltd. | 48.50 | 37.96 |
| NANTONG YANGZI FURNITURE CO., LTD .......... | NANTONG YANGZI FURNITURE CO., LTD .......... | 48.50 | 37.96 |
| NINGBO KINGWOOD FURNITURE CO., LTD ......... | NINGBO KINGWOOD FURNITURE CO., LTD ......... | 48.50 | 37.96 |
| NINGBO ROVSA HOME FURNISHING CO., LTD .. | NINGBO ROVSA HOME FURNISHING CO., LTD | 48.50 | 37.96 |
| Ojans Company Limited ............................................ | Foshan Shunde Ojans Intelligent Sanitary Ware Co., Ltd. | 48.50 | 37.96 |
| Oppein Home Group Inc ........................................... | Oppein Home Group Inc ........................................... | 48.50 | 37.96 |
| PIZHOU OUYME IMPORT & EXPORT TRADE CO., LTD. | XUZHOU OUMEC WOOD–BASED PANEL CO., LTD. | 48.50 | 37.96 |
| Pneuma Asia Sourcing & Trading Co. LIMITED ...... | Dalian Tianxin Home Product Co., Ltd ..................... | 48.50 | 37.96 |
| Pneuma Asia Sourcing & Trading Co. LIMITED ...... | Qingdao Haiyan Drouot Household Co., Ltd ............ | 48.50 | 37.96 |
| Putian Jinggong Furniture Co., Ltd ........................... | Putian Jinggong Furniture Co., Ltd ........................... | 48.50 | 37.96 |
| Qingdao Coomex Sources Co., Ltd. also known as Coomex Sources Co., Ltd. | Nantong Aershin Cabinets Co., Ltd .......................... | 48.50 | 37.96 |
| Qingdao Haiyan Drouot Household Co., Ltd ............ | Qingdao Haiyan Drouot Household Co., Ltd ............ | 48.50 | 37.96 |
| Qingdao Liangmu Hongye Co., Ltd ........................... | Qingdao Liangmu Hongye Co., Ltd ........................... | 48.50 | 37.96 |
| Qingdao Liangmu Jinshan Woodwork Co., Ltd ........ | Qingdao Liangmu Jinshan Woodwork Co., Ltd ........ | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Lankao Sanqiang Wooden Products Co., Ltd ......... | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Lanshan Chengxinli Woods Co., Ltd ............... | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Shouguang Shi Qifeng Woods Co., Ltd .................. | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Mingzhu Woods Co., Ltd ................................. | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Yichun Senhai Woods Industry Co., Ltd .................. | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Linyi Jinde Arts&Crafts Co., Ltd ............................. | 48.50 | 37.96 |
| Qingdao Northriver Wooden Resource Industry & Trading Co., Ltd. | Qingdao Ruirong Woods Co., Ltd ............................ | 48.50 | 37.96 |
| Qingdao Shousheng Industry Co., Ltd ..................... | Qingdao Shousheng Industry Co., Ltd ..................... | 48.50 | 37.96 |
| Qingdao Yimei Wood Work Co., Ltd ......................... | Qingdao Yimei Wood Work Co., Ltd ......................... | 48.50 | 37.96 |
| QINGDAOHONGXINCHENGDA WOOD INDUS-TRY CO., LTD. | QINGDAOHONGXINCHENGDA WOOD INDUS-TRY CO., LTD. | 48.50 | 37.96 |

Case 1:20-cv-00114-GSK   Document 72   Filed 01/04/22   Page 113 of 339

Barcode:3959649-01 A-570-106 INV - Investigation -
**Federal Register** / Vol. 85, No. 62 / Tuesday, March 31, 2020 / Notices          **17859**

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| QUFU XINYU FURNITURE CO., LTD ................. | QUFU XINYU FURNITURE CO., LTD ................. | 48.50 | 37.96 |
| Ronbow Hong Kong Limited ..................................... | Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd. | 48.50 | 37.96 |
| Sagarit Bathroom Manufacturer Limited ................. | Shouguang Fushi Wood Co., Ltd ........................... | 48.50 | 37.96 |
| Sagarit Bathroom Manufacturer Limited ................. | Zhangzhou Guohui Industrial & Trade Co., Ltd ...... | 48.50 | 37.96 |
| Sagarit Bathroom Manufacturer Limited ................. | Qingdao Runpeng Wood Industrial Co., Ltd ........... | 48.50 | 37.96 |
| Sankok Arts Co., Ltd ............................................. | Sankok Arts Co., Ltd ............................................. | 48.50 | 37.96 |
| Senke Manufacturing Company ............................. | Qindao Yimei Wood Work Co., Ltd ........................ | 48.50 | 37.96 |
| Senke Manufacturing Company ............................. | Linyi Kaipu Furniture Co., Ltd .............................. | 48.50 | 37.96 |
| Senke Manufacturing Company ............................. | Shandon Honsoar Cabinetry Co., Ltd ................... | 48.50 | 37.96 |
| Senke Manufacturing Company ............................. | Huimin Hanlong Furniture Co, Ltd ......................... | 48.50 | 37.96 |
| Shandong Cubic Alpha Timber Co., Ltd ................ | Shandong Cubic Alpha Timber Co., Ltd ................ | 48.50 | 37.96 |
| Shandong Fusheng Wood Co., Ltd ....................... | Shandong Fusheng Wood Co., Ltd ....................... | 48.50 | 37.96 |
| Shandong Huanmei Wood Co., Ltd ....................... | Shandong Huanmei Wood Co., Ltd ....................... | 48.50 | 37.96 |
| SHANDONG JINGYAO HOME DECORATION PRODUCTS CO., LTD. | SHANDONG JINGYAO HOME DECORATION PRODUCTS CO., LTD. | 48.50 | 37.96 |
| Shandong Longsen Woods Co., Ltd ...................... | Shandong Longsen Woods Co., Ltd ...................... | 48.50 | 37.96 |
| Shandong Sanfortune Home and Furniture Co., Ltd | Shandong Sanfortune Home and Furniture Co., Ltd | 48.50 | 37.96 |
| Shanghai Aiwood Home Supplies Co., Ltd ............ | Jiangsu Gangxing Kitchen Cabinet Co., Ltd .......... | 48.50 | 37.96 |
| Shanghai Aiwood Home Supplies Co., Ltd ............ | Shanghai Homebase SanSheng Household Prod-uct Co., Ltd. | 48.50 | 37.96 |
| Shanghai Baiyulan Furniture Co., Ltd .................... | Kunshan Baiyulan Furniture Co., Ltd .................... | 48.50 | 37.96 |
| Shanghai Beautystar Cabinetry Co., Ltd ............... | Jiangsu Sunwell Cabinetry Co., Ltd ..................... | 48.50 | 37.96 |
| Shanghai Beautystar Cabinetry Co., Ltd ............... | Nantong Jiegao Furniture Co., Ltd ....................... | 48.50 | 37.96 |
| Shanghai Jiang Feng Furniture Co., Ltd ............... | Shanghai Jiang Feng Furniture Co., Ltd ............... | 48.50 | 37.96 |
| SHANGHAI LINE KING INTERNATIONAL TRAD-ING CO., LTD. | SHANGHAI YAZHI WOODEN INDUSTRY CO., LTD. | 48.50 | 37.96 |
| Shanghai Mebo Industry Co. Ltd ........................... | Shanghai Mebo Industry Co. Ltd ........................... | 48.50 | 37.96 |
| Shanghai Qingzhou Woodenware Co., Ltd ............ | Shanghai Qingzhou Woodenware Co., Ltd ............ | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Anhui GeLun Wood Industry Co., Ltd ................... | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Ning'an City Jiude Wood Co., Ltd ........................ | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Muling City Bamiantong Forestry Bureau Jisen Wood Co., Ltd. | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Dalian Ruiyu Mountain Wood Co., Ltd .................. | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Linshu Meibang Furniture Co., Ltd ....................... | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Jiamusi City Quanhong Wood Industry Co., Ltd ..... | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Kunshan Fangs Furniture Co., Ltd ....................... | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Dalian Chunyao Wood Industry Co., Ltd .............. | 48.50 | 37.96 |
| Shanghai S&M Trade Co., Ltd .............................. | Anhui Juxin Wood Industry Co., Ltd ..................... | 48.50 | 37.96 |
| Shanghai Wang Lei Industries- Taicang Branch ...... | Shanghai Wang Lei Industries- Taicang Branch ...... | 48.50 | 37.96 |
| Shanghai Wen Bo Industries Co. Ltd .................... | Shanghai Yinbo Manufacturing Co. Ltd ................ | 48.50 | 37.96 |
| Shanghai Wen Bo Industries Co. Ltd .................... | Dalian Jiaye Wood Products Co., Ltd ................... | 48.50 | 37.96 |
| Shanghai Wen Bo Industries Co. Ltd .................... | Shanghai Baiyulan Furniture Co., Ltd ................... | 48.50 | 37.96 |
| Shanghai Xietong (Group) Co., Ltd ....................... | Nantong Jiegao Furniture Co., Ltd ....................... | 48.50 | 37.96 |
| Shanghai Xietong (Group) Co., Ltd ....................... | Jiangsu Senwei Smart Home Co., Ltd ................. | 48.50 | 37.96 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | SHANDONG GAINVAST WOODEN PRODUCTS CO., LTD. | 48.50 | 37.96 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | SHANGHAI WENYI WOODEN CO., LTD ............... | 48.50 | 37.96 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | NAN TONG DI LIN FURNITURE CO., LTD ........... | 48.50 | 37.96 |
| SHANGHAI ZIFENG INTERNATIONAL TRADING CO., LTD. | JIANGSU YANAN WOODEN CO., LTD ................. | 48.50 | 37.96 |
| Sheen Lead International Trading (Shanghai)Co., Ltd. | SHANGHAI RUIYING FURNITURE CO., LTD ........ | 48.50 | 37.96 |
| Shouguang Fushi Wood Co., Ltd ........................... | Shouguang Fushi Wood Co., Ltd ........................... | 48.50 | 37.96 |
| Shouguang Honsoar Imp. & Exp. Trading Co., Ltd .. | Shandong Honsoar Cabinet Materials Co., Ltd ...... | 48.50 | 37.96 |
| SHOUGUANG JIAXIU WOOD CO., LTD ............... | SHOUGUANG JIAXIU WOOD CO., LTD ............... | 48.50 | 37.96 |
| SHOUGUANG JIAXIU WOOD CO., LTD ............... | SHOUGUANG JIAXIU WOOD CO., LTD ............... | 48.50 | 37.96 |
| Shouguang Jinxiangyuan Home Furnishing Co., Ltd | Shouguang Jinxiangyuan Home Furnishing Co., Ltd. | 48.50 | 37.96 |
| Shouguang Sanyang Wood Industry Co., Ltd .......... | Shouguang Sanyang Wood Industry Co., Ltd .......... | 48.50 | 37.96 |
| Silver Stone Group Co., Ltd .................................. | QINGDAO FAMILY CRAFTS CO., LTD ................. | 48.50 | 37.96 |
| Silver Stone Group Co., Ltd .................................. | QingDao XiuZhen Furniture Co., Ltd .................... | 48.50 | 37.96 |
| Smart Gift International ......................................... | Anhui GeLun Wood Industry Co., Ltd ................... | 48.50 | 37.96 |
| Smart Gift International ......................................... | Ning'an City Jiude Wood Co., Ltd ........................ | 48.50 | 37.96 |
| Smart Gift International ......................................... | Muling City Bamiantong Forestry Bureau Jisen Wood Co., Ltd. | 48.50 | 37.96 |
| Smart Gift International ......................................... | Dalian Ruiyu Mountain Wood Co., Ltd .................. | 48.50 | 37.96 |
| Smart Gift International ......................................... | Jiamusi City Quanhong Wood Industry Co., Ltd ..... | 48.50 | 37.96 |

Barcode:3959649-01 A-570-106 INV - Investigation -

**17860**   **Federal Register** / Vol. 85, No. 62 / Tuesday, March 31, 2020 / Notices

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| Smart Gift International ............................................. | Dalian Chunyao Wood Industry Co., Ltd ................ | 48.50 | 37.96 |
| SUNCO TIMBER(KUNSHAN) CO., LTD .................. | SUNCO TIMBER(KUNSHAN) CO., LTD .................. | 48.50 | 37.96 |
| Supree (Fujian) Wood Co., Ltd ................................ | Supree (Fujian) Wood Co., Ltd ................................ | 48.50 | 37.96 |
| Supree (Fujian) Construction Materials Co., Ltd ...... | Supree (Fujian) Construction Materials Co., Ltd ..... | 48.50 | 37.96 |
| SUZHOU BAOCHENG INDUSTRIES CO., LTD ...... | WALLBEYOND (SHUYANG) HOME DECOR CO., LTD. | 48.50 | 37.96 |
| Suzhou Five Cubic Wood Co., Ltd .......................... | Suzhou Geda Office Equipment Manufacturing Co., Ltd. | 48.50 | 37.96 |
| Suzhou Oriental Dragon Import and Export Co., Ltd. also known as Suzhou Oriental Dragon Import and Export Corp., Ltd. | Lingbi Xianghe Wood Co., Ltd ................................ | 48.50 | 37.96 |
| Tai Yuan Trading Co., Ltd also known as Heshan Tai Yuan Trading Co., Ltd. | Heshan Yingmei Cabinet Co., Ltd ........................... | 48.50 | 37.96 |
| Taishan Changfa Wood Industry Co., Ltd ................ | Taishan Changfa Wood Industry Co., Ltd ............... | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Chang He Xing Wood Manufacturer Co., Ltd ......... | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Heshan Yingmei Cabinets Co., Ltd ......................... | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Heshan Feiqiu Cabinet Co., Ltd ............................. | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Yuanwang Wood Product Factory Dajiang Taishan | 48.50 | 37.96 |
| TAISHAN HONGXIANG TRADING CO., LTD .......... | Can-Am Cabinet Ltd ............................................... | 48.50 | 37.96 |
| Taishan Hongzhou Cabinet Co., Ltd ....................... | Taishan Hongzhou Cabinet Co., Ltd ....................... | 48.50 | 37.96 |
| Taishan Jiahong Trade Co., Ltd .............................. | Taishan Dajiang Town Dutou Wood Furniture Factory. | 48.50 | 37.96 |
| Taishan Jiahong Trade Co., Ltd .............................. | Foshan Nanhai Jinwei Cabinet Furniture Co., Ltd .. | 48.50 | 37.96 |
| Taishan Jiahong Trade Co., Ltd .............................. | Taishan Huali Kitchen Cabinet Co., Ltd ................. | 48.50 | 37.96 |
| Taishan Jiahong Trade Co., Ltd .............................. | Taishan Empire Wood Co., Ltd ............................... | 48.5 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | TAISHAN GANHUI STONE KITCHEN CO., LTD ... | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | Can-Am Cabinet Ltd ............................................... | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | TAISHAN QUANMEI KITCHEN WARE CO., LTD .. | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | TAISHAN JIAFU CABINET CO., LTD ...................... | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | TAISHAN DAJIANG TOWN DUTOU FURNITURE FACTORY. | 48.50 | 37.96 |
| TAISHAN OVERSEA TRADING COMPANY LTD ... | Feiteng Kitchen Cabinets Taishan Corporation ....... | 48.50 | 37.96 |
| Taizhou Overseas Int'l Ltd ..................................... | Zhejiang Royal Home Co., Ltd ............................... | 48.50 | 37.96 |
| TANGSHAN BAOZHU FURNITURE CO., LTD ........ | TANGSHAN BAOZHU FURNITURE CO.FF0C;LTD | 48.50 | 37.96 |
| Tech Forest Cabinetry Co., Ltd ............................... | Tech Forest Cabinetry Co., Ltd ............................... | 48.50 | 37.96 |
| The Frame Manufacturing Co. Ltd ........................... | HUIZHOU DIWEIXIN JIATINGYONGPIN CO., LTD | 48.50 | 37.96 |
| Top Goal International Group Ltd. (Hong Kong) ...... | Dongguan City Top Goal Furniture Co., Ltd ........... | 48.50 | 37.96 |
| Tradewinds Furniture Ltd ........................................ | Tradewinds Furniture Ltd ........................................ | 48.50 | 37.96 |
| Wa Fok Art Craft Furniture (MACAO) Co., Ltd ........ | Zhongshan Huafu Art Craft Furniture Co., Ltd ........ | 48.50 | 37.96 |
| Weifang Fuxing Wood Co., Ltd ............................... | Weifang Fuxing Wood Co., Ltd ............................... | 48.50 | 37.96 |
| WEIFANG KITCHINET CORPORATION ................. | WEIFANG KITCHINET CORPORATION ................. | 48.50 | 37.96 |
| Weifang Lan Gu Wood Industry Co., Ltd ................ | Weifang Lan Gu Wood Industry Co., Ltd ................ | 48.50 | 37.96 |
| Weifang Master Wood Industry Co., Ltd ................. | Weifang Master Wood Industry Co., Ltd ................. | 48.50 | 37.96 |
| Weifang Yuanlin Woodenware Co., Ltd ................... | Weifang Yuanlin Woodenware Co., Ltd ................... | 48.50 | 37.96 |
| Weihai Adornus Cabinetry Manufacturing Co., Ltd .. | Weihai Adornus Cabinetry Manufacturing Co., Ltd .. | 48.50 | 37.96 |
| WEIHAI JARLIN CABINETRY MANUFACTURE CO., LTD. | WEIHAI JARLIN CABINETRY MANUFACTURE CO., LTD. | 48.50 | 37.96 |
| Wellday International Company Limited also known as Dongguan Wellday Household Co., Ltd. | Wellday International Company Limited also known as Dongguan Wellday Household Co., Ltd. | 48.50 | 37.96 |
| Wenzhou Youbo Industrial Co., Ltd ........................ | Wenzhou Youbo Industrial Co., Ltd ........................ | 48.50 | 37.96 |
| Wuxi Yushea Furniture Co., Ltd ............................. | Wuxi Yushea Furniture Co., Ltd ............................. | 48.50 | 37.96 |
| Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd. | Wuxi Yusheng Kitchen-Bathroom Equipment Co., Ltd. | 48.50 | 37.96 |
| Xiamen Adler Cabinetry Co., Ltd ............................ | Xiamen Adler Cabinetry Co., Ltd ............................ | 48.50 | 37.96 |
| XIAMEN GOFOR STONE CO., LTD ...................... | KAICHENG (FUJIAN) KITCHEN CABINET CO., LTD. | 48.50 | 37.96 |
| XIAMEN GOLDEN HUANAN IMP.& EXP. CO., LTD | Changtai Guanjia Industrial Co., Ltd ...................... | 48.50 | 37.96 |
| XIAMEN GOLDENHOME CO., LTD ...................... | XIAMEN GOLDENHOME CO., LTD ...................... | 48.50 | 37.96 |
| XIAMEN KAICHENG TRADING LIMITED COMPANY. | KAICHENG (FUJIAN) KITCHEN CABINET CO., LTD. | 48.50 | 37.96 |
| Xiamen Sintop Display Fixtures Co., Ltd ................. | Xiamen Sintop Display Fixtures Co., Ltd ................. | 48.50 | 37.96 |
| XINGZHI INTERNATIONAL TRADE LIMITED ........ | XUZHOU YIHE WOOD CO., LTD ........................... | 48.50 | 37.96 |
| XUZHOU JIA LI DUO IMPORT&EXPORT CO., LTD | XUZHOU OUMEC WOOD–BASED PANEL CO., LTD. | 48.50 | 37.96 |
| XUZHOU YIHE WOOD CO., LTD ........................... | XUZHOU YIHE WOOD CO., LTD ........................... | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ..................................... | DONGGUAN TODA FURNITURE CO., LTD ............ | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ..................................... | GUANGZHOUSHI BAISEN DECORATIVE MATERIALS COMPANY LIMITED. | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ..................................... | DONGGUAN FANYANUO FURNITURE CO., LTD | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC ..................................... | DONGGUANSHI ANKE BUILDING MATERIALS CO., LTD. | 48.50 | 37.96 |

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offsets) (percent) |
|---|---|---|---|
| YEKALON INDUSTRY, INC .................................... | Oriental Chic Furniture Company Limited ............... | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC .................................... | DONGGUAN FRANCISS FURNITURE CO., LTD .. | 48.50 | 37.96 |
| YEKALON INDUSTRY, INC .................................... | SHANGHAI YUANYANG WOODEN CO., LTD ....... | 48.50 | 37.96 |
| Yi Sen Wood Industry Limited Company of Ning An City. | Yi Sen Wood Industry Limited Company of Ning An City. | 48.50 | 37.96 |
| Yichun Dongmeng Wood Co., Ltd .......................... | Yichun Dongmeng Wood Co., Ltd .......................... | 48.50 | 37.96 |
| Yichun Dongmeng Wood Co., Ltd .......................... | Qingdao Dimei Wood Co., Ltd ............................... | 48.50 | 37.96 |
| Yichun Sunshine Wood Products Co., Ltd ............. | Yichun Sunshine Wood Products Co., Ltd ............. | 48.50 | 37.96 |
| Yixing Pengjia Cabinetry Co. Ltd .......................... | Yixing Pengjia Cabinetry Co. Ltd .......................... | 48.50 | 37.96 |
| Zhangjiagang Daye Hotel Furniture Co., Ltd ......... | Zhangjiagang Daye Hotel Furniture Co., Ltd ......... | 48.50 | 37.96 |
| ZHANGJIAGANG PRO–FIXTURE CO., LTD ........... | Zhangjiagang Yuanjiahe Home Furniture Co., Ltd .. | 48.50 | 37.96 |
| ZHANGZHOU CITY XIN JIA HUA FURNITURE CO., LTD. | ZHANGZHOU CITY XIN JIA HUA FURNITURE CO., LTD. | 48.50 | 37.96 |
| Zhangzhou Guohui Industrial & Trade Co., Ltd ...... | Zhangzhou Guohui Industrial & Trade Co., Ltd ...... | 48.50 | 37.96 |
| Zhangzhou OCA Furniture Co., Ltd ....................... | Zhangzhou OCA Furniture Co., Ltd ....................... | 48.50 | 37.96 |
| Zhaoqing Centech Decorative Material Company Ltd. | Zhaoqing Centech Decorative Material Company Ltd. | 48.50 | 37.96 |
| Zhejiang Jindi Holding Group Co., Ltd .................... | Zhejiang Jindi Holding Group Co., Ltd .................... | 48.50 | 37.96 |
| Zhong Shan Shi Yicheng Furniture & Craftwork Co., Ltd. | Zhong Shan Shi Yicheng Furniture & Craftwork Co., Ltd. | 48.50 | 37.96 |
| Zhong Shan Yue Qin Imp. & Exp. Co., Ltd ............ | Zhongshan Jinpeng Furniture Co., Ltd .................. | 48.50 | 37.96 |
| Zhongshan City Shenwan Meiting Furniture Factory | Zhongshan City Shenwan Meiting Furniture Factory. | 48.50 | 37.96 |
| Zhongshan Fookyik Furniture Co., Ltd ................... | Zhongshan Fookyik Furniture Co., Ltd ................... | 48.50 | 37.96 |
| ZHONGSHAN GAINWELL FURNITURE CO., LTD .. | ZHONGSHAN GAINWELL FURNITURE CO., LTD | 48.50 | 37.96 |
| Zhongshan Guanda Furniture Manufacturing Co., Ltd also known as Guanda Furniture Co., Ltd. | Zhongshan Guanda Furniture Manufacturing Co., Ltd. | 48.50 | 37.96 |
| ZHONGSHAN HENGFU FURNITURE COMPANY LIMITED. | ZHONGSHAN HENGFU FURNITURE COMPANY LIMITED. | 48.50 | 37.96 |
| Zhongshan King's Group Furniture (ENTER-PRISES) Co., Ltd. | Zhongshan King's Group Furniture (ENTER-PRISES) Co., Ltd. | 48.50 | 37.96 |
| Zhoushan For-strong Wood Co., Ltd ...................... | Zhoushan For-strong Wood Co., Ltd ...................... | 48.50 | 37.96 |
| Zhoushan For-strong Wood Co., Ltd ...................... | Shanghai Wanmuda Furniture Co., Ltd .................. | 48.50 | 37.96 |
| Zhucheng Tonghe Woodworks Co., ltd ................... | Zhucheng Tonghe Woodworks Co., ltd ................... | 48.50 | 37.96 |
| Zhuhai Seagull Kitchen and Bath Products Co., Ltd | Zhuhai Seagull Kitchen and Bath Products Co., Ltd | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED .................... | DONGGUAN FANG CHENG FURNITURE LTD ..... | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED .................... | ZhongShan PRO–YEARN Crafts Product Co., Ltd | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED .................... | FUJIAN NEWMARK INDUSTRIAL CO., LTD .......... | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED .................... | Fuzhou Zhonghe Houseware CO., LTD .................. | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED .................... | MING LIANG FURNITURE PRODUCT CO., LTD .. | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED .................... | XIANJU JUNYANG HOUSEHOLD PRODUCTS CO., LTD. | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED .................... | DongGuan HeTai Homewares CO., LTD ................. | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED .................... | CHENG TONG HARDWARE PRODUCT LTD ........ | 48.50 | 37.96 |
| ZIEL INTERNATIONAL CO., LIMITED .................... | Nantong Jon Ergonomic Office Co., Ltd ................. | 48.50 | 37.96 |
| China-Wide Entity .................................................. | ........................................................................... | 262.18 | 251.64 |

**Suspension of Liquidation**

Suspension of liquidation and cash deposit rates for all producers and exporters of subject merchandise from China unaffected by this correction notice. Refer to the *Final Determination* for the suspension instructions in effect at the time of the issuance of this notice.

**Public Comment**

Commerce is not accepting public comments in response to this corrected final determination.

**International Trade Commission Notification**

In accordance with section 735(d) of the Act, Commerce will notify the International Trade Commission of this correction notice.

**Notification to Interested Parties**

This corrected final determination is issued and published in accordance with sections 735(d) and 777(i)(1) of the Tariff Act of 1930, as amended, and 19 CFR 351.210(c).

Dated: March 25, 2020.

**Jeffrey I. Kessler,**

*Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2020–06645 Filed 3–30–20; 8:45 am]

**BILLING CODE 3510–DS–P**

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[A–580–907]**

**Ultra-High Molecular Weight Polyethylene From the Republic of Korea: Initiation of Less-Than-Fair-Value Investigation**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable March 24, 2020.

**FOR FURTHER INFORMATION CONTACT:** Darla Brown or Ian Hamilton, AD/CVD Operations, Office II, Enforcement and Compliance, International Trade Administration, U.S. Department of

REM JA 4

Petitioner, Surrogate Country Comments (July 16, 2019)
PR 898

Barcode:3863793-01 A-570-106 INV - Investigation -



**PUBLIC DOCUMENT**

July 16, 2019

| |
|---|
| Case No. A-570-106 |
| Total Pages: 7 |
| Investigation |
| AD/CVD Operations, E&C Office V |
| **PUBLIC DOCUMENT** |

The Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

      Re:    ***Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China:*** Surrogate Country Comments

Dear Secretary Ross:

On behalf of the American Kitchen Cabinet Alliance ("Petitioner"), we hereby submit the following surrogate country comments for the Department of Commerce's ("Department") consideration in the above-referenced investigation. This submission is timely filed.[1]

On June 17, 2019, the Department provided a list of six countries identified by the Office of Policy as economically comparable to China and likely to have good data availability and quality for the purposes of this administrative review.[2] The list includes Brazil, Mexico, Romania, Malaysia, Russia, and Kazakhstan.[3] With respect to the first element of the

---

[1]     Letter from Sec'y Commerce to All Interested Parties, re: *Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information* (June 17, 2019).

[2]     *Id.* at Attachment.

[3]     *Id.*

Filed 2021-10-19 2:14 PM, Submission Status - Approved

Barcode:3863793-01 A-570-106 INV - Investigation -

The Honorable Wilbur L. Ross, Jr.
July 16, 2019                                                          **PUBLIC DOCUMENT**
Page 2

Department's surrogate country analysis – that a surrogate country be "at a level of economic

development comparable" as the subject country – the Department's June 17th letter found that

the six countries "are at the same level of economic development as China in terms of per capita

gross national income (GNI)."[4] Thus, this first element appears to be settled.

The Department requested that parties submit comments on surrogate country selection

addressing the remaining criteria outlined in Policy Bulletin 04.1, *Non-Market Economy*

*Surrogate Country Selection Process*:[5]

> (1) Information on whether the country is a significant producer of merchandise
>      comparable to the merchandise subject to this review;
>
> (2) Information regarding data availability and quality of the data available within
>      that single country for the major factors of production used to produce the
>      merchandise subject to this review; and
>
> (3) Information regarding data availability and quality of financial statements
>      available within that country for producers of merchandise identical or
>      comparable to the merchandise subject to this review.

Pursuant to the Department's instructions and solicitation, Petitioner presents the following

information and comments with respect to these criteria.

Petitioner cannot at this time take a position regarding which country represents the

"best" option for the primary surrogate country in this proceeding because the factors of

production from the three mandatory respondents have not yet been submitted. Consequently,

although known by respondents, the availability and quality of the surrogate data from these

countries cannot yet be determined by Petitioner. However, Petitioner can comment on whether

the listed countries are significant producers of comparable merchandise.

---

4       *Id.* at 1.

5       *See id.* at 1-2.

Barcode:3863793-01 A-570-106 INV - Investigation  -

The Honorable Wilbur L. Ross, Jr.
July 16, 2019                                                        **PUBLIC DOCUMENT**
Page 3

The Department has found that "{t}he legislative history provides that the term 'significant producer' includes any country that is a significant 'net exporter' and it does not preclude reliance on additional or alternative metrics."[6]   The Department should use HTS categories 9403.40, 9403.60, and 9403.90 to determine net exporters as these HTS categories are used for entries of subject merchandise.[7]   As already demonstrated in Dalian Meisen Woodworking Co., Ltd.'s comments on the surrogate country list, Brazil, Mexico, Romania, Malaysia, and Russia are net exporters of comparable merchandise by quantity when all three HTS categories are combined, and each of these countries has substantial exports of subject merchandise.[8]   Consequently, all five countries should be considered significant producers of comparable merchandise.   On the other hand, Kazakhstan is a huge net importer with hardly any exports and, therefore, should be excluded from the list of viable surrogate countries.[9]

Petitioner is continuing to assess the viability of these countries as they relate to the suitability of surrogate values.   Preliminary research on the likely surrogate values indicates that there could be significant differences in quality and availability of data among the various countries on the list.   However, because section D responses have not been filed and the surrogate values are not due until July 26, 2019, it is impossible to determine which country

---

[6]      *Certain Activated Carbon From the People's Republic of China: Preliminary Results of the Fourth Antidumping Duty Administrative Review, and Intent To Rescind in Part*, 77 Fed. Reg. 26,496, 26,499 (May 4, 2012) (footnote omitted) ("The GTA data demonstrates that Indonesia, the Philippines, and Thailand were significant net exporters of identical merchandise in 2010. Accordingly, because Colombia, South Africa and Ukraine are not significant net exporters of activated carbon under HTS 3802.10, these countries will not be considered for primary surrogate country selection purposes at this time." (footnote omitted)).

[7]      *See Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 84 Fed. Reg. 12,587 (Apr. 2, 2019) at Appendix (Scope).

[8]      *See* Letter from Husch Blackwell to Sec'y Commerce, re: *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Surrogate Country Comments* (July 5, 2019) at Exhibit 1.

[9]      *Id.*

The Honorable Wilbur L. Ross, Jr.
July 16, 2019                                                                    **PUBLIC DOCUMENT**
Page 4

offers the best and most reliable data at this time.   Nonetheless, Brazil, Mexico, Romania,

Malaysia, and Russia are all market economy countries at a level of economic development that

is comparable to China and are significant producers of comparable merchandise.   Therefore,

pursuant to the Department's practice, the country which offers the best quality data available

should be selected as the primary surrogate country in this investigation.

*       *       *

If you have any questions regarding this submission, please do not hesitate to contact us.

Respectfully submitted,

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.
Jeffrey O. Frank, Esq.

*Counsel to the American Kitchen Cabinet Alliance*

REM JA 5

Petitioner, Initial Surrogate Value Comments
(August 7, 2019)
PR 956-961

Barcode:3875858-01 A-570-106 INV - Investigation -



**PUBLIC DOCUMENT**

August 7, 2019

Case No. A-570-106
Total Pages: 513
Investigation
AD/CVD Operations, E&C Office II
**PUBLIC DOCUMENT**

The Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

Re:     ***Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China:*** Petitioner's Initial Surrogate Value Comments

On behalf of the American Kitchen Cabinet Alliance ("Petitioner"), we hereby submit initial surrogate value comments to Department of Commerce (the "Department") in the above-captioned administrative review. This submission contains new factual information within the meaning of 19 C.F.R. § 351.102(b)(21)(iii), *i.e.*, information submitted to value factors of production ("FOPs"). These comments are timely filed pursuant to the Department's August 1, 2019 letter extending the deadline to submit information relating to surrogate values to August 7, 2019.

For the reasons enumerated in Petitioner's July 16, 2019 comments, Petitioner believes at this time that Romania would be an appropriate selection as the primary surrogate country.[1] As such, Petitioner submits information, as described below, on costs in Romania. However, as an initial matter, Petitioner reiterates that information necessary to accurately determine the all

---

[1]     *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Fabricated Structural Steel from the People's Republic of China: Comments on Surrogate Country Selection* (June 14, 2019).

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:33 PM, Submission Status: Approved

Barcode:3875858-01 A-570-106 INV - Investigation -

The Honorable Wilbur L. Ross, Jr.
August 7, 2019                                                                    **PUBLIC DOCUMENT**
Page 3

**Exhibit 6** provides preliminary information on the cost of brokerage and handling in Romania.  **Exhibit 6A** includes the calculation of the cost of brokerage and handling incurred at the port of exportation in Romania as reported by the World Bank publication *Doing Business in Romania 2019* ("DBR 2019").  The data upon which Petitioner relied in this calculation of brokerage and handling are included in **Exhibit 6B**, while the World Bank's methodology is in **Exhibit 6C**.

With respect to inland freight within Romania, Petitioner is supplying in **Exhibit 7** an internal movement freight calculation based on data available from DBR 2019.

**Exhibit 8** contains the U.S. Dollar per European Union's Euro exchange rate for the POI, as reported by the Federal Reserve.

**Exhibit 9** contains information on the producer price index in Romania, obtained from the International Monetary Fund database International Financial Statistics ("IFS").

**Exhibit 10** contains information for use in calculating the surrogate financial ratios.  A worksheet is included in **Exhibit 10A** that provides the calculations for the surrogate overhead expense, selling, general, and administrative expense, and profit ratios based on the 2018 financial statement for S.C. Sigstrat s.a. ("Sigstrat") a producer of comparable wood products. The Romanian financial statement for Sigstrat, which Petitioner relied on for the calculation of the surrogate financial ratios, is included in **Exhibit 10B**.

*     *     *

Barcode:3875858-04 A-570-106 INV - Investigation  -

# EXHIBIT 10A

Barcode:3875858-04 A-570-106 INV - Investigation  -

**Calculation of Surrogate Financial Ratios: Manufacturing Overhead, SG&A and Profit**

**SOURCE:  S.C. Sigstrate (Romania) FY2018**

| Items in Romanian Leu | Schedule | Income Statement Amounts | Breakout | Category | Materials, Labor, and Energy | | | Mfg Overhead (MOH) | Traded / Finished Goods (TFG) | SG&A and Interest (SGA) | Profit & Profit Adjustments | Exclude |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REVENUE: | | | | | | | | | | | | |
| Net Turnover + Stocks Fluctuation | 7 | 34,682,935 | | Exclude | | | | | | | | 34,682,935 |
| Other operating revenues | 7 | 2,489,925 | | SGA | | | | | | 2,489,925 | | |
| Interest Income | P&L | 38 | | SGA | | | | | | 38 | | |
| Financial income | P&L | 193,953 | | SGA | | | | | | 193,953 | | |
| Total Income | | 37,366,851 | | a | - | - | - | - | - | 2,683,916 | - | 34,682,935 |
| EXPENSE: | | | | | | | | | | | | |
| Cost of Goods Sold | 7 | 30,703,287 | | MLE | 30,703,287 | | | | | | | |
| | | | | | | | | | | | | |
| Beginning FG Inventory | BS | | 3,664,861 | TFG | (3,664,861) | | | | 3,664,861 | | | |
| Ending FG Inventory | BS | | 3,843,275 | TFG | 3,843,275 | | | | (3,843,275) | | | |
| Indirect Production Expenses | 7 | | 8,512,590 | MOH | | | | 8,512,590 | | | | |
| Total of MOH Items Above (remove from MLE Denom) | | | 8,512,590 | MLE | (8,512,590) | | | | | | | |
| | | | | | | | | | | | | |
| Expenditure on Sales | 7 | 109,792 | | SGA | | | | | | 109,792 | | |
| General Administrative Expenses | 7 | 4,383,473 | | SGA | | | | | | 4,383,473 | | |
| other operating expenses | 7 | 1,337,915 | | SGA | | | | | | 1,337,915 | | |
| finance costs | P&L | 358,610 | | SGA | | | | | | 358,610 | | |
| | | | | | | | | | | | | |
| Calculate Sub Totals | | 36,893,077 | | b | 22,369,111 | - | - | 8,512,590 | (178,414) | 6,189,790 | - | - |
| Pre-tax Profit from Income Statement (Ispu) | | 473,774 | | Profit   c | | | | | | | 473,774 | |
| Total For Calculations | | | | d = b + c - a | 22,369,111 | - | - | 8,512,590 | (178,414) | 3,505,874 | 473,774 | (34,682,935) |
| Calculate (Revenue - Expenditures - Profit = zero) | Check Total | - | | | d1 | d2 | d3 | d4 | d5 | d6 | d7 | d8 |

| | | | |
|---|---|---|---|
| Total Material, Labor, and Energy | | e = d1+d2+d3 | 22,369,111 |
| Overhead as % of Material, Labor & Energy | | =d4/e | 38.06% |
| Total Material, Labor, Energy, Mfg Overhead, and Traded & Finished Goods | | f = d4+d5+e | 30,703,287 |
| SG&A/Interest as % of Material, Labor, Energy, Mfg Overhead, and Traded & Finished Goods | | =d6/f | 11.42% |
| Total Material, Labor, Energy, Mfg Overhead, Traded & Finished Goods, and SG&A/Interest | | g=d6+f | 34,209,161 |
| Profit as % of Material, Labor, Energy, Mfg Overhead, SG&A/Interest, and Traded & Finished Goods | | =d7/g | 1.38% |

Barcode:3875858-04 A-570-106 INV - Investigation  -

# EXHIBIT 10B





# S.C. SIGSTRAT s.a.

Tel: 0040-262-317575, 311117          e-mail: sigstrat @ sigstrat.ro ; web: www.sigstrat.ro
Fax: 0040 - 262  315464               TRADE REG. J-24-13-1993 ;  VAT No: RO 2954386
Ro 435500  Sighetu Marmatiei  str.Unirii nr.40

ISO 9001  Certificat  7275 C
ISO 14001  Certificat  3384 M
OHSAS 18001  Certificat  2540 SS

2847/ 30.04. 2019

Catre,

ASF Bucuresti

BVB - AeRO Bucuresti


Alaturat va transmitem Raportul Anual,aferent anului 2018,in conformitate cu prevederile legale in

viguare aprobate in Adunarea Generala Ordinara a Actionarilor,care a avut loc in data de 25.04.2019


Documentele anexate sunt:

Raportul Anual al Consiliului de Administratie.

Raportul Auditorului Financiar

Bilantul contabil la 31.12.2018 , inregistrat la DGF

Declaratia Directorului General,Presedintele C.A.

Comunicatul de presa,privind disponibilitatea Raportului Anual.


Director General,
Ing. Kertesz Stefan

Int.ec.T.S.

# RAPORT ANUAL
## CONFORM LEGII 297/2004 SI A REGULAMENTULUI CNVM NR.1/2006

**PENTRU EXERCITIUL FINANCIAR 2018**
Nr....*1946*.........din...*20.03*.......2019

S.C. SIGSTRAT S.A. Sighetu Marmatiei
Sediul : str.Unirii nr.40, Sighetu Marmatiei, jud.Maramures
Telefon : 0262 311117/ 317575, fax : 0262 315464
Cod unic de inregistrare fiscala : RO 2954386
Nr.de ordine in Registrul Comertului : J 24/13/05.01.1993
Piata reglementata pe care se tranzactioneaza Valorile Mobiliare
emise : BVB - AeRO
Capitalul subscris si varsat : 2.325.077 lei
Tipul actiunilor : comune , nominative, dematerializate. Nr.total de actiuni
emise : 23.250.770
Valoarea nominala a unei actiuni : 0,1 lei

**Analiza activitatii societatii comerciale**
**1.1. a) Descrierea activitatii de baza a societatii comerciale**
    Obiectul principal de activitate potrivit Clasificarii Activitatilor din Economia Nationala este "Fabricarea de furnire si a panourilor de lemn", cod CAEN 1621. Produse fabricate si comercializate de SC SIGSTRAT SA sunt : placaje din lemn, furnire, sezuturi si spatare, scaune, mese, brichete din aschii de lemn si alte produse din lemn.

    **b) Infiintarea societatii**
Societatea comerciala Sigstrat SA a fost infiintata ca societate pe actiuni  la data de 19.11.1992, prin Hotararea Guvernului nr.753/1992 Privind aprobarea divizarii societatii comerciale SIGMOB SA Sighetu Marmatiei.

**c) Fuziuni sau reorganizari semnificative a societatii comerciale, a filialelor sale sau a societatilor controlate, realizate in timpul exercitiului financiar**

In cursul exercitiului financiar 2018 societatea nu a fost divizata, nu a fuzionat si nu a fost reorganizata semnificativ. Societatea nu are filiale si nu detine actiuni la alte societati.

**d) Achizitii si/sau instrainari de active**

Investitiile efectuate in anul 2018 au fost in suma de 546.621 lei, finantate din surse propii. S-au concretizat in urmatoarele obiective:

| | |
|---|---:|
| - constructii si amenajari de constructii | 199.545 lei |
| - echipamente tehnologice | 277.087 lei |
| - mijloace de transport | 55.923 lei |
| - aparate si instalatii de masurare, control | 14.066 lei |

Investitiile au fost realizate in proportie de 88,13 % in regie proprie.

Iesirile de active se refera la vanzarile de active si casarile de mijloace fixe aprobate de AGA.

### 1.1.1. Elemente de evaluare generala

**a)** In exercitiul financiar 2018 societatea a inregistrat un **profit brut** in valoare de 473.774 lei, pentru care s-a calculat impozit pe profit in suma de 112.891 lei, rezultand un profit net de 360.883 lei. Cresterea profitului net in anul 2018 comparativ cu anul 2017 se datoreaza veniturilor obtinute din alte activitati de exploatare decat cele de baza.

**b) Cifra de afaceri** aferenta anului 2018 a fost in valoare de 27.093.475 lei si s-a concretizat in urmatoarele venituri :

| | |
|---|---:|
| - venituri din vanzarea produselor finite | 24.374.676 lei |
| - venituri din vanzarea semifabricatelor | 471.284 lei |
| - venituri din vanzarea produselor reziduale | 747.671 lei |
| - venituri din servicii prestate | 1.194.913 lei |
| - venituri din chirii | 139.046 lei |
| - venituri din vanzarea marfurilor | 165.885 lei |

Diminuarea cifrei de afaceri fata de anul precedent s-a datorat pe de o parte scaderii volumului de comenzi de pe piata araba, iar pe de alta parte majorarii preturilor de vanzare a produselor finite destinate pietei interne in urma careia cererea a scazut.

Barcode:3875858-04 A-570-106 INV - Investigation  -

| Indicatori | Formula | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| Rata de lichiditate curenta | Active circulante/Datorii pe termen scurt | 1,60 | 1,81 | 1,99 |
| Rata de lichiditate rapida | ( Creante +disponibilitati banesti)/Datorii pe termen scurt | 0,68 | 0,87 | 0,90 |
| Rata de lichiditate imediata | Disponibilitati banesti/Datorii pe termen scurt | 0,12 | 0,19 | 0,15 |

Structura elementelor de activ influenteaza lichiditatea si echilibrul financiar.

Lichiditatea curenta reflecta masura in care activele circulante se pot transforma intr-un termen scurt in lichiditati, pentru a onora platile curente exigibile. Se observa ca in ultimii trei ani acest indicator a avut o tendinta de crestere.

Lichiditatea rapida arata capacitatea societatii de a-si plati datoriile pe termen scurt din creante si disponibilitati. In comparatie cu anii trecuti se inregistreaza o crestere la acest indicator.

Lichiditatea imediata masoara capacitatea firmei de a-si acoperi datoriile pe termen scurt cu ajutorul disponibilitatilor banesti proprii. Un raport de unu la unu este foarte greu de realizat deoarece societatea nu poate sa mentina un nivel atat de ridicat de active in numerar pentru a putea acoperi datoriile curente.


**1.1.2. Evaluarea nivelului tehnic al societatii comerciale**

a) Produsele comercializate de SC SIGSTRAT SA sunt: placaje din lemn, furnire, sezuturi si spatare, scaune, mese, brichete din lemn si alte produse din lemn. Obiectivele societatii vizeaza in continuare cresterea ponderii productiei de elemente mulate in totalul productiei, datorita faptului ca aceste produse au o plusvaloare net superioara produselor standard.

b) Ponderea produselor si a serviciilor in veniturile si in totalul cifrei de afaceri a societatii

| Produse/servicii | 2016 | | 2017 | | 2018 | |
|---|---|---|---|---|---|---|
| | Cifra de afaceri % | Venituri % | Cifra de afaceri % | Venituri % | Cifra de afaceri % | Venituri % |
| Placaj uz interior | 57,37 | 44,44 | 52,17 | 43,28 | 45,02 | 32,64 |
| Placaj uz exterior | 0,05 | 0,04 | - | - | - | - |
| Furnire | 1,40 | 1,08 | 1,73 | 1,44 | 2,16 | 1,57 |
| Produse mulate | 31,41 | 24,33 | 36,87 | 30,59 | 42,59 | 30,88 |
| Brichete | 0,36 | 0,28 | 0,51 | 0,42 | 0,20 | 0,14 |
| Semifabricate | 1,81 | 1,40 | 2,07 | 1,72 | 1,74 | 1,26 |
| Produse reziduale | 2,39 | 1,85 | 1,96 | 1,63 | 2,76 | 2,00 |
| Servicii prestate | 3,13 | 2,43 | 3,76 | 3,12 | 4,41 | 3,20 |
| Chirii | 1,85 | 1,44 | 0,56 | 0,46 | 0,51 | 0,37 |
| Marfuri | 0,23 | 0,18 | 0,37 | 0,30 | 0,61 | 0,44 |

**c)** Strategia de dezvoltare a societatii se bazeaza in principal pe cresterea capacitatilor de productie, pe extinderea productiei de elemente mulate in detrimentul placajelor standard si pe imbunatatirea structurii calitatii produselor finite.

### 1.1.3. Evaluarea activitatii de aprovizionare

Materiile prime si materialele au fost achizitionate atat de pe piata interna,  cat si de pe cea externa, in proportie de 8,7%.

La dimensionarea stocurilor de materii prime si materiale directe s-a tinut cont de graficul de productie si de consumurile specifice, astfel incat continuitatea productiei sa fie asigurata, evitand totodata blocarea activelor si generarea de  cheltuieli inutile de stocare.

Totodata, specificul activitatii impune asigurarea permanenta a unei cantitati de piese de schimb pentru mentenanta preventiva si corectiva a echipamentelor tehnologice din dotare.

Societatea negociaza permanent contractele cu furnizorii, tinand cont de costul de cumparare dat de raportul pret/calitate.

S-a tinut cont si in acest an de ciclurile sezoniere de exploatare a materiei prime lemnoase.

Nu exista o dependenta semnificativa fata de un singur furnizor, a carui pierdere ar afecta activitatea societatii.

## 1.1.4. Evaluarea activitatii de vanzare

Analizand ultimii trei ani, se observa o scadere permanenta a cifrei de afaceri, in special la placajele standard, datorita lipsei cererii de pe piata araba si de pe piata interna, in urma cresterii preturilor de vanzare al acestor produse.

In ceea ce priveste asigurarea desfacerii pe termen mediu si lung, anticipam o revenire a pietei interne  pentru placajele standard, cat si gasirea de clienti interni noi pentru elementele mulate pentru mobila.

In anul 2018 cifra de afaceri a inregistrat o scadere de 6% fata de nivelul inregistrat in anul 2017, respectiv 1.741.726 lei. Ponderea vanzarilor de produse mulate in totalul cifrei de afaceri a crescut in ultimii trei ani, ceea ce este in concordanta cu politica de marketing a firmei.

**a)** Veniturile din vanzarea produselor finite, care reprezinta 89,97% din cifra de afaceri inregistrata, au avut urmatoarea structura pe produse :

| DENUMIRE PRODUS | 2016 | 2017 | 2018 |
|---|---|---|---|
| - placaj uz interior | 18.797.432 | 15.043.357 | 12.196.526 |
| - placaj uz exterior | 17.135 | - | - |
| - furnir | 457.516 | 499.432 | 584.842 |
| - elemente mulate | 10.292.013 | 10.632.753 | 11.539.443 |
| - brichete | 117.666 | 146.228 | 53.865 |
| TOTAL | 29.681.762 | 26.321.770 | 24.374.676 |

In anul 2018, ponderea exportului in totalul cifrei de afaceri a fost de 54,11%.

**b) Societati cu domenii de activitate similare sunt : Stratusmob Blaj, Silvarom Bucuresti, Sortilemn Gherla, Gamoni Satu Mare, Beker Slovacia.**

**c)** Societatea nu depinde semnificativ de un client sau de un grup de clienti.

## 1.1.5. Evaluarea aspectelor legate de angajatii/ personalul societatii

**a)** Numarul mediu de angajati in anul 2018 a fost de 333 persoane. Structura si nivelul de pregatire al acestora fiind : 28 persoane cu studii superioare, 5 persoane cu studii postliceale, 7 persoane cu pregatire de specialitate ( maistrii ), 88 persoane cu studii liceale, 73 persoane cu scoli profesionale, 13 persoane cu scoala de ucenici, 106 persoane cu scoala generala, 13 persoane cu mai putin de 8 clase.

Nu exista sindicat in cadrul societatii.

**b)** Raporturile de munca dintre angajator si angajati sunt reglementate prin Contractul colectiv de munca la nivel de societate, incheiat intre angajator si reprezentantii salariatiilor, precum si prin contractele individuale de munca ale salariatilor, conform Codului Muncii.

Pe parcursul anului 2018 nu s-au inregistrat evenimente sau stari conflictuale intre salariati si conducerea societatii.

## 1.1.6. Evaluarea aspectelor legate de impactul activitatii de baza asupra mediului inconjurator

Societatea gestioneaza eficient aspectele de mediu vizavi de activitatea desfasurata . In acest sens se asigura intretinerea si exploatarea adecvata a echipamentelor tehnologice, a instalatiilor si amenajarilor pentru protectia mediului, colectarea, sortarea si valorificarea deseurilor.

Societatea detine autorizatie de mediu eliberata de APM Maramures si are implementat un sistem de management al calitatii, al sanatatii si securitatii ocupationale si de mediu, conform ISO 9001 : 2018, OHSAS 18001 : 2008, ISO 14001 : 2015, respectand cerintele legale in vigoare.

Nu exista litigii si nici nu se preconizeaza litigii cu privire la incalcarea legislatiei privind protectia mediului inconjurator.

## 1.1.7. Evaluarea activitatii de cercetare – dezvoltare

Obiectivele activitatii de cercetare – dezvoltare in cadrul societatii au vizat elaborarea de tehnologii pentru fabricarea de produse noi, asimilarea si introducerea in fabricatie a unor produse noi, optimizarea celor existente, executarea si omologarea prototipurilor.

## 1.1.8. Evaluarea activitatii societatii comerciale privind managementul riscului

Exista o monitorizare permanenta a riscurilor semnificative la care societatea poate fi expusa, cu scopul de a reduce impactul acestora asupra fluxului de trezorerie :

- **riscul de lichiditate** – este tinut sub control prin aplicarea unei politici de asigurare permanenta a lichiditatilor necesare onorarii obligatiilor financiare scadente ;
- **riscul valutar** – societatea este expusa riscului fluctuatiilor cursului de schimb valutar datorita incasarilor in valuta, imprumuturilor in valuta sau datoriilor comerciale in valuta ;
- **riscul de dobanda** – poate fi influentat de componenta variabila a ratei dobanzii, respectiv de evolutia indicilor EURIBOR si ROBOR ;
- **riscul de creditare** – poate fi generat de creantele din activitatea de baza, din acest motiv s-a urmarit diversificarea pietelor de desfacere si a clientilor, stabilirea unei limite de creditare pentru fiecare client si un termen de plata prin care sa se evite un eventual blocaj financiar;

- **riscul de pret** – este greu de controlat datorita cresterii continue a preturilor la materii prime, indeosebi la busteni, la materiale, a salariului minim pe economie impus de politica financiara a statului. Pentru a remedia efectele negative ale acestora suntem nevoiti sa majoram preturile de vanzare a produselor fabricate si/sau sa crestem volumul cifrei de afaceri cu clientii existenti, sa incercam plafonarea preturilor furnizorilor daca este posibil.
- **riscuri de natura legislativa** – sunt riscuri care nu pot fi prevazute , iar impactul lor este foarte greu de combatut. Rezultatele financiare au de suferit de pe urma instabilitatii legislative din Romania, consecintele acesteia fiind scaderea cererii de produse sau chiar renuntarea din partea unor clienti la produsele noastre. Costurile suplimentare care sunt generate de aceste masuri fiscale, care au un ritm alert, nu pot fi acoperite de majorarile preturilor de vanzare, iar eforturile societatii pentru gasirea de solutii sunt din ce in ce mai anevoioase .

**Elemente de perspectiva privind activitatea societatii comerciale**

a) Lichiditatea societatii poate fi afectata de :
- fluctuatia cursului valutar, acesta avand influenta atat asupra incasarilor din export, cat si asupra imprumuturilor contractate in valuta ;
- incidentele de plata si neincasarea creantelor datorita intrarii in insolventa a clientilor ;
- lipsa comenzilor ;
- politica fiscala a statului ;
- cresterea necontrolabila a  preturilor la materia prima lemnoasa.

b) In exercitiul financiar 2018 societatea a realizat investitii in valoare totala de 546.621 lei efectuate in vederea extinderii capacitatilor de productie, pentru diversificarea productiei de elemente mulate, reducerea consumurilor specifice. Valoarea investitiilor realizate in anul 2017 a fost in suma de 574.949 lei.

c) Veniturile din activitatea de baza  sunt direct influentate de urmatorii factori : cresterea preturilor la materii prime, in special la busteni,  cresterea salariului minim pe economie,  cererea de pe piata,  nivelul si dinamica preturilor de vanzare, politica fiscala a statului.

## 2.    Active corporale ale societatii comerciale

**2.1.** Activele si capacitatile de productie aflate in proprietatea societatii sunt amplasate in Sighetu Marmatiei, str.Unirii nr.40.
Societatea mai are in proprietate constructii si terenuri situate in judetul Satu Mare, sat Nisipeni.

Structura imobilizarilor corporale la 31.12.2018 a fost  urmatoarea :

- Terenuri, amenajari                                          417.309 lei
- Constructii                                                      8.460.107 lei
- Echipamente tehnologice                            13.172.817 lei
- Aparate si instalatii de masurare, control        280.474 lei
- Mijloace de transport                                   3.624.423 lei
- Mobilier, aparatura  birotica                            307.067 lei
- Avansuri si imobilizari corporale in curs de executie   1.224.800 lei

Productia se desfasoara  in doua sectii de activitate, in sectia placaj si in sectia mulate, ambele fiind supuse unui regim de intretinere si dezvoltare continua.
Echipamentele de productie sunt exploatate corespunzator si intretinute permanent, astfel incat sa se asigure o functionare corespunzatoare a lor.

**2.2. Gradul de uzura** scriptica  al activelor corporale pe grupe de imobilizari la 31.12.2018 se prezinta astfel :
- constructii                          22,18%
 - instalatii, mijloace transport   72,87%
 - alte imobilizari corporale       71,11%
Pentru a beneficia de o durata de functionare cat mai lunga a echipamentelor tehnologice si a mijloacelor de transport, se asigura exploatarea si intretinerea lor corecta, executarea reparatiilor la timp, prin operatii de control si revizii, care sa permita depistarea din timp a eventualelor defectiuni.

**2.3.** Societatea nu are niciun fel de probleme privind dreptul de proprietate asupra imobilizarilor corporale sau asupra terenurilor din patrimoniu.

## 3. Piata valorilor mobiliare emise de societatea comerciala

**3.1.** Valorile mobiliare emise de societatea Sigstrat S.A. sunt tranzactionate pe BVB - AeRO. Numarul detinatorilor de actiuni ale societatii este de 5.037 , din care actionari persoane fizice 5.023 si juridice 14. Ponderea detinerii capitalului social este urmatoarea : persoane fizice 34,86 %, persoane juridice 12,86 %, Asociatia SIGSTRAT PAS 52,28 %.

**3.2.** Societatea  a inregistrat profit atat in anul 2016, cat si in anul 2017, profit care a fost repartizat conform hotararii AGA la surse proprii de finantare. Din profitul contabil al anului 2018 a fost calculat si repartizat 5% pentru cresterea rezervei legale, respectiv suma de 23.688,68 lei, urmand ca AGA sa stabileasca modul de repartizare a profitului ramas.

**3.3.** Societatea nu a rascumparat actiuni proprii in cursul anului 2018.

**3.4.** Societatea nu are filiale.

**3.5.** Societatea nu a emis obligatiuni sau alte titluri de creanta.

## 4. Conducerea societatii comerciale

### 4.1. Prezentarea administratorilor societatii comerciale

**a) Lista administratorilor :**
    1. ing.Kertesz Stefan, nascut la 10.07.1949, de profesie inginer, angajat din 1972 ca inginer in cadrul CPL-ului Sighetu Marmatiei. Din 1976 este sef de sectie PAL, iar din 1992 si pana in prezent, director general al S.C. Sigstrat S.A. Sighetu Marmatiei, administrator - Presedinte CA.
    2. ec.Tivadar Stefan – nascut la 24.12.1966, de profesie economist, angajat din 1985 pana in 2001 in diferite functii, din 2001 pana in octombrie 2008 sef serviciu administrativ - protocol, din octombrie 2008  administrator - secretar CA, vicepresedinte CA.
    3. ing.Gavris Mircea – nascut la 25.06.1948, de profesie inginer, din 28.04.2009 administrator - membru CA.
    4. ec.Petrovan Sorin – nascut la 12.10.1977, de profesie economist, angajat din 2004  pana in 2012 in cadrul serviciului aprovizionare, din noiembrie 2012  administrator - membru CA.
    5. ec.Tiran Florin – nascut la data de 19.04.1982, de profesie inginer, angajat din 2009 pana 2011 SC Ecocenter Serv SRL, din 2011 pana in 2016 in cadrul s serviciului mecano - energetic la SC Sigstrat SA, din mai 2016 administrator - membru CA.

    **b)** Nu exista niciun acord, intelegere sau legatura de familie pentru care ar fi fost numita vreo persoana ca administrator.

    **c)** Numarul de actiuni detinute nominal de catre administratorii societatii :

| | |
|---|---:|
| – ing.Kertesz Stefan | 2.598.687 actiuni |
| – ec.Tivadar Stefan | 14.956 actiuni |
| – ec.Petrovan Sorin | 1.550 actiuni |
| – ing.Tiran Florin | 500 actiuni |
| – ing.Gavris Mircea | 560 actiuni |

Majoritatea administratorilor detin actiuni in cadrul Asociatiei Sigstrat PAS.

    **d)** Nu sunt persoane afiliate SC SIGSTRAT SA.

**4.2. Prezentarea conducerii executive a societatii :**

1. ing.Kertesz Stefan, director general, avand incheiat contract de management pana la data de 02.05.2020.

2. ing.Ilicsuk Adalbert, director tehnic, avand incheiat contract de management pana la data de 02.05.2020. Numarul de actiuni detinute este de 1.680, adica 0,007226%.

3. ec.Tivadar Stefan, director comercial, avand incheiat contract de management pana la data de 02.05.2020.

4. ing.Kokenyesdi Mihai, director de productie pana in data data de 01.03.2018. Numarul de actiuni detinute este de 840, adica 0,003613%.

5. ec.Mujdar Erika, director economic, avand incheiat contract de management pana la data 02.05.2020. Numarul de actiuni detinute este de 1.680, adica 0,007226%.

Nu exista niciun acord, intelegere sau legatura de familie pentru care ar fi fost numita vreo persoana ca membru al conducerii executive.

Nici membrii consiliului de administratie si nici membrii conducerii executive a societatii nu au avut litigii si nici proceduri administrative privind activitatea lor in cadrul SC SIGSTRAT SA.

**5. Situatia financiar – contabila**
**a) Elemente de bilant**

| Denumirea indicatorului | Sold la | | |
|---|---|---|---|
| | 31.12.2016 | 31.12.2017 | 31.12.2018 |
| I.Active imobilizate -- total | 15.702.433 | 14.345.045 | 13.118.130 |
| 1.Imobilizari necorporale | 169.099 | 169.895 | 164.002 |
| 2.Imobilizari corporale | 15.516.375 | 14.160.536 | 12.940.772 |
| - Terenuri si constructii | 7.488.763 | 7.267.405 | 6.993.320 |
| - Instalatii tehnice si masini | 6.395.380 | 5.553.017 | 4.633.929 |
| - Alte instalatii, utilaje | 121.741 | 106.764 | 88.723 |
| - Avansuri si imobilizari corporale in curs de executie | 1.510.491 | 1.233.350 | 1.224.800 |
| 3.Imobilizari financiare | 16.959 | 14.614 | 13.356 |
| II.Active circulante -- total | 15.422.681 | 14.055.621 | 14.875.608 |
| 1.Stocuri | 8.848.378 | 7.293.513 | 8.178.249 |
| 2.Creante | 5.419.600 | 5.262.049 | 5.560.695 |
| 3.Casa si conturi la banci | 1.154.703 | 1.500.059 | 1.136.664 |
| III.Cheltuieli in avans | 58.292 | 57.908 | 106.682 |
| TOTAL ACTIV | 31.183.406 | 28.458.574 | 28.100.420 |
| IV.Datorii : sumele care trebuie platite intr-o perioada de pana la un an | 9.647.180 | 7.760.046 | 7.461.386 |

| V.Datorii : sume care trebuie platite intr-o perioada mai mare de un an | 1.176.816 | 420.375 | - |
|---|---|---|---|
| VI.Provizioane | 140.000 | - | - |
| VII.Subventii pentru investitii | - | - | - |
| VIII.Capital si rezerve | 17.845.425 | 20.262.498 | 20.141.867 |
| Actiuni proprii | - | - | - |
| Pierderi legate de instrumentele de capitalui proprii | 65.117 | 65.117 | 65.117 |
| IX. Profit reportat | 749.556 | 27.362 | 225.090 |
| X.Profitul exercitiului financiar | 1.792.528 | 58.744 | 360.883 |
| XI. Repartizarea profitului | 102.982 | 5.334 | 23.689 |
| TOTAL PASIV | 31.183.406 | 28.458.574 | 28.100.420 |

**Elemente de activ care depasesc 10% din total active sunt :**

| Denumire indicator | Valoare la 31.12.2016 | Pondere in total active | Valoare la 31.12.2017 | Pondere in total active | Valoare la 31.12.2018 | Pondere in total active |
|---|---|---|---|---|---|---|
| Imobilizari corporale | 15.516.375 | 49,76% | 14.160.536 | 49,76% | 12.940.772 | 46,05 |
| Stocuri | 8.848.378 | 28,38% | 7.293.513 | 25,63% | 8.178.249 | 29,10 |
| Creante | 5.419.600 | 17,38% | 5.262.049 | 18,49% | 5.560.695 | 19,79 |

Din analiza elementelor de bilant se constata urmatoarele:
- imobilizarile corporale s-au diminuat cu 8,61% in anul 2018 comparativ cu anul 2017, datorita vanzarii unor active;
- stocurile au crescut cu 12,13% fata de anul 2017, respectiv de la 7.293.513 lei la 8.178.249 lei;
- creantele au crescut comparativ cu anul 2017, reprezentand 19,79% din total active in anul 2018, in timp ce in anul 2017 au reprezentat 18,49%.

Casa si conturile la banci la sfarsitul exercitiului financiar 2018 au fost in valoare de 1.136.664 lei.
In anul 2018 valoarea activelor curente a fost in suma de 14.875.608 lei, in timp ce in anul 2017 se cifrau la suma de 14.055.621 lei, cresterea lor fiind influentata de valoarea stocurilor.

Total pasive curente in anul 2018 au fost in valoare de 7.461.386 lei, in timp ce in anul 2017 au fost in suma de 7.760.046 lei.

In cursul anului 2018 capitalul social nu a suferit modificari. La data de 31.12.2018, capitalul social subscris si varsat a fost in valoare de 2.325.077 lei, reprezentat de 23.250.770 actiuni, cu valoare nominala de 0,1 lei/actiune.

Rezervele au inregistrat o crestere ca urmare a repartizarii profitului net al anului 2017 la surse proprii de finantare, conform hotararii AGA. Rezervele din reevaluare s-au diminuat datorita scoaterii din evidenta a unei cladiri reevaluate, in urma vanzarii acesteia.

La sfarsitul anului 2018 s-a majorat rezerva legala cu suma de 23.688,68 lei, prin aplicarea unui procent de 5% asupra profitului brut contabil, conform reglementarilor legislative in vigoare.

## b) Contul de profit si pierdere

| INDICATORI | EXERCITIUL FINANCIAR | | |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| 1.Venituri din exploatare – total, din care: | 41.827.773 | 34.526.026 | 37.172.860 |
| - Cifra de afaceri neta | 32.768.096 | 28.835.201 | 27.093.475 |
| 2.Cheltuieli de exploatare – total, din care : | 39.505.981 | 34.069.239 | 36.534.467 |
| - Cheltuieli cu materii prime si materiale | 18.661.096 | 15.891.758 | 18.689.846 |
| - Cheltuieli cu personalul | 13.156.346 | 12.492.778 | 12.458.240 |
| - Cheltuieli cu energia | 1.707.117 | 1.451.981 | 1.534.472 |
| - Cheltuieli privind amortizarea | 1.980.076 | 1.863.557 | 1.587.412 |
| - Ajustari privind activele circulante | - | - | 49.497 |
| - Ajustari privind provizioanele | - | -140.000 | - |
| - Alte cheltuieli de exploatare | 4.001.346 | 2.509.165 | 2.313.994 |
| 3. Profitul din exploatare | 2.321.792 | 456.787 | 638.393 |
| 4.Venituri financiare | 470.653 | 234.248 | 193.991 |
| 5.Cheltuieli financiare | 732.797 | 584.361 | 358.610 |
| 6.Pierderea financiara | 262.144 | 350.113 | 164.619 |
| 7.Venituri totale | 42.298.426 | 34.760.274 | 37.366.851 |
| 8.Cheltuieli totale | 40.238.778 | 34.653.600 | 36.893.077 |
| 9.Profitul sau pierderea brut(a) | 2.059.648 | 106.674 | 473.774 |
| 10.Impozitul pe profit | 267.120 | 47.930 | 112.891 |
| 11.Profitul sau pierderea net(a) | 1.792.528 | 58.744 | 360.883 |

Barcode:3875858-05 A-570-106 INV - Investigation  -

In anul 2018 cifra de afaceri realizata a fost in suma de 27.093.475 lei, cu 1.741.726 lei mai putin decat cea inregistrata in anul 2017. Veniturile obtinute din activitatea de baza au contribuit in proportie de 94,46 % la realizarea cifrei de afaceri.

Societatea a inregistrat in anul 2018 un rezultat net de 360.883 lei fata de 58.744 lei realizat in anul 2017.

**Cheltuielile cu o pondere de cel putin 20% din cifra de afaceri sunt :**

| Denumire indicator | Valoare la 31.12.2016 | Pondere in cifra de afaceri | Valoare la 31.12.2017 | Pondere in cifra de afaceri | Valoare la 31.12.2018 | Pondere in cifra de afaceri |
|---|---|---|---|---|---|---|
| Cheltuieli cu materii prime si materiale | 18.661.096 | 56,95% | 15.891.758 | 55,11% | 18.689.846 | 68,98% |
| Cheltuieli cu personalul | 13.156.346 | 40,15% | 12.492.778 | 43,32% | 12.458.240 | 45,98% |

Nu au fost constituite provizioane in anul 2018.

In anul 2018 nu a fost oprit niciun segment de activitate si nici nu se preconizeaza a se efectua in urmatorul an.

Nu au fost acordate dividende, profitul anilor 2016 si 2017 a fost repartizat la surse proprii de finantare.

**c) Fluxul de trezorerie**

| INDICATORI | 31.12.2016 | 31.12.2017 | 31.12.2018 |
|---|---|---|---|
| Fluxul de numerar din activitatea de exploatare | 4.601.465 | 4.418.894 | 105.025 |
| Fluxul de numerar din activitatea de investitii | -1.531.480 | -444.652 | -63.221 |
| Fluxul de numerar din activitatea financiara | -2.226.501 | -3.628.886 | -405.199 |
| Disponibilitati banesti la inceputul perioadei | 311.219 | 1.154.703 | 1.500.059 |
| Flux de numerar net | 843.484 | 345.356 | -363.395 |

| Disponibiliati banesti la sfarsitul perioadei | 1.154.703 | 1.500.059 | 1.136.664 |
|---|---|---|---|

Fluxul de numerar din activitatea de exploatare reprezinta intrarile si iesirile de numerar care provin din activitatile principale ale societatii. Fiind pozitiv   inseamna ca din exploatare se degaja suficienta trezorerie pentru a face fata nevoilor de finantare.

Fluxul de numerar provenit din activitatea de investitii apreciaza efortul investitional a societatii si include banii investiti in imobilizari corporale si necorporale.

Fluxul de numerar din activitatea financiara este negativ, datorandu-se platilor determinate de rambursarea creditelor angajate in anii precedenti.

**Semnaturi**

**Presedinte CA - director general,**
**ing.Kertesz Stefan**

**Director economic,**
**ec.Mujdar Erika**

Barcode:3875858-05 A-570-106 INV - Investigation  -

# R A P O R T UL

## AUDITORULUI INDEPENDENT

## PENTRU SITUATIILE FINANCIARE

## LA 31 DECEMBRIE 2018

## INTOCMIT LA SOCIETATEA COMERCIALA

## SIGSTRAT S.A.

SIGHETU MARMATIEI
Str.Unirii, Nr 40
R.C. J24/13/1993

C.I.F. RO 2954386

**AUDITOR FINANCIAR**
**S.C. GDV AUDIT CONSULT S.R.L.**
**CAMERA AUDITORILOR FINANCIARI DIN ROMANIA**
**AUTORIZATIE nr.481/2004**

Barcode:3875858-05 A-570-106 INV - Investigation  -

# GDV AUDIT CONSULT SRL

Bucuresti Sector 2 Sos. Mihai Bravu nr.172 bl.230 sc.1 et.3 ap.9 - Tel/Fax 021.322.88.42/ tel 031.804.33.67 RC J40/9297/2003 – CIF RO 15574257 - Capital social 2.000 Lei - Cont Bancar BCR SECTOR 3 IBAN RO71RNCB0074029234840001 - Auditor Financiar Autorizatie Camera Auditorilor Financiari din Romania nr.481/2004

------------------------------------------------------------------------------------------------------

## RAPORTUL AUDITORULUI INDEPENDENT

Catre
ACTIONARII SOCIETATII  SIGSTRAT SA

### *Opinie*

1. Am auditat situațiile financiare individuale anexate ale societății SIGSTRAT SA (**"Societatea"**), cu sediul social în Sighetu Marmatiei,Judet Maramures,Str Unirii,Nr 40, identificata prin codul unic de înregistrare fiscală 2954386, care cuprind bilanțul la data de 31 decembrie 2018, contul de profit și pierdere, situația modificarilor capitalului propriu si situatia fluxurilor de trezorerie pentru exercitiul financiar incheiat la aceasta data, precum si un sumar al politicilor contabile semnificative si notele explicative.

2. Situatiile financiare individuale la 31 decembrie 2018 se identifica astfel:

- Total capitaluri proprii:                         20.639.034  lei
- Profitul net al exercitiului financiar:              360.883  lei


3. In opinia noastra, situatiile financiare individuale anexate ofera o imagine fidela a pozitiei financiare  a Societatii la data de 31 decembrie 2018 precum si a performantei financiare si a fluxurilor de trezorerie pentru exercitiul financiar incheiat la aceasta data,  in conformitate cu OMFP nr. 1802/2014 pentru aprobarea Reglementarilor contabile privind situatiile financiare anuale individuale si situatiile financiare anuale consolidate, cu modificarile ulterioare ("OMFP nr. 1802/2014").

### *Baza pentru opinie*

4. Am desfasurat auditul nostru  in conformitate cu Standardele Internationale de Audit ("ISA") si Legea nr.162/2017 ("Legea"). Responsabilitatile noastre in baza acestor standarde sunt descrise detaliat in sectiunea "Responsabilitatile auditorului intr-un audit al situatiilor financiare" din raportul nostru. Suntem independenti fata de Societate, conform Codului Etic al Profesionistilor Contabili emis de Consiliul pentru Standarde Internationale de Etica pentru Contabili (codul IESBA), conform cerintelor etice care sunt relevante pentru auditul situatiilor financiare in Romania, inclusiv Legea, si ne-am indeplinit responsabilitatile etice conform acestor cerinte si conform Codului IESBA. Credem ca probele de audit pe care le-am obtinut sunt suficiente si adecvate pentru a furniza o baza pentru opinia noastra.

1

Barcode:3875858-05 A-570-106 INV - Investigation -

*Alte informatii-Raportul administratorilor*

5. Administratorii sunt responsabili pentru întocmirea si prezentarea altor informatii. Acele alte informatii cuprind Raportul administratorilor, dar nu cuprind situatiile financiare si raportul auditorului cu privire la acestea și nici declarația nefinanciară.

Opinia noastra cu privire la situatiile financiare nu acopera si aceste alte informatii si cu exceptia cazului in care se mentioneaza explicit in raportul nostru, nu exprimam nici un fel de concluzie de asigurare cu privire la acestea.

In legătura cu auditul situatiilor financiare pentru exercițiul financiar încheiat la 31 decembrie 2018, responsabilitatea noastră este sa citim acele alte informatii si, in acest demers, sa apreciem daca acele alte informatii sunt semnificativ inconsecvente cu situatiile financiare, sau cu cunostintele pe care noi le-am obtinut in timpul auditului, sau daca ele par a fi denaturate semnificativ.

In ceea ce priveste Raportul administratorilor, am citit si raportam daca acesta a fost intocmit, in toate aspectele semnificative, in conformitate cu OMFP nr. 1802/2014 punctele 489-492 .

In baza exclusiv a activitatilor care trebuie desfasurate in cursul auditului situatiilor financiare, in opinia noastra:

a) Informatiile prezentate in Raportul administratorilor pentru exercitiul financiar pentru care au fost intocmite situatiile financiare sunt in concordanta, in toate aspectele semnificative, cu situatiile financiare;

b) Raportul administratorilor a fost intocmit, in toate aspectele semnificative, in conformitate cu OMFP nr. 1802/2014 punctele 489-492 .

In plus, in baza cunostintelor si intelegerii noastre cu privire la Societate si la mediul acesteia, dobandite in cursul auditului situatiilor financiare pentru exercitiul financiar incheiat la data de 31 decembrie 2018, ni se cere sa raportam daca am identificat denaturari semnificative in Raportul administratorilor. Nu avem nimic de raportat cu privire la acest aspect.

*Responsabilitatile conducerii si ale persoanelor responsabile cu guvernanta pentru situatiile financiare*

6. Conducerea Societatii este responsabila pentru intocmirea situatiilor financiare care sa ofere o imagine fidela in conformitate cu OMFP nr. 1802/2014 si pentru acel control intern pe care conducerea il considera necesar pentru a permite intocmirea de situatii financiare lipsite de denaturari semnificative, cauzate fie de frauda, fie de eroare.

7. In intocmirea situatiilor financiare, conducerea este responsabila pentru evaluarea capacitatii Societatii de a-si continua activitatea, pentru prezentarea, daca este cazul, a aspectelor referitoare la continuitatea activitatii si pentru utilizarea contabilitatii pe baza continuitatii activitatii, cu exceptia cazului in care conducerea fie intentioneaza

2

Barcode:3875858-05 A-570-106 INV - Investigation  -

sa lichideze Societatea sau sa opreasca operatiunile, fie nu are nicio alta alternativa realista in afara acestora.

8. Persoanele responsabile cu guvernanta sunt responsabile pentru supravegherea procesului de raportare financiara al Societatii.

### *Responsabilitatile auditorului intr-un audit al situatiilor financiare*

9. Obiectivele noastre constau in obtinerea unei asigurari rezonabile privind masura in care situatiile financiare, in ansamblu, sunt lipsite de denaturari semnificative, cauzate fie de frauda, fie de eroare, precum si in emiterea unui raport al auditorului care include opinia noastra. Asigurarea rezonabila reprezinta un nivel ridicat de asigurare, dar nu este o garantie a faptului ca un audit desfasurat in conformitate cu ISA va detecta intotdeauna o denaturare semnificativa, daca aceasta exista. Denaturarile pot fi cauzate fie de frauda, fie de eroare si sunt considerate semnificative daca se poate preconiza, in mod rezonabil, ca acestea, individual sau cumulat, vor influenta deciziile economice ale utilizatorilor, luate in baza acestor situatii financiare.

10. Ca parte a unui audit in conformitate cu ISA, exercitam rationamentul profesional si mentinem scepticismul profesional pe parcursul auditului. De asemenea:

- Identificam si evaluam riscurile de denaturare semnificativa a situatiilor financiare, cauzate fie de frauda, fie de eroare, proiectam si executam proceduri de audit ca raspuns la respectivele riscuri si obtinem probe de audit suficiente si adecvate pentru a furniza o baza pentru opinia noastra. Riscul de nedetectare a unei denaturari semnificative cauzate de frauda este mai ridicat decat cel de nedetectare a unei denaturari semnificative cauzate de eroare, deoarece frauda poate presupune intelegeri secrete, fals, omisiuni intentionate, declaratii false si evitarea controlului intern.

- Intelegem controlul intern relevant pentru audit, in vederea proiectarii de proceduri de audit adecvate circumstantelor, dar fara a avea scopul de a exprima o opinie asupra eficacitatii controlului intern al Societatii.

- Evaluam gradul de adecvare a politicilor contabile utilizate si caracterul rezonabil al estimarilor contabile si al prezentarilor aferente de informatii realizate de catre conducere.

- Formulam o concluzie cu privire la gradul de adecvare a utilizarii de catre conducere a contabilitatii pe baza continuitatii activitatii si determinam, pe baza probelor de audit obtinute, daca exista o incertitudine semnificativa cu privire la evenimente sau conditii care ar putea  genera  indoieli semnificative  privind capacitatea Societatii de a-si continua activitatea. In cazul in care concluzionam ca exista o incertitudine semnificativa, trebuie sa atragem atentia in raportul auditorului asupra prezentarilor aferente din situatiile financiare sau, in cazul în care aceste prezentari sunt neadecvate, sa ne modificam opinia. Concluziile noastre se bazeaza pe probele de audit obtinute pana la data raportului auditorului. Cu toate acestea, evenimente sau conditii viitoare pot determina Societatea sa nu isi mai desfasoare activitatea in baza principiului continuitatii activitatii.

3

Barcode:3875858-05 A-570-106 INV - Investigation -

- Evaluam prezentarea, structura si continutul situatiilor financiare, inclusiv al prezentarilor de informatii, si masura in care situatiile financiare reflecta tranzactiile si evenimentele care stau la baza acestora intr-o maniera care sa rezulte intr-o prezentare fidela.

11. Comunicam persoanelor responsabile cu guvernanta, printre alte aspecte, aria planificata si programarea in timp a auditului, precum si principalele constatari ale auditului, inclusiv orice deficiente semnificative ale controlului intern, pe care le identificam pe parcursul auditului.

28.03.2019

*In numele societatii*

*GDV AUDIT CONSULT SRL*

*Membra CAFR (Nr. 481/2004)*

*OLIVIU TRAISTARU*

*Membru CAFR ( Nr. 452/2001)*



4

Barcode:3875858-05 A-570-106 INV - Investigation  -

S.C. SIGSTRAT S.A.

# SOCIETATEA COMERCIALA
# SIGSTRAT SA.

## SITUATIILE FINANCIARE
## PENTRU EXERCITIUL FINANCIAR 01.01 – 31.12.2018

Intocmite in conformitate cu Legea 82/1991 si
OMFP nr. 1802/2014 cu modificarile si completarile ulterioare

S.C GDV AUDIT CONSULT S.R.L.                           AUDIT EXTERN

Barcode:3875858-05 A-570-106 INV - Investigation  -

S.C. SIGSTRAT SA

# CUPRINS

|  | **Pagina** |
|---|---|
| RAPORTUL AUDITORULUI INDEPENDENT |  |
| SITUATIILE FINANCIARE |  |
| Bilantul | 7 |
| Contul de profit si pierdere | 9 |
| Situatia modificarilor capitalurilor proprii | 11 |
| Situatia fluxurilor de trezorerie | 12 |
| Note anexe la situatiile financiare | 14-23 |

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile    6
de la 7 la 10.

Barcode:3875858-05 A-570-106 INV - Investigation  -

S.C. SIGSTRAT SA

*BILANT CONTABIL LA  31.12.2018(exprimat in  Lei)*

| DENUMIRE INDICATOR | 31-dec-2018 | 1-ian-2018 |
|---|---|---|
| Concesiuni, brevete, licente, marci, drepturi si valori similare imob.necorp. | 164.002 | 169.895 |
| TOTAL IMOBILIZARI NECORPORALE | 164.002 | 169.895 |
| Terenuri si constructii | 6.993.320 | 7.267.405 |
| Instalatii tehnice si masini | 4.633.929 | 5.553.017 |
| Alte instalatii, utilaje si mobilier | 88.723 | 106.764 |
| imobilizari corporale in curs de executie | 1.170.528 | 1.179.078 |
| Avansuri | 54.272 | 54.272 |
| TOTAL IMOBILIZARI CORPORALE | 12.940.772 | 14.160.536 |
| Alte imprumuturi | 13.356 | 14.614 |
| TOTAL IMOBILIZARI FINANCIARE | 13.356 | 14.614 |
| **ACTIVE IMOBILIZATE - TOTAL** | **13.118.130** | **14.345.045** |
| Materii prime si materiale consumabile | 2.680.300 | 2.236.808 |
| Productie in curs de executie | 1.188.774 | 961.327 |
| Produse finite si marfuri | 3.843.275 | 3.664.861 |
| Avansuri pentru cumparari de stocuri | 465.900 | 430.517 |
| **TOTAL STOCURI** | **8.178.249** | **7.293.513** |
| Creante comerciale | 5.235.446 | 4.990.592 |
| Alte creante | 325.249 | 271.457 |
| **TOTAL CREANTE** | **5.560.695** | **5.262.049** |
| Casa si conturi la banci | 1.136.664 | 1.500.059 |
| **ACTIVE CIRCULANTE - TOTAL** | **14.875.608** | **14.055.621** |
| CHELTUIELI IN AVANS-sume de reluat intr-o perioada de pana la un an | 106.682 | 57.908 |
| Sume datorate institutiilor de credit | 2.594.968 | 2.579.792 |
| Avansuri incasate in contul comenzilor | 1.611.087 | 1.648.872 |
| Datorii comerciale | 2.086.228 | 2.442.901 |
| Alte datorii, inclusiv datorii fiscale si alte datorii pt.asigurarile sociale | 1.169.103 | 1.088.481 |
| **TOTAL DATORII CE TREBUIE PLATITE INTR-O PERIOADA DE UN AN** | **7.461.386** | **7.760.046** |
| ALTE ACTIVE CIRCULANTE, RESPECTIV DATORII CURENTE NETE | 7.520.904 | 6.353.483 |
| **TOTAL ACTIVE MINUS DATORII CURENTE** | **20.639.034** | **20.698.528** |
| Sume datorate institutiilor de credit | - | 420.375 |
| **TOTAL DATORII CE TREBUIE PLATITE INTR-O PERIOADA MAI MARE DE UN AN** | - | 420.375 |

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile     7
de la 7 la 10.

Barcode:3875858-05 A-570-106 INV - Investigation  -

S.C SIGSTRAT SA

| | | |
|---|---|---|
| Capital din care: | 2.325.077 | 2.325.077 |
| Capital subscris varsat | 2.325.077 | 2.325.077 |
| Rezerve din reevaluare | 4.176.106 | 4.401.197 |
| **Rezerve** | **13.640.684** | **13.536.224** |
| Rezerve legale | 435.584 | 411.896 |
| Alte rezerve | 13.205.100 | 13.124.328 |
| Pierderi legate de instrumentie de capitaluri proprii | 65.117 | 65.117 |
| REZULTATUL REPORTAT          Profitul nerepartizat | 225.090 | 27.362 |
| **REZULTATUL EXERCITIULUI**   Profit | **360.883** | **58.744** |
| Repartizarea profitului | 23.689 | 5.334 |
| **CAPITALURI PROPRII - TOTAL** | 20.639.034 | 20.278.153 |
| **CAPITALURI  - TOTAL** | **20.639.034** | **20.278.153** |

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile    8
de la 7 la 10.

Barcode:3875858-05 A-570-106 INV - Investigation -

S.C. SIGSTRAT SA

*CONTUL DE PROFIT SI PIERDERE*
*PENTRU EXERCITIUL FINANCIAR 01.01 – 31.12.2018(exprimat in Lei)*

| Denumirea indicatorului | 31.12.2018 | 31.12.2017 |
|---|---|---|
| **Cifra de afaceri neta** | **27.093.475** | **28.835.201** |
| Venituri din activitatea curenta | 26.928.966 | 28.729.957 |
| Venituri din vanzarea marfurilor | 165.885 | 105.244 |
| Reduceri comerciale acordate | 1.376 | - |
| Venituri aferente costului productiei in curs(sold creditor) | 7.589.460 | 3.511.935 |
| Venituri din productia de imobilizari necorporale si corporale | 308.107 | 319.851 |
| Alte venituri din exploatare | 2.181.818 | 1.859.039 |
| **VENITURI DIN EXPLOATARE - TOTAL** | **37.172.860** | **34.526.026** |
| Cheltuieli cu materiile prime si materialele consumabile | 18.581.300 | 15.791.056 |
| Alte cheltuieli materiale | 26.641 | 29.578 |
| Alte cheltuieli din afara (cu energie si apa) | 1.534.472 | 1.451.981 |
| Cheltuieli privind marfurile | 81.905 | 71.124 |
| **Cheltuieli cu personalul -total** | **12.458.240** | **12.492.778** |
| Salarii | 12.083.321 | 10.207.608 |
| Cheltuieli cu asigurarile si protectia sociala | 374.919 | 2.285.170 |
| *Ajustarea valorii imobilizarilor corporale si necorporale* | *1.587.412* | *1.863.557* |
| Cheltuieli | 1.587.412 | 1.863.557 |
| *Ajustarea valorii activelor circulante* | *-49.497* | *-* |
| Venituri | 49.497 | - |
| *Alte cheltuieli de exploatare* | *2.313.994* | *2.509.165* |
| Cheltuieli privind prestatiile externe | 1.852.500 | 2.113.680 |
| Cheltuieli cu alte impozite, taxe si varsaminte asimilate | 217.653 | 224.108 |
| Alte cheltuieli | 243.841 | 171.377 |
| *Ajustari privind provizioanele* | *-* | *-140.000* |
| Venituri | | 140.000 |
| **CHELTUIELI DE EXPLOATARE - TOTAL** | **36.534.467** | **34.069.239** |
| **REZULTATUL DIN EXPLOATARE Profit** | **638.393** | **456.787** |
| Venituri din dobanzi | 38 | 64 |
| Alte venituri financiare | 193.953 | 234.184 |
| **VENITURI FINANCIARE - TOTAL** | **193.991** | **234.248** |
| Cheltuieli privind dobanzile | 120.344 | 127.043 |
| Alte cheltuieli financiare | 238.266 | 457.318 |
| **CHELTUIELI FINANCIARE -TOTAL** | **358.610** | **584.361** |
| **REZULTATUL FINANCIAR Pierdere** | **164.619** | **350.113** |

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile
de la 7 la 10.

9

Barcode:3875858-05 A-570-106 INV - Investigation  -

S.C. SIGSTRAT SA

| | | |
|---|---|---|
| *VENITURI TOTALE* | *37.366.851* | *34.760.274* |
| *CHELTUIELI TOTALE* | *36.893.077* | *34.653.600* |
| *REZULTATUL BRUT AL EXERCITIULUI    Profit* | *473.774* | *106.674* |
| Impozitul pe profit | 112.891 | 47.930 |
| *REZULTATUL NET AL EXERCITIULUI   Profit* | *360.883* | *58.744* |

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile    10
de la 7 la 10.

Barcode:3875858-05 A-570-106 INV - Investigation  -

S.C. SIGSTRAT SA

*SITUATIA MODIFICARILOR CAPITALULUI PROPRIU PENTRU EXERCITIUL FINANCIAR 01.01 – 31.12.2018(exprimat in  Lei)*

| Denumirea elementului | Sold la inceputul exercitiului financiar 2018 | Cresteri | Reduceri | Sold la sfarsitul exercitiului financiar 2018 |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |
| Capital subscris | 2.325.077 | | | 2.325.077 |
| Rezerve din reevaluare | 4.401.197 | | 225.091 | 4.176.106 |
| Rezerve legale | 411.896 | 23.688 | | 435.584 |
| Alte rezerve | 13.124.328 | 80.772 | | 13.205.100 |
| Rezultat reportat reprezentand surplusul realizat din rezerve din reevaluare | 27.362 | 225.090 | 27.362 | 225.090 |
| Pierderi legate de instrumentele de capitaluri proprii | 65.117 | | | 65.117 |
| Profitul exercitiului financiar | 58.744 | 360.883 | 58.744 | 360.883 |
| Repartizarea profitului | 5.334 | 23689 | 5.334 | 23.689 |
| Total capitaluri proprii | 20.278.153 | 666.744 | 305.863 | 20.639.034 |

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile   11
de la 7 la 10.

Barcode:3875858-05 A-570-106 INV - Investigation  -

S.C. SIGSTRAT SA

*SITUATIA FLUXURILOR DE TREZORERIE*
*PENTRU EXERCITIUL FINANCIAR 01.01 – 31.12.2018(exprimat in  Lei)*

| DENUMIREA  ELEMENTULUI | EXERCITIUL  FINANCIAR | |
|---|---|---|
| | **Precedent** | **Curent** |
| Cifra de afaceri | 28.835.201 | 27.093.475 |
| Productia stocata | 3.511.935 | 7.589.460 |
| Productia imobilizata | 319,851 | 308.107 |
| Alte venituri din exploatare | 1.859.039 | 2.181.818 |
| *Total venituri din exploatare* | **34.526.026** | **37.172.860** |
| Cheltuieli privind materiile prime, materialele consumabile si marfurile | 15.891.758 | 18.689.846 |
| Cheltuieli cu energia | 1.451.981 | 1.534.472 |
| Cheltuieli cu personalul | 12.492.778 | 12.458.240 |
| Amortizari | 1.863.557 | 1.587.412 |
| Alte cheltuieli de exploatare | 2.509.165 | 2.313.994 |
| Ajustari privind provizioanele | -140,000 | - |
| *Total cheltuieli din exploatare* | **34.069.239** | **36.534.467** |
| *Rezultatul din exploatare* | **456,787** | **638.393** |
| Venituri financiare | 234,248 | 193,991 |
| Cheltuieli financiare | 584,361 | 358.610 |
| *Rezultatul financiar* | **-350,113** | **-164.619** |
| *Rezultatul brut al exercitiului* | **106,674** | **473.774** |
| Impozit pe profit | 47,930 | 112.891 |
| *Rezultatul net al exercitiului* | **58,744** | **360.883** |
| *Flux de numerar* | | |
| + Profit | 58,744 | 360.883 |
| + Amortizare | 1.863.557 | 1.587.412 |
| - Variatia stocurilor | -1.554.865 | 884.736 |
| - Variatia creantelor | -157,551 | 298.646 |
| + Variatia furnizorilor si clientilor creditori | 977,340 | -394.458 |
| - Variatia altor elemente de activ | -1.932.720 | -1.527.762 |
| + Variatia altor pasive | -2.125.883 | -1.793.192 |
| *Flux de numerar din activitatea de exploatare (A)* | **4.418.894** | **105.025** |
| + Sume din vanzarea activelor si mijloacelor fixe | 130.297 | 286.400 |
| - Achizitii de imobilizari corporale | 255.098 | 41.514 |

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile     12
de la 7 la 10.

Barcode:3875858-05 A-570-106 INV - Investigation  -

S.C. SIGSTRAT SA

| | | |
|---|---|---|
| - Cheltuieli pentru imobilizari corporale executate in regie proprie | 319.851 | 308.107 |
| *Flux de numerar din activitatea de investitii (B)* | **-444.652** | **-63.221** |
| + Variatia imprumuturilor | -3.628.886 | -405.199 |
| *Flux de numerar din activitatea financiara ( C )* | **-3.628.886** | **-405.199** |
| *Disponibilitati banesti la inceputul perioadei* | **1.154.703** | **1.500.059** |
| *Flux de numerar net    (A+B+C)* | **345,356** | **-363.395** |
| *Disponibilitati banesti la sfarsitul perioadei* | **1.500.059** | **1.136.664** |

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile      13
de la 7 la 10.

Barcode:3875858-05 A-570-106 INV - Investigation  -

S.C. SIGSTRAT SA

## NOTE LA SITUATIILE FINANCIARE
## PENTRU EXERCITIUL FINANCIAR 01.01 – 31.12.2018 ( Lei)

### 1. Prezentarea situatiilor financiare

Situatiile financiare ale S.C. SIGSTRAT S.A. pentru anul 2018 au fost intocmite in conformitate cu  OMF 1802/2014 cu modificarile si completarile ulterioare.

Societatea efectuează înregistrările contabile în lei româneşti , în conformitate cu Reglementările Contabile şi de Raportare ("RCR") emise de Ministerul  Finanțelor Publice al Guvernului  României.

### 2. Sinteza politicilor contabile semnificative aplicate

#### Imobilizari corporale

Imobilizările corporale sunt inițial înregistrate în contabilitate la cost istoric  minus amortizarea cumulată.

Întreținerea şi reparațiile mijloacelor fixe se trec pe cheltuieli la momentul efectuarii lor, iar îmbunătățirile aduse activelor, care cresc valoarea sau durata de viață a acestora, sunt capitalizate.

Activele imobilizate de natura obiectelor de inventar, inclusiv uneltele şi sculele, sunt trecute pe cheltuieli în momentul achiziționării şi nu sunt incluse în valoarea contabilă a imobilizărilor.

Elementele de imobilizări corporale care sunt casate sau cesionate sunt eliminate din bilanț împreună cu amortizarea cumulată corespunzătoare. Profitul sau pierderea rezultate dintr-o asemenea operațiune se determină ca diferență între suma obținută şi valoarea contabilă netă şi sunt incluse în profitul din exploatare al perioadei.

Modernizările semnificative sunt capitalizate dacă acestea extind durata de viață a activului sau dacă măresc semnificativ capacitatea de generare a unor beneficii economice de către acestea.
Terenurile sunt înregistrate la valoare dată de evaluare. Terenurile nu se amortizează deoarece se considera ca au o durata de viata indefinita.

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile   14
de la 7 la 10.

Barcode:3875858-05 A-570-106 INV - Investigation  -

S.C SIGSTRAT SA

## NOTE LA SITUATIILE FINANCIARE
## PENTRU EXERCITIUL FINANCIAR 01.01 – 31.12.2018 ( Lei)

### 2.  Sinteza politicilor contabile semnificative aplicate – Continuare

Costul initial al mijloacelor fixe include pretul de cumparare, inclusiv taxele nerecuperabile generate de achizitionarea mijloacelor fixe si alte costuri direct atribuite aducerii activului in stare de functionare si la locul utilizarii acestuia.

Cheltuielile suportate dupa ce mijloacele fixe au fost puse in functiune, cum ar fi costurile cu reparatiile si intretinerea, sunt incluse in contul de profit si pierdere in perioada in care sunt angajate.

Amortizarea imobilizarilor corporale a fost calculata pe baza metodei liniare  în cursul anului 2018 de la momentul intrarii in functiune si pana la recuperarea integrala a valorii lor de intrare conform duratelor normale de functionare în conformitate cu normele legale in vigoare .

### Stocuri

Stocurile sunt înregistrate la cea mai mica valoare dintre cost şi valoarea neta realizabila. Costul produselor finite şi în curs de execuţie include materialele, forţa de muncă şi cheltuielile de producţie indirecte aferente. Valoarea netă realizabilă este preţul normal de vânzare mai puţin costurile de finalizare şi cheltuielile de vânzare.

### Creante

Creanţele sunt înregistrate la valoarea realizabila anticipata.  Fluxurile de numerar aferente creanţelor pe termen scurt nu sunt actualizate. Societatea a avut provizioane constituite pentru clienti incerti.

### Disponibilitati

Numerarul şi echivalentele de numerar sunt înregistrate în bilanţ la cost. Disponibilitatile cuprind casa, conturile curente si depozitele la banci. Pentru conversia in Lei a sumelor in devize, s-au utilizat cursurile de schimb valabile la 31.12.2018 comunicate de BNR.

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile de la 7 la 10.

15

Barcode:3875858-05 A-570-106 INV - Investigation  -

S.C. SIGSTRAT SA

## NOTE LA SITUATIILE FINANCIARE
## PENTRU EXERCITIUL FINANCIAR 01.01 – 31.12.2018 ( Lei)

### 2. Sinteza politicilor contabile semnificative aplicate – Continuare

### Capital social

Capitalul social este prezentat la valoarea nominala.

### Imprumuturi

Societatea  a utilizat surse atrase de la institutii de credit.

### Datorii

Datoriile sunt înregistrate la cost, care este valoarea justă a sumelor ce urmează a fi plătite pentru bunurile sau serviciile primite.

### Recunoasterea cheltuielilor si veniturilor

Veniturile sunt recunoscute daca este probabil ca beneficiile economice, asociate cu tranzactia respectiva vor intra in societate si marimea acestor beneficii poate fi determinata in mod credibil. Veniturile din vânzări sunt înregistrate în momentul în care bunurile sunt livrate la client la o valoare care nu include rabaturile comerciale sau discount-urile oferite.

Cheltuielile si veniturile sunt incluse in contul de profit si pierdere la data la care proprietatea legala asupra bunurilor se schimba. In contabilitate se inregistreaza valoarea totala a tranzactiei la data transferului proprietatii pentru bunurile in cauza.

### Cheltuieli financiare

Cheltuielile financiare sunt inregistrate in contul de profit si pierdere in momentul efectuarii, pe masura ce operatiunile sunt incheiate.

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile     16
de la 7 la 10.

Barcode:3875858-05 A-570-106 INV - Investigation -

S.C. SIGSTRAT SA

## NOTE LA SITUATIILE FINANCIARE
## PENTRU EXERCITIUL FINANCIAR 01.01 – 31.12.2018 ( Lei)

### 2. Sinteza politicilor contabile semnificative aplicate – Continuare

#### Cifra de afaceri
Cifra de afaceri reprezintă sumele facturate terților, exclusiv TVA.
Cifra de afaceri este obținută ca urmare a activității din domeniul " Fabricarea de furnire si panouri din lemn" cod CAEN 1621.

#### Impozitul pe profit
Societatea inregistreaza impozitul pe profit in conformitate cu situatiile financiare intocmite conform reglementarilor legislatiei romane.

### 3. Imobilizari corporale si necorporale
Imobilizarile corporale sunt inregistrate la valorile obtinute prin aplicarea prevederilor HG 1553/2003   , tratament contabil alternativ permis de OMFP 1802/2014, mai putin amortizarea cumulata, dupa cum urmeaza:

| Denumirea elementului de imobilizare | Sold la 01.01.2018 | Cumparari | Cresteri Productie proprie | Cedari, casari si alte reduceri | Sold la 31.12.2018 |
|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 6 | 7 |
| Imobilizari necorporale | 314.928 | 21.397 | - | - | 336.325 |
| Terenuri, amenajari terenuri | 426.869 | - | - | 9.560 | 417.309 |
| Constructii | 8.501.707 | 197.000 | - | 238.600 | 8.460.107 |
| Echipamente tehnologice | 12.821.008 | 12.864 | 339.085 | 140 | 13.172.817 |
| Aparate si instalatii de masurare, control si reglare | 282.815 | 3.399 | - | 5.740 | 280.474 |
| Mijloace de transport | 3.664.678 | - | - | 40.255 | 3.624.423 |
| Mobilier, aparatura birotica | 304.418 | 2.824 | - | 175 | 307.067 |
| Imobilizari corporale in curs de executie | 1.233.350 | 41.514 | 308.107 | 358.171 | 1.224.800 |
| Alte creante imobilizate | 14.614 | 2.000 | - | 3.258 | 13.356 |
| TOTAL | 27.564.387 | 280.998 | 647.192 | 655.899 | 27.836.678 |

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile de la 7 la 10.          17

Barcode:3875858-05 A-570-106 INV - Investigation  -

S.C. SIGSTRAT SA

## NOTE LA SITUATIILE FINANCIARE
## PENTRU EXERCITIUL FINANCIAR 01.01 – 31.12.2018 ( Lei)
## 3. Imobilizari corporale si necorporale(continuare)

Deprecieri

| Elemente de imobilizare | Sold la 01.01.2018 | Amortizare | Amortizare aferenta imobiliz. scoase din evid./reeval. | Amortizare la 31.12.2018 |
|---|---|---|---|---|
| Alte imobilizari | 145,033 | 27.290 | - | 172.323 |
| Constructii,amenajari terenuri | 1.661.171 | 264.822 | 41.897 | 1.884.096 |
| Instalatii tehnice si masini | 11.215.484 | 1.274.435 | 46.134 | 12.443785 |
| Alte instalatii, utilaje si mobilier | 197.654 | 20.865 | 175 | 218.344 |
| TOTAL | 13.219.342 | 1.587.412 | 88.206 | 14.718.548 |

## 4.Provizioane

| Denumirea provizionului | Sold la 01.01.2018 | Transferuri in cont | Transferuri din cont | Sold la 31.12.2018 |
|---|---|---|---|---|
| Provizioane pentru clienti neincasati | 584.346 | - | 49.497 | 534.849 |

## 5.Repartizarea profitului

| | |
|---|---|
| PROFIT BRUT | 473.774 |
| Impozit pe profit | 112.891 |
| PROFIT NET DE REPARTIZAT | 360.883 |
| Rezultat reportat reprezentand surplusul realizat din rezerve din reevaluare | 225.090 |
| Majorare rezerva legala datorata majorarii capitalului social | 23.689 |
| Rezerve pentru surse proprii de finantare | 562.284 |

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile 18 de la 7 la 10.

Barcode:3875858-05 A-570-106 INV - Investigation  -

S.C. SIGSTRAT SA

## NOTE LA SITUATIILE FINANCIARE
## PENTRU EXERCITIUL FINANCIAR 01.01 – 31.12.2018( Lei)
### 6.Creante si datorii

| CREANTE | Sold la 31.12.2018 | Termen de lichiditate | |
|---|---|---|---|
| | | sub 1 an | peste 1 an |
| **Total, din care:** | 6.095.544 | 6.095.544 | |
| Clienti | 4.387.674 | 4.387.674 | |
| Clienti incerti | 1.188.934 | 1.188.934 | |
| Furnizori debitori | 193.687 | 193.687 | |
| Alte creante in legatura cu personalul | 31.427 | 31.427 | |
| Contributia angajator concedii | 241.775 | 241.775 | |
| Debitori diversi | 39.876 | 39.876 | |
| Alte Creante | 5.079 | 5.079 | |
| TVA neexigibil | 7.092 | 7.092 | |

| DATORII | Sold la 31.12.2018 | Termen de exigibilitate | | |
|---|---|---|---|---|
| | | sub 1 an | 1-5 ani | peste 5 ani |
| **Total, din care:** | 7.461.386 | 7.461.386 | | |
| Furnizori | 2.062.081 | 2.062.081 | | |
| Furnizori imobilizari | 24.147 | 24.147 | | |
| Clienti creditori | 1.611.087 | 1.611.087 | | |
| Contributii pt.asigurari sociale | 300.617 | 300.617 | | |
| Contributii somaj | 19.551 | 19.551 | | |
| Impozit salarii | 45.482 | 45.482 | | |
| Datorii cu personalul | 540.825 | 540.825 | | |
| Alte impozite si taxe | 7.653 | 7.653 | | |
| Linie credit in lei | 1.647.072 | 1.647.072 | | |
| Linie credit in valuta | 527.143 | 527.143 | | |
| Impozit pe profit | 112.891 | 112.891 | | |
| Credite bancare pe termen mediu | 420.753 | 420.753 | | |
| TVA de plata | 24.608 | 24.608 | | |
| Creditori diversi | 1.589 | 1.589 | | |
| Alte imprumuturi | 7.957 | 7.957 | | |
| Datorii fata de alti creditori | 107.930 | 107.930 | | |

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile    19
de la 7 la 10.

Barcode:3875858-05 A-570-106 INV - Investigation  -

S.C. SIGSTRAT SA

## NOTE LA SITUATIILE FINANCIARE
## PENTRU EXERCITIUL FINANCIAR 01.01 – 31.12.2018( Lei

### 7.Analiza rezultatului din exploatare

| Nr. crt. | INDICATOR | EXERCITIUL PRECEDENT (2017) | EXERCITIUL CURENT (2018) |
|---|---|---|---|
| 1 | Cifra de afaceri neta + variatia stocurilor | 32.347.136 | 34.682.935 |
| 2 | Costul bunurilor vandute si al serviciilor prestate (3+4+5) | 27.626.962 | 30.703.287 |
| 3 | Cheltuielile activitatii de baza | 18.568.260 | 21.270.123 |
| 4 | Cheltuielile activitatilor auxiliare | 864.543 | 920.574 |
| 5 | Cheltuielile indirecte de productie | 8.194.159 | 8.512.590 |
| 6 | Rezultatul brut aferent cifrei de afaceri nete (1-2) | 4.720.174 | 3.979.648 |
| 7 | Cheltuielile de desfacere | 298.664 | 109.792 |
| 8 | Cheltuielile generale de administratie | 4.918.639 | 4.383.473 |
| 9 | Alte venituri din exploatare | 2.178.890 | 2.489.925 |
| 10 | Alte cheltuieli de exploatare | 1.224.974 | 1.337.915 |
| 11 | Rezultatul din exploatare (6-7-8+9-10) | 456.787 | 638.393 |

### 8.Capital social

La data de 31.12.2018, capitalul social subscris si varsat al SC SIGSTRAT SA este de 2.325.077 lei, reprezentat de 23.250.770 actiuni, cu valoare nominala de 0,1 lei/actiune.

Acţiunile sunt comune, nominative şi dematerializate.

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile de la 7 la 10.                                                                    20

Barcode:3875858-05 A-570-106 INV - Investigation  -

S.C. SIGSTRAT SA

## NOTE LA SITUATIILE FINANCIARE
## PENTRU EXERCITIUL FINANCIAR 01.01 – 31.12.2018( Lei)
### 9.Indicatori economici

| Denumire indicator | Formula de calcul | U.M. | 31.12.2018 | 31.12.2017 |
|---|---|---|---|---|
| Cifra de afaceri | | lei | 27.093.475 | 28.835.201 |
| Activul net | Total activ-Datorii totale | lei | 20.639.034 | 20.278.153 |
| Profit din exploatare | | lei | 638.393 | 456.787 |
| Rata profitului din exploatare | (Profit din exploatare/Cifra de afaceri)*100 | % | 2,36 | 1,58 |
| Rentabilitatea costurilor | (Profit din exploatare/Cheltuieli totale)*100 | % | 2,75 | 1,24 |
| Profit brut | | lei | 473.774 | 106.674 |
| Marja bruta a profitului | (Profit brut/Cifra de afaceri)*100 | % | 1,75 | 0,37 |
| Impozitul pe Profit | | lei | 112.891 | 47.930 |
| Profit net | | lei | 360.883 | 58.744 |
| Marja neta a profitului | (Profit net/Cifra de afaceri)*100 | % | 1,33 | 0,20 |
| Rata rentabilitatii financiare | (Profit net/Capital propriu)*100 | % | 1,75 | 0,29 |
| Rata rentabilitatii activului total | (Profit net/Activ Total)*100 | % | 1,28 | 0,21 |
| Rata rentabilitatii activului circulant | (Profit net/Activ circulant)*100 | % | 2,43 | 0,42 |
| Gradul de lichiditate al activului total | (Activ circulant/Activ Total)*100 | % | 52,94 | 49,39 |
| Viteza de rotatie a activelor totale | Cifra de afaceri/Total active | | 0,96 | 1,01 |
| Viteza de rotatie a activelor imobilizate | Cifra de afaceri/Active imobilizate | | 2,07 | 2,01 |
| Lichiditatea generala | (Activ circulant/Datorii curente)*100 | % | 199,37 | 181,13 |
| Lichiditatea curenta | (Activ circulant - Stocuri)/Datorii curente *100 | % | 89,76 | 87,14 |
| Lichiditatea imediata | (Disponibilitati/Datorii curente)*100 | % | 15,23 | 19,33 |
| Solvabilitatea patrimoniala | (Capital propriu/Total pasiv)*100 | % | 73,45 | 71,25 |
| Solvabilitatea generala | (Total activ/Obligatii terti)*100 | % | 376,61 | 366,73 |

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile de la 7 la 10.            21

Barcode:3875858-05 A-570-106 INV - Investigation  -

S C SIGSTRAT SA

| | | | | |
|---|---|---|---|---|
| Gradul de indatorare | (Datorii curente/Total activ)*100 | % | 26,55 | 27,27 |
| Durata medie de incasare a creantelor | (Total creante/Total venituri)*360 | zile | 53,57 | 54,50 |
| Durata medie de plata a datoriilor | (Total datorii/Venituri totale)*360 | zile | 71,88 | 80,37 |
| Numarul de rotatii al stocurilor | Cifra de afaceri/Total stocuri | | 3,31 | 3,95 |
| Gradul de utilizare al stocurilor | (Venituri totale/Total stocuri)*100 | % | 456,91 | 476,59 |
| Rata generala a indatorarii | (Datorii totale/Capital propriu)*100 | % | 36,15 | 40,34 |
| Gradul de risc | (Imprumuturi/Capital propriu)*100 | % | 0,00 | 0,02 |

**10.Alte Informatii**

SC SIGSTRAT SA a fost inființată ca societate pe acțiuni prin HG nr. 753/1992, isi desfasoara activitatea in conformitate cu legislatia romana aplicabila coroborat cu prevederile Actului constitutiv.

Obiectul principal de activitate potrivit CAEN este "Fabricarea de furnire si a panourilor din lemn"(cod CAEN 1621).

Sediul societății se află în Sighetu Marmației, str. Unirii nr.40, jud. Maramures.Societatea nu detine sedii secundare si nici puncte de lucru.

Tranzacțiile în valută au fost contabilizate la cursurile de schimb valutar de la data tranzacției. Pierderile sau câștigurile din diferențe de curs valutar au fost recunoscute în contul de profit și pierdere. La finele fiecarei luni, creantele si datoriile in valuta au fost evaluate la cursul de schimb al pietei valutare, comunicat de BNR din ultima zi bancara a lunii in cauza, iar diferențele de curs valutar înregistrate au fost recunoscute in contabilitate la venituri sau cheltuieli din diferente de curs valutar, dupa caz.

La stabilirea profitului impozabil si a impozitului pe profit pe anul 2018 s-au avut in vedere prevederile  Legii nr.227/2015 privind Codul fiscal, cota de impozitare in vigoare la 31.12.2018 fiind de 16%, iar impozitul pe profit rezultat la sfarsitul anului 2018 a fost in suma de  112.891 lei.

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile    22
de la 7 la 10.

Barcode:3875858-05 A-570-106 INV - Investigation -

S.C. SIGSTRAT SA

## NOTE LA SITUATIILE FINANCIARE
## PENTRU EXERCITIUL FINANCIAR 01.01 – 31.12.2018( Lei

### 10.Alte Informatii(continuare)

Cifra de afaceri în valoare totală de 27.093.475 lei s-a concretizat în următoarele venituri:

a) Venituri din vânzarea produselor în valoare de 24.376.052 lei, cu următoarea structură pe produse:

- lei -

| DENUMIRE  PRODUS | VALOARE |
|---|---|
| - placaj uz interior | 12.197.902 |
| - furnir | 584.842 |
| - produse mulate | 11.539.443 |
| - brichete | 53.865 |
| TOTAL | 24.376.052 |

b) Venituri din vânzarea semifabricatelor — 471.284 lei
c) Venituri din vânzarea produselor reziduale — 747.671 lei
d) Venituri din lucrări executate şi servicii prestate — 1.194.913 lei
e) Venituri din chirii — 139.046 lei
f) Venituri din vânzarea mărfurilor — 165.885 lei
g) Reduceri comerciale acordate — -1.376 lei

Societatea nu a inregistrat in cursul anului 2018 venituri sau cheltuieli extraordinare.

Soldul contului 471 in suma de 106.682 lei, reprezinta cheltuieli efectuate in avans, pentru exercitiul financiar urmator, cum ar fi abonamente, asigurari aferente cladirilor, utilajelor, mijloacelor de transport, etc.

Nu au fost inregistrate venituri in avans.

Notele de la paginile 11la 23 fac parte integranta din situatiile financiare prezentate in paginile de la 7 la 10.    23

Barcode:3875858-05 A-570-106 INV - Investigation -

# MINISTERUL FINANȚELOR PUBLICE
# AGENȚIA NAȚIONALĂ DE ADMINISTRARE FISCALĂ

**Index încărcare: 172650123 din 25.04.2019**

Ați depus un formular tip S1002, cu numărul de înregistrare **INTERNT-172650123-2019** din data de **25.04.2019** pentru perioada de raportare 12 2018 pentru CIF: **2954386**

Nu există erori de validare.

| *Bifati numai dacă este cazul :* | ☐ Mari Contribuabili care depun bilanţul la Bucuresti |
|---|---|
| | ☐ Sucursala |
| | ☐ GIE - grupuri de interes economic |
| | ☐ Activ net mai mic de 1/2 din valoarea capitalului subscris |

Tip situaţie financiara : BL

◉ An   ○ Semestru   Anul  2018

Suma de control   2.325.077

**Entitatea**  SC SIGSTRAT SA

**Adresa**

| Judeţ | Sector | Localitate |
|---|---|---|
| Maramures | | SIGHETU MARMATIEI |

| Strada | Nr. | Bloc | Scara | Ap. | Telefon |
|---|---|---|---|---|---|
| UNIRII | 40 | | | | 0262311117 |

| Număr din registrul comerţului | J 24 13 1993 | Cod unic de inregistrare | 2 9 5 4 3 8 6 |
|---|---|---|---|

**Forma de proprietate**

34--Societati pe actiuni

**Activitatea preponderenta (cod si denumire clasa CAEN)**

1621 Fabricarea de furnire şi a panourilor din lemn

**Activitatea preponderenta efectiv desfasurata (cod si denumire clasa CAEN)**

1621 Fabricarea de furnire şi a panourilor din lemn

◉ **Situatii financiare anuale**
( entităţi al căror exerciţiu financiar coincide cu anul calendaristic )

○ **Raportări anuale**

| ◉ **Entităţi mijlocii, mari si entităţi de interes public** | ☐ Entităţi de interes public | ? | ☐ 1. entităţile care au optat pentru un exerciţiu financiar diferit de anul calendaristic, cf.art. 27 din *Legea contabilităţii nr. 82/1991* |
|---|---|---|---|
| ○ **Entităţi mici** | | | ☐ 2. persoanele juridice aflate in lichidare, *potrivit legii* |
| ○ **Microentităţi** | | | ☐ 3. subunitaţile deschise in România de *societăţi rezidente in state aparţinând Spaţiului Economic European* |

Situaţiile financiare anuale încheiate la 31.12.2018 de către entităţile de interes public si de entităţile prevazute la pct.9 alin.(4) din Reglementarile contabile, aprobate prin OMFP nr. 1.802/2014, cu modificarile şi completarile ulterioare, al caror exercitiu financiar corespunde cu anul calendaristic

**F10 - BILANT**
**F20 - CONTUL DE PROFIT ŞI PIERDERE**
**F30 - DATE INFORMATIVE**
**F40 - SITUATIA ACTIVELOR IMOBILIZATE**

| **Indicatori :** | | |
|---|---|---|
| Capitaluri - total | | 20.639.034 |
| Capital subscris | | 2.325.077 |
| Profit/ pierdere | | 360.883 |

**ADMINISTRATOR,**

Numele si prenumele

ING.KERTESZ STEFAN

Semnatura

**INTOCMIT,**

Numele si prenumele

EC.MUJDAR ERIKA

Calitatea

11--DIRECTOR ECONOMIC

Semnatura

Nr.de inregistrare in organismul profesional

SEMNATURA DEVINE VIZIBILA DUPA O VALIDARE CORECTA

| Entitatea are obligaţia legală de auditare a situaţiilor financiare anuale? | ○ DA | ◉ NU |
|---|---|---|
| Entitatea a optat voluntar pentru auditarea situaţiilor financiare anuale? | ○ DA | ◉ NU |

Situatiile financiare anuale au fost aprobate potrivit legii  ☒

**AUDITOR**

Nume si prenume auditor persoana fizică/ Denumire firma de audit

SC GDV AUDIT CONSULT SRL

| Nr.de inregistrare in Registrul CAFR | CIF/ CUI |
|---|---|
| 481/2004 | 1 5 5 7 4 2 5 7 |

**Formular VALIDAT**

Barcode:3875858-05 A-570-106 INV - Investigation -

F10 - pag. 1

# BILANT
## la data de 31.12.2018

Cod 10

- lei -

| Denumirea elementului | Nr.rd. OMFP nr.10/ 03.01.19 | Nr. rd. | Sold la: | |
|---|---|---|---|---|
| | | | 01.01.2018 | 31.12.2018 |
| A | | B | 1 | 2 |
| **A. ACTIVE IMOBILIZATE** | | | | |
| I. IMOBILIZĂRI NECORPORALE | | | | |
| 1.Cheltuieli de constituire  (ct.201-2801) | 01 | 01 | | |
| 2.Cheltuielile de dezvoltare (ct.203-2803-2903) | 02 | 02 | | |
| 3. Concesiuni, brevete, licenţe, mărci comerciale, drepturi şi active similare şi alte imobilizări necorporale (ct. 205 + 208 - 2805 - 2808 - 2905 - 2908) | 03 | 03 | 169.895 | 164.002 |
| 4. Fond comercial (ct.2071-2807) | 04 | 04 | | |
| 5.Active necorporale de explorare si evaluare a resurselor minerale (ct. 206-2806-2906) | 05 | 05 | | |
| 6. Avansuri (ct.4094) | 06 | 06 | | |
| TOTAL (**rd.01 la 06**) | 07 | 07 | 169.895 | 164.002 |
| II. IMOBILIZĂRI CORPORALE | | | | |
| 1. Terenuri şi construcţii (ct. 211 + 212 - 2811 - 2812 - 2911 - 2912) | 08 | 08 | 7.267.405 | 6.993.320 |
| 2. Instalaţii tehnice şi maşini (ct. 213 + 223 - 2813 - 2913) | 09 | 09 | 5.553.017 | 4.633.929 |
| 3. Alte instalaţii, utilaje şi mobilier (ct. 214 + 224 - 2814 - 2914) | 10 | 10 | 106.764 | 88.723 |
| 4. Investiţii imobiliare (ct. 215 - 2815 - 2915) | 11 | 11 | | |
| 5. Imobilizari corporale in curs de executie (ct. 231-2931) | 12 | 12 | 1.179.078 | 1.170.528 |
| 6.Investitii imobiliare in curs de executie (ct. 235-2935) | 13 | 13 | | |
| 7.Active corporale de explorare si evaluare a resurselor minerale (ct. 216-2816-2916) | 14 | 14 | | |
| 8.Active biologice productive (ct.217+227-2817-2917) | 15 | 15 | | |
| 9. Avansuri (ct. 4093) | 16 | 16 | 54.272 | 54.272 |
| **TOTAL (rd. 08 la 16)** | 17 | 17 | 14.160.536 | 12.940.772 |
| III. IMOBILIZĂRI FINANCIARE | | | | |
| 1. Acţiuni deţinute la filiale (ct. 261 - 2961) | 18 | 18 | | |
| 2. Împrumuturi acordate entităţilor din grup (ct. 2671 + 2672 - 2964) | 19 | 19 | | |
| 3. Actiunile detinute la entitatile asociate si la entitatile controlate in comun  (ct. 262+263 - 2962) | 20 | 20 | | |
| 4. Împrumuturi acordate entităţilor asociate si entitatilor controlate in comun (ct. 2673 + 2674 - 2965) | 21 | 21 | | |
| 5. Alte titluri imobilizate (ct. 265 + 266 - 2963) | 22 | 22 | | |
| 6. Alte împrumuturi (ct. 2675* + 2676* + 2677 + 2678* + 2679* - 2966* - 2968*) | 23 | 23 | 14.614 | 13.356 |
| **TOTAL (rd. 18 la 23)** | 24 | 24 | 14.614 | 13.356 |
| **ACTIVE IMOBILIZATE - TOTAL (rd. 07 + 17 + 24)** | 25 | 25 | 14.345.045 | 13.118.130 |
| **B. ACTIVE CIRCULANTE** | | | | |
| I. STOCURI | | | | |

Barcode:3875858-05 A-570-106 INV - Investigation -

F10 - pag. 2

| | | | | |
|---|---|---|---|---|
| 1. Materii prime și materiale consumabile (ct. 301 + 302 + 303 +/- 308 +321 + 322 + 323 + 328 + 351 + 358 + 381 +/- 388 - 391 - 392 - 3951 - 3958 - 398) | 26 | 26 | 2.236.808 | 2.680.300 |
| 2. Producția în curs de execuție (ct. 331 + 332 + 341 +/- 348* - 393 - 3941 - 3952) | 27 | 27 | 961.327 | 1.188.774 |
| 3. Produse finite și mărfuri (ct. 345 + 346 + 347 +/- 348* + 354 + 356 + 357 + 361 + 326 +/-368 + 371 +327 +/- 378 - 3945 - 3946 - 3947 - 3953 - 3954 - 3955 - 3956 - 3957 - 396 - 397 - din ct. 4428) | 28 | 28 | 3.664.861 | 3.843.275 |
| 4. Avansuri (ct. 4091) | 29 | 29 | 430.517 | 465.900 |
| **TOTAL (rd. 26 la 29)** | 30 | 30 | 7.293.513 | 8.178.249 |
| **II. CREANȚE** (Sumele care urmează să fie încasate după o perioadă mai mare de un an trebuie prezentate separat pentru fiecare element.) | | | | |
| 1. Creanțe comerciale 1) (ct. 2675* + 2676 *+ 2678* + 2679* - 2966* - 2968* + 4092 + 411 + 413 + 418 - 491) | 31 | 31 | 4.990.592 | 5.235.446 |
| 2. Sume de încasat de la entitățile afiliate (ct. 451** - 495*) | 32 | 32 | | |
| 3. Sume de încasat de la entitățile asociate si entitatile controlate in comun (ct. 453** - 495*) | 33 | 33 | | |
| 4. Alte creanțe (ct. 425+4282+431**+436** + 437**+ 4382+ 441**+4424+ din ct.4428**+ 444**+445+446**+447**+4482+4582+4662+ 461 + 473** - 496 + 5187) | 34 | 34 | 271.457 | 325.249 |
| 5. Capital subscris și nevărsat (ct. 456 - 495*) | 35 | 35 | | |
| 6. Creanțe reprezentând dividende repartizate în cursul exercițiului financiar (ct. 463) | 36 | 35a (301) | | |
| **TOTAL (rd. 31 la 35 +35a)** | 37 | 36 | 5.262.049 | 5.560.695 |
| **III. INVESTIȚII PE TERMEN SCURT** | | | | |
| 1. Acțiuni deținute la entitățile afiliate (ct. 501 - 591) | 38 | 37 | | |
| 2. Alte investiții pe termen scurt (ct. 505 + 506 + 507 + din ct. 508 - 595 - 596 - 598 + 5113 + 5114) | 39 | 38 | | |
| **TOTAL (rd. 37 + 38)** | 40 | 39 | | |
| **IV. CASA ȘI CONTURI LA BĂNCI** (din ct. 508+ct. 5112 + 512 + 531 + 532 + 541 + 542) | 41 | 40 | 1.500.059 | 1.136.664 |
| **ACTIVE CIRCULANTE - TOTAL (rd. 30 + 36 + 39 + 40)** | 42 | 41 | 14.055.621 | 14.875.608 |
| **C. CHELTUIELI ÎN AVANS (ct. 471) (rd.43+44)** | 43 | 42 | 57.908 | 106.682 |
| Sume de reluat intr-o perioada de pana la un an (din ct. 471*) | 44 | 43 | 57.908 | 106.682 |
| Sume de reluat intr-o perioada mai mare de un an (din ct. 471*) | 45 | 44 | | |
| **D. DATORII: SUMELE CARE TREBUIE PLĂTITE ÎNTR-O PERIOADĂ DE PÂNĂ LA 1 AN** | | | | |
| 1. Împrumuturi din emisiunea de obligațiuni, prezentându-se separat împrumuturile din emisiunea de obligațiuni convertibile (ct. 161 + 1681 - 169) | 46 | 45 | | |
| 2. Sume datorate instituțiilor de credit (ct. 1621 + 1622 + 1624 + 1625 + 1627 + 1682 + 5191 + 5192 + 5198) | 47 | 46 | 2.579.792 | 2.594.968 |
| 3. Avansuri încasate în contul comenzilor (ct. 419) | 48 | 47 | 1.648.872 | 1.611.087 |
| 4. Datorii comerciale - furnizori (ct. 401 + 404 + 408) | 49 | 48 | 2.442.901 | 2.086.228 |
| 5. Efecte de comerț de plătit (ct. 403 + 405) | 50 | 49 | | |
| 6. Sume datorate entităților din grup (ct. 1661 + 1685 + 2691 + 451***) | 51 | 50 | | |
| 7. Sume datorate entităților asociate si entitatilor controlate in comun (ct. 1663+1686+2692+2693+ 453***) | 52 | 51 | | |

Barcode:3875858-05 A-570-106 INV - Investigation -

F10 - pag. 3

| | | | | |
|---|---|---|---|---|
| 8. Alte datorii, inclusiv datoriile fiscale şi datoriile privind asigurările sociale (ct. 1623 + 1626 + 167 + 1687 + 2695 + 421 + 423 + 424 + 426 + 427 + 4281 + 431*** + 436***+ 437*** + 4381 + 441*** + 4423 +4428*** + 444*** + 446*** + 447*** + 4481 + 455 + 456*** + 457 + 4581 + 462 + 4661+ 473*** + 509 + 5186 + 5193 + 5194 + 5195 + 5196 + 5197) | 53 | 52 | 1.088.481 | 1.169.103 |
| **TOTAL (rd. 45 la 52)** | 54 | 53 | 7.760.046 | 7.461.386 |
| **E. ACTIVE CIRCULANTE NETE/DATORII CURENTE NETE (rd. 41+43-53-70-73-76)** | 55 | 54 | 6.353.483 | 7.520.904 |
| **F. TOTAL ACTIVE MINUS DATORII CURENTE (rd. 25+44+54)** | 56 | 55 | 20.698.528 | 20.639.034 |
| **G. DATORII: SUMELE CARE TREBUIE PLĂTITE ÎNTR-O PERIOADA MAI MARE DE 1 AN** | | | | |
| 1. Împrumuturi din emisiunea de obligaţiuni, prezentându-se separat împrumuturile din emisiunea de obligaţiuni convertibile (ct. 161 + 1681 – 169) | 57 | 56 | | |
| 2. Sume datorate instituţiilor de credit (ct. 1621 + 1622 + 1624 + 1625 + 1627 + 1682 + 5191 + 5192 + 5198) | 58 | 57 | 420.375 | |
| 3. Avansuri încasate în contul comenzilor (ct. 419) | 59 | 58 | | |
| 4. Datorii comerciale - furnizori (ct. 401 + 404 + 408) | 60 | 59 | | |
| 5. Efecte de comerţ de plătit (ct. 403 + 405) | 61 | 60 | | |
| 6. Sume datorate entităţilor din grup (ct. 1661 + 1685 + 2691 + 451***) | 62 | 61 | | |
| 7. Sume datorate entităţilor asociate si entităţilor controlate in comun (ct. 1663 + 1686 + 2692 +2693+ 453***) | 63 | 62 | | |
| 8. Alte datorii, inclusiv datoriile fiscale şi datoriile privind asigurările sociale (ct. 1623 + 1626 + 167 + 1687 + 2695 + 421 + 423 + 424 + 426 + 427 + 4281 + 431*** + 436*** +437*** + 4381 + 441*** + 4423 +4428*** + 444*** + 446*** + 447*** + 4481 + 455 + 456*** + 4581+462+4661 + 473*** + 509 + 5186 + 5193 + 5194 + 5195 + 5196 + 5197) | 64 | 63 | | |
| **TOTAL (rd.56 la 63)** | 65 | 64 | 420.375 | |
| **H. PROVIZIOANE** | | | | |
| 1. Provizioane pentru beneficiile angajatilor (ct. 1515+1517) | 66 | 65 | | |
| 2. Provizioane pentru impozite (ct. 1516) | 67 | 66 | | |
| 3. Alte provizioane (ct. 1511 + 1512 + 1513 + 1514 + 1518) | 68 | 67 | | |
| **TOTAL (rd. 65 la 67)** | 69 | 68 | | |
| **I. VENITURI ÎN AVANS** | | | | |
| 1. Subvenţii pentru investiţii (ct. 475)**(rd. 70+71)** | 70 | 69 | | |
| Sume de reluat intr-o perioada de pana la un an (ct. 475*) | 71 | 70 | | |
| Sume de reluat intr-o perioada mai mare de un an (ct. 475*) | 72 | 71 | | |
| 2. Venituri înregistrata în avans (ct. 472) **(rd.73 + 74)** | 73 | 72 | | |
| Sume de reluat intr-o perioada de pana la un an (ct. 472*) | 74 | 73 | | |
| Sume de reluat intr-o perioada mai mare de un an (ct. 472*) | 75 | 74 | | |
| 3. Venituri în avans aferente activelor primite prin transfer de la clienţi (ct. 478)**(rd.76+77)** | 76 | 75 | | |
| Sume de reluat intr-o perioada de pana la un an (ct. 478*) | 77 | 76 | | |
| Sume de reluat intr-o perioada mai mare de un an (ct. 478*) | 78 | 77 | | |
| **Fond comercial negativ (ct.2075)** | 79 | 78 | | |
| **TOTAL (rd. 69 + 72 + 75 + 78)** | 80 | 79 | | |
| **J. CAPITAL ŞI REZERVE** | | | | |
| **I. CAPITAL** | | | | |
| 1. Capital subscris vărsat (ct. 1012) | 81 | 80 | 2.325.077 | 2.325.077 |

Barcode:3875858-05 A-570-106 INV - Investigation -

F10 - pag. 4

| | | | | |
|---|---|---|---|---|
| 2. Capital subscris nevărsat (ct. 1011) | 82 | 81 | | |
| 3. Patrimoniul regiei (ct. 1015) | 83 | 82 | | |
| 4. Patrimoniul institutelor naționale de cercetare-dezvoltare (ct. 1018) | 84 | 83 | | |
| 5.Alte elemente de capitaluri proprii (1031) | 85 | 84 | | |
| **TOTAL (rd. 80 la 84)** | 86 | 85 | 2.325.077 | 2.325.077 |
| **II. PRIME DE CAPITAL** (ct. 104) | 87 | 86 | | |
| **III. REZERVE DIN REEVALUARE** (ct. 105) | 88 | 87 | 4.401.197 | 4.176.106 |
| **IV. REZERVE** | | | | |
| 1. Rezerve legale (ct. 1061) | 89 | 88 | 411.896 | 435.584 |
| 2. Rezerve statutare sau contractuale (ct. 1063) | 90 | 89 | | |
| 3. Alte rezerve (ct. 1068) | 91 | 90 | 13.124.328 | 13.205.100 |
| **TOTAL (rd. 88 la 90)** | 92 | 91 | 13.536.224 | 13.640.684 |
| Acțiuni proprii (ct. 109) | 93 | 92 | | |
| Câștiguri legate de instrumentele de capitaluri proprii (ct. 141) | 94 | 93 | | |
| Pierderi legate de instrumentele de capitaluri proprii (ct. 149) | 95 | 94 | 65.117 | 65.117 |
| **V. PROFITUL SAU PIERDEREA REPORTAT(Ă)**     **SOLD C** (ct. 117) | 96 | 95 | 27.362 | 225.090 |
| **SOLD D** (ct. 117) | 97 | 96 | 0 | 0 |
| **VI. PROFITUL SAU PIERDEREA EXERCIȚIULUI FINANCIAR** | | | | |
| **SOLD C** (ct. 121) | 98 | 97 | 58.744 | 360.883 |
| **SOLD D** (ct. 121) | 99 | 98 | 0 | 0 |
| Repartizarea profitului (ct. 129) | 100 | 99 | 5.334 | 23.689 |
| **CAPITALURI PROPRII - TOTAL (rd. 85+86+87+91-92+93-94+95-96 +97-98-99)** | 101 | 100 | 20.278.153 | 20.639.034 |
| Patrimoniul public (ct. 1016) | 102 | 101 | | |
| Patrimoniul privat (ct. 1017) 2) | 103 | 102 | | |
| **CAPITALURI - TOTAL (rd.100+101+102) (rd.25+41+42-53-64-68-79** | 104 | 103 | 20.278.153 | 20.639.034 |

Suma de control F10 :   408268369 / 1274160645

\*) Conturi de repartizat după natura elementelor respective.
\*\*) Solduri debitoare ale conturilor respective.
\*\*\*) Solduri creditoare ale conturilor respective.

1) Sumele înscrise la acest rând și preluate din contul 2675 la 2679 reprezintă creanțele aferente contractelor de leasing financiar și alor contracte asimilate, precum și alte creanțe imobilizate, scadente într-o perioadă mai mică de 12 luni.
2) Se va completa de către entitățile cărora le sunt incidente prevederile Ordinului ministrului finanțelor publice și al ministrului delegat pentru buget nr. 668/2014 pentru aprobarea Precizărilor privind întocmirea și actualizarea inventarului centralizat al bunurilor imobile proprietate privată a statului și a drepturilor reale supuse inventarierii, cu modificările și completările ulterioare

## ADMINISTRATOR,

Numele si prenumele

ING.KERTESZ STEFAN

Semnătura _____

## INTOCMIT,

Numele si prenumele

EC.MUJDAR ERIKA

Calitatea

11--DIRECTOR ECONOMIC

Semnătura _____

Nr.de inregistrare in organismul profesional:

Formular
VALIDAT

Barcode:3875858-05 A-570-106 INV - Investigation -

F20 – pag. 1

# CONTUL DE PROFIT ŞI PIERDERE

## la data de  31.12.2018

Cod 20

- lei -

| Denumirea indicatorilor | Nr. rd. | Exerciţiul financiar | |
|---|---|---|---|
| | | 2017 | 2018 |
| A | B | 1 | 2 |
| 1. Cifra de afaceri netă (**rd. 02+03-04+05+06**) | 01 | 28.835.201 | 27.093.475 |
| Producţia vândută (ct.701+702+703+704+705+706+708) | 02 | 28.729.957 | 26.928.966 |
| Venituri din vânzarea mărfurilor (ct. 707) | 03 | 105.244 | 165.885 |
| Reduceri comerciale acordate (ct. 709) | 04 | | 1.376 |
| Venituri din dobânzi înregistrate de entităţile radiate din Registrul general si care mai au in derulare contracte de leasing  (ct.766* ) | 05 | | |
| Venituri din subvenţii de exploatare aferente cifrei de afaceri nete (ct.7411) | 06 | | |
| 2. Venituri aferente costului producţiei în curs de execuţie  (ct.711+712) | | | |
| Sold C | 07 | 3.511.935 | 7.589.460 |
| Sold D | 08 | 0 | 0 |
| 3. Venituri din producţia de imobilizari necorporale si corporale  (ct.721+ 722) | 09 | 319.851 | 308.107 |
| 4. Venituri din reevaluarea imobilizărilor corporale (ct. 755) | 10 | | |
| 5. Venituri din producţia de investiţii imobiliare (ct. 725) | 11 | | |
| 6. Venituri din subvenţii de exploatare (ct. 7412 + 7413 + 7414 + 7415 + 7416 + 7417 + 7419) | 12 | | |
| 7. Alte venituri din exploatare (ct.751+758+7815) | 13 | 1.859.039 | 2.181.818 |
| -din care, venituri din fondul comercial negativ (ct.7815) | 14 | | |
| -din care, venituri din subvenţii pentru investiţii (ct.7584) | 15 | | |
| **VENITURI DIN EXPLOATARE – TOTAL (rd. 01+ 07 - 08 + 09 + 10 + 11 + 12 + 13)** | 16 | 34.526.026 | 37.172.860 |
| 8. a)  Cheltuieli cu materiile prime şi materialele consumabile (ct.601+602) | 17 | 15.791.056 | 18.581.300 |
| Alte cheltuieli materiale (ct.603+604+606+608) | 18 | 29.578 | 26.641 |
| b) Alte cheltuieli externe (cu energie şi apă)(ct.605) | 19 | 1.451.981 | 1.534.472 |
| c) Cheltuieli privind mărfurile (ct.607) | 20 | 71.124 | 81.905 |
| Reduceri comerciale primite (ct. 609) | 21 | | |
| 9. Cheltuieli cu personalul (**rd. 23+24**) | 22 | 12.492.778 | 12.458.240 |
| a) Salarii şi indemnizaţii  (ct.641+642+643+644) | 23 | 10.207.608 | 12.083.321 |
| b) Cheltuieli cu asigurările şi protecţia socială (ct.645+646) | 24 | 2.285.170 | 374.919 |
| 10.a) Ajustări de valoare privind imobilizările corporale şi necorporale (**rd. 26 - 27**) | 25 | 1.863.557 | 1.587.412 |
| a.1) Cheltuieli (ct.6811+6813+6817) | 26 | 1.863.557 | 1.587.412 |
| a.2) Venituri (ct.7813) | 27 | | |
| b) Ajustări de valoare privind activele circulante (**rd. 29 - 30**) | 28 | | -49.497 |

Barcode:3875858-05 A-570-106 INV - Investigation -

F20 - pag. 2

| | | | |
|---|---|---|---|
| b.1) Cheltuieli (ct.654+6814) | 29 | | |
| b.2) Venituri (ct.754+7814) | 30 | | 49.497 |
| 11. Alte cheltuieli de exploatare (rd. 32 la 38) | 31 | 2.509.165 | 2.313.994 |
| 11.1. Cheltuieli privind prestaţiile externe (ct.611+612+613+614+615+621+622+623+624+625+626+627+628) | 32 | 2.113.680 | 1.852.500 |
| 11.2. Cheltuieli cu alte impozite, taxe şi vărsăminte asimilate; cheltuieli reprezentând transferuri şi contribuţii datorate în baza unor acte normative speciale(ct. 635 + 6586*) | 33 | 224.108 | 217.653 |
| 11.3. Cheltuieli cu protecţia mediului înconjurător (ct. 652) | 34 | | |
| 11.4 Cheltuieli din reevaluarea imobilizărilor corporale (ct. 655) | 35 | | |
| 11.5. Cheltuieli privind calamităţile şi alte evenimente similare (ct. 6587) | 36 | | |
| 11.6. Alte cheltuieli (ct.651+ 6581+ 6582 + 6583 + 6584 + 6588) | 37 | 171.377 | 243.841 |
| Cheltuieli cu dobânzile de refinanţare înregistrate de entităţile radiate din Registrul general si care mai au in derulare contracte de leasing (ct.666*) | 38 | | |
| Ajustări privind provizioanele (rd. 40 - 41) | 39 | -140.000 | |
| - Cheltuieli (ct.6812) | 40 | | |
| - Venituri (ct.7812) | 41 | 140.000 | |
| CHELTUIELI DE EXPLOATARE – TOTAL (rd. 17 la 20 - 21 +22 + 25 + 28 + 31 + 39) | 42 | 34.069.239 | 36.534.467 |
| PROFITUL SAU PIERDEREA DIN EXPLOATARE: | | | |
| - Profit (rd. 16 - 42) | 43 | 456.787 | 638.393 |
| - Pierdere (rd. 42 - 16) | 44 | 0 | 0 |
| 12. Venituri din interese de participare (ct.7611+7612+7613) | 45 | | |
| - din care, veniturile obţinute de la entităţile afiliate | 46 | | |
| 13. Venituri din dobânzi (ct. 766*) | 47 | 64 | 38 |
| - din care, veniturile obţinute de la entităţile afiliate | 48 | | |
| 14. Venituri din subvenţii de exploatare pentru dobânda datorată (ct. 7418) | 49 | | |
| 15. Alte venituri financiare (ct.762+764+765+767+768+7615) | 50 | 234.184 | 193.953 |
| - din care, venituri din alte imobilizări financiare ( ct. 7615) | 51 | | |
| VENITURI FINANCIARE – TOTAL (rd. 45+47+49+50) | 52 | 234.248 | 193.991 |
| 16. Ajustări de valoare privind imobilizările financiare şi investiţiile financiare deţinute ca active circulante (rd. 54 - 55) | 53 | | |
| - Cheltuieli (ct.686) | 54 | | |
| - Venituri (ct.786) | 55 | | |
| 17. Cheltuieli privind dobânzile (ct.666*) | 56 | 127.043 | 120.344 |
| - din care, cheltuielile în relaţia cu entităţile afiliate | 57 | | |
| Alte cheltuieli financiare (ct.663+664+665+667+668) | 58 | 457.318 | 238.266 |
| CHELTUIELI FINANCIARE – TOTAL (rd. 53+56+58) | 59 | 584.361 | 358.610 |
| PROFITUL SAU PIERDEREA FINANCIAR(Ă): | | | |
| - Profit (rd. 52 - 59) | 60 | 0 | 0 |
| - Pierdere (rd. 59 - 52) | 61 | 350.113 | 164.619 |

Barcode:3875858-05 A-570-106 INV - Investigation -

F20 – pag. 3

| | | | |
|---|---|---|---|
| **VENITURI TOTALE (rd. 16 + 52)** | 62 | 34.760.274 | 37.366.851 |
| **CHELTUIELI TOTALE (rd. 42 + 59)** | 63 | 34.653.600 | 36.893.077 |
| 18. PROFITUL SAU PIERDEREA BRUT(Ă): | | | |
| - Profit **(rd. 62 - 63)** | 64 | 106.674 | 473.774 |
| - Pierdere **(rd. 63 - 62)** | 65 | 0 | 0 |
| 19. Impozitul pe profit (ct.691) | 66 | 47.930 | 112.891 |
| 20. Impozitul specific unor activități (ct. 695) | 67 | | |
| 21. Alte impozite neprezentate la elementele de mai sus (ct.698) | 68 | | |
| **22. PROFITUL SAU PIERDEREA NET(Ă) A EXERCIȚIULUI FINANCIAR:** | | | |
| - Profit **(rd. 64 - 65 - 66 - 67 - 68)** | 69 | 58.744 | 360.883 |
| - Pierdere **(rd. 65 + 66 + 67 + 68 - 64)** | 70 | 0 | 0 |

Suma de control F20 :     523138285 / 1274160645

*) Conturi de repartizat după natura elementelor respective.
    La rândul 23 - se cuprind și drepturile colaboratorilor, stabilite potrivit legislației muncii, care se preiau din rulajul debitor al contului 621
„Cheltuieli cu colaboratorii", analitic „Colaboratori persoane fizice".

**ADMINISTRATOR,**                                          **INTOCMIT,**

Numele si prenumele                                        Numele si prenumele

| ING.KERTESZ STEFAN |
|---|

| EC.MUJDAR ERIKA |
|---|

Semnătura _____

Calitatea

| 11--DIRECTOR ECONOMIC |
|---|

Semnătura _____

| Formular VALIDAT |
|---|

Nr.de inregistrare in organismul profesional:

| |
|---|

Barcode:3875858-05 A-570-106 INV - Investigation -

# DATE INFORMATIVE

F30 - pag. 1

la data de 31.12.2018

Cod 30

- lei -

| I. Date privind rezultatul inregistrat | Nr.rd. OMFP nr.10/ 03.01.19 | Nr. rd. | Nr.unitati | Sume |
|---|---|---|---|---|
| A | B | 1 | | 2 |
| Unitaţi care au inregistrat profit | 01 | 01 | 1 | 360.883 |
| Unitaţi care au inregistrat pierdere | 02 | 02 | | |
| Unitaţi care nu au inregistrat nici profit nici pierdere | 03 | 03 | | |

| II Date privind platile restante | | Nr. rd. | Total, din care: | Pentru activitatea curenta | Pentru activitatea de investitii |
|---|---|---|---|---|---|
| A | B | | 1=2+3 | 2 | 3 |
| Plati restante – total (rd.05 + 09 + 15 la 17 + 18) | 04 | 04 | 1.270.275 | 1.246.129 | 24.146 |
| Furnizori restanţi – total (rd. 06 la 08) | 05 | 05 | 1.162.345 | 1.138.199 | 24.146 |
| - peste 30 de zile | 06 | 06 | 150.868 | 150.868 | |
| - peste 90 de zile | 07 | 07 | 144.650 | 144.650 | |
| - peste 1 an | 08 | 08 | 866.827 | 842.681 | 24.146 |
| Obligatii restante fata de bugetul asigurarilor sociale – total(rd.10 la 14) | 09 | 09 | | | |
| - contributii pentru asigurari sociale de stat datorate de angajatori, salariati si alte persoane asimilate | 10 | 10 | | | |
| - contributii pentru fondul asigurarilor sociale de sanatate | 11 | 11 | | | |
| - contribuţia pentru pensia suplimentară | 12 | 12 | | | |
| - contributii pentru  bugetul asigurarilor pentru somaj | 13 | 13 | | | |
| - alte datorii sociale | 14 | 14 | | | |
| Obligatii restante fata de bugetele fondurilor speciale si alte fonduri | 15 | 15 | | | |
| Obligatii restante fata de alti creditori | 16 | 16 | 107.930 | 107.930 | |
| Impozite, contributii  si taxe neplatite la termenul stabilit la bugetul de stat, din care: | 17 | 17 | | | |
| - contributia asiguratorie pentru munca | 18 | 17a (301) | | | |
| Impozite si taxe neplatite la termenul stabilit la bugetele locale | 19 | 18 | | | |

| III. Numar mediu de salariati | | Nr. rd. | 31.12.2017 | 31.12.2018 |
|---|---|---|---|---|
| A | B | | 1 | 2 |
| Numar mediu de salariati | 20 | 19 | 364 | 333 |
| Numarul efectiv de salariati existenti la sfarsitul perioadei, respectiv la data de 31 decembrie | 21 | 20 | 335 | 326 |

| IV. Redevenţe plătite în cursul perioadei de raportare, subvenţii  încasate şi creanţe restante | | Nr. rd. | Sume (lei) |
|---|---|---|---|
| A | B | | 1 |
| Redevenţe plătite în cursul perioadei de raportare pentru bunurile din domeniul public, primite în concesiune, din care: | 22 | 21 | |
| - redevenţe pentru bunurile din domeniul public plătite la bugetul de stat | 23 | 22 | |
| Redevenţă minieră plătită la bugetul de stat | 24 | 23 | |

Barcode:3875858-05 A-570-106 INV - Investigation -

F30 - pag. 2

| | | | |
|---|---|---|---|
| Redevență petrolieră plătită la bugetul de stat | 25 | 24 | |
| Chirii plătite în cursul perioadei de raportare pentru terenuri i) | 26 | 25 | |
| Venituri brute din **servicii** plătite către **persoane nerezidente**, din care: | 27 | 26 | |
| - impozitul datorat la bugetul de stat | 28 | 27 | |
| Venituri brute din **servicii** plătite către **persoane nerezidente** din statele membre ale Uniunii Europene, din care: | 29 | 28 | |
| - impozitul datorat la bugetul de stat | 30 | 29 | |
| **Subvenții** încasate în cursul perioadei de raportare, din care: | 31 | 30 | |
| - subvenții încasate în cursul perioadei de raportare aferente activelor | 32 | 31 | |
| - subvenții aferente veniturilor, din care: | 33 | 32 | |
| - subvenții pentru stimularea ocupării forței de muncă *) | 34 | 33 | |
| **Creanțe restante**, care nu au fost încasate la termenele prevăzute în contractele comerciale și/sau în actele normative în vigoare, din care: | 35 | 34 | |
| - creanțe restante de la entități din sectorul majoritar sau integral de stat | 36 | 35 | |
| - creanțe restante de la entități din sectorul privat | 37 | 36 | |

| **V. Tichete acordate salariaților** | | Nr. rd. | Sume (lei) |
|---|---|---|---|
| A | | B | 1 |
| Contravaloarea tichetelor acordate salariaților | 38 | 37 | 788.133 |
| Contravaloarea tichetelor acordate altor categorii de beneficiari, alții decat salariații | 39 | 37a (302) | 1.020 |

| **VI. Cheltuieli efectuate pentru activitatea de cercetare - dezvoltare **)** | | Nr. rd. | 31.12.2017 | 31.12.2018 |
|---|---|---|---|---|
| A | | B | 1 | 2 |
| Cheltuieli de cercetare - dezvoltare : | 40 | 38 | | |
| - dupa surse de finantare (rd. 40+41) | 41 | 39 | 0 | 0 |
| - din fonduri publice | 42 | 40 | | |
| - din fonduri private | 43 | 41 | | |
| - dupa natura cheltuielilor (rd. 43+44) | 44 | 42 | 0 | 0 |
| - cheltuieli curente | 45 | 43 | | |
| - cheltuieli de capital | 46 | 44 | | |

| **VII.  Cheltuieli de inovare ***)** | | Nr. rd. | 31.12.2017 | 31.12.2018 |
|---|---|---|---|---|
| A | | B | 1 | 2 |
| Cheltuieli de inovare | 47 | 45 | | |

| **VIII. Alte informații** | | Nr. rd. | 31.12.2017 | 31.12.2018 |
|---|---|---|---|---|
| A | | B | 1 | 2 |
| Avansuri acordate pentru imobilizări necorporale (ct. 4094),  din care: | 48 | 46 | | |
| - avansuri acordate entităților neafiliate nerezidente pentru imobilizări necorporale (din ct. 4094) | 49 | 46a (303) | | |
| - avansuri acordate entităților afiliate nerezidente pentru imobilizări necorporale (din ct. 4094) | 50 | 46b (304) | | |
| Avansuri acordate pentru imobilizări corporale (ct. 4093), din care: | 51 | 47 | 54.272 | 54.272 |
| - avansuri acordate entităților neafiliate nerezidente pentru imobilizări corporale (din ct. 4093) | 52 | 47a (305) | | |
| - avansuri acordate entităților afiliate nerezidente pentru imobilizări corporale (din ct. 4093) | 53 | 47b (306) | | |
| Imobilizări financiare, în sume brute (rd. 49+54) | 54 | 48 | 14.614 | 13.356 |

Barcode:3875858-05 A-570-106 INV - Investigation -

F30 - pag. 3

| | | | | |
|---|---|---|---|---|
| Acţiuni deţinute la entităţile afiliate, interese de participare, alte titluri imobilizate şi obligaţiuni, în sume brute (**rd. 50 + 51 + 52 + 53**) | 55 | 49 | | |
| acţiuni necotate emise de rezidenţi | 56 | 50 | | |
| - părţi sociale emise de rezidenţi | 57 | 51 | | |
| - actiuni si parti sociale emise de nerezidenti,din care: | 58 | 52 | | |
| - detineri de cel putin 10% | 59 | 52a (307) | | |
| - obligatiuni emise de nerezidenti | 60 | 53 | | |
| Creanţe imobilizate, în sume brute (**rd. 55+56**) | 61 | 54 | 14.614 | 13.356 |
| - creanţe imobilizate în lei si exprimate în lei, a caror decontare se face în functie de cursul unei valute (din ct. 267) | 62 | 55 | 14.614 | 13.356 |
| - creanţe imobilizate în valută (din ct. 267) | 63 | 56 | | |
| Creanţe comerciale, avansuri pentru cumpărări de bunuri de natura stocurilor şi pentru prestări de servicii acordate furnizorilor şi alte conturi asimilate, în sume brute (ct. 4091 + 4092 + 411 + 413 + 418), din care: | 64 | 57 | 6.005.455 | 6.236.195 |
| - creanţe comerciale în relaţia cu entităţile neafiliate nerezidente, avansuri pentru cumpărări de bunuri de natura stocurilor şi pentru prestări de servicii acordate furnizorilor neafiliaţi nerezidenţi şi alte conturi asimilate, în sume brute în relaţie cu neafiliaţii nerezidenţi (din ct. 4091 + din ct. 4092 + din ct. 411 + din ct. 413 + din ct. 418) | 65 | 58 | 2.216.142 | 2.550.824 |
| - creanţe comerciale în relaţia cu entităţile afiliate nerezidente, avansuri pentru cumpărări de bunuri de natura stocurilor şi pentru prestări de servicii acordate furnizorilor afiliaţi nerezidenţi şi alte conturi asimilate, în sume brute în relaţie cu afiliaţii nerezidenţi (din ct. 4091 + din ct. 4092 + din ct. 411 + din ct. 413 + din ct. 418) | 66 | 58a (308) | | |
| Creanţe neîncasate la termenul stabilit (din ct. 4091 + din ct. 4092 + din ct. 411 + din ct. 413) | 67 | 59 | 4.539.195 | 4.517.477 |
| Creanţe în legătură cu personalul şi conturi asimilate (ct. 425 + 4282) | 68 | 60 | 47.261 | 31.427 |
| Creanţe în legătură cu bugetul asigurărilor sociale şi bugetul statului (din ct. 431+436+437+4382+ 441 + 4424 + 4428 + 444 + 445 + 446 + 447 + 4482) , (**rd.62 la 66**) | 69 | 61 | 175.475 | 248.867 |
| - creante in legatura cu bugetul asigurarilor sociale (ct.431+437+4382) | 70 | 62 | 165.138 | 241.775 |
| - creante fiscale in legatura cu bugetul statului (ct.436+441+4424+4428+444+446) | 71 | 63 | 10.337 | 7.092 |
| - subventii de incasat(ct.445) | 72 | 64 | | |
| - fonduri speciale - taxe si varsaminte asimilate (ct.447) | 73 | 65 | | |
| - alte creante in legatura cu bugetul statului(ct.4482) | 74 | 66 | | |
| Creanţele entităţii în relaţiile cu entităţile afiliate (ct. 451), din care: | 75 | 67 | | |
| - creanţe cu entităţi afiliate nerezidente (din ct. 451), din care: | 76 | 68 | | |
| - creanţe comerciale cu entităţi afiliate nerezidente (din ct. 451) | 77 | 69 | | |
| Creanţe în legătură cu bugetul asigurărilor sociale şi bugetul statului neîncasate la termenul stabilit (din ct. 431+ din ct. 436 + din ct. 437 + din ct. 4382 + din ct. 441 + din ct. 4424 + din ct. 4428 + din ct. 444 + din ct. 445 + din ct. 446 + din ct. 447 + din ct. 4482) | 78 | 70 | | |

Barcode:3875858-05 A-570-106 INV - Investigation -

F30 - pag. 4

| | | | | |
|---|---|---|---|---|
| Alte creanţe (ct. 453 + 456 + 4582 + 461 + 4662 + 471 + 473), **(rd.72 la 74)** | 79 | 71 | 106.629 | 151.637 |
| - decontari privind interesele de participare ,decontari cu actionarii/ asociatii privind capitalul ,decontari din operatiuni in participatie (ct.453+456+4582) | 80 | 72 | | |
| - alte creante in legatura cu persoanele fizice si persoanele juridice, altele decat creantele in legatura cu institutiile publice (institutiile statului) (din ct. 461 + din ct. 471 + din ct.473+4662) | 81 | 73 | 106.629 | 151.637 |
| - sumele preluate din contul 542 'Avansuri de trezorerie' reprezentând avansurile de trezorerie, acordate potrivit legii şi nedecontate până la data de raportare (din ct. 461) | 82 | 74 | | |
| Dobânzi de încasat (ct. 5187) , din care: | 83 | 75 | | |
| - de la nerezidenti | 84 | 76 | | |
| Valoarea imprumuturilor acordate operatorilor economici ****) | 85 | 77 | | |
| Investiţii pe termen scurt, în sume brute (ct. 501 + 505 + 506 + 507 + din ct.508), **(rd.79 la 82)** | 86 | 78 | | |
| - acţiuni necotate emise de rezidenti | 87 | 79 | | |
| - părţi sociale emise de rezidenti | 88 | 80 | | |
| - actiuni emise de nerezidenti | 89 | 81 | | |
| - obligatiuni emise de nerezidenti | 90 | 82 | | |
| Alte valori de încasat (ct. 5113 + 5114) | 91 | 83 | | |
| Casa în lei şi în valută **(rd.85+86 )** | 92 | 84 | | |
| - în lei (ct. 5311) | 93 | 85 | | |
| - în valută (ct. 5314) | 94 | 86 | | |
| Conturi curente la bănci în lei şi în valută **(rd.88+90)** | 95 | 87 | 1.481.000 | 1.104.788 |
| - în lei (ct. 5121), din care: | 96 | 88 | 1.071.000 | 1.072.840 |
| - conturi curente în lei deschise la bănci nerezidente | 97 | 89 | | |
| - în valută (ct. 5124), din care: | 98 | 90 | 410.000 | 31.948 |
| - conturi curente în valută deschise la bănci nerezidente | 99 | 91 | | |
| Alte conturi curente la bănci şi acreditive, **(rd.93+94)** | 100 | 92 | 5.011 | 13.954 |
| - sume în curs de decontare, acreditive şi alte valori de încasat, în lei (ct. 5112 + din ct. 5125 + 5411) | 101 | 93 | 5.011 | 13.954 |
| - sume în curs de decontare şi acreditive în valută (din ct. 5125 + 5414) | 102 | 94 | | |
| Datorii **(rd. 96 + 99 + 102 + 103 + 106 + 108 + 110 + 111 + 116 + 119 + 122 + 128)** | 103 | 95 | 5.163.395 | 4.866.418 |
| Credite bancare externe pe termen lung (credite primite de la instituţii financiare pentru care durata contractului de credit este mai mare sau egală cu 1 an) (din ct. 162), **(rd .97+98)** | 104 | 96 | | |
| - în lei | 105 | 97 | | |
| - în valută | 106 | 98 | | |
| Credite bancare externe pe termen lung (ct. 1623 + 1624 + 1625 ) **(rd.100+101)** | 107 | 99 | | |
| - în lei | 108 | 100 | | |
| - în valută | 109 | 101 | | |
| Credite de la trezoreria statului si dobanzile aferente (ct. 1626 + din ct. 1682) | 110 | 102 | | |

Barcode:3875858-05 A-570-106 INV - Investigation -

F30 - pag.5

| | | | | |
|---|---|---|---:|---:|
| Alte împrumuturi şi dobânzile aferente (ct. 166 + 1685 + 1686 + 1687) **(rd. 104+105)** | 111 | 103 | | |
| - în lei si exprimate in lei, a caror decontare se face in functie de cursul unei valute | 112 | 104 | | |
| - în valută | 113 | 105 | | |
| Alte împrumuturi şi datorii asimilate (ct. 167), din care: | 114 | 106 | 7.957 | 7.957 |
| - valoarea concesiunilor primite (din ct. 167) | 115 | 107 | | |
| Datorii comerciale, avansuri primite de la clienţi şi alte conturi asimilate, in sume brute (ct. 401 + 403 + 404 + 405 + 408 + 419), din care: | 116 | 108 | 4.074.914 | 3.697.315 |
| - datorii comerciale în relaţia cu entităţile neafiliate nerezidente, avansuri primite de la clienţi neafiliaţi nerezidenţi şi alte conturi asimilate, în sume brute în relaţie cu neafiliaţii nerezidenţi (din ct. 401 + din ct. 403 + din ct. 404 + din ct. 405 + din ct. 408 + din ct. 419) | 117 | 109 | 413.195 | 159.195 |
| - datorii comerciale în relaţia cu entităţile afiliate nerezidente, avansuri primite de la clienţi afiliaţi nerezidenţi şi alte conturi asimilate, în sume brute în relaţie cu afiliaţii nerezidenţi (din ct. 401 + din ct. 403 + din ct. 404 + din ct. 405 + din ct. 408 + din ct. 419) | 118 | 109a (309) | | |
| Datorii în legătură cu personalul şi conturi asimilate (ct. 421 + 423 + 424 + 426 + 427 + 4281) | 119 | 110 | 543.693 | 540.825 |
| Datorii în legătură cu bugetul asigurărilor sociale şi bugetul statului (ct. 431+436 + 437 + 4381 + 441 + 4423 + 4428 + 444 + 446 + 447 + 4481) **(rd.112 la 115)** | 120 | 111 | 427.212 | 510.802 |
| - datorii in legatura cu bugetul asigurarilor sociale (ct.431+437+4381) | 121 | 112 | 238.224 | 300.617 |
| - datorii fiscale in legatura cu bugetul statului(ct.436 +441+4423+4428+444+446) | 122 | 113 | 185.380 | 202.532 |
| - fonduri speciale - taxe si varsaminte asimilate (ct.447) | 123 | 114 | 3.608 | 7.653 |
| - alte datorii in legatura cu bugetul statului (ct.4481) | 124 | 115 | | |
| Datoriile entităţii în relaţiile cu entităţile afiliate (ct. 451), din care: | 125 | 116 | | |
| - datorii cu entităţi afiliate nerezidente 2) (din ct. 451), din care: | 126 | 117 | | |
| - cu scadenţa iniţială mai mare de un an | 127 | 118 | | |
| - datorii comerciale cu entităţile afiliate nerezidente indiferent de scadenţă (din ct. 451) | 128 | 118a (310) | | |
| Sume datorate actionarilor / asociatilor (ct.455), din care: | 129 | 119 | | |
| - sume datorate actionarilor / asociatilor pers.fizice | 130 | 120 | | |
| - sume datorate actionarilor / asociatilor pers.juridice | 131 | 121 | | |
| Alte datorii (ct. 269 + 453 + 456 + 457 + 4581 + 4661 + 462 + 472 + 473 + 478 + 509)   **(rd.123 la 127)** | 132 | 122 | 109.619 | 109.519 |
| -decontari privind interesele de participare , decontari cu actionarii /asociatii privind  capitalul, decontari din operatii in participatie   (ct.453+456+457+4581) | 133 | 123 | 108.430 | 107.930 |
| -alte datorii in legatura cu persoanele fizice si persoanele juridice, altele decat datoriile in legatura cu institutiile publice (institutiile statului ) 3)   (din ct.462+4661+din ct.472+din ct.473) | 134 | 124 | 1.189 | 1.589 |
| - subventii nereluate la venituri (din ct. 472) | 135 | 125 | | |
| - varsaminte de efectuat pentru imobilizari financiare si investitii pe termen  scurt (ct.269+509) | 136 | 126 | | |

Barcode:3875858-05 A-570-106 INV - Investigation -

F30 - pag.6

| A | | | 1 | 2 |
|---|---|---|---|---|
| - venituri în avans aferente activelor primite prin transfer de la clienți (ct. 478) | 137 | 127 | | |
| Dobânzi de plătit (ct. 5186), din care: | 138 | 128 | | |
| - către nerezidenți | 139 | 128a (311) | | |
| Valoarea împrumuturilor primite de la operatorii economici ****) | 140 | 129 | | |
| Capital subscris vărsat (ct. 1012), din care: | 141 | 130 | 2.325.077 | 2.325.077 |
| - acțiuni cotate 4) | 142 | 131 | 2.325.077 | 2.325.077 |
| - acțiuni necotate 5) | 143 | 132 | | |
| - părți sociale | 144 | 133 | | |
| - capital subscris vărsat de nerezidenți (din ct. 1012) | 145 | 134 | | |
| Brevete si licente (din ct.205) | 146 | 135 | | |

| IX. Informatii privind cheltuielile cu colaboratorii | | Nr. rd. | 31.12.2017 | 31.12.2018 |
|---|---|---|---|---|
| A | | B | 1 | 2 |
| Cheltuieli cu colaboratorii (ct. 621) | 147 | 136 | 507.286 | 601.616 |

| X. Informații privind bunurile din domeniul public al statului | | Nr. rd. | 31.12.2017 | 31.12.2018 |
|---|---|---|---|---|
| A | | B | 1 | 2 |
| Valoarea bunurilor din domeniul public al statului aflate în administrare | 148 | 137 | | |
| Valoarea bunurilor din domeniul public al statului aflate în concesiune | 149 | 138 | | |
| Valoarea bunurilor din domeniul public al statului închiriate | 150 | 139 | | |

| XI. Informații privind bunurile din proprietatea privată a statului supuse inventarierii cf. OMFP nr. 668/2014 | | Nr. rd. | 31.12.2017 | 31.12.2018 |
|---|---|---|---|---|
| A | | B | 1 | 2 |
| Valoarea contabilă netă a bunurilor 6) | 151 | 140 | | |

| XII. Capital social vărsat | | Nr. rd. | 31.12.2017 | | 31.12.2018 | |
|---|---|---|---|---|---|---|
| | | | Suma (lei) | % 7) | Suma (lei) | % 7) |
| A | | B | Col.1 | Col.2 | Col.3 | Col.4 |
| **Capital social vărsat (ct. 1012) 7), (rd. 142 + 145 + 149 + 150 + 151 + 152)** | 152 | 141 | 2.325.077 | X | 2.325.077 | X |
| - deținut de instituții publice, (rd. 143+144) | 153 | 142 | | | | |
| - deținut de instituții publice de subord. centrală | 154 | 143 | | | | |
| - deținut de instituții publice de subord. locală | 155 | 144 | | | | |
| - deținut de societățile cu capital de stat, din care: | 156 | 145 | | | | |
| - cu capital integral de stat | 157 | 146 | | | | |
| - cu capital majoritar de stat | 158 | 147 | | | | |
| - cu capital minoritar de stat | 159 | 148 | | | | |
| - deținut de regii autonome | 160 | 149 | | | | |
| - deținut de societăți cu capital privat | 161 | 150 | 301.101 | 12,95 | 298.901 | 12,86 |
| - deținut de persoane fizice | 162 | 151 | 808.426 | 34,77 | 810.626 | 34,86 |
| - deținut de alte entități | 163 | 152 | 1.215.550 | 52,28 | 1.215.550 | 52,28 |

Barcode:3875858-05 A-570-106 INV - Investigation -

F3O - pag. 7

| A | Nr. rd. | Sume | |
|---|---|---|---|
| | B | 2017 | 2018 |
| **XIII. Dividende/vărsăminte cuvenite bugetului de stat sau local, de repartizat din profitul exercițiului financiar de către companiile naționale, societățile naționale, societățile și regiile autonome, din care:** 164 153 | | | |
| - către instituții publice centrale; 165 154 | | | |
| - către instituții publice locale; 166 155 | | | |
| - către alți acționari la care statul/unitățile administrativ teritoriale/instituțiile publice dețin direct/indirect acțiuni sau participații indiferent de ponderea acestora. 167 156 | | | |

| A | Nr. rd. | Sume | |
|---|---|---|---|
| | B | 2017 | 2018 |
| **XIV. Dividende/vărsăminte cuvenite bugetului de stat sau local, virate în perioada de raportare din profitul companiilor naționale, societăților naționale, societăților și al regiilor autonome, din care:** 168 157 | | | |
| - dividende/vărsăminte din profitul exercițiului financiar al anului precedent, din care virate: 169 158 | | | |
|   - către instituții publice centrale 170 159 | | | |
|   - către instituții publice locale 171 160 | | | |
|   - către alți acționari la care statul/ unitățile administrativ teritoriale /instituțiile publice dețin direct/indirect acțiuni sau participații indiferent de ponderea acestora. 172 161 | | | |
| - dividende/vărsăminte din profitul exercițiilor financiare anterioare anului precedent, din care virate: 173 162 | | | |
|   - către instituții publice centrale 174 163 | | | |
|   - către instituții publice locale 175 164 | | | |
|   - către alți acționari la care statul/ unitățile administrativ teritoriale /instituțiile publice dețin direct/indirect acțiuni sau participații indiferent de ponderea acestora 176 165 | | | |

| A | Nr. rd. | Sume (lei) | |
|---|---|---|---|
| **XV. Repartizări interimare de dividende potrivit Legii nr. 163/2018** | | | |
| | B | 2017 | 2018 |
| - dividendele interimare repartizate  8) | 177 | 165a (312) | |

| A | Nr. rd. | Sume (lei) | |
|---|---|---|---|
| **XVI. Creanțe preluate prin cesionare de la persoane juridice *****)** | | | |
| | B | 2017 | 2018 |
| Creanțe preluate prin cesionare de la persoane juridice (la valoarea nominală), din care: | 178 | 166 | |
| - creanțe preluate prin cesionare de la persoane juridice afiliate | 179 | 167 | |
| Creanțe preluate prin cesionare de la persoane juridice (la cost de achiziție), din care: | 180 | 168 | |
| - creanțe preluate prin cesionare de la persoane juridice afiliate | 181 | 169 | |

| A | Nr. rd. | Sume (lei) | |
|---|---|---|---|
| **XVII. Venituri obținute din activități agricole ******)** | | | |
| | B | 2017 | 2018 |
| Venituri obținute din activități agricole | 182 | 170 | |

Barcode:3875858-05 A-570-106 INV - Investigation -

Suma de control F30 :  82967023 / 1274160645

F30 - pag.8

| ADMINISTRATOR, | INTOCMIT, |
|---|---|
| Numele si prenumele | Numele si prenumele |
| ING.KERTESZ STEFAN | EC.MUJDAR ERIKA |
| Semnatura | Calitatea |
| | 11--DIRECTOR ECONOMIC |
| Formular VALIDAT | Semnatura |
| | Nr.de inregistrare in organismul profesional: |

SOCIETATEA COMERCIALA SIGSTRAT SIGHETU-MARMATIEI

*) Subvenţii pentru stimularea ocupării forţei de muncă (transferuri de la bugetul statului către angajator) – reprezintă sumele acordate angajatorilor pentru plata absolvenţilor instituţiilor de învăţământ, stimularea şomerilor care se încadrează în muncă înainte de expirarea perioadei de şomaj, stimularea angajatorilor care încadrează în muncă pe perioadă nedeterminată şomeri în vârstă de peste 45 ani, şomeri întreţinători unici de familie sau şomeri care în termen de 3 ani de la data angajării îndeplinesc condiţiile pentru a solicita pensia anticipată parţială sau de acordare a pensiei pentru limita de vârstă, ori pentru alte situaţii prevăzute prin legislaţia în vigoare privind sistemul asigurărilor pentru şomaj şi stimularea ocupării forţei de muncă.

**) Se va completa cu cheltuielile efectuate pentru activitatea de cercetare-dezvoltare, respectiv cercetarea fundamentală, cercetarea aplicativă, dezvoltarea tehnologică şi inovarea, stabilite potrivit prevederilor Ordonanţei Guvernului nr. 57/2002 privind cercetarea ştiinţifică şi dezvoltarea tehnologică, aprobată cu modificări şi completări prin Legea nr. 324/2003, cu modificările şi completările ulterioare. Cheltuielile se vor completa conform Regulamentului de punere în aplicare (UE) nr. 995/2012 al Comisiei din 26 octombrie 2012 de stabilire a normelor de punere în aplicare a Deciziei nr. 1.608/2003/CE a Parlamentului European şi a Consiliului privind producţia şi dezvoltarea statisticilor comunitare în domeniul ştiinţei şi al tehnologiei, publicat în Jurnalul Oficial al Uniunii Europene, seria L, nr. 299/27.10.2012.

**) Se va completa cu cheltuielile efectuate pentru activitatea de inovare conform Regulamentului de punere în aplicare (UE) nr. 995/2012 al Comisiei din 26 octombrie 2012 de stabilire a normelor de punere în aplicare a Deciziei nr. 1.608/2003/CE a Parlamentului European şi a Consiliului privind producţia şi dezvoltarea statisticilor comunitare în domeniul ştiinţei şi al tehnologiei, publicat în Jurnalul Oficial al Uniunii Europene, seria L, nr. 299/27.10.2012.

***) În categoria operatorilor economici nu se cuprind entităţile reglementate şi supravegheate de Banca Naţională a României, respectiv Autoritatea de Supraveghere Financiară, societăţile reclasificate în sectorul administraţiei publice şi instituţiile fără scop lucrativ în serviciul gospodăriilor populaţiei.

****) Pentru creanţele preluate prin cesionare de la persoane juridice se va completa atât valoarea nominală a acestora, cât şi costul lor de achiziţie. Pentru statutul de 'persoane juridice afiliate' se vor avea în vedere prevederile art. 7 pct. 26 lit. c) şi d) din Legea nr.227/2015 privind Codul fiscal, cu modificările şi completările ulterioare.

*****) Conform art. 11 din Regulamentul Delegat (UE) nr. 639/2014 al Comisiei din 11 martie 2014 de completare a Regulamentului (UE) nr. 1307/2013 al Parlamentului European şi al Consiliului de stabilire a unor norme privind plăţile directe acordate fermierilor prin scheme de sprijin în cadrul politicii agricole comune şi de modificare a anexei X la regulamentul menţionat, '(1) ... veniturile obţinute din activităţile agricole sunt veniturile care au fost obţinute de un fermier din activitatea sa agricolă în sensul articolului 4 alineatul (1) litera (c) din regulamentul menţionat (R (UE) 1307/2013), în cadrul exploataţiei sale, inclusiv sprijinul din partea Uniunii din Fondul european de garantare agricolă (FEGA) şi din Fondul european agricol pentru dezvoltare rurală (FEADR), precum şi orice ajutor naţional acordat pentru activităţi agricole, cu excepţia plăţilor directe naţionale complementare în temeiul articolelor 18 şi 19 din Regulamentul (UE) nr. 1307/2013.

Veniturile obţinute din prelucrarea produselor agricole în sensul articolului 4 alineatul (1) litera (d) din Regulamentul (UE) nr. 1307/2013 ale exploataţiei sunt considerate venituri din activităţi agricole cu condiţia ca produsele prelucrate să rămână proprietatea fermierului şi ca o astfel de prelucrare să aibă ca rezultat un alt produs agricol în sensul articolului 4 alineatul (1) litera (d) din Regulamentul (UE) nr. 1307/2013.

Orice alte venituri sunt considerate venituri din activităţi neagricole.

(2) În sensul alineatului (1), 'venituri' înseamnă veniturile brute, înainte deducerii costurilor şi impozitelor aferente. ...'.

1) Se vor include chiriile plătite pentru terenuri ocupate (culturi agricole, păşuni, fâneţe etc.) şi aferente spaţiilor comerciale (terase etc.) aparţinând proprietarilor privaţi sau unor unităţi ale administraţiei publice, inclusiv chiriile pentru folosirea luciului de apă în scop recreativ sau în alte scopuri (pescuit etc.).

2) Valoarea înscrisă la rândul 'datorii cu entităţile nerezidente (din ct.451), din care:' NU se calculează prin însumarea valorilor de la rândurile „cu scadenţa iniţială mai mare de un an' şi 'datorii comerciale cu entităţile afiliate nerezidente indiferent de scadenţa (din ct.451)'.

3) În categoria 'Alte datorii în legătură cu persoanele fizice şi persoanele juridice, altele decât datoriile în legătură cu instituţiile publice (instituţiile statului)' nu se vor înscrie subvenţiile aferente veniturilor existente în soldul contului 472.

4) Titluri de valoare care conferă drepturi de proprietate asupra societăţilor, care sunt negociabile şi tranzacţionate, potrivit legii.

5) Titluri de valoare care conferă drepturi de proprietate asupra societăţilor, care nu sunt tranzacţionate.

6) Se va completa de către operatorii economici cărora le sunt incidente prevederile Ordinului ministrului finanţelor publice şi al ministrului delegat pentru buget nr. 668/2014 pentru aprobarea Precizărilor privind întocmirea şi actualizarea inventarului centralizat al bunurilor imobile proprietate privată a statului şi a drepturilor reale supuse inventarierii, cu modificările şi completările ulterioare.

7) La secţiunea 'XII Capital social vărsat' la rd. 153 - 163 în col. 2 şi col. 4 entităţile vor înscrie procentul corespunzător capitalului social deţinut în totalul capitalului social vărsat înscris la rd. 152.

8) La acest rând se cuprind dividendele repartizate potrivit Legii nr. 163/2018 pentru modificarea şi completarea Legii contabilităţii nr. 82/1991, modificarea şi completarea Legii societăţilor nr. 31/1990, precum şi modificarea Legii nr. 1/2005 privind organizarea şi funcţionarea cooperaţiei. Nu se raportează dividendele prezentate la rd. 164.

Barcode:3875858-05 A-570-106 INV - Investigation -

F40 - pag. 1

# SITUATIA ACTIVELOR IMOBILIZATE
## la data de  31.12.2018

Cod 40                                                                                      - lei -

| Elemente de imobilizari | Nr. rd. | Valori brute | | | | |
|---|---|---|---|---|---|---|
| | | Sold initial | Cresteri | Reduceri | | Sold final (col.5=1+2-3) |
| | | | | Total | Din care: dezmembrari si casari | |
| A | B | 1 | 2 | 3 | 4 | 5 |
| **I.Imobilizari necorporale** | | | | | | |
| Cheltuieli de constituire si cheltuieli de dezvoltare | 01 | | | | X | |
| Alte imobilizari | 02 | 314.928 | 21.397 | | X | 336.325 |
| Avansuri acordate pentru imobilizari necorporale | 03 | | | | X | |
| Active necorporale de explorare si evaluare a resurselor minerale | 04 | | | | X | |
| TOTAL (rd. 01 la 04) | 05 | 314.928 | 21.397 | | X | 336.325 |
| **II.Imobilizari corporale** | | | | | | |
| Terenuri | 06 | 426.869 | | 9.560 | X | 417.309 |
| Constructii | 07 | 8.501.707 | 197.000 | 238.600 | | 8.460.107 |
| Instalatii tehnice si masini | 08 | 16.768.501 | 355.348 | 46.135 | 7.895 | 17.077.714 |
| Alte instalatii , utilaje si mobilier | 09 | 304.418 | 2.824 | 175 | 175 | 307.067 |
| Investitii imobiliare | 10 | | | | | |
| Active corporale de explorare si evaluare a resurselor minerale | 11 | | | | | |
| Active biologice productive | 12 | | | | | |
| Imobilizari corporale in curs de executie | 13 | | | | | |
| Investitii imobiliare in curs de executie | 14 | 1.179.078 | 349.621 | 358.171 | | 1.170.528 |
| Avansuri acordate pentru imobilizari corporale | 15 | 54.272 | | | | 54.272 |
| TOTAL (rd. 06 la 15) | 16 | 27.234.845 | 904.793 | 652.641 | 8.070 | 27.486.997 |
| **III.Imobilizari financiare** | 17 | 14.614 | 2.000 | 3.258 | X | 13.356 |
| ACTIVE IMOBILIZATE - TOTAL (rd.05+16+17) | 18 | 27.564.387 | 928.190 | 655.899 | 8.070 | 27.836.678 |

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:33 PM, Submission Status: Approved

Barcode:3875858-05 A-570-106 INV - Investigation  -

F40  - pag. 2

## SITUATIA AMORTIZARII ACTIVELOR IMOBILIZATE

- lei -

| Elemente de imobilizari | Nr. rd. | Sold initial | Amortizare in cursul anului | Amortizare aferenta imobilizarilor scoase din evidenta | Amortizare la sfarsitul anului (col.9=6+7-8) |
|---|---|---|---|---|---|
| A | B | 6 | 7 | 8 | 9 |
| **I.Imobilizari necorporale** | | | | | |
| Cheltuieli de constituire si cheltuieli de dezvoltare | 19 | | | | |
| Alte imobilizari | 20 | 145.033 | 27.290 | | 172.323 |
| Active necorporale de explorare si evaluare a resurselor minerale | 21 | | | | |
| TOTAL (rd.19+20+21) | 22 | 145.033 | 27.290 | | 172.323 |
| **II.Imobilizari corporale** | | | | | |
| Terenuri | 23 | 6.595 | 1.070 | | 7.665 |
| Constructii | 24 | 1.654.576 | 263.752 | 41.897 | 1.876.431 |
| Instalatii tehnice si masini | 25 | 11.215.484 | 1.274.435 | 46.134 | 12.443.785 |
| Alte instalatii ,utilaje si mobilier | 26 | 197.654 | 20.865 | 175 | 218.344 |
| Investitii imobiliare | 27 | | | | |
| Active corporale de explorare si evaluare a resurselor minerale | 28 | | | | |
| Active biologice productive | 29 | | | | |
| TOTAL (rd.23 la 29) | 30 | 13.074.309 | 1.560.122 | 88.206 | 14.546.225 |
| AMORTIZARI - TOTAL (rd.22 +30) | 31 | 13.219.342 | 1.587.412 | 88.206 | 14.718.548 |

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:33 PM, Submission Status: Approved

Barcode:3875858-05 A-570-106 INV - Investigation -

F40 - pag. 3

# SITUATIA AJUSTARILOR PENTRU DEPRECIERE

- lei -

| Elemente de imobilizari | Nr. rd. | Sold initial | Ajustari constituite in cursul anului | Ajustari reluate la venituri | Sold final (col. 13=10+11-12) |
|---|---|---|---|---|---|
| A | B | 10 | 11 | 12 | 13 |
| **I.Imobilizari necorporale** | | | | | |
| Cheltuieli de constituire si cheltuieli de dezvoltare | 32 | | | | |
| Alte imobilizari | 33 | | | | |
| Active necorporale de explorare si evaluare a resurselor minerale | 34 | | | | |
| **TOTAL (rd.32 la 34)** | 35 | | | | |
| **II.Imobilizari corporale** | | | | | |
| Terenuri | 36 | | | | |
| Constructii | 37 | | | | |
| Instalatii tehnice si masini | 38 | | | | |
| Alte instalatii, utilaje si mobilier | 39 | | | | |
| Investitii imobiliare | 40 | | | | |
| Active corporale de explorare si evaluare a resurselor minerale | 41 | | | | |
| Active biologice productive | 42 | | | | |
| Imobilizari corporale in curs de executie | 43 | | | | |
| Investitii imobiliare in curs de executie | 44 | | | | |
| **TOTAL (rd. 36 la 44)** | 45 | | | | |
| **III.Imobilizari financiare** | 46 | | | | |
| AJUSTARI PENTRU DEPRECIERE - TOTAL (rd.35+45+46) | 47 | | | | |

Suma de control F40 :   259786968 / 1274160645

## ADMINISTRATOR,                                          INTOCMIT,

Numele si prenumele                                        Numele si prenumele

ING.KERTESZ STEFAN                                         EC.MUJDAR ERIKA

Semnatura _____                                  Calitatea

                                                           11--DIRECTOR ECONOMIC

                                                           Semnatura _____

Formular
VALIDAT                                                     Nr.de inregistrare in organismul profesional:

SC SIGSTRAT SA
SIGHETU MARMATIEI

NOTA  1          ACTIVE  IMOBILIZATE

- lei -

| Denumirea elementului de imobilizare | Sold la 01.01.2018 | Cresteri | | Reevaluare | Cedari, casari si alte reduceri | Sold la 31.12.2018 |
|---|---|---|---|---|---|---|
| | | Cumparari | Productie proprie | | | |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Imobilizari necorporale | 314.928 | 21.397 | - | - | - | 336.325 |
| Terenuri, amenajari terenuri | 426.869 | - | - | - | 9.560 | 417.309 |
| Constructii | 8.501.707 | 197.000 | - | - | 238.600 | 8.460.107 |
| Echipamente tehnologice | 12.821.008 | 12.864 | 339.085 | - | 140 | 13.172.817 |
| Aparate si instalatii de masurare, control si reglare | 282.815 | 3.399 | - | - | 5.740 | 280.474 |
| Mijloace de transport | 3.664.678 | - | - | - | 40.255 | 3.624.423 |
| Mobilier, aparatura birotica | 304.418 | 2.824 | - | - | 175 | 307.067 |
| Imobilizari corporale in curs de executie si avansuri | 1.233.350 | 41.514 | 308.107 | - | 358.171 | 1.224.800 |
| Alte creante imobilizate | 14.614 | 2.000 | - | - | 3.258 | 13.356 |
| TOTAL | 27.564.387 | 280.998 | 647.192 | - | 655.899 | 27.836.678 |

Administrator,
ing. Kertesz Stefan

Intocmit,
ec. Mujdar Erika

Barcode:3875858-05 A-570-106 INV - Investigation  -

SC SIGSTRAT SA
SIGHETU MARMATIEI

**NOTA 1**      SITUATIA AMORTIZARII ACTIVELOR IMOBILIZATE

- lei -

| Elemente de imobilizare | Sold la 01.01.2018 | Amortizare liniara | Amortizare aferenta imobiliz. scoase din evid./reeval. | Amortizare la 31.12.2018 |
|---|---|---|---|---|
| Alte imobilizari | 145.033 | 27.290 | - | 172.323 |
| Constructii,amenajari terenuri | 1.661.171 | 264.822 | 41.897 | 1.884.096 |
| Instalatii tehnice si masini | 11.215.484 | 1.274.435 | 45.134 | 12.443.785 |
| Alte instalatii, utilaje si mobilier | 197.654 | 20.865 | 175 | 218.344 |
| TOTAL | 13.219.342 | 1.587.412 | 83.206 | 14.718.548 |

Administrator,
Numele si prenumele
ing. Kertesz Stefan

Intocmit,
Numele si prenumele
ec Mujdar Erika

Semnatura

Semnatura

Stampila

Barcode:3875858-05 A-570-106 INV - Investigation   -

**S.C. SIGSTRAT S.A.**
SIGHETU MARMATIEI

**NOTA 2**

## AJUSTARI PENTRU DEPRECIERE

- lei -

| Denumirea provizionului | Sold la 01.01.2018 | Transferuri | | Sold la 31.12.2018 |
|---|---|---|---|---|
| | | In cont | din cont | |
| 0 | 1 | 2 | 3 | 4 = 1+2-3 |
| Ajustari pentru deprecierea creantelor | 584.346 | - | 49.497 | 534.849 |

Administrator,
Numele si prenumele
ing.Kertesz Stefar

Semnatura

Intocmit,
Numele si prenumele
ec.Mujdar Erika

Semnatura

Barcode:3875858-05 A-570-106 INV - Investigation  -

S.C. SIGSTRAT S.A.
SIGHETU MARMATIEI

NOTA 3

PROPUNERE DE REPARTIZARE A PROFITULUI
AFERENT ANULUI 2018

| PROFIT BRUT | 473.773,63 |
| Impozit pe profit | 112.891 |
| PROFIT NET DE REPARTIZAT | 360.882,63 |
| Rezultat reportat reprezentand surplusul realizat din rezerve din reevaluare | 225.090,31 |
| Majorare rezerva legala datorata majorarii capitalului social | 23.688,68 |
| Rezerve pentru surse proprii de finantare | 562.284,26 |

Administrator,
Numele si prenumele,
ing.Kertesz Stefan

Director economic,
Numele si prenumele
ec.Mujdar Erika

Barcode:3875858-05 A-570-106 INV - Investigation  -

SC SIGSTRAT SA
SIGHETU MARMATIEI

NOTA 4

### ANALIZA REZULTATULUI DIN EXPLOATARE

- lei-

| Nr. crt. | INDICATOR | EXERCITIUL PRECEDENT (2017) | EXERCITIUL CURENT (2018) |
|---|---|---|---|
| 1 | Cifra de afaceri neta + variatia stocurilor | 32.347.136 | 34.682.935 |
| 2 | Costul bunurilor vandute si al serviciilor prestate (3+4+5) | 27.626.962 | 30.703.287 |
| 3 | Cheltuielile activitatii de baza | 18.568.260 | 21.270.123 |
| 4 | Cheltuielile activitatilor auxiliare | 864.543 | 920.574 |
| 5 | Cheltuielile indirecte de productie | 8.194.159 | 8.512.590 |
| 6 | Rezultatul brut aferent cifrei de afaceri nete (1-2) | 4.720.174 | 3.979.648 |
| 7 | Cheltuielile de desfacere | 298.664 | 109.792 |
| 8 | Cheltuielile generale de administratie | 4.918.639 | 4.383.473 |
| 9 | Alte venituri din exploatare | 2.178.890 | 2.489.925 |
| 10 | Alte cheltuieli de exploatare | 1.224.974 | 1.337.915 |
| 11 | Rezultatul din exploatare (6-7-8+9-10) | 456.787 | 638.393 |

Administrator,
Numele si prenumele
ing. Kertesz Stefan

Semnatura

Stampila

Intocmit,
Numele si prenumele
ec. Mujdar Erika

Semnatura

**S.C. SIGSTRAT S.A.**
**SIGHETU MARMATIEI**    Barcode:3875858-05 A-570-106 INV - Investigation -

**Nota 5**

**SITUATIA CREANTELOR SI DATORIILOR**

lei

| CREANTE | Sold la 31.12.2018 | Termen de lichiditate | |
|---|---|---|---|
| | | sub 1 an | peste 1 an |
| 0 | 1 = 2 + 3 | 2 | 3 |
| **Total, din care:** | **6.095.544** | **6.095.544** | |
| Clienti | **4.387.674** | **4.387.674** | |
| Clienti incerti | **1.188.934** | **1.188.934** | |
| Furnizori debitori | **193.687** | **193.687** | |
| Alte creante in legatura cu personalul | **31.427** | **31.427** | |
| Contributia angajator concedii | **241.775** | **241.775** | |
| Debitori diversi | **39.876** | **39.876** | |
| TVA neexigibil | **7.092** | **7.092** | |
| Alte creante | **5.079** | **5.079** | |

| DATORII | Sold la 31.12.2018 | Termen de exigibilitate | | |
|---|---|---|---|---|
| | | sub 1 an | 1-5 ani | peste 5 ani |
| 0 | 1 = 2 + 3 + 4 | 2 | 3 | 4 |
| **Total, din care:** | **7.461.386** | **7.461.386** | | |
| Furnizori | **2.062.081** | **2.062.081** | | |
| Furnizori imobilizari | **24.147** | **24.147** | | |
| Clienti creditori | **1.611.087** | **1.611.087** | | |
| Contributii pt.asigurari sociale | **300.617** | **300.617** | | |
| Contributii somaj | **19.551** | **19.551** | | |
| Impozit salarii | **45.482** | **45.482** | | |
| Datorii cu personalul | **540.825** | **540.825** | | |
| Alte impozite si taxe | **7.653** | **7.653** | | |
| Linie credit in lei | **1.647.072** | **1.647.072** | | |
| Linie credit in valuta | **527.143** | **527.143** | | |
| Impozit pe profit | **112.891** | **112.891** | | |
| Credite bancare pe termen mediu | **420.753** | **420.753** | | |
| TVA de plata | **24.608** | **24.608** | | |
| Creditori diversi | **1.589** | **1.589** | | |
| Alte imprumuturi | **7.957** | **7.957** | | |
| Datorii fata de alti creditori | **107.930** | **107.930** | | |

Administrator,                                          Intocmit,

Numele si prenumele                          Numele si prenumele

ing.Kertesz Stefan                                    ec.Mujdar Erika

Barcode:3875858-05 A-570-106 INV - Investigation  -

SC SIGSTRAT SA
SIGHETU MARMATIEI

## NOTA  6

## PRINCIPII, POLITICI  SI  METODE  CONTABILE

Situaţiile financiare s-au întocmit în conformitate cu prevederile Reglementărilor contabile privind situatiile financiare anuale individuale si situatiile financiare anuale consolidate, aprobate prin Ordinul Ministrului Finantelor Publice nr. 1802/2014, cu modificarile si completarile ulterioare, Legii Contabilitatii nr. 82/1991 si a reglementarilor Ordinului Ministrului Finantelor Publice nr. 10/2019.

Politicile contabile au fost aplicate in mod consecvent pe perioada 01.01.2018 – 31.12.2018. Nu s-au înregistrat abateri de la principiile şi politicile contabile şi de la alte prevederi din reglementările contabile.

Valorile prezentate in situatiile financiare aferente anului 2018 sunt comparabile. S-au aplicat aceleasi reguli de evaluare, inregistrare si prezentare in contabilitate a elementelor patrimoniale, asigurandu-se comparabilitatea in timp a acestora.

S-au luat in considerare toate cheltuielile si veniturile aferente exercitiului, indiferent de data platilor, respectiv incasarilor.

Cheltuielile cu reparatiile si intretinerea imobilizarilor corporale, efectuate in scopul asigurarii utilizarii continue a acestora, au fost recunoscute in contul de profit si pierdere la data efectuarii lor.

Cheltuielile efectuate pentru modernizarea imobilizarilor corporale au fost recunoscute in valoarea acestora.

Imobilizarile corporale in curs de executie reprezinta investitiile nepuse in functiune. Acestea s-au evaluat la costul de productie sau costul de achizitie, dupa caz. Imobilizarile corporale in curs de executie nu au fost supuse amortizarii.

Pentru amortizarea activelor imobilizate, in anul 2018, societatea a folosit metoda de amortizare liniara.

Stocurile de materii prime si materiale sunt inregistrate in contabilitate la pret de achizitie, iar cele de produse la pret prestabilit. Diferentele de pret fata de costul de achizitie sau de productie sunt evidentiate distinct si se repartizeaza asupra valorii bunurilor iesite din gestiune si asupra stocurilor. La iesirea din gestiune a stocurilor de materii prime si materiale se foloseste metoda costului mediu ponderat, iar a stocurilor de produse metoda FIFO.

Cheltuielile cu salariile personalului sunt inregistrate lunar, conform statelor de plata. Societatea calculeaza si achita in termen datoriile catre salariati si catre bugete.

Tranzactiile societatii in moneda straina sunt inregistrate la cursul de schimb din data tranzactiilor. Castigurile si pierderile rezultate din decontarea unor astfel de tranzactii si din conversia activelor si datoriilor monetare exprimate in moneda straina sunt recunoscute in contul de profit si pierdere.

Veniturile sunt inregistrate in momentul in care riscurile si beneficiile aferente drepturilor de proprietate sunt transferate intr-o proportie semnificativa asupra consumatorilor, respectiv cand a avut loc transferul titlului legal de proprietate. O promisiune de vânzare nu generează contabilizarea de venituri.

Cheltuielile de exploatare sunt inregistrate in momentul in care au fost efectuate. Dobanzile aferente imprumuturilor sunt inregistrate pe cheltuieli in momentul cand apar, dar nu sunt incluse in costurile de productie.

|  |  |
|---|---|
| Administrator,<br>Numele si prenumele<br>ing. Kertesz Stefan | Intocmit,<br>Numele si prenumele<br>ec Mujdar Erika |
| Semnatura | Semnatura |
| Stampila | |

Barcode:3875858-05 A-570-106 INV - Investigation -

SC SIGSTRAT SA
SIGHETU MARMATIEI

## NOTA 7

## A C T I U N I

La data de 31.12.2018, capitalul social subscris si varsat al SC SIGSTRAT SA este de 2.325.077 lei, reprezentat de 23.250.770 actiuni, cu valoare nominala de 0,1 lei/actiune.

Acţiunile sunt comune, nominative şi dematerializate.

| Administrator, | Intocmit, |
|---|---|
| Numele si prenumele | Numele si prenumele |
| ing. Kertesz Stefan | ec Mujdar Erika |

Semnatura                        Semnatura

Stampila

Barcode:3875858-05 A-570-106 INV - Investigation -

SC SIGSTRAT SA
SIGHETU MARMATIEI

## NOTA 8

Indemnizațiile membrilor Consiliului de administrație sunt stabilite conform prevederilor Statutului societatii, iar cele ale membrilor conducerii executive a societății sunt negociate cu Consiliul de administrație.

Numărul mediu de salariați în exercițiul 2018 a fost de 333 persoane. Nivelul de pregătire al acestora se prezintă astfel:
- 28 persoane cu studii superioare
- 5 persoane cu studii postliceale
- 7 persoane cu pregătire de specialitate (maistrii)
- 88 persoane cu studii liceale
- 73 persoane cu scoli profesionale
- 13 persoane cu scoala de ucenici
- 106 persoane cu scoala generală
- 13 persoane cu mai puțin de 8 clase

Toti angajatii au salariu peste salariul minim pe economie.

Contributiile angajatilor si angajatorului, aferente salariilor, sunt determinate conform legislatiei in vigoare si au fost platite la scadenta.

Nu au fost acordate credite membrilor organelor de conducere sau de administratie.

Societatea nu are obligatii de genul garantiilor asumate in numele directorilor, administratorilor sau altor categorii de personal.

| Administrator, | Intocmit, |
|---|---|
| Numele si prenumele | Numele si prenumele |
| ing. Kertesz Stefan | ec. Mujdar Erika |
| Semnatura | Semnatura |
| Stampila | |

Barcode:3875858-05 A-570-106 INV - Investigation -

SC SIGSTRAT SA
SIGHETU MARMATIEI

NOTA 9

### PRINCIPALII INDICATORI ECONOMICO-FINANCIARI
### 2018

| DENUMIREA | FORMULA DE CALCUL | VALORI DE CALCUL | RATA |
|---|---|---|---|
| 1. Indicatori de lichiditate | | | |
| - Lichiditate curenta | Active circulante / Datorii pe TS | 14.875.608 / 7.461.386 | 1,99 |
| - Lichiditate imediata | Active curente - stocuri / Datorii curente | 14.875.608-8.178.249 / 7.461.386 | 0,90 |
| 2. Indicatori de risc | | | |
| - Gradul de indatorare | Datorii curente x 100 / Total activ | 7.461.386X100 / 28.100.420 | 26,55 |
| - Indicator prin acoperirea dobanzilor | Profit inaintea platii dob.si imp.profit / Cheltuieli cu dobanda | 594.118 / 120.344 | 4,94 |
| 3. Indicatorii de activitate | | | |
| - Viteza de rotatie a stocurilor | Costul vanzarilor / Stocul mediu | 36.534.467 / 7.735.881 | 4,72 |
| - Perioada de recuperare a creantelor (clienti) | Sold mediu clienti x 365 / Cifra de afaceri | 4.763.101X365 / 27.093.475 | 64,17 |
| - Perioada de rambursare a datoriilor (furnizori) | Sold mediu furnizori x 365 / Cifra de afaceri | 2.281.542X365 / 27.093.475 | 30,74 |
| - Viteza de rotatie a activelor imobilizate | Cifra de afaceri / Active imobilizate | 27.093.475 / 13.118.130 | 2,07 |
| - Viteza de rotatie a activelor totale | Cifra de afaceri / Active totale | 27.093.475 / 28.100.420 | 0,96 |
| 4. Indicatori de profitabilitate | | | |
| - Rentabilitatea capitalului angajat | Profit inaintea platii dob.si imp.profit / Capital angajat | 594.118 / 20.639.034 | 0,03 |
| - Marja bruta din vanzari | Profit brut din vanzari x 100 / Cifra de afaceri | 638.393X100 / 27.093.475 | 2,36 |

Administrator,
Numele si prenumele
ing. Kertesz Stefan

Semnatura

Stampila

Intocmit,
Numele si prenumele
ec. Mujdar Erika

Semnatura

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:33 PM, Submission Status: Approved

Barcode:3875858-05 A-570-106 INV - Investigation -

SC SIGSTRAT SA
SIGHETU MARMATIEI

## NOTA 10

## ALTE INFORMATII

1. SC SIGSTRAT SA a fost inființată ca societate pe acțiuni prin HG nr. 753/1992, isi desfasoara activitatea in conformitate cu legislatia romana aplicabila coroborat cu prevederile Actului constitutiv.

Obiectul principal de activitate potrivit CAEN este "Fabricarea de furnire si a panourilor din lemn"(cod CAEN 1621).

Sediul societății se află în Sighetu Marmației, str. Unirii nr.40, jud. Maramures. Societatea nu detine sedii secundare si nici puncte de lucru.

2. Componența conducerii la 31.12.2018:

- director general – ing. Kertesz Stefan
- director tehnic – ing. Ilicsuk Adalbert
- director comercial – ec. Tivadar Stefan
- director economic – ec. Mujdar Erika
- director de producție – ing. Kokenyesdi Mihai pana in data de 01.03.2018

Membrii Consiliului de Administrație la 31.12.2018:
- ing. Kertesz Stefan – preşedinte
- ec. Tivadar Stefan – secretar
- ec.Petrovan Sorin – membru
- ec.Gavris Mircea – membru
- ing.Tiran Florin – membru

3. Tranzacțiile în valută au fost contabilizate la cursurile de schimb valutar de la data tranzacției. Pierderile sau câştigurile din diferențe de curs valutar au fost recunoscute în contul de profit şi pierdere. La finele fiecarei luni, creantele si datoriile in valuta au fost evaluate la cursul de schimb al pietei valutare, comunicat de BNR din ultima zi bancara a lunii in cauza, iar diferențele de curs valutar înregistrate au fost recunoscute in contabilitate la venituri sau cheltuieli din diferente de curs valutar, dupa caz.

4. La stabilirea profitului impozabil si a impozitului pe profit pe anul 2018 s-au avut in vedere prevederile  Legii nr.227/2015 privind Codul fiscal, cota de impozitare in vigoare la 31.12.2018 fiind 16%, iar impozitul pe profit rezultat la sfarsitul anului 2018 a fost in suma de  112.891 lei.

Barcode:3875858-05 A-570-106 INV - Investigation -

5. Cifra de afaceri în valoare totală de 27.093.475 lei s-a concretizat în următoarele venituri:

a) Venituri din vânzarea produselor în valoare de 24.376.052 lei, cu următoarea structură pe produse:

- lei -

| DENUMIRE  PRODUS | VALOARE |
|---|---|
| - placaj uz interior | 12.197.902 |
| - furnir | 584.842 |
| - produse mulate | 11.539.443 |
| - brichete | 53.865 |
| TOTAL | 24.376.052 |

b) Venituri din vânzarea semifabricatelor         471.284 lei
c) Venituri din vânzarea produselor reziduale      747.671 lei
d) Venituri din lucrări executate şi servicii prestate   1.194.913 lei
e) Venituri din chirii                   139.046 lei
f) Venituri din vânzarea mărfurilor           165.885 lei
g) Reduceri comerciale                    -1.376 lei

Societatea nu a inregistrat in cursul anului 2018 venituri sau cheltuieli extraordinare.

Soldul contului 471 in suma de 106.682 lei, reprezinta cheltuieli efectuate in avans, pentru exercitiul financiar urmator, cum ar fi abonamente, asigurari aferente cladirilor, utilajelor, mijloacelor de transport, etc.

Nu au fost inregistrate venituri in avans.

Administrator,
Numele si prenumele
ing. Kertesz Stefan

Semnatura

Stampila

Intocmit,
Numele si prenumele
ec Mujdar Erika

Semnatura

Barcode:3875858-05 A-570-106 INV - Investigation  -

SC SIGSTRAT SA
SIGHETU MARMATIEI

## SITUATIA MODIFICARILOR CAPITALULUI PROPRIU
la data de 31.12.2018

- lei -

| Denumirea elementului | Sold la inceputul exercitiului financiar 2018 | Cresteri | Reduceri | Sold la sfarsitul exercitiului financiar 2018 |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |
| Capital subscris | 2.325.077 | - | - | 2.325.077 |
| Rezerve din reevaluare | 4.401.197 | - | 225.091 | 4.176.106 |
| Rezerve legale | 411.896 | 23.688 | - | 435.584 |
| Alte rezerve | 13.124.328 | 80.772 | - | 13.205.100 |
| Rezultat reportat reprezentand surplusul realizat din rezerve din reevaluare | 27.362 | 225.090 | 27.362 | 225.090 |
| Pierderi legate de instrumentele de capitaluri proprii | 65.117 | - | - | 65.117 |
| Profitul exercitiului financiar | 58.744 | 360.883 | 58.744 | 360.883 |
| Repartizarea profitului | 5.334 | 23.689 | 5.334 | 23.689 |
| **Total capitaluri proprii** | **20.278.153** | **666.744** | **305.863** | **20.639.034** |

Administrator,
Numele si prenumele
ing. Kertesz Stefan

Semnatura

Intocmit,
Numele si prenumele
ec Mujdar Erika

Semnatura

Barcode:3875858-05 A-570-106 INV - Investigation  -

SC SIGSTRAT SA
SIGHETU MARMATIEI

## SITUATIA FLUXURILOR DE TREZORERIE
### la data de 31.12.2018

- lei -

| DENUMIREA ELEMENTULUI | EXERCITIUL FINANCIAR | |
|---|---|---|
| | **Precedent** | **Curent** |
| 1 | **2** | **3** |
| Cifra de afaceri | 28.835.201 | 27.093.475 |
| Productia stocata | 3.511.935 | 7.589.460 |
| Productia imobilizata | 319.851 | 308.107 |
| Alte venituri din exploatare | 1.859.039 | 2.181.818 |
| *Total venituri din exploatare* | **34.526.026** | **37.172.860** |
| Cheltuieli privind materiile prime, materialele consumabile si marfurile | 15.891.758 | 18.689.846 |
| Cheltuieli cu energia | 1.451.981 | 1.534.472 |
| Cheltuieli cu personalul | 12.492.778 | 12.458.240 |
| Amortizari | 1.863.557 | 1.587.412 |
| Alte cheltuieli de exploatare | 2.509.165 | 2.313.994 |
| Ajustari privind provizioanele | -140.000 | |
| Ajustari privind activele circulante | - | -49.497 |
| *Total cheltuieli din exploatare* | **34.069.239** | **36.534.467** |
| *Rezultatul din exploatare* | **456.787** | **638.393** |
| Venituri financiare | 234.248 | 193.991 |
| Cheltuieli financiare | 584.361 | 358.610 |
| *Rezultatul financiar* | **-350.113** | **-164.619** |
| *Rezultatul brut al exercitiului* | **106.674** | **473.774** |
| Impozit pe profit | 47.930 | 112.891 |
| *Rezultatul net al exercitiului* | **58.744** | **360.883** |
| *Flux de numerar* | | |
| + Profit | 58.744 | 360.883 |
| + Amortizare | 1.863.557 | 1.587.412 |
| - Variatia stocurilor | -1.554.865 | 884.736 |
| - Variatia creantelor | -157.551 | 298.646 |
| + Variatia furnizorilor si clientilor creditori | 977.340 | -394.458 |
| - Variatia altor elemente de activ | -1.932.720 | -1.527.762 |
| + Variatia altor pasive | -2.125.883 | -1.793.192 |
| *Flux de numerar din activitatea de exploatare (A)* | **4.418.894** | **105.025** |
| + Sume din vanzarea activelor si mijloacelor fixe | 130.297 | 286.400 |
| - Achizitii de imobilizari corporale | 255.098 | 41.514 |
| - Cheltuieli pentru imobilizari corporale executate in regie proprie | 319.851 | 308.107 |
| *Flux de numerar din activitatea de investitii (B)* | **-444.652** | **-63.221** |
| + Variatia imprumuturilor | -3.628.886 | -405.199 |
| *Flux de numerar din activitatea financiara ( C )* | **-3.628.886** | **-405.199** |

Barcode:3875858-05 A-570-106 INV - Investigation  -

| 1 | 2 | 3 |
|---|---|---|
| *Disponibilitati banesti la inceputul perioadei* | 1.154.703 | 1.500.059 |
| *Flux de numerar net    (A+B+C)* | 345.356 | -363.395 |
| *Disponibilitati banesti la sfarsitul perioadei* | 1.500.059 | 1.136.664 |

Administrator,
Numele si prenumele
ing. Kertesz Stefan

Semnatura

Stampila

Intocmit,
Numele si prenumele
ec Mujdar Erika

Semnatura

Barcode:3875858-05 A-570-106 INV - Investigation -

## DECLARATIE

S-au intocmit situatiile financiare anuale la 31/12/2018 pentru :

Entitate: S.C. SIGSTRAT S.A.
Judetul: 24 -  Maramures
Adresa: Sighetu Marmatiei, str.Unirii  nr.40, tel.0262311117
Numar din registrul comertului: J 24/13/1993
Forma de proprietate: 34 – Societati comerciale pe actiuni
Activitatea desfasurata (cod si denumire clasa CAEN): 1621 – Fabricarea de furnire si a panourilor din lemn
Cod unic de inregistrare: RO 2954386

Subsemnatul ing.Kertesz Stefan, in calitate de director general , imi asum raspunderea pentru intocmirea situatiilor financiare anuale la 31/12/2018 si confirm ca:

a) Politicile contabile utilizate la intocmirea situatiilor financiare anuale sunt in conformitate cu reglementarile contabile aplicabile.

b) Situatiile financiare anuale ofera o imagine fidela a pozitiei financiare, performantei financiare si a celorlalte informatii referitoare la activitatea desfasurata.

c) Societatea isi desfasoara activitatea in conditii de continuitate.

Semnatura 



Produces and Sells Plywood, Moulded Plywood, Chairs, Chair Elements

Barcode:38... ...A ...v ...stigation -

# S.C. SIGSTRAT S.A.



Tel: 0040-262-317575, 311117
Fax: 0040 - 262 315464
Ro 435500  Sighetu Marmatiei  str.Unirii nr.40

e-mail: sigstrat @ sigstrat.ro ; web: www.sigstrat.ro
TRADE REG. J-24-13-1993 ; VAT No: RO 2954386

Nr. 2629/25.04.2019

Catre,

Cotidianul Romania Libera

Pentru publicare - Mica publicitate

o aparitie - cat mai curand posibil

COMUNICAT DE PRESA

SC SIGSTRAT SA Sighetu Marmatiei,in conformitate cu Legea 297/2004 art. 227 alin. (1) si
Regulamentelor ASF / CNVM,instiinteaza toti actionarii societatii,ca Raportul anual
aferent anului 2018 ,poate fi consultat  si descarcat de pe pagina de internet a societatii
adresa  www.sigstrat.ro , sectiunea "Info actionari "sau poate fi consultat sau obtinut in copie
de la sediul societatii contra cost. Deasemenea copia raportului  anual, poate fi expediata la
 solicitare scrisa a oricarui actionar prin servicii postale,costurile aferente se vor suporta de catre
solicitant.Raportul anual aferent anului 2018 ,va fi disponibil incepand cu data de 30.04.2019.

Director General,
Ing. Kertesz Stefan





Produces and Sells Plywood, Moulded Plywood, Chairs, Chair Elements

# s.c. SIGSTRAT s.a.



Tel: 0040-262-317575, 311117
Fax: 0040 - 262 315464
Ro 435500 Sighetu Marmaţiei  str.Unirii nr.40

e-mail: sigstrat @ sigstrat.ro ; web: www.sigstrat.ro
TRADE REG. J-24-13-1993 ; VAT No: RO 2954386

ISO 9001
ISO 14001
OHSAS 18001

2847/ 30.04.2019

To

ASF Bucharest

BVB – AeRO Bucharest


We will next forward the Annual Report for 2019, in accordance with the legal provisions approved by the Shareholders' Ordinary General Meeting, held on 25.04.2019


The attached documents are:

Annual Report of the Board of Directors.

Financial Auditor's Report

Balance sheet at 31.12.2018, registered with DGF

Statement of the Managing Director, President C.A.

Press release on the availability of the Annual Report.



General Director,

Ing. Kertesz Stefan                        Intec T.S.

[Signature]                                [Signature]

[Stamp of SIGSTRAT S.A.]

Barcode:3875858-05 A-570-106 INV - Investigation  -

# ANNUAL REPORT

# IN ACCORDANCE WITH LAW 297/2004 AND REGULATION OF CNVM

# NO.1/2006

## FOR THE FINANCIAL YEAR 2018

No. 1946 of 2003 2019

SC SIGSTRAT S.A. Sighetu Marmatiei
Headquarters: Unirii Street, no 40, Sighetu Marmatiei, Maramures
Phone: 0262 311117/317575, Fax: 0262 315464
Unique fiscal registration code: RO 2954386
Order Number in the Trade Register: J 24/13/05.01.1993
Regulated market on which the issued Securities are traded: BVB - AeRO
Subscribed and paid-up capital: 2.325.077 lei
Type of shares: common, nominative, dematerialized. Total number of shares issued:
23.250.770
Nominal value of one share: 0.1 lei

## The analysis of the commercial company's activity

### 1.1. a) Description of the basic activity of the commercial company

The main activity objective, according to the Classification of Activities in the National Economy, is "Manufacturing of veneer and wooden panels", CAEN code 1621. The products manufactured and marketed by S.C. SIGSTRAT S.A. are: wooden plywood, veneering, seats and backrests, chairs, tables, wood chips lighters and other wooden products.

### b) Establishment of the company

The trading company SIGSTRAT S.A. was established as a joint stock company on 19.11.1992, by the Government Decision no.753/1992 Concerning the approval of the division of the commercial company SIGMOB SA Sighetu Marmatiei.

**c) Significant mergers or reorganisations of the trading company, its subsidiaries or controlled companies during the financial year**

During the financial year 2018, the company was not divided, merged and significantly reorganized. The company has no subsidiaries and no shares in other companies.

**d) Acquisitions and/or disposal of assets**

The investments made in 2018 amounted to 546.621 lei, financed from own sources. The following objectives have been achieved:

| | |
|---|---|
| - building and building designs | 199.545 lei |
| - technological equipment | 277.087 lei |
| - means of transport | 55.923 lei |
| - measuring instruments and equipment, control | 14.066 lei |

The investments were realized in proportion of 88.13%, without involvement from anyone else.

Asset write-offs refer to asset sales and disposals of fixed assets approved by the AGA.

**1.1.1. General evaluation elements**

**a)** In the financial year 2018, the company registered a **gross profit** of 473.774 lei, a profit tax of 112.891 lei, resulting in a net profit of 360.883 lei. The increase in net profit in 2018 compared to 2017 is due to revenues from other operating activities other than the underlying activities.

**b) The turnover** for the year 2018 amounted to 27.093.475 lei and resulted in the following revenue:

| | |
|---|---|
| - revenue from the sale of finished products | 24.374.676 lei |
| - revenue from the sale of semi-finished products | 471.284 lei |
| - revenue from the sale of residual products | 747.671 lei |
| - revenue from rendered services | 1.194.913 lei |
| - revenue from rent | 139.046 lei |
| - revenue from the sale of goods | 165.885 lei |

The decrease in turnover, as compared to the previous year, was partly due to the decrease in the volume of orders on the Arab market, and also due to the increase in the selling price of finished products for the domestic market, for which the demand has decreased.

Barcode:3875858-05 A-570-106 INV - Investigation   -

Barcode:3875858-05 A-570-106 INV - Investigation  -

| Indicators | Formula | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| Current liquidity ratio | Current assets / Short-term liquidity | 1,60 | 1,81 | 1,99 |
| Immediate liquidity rate | (Receivables + cash deposits) / Short-term liquidity | 0,68 | 0,87 | 0,90 |
| Immediate liquidity rate | Cash deposits / Short-term liquidity | 0,12 | 0,19 | 0,15 |

The structure of asset items influences liquidity and financial equilibrium.

The current liquidity reflects the extent to which circulating assets can be turned into short-term liquidity to honour current payables. It can be noted that over the last three years, this indicator has had a growing trend.

The rapid liquidity shows the company's ability to pay its short-term debts from receivables and availability. Compared to the previous years, there is an increase in this indicator.

The immediate liquidity measures the company's capacity to cover its short-term debts with its own cash resources. A one-to-one report is very difficult to achieve because the company cannot maintain such a high level of cash assets to cover its current liabilities.

## 1.1.2. Evaluation of the technical level of the commercial company

a) The products sold by S.C. SIGSTRAT S.A. are: wooden plywood, veneering, seats and backrests, chairs, tables, wood chips lighters and other wooden products. The objectives of the company continue to focus on the increasing the share of the production of molded elements in the total production, due to the fact that these products have a net value superior to the standard products.

b) The share of products and services in the revenues and in the total turnover of the commercial company

Barcode:3875858-05 A-570-106 INV - Investigation  -

| Products/services | 2016 | | 2017 | | 2018 | |
|---|---|---|---|---|---|---|
| | Turnover % | Revenue % | Turnover % | Revenue % | Turnover % | Revenue % |
| Plywood interior use | 57,37 | 44,44 | 52,17 | 43,28 | 45,02 | 32,64 |
| Plywood exterior use | 0,05 | 0,04 | - | - | - | - |
| Veneer | 1,40 | 1,08 | 1,73 | 1,44 | 2,16 | 1,57 |
| Molded products | 31,41 | 24,33 | 36,87 | 30,59 | 42,59 | 30,88 |
| Lighters | 0,36 | 0,28 | 0,51 | 0,42 | 0,20 | 0,14 |
| Semi-finished products | 1,81 | 1,40 | 2,07 | 1,72 | 1,74 | 1,26 |
| Residual products | 2,39 | 1,85 | 1,96 | 1,63 | 2,76 | 2,00 |
| Services provided | 3,13 | 2,43 | 3,76 | 3,12 | 4,41 | 3,20 |
| Rent | 1,85 | 1,44 | 0,56 | 0,46 | 0,51 | 0,37 |
| Goods | 0,23 | 0,18 | 0,37 | 0,30 | 0,61 | 0,44 |

**c)** The company's development strategy is based mainly on increasing the production capacities, expanding the production of molded elements to the detriment of standard plywood and improving the quality structure of finished products.

## 1.1.3. Evaluation of the supply activity

The raw materials were purchased on the domestic and foreign market, in the proportion of 8.7%.

In the stocking of raw materials and direct materials, the production schedule and specific consumption were taken into account, to ensure production's continuity, while avoiding asset blocking and unnecessary storage costs.

At the same time, the specificity of the activity requires the permanent supply of a spare parts quantity for the preventive and corrective maintenance of the technological equipment.

The company continuously negotiates contracts with suppliers, taking into account the cost of purchase given by the price/quality ratio.

The seasonal cycles of exploitation of wooden raw materials have also been taken into account this year.

There is no significant dependence on a single supplier whose loss would affect the company's business.

### 1.1.4. Evaluation of sales activity

Analysing the last three years, it can be seen a steady decline in turnover, especially when it comes to standard flat boards, due to a lack of demand in the Arab and domestic markets, as a result of rising sales prices for these products.

With regards to securing medium and long term dismantling, we anticipate a return of the domestic market for standard plywood, as well as finding new domestic customers for molded furniture.

In 2018, the turnover recorded a 6% decrease compared to the level recorded in 2017, respectively 1.741.726 lei. The share of sales of molded products in total turnover has increased over the past three years, which is in line with the company's marketing policy.

**a)** Revenues from the sale of finished products, which represent 89.97% of the registered turnover, had the following products structure:

| PRODUCT NAME | 2016 | 2017 | 2018 |
|---|---|---|---|
| - plywood interior use | 18.787.432 | 15.043.357 | 12.196.526 |
| - plywood exterior use | 17.135 | - | - |
| - veneer | 457.516 | 499.432 | 584.842 |
| - molded products | 10.292.031 | 10.632.753 | 11.539.443 |
| - lighters | 117.666 | 146.228 | 53.865 |
| TOTAL | 29.681.762 | 26.321.700 | 24.374.676 |

In 2018, the share of export as part of the total turnover was 54.11%.

**b) Companies with similar fields of activity are: Stratusmob Blaj, Silvarom Bucharest, Sortilemn Gherla, Gamoni Satu Mare, Beker Slovakia.**

**c)** The company does not depend significantly on a client or a group of clients.

### 1.1.5. Evaluating aspects related to employees/company's staff

**a)** The average number of employees in 2018 was 333. The structure and level of their training are: 28 people with higher education, 5 people with post-secondary education, 7 people with specialized training (craftsmanship), 88 people with high school education, 73 people with vocational schools, 13 people with apprenticeship, 106 people with secondary school, 13 people who did not graduate secondary school.

There is no union within the company.

**b)** The work relations between the employer and the employees are regulated by the Collective Labour Contract at the company level concluded between the employer and the employees' representatives, as well as by the individual labour contracts of the employees, according to the Labour Code.

During 2018, there were no conflicting events or any type of conflicts between the employees and the management of the company.

### 1.1.6. Evaluating aspects related to the impact of the core activity on the environment

The company manages effectively the environmental aspects of the activity. In this respect, the maintenance and proper exploitation of technological equipment, installations and facilities for environmental protection, collection, sorting and waste recovery are ensured.

The company holds an environmental permit issued by APM Maramures and has implemented a system of quality management, occupational health and safety according to ISO 9001: 2018, OHSAS 18001: 2008, ISO 14001: 2015, respecting the current legal requirements.

There are no litigation and no litigation is envisaged regarding the violation of environmental legislation.

### 1.1.7. Evaluation of research - development activity

The objectives of the research and development activity within the company were to develop technologies for new product manufacturing, assimilation and introduction of new products in the fabrication, optimization of existing ones, execution and approval of prototypes.

### 1.1.8. Evaluating the company's business activity when it comes to risk management

There is a permanent monitoring of the significant risks to which the company could be exposed in order to reduce its impact on the cash flow:

- **liquidity risk -** is under control by applying a policy of permanent liquidity assurance to meet outstanding debt obligations;
- **exchange rate risk -** the society is exposed to the fluctuations of the exchange rate due to foreign currency earnings, foreign currency loans or foreign currency commercial debt;
- **interest rate risk -** may be influenced by the variable component of the interest rate, respectively by the evolution of the EURIBOR and ROBOR indices.
- **the credit risk -** it may be generated by the receivables from the core business, this is the reason for needing the diversification of outlets and customers, the setting of a credit limit for each client and a payment term to avoid a possible financial blockage;

- **the price risk** - is difficult to control due to the continuous increase of the raw material prices, especially the logs, materials, the minimum wage imposed by the state's financial policy. In order to remedy the negative effects of those, we need to reduce the sales prices of manufactured products and/or increase the volume of turnover with existing customers, and try to cap supplier prices if possible.
- **legislative risks** - are risks that cannot be predicted and their impact is difficult to combat. The financial results suffer from the legislative instability in Romania, the consequences of which are the decrease of the demand for products or even customer abandonment of our products. The additional costs that are generated by these fast-track fiscal measures cannot be covered by the increase in sales prices and the commercial company's efforts to find solutions are becoming increasingly difficult.

**Prospective elements regarding the activity of the commercial company**

**a)** The liquidity of the company may be affected by:
- exchange rate fluctuations, influencing both export receipts and foreign currency loans
- incidents of payment and non-payment of receivables due to insolvency of clients
- insufficient orders
- fiscal policy of the state
- uncontrollable rise in prices for wooden raw materials.

**b)** During the financial year 2018, the company has made investments of 546.621 lei in order to expand the production capacities, to diversify the production of molded elements, to reduce the specific consumption. The value of investments made in 2017 amounted to 574.949 lei.

**c)** Revenues from the core business are directly influenced by the following factors: rising raw material prices, especially logs, rising minimum wages, market demand, sales price level and dynamics, fiscal policy of the state.

## 2. Tangible assets of the commercial company

**2.1.** The assets and production capacities owned by the company are located in Sighetu Marmatiei, No.40, Unirii Street.

The company also owns buildings and lands located in Satu Mare County, Nisipeni village.

The structure of property, plant and equipment at 31.12.2018 was the following:

| | |
|---|---:|
| - Land, landscaping | 417.309 lei |
| - Construction | 8.460.107 lei |
| - Technological equipment | 13.172.817 lei |
| - Measuring and control devices | 280.474 lei |
| - Means of transport | 3,624.423 lei |
| - Furniture, office equipment | 307.067 lei |
| - Advances and tangible assets under construction | 1.224.800 lei |

The production takes place in two sections of activity, in the plywood section and in the mold section, both of which are subject to a maintenance and continuous development regime.

The production equipment is properly operated and permanently maintained, to ensure its proper operation.

**2.2. The degree of wear and tear** of tangible assets, divided by groups of properties at 31.12.2018 is as follows:

| | |
|---|---|
| - construction | 22,18% |
| - installations, means of transport | 72,87% |
| - other tangible assets | 71.11% |

To get the most out of the service life of the technological equipment and of the means of transport, their operation and maintenance needs to be ensured, the repairs are carried out, through control operations and revisions, which allow the early detection of any malfunctions.

**2.3.** The commercial company does not have any issues regarding the property rights of tangible assets or patrimony land.

**3. Securities market issued by the commercial company**

**3.1**. Securities issued by Sigstrat S.A. are traded on BVB AeRO. The number of shareholders of the company is 5.037, of which 5.023 are shareholders and 14 are legal entities. The weight of the share capital is the following: individuals 34,86%, legal people 12,86%, SIGSTRAT PAS Association 52,28%.

**3.2.** The company made a profit in both 2016 and 2017, profit which was distributed according to the AGA decision to its own sources of financing. From the accounting profit of 2018, 5% was calculated and allocated for the increase of the legal reserve, worth 23.688.68 lei, giving the AGA the task of determining the distribution of the remaining profit.

**3.3.** The company did not redeem its own shares in 2018.

Barcode:3875858-05 A-570-106 INV - Investigation   -

**3.4.** The company has no subsidiaries.

**3.5.** The company has not issued bonds or other debt securities.

4. **Management of the commercial company**

4. 1. **Presentation of the managers of the company**

**a) Administrators list:**

1. ing. Kertesz Stefan, born on 10.07.1949, engineer, employed since 1972 as engineer at CPL Sighetu Marmatiei. Since 1976, he has been the head of the PAL section and since 1992 to present, he has been the general manager of S.C. Sigstrat S.A. Sighetu Marmatiei - CA President.

2. ec. Tivadar Stefan - born on 24.1 2.1 966, economist, employed from 1985 to 2001 in different positions, head of administrative-protocol service from 2001 to October 2008, and administrator - CA secretary, CA vice-president since October 2008.

3. ing. Gavris Mircea - born on 25.06.1948, engineer, administrator - member CA since 28.04.2009.

4. ec. Petrovan Sorin born on 12.10.1977, economist profession, employed from 2004 to 2012 as part of the supply service, administrator - CA member since November 2012.

5. ec. Tiran Florin - born on 19.04.1982, engineer, employed from 2009 to 2011 SC Ecocenter Serv SRL, within the Inecano - energetic service at S.C. SIGSTRAT S.A. from 2011 to 2016, administrator - CA member since May 2016.

**b)** No person has been appointed in a director role as a result of an agreement, understanding, or family relationship.

**c)** Number of shares held nominally by the company's directors:

| | |
|---|---:|
| - ing. Kertesz Stefan | 2.598.687 shares |
| - ec. Tivadar Stefan | 14.956 shares |
| - ec. Petrovan Sorin | 1.550 shares |
| - ing. Tiran Florin | 500 shares |
| - ing. Gavris Mircea | 560 shares |

Most directors hold shares within the Sigstrat PAS Association.

**d)** There are no people affiliated with S.C. SIGSTRAT S.A.

Barcode:3875858-06 A-570-106 INV - Investigation  -

**4.2. Presentation of the executive management of the company:**

1. ing. Kerttesz Stefan, general manager, having signed a management contract until 02.05.2020.

2. ing. Ilicsuk Adalbert, technical director, having signed a management contract until 02.05.2020. The number of shares held is 1.680, or 0.007226%.

3. ec. Tivadar Stefan, commercial director, having signed a management contract until 02.05.2020.

4. ing. Kokenyesdi Mihai, production director until 01.03.2018. The number of shares held is 840, or 0,003613%.

5. ec. Mujdar Erika, economic director, having signed a management contract until 02.05.2020. The number of shares held is 1.680, or 0.007226%.

No person has been appointed as a member of the executive management as a result of an agreement, understanding, or family relationship.

Neither the members of the board of directors nor the members of the executive management of any company had any disputes or administrative procedures regarding their activity within S.C. SIGSTRAT S.A.

**5. Financial - accounting situation**
**a) Balance sheet items**

| Indicator name | Balance at | | |
|---|---|---|---|
| | 31.12.2016 | 31.12.2017 | 31.12.2018 |
| I. Fixed assets - total | 15.702.433 | 14.345.045 | 13.118.130 |
| 1. Intangible assets | 169.099 | 169.895 | 164.002 |
| 2. Tangible assets | 15.516.375 | 14.160.536 | 12.940.772 |
| - Lands and buildings | 7.488.763 | 7.267.405 | 6.993.320 |
| - Technical installations and machines | 6.395.380 | 5.553.017 | 4.633.929 |
| - Other installations, machinery | 121.741 | 106.764 | 88.723 |
| - Advances and tangible assets under construction | 1.510.491 | 1.233.350 | 1.224.800 |
| 3. Financial leasing | 16.959 | 14.614 | 13.356 |
| II. Circulating assets - total | 15.422.681 | 14.055.621 | 14.875.608 |
| 1. Stocks | 8.848.378 | 7.293.513 | 8.178.249 |
| 2. Claims | 5.419.600 | 5.262.049 | 5.560.695 |
| 3. Bank accounts | 1.154.703 | 1.500.059 | 1.136.664 |
| III. Prepayments | 58.292 | 57.908 | 106.682 |
| TOTAL ACTIVE | 31.183.406 | 28.458.574 | 28.100.420 |
| IV. Liabilities: the amounts to be paid in a period of up to one year | 9.647.180 | 7.760.046 | 7.461.386 |

Barcode:3875858-06 A-570-106 INV - Investigation  -

| | | | |
|---|---|---|---|
| V. Liabilities: the amounts to be paid over a period of one year | 1.176.816 | 420.375 | - |
| VI: Provisions | 140.000 | - | - |
| VII: Investment grants | - | - | - |
| VIII: Capital and reserves | 17.845.425 | 20.262.498 | 20.141.867 |
| Own actions | - | - | - |
| Losses related to equity instruments | 65.117 | 65.117 | 65.117 |
| IX. Profit carried forward | 749.556 | 27.362 | 225.090 |
| X. Profit for the financial year | 1.792.528 | 58.744 | 360.883 |
| XI. Distribution of profit | 102.982 | 5.334 | 23.689 |
| TOTAL PASSIVE | 31.183.406 | 28.458.574 | 28.100.420 |

**Assets that exceed 10% of total assets are:**

| Indicator name | Value at 31.12.2016 | Share in total assets | Value at 31.12.2017 | Share in total assets | Value at 31.12.2018 | Share in total assets |
|---|---|---|---|---|---|---|
| Tangible assets | 15.516.375 | 49,76% | 14.160.536 | 49,76% | 12.940.772 | 46,05 |
| Stocks | 8.848.378 | 28,38% | 7.293.513 | 25,63% | 8.178.249 | 29,10 |
| Receivables | 5.419.600 | 17,38% | 5.262.049 | 18,49% | 5.560.695 | 19,79 |

The analysis of the balance sheet items shows the following:

- tangible assets decreased by 8,61% in 2018 compared to 2017 due to the sale of some assets;
- stocks increased by 12,13% compared to 2017, respectively from 7.293.513 lei to 8.178.249 lei;
- receivables increased compared to 2017, representing 19,79% of the total assets in 2018, while in 2017 they represented 18,49%.

Bank accounts amounted to 1.136.664 lei at the end of the financial year 2018.

In 2018, the current assets value was 14.875.608 lei, while in 2017 they amounted to 14.055.621 lei, their growth being influenced by the stocks value.

Total current liabilities in the year 2018 amounted to 7.461.386 lei, while in 2017 they amounted to 7.760.046 lei.

During the year 2018, the share capital remained the same. As of 31.12.2018, the subscribed and paid up share capital in the amount of 2.325.077 lei represented 23.250.770 shares, with a nominal value of 0,1 lei/share.

Barcode:3875858-06 A-570-106 INV - Investigation  -

Reserves recorded an increase as a result of the distribution of the net profit of 201 7 to own financing sources, according to the AGA decision. Revaluation reserves have diminished as a result of the revaluation of a revalued building following its sale.

At the end of 2018 the legal reserve increased by the amount of 23.688.68 lei, by applying a 5% on the gross profit, according to the legal regulations in force.

**b) Profit and loss account**

| Indicators | FINANCIAL EXERCISE | | |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| 1. Operating income - total, of which: | 41.827.773 | 34.526.026 | 37.172.860 |
| - Net turnover | 32.768.096 | 28.835.201 | 27.093.475 |
| 2. Operating expenses - total, out of which: | 39.505.981 | 34.069.239 | 36.534.467 |
| - Expenses for raw materials and materials | 18.661.096 | 15.891.758 | 18.689.846 |
| - Staff expenses | 13.156.346 | 12.492.778 | 12.458.240 |
| - Energy expenses | 1.707.117 | 1.451.981 | 1.534.472 |
| - Depreciation expenses | 1.980.076 | 1.863.557 | 1.587.412 |
| - Adjustments for current assets | - | - | 49.497 |
| - Adjustments for provisions | - | -140.000 | - |
| - Other operating expenses | 4.001.346 | 2.509.165 | 2.313.994 |
| 3. Operating profit | 2.321.792 | 456.787 | 638.393 |
| 4. Financial Income | 470.653 | 234.248 | 193.991 |
| 5. Financial expenses | 732.797 | 584.361 | 358.610 |
| 6. Financial loss | 262.144 | 350.113 | 164.619 |
| 7. Total revenues | 42.298.426 | 34.760.274 | 37.366.851 |
| 8. Total expenses | 40.238.778 | 34.653.600 | 36.893.077 |
| 9. Gross profit or loss | 2.059.648 | 106.674 | 473.774 |
| 10. Income tax | 267.120 | 47.930 | 112.891 |
| 11. Net profit or loss | 1.792.528 | 58.744 | 360.883 |

Barcode:3875858-06 A-570-106 INV - Investigation   -

In 2018, the turnover achieved was 27.093.475 lei, which was 1.741.726 lei less than the one registered in 2017. Revenues from basic activity contributed 94.46% to the realization of its business figures.

In 2018, the company recorded a net result of 360.883 lei, whereas the in 2017 this was 58.744 lei.

**Expenses with a weight of at least 20% of turnover are:**

| Indicator name | Value at 31.12.2016 | Share in total assets | Value at 31.12.2017 | Share in total assets | Value at 31.12.2018 | Share in total assets |
|---|---|---|---|---|---|---|
| Expenses for raw materials and materials | 18.661.096 | 56,95% | 15.891.758 | 55,11% | 18.689.846 | 68,98% |
| Staff expenses | 13.156.346 | 40,15% | 12.492.778 | 43,32% | 12.458.240 | 45,98% |

No provisions were made in 2018.

In 2018, no segment of activity was stopped and this is not expected to happen in the next year.

There have been no dividends granted, the profit of 2016 and 2017 was allocated to its own financing sources.

**c) Treasury flow**

| INDICATORS | | 31.12.2016 | 31.12.2017 | 31.12.2018 |
|---|---|---|---|---|
| Cash flow from operating activities | | 4.601.465 | 4.418.894 | 105.025 |
| Cash flow from investment activity | | -1.531.480 | -444.652 | -63.221 |
| Cash flow from financial activity | | -2.226.501 | -3.628.886 | -405.199 |
| Cash availability at the beginning of the period | | 311.219 | 1.154.703 | 1.500.059 |
| Net cash flow | | 843.484 | 345.356 | -363.395 |

Barcode:3875858-06 A-570-106 INV - Investigation  -

| Cash availability at the end of the period | 1.154.703 | 1.500.059 | 1.136.664 |
|---|---|---|---|

The cash flow from operating activities represents the cash inflows and outflows arising from the company's main activities. A positive cash flows means that operations generate sufficient treasury to meet financing needs.

The cash flow from the investment activity appreciates the company's investment effort and includes the money invested in tangible and intangible assets.

The cash flow from the financial activity is negative, due to the payments determined by the reimbursement of the credits committed in the previous years.

**Signatures**

**CA President – general director**   **Economic director,**

**Ing. Kertesz Stefan**     **ec. Mujdar Erika**

[Signature]        [Signature]

[Stamp of SIGSTRAT S.A.]

# R E P O R T

## INDEPENDENT AUDITOR

## FOR FINANCIAL SITUATIONS

## AT 31st DECEMBER 2018

## INTRODUCED TO THE COMMERCIAL SOCIETY

## SIGSTRAT S.A.

SIGHETU MARMATIEI
Unirii Street, No.40
R.C. J24/13/1993

C.I.F. RO 2954386

**FINANCIAL OFFICER**
**S.C. GDV AUDIT CONSULT S.R.L.**
**THE ROOM OF FINANCIAL AUDITORS IN ROMANIA**
**AUTHORIZATION no. 481/2004**

Barcode:3875858-06 A-570-106 INV - Investigation -

## GDV AUDIT CONSULT SRL

Bucharest Sector 2 Sos. Mihai Bravu no.172 bl.230 sc.I et.3 ap.9 – Tel/Fax 021.322.88.42/ tel 031.804.33.67 RC J40/9297/2003 - CIF RO 15574257 - Social Capital 2.000 Lei - Bank Account BCR SECTOR 3 IBAN RO71RNCB0074029234840001 – Financial Auditor
Authorization of the Chamber of Financial Auditors in Romania no.481/2004

---------------------------------------------------------------------------------------------------------------------------------------------------------

## INDEPENDENT AUDITOR'S REPORT

To

COMPANY SHAREHOLDERS SIGSTRAT S.A.

### *Opinion*

1. We have audited the separate financial statements of SIGSTRAT S.A. (**"Commercial Company"),** having its registered office in Sighetu Marmatiei, Maramures County, Unirii Street, No.40, identified by the unique fiscal code 2954386, which comprise the balance sheet as at 31st December 2018, the profit and loss account, the exchanges of equity and the cash flow statement for the financial year ended this date, as well as a summary of significant accounting policies and explanatory notes.

2. The individual financial statements as of 31 December 2018 are identified as follows:

- Total Equity:                                        20.639.034 lei
- Net profit:                                             360.883 lei

3. In our opinion, the accompanying financial statements provide a true and fair view of the financial position of the company as at 31st December 2018, as well as of its financial performance and cash flows for the year in accordance with the OMFP no. 1802/2014 for the approval of the Accounting Regulations on the individual annual financial statements and the consolidated annual financial statements, as amended ("OMFP no. 1802/2014").

### *The basis for opinion*

4. We conducted our audit in accordance with the International Standards on Auditing ("ISA") and Law no.162/2017 ("The Law"). Our responsibilities under these standards are described in detail in the "Auditor's responsibilities in the financial statements audit" section of our report. We are independent of the company, according to the Ethical Code of Professional Accountants issued by the Board for International Ethics Standards Board for Accountants (IESBA Code), according to the ethical requirements relevant to the audit of financial statements in Romania, including The Law, and we have fulfilled our ethical responsibilities according to these requirements and according to the IESBA Code. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

1

Barcode:3875858-06 A-570-106 INV - Investigation  -

### *Other information – Directors' Report*

5. Directors are responsible for replacing and presenting other information. This other information includes the Directors' Report, but does not include the auditor's financial statements and reports or the non-financial statement.

Our opinion on the financial statements does not cover this other information and, unless it is explicitly mentioned in our report, we do not express any assurance as to its conclusion.

With regards to the audit of the financial statements for the financial year ended 31st December 2018, it is our responsibility to read that other information and to assess whether that other information is materially inconsistent with the financial statements or with the knowledge that we have obtained during the audit, or if they appear to be significantly distorted.

Regarding the Directors' Report, we read and report on whether it was drafted, in all significant aspects, in accordance with OMFP no. 1802/2014, paragraphs 489-492.

On the sole basis of the activities to be carried out during the audit of the financial statements, in our opinion:

a) The information detailed in the Directors' Report for the financial year for which the financial statements were prepared are in accordance, in all material respects, with the financial statements;

b) The directors' report was drafted in accordance with OMFP no. 1802/2014, paragraphs 489-492.

In addition, based on our knowledge and understanding of the Company and its environment, acquired during the audit of the financial statements for the financial year ended 31st December 2018, we are required to report whether we identified significant distortions in the Directors' Report. We have nothing to say about this aspect.

### *Responsibilities of the management and those responsible for the financial statements governance*

6. The Company's management is responsible for preparing the financial statements to provide a true and fair view in accordance with OMFP no. 1802/2014 and for the internal control that management deems necessary to enable it to prepare financial statements free of significant distortions whether due to fraud or error.

7. In the preparation of the financial statements, management is responsible for assessing the Company's ability to continue its business, for presenting, if necessary, business continuity and use-based accounting, unless management intends to liquidate the Company or to stop its operations, or has no realistic alternative outside of it.

2

Barcode:3875858-06 A-570-106 INV - Investigation  -

8. The people responsible for governance are responsible for overseeing the Company's financial reporting process

***Auditor's responsibilities during a financial statements audit***

9. Our objectives are to obtain reasonable assurance that the financial statements are free of significant distortions whether due to fraud or error, and to the issuance of an auditor's report that includes our opinion. Reasonable assurance represents a high level of assurance, but it does not guarantee that an audit conducted in accordance with ISA will always detect significant distortion if it exists. Distortions can be caused by fraud, error and are considered to be significant if it can reasonably be expected that they, individually or cumulatively, will influence the users' economic decisions made on the basis of these financial statements.

10. As part of an audit in accordance with ISA, we exercise our professional judgment and maintain professional scepticism during the audit. Also:

- We identify and evaluate the risks of significant distortions of financial statements due to fraud, mistake, we design and perform audit procedures in response to those risks and we obtain appropriate audit evidence to provide a basis for our opinion. The risk of not detecting a significant distortion caused by fraud is higher than the failure to detect a significant distortion caused by error, as fraud may imply secret, false, deliberate omissions, false statements, and avoidance of internal control.
- We understand the internal audit relevant to the audit in order to design audit procedures appropriate to the circumstances, but without the purpose of expressing an opinion on the effectiveness of the Company's internal control.
- We evaluate the appropriateness of the accounting policies used and the reasonable charts of accounting estimates and related disclosures made by the management.
- We formulate a conclusion on the suitability of management's use of accruals based on the continuity of activity and determine, based on the audit evidence obtained, whether there is significant uncertainty about events or conditions that could generate significant doubts about the Company's ability to continue its activity. If we conclude that there is a significant uncertainty, we must draw attention in the auditor's report to the accompanying financial statements or, if these presentations are inappropriate, change our opinion. Our findings are based on audit evidence obtained by the date of the auditor's report. However, future events or conditions may cause the Company not to continue operating on a business continuity basis.



3

- We evaluate the presentation, structure and content of the financial statements, including disclosures, the extent to which the financial statements reflect the transactions and events underlying them in a manner that results in a fair presentation.

11. We communicate to those responsible for governance, among other things, the planned area and timing of the audit, as well as the main audit findings, including any internal control shortcomings that we identify during the audit.

03/28/2019

*On behalf of the company*

*GDV AUDIT CONSULT SRL*

*CAFR Member (No. 481/2004)*

*OLIVIU TRAISTARU*

*CAFR Member (No. 452/2001)*





4

SIGSTRAT S.A.

# COMMERCIAL SOCIETY

# SIGSTRAT S.A.

FINANCIAL SITUATIONS

FOR THE FINANCIAL YEAR 01.01 - 31.12.2018

Drafted in accordance with Law 82/1991 and OMFP no. 1802/2014 with subsequent amendments and completions

S.C. GDV AUDIT CONSULT S.R.L.                                          EXTERNAL AUDIT

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

## CONTENTS

|                                      | Page  |
| ------------------------------------ | ----- |
| INDEPENDENT AUDITOR'S REPORT         |       |
| FINANCIAL SITUATIONS                 |       |
| Balance                              | 7     |
| Profit and loss account             | 9     |
| Statement of changes in equity      | 11    |
| State of treasury flows             | 12    |
| Notes to the financial statements   | 14-23 |

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

6

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

*BALANCE SHEET AS OF 31.12.2018 (expressed in Lei)*

| INDICATOR NAME | 31-Dec-2018 | 1-Jan-2018 |
|---|---|---|
| Concessions, patents, licenses, trademarks, rights and similar intangible assets | 164.002 | 169.895 |
| TOTAL INTANGIBLE ASSETS | 164.002 | 169.895 |
| Land and construction | 6.993.320 | 7.267.405 |
| Technical installations and machines | 4.633.929 | 5.553.017 |
| Other plant, machinery and furniture | 88.723 | 106.765 |
| Tangible assets under construction | 1.170.528 | 1.179.078 |
| Overtures | 54.272 | 54.272 |
| TOTAL TANGIBLE ASSETS | 12.940.772 | 14.160.536 |
| Other loans | 13.356 | 14.614 |
| TOTAL FINANCIAL ASSETS | 13.356 | 14.614 |
| **ASSETS - TOTAL** | **13.118.130** | **14.345.045** |
| Raw materials and consumables | 2.680.300 | 2.236.808 |
| Production under execution | 1.188.774 | 961.327 |
| Finished goods and merchandise | 3.843.275 | 3.664.861 |
| Advance payments for stock purchases | 465.900 | 430.517 |
| **TOTAL STOCKS** | **8.178.249** | **7.293.513** |
| Commercial receivables | 5.235.446 | 4.990.592 |
| Other receivables | 325.249 | 271.457 |
| **TOTAL RECEIVABLES** | **5.560.695** | **5.262.049** |
| Bank accounts | 1.136.664 | 1.500.059 |
| **CURRENT ASSETS - TOTAL** | **14.875.608** | **14.055.621** |
| PREPAYMENTS in a period of up to one year | 106.682 | 57.908 |
| Amounts owed to credit institutions | 2.594.968 | 2.579.792 |
| Advance payments received in the orders account | 1.611.087 | 1.648.872 |
| Commercial debt | 2.086.228 | 2.442.901 |
| Other debts, including tax and other social security debts | 1.169.103 | 1.088.481 |
| **TOTAL LIABILITIES TO BE PAID IN A YEAR PERIOD** | **7.461.386** | **7.760.046** |
| OTHER ACTIVE ASSETS, RESPECTIVELY NET CURRENT LIABILITIES | 7.520.904 | 6.353.483 |
| **TOTAL ASSETS MINUS CURRENT LIABILITIES** | **20.639.034** | **20.698.528** |
| Amounts owed to credit institutions | - | 420.375 |
| TOTAL DEBTS TO BE PAID IN A PERIOD LONGER THAN ONE YEAR | - | 420.375 |

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:34 PM, Submission Status: Approved

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

| | | |
|---|---:|---:|
| Capital of which: | 2.325.077 | 2.325.077 |
| Paid subscribed capital | 2.325.077 | 2.325.077 |
| Revaluation reserves | 4.176.106 | 4.401.197 |
| **Reserves** | **13.640.684** | **13.536.224** |
| Legal reserves | 435.684 | 411.896 |
| Other reserves | 13.205.100 | 13.124.328 |
| Losses related to equity instruments | 65.117 | 65.117 |
| REPORTED RESULT - Non-distributed profit | 225.090 | 27.362 |
| **EXERCISE RESULT Profit** | **360.883** | **58.744** |
| Profit Distribution | 23.689 | 5.334 |
| **OWN CAPITAL - TOTAL** | 20.639.034 | 20.278.158 |
| **CAPITAL - TOTAL** | **20.639.034** | **20.278.153** |

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:34 PM, Submission Status: Approved

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

*PROFIT AND LOSS ACCOUNT*

*FOR THE FINANCIAL EXERCISE 01.01 - 31.12.2018 (expressed in Leı)*

| INDICATOR NAME | 31.12.2018 | 31.12.2017 |
|---|---|---|
| **Net turnover** | **27.093.475** | **28.835.201** |
| Income from current activity | 26.928.966 | 28.729.957 |
| Income from the sale of goods | 165.885 | 105.244 |
| Specialized corner discounts | 1.376 | - |
| Income related to current production cost (credit balance) | 7.589.460 | 3.511.935 |
| Income from the production of intangible and tangible assets | 308.107 | 319.851 |
| Other operating revenues | 2.181.818 | 1.859.039 |
| **OPERATING REVENUE - TOTAL** | **37.172.860** | **34.526.026** |
| Expenditure on raw materials and consumables | 18.581.300 | 15.791.056 |
| Other material expenses | 26.641 | 29.578 |
| Other outside expenses (with energy and water) | 1.534.472 | 1.451.981 |
| Expenditure on goods | 81.905 | 71.124 |
| **Staff costs - total** | **12.458.240** | **12.492.778** |
| Wages | 12.083.321 | 10.207.608 |
| Expenditure on insurance and social protection | 374.919 | 2.285.170 |
| Adjustment of value of tangible and intangible assets | 1.587.412 | 1.863.557 |
| Expenses | 1.587.412 | 1.863.557 |
| Adjusting the value of current assets | -49.497 | - |
| Income | 49.497 | - |
| Other operating expenses | 2.313.994 | 2.509.165 |
| Expenditure on external benefits | 1.852.500 | 2.113.680 |
| Expenses with other taxes and similar charges | 217.653 | 224.108 |
| Other expenses | 243.841 | 171.377 |
| Adjustments for provisions | - | -140.000 |
| Income | | 140.000 |
| **OPERATING EXPENDITURE - TOTAL** | **36.534.467** | **34.069.239** |
| **OPERATING RESULTS Profit** | **638.393** | **456.787** |
| Interest income | 38 | 64 |
| Other incomes | 193.953 | 234.184 |
| **FINANCIAL FUNDS - TOTAL** | **193.991** | **234.248** |
| Interest charges | 120.344 | 127.043 |
| Other financial expenses | 238.266 | 457.318 |
| **FINANCIAL EXPENDITURE - TOTAL** | **358.610** | **584.361** |
| **FINANCIAL RESULT Loss** | **164.619** | **350.113** |

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:34 PM, Submission Status: Approved

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

| | | |
|---|---:|---:|
| *TOTAL INCOME* | *37.366.851* | *34.760.274* |
| *TOTAL EXPENSES* | *36.893.077* | *34.653.600* |
| *GROSS RESULT OF THE EXERCISE Profit* | *473.774* | *106.674* |
| Profit tax | 112.891 | 47.930 |
| *NET RESULT OF EXERCISE Profit* | *360.883* | *58.744* |

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:34 PM, Submission Status: Approved

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

*SITUATION OF THE CHANGES IN OWN CAPITAL FOR THE FINANCIAL YEAR*

*01.01 - 31.12.2018 (expressed in Lei)*

| The element's name | Balance at the beginning of the financial year 2018 | Increases | Discounts | Balance at the end of the financial year 2018 |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |
| Subscribed capital | 2.325.077 | | | 2.325.077 |
| Revaluation reserves | 4.401.197 | | 225.091 | 4.176.106 |
| Legal reserves | 411.896 | 23.688 | | 435.584 |
| Other reserves | 13.124.328 | 80.772 | | 13.205.100 |
| Retained earnings representing surplus from revaluation reserves | 27.362 | 225.090 | 27.362 | 225.090 |
| Losses related to equity instruments | 65.117 | | | 65.117 |
| Profit of the financial year | 58.744 | 360.883 | 58.744 | 360.883 |
| Distribution of profit | 5.334 | 23.689 | 5.334 | 23.689 |
| Total equity | 20.278.153 | 666.744 | 305.863 | 20.639.034 |

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:34 PM, Submission Status: Approved

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

## SITUATION OF CASH FLOWS

FOR THE FINANCIAL YEAR 01.01 - 31.12.2018 (expressed in Lei)

| ELEMENT'S NAME | FINANCIAL EXERCISE | |
| --- | --- | --- |
| | **Previous** | **Current** |
| Fiscal value | 28.835.201 | 27.093.475 |
| Production stored | 3.511.935 | 7.589.460 |
| Production immobilized | 319.851 | 308.107 |
| Other operating income | 1.859.039 | 2.181.818 |
| *Total operating income* | **34.526.026** | **37.172.860** |
| Expenditure on raw materials, consumables and goods | 15.891.758 | 18.689.846 |
| Energy costs | 1.451.981 | 1.534.472 |
| Staff costs | 12.492.778 | 12.458.240 |
| Depreciation | 1.863.557 | 1.587.412 |
| Other operating expenses | 2.509.165 | 2.313.994 |
| Adjustments for provisions | -140.000 | - |
| *Total operating expenses* | **34.069.239** | **36.534.467** |
| *Operating result* | **456.787** | **638.393** |
| Financial income | 234.248 | 193.991 |
| Financial expenses | 584.361 | 358.610 |
| *Financial result* | **-350.113** | **-164.619** |
| *The raw result of the exercise* | **106.674** | **473.774** |
| Tax | 47.930 | 112.891 |
| *Net result of the exercise* | **58.744** | **360.883** |
| Cash flow | | |
| + Profit | 58.744 | 360.883 |
| + Liquidation | 1.863.557 | 1.587.412 |
| - Stock changes | -1.554.865 | 884.736 |
| - Variation of receivables | -157.551 | 298.646 |
| + Variance of creditors and suppliers | 977.340 | -394.458 |
| - Variation of other asset items | -1.932.720 | -1.527.762 |
| + Variation of other liabilities | -2.125.883 | -1.793.192 |
| *Cash flow from operating activities (A)* | **4.418.894** | **105.025** |
| + Amounts from the sale of fixed assets and miracles | 130.297 | 286.400 |
| - Acquisitions of tangible assets | 255.098 | 41.514 |

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:34 PM, Submission Status: Approved

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

| | | |
|---|---|---|
| - Expenditure on tangible fixed assets executed on own account | 319.851 | 308.107 |
| *Cash flow from investment activity (B)* | **-444.652** | **-62.221** |
| + Change in loans | -3.628.886 | -405.199 |
| *Cash flow from financial activity (C)* | **-3.628.886** | **-405.199** |
| *Cash availability at the beginning of the period* | **1.154.703** | **1.500.059** |
| *Net cash flow (A + B + C)* | **345.356** | **-363.395** |
| *Cash availability at the end of the period* | **1.500.059** | **1.136.664** |

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:34 PM, Submission Status: Approved

SIGSTRAT S.A.

## NOTES TO FINANCIAL SITUATIONS
## FOR THE FINANCIAL EXERCISE 01.01 - 31.12.2018 (Lei)

### 1. Presentation of financial statements

The financial statements of S.C. SIGSTRAT S.A. for 2018 were prepared in accordance with OMF 1802/2014 with subsequent amendments and completions.

The Company carries out the accounting records in Romanian Lei in accordance with the Accounting and Reporting Regulations ("RCR") issued by the Ministry of Public Finance of the Government of Romania.

### 2. Summary of significant accounting policies applied

**Tangible assets**

Tangible assets are initially recorded in accounting at historical cost minus cumulative depreciation.

Fixed assets maintenance and repairs are expensed at the time they are performed, and improvements to assets that increase their value or life span are capitalized.

Assets that are unaffected by the nature of inventory items, including tools, are expensed at the time of acquisition and are not included in the carrying amount of property, plant and equipment.

Items of tangible assets that are scrapped or disposed of are removed from the balance sheet, together with the appropriate cumulative depreciation. The gain or loss arising from such an operation is the difference between the amount received and the net carrying amount and are included in the operating profit of the period.

Significant upgrades are capitalized if they extend the life of the asset or significantly increase the ability to generate economic benefits from it.

Land is recorded at the valuation date. Land is not depreciated because it is believed it has an indefinite life.

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

**NOTES TO FINANCIAL SITUATIONS**
**FOR THE FINANCIAL EXERCISE 01.01 - 31.12.2018 (Lei)**

**2. Summary of significant accounting policies applied – Continued**

The initial cost of fixed assets includes the purchase price, including the unrecoverable fees generated by the purchase of fixed assets and other costs directly attributable to the bringing of the asset into service and at its place of use.

Expenses incurred after fixed assets have been put into operation, such as repairs and maintenance costs, are included in the income statement of the period in which they are incurred.

Depreciation of tangible assets was calculated during 2018, based on the straight line method, starting with the moment of commissioning to the full recovery of the input value, according to the normal operating times of the legal norms in force.

**Stocks**

Inventories are recorded at the lowest cost and net realizable value. The cost of finished and in-process products includes materials, workforce, and related indirect production costs. The net realizable value is the normal selling price less the closing costs and the selling expenses.

**Receivables**

Receivables are recorded at the anticipated realizable amount. Short-term receivables are not updated. The Company had provisions for uncertain clients.

**Availability**

Cash and cash equivalents are recorded in the balance sheet at cost. Availability includes house, current accounts, and bank deposits. There have been used exchange rates valid on 31.12.2018, communicated by the NBR, for the conversion into Lei of the foreign currency amounts.

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:34 PM, Submission Status: Approved

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

**NOTES TO FINANCIAL SITUATIONS**
**FOR THE FINANCIAL EXERCISE 01.01 - 31.12.2018 (Lei)**

**2. Summary of significant accounting policies applied – Continued**

**Share capital**

The share capital is presented at nominal value.

**Loans**

The company used sources from credit institutions.

**Liability**

Debts are recorded at cost, which is the fair value of the amounts to be paid for the goods or services received.

**Recognition of expenses and income**

Revenue is recognized as economic benefits associated with that transaction and it will enter into the company and the extent of those benefits can be reliably determined. Sales revenue is recorded when the goods are delivered to the customer at a value that does not include commercial rebates or discounts.

Expenses and income are included in the profit and loss account at the time the property law changes on the property. In accounting, the total value of the transaction is recorded at the date of the transfer of the property for the goods in question.

**Financial expenses**

Financial expenses are recorded in the profit and loss account at the time they are performed, as the operations are completed.

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

16

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

**NOTES TO FINANCIAL SITUATIONS**
**FOR THE FINANCIAL EXERCISE 01.01 - 31.12.2018 (Lei)**

### 2. Summary of significant accounting policies applied – Continued

**Turnover**
Turnover represents the amounts invoiced to third parties, excluding VAT.
The turnover is obtained as a result of the activity in the field of "Manufacturing of veneers and wooden panels"
CAEN code 1621.

**Profit tax**

The company records the profit tax in accordance with the financial statements prepared based on the Romanian legislation.

### 3. Tangible and intangible assets
Tangible assets are recorded at the values obtained by applying the provisions of GD 1553/2003, alternative accounting treatment allowed by OMFP 1802/2014, less cumulative depreciation, as follows:

| Asset names | Balance at 01.01.2018 | Purchases | Increases Own production | Other discounts | Balance at 31.12.2018 |
|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 |
| Intangible assets | 314.928 | 21.397 | - | - | 336.325 |
| Land, landscaping | 426.869 | - | - | 9.560 | 417.309 |
| Construction | 8.501.707 | 197.000 | - | 238.600 | 8.460.107 |
| Technological equipment | 12.821.008 | 12.864 | 339.085 | 140 | 13.172.817 |
| Control and measurement devices | 282.815 | 3.399 | - | 5.740 | 280.474 |
| Means of transport | 3.664.678 | - | - | 40.255 | 3.624.423 |
| Furniture, office equipment | 304.418 | 2.824 | - | 175 | 307.067 |
| Tangible assets under construction | 1.233.350 | 41.514 | 308.107 | 358.171 | 1.224.800 |
| Other non-current receivables | 14.614 | 2.000 | - | 3.258 | 13.356 |
| **TOTAL** | **27.564.387** | **280.998** | **647.192** | **655.899** | **27.836.678** |

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:34 PM, Submission Status: Approved

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

**NOTES TO FINANCIAL SITUATIONS**
**FOR THE FINANCIAL EXERCISE 01.01 - 31.12.2018 (Lei)**
**3. Tangible and intangible assets – Continued**

Depreciation

| Immobilizing elements | Balance at 01/01/2018 | Depreciation | Depreciation related to the asset removed/revaluation | Depreciation at 31.12.2018 |
|---|---|---|---|---|
| Other immobilizations | 145,033 | 27.290 | - | 172.323 |
| Construction, landscaping | 1.661.171 | 264.822 | 41.897 | 1.884.096 |
| Technical installations and machinery | 11.215.484 | 1.274.435 | 46.134 | 12.443.785 |
| Other installations, machinery and furniture | 197,654 | 20.865 | 175 | 218.322 |
| TOTAL | 13.219.342 | 1.587.412 | 88.206 | 14.718.548 |

**4. Provisions**

| Provision name | Balance at | Transfers | | Balance at 31.12.2018 |
|---|---|---|---|---|
| | | to account | from account | |
| Provisions for non-incumbent clients | 584.346 | - | 49.497 | 534.849 |

**5. Repartizarea profitului**

| | |
|---|---|
| GROSS PROFIT | 473.774 |
| Tax profit | 112.891 |
| NET PROFIT TO BE DISTRIBUTED | 360.883 |
| Retained earnings representing surplus from revaluation reserves | 225.090 |
| Increasing the legal reserve due to the increase of the share capital | 23.689 |
| Reserves for own financing sources | 562.284 |

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:34 PM, Submission Status: Approved

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

**NOTES TO FINANCIAL SITUATIONS**
**FOR THE FINANCIAL EXERCISE 01.01 - 31.12.2018 (Lei)**
**6. Receivables and debts**

| RECEIVABLES | Balance at 31.12.2018 | Liquidity term | |
|---|---|---|---|
| | | Under 1 year | Over 1 year |
| **Total, out of which:** | 6.095.544 | 6.095.544 | |
| Customers | 4.387.674 | 4.387.674 | |
| Uncertain customers | 1.188.934 | 1.188.934 | |
| Debtors | 193.687 | 193.687 | |
| Other receivables related to staff | 31.427 | 31.427 | |
| Employer contribution leaves | 241.775 | 241.775 | |
| Different debitors | 39.876 | 39.876 | |
| Other receivables | 5.079 | 5.079 | |
| VAT under settlement | 7.092 | 7.092 | |

| DEBTS | Balance at 31.12.2018 | Time limit for eligibility | | |
|---|---|---|---|---|
| | | Under 1 year | 1-5 years | Over 5 years |
| Total, out of which: | 7.461.386 | 7.461.386 | | |
| Suppliers | 2.062.081 | 2.062.081 | | |
| Real estate suppliers | 24.147 | 24.147 | | |
| Customer creditors | 1.611.087 | 1.611.087 | | |
| Contributions to social insurance | 300.617 | 300.617 | | |
| Contributions to unemployment | 19.551 | 19.551 | | |
| Payroll tax | 45.482 | 45.482 | | |
| Staff debt | 540.825 | 540.825 | | |
| Other taxes and fees | 7.653 | 7.653 | | |
| Credit line in lei | 1.647.072 | 1.647.072 | | |
| Credit line in foreign currency | 527.143 | 527.143 | | |
| Profit tax | 112.891 | 112.891 | | |
| Medium-term bank loans | 420.753 | 420.753 | | |
| VAT on payment | 24.608 | 24.608 | | |
| Various creditors | 1.589 | 1.589 | | |
| Other loans | 7.957 | 7.957 | | |
| Debts to other creditors | 107.930 | 107.930 | | |

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:34 PM, Submission Status: Approved

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

**NOTES TO FINANCIAL SITUATIONS**
**FOR THE FINANCIAL EXERCISE 01.01 - 31.12.2018 (Lei)**

### 7. Analysis of operating result

| No. | INDICATOR | PREVIOUS EXERCISE (2017) | CURRENT EXERCISE (2018) |
|---|---|---|---|
| 1 | Net turnover + stocks fluctuation | 32.347.136 | 34.682.935 |
| 2 | Cost of goods sold and services rendered (3+4+5) | 27.626.962 | 30.703.287 |
| 3 | Expenditure on basic activity | 18.568.260 | 21.270.123 |
| 4 | Expenditure on basic activity | 864.543 | 920.574 |
| 5 | Indirect production expenses | 8.194.159 | 8.512.590 |
| 6 | Gross net turnover (1-2) | 4.720.174 | 3.979.648 |
| 7 | Expenditure on sales | 298.664 | 109.792 |
| 8 | General administrative expenses | 4.918.639 | 4.383.473 |
| 9 | Other operating revenues | 2.178.890 | 2.489.925 |
| 10 | Other operating expenses | 1.224.974 | 1.337.915 |
| 11 | Operating result (6-7-8+9-10) | 456.787 | 638.393 |

### 8. Social capital

On 31.12.2018, the subscribed and paid-up share capital of S.C. SIGSTRAT S.A. is worth 2.325.077 lei, representing 23.250.770 shares, with a nominal value of 0.1 lei/share.

Shares are joint, nominative and dematerialized.

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

20

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

**NOTES TO FINANCIAL SITUATIONS**
**FOR THE FINANCIAL EXERCISE 01.01 - 31.12.2018 (Lei)**
**9. Economic indicators**

| Indicator Name | Formula | Unit of measurement | 31.12.2018 | 31.12.2017 |
|---|---|---|---|---|
| Fiscal value | | lei | 27.093.475 | 28.835.201 |
| Net asset | Total Assets-Total Debt | lei | 20.639.034 | 20.278.153 |
| Operating profit | | lei | 638.393 | 456.787 |
| Operating profit rate | (Operating Income / Turnover) * 100 | % | 2,36 | 1,58 |
| Cost-effectiveness | (Operating Income / Total Expenses) * 100 | % | 2,75 | 1,24 |
| Gross profit | | lei | 473.774 | 106.674 |
| Profit gross margin | (Gross Profit / Turnover) * 100 | % | 1,75 | 0,37 |
| Profit tax | | lei | 112.891 | 47.930 |
| Net income | | lei | 360.883 | 58.744 |
| Net profit margin | (Net profit / Turnover) * 100 | % | 1,33 | 0,20 |
| Rate of financial return | (Net profit / equity) * 100 | % | 1,75 | 0,29 |
| Return rate of the total asset | (Net Assets / Total Assets) * 100 | % | 1,28 | 0,21 |
| Ratio of return on the current asset | (Net / Circulating Profit) * 100 | % | 2,43 | 0,42 |
| The liquidity degree of the total asset | (Circulating Assets / Total Assets * 100 | % | 52,94 | 49,39 |
| Speed of rotation of total assets | Turnover / Total assets | | 0,96 | 1,01 |
| Speed of rotation of fixed assets | Turnover / Fixed Assets | | 2,07 | 2,01 |
| General liquidity | (Circulating Asset / Current Debt) * 100 | % | 199,37 | 181,13 |
| Current liquidity | (Circulating Assets) / Current liabilities * 100 | % | 89,76 | 87,14 |
| Immediate liquidity | (Availability / Current Debt) * 100 | % | 15,23 | 19,33 |
| Atrimonial solvency | (Equity / Total liabilities) * 100 | % | 73,45 | 71,25 |
| Overall solvency | (Total Assets / Third Bonds) * 100 | % | 376,61 | 366,73 |

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:34 PM, Submission Status: Approved

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

| Degree of indebtedness | (Current / Total Assets) * 100 | % | 26,55 | 27,27 |
|---|---|---|---|---|
| Average debt collection time | (Total Receivables / Total Income) * 360 | days | 53,57 | 54,50 |
| Average payment time for debt | (Total Liabilities / Total Income) * 360 | days | 71,88 | 80,37 |
| Number of rotation of stocks | Turnover / Total stocks | | 3,31 | 3,95 |
| Inventory utilization rate | (Total Income / Total Inventory) * 100 | % | 456,91 | 476,59 |
| Overall rate of indebtedness | (Total Debt / Equity) * 100 | % | 36,15 | 40,34 |
| The degree of risk | (Loans / Equity) * 100 | % | 0,00 | 0,02 |

## 10. Other Information

S.C. SIGSTRAT S.A. was founded as a joint-stock company through HD no. 753/1992 and it performs its activity in accordance with the applicable Romanian legislation, in collaboration with the provisions of the Constitutive Act.

Its main activity, according to CAEN, is "Manufacturing of veneer and wooden panels" (CAEN Code 1621).

The headquarters of the company are in Sighetu Marmatiei, No.40, Unirii Street, Maramures county. The company does not have secondary offices or work points.

Foreign currency transactions have been accounted for at exchange rates at the date of the transaction. Losses or gains on foreign exchange differences have been recognized on the income statement. At the end of each month, foreign currency receivables and debts were valued at the exchange rate of the foreign exchange market communicated by the NBR on the last banking day of the month, and the exchange rate differences recorded were accounted for in income or differences in bookkeeping the exchange rate.

In establishing the taxable profit and profit tax for 2018, the provisions of the Law no. 227/2015 on the Fiscal Code were taken into account, the tax rate at 31.12.2018 being 16% and the profit tax at the end of the year 2018 was worth 112.891 lei.

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:34 PM, Submission Status: Approved

Barcode:3875858-06 A-570-106 INV - Investigation  -

SIGSTRAT S.A.

**NOTES TO FINANCIAL SITUATIONS**
**FOR THE FINANCIAL EXERCISE 01.01 - 31.12.2018 (Lei)**

**10. Other Information (continued)**

The total turnover of 27.093.475 lei resulted in the following revenues:

a)   Revenues from the sale of products amounting to 24.376.052 lei, with the following structure by products:

lei -

| PRODUCT NAME | VALUE (lei) |
|---|---|
| - plywood interior use | 12.197.902 |
| - veneer | 584.842 |
| - molded products | 11.539.443 |
| - lighters | 53.865 |
| TOTAL | 24.376.052 |

b) Revenues from the sale of semi-finished products      471.284 lei
c) Revenues from sale of residual products      747.671 lei
d) Revenues from executed works and rendered services      1.194.913 lei
e) Rent income      139.046 lei
f) Revenues from goods sale      165,885 lei
g) Commercial discounts granted      -1.376 lei

The Company did not record extra income or expenses during 2018.

The balance of account 471, worth 106.682 lei, represents the expenses made in advance for the next financial year, such as subscriptions, buildings insurance, equipment, means of transport, etc.

There were no earnings in advance.

The notes on pages 11 to 23 are an integral part of the financial statements presented on pages 7 to 10.

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:34 PM, Submission Status: Approved

Barcode:3875858-06 A-570-106 INV - Investigation  -

# MINISTER OF PUBLIC FINANCE

# NATIONAL FISCAL ADMINISTRATION AGENCY

**Uploading index: 172650123/ 25.04.2019**

You have submitted a S1002 form having the registration no **INTERNT – 172650123 – 2019** from **25.04.2019** for the financial year ended 31st Dec 2018, for CIF (VAT no) **2954386**

There are no validation errors.

Barcode:3875858-06 A-570-106 INV - Investigation -

F10 – page 1

**BALANCE SHEET**
as at 31.12.2018

Code 10                                                                                                          - lei -

| Description | Row number 10/ 03.01.19 | Row numbe r | Balance at: | |
|---|---|---|---|---|
| | | | 01.01.2018 | 31.12.2018 |
| A | | B | 1 | 2 |
| **A. NON-CURRENT ASSETS** | | | | |
| **I. INTANGIBLES** | | | | |
| 1. Set-up costs (acc 201-2801) | 01 | 01 | | |
| 2. Development expenses (acc 203-2801-2903) | 02 | 02 | | |
| 3. Concessions rights, patents, licenses, trademarks and other similar rights and other intangible assets (acc 205+208-2805-2808-2905-2908) | 03 | 03 | 169.895 | 164.002 |
| 4. Goodwill  (acc 2071-2807) | 04 | 04 | | |
| 5. Intangible assets for exploration and evaluation of mineral resources (acc 206-2806-2906) | 05 | 05 | | |
| 6. Advances (acc 4094) | 06 | 06 | | |
| **TOTAL (rows 01 to 06)** | **07** | **07** | 169.895 | 164.002 |
| **II. PROPERTY, PLANT AND EQUIPMENT** | | | | |
| 1. Land and buildings(acc 211+212-2811-2812-2911-2912) | 08 | 08 | 7.267.405 | 6.993.320 |
| 2. Technical equipment & machinery (acc 213+223-2813-2913) | 09 | 09 | 5.553.017 | 4.633.929 |
| 3. Other equipment & furniture (acc 214+224-2814-2914) | 10 | 10 | 106.764 | 88.723 |
| 4. Investment properties  (acc 215-2815-2915) | 11 | 11 | | |
| 5. Tangible assets in progress  (acc 231-2931) | 12 | 12 | 1.179.078 | 1.170.528 |
| 6. Investment property in progress (acc 235-2935) | 13 | 13 | | |
| 7. Tangible assets for exploration and evaluation of mineral resources  (acc 216-2816-2916) | 14 | 14 | | |
| 8. Bearer biological assets (acc 217+227-2817-2917) | 15 | 15 | | |
| 9. Advances  (acc 4093) | 16 | 16 | 54.272 | 54.272 |
| **TOTAL (rows 08 to 16)** | 17 | 17 | 14.160.536 | 12.940.772 |
| **III. FINANCIAL INVESTMENTS** | | | | |
| 1. Shares in subsidiaries (acc 261-2961) | 18 | 18 | | |
| 2. Intragroup loans  (acc 2671+2672-2964) | 19 | 19 | | |
| 3. Shares in associates and jointly controlled entities (acc 262+263-2962) | 20 | 20 | | |
| 4. Loans given to associates and jointly controlled entities (acc 2673+2674-2965) | 21 | 21 | | |
| 5. Other non-current investments (acc 265+266-2963) | 22 | 22 | | |
| 6. Other loans (acc 2675*+2676*+2677*+2678*+2679*-2966*-2968*) | 23 | 23 | 14.614 | 13.356 |
| **TOTAL (rows 18 to 23)** | 24 | 24 | 14.614 | 13.356 |
| **NON-CURRENT ASSETS – TOTAL (rows 07+17+24)** | 25 | 25 | 14.345.045 | 13.118.130 |

Barcode:3875858-06 A-570-106 INV - Investigation  -

| | | | | F10 – page 2 |
|---|---|---|---|---|
| **B.** | **CURRENT ASSETS** | | | |
| | **I. INVENTORIES** | | | |
| | 1. Raw materials and consumables (acc 301+302+303+/-308+321+322+323+328+351+358+381+/-388-391-392-3951-3958-398) | 26 | 26 | 2.236.808 | 2.680.300 |
| | 2. Work in progress (acc331+332+341+/-348*-393-3941-3952) | 27 | 27 | 961.327 | 1.188.774 |
| | 3. Finished goods and merchandise (acc 345+346+347+/-348+354+356+357+361+326+/-368+371+327+/-378-3945-3946-3947-3953-3954-3955-3956-3957-396-397-from acc 4428) | 28 | 28 | 3.664.861 | 3.843.275 |
| | 4. Advances (acc 4091) | 29 | 29 | 430.517 | 465.900 |
| | **TOTAL (rows 26 to 29)** | 30 | 30 | 7.293.513 | 8.178.249 |
| | **II. RECEIVABLES** | | | |
| | 1. Trade receivables (acc 2675*+2676*+2678*+2679*-2966*-2968*+4092+411+413+418-491) | 31 | 31 | 4.990.592 | 5.235.446 |
| | 2. Receivables from subsidiaries (acc 451**-495*) | 32 | 32 | | |
| | 3. Receivables from associates and jointly controlled entities (acc 453**-495*) | 33 | 33 | | |
| | 4. Other receivables (acc 425+4282+431**+436**+437**+4382+441+4424+from acc 4428**+444*+445+446**+447**+4482+4582+4662+461+473-496+5187)) | 34 | 34 | 271.457 | 325.249 |
| | 5. Share capital called up but not paid up (acc 456-495*) | 35 | 35 | | |
| | 6. Receivables representing dividends distributed during the financial year  (acc 463) | 36 | 35a (301) | | |
| | **TOTAL (rows 31 to 35+35a))** | 37 | 36 | 5,262,049 | 5,560,695 |
| | **III. SHORT-TERM INVESTMENTS** | | | |
| | 1. Shares in subsidiaries (acc 501-591) | 38 | 37 | | |
| | 2. Other short-term investments (acc 505+506+507+from acc 508-595-596-598+5113+5114) | 39 | 38 | | |
| | **TOTAL (rows 37 to 38)** | 40 | 39 | | |
| | **IV. PETTY CASH AND BANK ACCOUNTS** (from acc508+acc 5112+512+531+532+541+542) | 41 | 40 | 1.500.059 | 1.136.664 |
| | **CURRENT ASSETS (rows 30 + 36 + 39 + 40)** | 42 | 41 | 14.055.621 | 14.875.608 |
| **C.** | **PREPAYMENTS (rows 44 + 43)** (acc 471) | 43 | 42 | 57.908 | 106.682 |
| | Amounts to be reversed in a period below one year  (from acc 471) | 44 | 43 | 57.908 | 106.682 |
| | Amounts to be reversed in a period above one year  (from acc 471) | 45 | 44 | | |
| **D.** | **LIABILITIES: AMOUNTS PAYABLE IN A PERIOD BELOW ONE YEAR** | | | |
| | 1. Debenture loans  (acc 161+1681-169) | 46 | 45 | | |
| | 2. Bank loans (acc acc 1621+1622+1624+1625+1627+1682+5191+5192+5198) | 47 | 46 | 2.579.792 | 2.594.968 |
| | 3. Advance payments from customers (acc 419) | 48 | 47 | 1.648.872 | 1.611.087 |
| | 4. Trade suppliers (acc 401+404+408) | 49 | 48 | 2.442.901 | 2.086.228 |
| | 5. Trade notes payable  (acc 403+405) | 50 | 49 | | |
| | 6. Intragroup payables  (acc 1661+1685+2691+451***) | 51 | 50 | | |
| | 7. Amounts due to associates and jointly controlled entities (acc 1663+1686+2692+2693+453***) | 52 | 51 | | |

| | | | F10 – page 3 |
|---|---|---|---|
| 8. Other payables (including debts to the state budget and social security budget (acc 1623+1626+167+1687+2695+421+423+424+426+427+4281+431***+436***+437***+4381+441***+4423+4428***+444***+446***+447***+4481+455+456***+457+4581+462+4661+473***+509+5186=5193+5194+5195+5196+5197) | 53 | 52 | 1.088.481 | 1.169.103 |
| TOTAL (rows 45 to 52) | 54 | 53 | 7.760.046 | 7.461.386 |
| E. NET CURRENT ASSETS/NET CURRENT LIABILITIES (rows 41+43-53-70-73-76) | 55 / 54 | | 6.353.483 | 7.520.904 |
| F. TOTAL ASSETS MINUS CURRENT LIABILITIES (rows 25+44+54) | 56 | 55 | 20.698.528 | 20.639.034 |
| G. LIABILITIES: AMOUNTS PAYABLE IN A PERIOD ABOVE ONE YEAR | | | | |
| 1. Debenture loans  (acc 161+1681-169) | 57 | 56 | | |
| 2. Bank loans (acc 1621+1622+1624+1625+1627+1682+5191+5192+5198) | 58 | 57 | 420.375 | |
| 3. Advance payments from customers (acc 419) | 59 | 58 | | |
| 4. Trade suppliers (acc 401+404+408) | 60 | 59 | | |
| 5. Trade notes payable  (acc 403+405) | 61 | 60 | | |
| 6. Intragroup payables  (acc 1661+1685+2691+451***) | 62 | 61 | | |
| 7. Payables to associates and jointly controlled entities (acc 1663+1686+2692+2693+453***) | 63 | 62 | | |
| 8. Other payables (including debts to the State Budget and Social Security Budget) (acc 1623+1626+167+1687+2695+421+423+424+426+427+4281+431***+436***+437***+4381+441***+4423+4428***+444***+446***+447***+4481+455+456***+4581+462+473***+509+5186+5193+5194+5195+5196+5197) | 64 | 63 | | |
| TOTAL (rows 56 to 63) | 65 | 64 | 420.375 | |
| H. PROVISIONS | | | | |
| 1. Provisions for employee benefits  (acc 1515+1517) | 66 | 65 | | |
| 2. Provisions for taxes (acc 1516) | 67 | 66 | | |
| 3. Other provisions (acc 1511+1512+1513+1514+1518) | 68 | 67 | | |
| TOTAL (rows 65 to 67) | 69 | 68 | | |
| I. DEFERRED INCOME | | | | |
| 1. Investment subsidies  (acc 475) (rows 70+71) | 70 | 69 | | |
| Amounts to be reversed in a period below one year (acc 475*) | 71 | 70 | | |
| Amounts to be reversed in a period above one year (acc 475*) | 72 | 71 | | |
| 2. Deferred income – total (acc 472*) (rows 73 + 74), out of which: | 73 | 72 | | |
| Amounts to be reversed in a period below one year (acc 472*) | 74 | 73 | | |
| Amounts to be reversed in a period above one year (acc 472*) | 75 | 74 | | |
| 3. Deferred income related to assets received from clients  (acc 478) (rows 77 + 76) | 76 | 75 | | |
| Amounts to be reversed in a period below one year (from  acc 478*) | 77 | 76 | | |
| Amounts to be reversed in a period above one year (from  acc 478*)) | 78 | 77 | | |
| Negative goodwill (acc 2075) | 79 | 78 | | |
| TOTAL (rows 69 + 72 + 75 + 78) | 80 | 79 | | |
| J. CAPITAL AND RESERVES | | | | |
| I. CAPITAL | | | | |
| 1. Paid in capital (acc 1012) | 81 | 80 | 2.325.077 | 2.325.077 |

Barcode:3875858-06 A-570-106 INV - Investigation -

F10 – page 4

| | | | | | |
|---|---|---|---|---|---|
| 2. Un-paid capital (acc 1011) | | 82 | 81 | | |
| 3. State regis patrimony (State-owned shares) (acc 1015) | | 83 | 82 | | |
| 4. Patrimony of research and development national institutes (Acc. 1018) | | 84 | 83 | | |
| 5. Other equity items (acc 1031) | | 85 | 84 | | |
| **TOTAL (rows 80 to 84)** | | **86** | **85** | 2.325.077 | 2.325.077 |
| **II. SHARE PREMIUM** (acc 104) | | **87** | **86** | | |
| **III. REVALUATION RESERVE** (acc 105) | | **88** | **87** | 4.401.197 | 4.176.106 |
| **IV. RESERVES** | | | | | |
| 1. Legal reserves (acc 1061) | | 89 | **88** | 411.896 | 435.584 |
| 2. Statutory and contractual reserves (acc 1063) | | 90 | 89 | | |
| 3. Other reserves (acc 1068) | | 91 | 90 | 13.124.328 | 13.205.100 |
| **TOTAL (rows 88 to 90)** | | **92** | **91** | 13.536.224 | 13.640.684 |
| Own shares (acc 109) | | 93 | 92 | | |
| Gains related to own shares instruments (acc 141) | | 94 | 93 | | |
| Losses related to own shares instruments (acc 149) | | 95 | 94 | 65.117 | 65.117 |
| **V. PROFIT OR LOSS CARRIED FORWARD** | **CR balance (acc117)** | **96** | **95** | 27.362 | 225.090 |
| | **DR balance (acc117)** | **97** | **96** | | |
| **VI. PROFIT OR LOSS FOR THE YEAR** | | **98** | | | |
| | **CR balance (acc121)** | | **97** | 58.744 | 360.883 |
| | **DR balance (acc121)** | **99** | **98** | | |
| Profit appropriation (acc 129) | | **100** | **99** | 5.334 | 23.689 |
| **EQUITY – TOTAL**<br>**(rows 85+86+87+91+92-93-94+95-96+97-98-99)** | | **101** | **100** | 20.278.153 | 20.639.034 |
| Public patrimony (acc 1016) | | 102 | 101 | | |
| Private patrimony (acc 1017[2]) | | 103 | 102 | | |
| **CAPITAL – TOTAL (rows 100+101+102) (rd 25+41+42-53-64-68-79)** | | **104** | **103** | 20.278.153 | 20.639.034 |

Check amount F10:       408268369/1274160645

\*)   accounts to classify based on the elements nature

\*\*)   debit balances of the respective accounts

\*\*\*)   credit balances of the respective accounts

1) The amounts recorded on this row and taken from accounts 2675 to 2679 represent receivables afferent to finance lease contracts plus other similar contracts, as well as other receivables falling due within 1 year.

2) Applicable to the companies which are subject to the provisions of Minister of Public Finance Order 668/2014. The order was issued for approving the indications for setting up and updating the centralized stock count of

| ADMINISTRATOR, | PREPARED BY, |
|---|---|
| Name and surname | Name and surname<br><br>EC. MUJDAR ERIKA |
| ING. KERTESZ STEFAN | Position |
| | 11 - CFO |
| Signature _____ | Signature_____ |
| Company stamp | Registration number of professional organization |

Barcode:3875858-06 A-570-106 INV - Investigation  -

F20 – page 1

# INCOME STATEMENT
## as at 31.12.2018

Code 20                                                                         - lei -

| Description | | Nr. rd. | Year ended | |
|---|---|---|---|---|
| | | | 2017 | 2018 |
| A | | B | 1 | 2 |
| 1. **Net turnover (rows 02+03–04+05+06)** | | 01 | 28.835.201 | 27.093.475 |
| Sold production (acc701+702+703+704+705+706+708) | | 02 | 28.729.957 | 26.928.966 |
| Income from sale of goods (acc707) | | 03 | 105.244 | 165.885 |
| Commercial discounts awarded (acc709) | | 04 | | 1.376 |
| Income from interest carried by the entities erased from the General Records and which still have lease contracts in progress (acc766*) | | 05 | | |
| Income from operating subsidies related to net turnover (acc7411) | | 06 | | |
| 2. Income related to the costs of work in progress  (acc711+712) | Balance C | 07 | 3.511.935 | 7.589.460 |
| | Balance D | 08 | 0 | 0 |
| 3. Income from intangible and tangible assets production  (acc721+722) | | 09 | 319.851 | 308.107 |
| 4. Income from revaluation of tangible assets  (acc755) | | 10 | | |
| 5. Income from production of investment properties (acc725) | | 11 | | |
| 6. Income from operating subsidies (acc7412+7413+7414+7415+7416+7417+7419) | | 12 | | |
| 7. Other operating income (acc751+758+7815) | | 13 | 1.859.039 | 2.181.818 |
| - out of which, revenues from negative goodwill (acc7815) | | 14 | | |
| - out of which, revenues from investment subsidies  (acc7584) | | 15 | | |
| **OPERATING INCOME - TOTAL** **(rows 01 + 07 – 08 + 09 + 10 + 11 + 12 + 13)** | | 16 | 34.526.026 | 37.172.860 |
| 8. a) Raw materials and consumables expenses (acc601+602) | | 17 | 15.791.056 | 18.581.300 |
| Other material expenses (acc603+604+606+608) | | 18 | 29.578 | 26.641 |
| b) Other external expenses (with energy and water) (acc605) | | 19 | 1.451.981 | 1.534.472 |
| c) Cost of goods sold(acc607) | | 20 | 71.124 | 81.905 |
| Commercial discounts received (acc609) | | 21 | | |
| 9. Personnel expenses (rows 23 + 24), out of which: | | 22 | 12.492.778 | 12.458.240 |
| a) Salaries and wages (acc641+642+643+644) | | 23 | 10.207.608 | 12.083.321 |
| b) Social security costs (acc645+646) | | 24 | 2.285.170 | 374.919 |
| 10. a) Adjustment to tangible and intangible assets value (row 26 - 27) | | 25 | 1.863.557 | 1.587.412 |
| a.1) Expenses (acc6811+6813+6817) | | 26 | 1.863.557 | 1.587.412 |
| a.2) Income  (acc7813) | | 27 | | |
| b) Adjustment of the value of current assets (row 29 - 30) | | 28 | | -49.497 |
| b.1) Expenses (acc654+6814) | | 29 | | |

Barcode:3875858-06 A-570-106 INV - Investigation  -

F20 – page 2

| | | | | |
|---|---|---|---|---|
| | b.2) Income  (acc754+7814) | 30 | | 49.497 |
| 11. | Other operating expenses (rows 32 to 38) | 31 | 2.509.165 | 2.313.994 |
| | 11.1. Expenses regarding external services (acc611+612+613+614+615+621+622+623+624+625+626+627+628) | 32 | 2.113.680 | 1.852.500 |
| | 11.2. Expenses with other taxes, duties and assimilated payments; expenses representing transfers and contributions payable under specific normative acts (acc635+6586*) | 33 | 224.108 | 217.653 |
| | 11.3 Environmental protection expenses  (acc652) | 34 | | |
| | 11.4 Expenses from revaluation of tangible assets  (acc655) | 35 | | |
| | 11.5 Natural disasters and other similar events expenses  (acc6587) | 36 | | |
| | 11.6 Other expenses  (acc651+6581+6582+6583+6584+6588) | 37 | 171.377 | 243.841 |
| | Expenses on refinancing interest carried by the entities erased from the General Records and which still have lease contracts in progress  (acc666*) | 38 | | |
| | **Adjustments related to provisions (row 40-41)** | **39** | -140.000 | |
| | - Expenses (acc6812) | 40 | | |
| | - Income (acc7812) | 41 | 140.000 | |
| | **OPERATING EXPENSES - TOTAL (acc7 (rows 17 to 20 -21 + 22 + 25 + 28 + 31 + 39)** | **42** | 34.069.239 | 36.534.467 |
| | **OPERATING PROFIT/LOSS** | | | |
| | **- Profit (rows 16 - 42)** | **43** | 456.787 | 638.393 |
| | **- Loss (rows 42 - 16)** | **44** | 0 | 0 |
| 12. | Income from financial investments (subsidiaries and associates) (acc 7611+7612+7613) | 45 | | |
| | - out of which, income from subsidiaries | 46 | | |
| 13. | Interest income (acc766) | 47 | 64 | 38 |
| | - out of which, income from affiliates | 48 | | |
| 14. | Income from operating subsidies for the interest owed (7418) | 49 | | |
| 15. | Other financial income (acc762+764+765+767+768+7615) | 50 | 234.184 | 193.953 |
| | - out of which, income from other financial investments  (acc7615) | 51 | | |
| | **FINANCIAL INCOME - TOTAL (rows 45 + 47 + 49 + 50)** | **52** | 234.184 | 193.953 |
| 16. | Adjustment of the value of financial assets and financial investments held as current assets (row 54 - 55) | 53 | | |
| | - Expenses (acc686) | 54 | | |
| | - Income (acc786) | 55 | | |
| 17. | Expenses on interest (acc666*) | 56 | 127.043 | 120.344 |
| | - out of which, expenses in relation with affiliates | 57 | | |
| | Other financial expenses (acc663+664+665+667+668) | 58 | 457.318 | 238.266 |
| | **FINANCIAL EXPENSES - TOTAL (rows 53 + 56 + 58)** | **59** | 584.361 | 358.610 |
| | **FINANCIAL PROFIT / LOSS** | | | |
| | **- Profit (rows 52 - 59)** | **60** | 0 | 0 |
| | **- Loss (rows 59 - 52)** | **61** | 350.113 | 164.619 |

Barcode:3875858-06 A-570-106 INV - Investigation  -

|  |  |  | F20 – page 3 | |
|---|---|---|---|---|
|  | **TOTAL INCOME (rows 16 + 52)** | 62 | 34.760.274 | 37.366.851 |
|  | **TOTAL EXPENSES (rows 42 + 59)** | 63 | 34.653.600 | 36.893.077 |
| 18. | **GROSS PROFIT OR LOSS** |  |  |  |
|  | - **Profit (rows 62 - 63)** | 64 | 106.674 | 473.774 |
|  | - **Loss (rows 63 - 62)** | 65 | 0 | 0 |
| 19. | Income tax (acc 691) | 66 | 47.930 | 112.891 |
| 20. | Income tax specific to certain activities (acc695) | 67 |  |  |
| 20. | Other taxes not presented among the above items (acc698) | 68 |  |  |
| 21 | **FINANCIAL YEAR NET PROFIT OR LOSS:** |  |  |  |
|  | - **Profit (rows 64 -66 -67 - 68)** | 69 | 58.744 | 360.883 |
|  | - **Loss (rows 65 + 66 + 67 + 68-64)** | 70 | 0 | 0 |

Check amount F20: 523138285/ 1274160645

*)  Accounts to be classified according to the nature of the respective elements

On row 23 – will be included the collaborators rights, as provided by the labour legislation. They are taken from the debit movement of account 621 "Expenses with collaborators", analytical account "Collaborators – Individuals".

|  |  |
|---|---|
| **ADMINISTRATOR,** | **PREPARED BY,** |
| Name and surname | Name and surname |
|  | Ec. Mujdar Erika |
| Ing. Kertesz Stefan | Position |
|  | CFO |
| Signature | Signature |
| Company stamp | Registration number of professional organization |

Barcode:3875858-06 A-570-106 INV - Investigation  -

F30 – page 1

# INFORMATIVE DATA
### as at 31.12.2018

**Code 30-**                                                                lei -

| I. Data relating to the net result | Row no | Row no | No of units | Amounts | |
|---|---|---|---|---|---|
| **A** | | **B** | **1** | **2** | |
| Units with profit | 01 | 01 | 1 | 360.883 | |
| Units with loss | 02 | 02 | | | |
| Units with neither profit, nor loss | 03 | 03 | | | |

| II. Information on outstanding payments | | Row no | Total | Out of which: | |
|---|---|---|---|---|---|
| | | | | For current activity | For investments |
| **A** | | **B** | **1=2+3** | **2** | **3** |
| Outstanding payments - total (row 05+09+15 to 17+18) of which: | 04 | 04 | 1.270.275 | 1.246.129 | 24.146 |
| Outstanding suppliers - total (row 06 to 08), out of which: | 05 | 05 | 1.162.345 | 1.138.199 | 24.146 |
| - above 30 days | 06 | 06 | 150.868 | 150.868 | |
| - above 90 days | 07 | 07 | 144.650 | 144.650 | |
| - above 1 year | 08 | 08 | 866.827 | 842.681 | 24.146 |
| Outstanding liabilities to social securities budget - total (row 10 to 14), out of which | 09 | 09 | | | |
| - contributions to state social securities due by employers, employees and other persons related | 10 | 10 | | | |
| - contributions to health fund | 11 | 11 | | | |
| - contributions to supplementary pension fund | 12 | 12 | | | |
| - contributions to unemployment fund | 13 | 13 | | | |
| - other social liabilities | 14 | 14 | | | |
| Outstanding liabilities to special funds budgets and other funds | 15 | 15 | | | |
| Outstanding liabilities to other creditors | 16 | 16 | 107.930 | 107.930 | |
| Outstanding taxes to the State Budget not paid at due term, out of which: | 17 | 17 | | | |
| -mandatory labor contribution | 18 | 17a (301) | | | |
| Outstanding taxes to the local budget not paid at due term | 19 | 18 | | | |

| III. Average number of employees | Row no | Row no | 31.12.20172017 | 31.12.2018 |
|---|---|---|---|---|
| **A** | | **B** | **1** | **2** |
| Average number of employees | 20 | 19 | 364 | 333 |
| Average number of employees at period end, 31 December | 21 | 20 | 335 | 326 |

| IV. Royalties paid within the reporting period, grants received and outstanding receivables | Row no | Row no | Amounts (lei) |
|---|---|---|---|
| **A** | | **B** | **1** |
| Royalties paid within the reporting period, for the assets in the public sector, used in concession agreements, out of which: | 22 | 21 | |
| Royalties paid to the state budget for the assets in the public sector, used in concession agreements | 23 | 22 | |
| Mining royalty paid to the state budget | 24 | 23 | |

Barcode:3875858-06 A-570-106 INV - Investigation  -

| | | | F30 – page 2 | |
|---|---|---|---|---|
| Oil royalty paid to the state budget | 25 | 24 | | |
| Leases for land paid within the reporting period [1] | 26 | 25 | | |
| Gross income from services paid to non-resident individuals, out of which: | 27 | 26 | | |
| - tax due to the State Budget | 28 | 27 | | |
| Gross revenues from services paid to non resident from  EU Member States, out of which: | 29 | 28 | | |
| - tax due to the State Budget | 30 | 29 | | |
| Grants received within the reporting period, out of which: | 31 | 30 | | |
| - Grants received within the reporting period related to assets | 32 | 31 | | |
| - Grants related to revenues, out of which: | 33 | 32 | | |
| -       Grants for employment improvement | 34 | 33 | | |
| Outstanding receivables, which were not collected by the due dates stipulated in the commercial contracts and/or in the current legislation, out of which: | 35 | 34 | | |
| -       Outstanding receivables from publc sector companies (either fully or majority owned by te state) | 36 | 35 | | |
| -       Outstanding receivables from private  sector companies | 37 | 36 | | |
| **V. Meal tickets given to employees** | Row no | Row no | **Amounts (lei)** | |
| A | | B | 1 | |
| Value of meal tickets given to employees | 38 | 37 | 788.133 | |
| Value of meal tickets given to others than employees | 39 | 37a | 1.020 | |
| **VI. R&D Expenses \*\*)** | Row no | Row no | **31.12.2017** | **31.12.2018** |
| A | | B | 1 | 2 |
| R&D Expenses: | 40 | 38 | | |
| By financing sources: (row 40+41) | 41 | 39 | 0 | 0 |
| - from publc sources | 42 | 40 | | |
| - from private sources | 43 | 41 | | |
| By the nature of expenses: (row 43+44) | 44 | 42 | 0 | 0 |
| - current expenses | 45 | 43 | | |
| - capital expenses | 46 | 44 | | |
| **VII. Innovation expenses \*\*\*)** | Row no. | Row no. | **31.12.2017** | **31.12.2018** |
| A | | B | 1 | 2 |
| Innovation expenses: | 47 | 45 | | |
| **VIII. Other information:** | Row no. | Row no. | **31.12.2017** | **31.12.201818** |
| A | | B | 1 | 2 |
| Advances for intangible assets (acc 4094), out of which: | 48 | 46 | | |
| -       Advances for intangible assets, granted to unrelated  non-resident entities (acc 4094) | 49 | 46a | | |
| -       Advances for intangible assets, granted to related  non-resident entities (acc 4094) | 50 | 46b | | |
| Advances for tangible assets (acc 4093), out of which: | 51 | 47 | 54.272 | 54.272 |
| -       Advances for tangible assets, granted to unrelated  non-resident entities (acc 4093) | 52 | 47a | | |
| -       Advances for tangible assets, granted to related  non-resident entities (acc 4093) | 53 | 47b | | |
| **Long-term financial investments, gross amounts (row 49+54):** | 54 | 48 | 14.614 | 13.356 |

F30 – page 3

| | | | |
|---|---|---|---|
| Shares in subsidiaries, Investments in associates and other such investments and bonds, gross amounts (rows 50+51+52+53) | 55 | 49 | |
| Unquoted shares issued by residents | 56 | 50 | |
| Social parts issued by residents | 57 | 51 | |
| Shares and social parts issued by non-residents, out of which: | 58 | 52 | |
| -    Euql or above 10% owned | 59 | 52a | |
| Other bonds issued by non-residents | 60 | 53 | |
| Long term receivables, gross amounts (rows 55+56) | 61 | 54 | 14.614 | 13.356 |
| -    Long term receivables denominated in LEI, which are settled according to another currency rate (from acc 267) | 62 | 55 | 14.614 | 13.356 |
| -    Long term receivables denominated in foreign currency (from acc 267) | 63 | 56 | |
| Commercial receivables, advances for inventory and advances for services, gross amounts (acc 4091, 4092, 411,413,418), out of which: | 64 | 57 | 6.005.455 | 6.236.195 |
| -    Commercial receivables, advances for inventory and advances for services from unrelated, non-resident entities, gross amounts (from acc 4091, 4092, 411,413,418) | 65 | 58 | 2.216.142 | 2.550.824 |
| -    Commercial receivables, advances for inventory and advances for services from related, non-resident entities, gross amounts (from acc 4091, 4092, 411,413,418) | 66 | 58a | |
| Receivables not cashed at due date (from acc 4091,4092,411,413) | 67 | 59 | 4.539.195 | 4.517.477 |
| Receivables related to employees (acc 425,4282) | 68 | 60 | 47.261 | 31.427 |
| Receivables related to social securities budget and state budget (from acc 431, 436, 437, 4382, 441, 4424,4428,444,445,446,447,4482);(rows 62 to 66) | 69 | 61 | 175.475 | 248.867 |
| -    Receivables related to social securities budget (acc 431+437+4382)) | 70 | 62 | 165.138 | 241.775 |
| -    Fiscal receivables related to the state budget (acc 436, 441, 4424, 4428, 444, 446) | 71 | 63 | 10.337 | 7.092 |
| -    Grants to be received (acc 445) | 72 | 64 | |
| -    Special funds – taxes and assimilated payments (acc 447) | 73 | 65 | |
| -    Other receivables related to state budget (acc 4482) | 74 | 66 | |
| Company's receivables related to affiliates (acc 451), out of which: | 75 | 67 | |
| -    receivables from non-resident afiliates (from acc 451), out of which: | 76 | 68 | |
| - commercial receivables from non-resident afiliates (from acc 451) | 77 | 69 | |
| Receivables related to social securities budget and state budget – overdue (from acc 431, 436, 437, 4382, 441, 4424,4428,444,445,446,447,4482) | 78 | 70 | |

Barcode:3875858-06 A-570-106 INV - Investigation  -

F30 – page 4

| | | | | | |
|---|---|---|---|---|---|
| Other receivables (acc 453, 456, 4582, 461, 4662, 471, 473) **(rows 72 to 74)** | 79 | 71 | | 106.629 | 151.637 |
| - settlements related to investment in associates, to shareholders/ associates in respect of capital (from acc 453, 456, 4582) | 80 | 72 | | | |
| - other receivables related to individuals and companies, other than those related to state entities (from acc 461, 471, 473, 4662) | 81 | 73 | | 106.629 | 151.637 |
| - amounts taken from account 542, representing Cash advances, provided according to legislation in force and unsettled at year end (from acc 461) | 82 | 74 | | | |
| Interest receivable (acc 5187), out of which: | 83 | 75 | | | |
| - from non-residents | 84 | 76 | | | |
| Loans given to economic operators ****) | 85 | 77 | | | |
| Short term investments, gross amounts (acc 501, 505, 506,507,508) **(rows 79 to 82)** | 86 | 78 | | | |
| - unquoted shares issued by residents | 87 | 79 | | | |
| - social parts issued by residents | 88 | 80 | | | |
| - shares issued by non-residents | 89 | 81 | | | |
| - bonds issued by non-residents | 90 | 82 | | | |
| Other amounts to be collected (acc 5113+5114) | 91 | 83 | | | |
| Petty cash, LEI + other currencies **(rows 85+86)** | 92 | 84 | | | |
| - denominated in LEI (acc5113) | 93 | 85 | | | |
| - denominated in other ccy (acc5114) | 94 | 86 | | | |
| Cash in current bank accounts, LEI + other ccy **(rows 88+90):** | 95 | 87 | | 1.481.000 | 1.104.788 |
| - denominated in LEI (acc. 5121), out of which: | 96 | 88 | | 1.071.000 | 1.072.840 |
| - LEI accounts at non-resident banks | 97 | 89 | | | |
| - denominated in other ccy (acc. 5124) | 98 | 90 | | 410.000 | 31.948 |
| - Other ccy accounts at non-resident banks | 99 | 91 | | | |
| Other current bank accounts and accreditives (row 72 + 73), out of which: | 100 | 92 | | 5.011 | 13.954 |
| - collections in progress, accreditives and other amounts to be collected, denominated in LEI (acc. 5112 + 5125 + 5411) | 101 | 93 | | 5.011 | 13.954 |
| - collections in progress and accreditives denominated in other ccy (acc. 5125 + 5412) | 102 | 94 | | | |
| Liabilities (rows 96+99+102+103+106+108+110+111+116+119+122+128), out of which: | 103 | 95 | | 5.163.395 | 4.866.418 |
| - External long term bank loans (loans received from financial institutions with a duration equal or longer than 1 year) (fom acc 162) (row 97 + 98), out of which: | 104 | 96 | | | |
| - denominated in LEI | 105 | 97 | | | |
| - denominated in other ccy | 106 | 98 | | | |
| - External long term bank loans (acc. 1623 + 1624 + 1625), (row 100 + 101), out of which: | 107 | 99 | | | |
| - denominated in LEI | 108 | 100 | | | |
| - denominated in other ccy | 109 | 101 | | | |
| - Loans from public Treasurery, plus related interest (acc. 1626 + from acc. 1682) | 110 | 102 | | | |

F30 – page 5

| | | | | |
|---|---|---|---|---|
| - Other loans plus related interest(acc. 166 + 1685 + 1686 + 1687), **(row 104 + 105)**, out of which: | 111 | 103 | | |
| -  denominated in LEI, which are settled according to another currency rate | 112 | 104 | | |
| - in other ccy | 113 | 105 | | |
| Other loans and related liabilities (acc 167), out of which: | 114 | 106 | 7.957 | 7.957 |
| -     value of concessions received (from acc 167) | 115 | 107 | | |
| - Trade suppliers, advances received from clients and other similar accounts, gross amounts (acc. 401 + 403 + 404 + 405 + 408 + 419) | 116 | 108 | 4.074.914 | 3.697.315 |
| - Trade suppliers with unrelated non-resident entities, advances received from unrelated non-resident client entities and other similar accounts with unrelated non-resident entities, gross amounts (from acc 401 + 403 + 404 + 405 + 408 + 419) | 117 | 109 | 413.195 | 159.195 |
| - Trade suppliers with related non-resident entities, advances received from related non-resident client entities and other similar accounts with related non-resident entities, gross amounts (from acc 401 + 403 + 404 + 405 + 408 + 419) | 118 | 109a | | |
| -Payables related to employees and similar accounts(acc. 421 + 423 + 424 + 426 + 427 + 4281) | 119 | 110 | 543.693 | 540.825 |
| -Payables related to social securities budget and state budget (acc. 431 +436+ 437 + 4381 + 441 + 4423 + 4428 + 444 + 446 + 447 + 4481) (rows 112 to 115) | 120 | 111 | 427.212 | 510.802 |
| -     payables related to social securities budget (ac 431+437+4381) | 121 | 112 | 238.224 | 300.617 |
| -     fiscal payables related to state budget (ac 436+441+4423+4428+4381+446) | 122 | 113 | 185.380 | 202.532 |
| -     special funds – taxes and similar payables (ac 447) | 123 | 114 | 3.608 | 7.653 |
| -     other payables related to state budget (ac 4481) | 124 | 115 | | |
| - Company's payables to affiliates (acc. 451), out of which: | 125 | 116 | | |
| -     payables to non-resident affiliates (from acc 451), out of which: | 126 | 117 | | |
| -     longer than 1 year initial credit term | 127 | 118 | | |
| -     trade payable to non-resident affiliates, regardless the due date (fromacc 451) | 128 | 118a | | |
| -Amounts owed to shareholders/ associates(acc. 455), out of which: | 129 | 119 | | |
| -     owed to shareholders/ associates individuals | 130 | 120 | | |
| -     owed to shareholders/ associates legal entities | 131 | 121 | | |
| - Other payables (acc. 269 + 453 + 456 + 457 + 4581 + 4661 + 462 + 472 + 473 + 478 + 509) (rows 123 to 127) | 132 | 122 | 109.619 | 109.519 |
| -     settlements related to investments in associates, shareholders and associates, affiliates (acc 453, 456, 457, 4581) | 133 | 123 | 108.430 | 107.930 |
| -     other payables related to individual and legal entities, other than payables to public institutions (from acc 462, 4661, 472, 473) | 134 | 124 | 1.189 | 1.589 |
| -     grants not reversed to revenues (from acc 472) | 135 | 125 | | |
| -     payments for financial long term assets and short term investments (acc 269+509) | 136 | 126 | | |

Barcode:3875858-06 A-570-106 INV - Investigation  -

F30 – page 6

| | | | 31.12.2017 | 31.12.2018 |
|---|---|---|---|---|
| -    deferred income related to assets acquired through transfers from clients (acc 478) | 137 | 127 | | |
| - Interest payable  (acc. 5186), out of which: | 138 | 128 | | |
| -    to non-residents | 139 | 128a | | |
| Value of loans from economic operators ****) | 140 | 129 | | |
| Paid share capital (acc. 1012), out of which: | 141 | 130 | 2.325.077 | 2.325.077 |
| - quoted shares4) | 142 | 131 | 2.325.077 | 2.325.077 |
| - unquoted shares 5) | 143 | 132 | | |
| - părţi sociale | 144 | 133 | | |
| - paid share capital from non-residents (from acc. 1012) | 145 | 134 | | |
| Patents and licences (from acc. 205) | 146 | 135 | | |

| IX. Information related to expenses with collaborators | Row no. | Row no. | 31.12.2017 | 31.12.2018 |
|---|---|---|---|---|
| A | B | | 1 | 2 |
| Expenses with collaborators (acc. 621) | 147 | 136 | 507.286 | 601.616 |

| X. Information related to assets owned by state | Row no. | Row no. | 31.12.2017 | 31.12.2018 |
|---|---|---|---|---|
| A | B | | 1 | 2 |
| Value of assets under state ownership, but administrated by the entity | 148 | 137 | | |
| Value of assets under state ownership, but concessioned by the entity | 149 | 138 | | |
| Value of assets under state ownership, but leased by the entity | 150 | 139 | | |

| XI. Information related to assets under private state ownership, which are subject to physical inspection, according to OMFP no 668/2014 | Row no. | Row no. | 31.12.2017 | 31.12.2018 |
|---|---|---|---|---|
| A | B | B | 1 | 2 |
| Net book value of the assets 6) | 151 | 140 | | |

| XII. Paid share capital | Row no. | Row no. | 31.12.2017 | | 31.12.2018 | |
|---|---|---|---|---|---|---|
| A | | B | Amount | % | Amount | % |
| Paid share capital (acc. 1012)+ (row 142+145+149+150+151+152): | 152 | 141 | 2.325.077 | X | 2.325.077 | X |
| Owned by public (state) institutions (row 143+144) | 153 | 142 | | | | |
| -    owned by central public (state)institutions | 154 | 143 | | | | |
| -    owned by local public (state) institutions | 155 | 144 | | | | |
| Owned by state capital entities, out of which | 156 | 145 | | | | |
| -    state as sole shareholder | 157 | 146 | | | | |
| -    state as majority shareholder | 158 | 147 | | | | |
| -    state as minority shareholder | 159 | 148 | | | | |
| Owned by autonomous administrations | 160 | 149 | | | | |
| Owned by private entities | 161 | 150 | 301.101 | 12.95 | 298.901 | 12.86 |
| Owned by individuals | 162 | 151 | 808.426 | 34.77 | 810.626 | 34.86 |
| Owned by other entities | 163 | 152 | 1.215.550 | 52.28 | 1.215.550 | 52.28 |

Filed By: tbrightbill@wileyrein.com, Filed Date: 8/7/19 3:34 PM, Submission Status: Approved

F30 – page 7

| A | | Row no | Amounts (lei) | |
|---|---|---|---|---|
| A | | B | 2017 | 2018 |
| **XIII. Dividends/payments owed to central state or local state budget, to be distributed out of current period result by the national companies and autonomous administrations, out of which** | 164 | 153 | | |
| -    to central state institutions | 165 | 154 | | |
| -    to local state institutions | 166 | 155 | | |
| -    to other shareholders where the state holds (directly or not) shares, regardless the extent. | 167 | 156 | | |
| | | | Amounts (lei | |
| A | | B | 2017 | 2018 |
| **XIV. Dividends/payments made to central state or local state budget in the current period from the profit of national companies and autonomous administrations, out of which** | 168 | 157 | | |
| -Dividends/payments from the previous period profit , out of which: | 169 | 158 | | |
| -    to central state institutions | 170 | 159 | | |
| -    to local state institutions | 171 | 160 | | |
| -    to other shareholders where the state holds (directly or not) shares, regardless the extent. | 172 | 161 | | |
| -Dividends/payments from the prior periods profit , out of which: | 173 | 162 | | |
| -    to central state institutions | 174 | 163 | | |
| -    to local state institutions | 175 | 164 | | |
| -    to other shareholders where the state holds (directly or not) shares, regardless the extent. | 176 | 165 | | |
| **XV. Interim dividends distribution according to Law no 163/ 2018** | Row no. | Row no. | Amounts (lei) | |
| A | B | B | 2017 | 2018 |
| Interim dividends distributed [8] | 177 | 165a | | |
| **XVI. Receivables acquired through cession from legal entities *****)** | | Row no. | Amounts (lei) | |
| A | | B | 2017 | 2018 |
| Receivables acquired through cession from legal entities (at nominal value), out of which: | 178 | 166 | | |
| -    Receivables acquired through cession from affiliate legal entities | 179 | 167 | | |
| Receivables acquired through cession from legal entities (at acquisition cost), out of which: | 180 | 168 | | |
| -    Receivables acquired through cession from affiliate legal entities | 181 | 169 | | |
| **XVII. Revenues from agricultural activity ******)** | Row no. | Row no. | Amounts (lei) | Amounts (lei) |
| A | B | B | 2017 | 2018 |
| Revenues from agricultural activity | 182 | 170 | | |

Check amount F30: 82967023/1274160645

F30 – page 8

| ADMINISTRATOR, | PREPARED BY, |
|---|---|
| Name and surname | Name and surname |
| | Ec. Mujdar Erika |
| Ing. Kertesz Stefan | Position |
| | CFO |
| | |
| Signature | Signature |

subsidies for stimulating the improvement of unemployment (transfers from state budget to employer) – include the amounts granted to employers for the payments made to the education institution ... mulation of unemployed people to get hired before unemployment period ends, stimulation of employers who hire unemployed people older than 45 years, unemployed sole breadwinners or ... employed who, within 3 months from hiring date meet the conditions to apply for partial early pension or old age pension, or any other circumstances stated by the legislation in force in respect of ... employment securities and unemployment improvement.

... to be filled in with the expenses made for R&D activity, respectively the fundamental research, applicable research, technological development and innovation defined by the provisions of the OG ... overnment Ordinance) 57/2002 in respect of scientific research and technological development, approved with updates and modifications by Law 324/2003, with subsequent updates. The expenses ... filled in according to the Implementing Regulation (EU) no 995/2012 issued on 26th Oct 2012, by the Commission for issuance of implementing rules for the Decision no 1608/2003 by European ... rliament and the Council, regarding the creation and development of the Community statistics in the field of science & technology, published in the Official Journal of EU, series L, no 299/ 27th Oct 2 ...

... ) to be filled in with the expenses made for the innovation activity, according to the Implementing Regulation (EU) no 995/ 2012 issued on 26th Oct 2012, by the Commission for issuance of impleme ... es for the Decision no 1608/2003 by European Parliament and the Council, regarding the creation and development of the Community statistics in the field of science & technology, published in the ... ficial Journal of EU, series L, no 299/ 27th Oct 2012

*) The category of economic operators does not include the entities ruled and supervised by the National Bank of Romania, respectively FSA (Financial Supervisory Authority), the entities reclassifi ... public administration sector and the non for profit organizations serving for the households.

**) For the receivables obtained through cession from legal entities, both the nominal value and acquisition cost will be filled in. The statute of "affiliated legal entity" will be assessed according to the ... provisions of art 7 point 26 lit c0 and d) of Law no 227/2015 regarding the Fiscal Code, with its subsequent updates and modifications.

***) According to art 11 of the Delegated Regulation (EU) no 639/2014 of the Commission form March,11 2014 for the completion of the Regulation (EU) no 1307/2013 of the European Parliament a ... Commission regarding the establishing of the standards regarding the direct payments made to the farmers through aid schemes within the common agricultural policy and the modification of App ... of the above mentioned Regulation, (1)... the revenues from agricultural activity are those revenues which were obtained by a farmer from its agricultural activity by the meaning of the Art 4, paragr ... , letter (c) of the mentioned Regulation no (R(UE) 1307/2013), within its agricultural holding, including the aid from EU from the European Agricultural Guarantee Fond (EAGF) and from the Europea ... ricultural Fund for Rural Development (EAFRD), as well as any other national aid granted for agricultural activities, except for the direct complimentary national payments under the articles 18 and 1 ... m the Regulation (EU) no 1307/2013.

e revenues obtained from processing the agricultural products of the holding, under the article 4 paragraph (1) letter (d) of the Regulation (EU) no 1307/2013 are considered as revenues from ... ricultural activities provided that the processed products remain in the farmer's property and the processing will produce agricultural products, as provided by the article 4 paragraph (1) letter (d) of t ... gulation (EU) no 1307/2013.

y other revenues are not considered as revenues from agricultural activities.

In the sense of paragraph (1), revenues mean gross revenues, before deducting costs and taxes.

... will include the rent paid for used land (crops, pastures, grasslands) and commercial space (terraces etc) owned by private owners or public administration units, including the rent for water luster fo ... creational purposes or other (fishing) etc.

the figure filled in the row - payables to non-resident affiliates (from acc 451), out of which is NOT to be calculated as the total of the figures from the rows - longer than 1 year initial credit term and ... de payable to non-resident affiliates, regardless the due date (from acc 451).

In the category - other payables related to individual and legal entities, other than payables to public institutions (from acc 462, 4661, 472, 473) to be excluded the grants applicable to the revenues ... cluded in the balance of 472 account

Securities conferring the property right on the companies, which are negotiable and tradable according to the law.

Securities conferring the property right on the companies, which are not traded.

To be filled in by the economic operators which are subject to the provisions of the Ministerial Order no 668/2014 of the Public Finance Minister and the Minister delegated for Budget, with respect t ... proval of the Details regarding the preparation and update of centralized inventory of state private property and of the real rights subject to inventory, with its updates and modifications.

At section XII, 'Paid share capital', on rows 153-163, columns 2 and 4, the entities will fill in the corresponding percentage of that share capital in the total paid share capital filled in row 152.

8) On this row will be included the dividends distributed according to Law 163/2018 for the modification and completion of Accounting Law no 82/1991, modification and completion of ... Companies Law 31/1990, as well as the modification of Law 1/2005 regarding the organization and functioning of the cooperative. Not to be included the dividends included on row 164

F40 – page 1

**FIXED ASSETS STATEMENT**
as at 31.12.2018

Code40

- lei -

| ASSETS | Row no. | Gross values | | | | |
|---|---|---|---|---|---|---|
| | | Opening balance | Increases | Decreases | | Closing balance (col.5=1+2-3) |
| | | | | Total | Out of which decommissioning | |
| A | B | 1 | 2 | 3 | 4 | 5 |
| **Intangibles** | | | | | | |
| Set-up and development costs | 1 | | | | X | |
| Other intangibles | 2 | 314.928 | 21.397 | | X | 336.325 |
| Advances and intangibles in progress | 3 | | | | X | |
| Intangibles for exploitation and evaluation of minerals assets | 4 | | | | | |
| **Total (row 1 to 4)** | 5 | 314.928 | 21.397 | | X | 336.325 |
| **Tangible assets** | | | | | | |
| Land | 6 | 426.869 | | 9.560 | X | 417.309 |
| Buildings | 7 | 8.501.707 | 197.000 | 238.600 | | 8.460.107 |
| Technical equipment and machinery | 8 | 16.768.501 | 355.348 | 46.135 | 7.895 | 17.077.714 |
| Other equipment and furniture | 9 | 304.418 | 2.824 | 175 | 175 | 307.067 |
| Investment property | 10 | | | | | |
| Tangible assets for exploitation and evaluation of minerals | 11 | | | | | |
| Productive biological assets | 12 | | | | | |
| Tangible assets in progress | 13 | | | | | |
| Investment property in construction | 14 | 1.179.078 | 349.621 | 358.171 | | 1.170.528 |
| Advances for tangible assets | 15 | 54.272 | | | | 54.272 |
| TOTAL (row. 06 la 15) | 16 | 27.234.845 | 904.793 | 652.641 | 8.070 | 27.486.997 |
| **Long term Financial investments** | 17 | 14.614 | 2.000 | 3.258 | X | 13.356 |
| **NON-CURRENT ASSETS - TOTAL (row 05+16+17)** | 18 | 27.564.387 | 928.190 | 655.899 | 8.070 | 27.836.678 |

F40 - page 2

## NON-CURRENT ASSETS DEPRECIATION STATEMENT

- lei

| Non-current assets | Row no. | Depreciation | | | |
|---|---|---|---|---|---|
| | | Opening balance | Depreciation during the year | Depreciation relating to write-offs | Accumulated depreciation in the closing balance (col.9=6+-8) |
| A | B | 6 | 7 | 8 | 9 |
| Intangibles | | | | | |
| Set-up and development expenses | 19 | | | | |
| Other intangibles | 20 | 145.033 | 27.290 | | 172.323 |
| Intangibles for operating and evaluation of minerals assets | 21 | | | | |
| TOTAL (row 19+20+21) | 22 | 145.033 | 27.290 | | 172.323 |
| Tangible assets | | | | | |
| Land | 23 | 6.595 | 1.070 | | 7.665 |
| Buildings | 24 | 1.654.576 | 263.752 | 41.897 | 1.876.431 |
| Technical equipment and machinery | 25 | 11.215.484 | 1.274.435 | 46.134 | 12.443.785 |
| Other equipment and furniture | 26 | 197.654 | 20.865 | 175 | 218.344 |
| Investment property | 27 | | | | |
| Tangible assets for exploitation and evaluation of minerals | 28 | | | | |
| Productive biological assets | 29 | | | | |
| TOTAL (row 23 to 29) | 30 | 13.074.309 | 1.560.122 | 88.206 | 14.546.225 |
| DEPRECIATION - TOTAL (row 22+30) | 31 | 13.219.342 | 1.587.412 | 88.206 | 14.718.548 |

Barcode:3875858-06 A-570-106 INV - Investigation  -

F40 – page 3

## NON-CURRENT ASSETS IMPAIRMENTS STATEMENT

- lei

| Non-current assets | Nr. rd. / Row no. | Impairment adjustments | | | |
|---|---|---|---|---|---|
| | | Opening balance | Impairment adjustments set during the year | Impairment adjustments charged to income | Closing balance (col. 13=10+11-12) |
| A | B | 10 | 11 | 12 | 13 |
| Intangibles | | | | | |
| Set-up and development expenses | 32 | | | | |
| Other intangibles | 33 | | | | |
| Intangibles for exploitation and evaluation of minerals assets | 34 | | | | |
| Total (row 1 to 4) | 35 | | | | |
| Tangible assets | | | | | |
| Land | 36 | | | | |
| Buildings | 37 | | | | |
| Technical equipment and machinery | 38 | | | | |
| Other equipment and furniture | 39 | | | | |
| Investment property | 40 | | | | |
| Tangible assets for exploitation and evaluation of minerals | 41 | | | | |
| Productive biological assets | 42 | | | | |
| Tangible non-current assets in construction | 43 | | | | |
| Investment property in construction | 44 | | | | |
| TOTAL (row. 06 la 15) | 45 | | | | |
| Long term Financial investments | 46 | | | | |
| IMPAIRMENTS - TOTAL (row 04+10+11) | 47 | | | | |

Check amount F40: 259786968/1274160645

**ADMINISTRATOR,**

Name and surname

ING. KERTESZ STEFAN

Signature

Company stamp

**PREPARED BY,**

Name and surname

EC. MUJDAR ERIKA

Position

CFO

Signature

Registration number of professional organization

S.C. SIGSTRAT S.A.

SIGHETU MARMATIEI

## NOTE 1                                    NON-CURRENT ASSETS

| Asset name | Balance as at 01.01.2018 | Purchases | Own production | Revaluation | Disposals, transfers and other decreases | Balance as at 31.12.2018 |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| **Intangible assets** | 314.928 | 21.397 | | | | 336.325 |
| Land and land improvements | 426.869 | | | | 9.560 | 417.309 |
| Buildings | 8.501.707 | 197.000 | | | 238.600 | 8.460.107 |
| Plant and equipment | 12.821.008 | 12.864 | 339.085 | | 140 | 13.172.817 |
| Other installations, machines and furniture | 282.815 | 3.399 | | | 5.740 | 280.474 |
| Means of transport | 3.664.678 | | | | 40.255 | 3.624.423 |
| Furniture, office | 304.418 | 2.824 | | | 175 | 307.067 |
| Tangible non-current assets in progress | 1.233.350 | 41.514 | 308.107 | | 358.171 | 1.224.800 |
| Other tangible non-current assets | 14.614 | 2.000 | | | 3.258 | 13.356 |
| **TOTAL** | **27.564.387** | **280.998** | **647.192** | | **655.899** | **27.836.678** |

Administrator,                                              Prepared by,

Ing. Kertesz Stefan

                                                           Ec. Mujdar Erika

[Signature] [Stamp]                        [Signature]

Barcode:3875858-06 A-570-106 INV - Investigation  -

S.C. SIGSTRAT S.A.

SIGHETU MARMATIEI

# NOTE 1              NON-CURRENT ASSETS DEPRECIATION

| Non-current assets | Balance as at 01.01.2018 | Straight line depreciation | Depreciation of disposals | Acc depreciation as at 31.12.2018 |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 7 |
| Intangible assets | 145.033 | 27.290 | | 172.323 |
| Other non-current assets | 1.661.171 | 264.822 | 41.897 | 1.884.096 |
| Buildings, land improvements | 11.215.484 | 1.274.435 | 46.134 | 12.443.785 |
| Plant and equipment | | | | |
| Other installations, machines and furniture | 197.654 | 20.865 | 175 | 218.344 |
| **TOTAL** | **13.219.342** | **1.587.412** | **88.206** | **14.718.548** |

**Administrator,**                                    **Prepared by,**

Name and surname                              Name and surname

Ing. Kertesz Stefan                               Ec. Mujdar Erika

[Signature] [Stamp]                              [Signature]

Barcode:3875858-06 A-570-106 INV - Investigation  -

S.C. SIGSTRAT S.A.

SIGHETU MARMATIEI

## NOTE 2                    IMPAIRMENT FOR DEPRECIATION

| Provision name | Balance as at 01.01.2018 | Increases | Decreases | Balance as at 31.12.2018 |
|---|---|---|---|---|
| 0 | 1 | 2 | 3 | 4=1+2-3 |
| Allowance for trade receivables | 584.346 | - | 49.497 | 534.849 |

Administrator,                                          Prepared by,

Name and surname                               Name and surname

Ing. Kertesz Stefan                               Ec. Mujdar Erika

[Signature] [Stamp]                               [Signature]

Barcode:3875858-06 A-570-106 INV - Investigation  -

S.C. SIGSTRAT S.A.

SIGHETU MARMATIEI

**NOTE 3**

**PROPOSAL REGARDING THE DISTRIBUTION**

**OF PROFIT FOR 2018**

| | |
|---|---:|
| GROSS PROFIT | 473.773,63 |
| Income tax | 112.891 |
| Net profit to be distributed | 360.882,63 |
| Retained earnings related to increase from revaluation reserve | 225.090,31 |
| Legal reserve increase due to share capital increase | 23.688,68 |
| Reserves for own equity financing | 562.284,26 |

**Administrator,**                                    **CFO,**

Name and surname                          Name and surname

Ing. Kertesz Stefan                          Ec. Mujdar Erika

[Signature]                                    [Signature]

[Stamp of SIGSTRAT]

[Signature]

Barcode:3875858-06 A-570-106 INV - Investigation  -

S.C. SIGSTRAT S.A.

SIGHETU MARMATIEI

**NOTE 4**

### OPERATING RESULT ANALYSIS

| INDICATOR | PREVIOUS FINANCIAL YEAR (2017) | CURRENT FINANCIAL YEAR (2018) |
|---|---|---|
| 1. Net turnover + stocks variation | 32.347.136 | 34.682.935 |
| 2. Cost of sold goods and services rendered (3+4+5) | 27.626.962 | 30.703.287 |
| 3. Main activity expenses | 18.568.260 | 21.270.123 |
| 4. Auxiliary activities | 864.543 | 920.574 |
| 5. Production overheads | 8.194.159 | 8.512.590 |
| 6. Gross result (1-2) | 4.720.174 | 3.979.648 |
| 7. Distribution expenses | 298.664 | 109.792 |
| 8. General administration expenses | 4.918.639 | 4.383.473 |
| 9. Other operating income | 2.178.890 | 2.489.925 |
| 10. Other operating expenses | 1.224.974 | 1.337.915 |
| 11. Operating result  (6-7-8+9-10) | 456.787 | 638.393 |

|  |  |
|---|---|
| Administrator, | Prepared by, |
| Name and surname | Name and surname |
| Ing. Kertesz Stefan | Ec. Mujdar Erika |
| [Signature] | [Signature] |
| [Stamp of SIGSTRAT] |  |

**S.C. SIGSTRAT S.A.**
**SIGHETU MARMATIEI**

## Note 5

## STATEMENT OF RECEIVABLES AND PAYABLES

lei

| RECEIVABLES | Balance as at 31.12.2018 | Liquidity term for balance as at 31.12.2018 | |
|---|---|---|---|
| | | Below 1 year | Above 1 year |
| 0 | 1 = 2 + 3 | 2 | 3 |
| TOTAL, out of which | 6.095.544 | 6.095.544 | |
| Trade receivables | 4.387.674 | 4.387.674 | |
| Trade receivables – doubtful accounts | 1.188.934 | 1.188.934 | |
| Suppliers debit | 193.687 | 193.687 | |
| Other receivables related to personnel | 31.427 | 31.427 | |
| Employer contribution to holiday | 241.775 | 241.775 | |
| Sundry debtors | 39.876 | 39.876 | |
| Not exigible VAT | 7.092 | 7.092 | |
| Other receivables | 5.079 | 5.079 | |

| PAYABLES | Balance as at 31.12.2018 | Maturity for balance as at 31.12.2018 | | |
|---|---|---|---|---|
| | | Below 1 year | 1 - 5 years | Above 5 years |
| 0 | 1 = 2 + 3 + 4 | 2 | 3 | 4 |
| **TOTAL, out of which** | 7.461.386 | 7.461.386 | | |
| Trade payables | 2.062.081 | 2.062.081 | | |
| Long term assets suppliers | 24.147 | 24.147 | | |
| Clients credit | 1.611.087 | 1.611.087 | | |
| Contributions to social securities | 300.617 | 300.617 | | |
| Contributions for unemployment | 19.551 | 19.551 | | |
| Wages tax | 45.482 | 45.482 | | |
| Personnel payables | 540.825 | 540.825 | | |
| Olther fees and taxes | 7.653 | 7.653 | | |
| Loans denominated in LEI | 1.647.072 | 1.647.072 | | |
| Loans denominated in other CCY | 527.143 | 527.143 | | |
| Income tax | 112.891 | 112.891 | | |
| Medium term Bank loans | 420.753 | 420.753 | | |
| VAT payable | 24.608 | 24.608 | | |
| Sundry creditors | 1.589 | 1.589 | | |
| Other loans | 7.957 | 7.957 | | |
| Payables to other creditors | 107.930 | 107.930 | | |

Administrator,
Name and surname
Ing. Kertesz Stefan
[Signature]

Prepared by,
Name and surname
Ec. Mujdar Erika

[Signature]

[Stamp of SIGSTRAT]

**S.C. SIGSTRAT S.A.**

**SIGHETU MARMATIEI**

**NOTE 6**

**SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

The financial statements are prepared by the Company in accordance with the accounting regulations related to stand alone and consolidated financial statements issued by:

- The Accounting Law 82/1991
- The provisions of the Minister of Public Finance Order No. 1802/2014 ("MFO 1802/2014") with subsequent amendments and supplements
- The provisions of the Minister of Public Finance Order No. 10/2019

The accounting policies were applied consistently in the period: 01.01.2018 – 31.12.2018. There were no cases of deviations from accounting policies and principles, or any other accounting regulations.

The figures in the financial statements of the year 2018 are comparable.  The patrimonial items were applied to the same principles for evaluation, registration and presentation in accounting, thus providing the comparability between periods.

All expenses and revenues were included, regardless of the payment date or collection date.

The repairs and maintenance expenses for tangible non-current assets were recognized in the P&L at the date of execution.

The expenses for the upgrade of the tangible non-current assets were capitalized. The tangible non-current assets in construction represent the investments not yet put into operation. These were evaluated at production cost or acquisition cost.  The tangible non-current assets in construction were not depreciated.

The depreciation of non-current assets was calculated using straight line method.

Barcode:3875858-06 A-570-106 INV - Investigation -

The raw materials and the materials are recorded in accounting at acquisition cost, while the finished goods at predetermined price. The price differences vs the acquisition or production costs are separately recorded and distributed to cost of sales and stocks. At the time items are disposed, the raw materials and materials are valued *based on the weighted average method, while the finished goods are valued at FIFO method*.

The personnel expenses are recorded on a monthly basis, according to the payroll. The company calculates sand pays within the due date the payables to employees and state budgets.

The transactions in foreign currencies are recorded using the exchange rate at the transaction date. The gains or losses related to such transactions or the revaluation of monetary items are recognized in the P&L.

The revenues are recognized when the risks and rewards are transferred in a significant proportion to the client, respectively when the legal property right is transferred. The presale purchase agreements are not recognized in revenues.

The operating expenses are recognized when incurred. The loan interest is recognized in P&L when it occurs, but are not included in the production cost.


Administrator,

Name and surname

Prepared by,

Name and surname



Ing. Kertesz Stefan

[Signature]

[Stamp of SIGSTRAT

Ec. Mujdar Erika

[Signature]

Barcode:3875858-06 A-570-106 INV - Investigation  -

S.C. SIGSTRAT S.A.

SIGHETU MARMATIEI


**NOTE 7**


**S H A R E S**


      As at 31.12.2018, the paid share capital of S.C. SIGSTRAT S.A. amounts to 2.325.077 LEI, consisting of 23.250.770 shares at a nominal value of 0.1 lei/share.


      The shares are all common, nominal and dematerialized.


|  Administrator, | Prepared by, |
| :---: | :---: |
| Name and surname | Name and surname |

 

|  Ing. Kertesz Stefan | Ec. Mujdar Erika |
| :---: | :---: |
| [Signature] | [Signature] |

[Stamp of SIGSTRAT]

Barcode:3875858-06 A-570-106 INV - Investigation  -

S.C. SIGSTRAT S.A.

SIGHETU MARMATIEI

## NOTE 8

The allowance for Board of Directors are set in accordance to the provisions of the company's charter, while those of the executive management are negotiated in the Board of Directors.

The average no of employees in 2018 was 333. According to the level of studies, they are classified as:

- 28 with university level
- 5 with post high school level
- 7 with technical specific studies (foremen)
- 88 with high school
- 73 with vocational school
- 13 with apprentice level
- 106 with secondary school
- 13 with less than secondary school
  All employees have salaries higher than the minimum national salary.

The social contributions for both employees and employers were calculated in accordance with current legislation and were paid in due time.

There were no loans granted to management or members of the Board of Directors.

The company is not liable for any guarantee in the name of directors, administrators or other employee categories.

|  Administrator, | Prepared by, |
| --- | --- |
| Name and surname | Name and surname |
| | |
| Ing. Kertesz Stefan | Ec. Mujdar Erika |
| [Signature] | [Signature] |

[Stamp of SIGSTRAT]

Barcode:3875858-06 A-570-106 INV - Investigation  -

S.C. SIGSTRAT S.A.
SIGHETU MARMATIEI

NOTE 9

### ANALYSIS OF MAIN FINANCIAL AND ECONOMIC INDICATORS
### 2018

| INDICATOR | FORMULA | VALUES | RATIO |
|---|---|---|---|
| | | | |
| **1. *Liquidity ratios*** | | | |
| *Current ratio* | Current assets / Short term liabilities | 14.875.608 / 7.461.386 | 1,99 |
| *Acid test* | Current assets - Inventories / Short term liabilities | 14.875.608-8.178.249 / 7.461.386 | 0,90 |
| | | | |
| **2. *Risk ratios*** | | | |
| *Gearing ratio* | Short term liabilities  x 100 / Total assets | 7.461.386X100 / 28.100.420 | 26,55 |
| *Interest cover ratio* | Profit before interest and tax  / Interest expense | 594.118 / 120.344 | 4,94 |
| | | | |
| **3. *Activity ratios*** | | | |
| | | | |
| *Number of stock days* | Cost of sales / Average inventory | 36.534.467 / 7.735.881 | 4,72 |
| *Receivables turnover* | Average trade receivables  / Turnover X  365 | 4.763.101X365 / 27.093.475 | 64,17 |
| *Payables turnover* | Average trade payables  / Turnover   X  365 | 2.281.542X365 / 27.093.475 | 30,74 |
| *Fixed assets turnover* | Turnover / Non-current assets | 27.093.475 / 13.118.130 | 2,07 |
| *Total assets turnover* | Turnover / Total assets | 27.093.475 / 28.100.420 | 0,96 |
| | | | |
| **4. *Profitability ratios*** | | | |
| *Return on capital employed* | Profit before interest and tax / Capital employed | 594.118 / 20.639.034 | 0,03 |
| *Gross margin* | Gross margin / Turnover  X  100 | 638.393X100 / 27.093.475 | 2,36 |
| | | | |

Administrator,                                 Prepared by,
Name and surname                          Name and surname


Ing. Kertesz Stefan                          Ec. Mujdar Erika
[Signature]                                       [Signature]
            [Stamp of SIGSTRAT]

S.C. SIGSTRAT S.A.

SIGHETU MARMATIEI

**NOTE 10**

**OTHER INFORMATION**

1.      SC   SIGSTRAT S.A. is a joint stock company established by HG no 753/1992 and is operating in accordance to Romanian legislation in force, in conjunction with the provisions of the Article of Incorporation.

The company main activity is, according to CAEN, the production of veneer and wooden panels (CAEN code = 1621).

The company's headquarter is located in Sighetu Marmatiei, No. 40, Unirii street, Maramures county. The company doesn't have any other sites or work points.

2.      The management board at 31.12.2018 consists of:

- general director: ing Kertesz Stefan
- technical director:  ing Ilicsuk Adalbert
- comercial director: ec. Tivadar Stefan
- economic director: ec. Mujdar Erika
- production manager: ing Kokenyesdi Mihai, up to 1.03.2018

The Board of Directors at 31.12.2018 includes:

- president: ing Kertesz Stefan
- secretary: ec. Tivadar Stefan
- member: ec. Petrovan sorin
- member: ec. Gavris Mircea
- member: ing Tiran Florin

3.      The transactions in foreign currencies are recorded using the exchange rate at the transaction date. The gains or losses related to such transactions were recognized in the P&L. At each month closing, the receivables and payables denominated in foreign currency were revalued at the closing exchange rate issued by National bank of Romania (BNR), and the exchange differences were booked in P&L in exchange rate income or expenses account, whichever applied.

4.      The taxable profit and income tax for 2018 were calculated in accordance with the provisions of Law 227/2015 regarding the Fiscal Code. The taxation level as at 31.12.2018 was 16%, and the income tax for 2018 amounted to 112.891 lei.

5.      The total turnover of 37.093.475 lei included the following categories:

a)      Revenue from selling of finished goods, amounting to 24.376.052 lei, split into:

- lei -

| PRODUCT NAME | TURNOVER |
|---|---|
| - Plywood for interior use | 12.197.202 |
| - Veneer | 584.842 |
| - Adapted products | 11.539.443 |
| - Briquettes | 53.865 |
| TOTAL | 24.376.052 |

b)  Revenues from selling of prefabricated                471.284 lei
c)  Revenues from selling of by-products                  747.671 lei
d)  Revenues from executed works and services rendered    1.194.913 lei
e)  Revenues from rent                                    139.046 lei
f)  Revenues from selling of merchandises                 165.885 lei
g)  Commercial discounts                                  -1.376 lei

The company has not recorded any extraordinary revenue or expense in 2018.

The balance of 471 account amounting to 106.682 lei represents prepayments for the next period such as: subscriptions and insurance for buildings, machines and equipment, means of transport etc.

Administrator,                            Prepared by,

Name and surname                         Name and surname

Ing. Kertesz Stefan                      Ec. Mujdar Erika

[Signature]                              [Signature]

[Stamp of SIGSTRAT]

Barcode:3875858-06 A-570-106 INV - Investigation  -

S.C. SIGSTRAT S.A.

SIGHETU MARMATIEI

## STATEMENT OF CHANGES IN SHAREHOLDERS EQUITY

### as at 31.12.2018

- lei -

| Item description | Balance as at 01.01.2018 | Increases | Decreases | Balance as at 31.12.2018 |
|---|---|---|---|---|
| Issued capital | 2.325.077 | | | 2.325.077 |
| Revaluation reserves | 4.401.197 | | 225.091 | 4.176.106 |
| Legal reserves | 411.896 | 23.688 | | 435.584 |
| Other reserves | 13.124.328 | 80.772 | | 13.205.100 |
| Retained earnings related to the realized revaluation reserve | 27.362 | 225.090 | 27.362 | 225.090 |
| Losses related to equity instruments | 65.117 | | | 65.117 |
| Profit or loss for the period | 58.744 | 360.883 | 58.744 | 360.883 |
| Profit appropriation | 5.334 | 23.689 | 5.334 | 23.689 |
| **Total** | **20.278.153** | **666.744** | **305.863** | **20.639.034** |

Administrator,

Name and surname

Ing. Kertesz Stefan

[Signature]

[Stamp of SIGSTRAT]

Prepared by,

Name and surname

Ec. Mujdar Erika

[Signature]

Barcode:3875858-06 A-570-106 INV - Investigation  -

S.C. SIGSTRAT S.A.

SIGHETU MARMATIEI

## CASH FLOW STATEMENT

### as at 31.12.2018

- lei -

| ITEM DESCRIPTION | FINANCIAL YEAR AS AT | |
|---|---|---|
| | Previous Year | Current Year |
| 1 | 2 | 3 |
| Turnover | 28.835.201 | 27.093.475 |
| Stocked Production | 3.511.935 | 7.589.460 |
| Capitalized production: | 319.851 | 308.107 |
| Other operating income | 1.859.039 | 2.181.818 |
| *TOTAL operating income* | **34.526.026** | **37.172.860** |
| Raw materials and consumables expenses and merchandises | 15.891.758 | 18.689.846 |
| Energy expenses | 1.451.981 | 1.534.472 |
| Personnel expenses | 12.492.778 | 12.458.240 |
| Depreciation | 1.863.557 | 1.587.412 |
| Other operating expenses | 2.509.165 | 2.313.994 |
| Provisions adjustments | -140.000 | - |
| Current assets adjustments | | -49.497 |
| *Total operating expenses* | **34.069.239** | **36.534.467** |
| *Operating profit* | 456.787 | 638.393 |
| Financial income | 234.248 | 193.991 |
| Financial expenses | 584.361 | 358.610 |
| **Financial result** | **-350.113** | **-164.619** |
| **Gross result of the period** | **106.674** | **473.774** |
| Income tax | 47.930 | 112.891 |
| *Net result of the period* | **58.744** | **360.883** |
| *Cash flow:* | | |
| +Profit | 58.744 | 360.883 |
| +Depreciation | 1.863.557 | 1.587.412 |
| Less Inventory variation | -1.554.865 | 884.736 |
| Less Receivables variation | -157.551 | 298.646 |
| + Payables variation | 977.340 | -394.458 |
| Other assets variation | -1.932.720 | -1.527.762 |
| Other liabilities variation | -2.125.883 | -1.793.192 |
| *Cash flow from operating activity (A)* | **4.418.894** | **105.025** |
| Proceeds from fixes assets sold | 130.297 | 286.400 |
| Fixed assets purchases | 255.098 | 41.514 |
| Expenses with  fixed assets self-produced | 319.851 | 308.107 |
| *Net cash from investing activities (B)* | **-444.652** | **-63.221** |

Barcode:3875858-06 A-570-106 INV - Investigation  -

| | | |
|---|---|---|
| + Loans variation | -3.628.886 | -405.199 |
| *Net cash from financing activities ©* | **-3.628.886** | **-405.199** |
| *Cash and cash equivalents at the beginning of the period* | **1.154.703** | **1.500.059** |
| *Net cash flow (A+B+C)* | **345.356** | **-363.395** |
| *Cash and cash equivalents at the end of the period* | **1.500.059** | **1.136.664** |

Administrator,
Name and surname

Prepared by,
Name and surname

Ing. Kertesz Stefan
[Signature]
[Stamp of SIGSTRAT]

Ec. Mujdar Erika
[Signature]

Barcode:3875858-06 A-570-106 INV - Investigation  -

# STATEMENT

We have prepared the annual financial statements as at 31/12/2018 for:

---

Entity: S.C. SIGSTRAT S.A.

County: 24 - Maramures

Address: Sighetu Marmatiei, No. 40 Unirii Street, Tel: 0262311117

Trade register registration no: J 24/13/1993

Incorporation type: 34 – Joint stock company

Activity (code and description under CAEN code): 1621 - production of veneer and wooden panels

VAT number (CIF): RO 2954386

---

The undersigned, eng. Kertesz Stefan, as the general director, I take the responsibility for the preparation of the annual financial statements as at 31/12/2018, and I confirm that:

a)      The accounting policies used for the preparation of the annual financial statements are in accordance with the applicable accounting rules and regulations.
b)      The annual financial statements present fairly the financial position of the company, the profitability and the other information related to the company's activity.
c)      The company is operating as a going concern.

Signature:

[Signature]

[Stamp of SIGSTRAT S.A.]

S.C. SIGSTRAT S.A.    Barcode:3875858-06 A-570-106 INV - Investigation  -

 

2847/ 30.04. 2019

To: Romania Libera daily newspaper

For publishing – Classifieds

One occurrence – As soon as possible

PRESS RELEASE

---

S.C. SIGSTRAT S.A. Sighetu Marmatiei, according to Law 297/2004, article 297, heading 227 and the Regulations of ASF/CNVM, notifies all the company's shareholders that the Annual Report for 2018 can be consulted and downloaded from the company's website – www.sigstrat.ro, section "Info for shareholders" or alternatively, can be consulted or purchased (a hard copy) at the company headquarter, for a price.

A hard copy of the annual report can also be shipped through postage services to any shareholder, provided the shareholder requires it in writing. The delivery costs will be under the shareholder. The annual report for 2018 will be available starting with 30.04.2019.

General Director,

Ing. Kertesz Stefan

[Signature]

[Stamp of SIGSTRAT S.A.]

1

REM JA 6

Ancientree, Rebuttal Preliminary Surrogate
Value Submission (August 19, 2019)
PR 1007

LAW OFFICES OF
DE KIEFFER & HORGAN, PLLC
1090 VERMONT AVENUE, N.W.
SUITE 410
WASHINGTON, D.C. 20005

GREGORY S. MENEGAZ
TEL 202-783-6900

AFFILIATED OFFICE:
SAARBRÜCKEN, GERMANY

GMENEGAZ@DHLAW.COM
DHLAW.COM

August 19, 2019

Electronic Filing

Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
Room 18022
U.S. Dept. of Commerce
Washington, D.C. 20230

A-570-106
Investigation
POI: 07/01/2018-12/31/2018
AD/CVD Operations

**Public Document**

RE:   *Wooden Cabinets and Vanities from the People's Republic of China*:
        **Rebuttal Preliminary Surrogate Value Submission**

Dear Mr. Secretary:

On behalf of The Ancientree Cabinet Co., Ltd ("Ancientree"), a Chinese exporter of

wooden cabinets and vanities, we hereby submit information to rebut, correct, or clarify

petitioner's August 7, 2019 surrogate value submission. *See* Dep't SC SV Deadline

Memorandum (June 17, 2019).  This submission contains information submitted pursuant to 19

C.F.R. § 351.301(c)(3)(iv) and (c)(3)(i).

**Exhibits SVR-1 and SVR-2** contain information to correct petitioner's Exhibit 10

Sigstrat financial ratio calculation.  Specifically, Exhibit SVR-1 contains a correct financial

ratios calculation for the 2018 Sigstrat financial statement provided by the petitioner.  Exhibit

SVR-2 contains the Department's calculation of the 2017 Sigstrat financial ratios in the recently

completed review of *Multilayered Wood Flooring from China*.  If the Department relies on the

Sigstrat financial statement in this investigation, the Department should calculate the financial

ratios consistent with its methodology in past reviews. **Exhibit SVR-3** contains information to

correct petitioner's Exhibit 1 with respect to the appropriate Romania HTS to value Ancientree's

inputs. Petitioner has suggested less specific and incorrect HTS for several of Ancientree's

inputs. Further, the Romanian imports values for several wood inputs were based on an

insignificant and uncommercial quantity. Therefore, if the Department relies on Romanian

import values at all, the Department must rely on values based on a significant commercial

quantity. Specifically, Romanian imported a mere 151 tons, or 196 M3, under HTS 4407.96.99

during the POI. Compared to the purchase quantities of respondents and the import quantity into

Malaysia, this is not a commercial quantity. Likewise, Romania imported a mere 1.5 tons, or 4

M3, under HTS 4407.97.10 during the POI. Compared to the purchase quantities of respondents

and the import quantity into Malaysia, this is not a commercial quantity and therefore not a

reliable surrogate value. Ancientree submits that this is a further reason to rely upon Malaysia as

the primary country, or at a minimum, rely upon Malaysian import values for the birch and

poplar sawnwood inputs.

      Please let us know if you have any questions regarding this submission.

Sincerely,

Gregory S. Menegaz
J. Kevin Horgan
Judith L. Holdsworth
Alexandra Salzman

2

Barcode:3880473-01 A-570-106 INV - Investigation  -

**Wooden Cabinets and Vanities from the PRC**
**A-570-106**
**POI: 07/01/2018-12/31/2018**

### THE ANCIENTREE CABINET CO., LTD.

**Rebuttal Preliminary Surrogate Value Submission**
**August 19, 2019**

## List of Exhibits

| | |
|---|---|
| Exhibit SVR-1 | Sigstrat 2018 Ratios |
| Exhibit SVR-2 | Dep't Commerce MLWF Sigstrat Ratio Calculation |
| Exhibit SVR-3 | Alternative Romania SVs |

# Exhibit SVR-1

Barcode:3880473-01 A-570-106 INV - Investigation  -

S.C. Sigstrate S.A - Financial Ratio Calculations

SC SIGSTRAT SA Financial Statements Year Ending December 31, 2018 (In Romanian Leu)

| Items | Page (Part 2) | Main Statements | Notes to accts | Raw Materials (f) | Direct Labor (L) | Energy (e) | Mfg Overhead (m) | SGAA and Interest (s) | Profit (p) | Excluded (x) |
|---|---|---|---|---|---|---|---|---|---|---|
| Net revenue | 9 | 37,172,860 | | | | | | | | 37,172,860 |
| Net revenue | 21 | 37,172,860 | 37,172,860 | | | | | | | 37,172,860 |
| | | | | | | | | | | |
| Raw materials and consumables expenses | 9, 21 | 18,581,300 | f | 18,581,300.00 | | | | | | |
| Other materials expenses | 9, 21 | 26,641 | m | | | | 26,641.00 | | | |
| Other external expenses (energy and water) | 9, 21 | 1,534,472 | e | | | 1,534,472.00 | | | | |
| Goods for resale | 9, 21 | 81,905 | x | | | | | | | 81,905 |
| Personnel expenditure - total | 9, 21 | 12,458,240 | l | | 12,458,240.00 | | | | | |
| Value adjustment of tangible and intangible assets | 9, 21 | 1,863,557 | m | | | | 1,863,557.00 | | | |
| Third party service expenses | 9, 21 | 1,587,412 | s | | | | | 1,587,412.00 | | |
| Other fees, taxes and similar expenses | 9, 21 | 217,653 | s | | | | | 217,653.00 | | |
| Other Expenses | 9, 21 | 243,841 | s | | | | | 243,841.00 | | |
| Adjustment related to current assets | 9, 21 | (49,497) | s | | | | | (49,497.00) | | |
| operating expenses adjustment | 9, 21 | (11,057) | s | | | | | (11,057.00) | | |
| | | | | | | | | | | |
| Operating Expenses | 9 | 36,534,467 | | | | | | | | |
| | | | | | | | | | | |
| Interest revenue | 9 | (38) | s | | | | | (38.00) | | |
| Other financial revenue | 9 | (193,953) | s | | | | | (193,953.00) | | |
| Interest expenses | 9 | 120,344 | s | | | | | 120,344.00 | | |
| Other financial expenses | 9 | 238,266 | s | | | | | 238,266.00 | | |
| | | | | | | | | | | |
| Profit before taxes | 9 | 473,774 | p | | | | | | 473,774 | |
| Total/check | | | | 18,581,300 | 12,458,240 | 1,534,472 | 1,890,198 | 2,152,971 | 473,774 | 473,774 |

| | | |
|---|---|---|
| Total Material, Direct Labor, and Energy Inputs | | |
| Overhead as % of Material, Direct Labor & Energy | 32,574,012 | 5.80% |
| Total Material, Direct Labor, Energy, Mfg Overhead, and Traded/Finished Goods | | |
| SG&A as % of Material, Direct Labor, Energy , Mfg Overhead, and Traded/Finished Goods | 36,534,467 | 5.89% |
| Total Material, Direct Labor, Energy, Mfg Overhead, Traded/Finished Goods, & SG&A as % of Material, Direct Labor, Energy, Mfg Overhead, Traded/Finished Goods, & COP) | 38,687,438 | 1.22% |
| Profit as % of COP (Material, Direct Labor, Energy, Mfg Overhead, Traded/Finished Goods, & SG&A & Interest) | | |

Exhibit SVR-2

UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

A-570-970
AR: 12/1/2016 - 11/30/2017
**Public Document**
E&C/VIII:  SB

December 17, 2018

| | |
|---|---|
| MEMORANDUM TO: | The File |
| THROUGH: | Rebecca Trainor<br>Program Manager, Office VIII<br>Antidumping and Countervailing Duty Operations |
| FROM: | Sergio Balbontin<br>International Trade Compliance Analyst, Office VIII<br>Antidumping and Countervailing Duty Operations |
| SUBJECT: | Antidumping Duty Administrative Review of Multilayered Wood<br>Flooring from the People's Republic of China; 2016-2017:<br>Surrogate Values for the Preliminary Determination |

## SUMMARY

The Department of Commerce (Commerce) is conducting an administrative review of multilayered wood flooring (MLWF) from the People's Republic of China (China).[1]  This memorandum outlines the methodology and selection of surrogate values (SV) used in the calculation of normal value (NV) and export price (EP) for the preliminary determination of this proceeding.  The presumption of non-market economy (NME) status for the China has not been revoked by Commerce and remains in effect for this administrative review. Commerce has determined that Romania is the appropriate surrogate country to use for the preliminary determination in this administrative review.[2]  Consistent with recent determinations involving NME countries, we selected where appropriate, and to the extent possible, values from publicly available information from the surrogate country to value factors of production (FOP) placed on the record by interested parties.

In selecting the best available information for valuing FOPs in accordance with section 773(c)(1) of the Tariff Act of 1930, as amended, Commerce selected, to the extent practicable, surrogate values that are:  1) non-export average values, 2) representative of a range of prices within the

---

[1] *See* Multilayered Wood Flooring from the People's Republic of China:  Preliminary Results of the Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Rescission of Review, in Part; 2016-2017, and Memorandum, "Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review:  Multilayered Wood Flooring from the People's Republic of China; 2016-2017," dated concurrently with this memorandum (Preliminary Decision Memorandum).

[2] *See* Preliminary Determination Memorandum.

Barcode:3725832-03 A-570-100 INV Review Investigation - 11/30/17

## VIII.   Surrogate Financial Ratios

To value factory overhead (OH), selling, general, and administrative expenses (SG&A), and profit, we used rates based on data taken from the 2017 annual report of S.C. Sigstrat S.A., the financial statements on the record.[15]  The surrogate financial ratios calculated from the financial statements of S.C. Sigstrat S.A. are as follows:

| | |
|---|---|
| OH: | 7.36% |
| SG&A: | 19.73% |
| Profit: | 0.26% |

---

[15] *Id.* at Exhibit 11.

Filed By: William Horn, Filed Date: 12/19/19 3:45 PM, Submission Status: Approved

Barcode:3880473-01 A-570-106 INV - Investigation   -

## MLWF from China
## S.C. Sigstrate S.A.- Financial Ratio Calculations

**SC SIGSTRAT SA Financial Statements Year Ending December 31, 2017 (in Romanian Leu)**

| Items | Page (Part 2) | Main Statements | Notes to accts | Raw Materials (j) | Direct Labor (l) | Energy (e) | Mfg Overhead (m) | SG&A and Interest (s) | Profit (p) | Excluded (x) |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue from production sold | | | | | | | | | | |
| Revenue from sale of semifinished products | | | | | | | | | | |
| Income from sale of residual | | | | | | | | | | |
| Income from work performed and services rendered | | | | | | | | | | |
| Rental income | | | | | | | | | | |
| Net revenue | 9 | 28,835,201 | | | | | | | | 28,835,201 |
| Income from work in progress (credit balance) | 9 | 3,511,935 | | | | | | | | 3,511,935 |
| Net sales and variation in inventories | 21 | 32,347,136 | 32,347,136 | | | | | | | 32,347,136 |
| Raw materials and consumables expenses | 9,21 | 15,791,056 | | 15,791,056 | | | | | | |
| Other materials expenses | 9,21 | 29,578 | | | | | 29,578 | | | |
| Other external expenses (energy and water) | 9,21 | 1,451,981 | | | | 1,451,981 | | | | |
| Goods for resale | 9,21 | 71,124 | | | | | | | | 71,124 |
| Personnel expenditure - total | 9,21 | 12,492,778 | | | 8,490,790 | | | 4,001,988 | | |
| Value adjustment of tangible and intangible assets | 9,21 | 1,863,557 | | | | | 1,863,557 | | | |
| Third party service expenses | 9,21 | 2,113,680 | | | | | | 2,113,680 | | |
| Other fees, taxes and similar expenses | 9,21 | 224,108 | | | | | | 224,108 | | |
| Other expenses | 9,21 | 171,377 | | | | | | 171,377 | | |
| Adjustment related to provisions | 9,21 | (140,000) | | | | | | (140,000) | | |
| **Operating Expenses** | **9** | **34,069,239** | | | | | | | | |
| Interest revenue | 9 | (64) | | | | | | (64) | | |
| Other financial revenue | 9 | (234,184) | | | | | | (234,184) | | |
| Interest expenses | 9 | 127,043 | | | | | | 127,043 | | |
| Other financial expenses | 9 | 457,318 | | | | | | 457,318 | | |
| Profit before taxes | 9 | 106,674 | | | | | | | 106,674 | |
| **Total** | | | | 15,791,056 | 8,490,790 | 1,455,981 | 1,893,135 | 6,721,266 | 106,674 | 32,347,136 |

| | | |
|---|---|---|
| Total Material, Direct Labor, and Energy Inputs | 26,733,827 | |
| Overhead as % of Material, Direct Labor & Energy | 7.36% | |
| Total Material, Direct Labor, Energy, Mfg Overhead, and Traded/Finished Goods | 34,049,239 | |
| SG&A as % of Material, Direct Labor, Energy, Mfg Overhead, and Traded/Finished Goods | 19.73% | |
| Total Material, Direct Labor, Energy, Mfg Overhead, Traded/Finished Goods, & SG&A & Interest (i.e., COP) | 40,790,505 | |
| Profit as % of COP (Material, Direct Labor, Energy, Mfg Overhead, Traded/Finished Goods, & SG&A & Interest) | 0.26% | |

REM JA 7

Department, Preliminary Surrogate Value
Memo (October 3, 2019)
PR 1411-1412

Barcode:3896610-01 A-570-106 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-106
Investigation
~~Proprietary Document~~
E&C/V:   KJA
Public Version

October 2, 2019

MEMORANDUM TO:   The File

THROUGH:             Emily Halle
                              Acting Program Manager, Office V
                              Enforcement & Compliance

FROM:                   Kabir Archuletta
                              Senior International Trade Analyst, Office V
                              Enforcement & Compliance

RE:                        Antidumping Duty Investigation of Wooden Cabinets and Vanities and
                              Components Thereof from the People's Republic of China:
                              Surrogate Value Memorandum for the Preliminary Determination

---

**SUMMARY**

The Department of Commerce (Commerce) is conducting an investigation of wooden cabinets and vanities and components thereof from the People's Republic of China (China).    This memorandum outlines the methodology and selection of surrogate values used in the calculation of normal value (NV) and export price (EP) for the preliminary determination of this proceeding. Commerce has determined that Romania is the appropriate surrogate country to use for the preliminary determination in this investigation.[1]    For an explanation of the decision to select Romania as the primary surrogate country for the preliminary determination, *see* the Preliminary Decision Memorandum.    In selecting the surrogate values (SVs) detailed below, Commerce reviewed and evaluated the comments received from the petitioner,[2]  The Ancientree Cabinet

---

[1]  *See* Memorandum, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:    Decision Memorandum for Preliminary Affirmative Determination of Sales at Less-Than-Fair Value," dated October 2, 2019 (Preliminary Decision Memorandum).

[2]  The petitioner is American Kitchen Cabinet Alliance.   *See* Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:    Surrogate Country Comments," dated July 16, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components, Thereof from the People's Republic of China:    Petitioner's Initial Surrogate Value Comments," dated August 7, 2019 (Petitioner SV Comments); Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Petitioner's Initial Rebuttal Surrogate Value Comments," dated August 19, 2019; Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:    Petitioner's Final Surrogate Value Comments," dated September 3, 2019 (Petitioner's Pre-prelim SV Comments); and Petitioner's Letter, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:    Petitioner's Comments on Respondents' Final Surrogate Value Comments," dated September 13, 2019 (Petitioner Pre-prelim SV Rebuttal Comments).

INTERNATIONAL
T R A D E
ADMINISTRATION

Barcode:3896610-01 A-570-106 INV - Investigation  -

Attachment List
*Contained in the accompanying electronic file*

| | |
|---|---|
| Attachment 1: | Ancientree Summary Spreadsheet |
| Attachment 2: | Foremost Summary Spreadsheet    ~~(contains BPI)~~ |
| Attachment 3a-f: | GTA Data |
| Attachment 4: | Exports of Comparable Merchandise |
| Attachment 5: | Labor |
| Attachment 6: | Water |
| Attachment 7: | Electricity |
| Attachment 8: | Natural Gas |
| Attachment 9: | Steam |
| Attachment 10: | Inland Freight |
| Attachment 11: | Brokerage and Handling |
| Attachment 12: | Financial Ratios |

**Wooden Cabinets and Vanities and Components Thereof from China**
**(A-570-106)**
**POI: 7/01/2018 - 12/31/2018**
**Calculation of Surrogate Financial Ratios: Manufacturing Overhead, SG&A and Profit**
**SOURCE: S.C. Sigstrat S.A. (2018)**

| Items | Schedule | Income Statement Amounts | | Category | Materials and Labor | | Energy | Mfg Overhead (MOH) | Traded / Finished Goods (TFG) | SG&A and Interest (SGA) | Profit & Profit Adjustments | Exclude | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE:** | | | | | | | | | | | | | |
| Net turnover + Stocks Fluctuation | 7 | 34,682,935 | | Exclude | | | | | | | | 34,682,935.00 | |
| Other operating revenues | 7 | 2,489,925 | | SGA | | | | | | 2,489,925.00 | | | |
| Interest Income | P&L | 38 | | SGA | | | | | | 38.00 | | | |
| Financial Income | P&L | 193,953 | | SGA | | | | | | 193,953.00 | | | |
| Operating Revenue | | 37,366,851 | | a | - | - | - | - | - | 2,683,916 | - | 34,682,935 | 37,366,851 |
| **EXPENSE:** | | | | | | | | | | | | | |
| **Cost of Goods Sold** | 7 | 30,703,287 | | ML | 30,703,287.00 | | | | | | | | |
| | | | | | | | | | | | | | |
| Finished Goods Beginning | BS | | 3,664,861 | TFG | (3,664,861.00) | | | | 3,664,861.00 | | | | |
| Finished Goods Ending | BS | | 3,843,275 | TFG | 3,843,275.00 | | | | (3,843,275.00) | | | | |
| Indirect Production Expenses | 7 | | 8,512,590 | MOH | (8,512,590.00) | | | 8,512,590.00 | | | | | |
| Other outside expenses (with energy and water) | P&L | | 1,534,472 | ENERGY | (1,534,472.00) | | 1,534,472.00 | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| *Expenditure on Sales* | 7 | 109,792 | | SGA | | | | | | 109,792.00 | | | |
| *General Administrative Expenses* | 7 | 4,383,473 | | SGA | | | | | | 4,383,473.00 | | | |
| *Other Operating Expenses* | 7 | 1,337,915 | | SGA | | | | | | 1,337,915.00 | | | |
| *Financial Expenditure* | P&L | 358,610 | | SGA | | | | | | 358,610.00 | | | |
| | | | | | | | | | | | | | |
| Calculate Sub Totals | | 36,893,017 | | b | 22,369,111.00 | | 1,534,472.00 | 6,978,118.00 | (178,414.00) | 6,189,790.00 | | - | 36,893,077.00 |
| *Profit from Income Statement (Input)* | | 473,774 | | Profit c | | | | | | | 473,774.00 | | 473,774.00 |
| | Total For Calculations | | | d = b + c - a | 22,369,111.00 | - | 1,534,472.00 | 6,978,118.00 | (178,414.00) | 3,505,874.00 | 473,774.00 | (34,682,935.00) | 0.00 |
| Calculate (Revenue - Expenditures - Profit = zero) Check Total | | - | | | d1 | d2 | d3 | d4 | d5 | d6 | d7 | d8 | |

| | | | | | |
|---|---|---|---|---|---|
| Total Material, Labor, and Energy | | | | e = d1+d2+d3 | 23,903,583 |
| Overhead as % of Material, Labor & Energy | | | | =d4/e | 29.19% |
| Total Material, Labor, Energy, Mfg Overhead, and Traded & Finished Goods | | | | f = d4+d5+e | 30,703,287 |
| SG&A/Interest as % of Material, Labor, Energy, Mfg Overhead, and Traded & Finished Goods | | | | =d6/f | 11.42% |
| Total Material, Labor, Energy, Mfg Overhead, Traded & Finished Goods, and SG&A/Interest | | | | g=d6+f | 34,209,161 |
| Profit as % of Material, Labor, Energy, Mfg Overhead, SG&A/Interest, and Traded & Finished Goods | | | | =d7/g | 1.38% |

REM JA 8

Ancientree, Case Brief (December 17, 2019)
PR 1511

Barcode:3921181-01 A-570-106 INV - Investigation -

LAW OFFICES OF

### deKIEFFER & HORGAN, PLLC
1090 VERMONT AVENUE, N.W.
SUITE 410
WASHINGTON, D.C. 20005

| GREGORY S. MENEGAZ TEL 202-783-6900 | AFFILIATED OFFICE: SAARBRÜCKEN, GERMANY | GMENEGAZ@DHLAW.COM DHLAW.COM |

December 17, 2019

Electronic Filing
Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
Room 18022
U.S. Dept. of Commerce
Washington, D.C. 20230

A-570-106
POI: 7/1/2018-12/31/2018
AD/CVD Operations
Office V

**PUBLIC DOCUMENT**

RE:   ***Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China* – Case Brief**

Dear Secretary Ross:

On behalf of The Ancientree Cabinet Co., Ltd., (Ancientree), a Chinese exporter of subject merchandise, we hereby submit its case brief in the above-referenced investigation.

Please let us know if you have any questions regarding this submission.

Sincerely,

Gregory S. Menegaz
J. Kevin Horgan
Judith L. Holdsworth
Alexandra Salzman

# UNITED STATES DEPARTMENT OF COMMERCE

_____

In the Matter of:

WOODEN CABINETS AND
VANITIES FROM THE PEOPLE'S
REPUBLIC OF CHINA

Case No.: A-570-106
Antidumping Investigation

_____


## CASE BRIEF

## Of

## The Ancientree Cabinet Co., Ltd ("Ancientree")


Of Counsel:

Gregory S. Menegaz
Alexandra H. Salzman
Judith L. Holdsworth
Kevin Horgan
**DEKIEFFER & HORGAN, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, D.C. 20005

Date: December 17, 2019

Barcode:3921181-01 A-570-106 INV - Investigation  -

**III.**   **If the Department Continues to Rely Upon Romania as the Primary Surrogate Country, the Department Must Adjust its Calculation of Sigstrat's Financial Ratios.**

In the Preliminary Determination, the Department relied upon the financial ratios calculated from Sigstrat's 2018 financial statement.  However, the Department's calculation of the financial ratios differed from how the Department has always calculated Sigstrat's financial ratios in the past.  The Department has calculated financial ratios from a Sigstrat financial ratios in multiple reviews of *Multilayered Wood Flooring from China* and in the investigation of *Hardwood Plywood Products from China*.  *See Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 38,002 (August 5, 2019); *Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Rescission; 2015-2016*, 83 Fed. Reg. 35,461 (July 26, 2018); *Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Partial Rescission of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 25,766 (June 5, 2017); *Multilayered Wood Flooring Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 46,899 (July 19, 2016); *Certain Hardwood Plywood Products Final Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 82 Fed. Reg. 53,460 (November 16, 2017).

In each instance, the Department has used significantly more delineated line items in Sigstrat's financial statement.  *See*, *e.g.*, Ancientree Rebuttal SVs at Exhibit 2 (submitting the 2017 Sigstrat ratio calculation relied upon in *Multilayered Wood Flooring from China*).  Ancientree has submitted the revised 2018 Sigstrat financial ratios based on the Department's calculation in Multilayered Wood Flooring from China.  *Id*. at Exhibit 1. This calculation method provides far more critical detail, including line items for raw materials and consumables and

14

Barcode:3921181-01 A-570-106 INV - Investigation  -

personnel expenditure.  The Department's calculation in the Preliminary Determination has not

properly accounted for the delineated line items in accordance with its past practice of

calculating financial ratios generally, and critically, for calculating this particular company's

financial ratios.  The Department must adjust its financial ratios calculation in the final

determination and use the ratio calculation submitted by Ancientree, which follows the

Department's well-established prior calculation method.

## IV.     Conclusion

In light of the above, Malaysia contains the best available information to value

respondents' inputs and surrogate financial ratios.  The Department should select Malaysia as the

primary surrogate country and value all inputs based on Malaysian information.  Regardless of

the surrogate country relied upon, the Department must also make changes to certain HTS it

relied upon for particleboard, MDF, glue, and paint.  If the Department continues to rely upon

Romania, the Department must recalculate Sigstrat's financial ratios in accordance with its past

practice.

Sincerely,

Gregory S. Menegaz
Judith L. Holdsworth
Alexandra Salzman
*On behalf of Ancientree*

December 17, 2019

15

REM JA 9

Petitioner, Rebuttal Brief (December 26, 2019)
PR 1525

**PUBLIC VERSION**



December 26, 2019

Case No. A-570-106
Total Pages: 51
Investigation
AD/CVD Operations, E&C Office V
Ancientree's Business Proprietary Information Removed
from Pages: 8, 19-22
Petitioner's Business Proprietary Information Removed
from Pages: 33-40
The Department's Business Proprietary Information
Removed from Page: 28
Fubuwood's Business Proprietary Information Removed
from Pages: 34-36, 38
Mixed Business Proprietary Information Removed from
Pages: 6-7, 38
**PUBLIC VERSION**

The Honorable Wilbur L. Ross, Jr.
Secretary of Commerce
Attn: Enforcement & Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, NW
Washington, DC 20230

Re: ***Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China***: Rebuttal Brief Regarding General and Ancientree-Specific Issues

Dear Secretary Ross:

On behalf of the American Kitchen Cabinet Alliance ("Petitioner"), we respectfully submit the enclosed rebuttal brief, in accordance with 19 C.F.R. § 351.309(d), for the consideration of the U.S. Department of Commerce (the "Department") in its upcoming final determination in the above-referenced investigation. This rebuttal brief is timely filed in accordance with the Department's December 20, 2019 memoranda.[1]

---

[1]      Memorandum from Eliza Siordia, Int'l Trade Compliance Analyst, Enf't & Compliance, Off. V to Interested Parties, re: *Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the*

Barcode:3924857-01 A-570-106 INV - Investigation   -

PUBLIC VERSION

Case No. A-570-106
Total Pages: 46
Investigation
AD/CVD Operations, E&C Office V
Ancientree's Business Proprietary Information Removed from Pages: 8, 19-22
Petitioner's Business Proprietary Information Removed from Pages: 33-40
The Department's Business Proprietary Information Removed from Page: 28
Fubuwood's Business Proprietary Information Removed from Pages: 34-36, 38
Mixed Business Proprietary Information Removed from Pages: 6-7, 38

**PUBLIC VERSION**

BEFORE THE
INTERNATIONAL TRADE ADMINISTRATION OF THE
U.S. DEPARTMENT OF COMMERCE

WOODEN CABINETS AND VANITIES AND COMPONENTS THEREOF FROM THE PEOPLE'S REPUBLIC OF CHINA

ON BEHALF OF:
AMERICAN KITCHEN CABINET ALLIANCE

REBUTTAL BRIEF REGARDING GENERAL AND ANCIENTREE-SPECIFIC ISSUES

Timothy C. Brightbill, Esq.
Jeffrey O. Frank, Esq.
Elizabeth S. Lee, Esq.
Theodore P. Brackemyre, Esq.

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the American Kitchen Cabinet Alliance*

December 26, 2019

Barcode:3924857-01 A-570-106 INV - Investigation -

**PUBLIC VERSION**

purchases [                                                                    ].[69] Given that

Ancientree goes to great lengths to highlight the existence of [


], the Department can only conclude that the totality of the evidence supports its utilization

of HTS number 3208.10.90 in the preliminary determination and its continued use in the final

determination.[70]

### C. The Department Should Reject Ancientree's Attempt to Discredit the Agency's Calculation of Financial Ratios

Ancientree argues in its case brief that the Department incorrectly calculated the financial

ratios for the Romanian company – Sigstrat.[71]  According to Ancientree, "the Department's

calculation of the financial ratios differed from how the Department has always calculated

Sigstrat's financial ratios in the past."[72]  Ancientree cites to a long line of cases where Sigstrat was

ostensibly used for purposes of calculating surrogate financial ratios.  Further, Ancientree placed

onto the record a copy of portion of the Department's preliminary surrogate values memorandum

from the 2016-2017 administrative review of the antidumping duty order of *Multilayered Wood

Flooring From the People's Republic of China.*[73]  Based on this calculation worksheet, Ancientree

claims that it "has submitted the revised 2018 Sigstrat financial ratios based on the Department's

calculation in Multilayered Wood Flooring from China."[74]  Ancientree concludes by asserting that

---

[69]     *See id.* {**Ancientree's BPI**}

[70]     *See id.* {**Ancientree's BPI**}

[71]     Ancientree Case Brief at 14-15.

[72]     *Id.* at 14.

[73]     *Id. citing* Letter from DeKieffer & Horgan PLLC to Commerce Dept. re: *Wooden Cabinets and Vanities from the People's Republic of China: Rebuttal Preliminary Surrogate Value Submission*, at Exhibit SVR-1 and SVR-2 (Aug. 19, 2019) ("Ancientree Aug. 19 SV Rebuttal Submission").

[74]     Ancientree Case Brief at 14.

22

"Department must adjust its financial ratios calculation in the final determination and use the ratio calculation submitted by Ancientree, which follows the Department's well-established prior calculation method."[75]   The Department should reject this request in its final determination.

First, Petitioner disagrees with Ancientree's assertion that the methodology employed to calculate financial ratios in the instant proceeding "differed from how the Department has *always* calculated Sigstrat's financial ratios in the past."[76]   The record of this proceeding contains a single alternate calculation methodology—namely for the 2016-2017 administrative review of multilayered wood flooring.   There is no information from the other proceedings that Ancientree cites to in its brief.[77]   Similarly absent from the record of this proceeding is any information as to the reasoning for the methodology performed in the 2016-2017 review of that order.   More problematic though, is that the 2017 financial statement of Sigstrat is absent from the record of this proceeding.   Without this data (including the auditors' notes and schedules), it is impossible to tell or to assume why certain categories of expenses would have been calculated as they were in the 2016-2017 review of that order.   Without this information, the Department is simply operating in a vacuum and cannot assume that the methodology applicable in a prior proceeding of a different antidumping duty order is relevant or applicable here.   Moreover, the Department may make adjustments in each proceeding that are unique to that proceeding (often based on the production experience of the company or companies being investigated), and such adjustments may not be appropriate in other proceedings and especially other cases.   For example, in *Xanthan Gum From the People's Republic of China,* the Department made adjustments to the financial ratio

---

[75]     *Id.* at 15.

[76]     *Id.* at 14 (emphasis added).

[77]     *Id.*

23

Barcode:3924857-01 A-570-106 INV - Investigation   -

**PUBLIC VERSION**

calculation because the surrogate value used to value labor included certain retirement benefits and costs.[78]  The Department reasoned that including the surrogate company's retirement expenses as overhead would result in a double counting of retirement expenses as the proxy surrogate labor rate already included values for retirement benefits.  Absent information from that proceeding, the Department cannot assume that its calculation methodology is relevant in this proceeding.

Moreover, Petitioner notes that, while Ancientree asserts that it has "submitted the revised 2018 Sigstrat financial ratios based on the Department's calculation" in *Multilayered Wood Flooring,* Ancientree's proffered calculation differs from the Department's worksheet in that proceeding.  First, whereas the Department assigned a certain percentage of personnel expenses to "direct labor" and a certain percentage to "SG&A and interest," Ancientree applied all of this expense line item to labor.[79]  The Department's 2017 calculation of Sigstrat's SG&A expense includes four line items (aside from allocated labor): "third party service expenses;" "other fees, taxes and similar expenses;" "Other expenses;" and "adjustment related to provisions."[80]  The recalculation includes two different line items in the 2018 recalculation:  (1) "adjustment to current assets," and (2) "operating expenses adjustment."[81]  Again, without the relevant prior year's financial statement (including notes and schedules), there is no way to assess if respondent's alternative calculation is accurate or reasonable.

Finally, Petitioner notes that Ancientree does not directly dispute the accuracy of the calculation presented in the preliminary determination of this proceeding.  Instead, the company

---

[78]     Issues and Decision Memorandum Accompanying *Xanthan Gum from the People's Republic of China*, 82 Fed. Reg. 11,428 (Dep't Commerce Feb. 23, 2017) (final results of antidumping duty admin. rev.; 2013-2014) at Cmt. 14.

[79]     Ancientree Aug. 19 SV Rebuttal Submission (compare Exhibit SVR-2 with Exhibit SVR-1).

[80]     *Id.* at Exhibit SVR-2.

[81]     *Id.* at Exhibit SVR-1.

argues for changes that utilize methods which are not possible in the Department to verify given the absence of information from the other proceeding.

As a result, the Department should find that Ancientree's surrogate financial ratio argument is unsupported and should reject it for purposes of the final determination.

### D. The Department Should Continue to Deny Separate Rates to Companies that Failed to Timely Submit a Supplemental Separate Rate Questionnaire Response

In their case briefs, Brentridge and Harbin HS argue that the Department should excuse them for failing to submit a complete and timely response to the agency's supplemental questionnaire regarding separate rate applications.[82] Both companies insist that they were not aware that they needed to submit a response to the Department's supplemental questionnaire until after the agency's preliminary determination.[83] As such, Brentridge and Harbin HS contend that the Department should grant these companies a separate rate in this investigation.[84] These arguments are without merit and should be rejected.

The Department was correct to deny these companies a separate rate in its preliminary determination, and the agency should continue to do so in its final determination. The failure of Brentridge and Harbin HS to realize that they needed to submit a response to the Department's supplemental questionnaire regarding separate rate applications is no justification for their failure to do so.[85] Both companies submitted separate rate applications and, thus, should have been aware that a supplemental questionnaire regarding those applications may be issued that would be

---

[82]     *See generally* Brentridge Case Br.; Harbin HS Case Br.

[83]     *See* Brentridge Case Br. at 1-2; Harbin HS Case Br. at 3-4.

[84]     *See generally* Brentridge Case Br.; Harbin HS Case Br.

[85]     *See* Brentridge Case Br. at 1-2; Harbin HS Case Br. at 3-4.

25

# REM JA 10

# Department, Final Surrogate Value Memo (February 21, 2020)
PR 1560

Barcode:3948601-01 A-570-106 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-106
Investigation
~~Proprietary Document~~
E&C/OV:   RG
Public Version

February 21, 2020

MEMORANDUM TO:    The File

THROUGH:    Emily Halle
    Program Manager, Office V
    Enforcement & Compliance

FROM:    Rachel Greenberg
    International Trade Analyst, Office V
    Enforcement & Compliance

RE:    Antidumping Duty Investigation of Wooden Cabinets and Vanities and
    Components Thereof from the People's Republic of China:
    Surrogate Value Memorandum for the Final Determination

---

On October 9, 2019, the Department of Commerce (Commerce) published in the *Federal Register* the *Preliminary Determination* of the antidumping duty investigation of wooden cabinets and vanities and components thereof from the People's Republic of China (China).[1] Most of the factor valuations remain unchanged since the *Preliminary Determination*.[2] However, since the *Preliminary Determination*, Commerce received additional comments regarding the FOPs used in the *Preliminary Determination*.[3]   After reviewing and analyzing these comments, and all information on the record, we have revised certain surrogate values (SVs) for The Ancientree Co., Ltd. (Ancientree) and Rizhao Foremost Woodwork Manufacturing Company Ltd. (Foremost) (collectively, the respondents) for the final determination.   For SVs used to value FOPs in the *Preliminary Determination* to which we did

---

[1]  *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:    Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 FR 54106 (October 9, 2019) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum, as corrected by *Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China:    Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 FR 56420 (October 22, 2019).
[2]  For a discussion of the factors of production (FOPs) not listed in this memorandum which have not changed from the Preliminary Determination, *see* Memorandum, "Antidumping Duty Investigation of Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:    Surrogate Value Memorandum for the Preliminary Determination," dated October 2, 2019 (Preliminary SV Memo).
[3]  For a discussion of the comments received regarding the valuation of FOPs used in the *Preliminary Results*, *see* Memorandum, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value," dated concurrently with this memorandum (Issues and Decision Memorandum).

Barcode:3948601-01 A-570-106 INV - Investigation  -

Attachment List
*Contained in the accompanying electronic file*

Attachment 1:            Ancientree Summary Spreadsheet
Attachment 2:            Foremost Summary Spreadsheet        (contains BPI)
Attachment 3a-f:         GTA Data
Attachment 4:            Exports of Comparable Merchandise
Attachment 5:            Labor
Attachment 6:            Water
Attachment 7:            Electricity
Attachment 8:            Natural Gas
Attachment 9:            Steam
Attachment 10:           Inland Freight
Attachment 11:           Brokerage and Handling
Attachment 12:           Financial Ratios

Filed By: Rachel Greenberg, Filed Date: 2/28/20 10:15 AM, Submission Status: Approved

**Wooden Cabinets and Vanities and Components Thereof from China**
**(A-570-106)**
**POI: 7/01/2018 - 12/31/2018**
**Calculation of Surrogate Financial Ratios: Manufacturing Overhead, SG&A and Profit**
**SOURCE: S.C. Sigstrat S.A. (2018)**

| Items | Schedule | Income Statement Amounts | | Category | Materials and Labor | | Energy | Mfg Overhead (MOH) | Traded / Finished Goods (TFG) | SG&A and Interest (SGA) | Profit & Profit Adjustments | Exclude | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE:** | | | | | | | | | | | | | |
| Net turnover + Stocks Fluctuation | 7 | 34,682,935 | | Exclude | | | | | | | | 34,682,935.00 | |
| Other operating revenues | 7 | 2,489,925 | | SGA | | | | | | 2,489,925.00 | | | |
| Interest Income | P&L | 38 | | SGA | | | | | | 38.00 | | | |
| Financial Income | P&L | 193,953 | | SGA | | | | | | 193,953.00 | | | |
| Operating Revenue | | 37,366,851 | | a | - | - | - | - | - | 2,683,916 | - | 34,682,935 | 37,366,851 |
| **EXPENSE:** | | | | | | | | | | | | | |
| **Cost of Goods Sold** | 7 | 30,703,287 | | ML | 30,703,287.00 | | | | | | | | |
| | | | | | | | | | | | | | |
| Finished Goods Beginning | BS | | 3,664,861 | TFG | (3,664,861.00) | | | | 3,664,861.00 | | | | |
| Finished Goods Ending | BS | | 3,843,275 | TFG | 3,843,275.00 | | | | (3,843,275.00) | | | | |
| Indirect Production Expenses | 7 | | 8,512,590 | MOH | (8,512,590.00) | | | 8,512,590.00 | | | | | |
| Other outside expenses (with energy and water) | P&L | | 1,534,472 | ENERGY | | | 1,534,472.00 | (1,534,472.00) | | | | | |
| | | | | | | | | | | | | | |
| *Expenditure on Sales* | 7 | 109,792 | | SGA | | | | | | 109,792.00 | | | |
| *General Administrative Expenses* | 7 | 4,383,473 | | SGA | | | | | | 4,383,473.00 | | | |
| *Other Operating Expenses* | 7 | 1,337,915 | | SGA | | | | | | 1,337,915.00 | | | |
| *Financial Expenditure* | P&L | 358,610 | | SGA | | | | | | 358,610.00 | | | |
| | | | | | | | | | | | | | |
| Calculate Sub Totals | | 36,893,077 | | b | 22,369,111.00 | - | 1,534,472.00 | 6,978,118.00 | (178,414.00) | 6,189,790.00 | | | 36,893,077.00 |
| *Profit from Income Statement (Input)* | | 475,774 | | Profit c | | | | | | | 475,774.00 | | 475,774.00 |
| | Total For Calculations | | d = b + c - a | | 22,369,111.00 | - | 1,534,472.00 | 6,978,118.00 | (178,414.00) | 3,505,874.00 | 475,774.00 | (34,682,935.00) | 0.00 |
| Calculate (Revenue - Expenditures - Profit = zero) | Check Total | - | | | d1 | d2 | d3 | d4 | d5 | d6 | d7 | d8 | |

| | | | | |
|---|---|---|---|---|
| Total Material, Labor, and Energy | | | | |
| Overhead as % of Material, Labor & Energy | | e = d1+d2+d3 | 23,903,583 | =d4/e  29.19% |
| Total Material, Labor, Energy, Mfg Overhead, and Traded & Finished Goods | | | | |
| SG&A/Interest as % of Material, Labor, Energy, Mfg Overhead, and Traded & Finished Goods | | f = d4+d5+e | 30,703,287 | =d6/f  11.42% |
| Total Material, Labor, Energy, Mfg Overhead, Traded & Finished Goods, and SG&A/Interest | | g=d6+f | 34,209,161 | |
| Profit as % of Material, Labor, Energy, Mfg Overhead, SG&A/Interest, and Traded & Finished Goods | | | =d7/g  1.38% | |

REM JA 11

Department, Draft Remand Redetermination
(September 10, 2021)
REM PR 1

A-570-106
Remand
Slip Op. 21-87
POI: 07/01/2018 – 12/31/2018
**Public Document**
E&C/OV: RG

***The Ancientree Cabinet Co., Ltd. v. United States***
**Court No. 20-00114, Slip Op. 21-87 (CIT July 12, 2021)**

**DRAFT RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.  SUMMARY

The Department of Commerce (Commerce) has prepared these draft results of

redetermination pursuant to the decision and remand order of the Court of International Trade

(CIT) in *The Ancientree Cabinet Co., Ltd.  v. United States*, Court No. 20-00114, Slip Op. 21-87

(CIT July 12, 2021) (*Remand Opinion and Order*).  These draft results of redetermination

concern Commerce's final determination in the less-than-fair-value (LTFV) investigation of

wooden cabinets and vanities and components thereof (wooden cabinets and vanities) from the

People's Republic of China (China).[1]  In the *Remand Opinion and Order*, the CIT remanded

Commerce's calculation of the surrogate financial ratios, computed using the financial

statements of S.C. Sigstrat s.a. (Sigstrat).  Specifically, the CIT ordered Commerce to address the

objections raised by The Ancientree Cabinet Co. Ltd. (Ancientree) to Commerce's calculation

and explain its departure from Commerce's financial ratio calculations using Sigstrat's financial

statements in other proceedings.[2]

---

[1] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 11953 (February 28, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Corrected Notice of Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 17855 (March 31, 2020) (*Corrected Final Determination*).
[2] *See Remand Opinion and Order* at 28.

Pursuant to the *Remand Opinion and Order*, we further explain Commerce's surrogate financial ratio calculations and why it was appropriate to apply the methodology used in this review rather than the one used in an administrative review of a separate proceeding.[3]  In particular, we address the arguments submitted in Ancientree's administrative case brief [4] and the administrative rebuttal brief submitted by American Kitchen Cabinet Alliance (the petitioner)[5] related to the surrogate financial ratios, and we provide additional explanation to support the calculations used in *Preliminary Determination*,[6] which were unchanged in the *Final Determination*.

## II.   BACKGROUND

On April 2, 2019, Commerce published the *Initiation Notice* in the LTFV investigation of wooden cabinets and vanities from China.[7]  Subsequently, we selected three Chinese exporters and producers of subject merchandise as mandatory respondents to Commerce's initial questionnaire:  Ancientree, Dalian Meisen Woodworking Co., Ltd. (Meisen), and Rizhao Foremost Woodwork Manufacturing Company Ltd. (Foremost).[8]  The period of investigation (POI) is July 1, 2018, through December 31, 2018.

On October 9, 2019, Commerce published the *Preliminary Determination*, finding that wooden cabinets and vanities from China are being sold in the United States at LTFV.[9]  On

---

[3] *See Multilayered Wood Flooring from the People's Republic of China:  Final Results of the Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 38005 (August 5, 2019) (*MLWF from China 2016-2017*).
[4] *See* Ancientree's Letter, "Case Brief," dated December 17, 2019 (Ancientree's Case Brief) at 14-15.
[5] *See* Petitioner's Letter, "Rebuttal Brief Regarding General and Ancientree-Specific Issues," dated December 26, 2019 (Petitioner's Rebuttal Brief) at 22-25.
[6] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 84 FR 54106 (October 9, 2019) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).
[7] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Initiation of Less-Than-Fair-Value Investigation*, 84 FR 12587 (April 2, 2019) (*Initiation Notice*).
[8] *See* Memorandum, "Respondent Selection," dated June 4, 2019.
[9] *See Preliminary Determination*.

December 17, 2019, Ancientree submitted its case brief, and on December 26, 2019, the petitioner submitted its rebuttal brief in response to Ancientree's arguments.[10]  In its case brief, Ancientree contested various aspects of Commerce's calculation of the surrogate financial ratios used to determine Ancientree's preliminary dumping margin.

On February 28, 2020, Commerce published the *Final Determination* and continued to find that wooden cabinets and vanities from China are sold at LTFV in the United States by the three mandatory respondents and the China-wide entity.[11]  In the *Final Determination*, Commerce made no changes to its calculation of the surrogate financial ratios.  On March 31, 2020, Commerce published a *Corrected Final Determination* to correct errors that were present in the *Final Determination* in certain company names.[12]

On July 12, 2021, the CIT held that Commerce did not adequately address Ancientree's Case Brief comments on the calculation of the surrogate financial ratios in its *Final Determination*.  As a result, the CIT remanded the *Final Determination* to Commerce to address Ancientree's arguments and further explain this calculation.[13]

## III.    REMANDED ISSUE

The CIT remanded the surrogate financial ratio calculation from the *Final Determination*, holding that Commerce did not adequately address Ancientree's arguments against the methodology used for the calculation.  The CIT specifically noted that the methodology used for calculating the surrogate financial ratios in this investigation differed from the methodology used in *MLWF from China 2016-2017*, although both proceedings relied on Sigstrat's financial statements (albeit from different years).  Therefore, the CIT instructed Commerce to address

---

[10] *See* Ancientree's Case Brief; *see also* Petitioner's Rebuttal Brief.
[11] *See Final Determination*.
[12] *See Corrected Final Determination*.
[13] *See Remand Opinion and Order* at 27-28.

Filed By: Rachel Greenberg, Filed Date: 9/10/21 11:16 AM, Submission Status: Approved

Ancientree's Case Brief arguments, and also explain why it was appropriate to change the financial ratio calculation methodology used in this investigation from the methodology employed in *MLWF from China 2016-2017*.[14]

Accordingly, we summarize and respond to the comments presented by Ancientree and the petitioner in their respective case and rebuttal briefs regarding the surrogate financial ratio calculations below.  We also explain why Commerce's calculation in this case, which differed from the calculation in *MLWF from China 2016-2017*, was appropriate based on the facts on this record and was also in accordance with the Tariff Act of 1930, as amended (the Act).

1.    **Legal Framework**

Pursuant to section 773(c)(1) of the Act, when investigating imports from a non-market economy (NME) country, Commerce bases normal value (NV), in most circumstances, on the NME producer's factors of production (FOP), valued in a surrogate market economy (ME) country or countries considered to be appropriate by Commerce.  Once Commerce selects the most appropriate surrogate ME country, in accordance with section 773(c)(1)(B) of the Act, Commerce calculates NV based on the FOP data reported by a respondent by multiplying the per-unit FOP consumption rates by the best publicly-available surrogate value (SV) information.  According to 19 CFR 351.408(c)(4), Commerce must value overhead, selling, general and administrative (SG&A) expenses, and profit using non-proprietary information gathered from producers of merchandise that is identical or comparable to the merchandise under consideration in the primary surrogate country.  Commerce uses the non-proprietary information from the surrogate producers to compute overhead, SG&A, and profit ratios; these ratios are known as the "surrogate financial ratios."

---

[14] *Id.* at 27.

## 2.    Background

Between July 16, 2019, and September 13, 2019, we received comments regarding the selection of a surrogate country and SVs from the petitioner,[15] Anciertree,[16] Foremost,[17] Meisen,[18] and Shanghai Wen Bo Industries Co., Ltd. (Wen Bo),[19] an exporter of subject merchandise.  After considering the information provided within those submissions, we selected Romania as the primary surrogate country.[20]  In calculating the overhead, SG&A, and profit surrogate financial ratios used for determining NV, we used the 2017-2018 financial statements of a Romanian producer of plywood and veneers, Sigstrat, which the petitioner provided along with its suggested financial ratio calculations.[21]  In response to Petitioner's SV Comments, Anciertree submitted alternative financial ratio calculations and the calculations from *MLWF from China 2016-2017*, a case where Commerce also relied on Sigstrat's financial statements.

---

[15] *See* Petitioner's Letters, "Surrogate Country Comments," dated July 16, 2019; "Petitioner's Initial Surrogate Value Comments," dated August 7, 2019 (Petitioner's SV Comments); "Petitioner's Initial Rebuttal Surrogate Value Comments," dated August 19, 2019; "Petitioner's Final Surrogate Value Comments," dated September 3, 2019; and "Petitioner's Comments on Respondents' Final Surrogate Value Comments," dated September 13, 2019.

[16] *See* Anciertree's Letters, "Surrogate Country Comments," dated July 16, 2019; "Preliminary Surrogate Value Submission," dated August 7, 2019; "Rebuttal Preliminary Surrogate Value Submission," dated August 19, 2019 (Anciertree's Rebuttal SV Comments); and "Final Surrogate Value Submission," dated September 3, 2019.

[17] *See* Foremost's Letters, "Foremost's Surrogate Country Selection Comments," dated July 16, 2019; "Foremost's Affirmative Surrogate Value Submission," dated August 7, 2019; "Foremost's Rebuttal Surrogate Value Submission," dated August 19, 2019; and "Foremost's Final Surrogate Value Submission," dated September 3, 2019.

[18] *See* Meisen's Letters, "Surrogate Country Comments," dated July 5, 2019; "Surrogate Value Comments," dated August 7, 2019; and "Rebuttal Surrogate Value Comments," dated August 19, 2019.

[19] *See* Web Bo's Letters, "Surrogate Country Comments," dated July 16, 2019; "Surrogate Value Selection Comments," dated August 7, 2019; "Surrogate Value Selection Rebuttal Comments," dated August 19, 2019; and "Factual Information to Value Factors of Production," dated September 3, 2019.

[20] *See Preliminary Determination* PDM at 11-14; *see also* Memorandum, "Surrogate Value Memorandum for the Preliminary Determination," dated October 2, 2019 (Preliminary SV Memorandum) at 2-5.  Commerce's decision to use Romania as the primary surrogate country was unchanged in the *Final Determination*.  In the *Remand Opinion and Order*, the CIT ruled that Commerce properly selected Romania as the primary surrogate country.  *See Final Determination* IDM at Comment 6; *see also Remand Opinion and Order* at 11-12.

[21] *See* Petitioner's SV Comments at Exhibits 10A and 10B.

5

Ancientree argued that Commerce should use its calculation because it followed the methodology used in *MLWF from China 2016-2017* (albeit with some modifications).[22]

In the *Preliminary Determination*, Commerce used a financial ratio calculation methodology containing elements from each suggested methodology provided in SV comments (*e.g.*, similar to the suggestion provided by the petitioner, we started with Note 7 and Sigstrat's cost of goods sold (COGS) to calculate the financial ratios),[23] and consistent with the suggestions provided by Ancientree, we included segregated energy costs in the calculation of the denominators.[24]  Thus, the preliminary financial ratio calculation methodology incorporated aspects of both the petitioner's and Ancientree's suggested calculations.

After the issuance of the *Preliminary Determination*, Ancientree submitted a case brief and argued that Commerce should recompute the surrogate financial ratios using Ancientree's suggested methodology.[25]  The petitioner rebutted Ancientree's argument and did not dispute Commerce's financial ratio calculations.[26]  In the *Final Determination*, Commerce made no changes to the financial ratio calculations.[27]

### 3.      The Court's Remand Order

In the *Remand Opinion and Order*, the CIT found that Commerce failed to address Ancientree's Case Brief arguments regarding the calculation of the surrogate financial ratios.[28] The CIT held that Commerce was obligated to not only specifically address Ancientree's

---

[22] *See* Ancientree's Rebuttal SV Comments at 1-2 and Exhibits SVR1 and SVR2 (referencing *MLWF from China 2016-2017*, and citing Memorandum, "Antidumping Duty Administrative Review of Multilayered Wood Flooring from the People's Republic of China; 2016-2017:  Surrogate Values for the Preliminary Determination," dated December 17, 2018) (*MLWF from China 2016-2017* SV Memorandum).
[23] *See* Petitioner's SV Comments at Exhibit 10A *cf.* Preliminary SV Memorandum at Exhibit 12.
[24] *See* Preliminary SV Memorandum at Exhibit 12 *cf.* Ancientree's SV Rebuttal at Exhibits SVR-1 and SVR-2.
[25] *See* Ancientree's Case Brief at 15.
[26] *See* Petitioner's Rebuttal Brief at 22-25.
[27] *See* Memorandum, "Surrogate Value Memorandum for the Final Determination," dated February 21, 2020 (Final SV Memorandum) at Attachment 12.
[28] *See Remand Opinion and Order* at 24-28.

arguments, but that it must explain why the methodology used in this case differed from previous financial ratio calculations that also relied on Sigstrat's financial statements.  The CIT explained that "{c}onsistency has long been a core interest of administrative law, and inconsistent treatment is inherently significant."[29]  It continued by explaining that, "{w}hen an agency departs from prior determinations, it is appropriate to compel the agency to explain whether:  (1) good reasons prompt that departure; or (2) the prior determinations are inapposite such that it is not in fact a departure at all."[30]  While the CIT noted that prior determinations are not legally binding, and that Commerce may exercise its discretion in selecting its methodology, Commerce "is constrained by the need to provide an adequate explanation for any deviation from its past practice,"[31] and that Commerce's decision "must be reasonably discernable."[32]  Therefore, the CIT remanded this issue to Commerce, and directed it to respond to Ancientree's Case Brief arguments and to further explain the calculations used in this investigation.

### 4.    Ancientree's Case Brief Arguments and the Petitioner's Rebuttal

In its case brief, Ancientree argued that Commerce computed the surrogate financial ratios in the *Preliminary Determination* in a manner that differed from the methodology it has "always" used to calculate Sigstrat's financial ratios in the past.[33]  Specifically, Ancientree claimed that, in several earlier administrative reviews of the AD order on multilayered wooden flooring from China, and in the LTFV investigation of certain hardwood plywood products from China, Commerce also used Sigstrat's financial statements, but computed the financial ratios using significantly more detailed line items compared to the information Commerce used in the

---

[29] *Id.* at 25 (citing *DAK Americas LLC v. United States*, 456 F. Supp. 3d 1340, 1355 (CIT 2020) (*Dak Americas LLC*)).
[30] *Id*. (citing *DAK Americas LLC*, 456 F. Supp. 3d at 1356).
[31] *Id*. at 25 (citing *SFK USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001)).
[32] *Id*. at 26 (citing *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)).
[33] *See* Ancientree's Case Brief at 14-15.

7

instant proceeding.[34]  Ancientree asserted that the financial ratio calculations it submitted in

Ancientree's SV Comments, which were based on the *MLWF from China 2016-2017* Sigstrat

financial ratio calculations, provided more "critical detail" by including line items for raw

materials, consumables, and personnel expenditures, than the calculations used in the

*Preliminary Determination*.[35]

In rebuttal, the petitioner noted that Ancientree did not contest the accuracy of the

financial ratio calculations used in this investigation and argued that there is no record

information to support modifying Commerce's calculations according to Ancientree's

suggestion.[36]  The petitioner also noted that the calculations provided in Ancientree's SV

Rebuttal Comments are themselves not consistent with the methodology used in *MLWF from

China 2016-2017*, and that these differences undermine Ancientree's claim that its suggestion is

based on Commerce's past practice.[37]  Further, the petitioner argued that, because the underlying

financial statements (*i.e.*, covering Fiscal Year (FY) 2016-2017) used to compute the surrogate

financial ratios in *MLWF from China 2016-2017* are not on this record, there is no information

on this record to explain why the *MLWF from China 2016-2017* financial ratios were calculated

the way they were.[38]  The petitioner pointed to *Xanthan Gum from China*, where Commerce

made adjustments that were unique to that segment which may not have been appropriate in

---

[34] *Id.* at 14 (citing *MLWF from China 2016-2017*, *Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Administrative Review; 2013-2014*, 81 FR 46899 (July 19, 2016) (*MLWF from China 2013-2014*), *Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Partial Rescission of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 25766 (June 5, 2017) (*MLWF from China 2014-2015*), *Multilayered Wood Flooring from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Rescission; 2015-2016*, 83 FR 35461 (July 26, 2018) (*MLWF from China 2015-2016*), and *Certain Hardwood Plywood Products from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 82 FR 53460 (November 16, 2017) (*Plywood from China*)).
[35] *Id.* at 14-15.
[36] *See* Petitioner's Rebuttal Brief at 24.
[37] *Id.*
[38] *Id.* at 23.

other segments of that proceeding, let alone other proceedings.[39]  Thus, the petitioner contended

that, without additional information to explain the *MLWF from China 2016-2017* financial ratio

calculations, there is no way for Commerce to confirm whether those calculations match the

unique circumstances of this investigation.[40]

###### 5.    Analysis

In selecting the best information and methodology for the surrogate financial ratio

calculations in this investigation, Commerce considered all information on this record.  During

the SV comment period, Commerce evaluated three proposed calculation methodologies, one

from the petitioner and two from Ancientree.[41]  Specifically, the petitioner's methodology,

provided along with Sigstrat's FY 2017-2018 contemporaneous financial statements that cover

the entire POI and an English translation,[42] started with the cost of goods sold (COGS) from

Note 7 of Sigstrat's financial statements to calculate the financial ratios.[43]  Ancientree provided

two methodologies:  (1) its own calculation using the 2017-2018 Sigstrat financial statements,

which it stated was based on Commerce's methodology in *MLWF from China 2016-2017*;[44] and

(2) Commerce's calculation from *MLWF from China 2016-2017*.[45]  Both calculations submitted

---

[39] *Id.* at 23-24 (citing *Xanthan Gum from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2013-2014*, 82 FR 11428 (February 23, 2017) (*Xanthan Gum from China*), and accompanying IDM at Comment 14).

[40] *Id.* at 23.

[41] *See* Commerce's Letter, "Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information," dated June 17, 2019 (establishing July 26, 2019, and July 31, 2019, as the deadlines to submit SV comments and rebuttal comments, respectively, and notifying interested parties that:  (1) pursuant to 19 CFR 351.301(c)(3), the deadline to submit publicly available information to value FOPs was no later than 30 days before the scheduled date of the preliminary determination; and (2) in accordance with 19 CFR 351.301(c)(3)(iv), interested parties were permitted one opportunity to rebut, clarify, or correct such factual information 10 days after the factual information was served); *see also* Memorandum, "Extension of the Deadline to Submit Publicly Available Information to Value Factors of Production (FOPs)," dated July 24, 2019 (extending the dead to submit publicly available information to value FOPS to August 2, 2019); and Memorandum, "Extension of Deadline to Submit Publicly Available Information to Value Factors of Production (FOPs)," dated August 1, 2019 (extending the deadline for parties to submit public information to value FOPs to August 7, 2019).

[42] *See* Petitioner's SV Comments at Exhibits 10A and 10B; *see also Final Determination* IDM at 33.

[43] *Id.*

[44] *See* Ancientree's Rebuttal SV Comments at Exhibits SVR-1.

[45] *Id.* at SVR-2.

Filed By: Rachel Greenberg, Filed Date: 9/10/21 11:16 AM, Submission Status: Approved

by Ancientree started with line items from Sigstrat's income statement (*i.e.*, costs identified by the type of transaction[46]) to calculate the financial ratios.

In our calculations for the *Final Determination*, we agreed with the petitioner that Notes 7 and 4 accompanying the financial statements were the appropriate starting points for the financial ratio calculations because Notes 7 and 4 identify Sigstrat's costs by function (*i.e.*, COGS, SG&A, etc.), not type of transaction, and allow Commerce to properly classify the costs as either manufacturing costs, operating costs (*i.e.*, selling, general, and administrative costs), and financial expenses.  Further, using the change in finished inventory, as reported on the balance sheet, and the COGS reported in the accompanying Notes 7 and 4 to the financial statements, we can accurately calculate the cost of manufacturing (COM) and we can accurately segregate the COM between direct manufacturing expenses and factory overhead.  As discussed below, Commerce's preference is to calculate the financial ratios starting from COGS, when available.

The CIT in *Nantong* outlined Commerce's practice with respect to the calculation of the surrogate financial ratios:

> {In calculating the} . . . surrogate financial ratios:  (1) for factory overhead, Commerce divides a surrogate company's total factory overhead expenses by its total direct manufacturing expenses; (2) for selling, general, and administrative expenses, Commerce divides the surrogate's selling, general, and administrative costs by its total cost of manufacture; and (3) for profit, Commerce divides the surrogate's before-tax profit by the sum of direct manufacturing expenses, overhead, and selling, general, and administrative expenses.[47]

---

[46] For example, the income statement shows a cost for "Salaries and wages."  These costs are not necessarily associated with the manufacture of finished goods during the fiscal year (*i.e.*, they can include the salaries of staff that only work in an administrative office).
[47] *See Nantong Uniphos Chems. Co. v. United States*, 415 F. Supp. 3d 1345, 1351 (CIT 2019) (*Nantong*).

10

Importantly, the denominator of Commerce's surrogate financial ratios incorporates the surrogate producer's total direct manufacturing costs,[48] and, therefore, selecting the best record information for the total direct manufacturing costs used in the financial ratio calculations is integral to the accuracy of Commerce's calculations.

Section 773(c)(1)(B) of the Act states that "the valuation of the factors of production shall be based on the best available information regarding the values of such factors{.}"[49] Therefore, when Commerce calculates surrogate financial ratios to value overhead, SG&A, and profit in an NME proceeding, it selects the best information on the record of the proceeding for direct manufacturing costs, which, as noted above is a core component to calculating the financial ratios.  The CIT upheld Commerce's decision in *Nantong*, where Commerce selected financial statements that specifically reported a surrogate company's COGS for calculating the financial ratios and maintained that using COGS for calculating direct manufacturing expenses is preferred over the reliance on individual income statement line items for calculating the surrogate financial ratios.  The CIT summarized Commerce's preference, explaining:

> Commerce prefers to use financial statements that list costs by function rather than by type of transaction, because expenses such as labor can relate to manufacturing, administration, and selling….  Commerce's preference is to use financial statements that include a line item for the cost of goods sold, because we know that the cost of goods sold include{s} all the manufacturing costs and changes in the finished goods inventory. From the cost of goods sold amount, we can calculate the cost of manufacturing by accounting for the change in the finished goods inventory from the inventory amounts reported in the corresponding comparative balance sheets.  From the cost of manufacturing, we deduct the depreciation costs reflected in the notes to the financial statements, with the residual classified as materials, labor and energy (MLE).[50]

---

[48] As explained further below, COGS, adjusted for the net change in a company's finished goods inventory, represents a company's total manufacturing costs (COM) during the fiscal year; a company's total direct manufacturing cost is COM less fixed factory overhead.

[49] *See* section 771(c)(1)(B) of the Act (emphasis added).

[50] *See Nantong*, 415 F. Supp 3d at 1354-5.

In that case, the plaintiff argued that Commerce could not rely on CYDSA S.A.B. de C.V.

(CYDSA)'s financial statements because the financial statements did not include line items that

clearly delineated labor, energy, and administrative expenses.[51]  However, Commerce explained

that it had reasonably used CYDSA's financial statements for calculating the financial ratios

because they were "the best available source of information to find an amount for the surrogate

producer's total cost of manufacture, and then MLE, because it contained an entry for the cost of

goods sold."[52]  The CIT explained that:

> Commerce, using the normal rules of cost accounting, expressed its preference for
> deriving the cost of manufacture from the cost of goods sold {*i.e.*, COGS} entry on
> financial statements, rather than by adding various individual entries for items such as
> wages and salaries that may, or may not, relate to the manufacture of a product.  By
> definition, *the cost of goods sold entry captures all of the costs of manufacture*.[53]

In sum, the CIT upheld Commerce's decision to use COGS as the starting point for valuing

overhead, SG&A, and profit surrogate financial ratios, because COGS captures the "the vast

majority of the costs of manufacture" relevant to Commerce's surrogate financial ratio

calculation (in the case of *Nantong*, COGS included labor costs that were disputed by the

plaintiff).[54]

  In the instant case, the line items from the *income statement* do not permit us to ascertain

Sigstrat's direct manufacturing costs because, as described below, they include costs related to

---

[51] *Id.* at 1354.

[52] *Id.*

[53] *Id.* at 1355 (emphasis added).

[54] *Id.* at 1359 (holding that "Commerce's Use of CYDSA's Cost of Goods Sold Amount to Determine the
Denominators of Surrogate Financial Ratios Is Sustained," and explaining that "Commerce did not find MLE by
determining the sum of various individual entries on the financials.  Rather, it started with the cost of goods sold
entry, which accounted for the cost of labor along with the other costs of manufacture… Commerce's rationale for
concluding that labor is adequately represented in the cost of goods sold entry is both reasonably discernable and
reasonable itself.  While it made some adjustments to the cost of goods sold amount, {Commerce} knew that it
already had the vast majority of the costs of manufacture, because the cost of goods sold entry accounts for those
costs.  The overarching problem with Plaintiffs' claims is that, by definition, the cost of goods sold entry contains all
of the costs of manufacture, including materials, labor, and energy.")

both cost of manufacturing *and* SG&A, and do not distinguish between the two.[55]  Thus, our chosen methodology (which starts with COGS from Note 7 of Sigstrat's financial statements, and accordingly, by its nature captures all costs of manufacture),[56] is preferable to the methodologies submitted by Ancientree (which use line items from the income statement that do not distinguish between manufacturing and administrative costs).[57]  In this way, we are able to start from COGS and specifically identify the direct and indirect manufacturing costs necessary for the financial ratio calculations.  Further, using COGS allows Commerce to avoid the uncertainty – and potential distortion – that comes with "adding various individual entries…that may, or may not, relate to the manufacture of {the} product."[58]  Accordingly, Commerce determines that, overall, the approach we employed in this review to calculating the surrogate financial ratios is more precise than the *MLWF from China 2016-2017* calculations, which used line items from Sigstrat's financial statements that do not appear to clearly distinguish between manufacturing and administrative costs.[59]

Ancientree suggests that, because the methodology used in *MLWF from China 2016-2017* includes "more critical detail, including line items for raw materials and consumables and personnel expenditure," the methodology used in that case is superior to the methodology used in the *Final Determination*.  We disagree because, as explained above, the methodology used in the *Final Determination* is more precise because it allows Commerce to determine which expenses

---

[55] *Id*. at 1351 and 1355; *see also, e.g.*, Petitioner's SV Comments at Exhibit 10B, English translation page 9 "Profit and Loss Account."
[56] "By definition, the cost of goods sold entry captures all of the costs of manufacture."  *See Nantong*, 415 F. Supp 3d at 1354-5; *see also* Petitioner's SV Comments at Exhibit 10A and Exhibit 10B at the English translation, Notes 4 and 7.
[57] *See* Ancientree's SV Comments at Exhibits SVR-1 and -2; *see also* Petitioner's SV Comments at Exhibit 10B at the English translation, pages 9 and 20.
[58] *See Nantong*, 415. F. Supp 3d at 1355; *see also* Petitioner's SV Comments at Exhibit 10A and Exhibit 10B at the English translation, Notes 4 and 7 *cf*. Ancientree's Rebuttal SV Comments and Exhibits SVR-1 and -2.
[59] *See* Preliminary SV Memorandum at Exhibit 12, unchanged in Final SV Memorandum at Attachment 12.

are tied to manufacturing, without having to estimate the proportion of the line item related to

those costs.  "{M}ore delineated line items," do not necessarily equate to "more critical detail,"

as Ancientree asserts, and these multiple line items do not necessarily capture the requisite costs

or the "critical detail" most *relevant* (*i.e.*, directly-related to production) to Commerce's financial

ratio calculation.[60]  Using more line items from the financial statements, as laid out in

Ancientree's SV comments, would not lead to a more accurate calculation because these line

items are either not limited to manufacturing costs (in the case of labor) or do not make critical

distinctions (in the case of raw material-related overhead).[61]

In the *MLWF from China 2016-2017* SV Memorandum, Commerce summed the line

items labeled "raw materials and consumables expenses," "personnel expenditure – total," and

"other external expenses (energy and water)" to calculate the costs directly related to

manufacturing used in the denominators of the financial ratio calculations.[62]  Sigstrat's 2017-

2018 income statement, which includes some of Sigstrat's 2016-2017 financial information (the

financial information used in *MLWF from China 2016-2017*), contains the same line items and

descriptors.  However, Sigstrat's 2017-2018 income statement does not segregate the costs in

those line items into amounts which are specific to production (*i.e.*, certain of these line items

include administrative expenses), nor do they necessarily break the amounts out into the

categories relevant to Commerce's ratio calculations (such as factory overhead).[63]  For example,

the line item identified as "personnel expenditure – total" in the *MLWF from China 2016-2017*

calculation ties to the "Staff Costs – total" reported in the Sigstrat income statement; although

---

[60] *See* Ancientree's Case Brief at 14.
[61] *See* Ancientree's Rebuttal SV Comments at Exhibits SVR-21 and Exhibits SVR-2; *see also* Petitioner's SV Comments at Exhibit 10B, English translation, page 9 "Profit and Loss Account."
[62] *See* Ancientree's Rebuttal SV Comments at Exhibit SVR-2 (citing *MLWF from China 2016 2017* SV Memorandum).
[63] *See* Petitioner's SV Comments at Exhibit 10B.

Filed By: Rachel Greenberg, Filed Date: 9/10/21 11:16 AM, Submission Status: Approved

the record here does not include the Sigstrat financial statements used in *MLWF from China 2016-2017*, the "Staff Costs – total" line item from Sigstrat's 2017-2018 financial statements includes costs for all personnel wages, insurance and social protection, irrespective of the area in which the personnel were employed (*e.g.*, production, sales, etc.).[64]  In *MLWF from China 2016-2017*, Commerce appears to have allocated the personnel expenses from the income statement line item, "Staff Costs – total," between "Direct Labor" (*i.e.*, an amount used to calculate the denominators of the surrogate ratios) and "SG&A and Interest"(*i.e.*, an amount used to calculate the numerator in the SG&A financial ratio).[65]  However, it is unclear how the amounts for these two categories were allocated because the amounts appear to have been assigned using a methodology that is not on this record and the rationale for which is not evident on its face.[66] This demonstrates the following:  (1) in *MLWF from China 2016-2017*, the "Staff Costs – total" from Sigstrat's income statement used in the financial ratio calculations included expenses attributable to SG&A; and (2) the basis for the amount of personnel costs attributed to SG&A in *MLWF from China 2016-2017* is not discernable from Sigstrat's financial statements on the record of this proceeding.  Thus, the "personnel expenditure – total" figure that Ancientree argues Commerce should use in this investigation includes wages, insurance, and social protection expenses related to both production and administrative costs, but the actual amount of personnel expenses related to SG&A is not known.[67]  Further, there is no information on the record of this investigation related to the specific circumstances of that administrative review

---

[64] *Id.* at Exhibit 10B, page 9 of the English translation, "Profit and Loss Account."
[65] *See* Ancientree's Rebuttal SV Comments at Exhibit SVR-2.  The total amount reported in the financial statements was 12,492,778 Ron.  Only 8,490,790 Ron was attributed to "Direct Labor"; the remainder, *i.e.*, 4,001,988 Ron, was attributed to the "SG&A and Interest" numerator.
[66] *Id.*
[67] In *MLWF from China 2016-2017*, Commerce allocated the costs captured in "Personnel Expenditure-Total" between direct labor expenses and SG&A and Interest.

such that we can identify the facts that underlay Commerce's choice of methodology in that other proceeding.

Given the nature of the information that serves as the source for financial ratio calculations in NME cases (*i.e.*, that they are based on surrogate financial data from a company that is not a party to the proceeding), we cannot go behind surrogate financial statements to determine precisely what each item includes or to what activity it relates.[68]  Therefore, when assigning the various expenses to particular categories for our financial ratio calculations, we prefer to rely on the classification of expenses in a manner that requires us to make only limited assumptions.[69]  In this case, as noted above, COGS includes all costs related to manufacturing, does not include administrative costs, and is reported in the notes of the Sigstrat's 2017-2018 financial statements (*i.e.*, Notes 4 and 7).[70]  There is no information on this record to suggest that the income statement line items were more relevant or specific to the production of Sigstrat's merchandise.  As such, we are faced with a choice between starting the financial ratio calculations with Note 7 and COGS (Commerce's preferred approach), or income statement line items that include a mixture of production and administrative expenses (Ancientree's preferred approach).  Given these choices, we find it is reasonable, and more precise, for Commerce to select the methodology that uses COGS, which "{b}y definition… captures all of the costs of manufacture,"[71] rather than the income statement line item "transaction{s}, because expenses such as labor can relate to manufacturing, administration, and selling."[72]

---

[68] *See Final Determination of Sales at Less Than Fair Value:  Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China*, 79 FR 25572 (May 5, 2014), and accompanying IDM at Comment 10.

[69] *See, e.g., Helical Spring Lock Washers from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 FR 13833 (March 17, 2015), and accompanying IDM at Comment 5.

[70] *See* Petitioner's SV Comments at Exhibit 10B, English translation Notes 4 and 7.

[71] *See Nantong*, 415 F. Supp 3d at 1355.

[72] *Id.*

16

Ancientree's argument that Commerce did not follow the practice that has "always" been used for calculating Sigstrat's financial ratios is also flawed and unsubstantiated.[73]  While Sigstrat's financial statements have been used in several other cases, Ancientree's reference to *MLWF from China 2013-2014*, *MLWF from China 2014-2015*, *MLWF from China 2015-2016*, and *Plywood from China* as support for its case brief argument is misleading.[74]  Outside of *MLWF from China 2013-2014*,[75] and the *MLWF from China 2016-2017* SV Memorandum,[76] there is no public information in the cited decisions, or information on this record, that can speak to the specifics of the financial ratio calculations from those cases.  The CIT explained that, while "Commerce must consider all information timely filed by interested parties, 'the burden of creating an adequate record lies with {interested parties} and not with Commerce.'"[77]  Therefore, it is reasonable for Commerce to rely on the information that Ancientree and the other interested parties to this proceeding actually submitted to this record, and the precedent the CIT upheld in *Nantong*, for determining the best methodology to use in the financial ratio calculations.

In that vein, the only documentation Ancientree provided to support its assertion that Commerce has "always" calculated Sigstrat's financial ratios in a particular way is the preliminary *MLWF from China 2016-2017* SV Memorandum.[78]  While Ancientree lists other cases where Commerce "has calculated financial ratios from a Sigstrat financial ratios," {sic}

---

[73] *See* Ancientree's Case Brief at 14 ("{Commerce's} calculation of the financial ratios differed from how {Commerce} has always calculated Sigstrat's financial ratios in the past," (citing *MLWF from China 2013-2014*, *MLWF from China 2014-2015*, *MLWF from China 2015-2016*, *MLWF from China 2016-2017*, and *Plywood from China*.))

[74] *Id*.

[75] *See MLWF from China 2013-2014* IDM at Comment 5.

[76] *See* Ancientree's Rebuttal SV Comments at Exhibit SVR-2.

[77] *See QVD Food Co., Ltd. v. United States*, 653 F.3d 1318, 1324 (Fed. Cir. 2011) (*QVD Food*) (citing *Tianjin Mach. Imp & Exp. Corp. v. United States*, 806 F. Supp. 1008, 115 (CIT 1992)).

[78] *See* Ancientree's Case Brief at 14 ("In each instance, {Commerce} has used significantly more delineated line items in Sigstrat's financial statement.  *See, e.g*., Ancientree's Rebuttal SVs at Exhibit 2 (submitting the 2017 Sigstrat ratio calculation relied upon in *Multilayered Wood Flooring from China*)").  We note that the *MLWF from China 2016-2017* IDM does not describe any changes to the preliminary financial ratio calculations.

17

Ancientree points to no evidence on this record which supports its assertions; further, neither the *Federal Register* notices for most of the cited cases nor the accompanying IDMs describe the specific calculations undertaken.  Moreover, Commerce cannot assume that the other cases Ancientree references in its case brief use precisely the same methodology employed in the *MLWF from China 2016-2017* SV Memorandum.[79]  Thus, Ancientree's claim is unsubstantiated.

Further, only one of the four other cases that Ancientree references in its case brief, *MLWF from China 2013-2014*, publicly discussed Commerce's financial ratio calculation methodology.[80]  Interestingly, in that case, Commerce stated:

> After careful examination of Sigstrat's financial statement{s}…Note 4 provides additional detail that is useful for the calculation of the surrogate financial ratios. {Footnote 90:  We note that parties make reference to Note 7 of the financial statements …However, the calculation in reality is based on Note 4 of the same exhibit under "Analysis Operating Result".}  Specifically, Sigstrat's profit and loss statement does not segregate costs between what {Commerce} uses as a denominator to the financial ratios (*i.e.*, {Materials, Labor, and Energy} that typically form part of COGS) and the expenses that {Commerce} includes in the numerator to the calculations (*e.g.*, energy and labor that typically form part of selling, G&A, and other operating expenses)...{W}e have recalculated the surrogate financial ratios using the information derived from Note 4 of Sigstrat's financial statement.  However, we have further adjusted COGS by the change in finished goods so that "material, labor, and energy" reflects cost of manufacturing for the overhead calculation.[81]

In other words, despite Ancientree's reliance on this case to support its position, the financial ratio methodology discussion from *MLWF from China 2013-2014* is in direct contradiction to Ancientree's Case Brief argument.[82]  In *MLWF from China 2013-2014*, Commerce calculated the financial ratios using COGS/Note 4 (*i.e.*, "Analysis Operating Result") from Sigstrat's

---

[79] *See Asociacion Colombiana De Exportadores de Flores v. United States*, 40 F. Supp. 2d 455, 471-472 (CIT 1999) (The CIT explained that Commerce's determinations much be supported by substantial evidence and that substantial evidence "is more than a mere scintilla.")

[80] *See* Ancientree's Case Brief at 14; *see also MLWF from China 2013-2014* IDM at Comment 5 *cf. MLWF from China 2014-2015* IDM; *MLWF from China 2015-2016* IDM; and *Plywood from China* IDM.

[81] *See MLWF from China 2013-2014* IDM at 27-28.

[82] *See* Ancientree's Case Brief at 14; *see also* Ancientree's Rebuttal SV Comments *cf. MLWF from China 2013-2014* IDM at Comment 5.

18

financial statements (and stated that parties were referencing Note 4 and Note 7 interchangeably[83]) and explained that using COGS was preferable to using the profit and loss statement (*i.e.*, income statement) for calculating the financial ratios.

The surrogate financial ratio calculations in this investigation appear to be consistent with the financial ratio calculation description from *MLWF from China 2013-2014*, wherein Commerce based its calculation of the financial ratios on Note 4, started with COGS, and explained that Note 7 and Note 4 were referenced interchangeably.  Likewise, in this case, we based our calculations on Note 7, "Analysis of Operating Result," which is identical to Note 4, and started the calculation with COGS.[84]  Therefore, the surrogate financial ratio calculations in this investigation are consistent with past financial ratio calculations using Sigstrat's financial statements (*MLWF from China 2013-2014*), albeit not the one that served as the basis for Ancientree's proposed calculation in this review (*MLWF from China 2016-2017*).  This undermines Ancientree's claim that Commerce's practice has "always" been in the manner Ancientree proposed.

Moreover, while the 2017-2018 Sigstrat financial statements do contain some of Sigstrat's FY 2016-2017 information, this record does not include significant information that could provide context about Commerce's *MLWF from China 2016-2017* calculations.  For example, we do not have the English translation of the 2016-2017 financial statements, or the accompanying notes.  As Commerce explained in *Xanthan Gum from China*, the adjustments made in each segment may not be appropriate in other segments, let alone other proceedings.[85]

---

[83] We also note that in Sigstrat's 2017-2018 financial statements Note 4 and Note 7 are identical.
[84] *See* Petitioner's SV Comments at Exhibit 10B (Just as they were described in *MLWF from China 2013-2014*, Sigstrat's 2017-2018 financial statements include "Operating Result Analysis" in Note 4, and this note is identical to Note 7.)
[85] *See Xanthan Gum from China* IDM at Comment 14.

*MLWF from China 2016-2017* deals with a different product, different time period, and different

interested parties who may have provided different suggested financial ratio calculations, as well

as different fact patterns, or notes and translations to the financial statements that are different

from the ones presented in this case.  Without the 2016-2017 Sigstrat financial statements and

the accompanying English translations that were on the *MLWF from China 2016-2017* record,

the record of this review does not contain the core information unique to that administrative

review, and as the CIT explained, the responsibility of building the administrative record lies

with the interested parties.[86]  Because no interested parties provided information regarding the

context of the *MLWF from China 2016-2017* financial ratio calculation, we are unable to

determine the rationale for the methodology used in that case, understand why it differed from

the methodology used in this investigation, and ultimately why Commerce departed from its

preferred use of the Notes and COGS in that case.

Finally, as the petitioner points out, Ancientree does not comment on the accuracy of

Commerce's surrogate financial ratio calculations.  As noted above, accuracy was at the core of

our decision to begin the financial ratio calculations with COGS.  By using COGS, and not the

income statement line items as Ancientree suggested, we used the methodology which yielded

the most precise ratios possible, given the information present on this record.  Therefore, it was

both reasonable and appropriate to rely on this methodology here, rather than the methodology

used in *MLWF from China 2016-2017*.

## IV.    DRAFT RESULTS OF REDETERMINATION

Pursuant to the *Remand Opinion and Order*, Commerce addressed Ancientree's Case

Brief comments regarding Commerce's financial ratio calculations and explained why it had

---

[86] *See Remand Opinion and Order* at 29 (quoting *QVD Food*, 806 F. Supp. 1008, 115).

Barcode:4159687-01 A-570-106 REM - Remand  -  Slip Op. 21-87

good reason to depart from the methodology used in *MLWF from China 2016-2017*.  We find

that for the reasons discussed above, the methodology used in the *Final Determination* is

reasonable and supported by substantial evidence and, therefore, it remains unchanged.

We invite interested parties to comment on this draft remand redetermination pursuant to

the CIT's remand order.  Comments are due by 5:00pm Eastern Time on September 17, 2021.

Submissions should be filed with Commerce in accordance with 19 CFR 351.303.  Any

comments received on these draft results will be addressed in our final results of redetermination.

Filed By: Rachel Greenberg, Filed Date: 9/10/21 11:16 AM, Submission Status: Approved

REM JA 12

Petitioner, Comments on Draft Remand
Redetermination (September 17, 2021)
REM PR 2

# SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 LMEISNER@SCHAGRINASSOCIATES.COM F: (202) 429-2522

Case No.  A-570-106
Remand
Slip Op. 21-87
POI: 07/01/2018 – 12/31/2018
Total Pages: 10

**<u>PUBLIC DOCUMENT</u>**

September 17, 2021

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn:  Enforcement & Compliance
APO/Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, D.C. 20230

Re:    **Wooden Cabinets and Vanities and Components Thereof from The People's
       Republic of China: Comments on Draft Remand Redetermination**

Dear Secretary Raimondo:

On behalf of the American Kitchen Cabinet Alliance, we hereby submit the following

comments on the draft remand redetermination issued by the U.S. Department of Commerce

("Commerce") pursuant to the remand in the above-captioned action ("*Draft Remand

Redetermination*"). For the reasons discussed below, the Draft Remand Redetermination is fully

in compliance with the opinion issued by the Court of International Trade ("CIT") in *The

Ancientree Cabinet Co., Ltd. v. United States*, Court No. 20-00114, Slip Op. 21-87 (CIT July 12,

2021) ("*Remand Opinion and Order*"). Accordingly, Commerce should make no changes in the

final remand redetermination. However, in addition to the rationale provided by Commerce in its

*Draft Remand Redetermination*, there are other considerations which support Commerce's

PUBLIC DOCUMENT

maintenance personnel. As a result, using this line item to calculate the manufacturing overhead ratio would result in a less precise ratio that understates the total amount of manufacturing overhead expenses. The upshot would be that Commerce would fail to take advantage of one of the critical features of Sigstrat's financial statements that, as the CIT recognized, make them superior to the Malaysian financial statements on the record.

## V.     Conclusion

For the foregoing reasons, Commerce's *Draft Remand Redetermination* is fully compliant with the *Remand Opinion and Order* and is supported by substantial evidence and otherwise in accordance with law. Accordingly, Commerce should make no changes to the calculation methodology for the Sigstrat financial ratios in the final remand redetermination.

Respectfully submitted,

Roger B. Schagrin
Luke A. Meisner
SCHAGRIN ASSOCIATES
*Counsel to the American Kitchen*
*Cabinet Alliance*

REM JA 13

Ancientree, Comments on Draft Remand
Redetermination (September 17, 2021)
REM PR 3

LAW OFFICES OF

deKIEFFER & HORGAN, PLLC

1090 VERMONT AVENUE, N.W.
SUITE 410
WASHINGTON, D.C. 20005

| GREGORY S. MENEGAZ<br>TEL 202-783-6900 | AFFILIATED OFFICE:<br>SAARBRÜCKEN, GERMANY | GMENEGAZ@DHLAW.COM<br>DHLAW.COM |
|---|---|---|

September 17, 2021

Electronic Filing                                            A-570-106
The Honorable Gina M. Raimondo                  Remand
Secretary of Commerce                                   Slip Op. 21-87
Room 18022                                                   POI: 7/1/2018-12/31/2018
U.S. Dept. of Commerce                                 AD/CVD Operations
Washington, D.C. 20230

                                                                  **PUBLIC DOCUMENT**

> **RE:**      ***Wooden Cabinets and Vanities and Components Thereof from the
> People's Republic of China*** **– Comment on Draft Remand
> Determination**

Dear Secretary Raimondo:

  On behalf of The Ancientree Cabinet Co., Ltd., (Ancientree), a Chinese exporter of

subject merchandise, we hereby provide comments on the Department's draft results of

redetermination pursuant to the decision and remand order of the Court of International Trade

(CIT) in *The Ancientree Cabinet Co., Ltd. v. United States*, Court No. 20-00114, Slip Op. 21-87

(CIT July 12, 2021) (*Remand Opinion and Order*).

  Please let us know if you have any questions regarding this submission.

         Sincerely,

         /s/ Gregory S. Menegaz
         Gregory S. Menegaz
         Judith L. Holdsworth
         Alexandra H. Salzman[*]
         Vivien Jinghui Wang[**]

---

[*] Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members
pursuant to D.C. Bar Rule 49(c)(8).
[**] Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule
49(c)(2).

Barcode:4161897-01 A-570-106 REM - Remand  -  Slip Op. 21-87

should be decided alike.").  Internal inconsistency and self-contradiction do not satisfy this requirement.

The Department must recalculate the financial ratios starting from the profit & loss statement consistent with its past practice, which it stated would result in the most accurate calculations of the surrogate financial ratios, and, in turn, in the most accurate calculation of Ancientree's antidumping duty margin calculation.

Thank you for your consideration of these comments.

Sincerely,

/s/ Gregory S. Menegaz
Gregory S. Menegaz
Judith L. Holdsworth
Alexandra H. Salzman
Vivien Jinghui Wang

5